**20-1509**

IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

▶▶ ◀◀

TODD KASHDAN, f/k/a John Doe,

*Plaintiff-Appellant,*

*v.*

GEORGE MASON UNIVERSITY; RECTOR AND BOARD OF VISITORS OF GEORGE MASON UNIVERSITY; JENNIFER RENEE HAMMAT, in her official and individual capacity; JULIAN ROBERT WILLIAMS, in his official and individual capacity; KEITH DAVID RENSHAW, in his official and individual capacity; ANN LOUISE ARDIS, in her official and individual capacity; SZUYUNG DAVID DWU, in his official and individual capacity,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the Eastern District of Virginia at Alexandria*

**APPENDIX
VOLUME I OF III
Pages A1 to A406**

TOBY JAY HEYTENS
OFFICE OF THE ATTORNEY GENERAL
  OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
804-786-7420

     *and*

ELI SAMUEL SCHLAM
GEORGE MASON UNIVERSITY
Merten Hall, Room 5400
4400 University Drive
Fairfax, Virginia 22030
703-993-2619

*Attorneys for Defendants-Appellees*

NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500

*Attorneys for Plaintiff-Appellant*

# **Table of Contents**

**Page**

## **Volume I**

District Court Docket Entries ................................................................ A1

Complaint and Jury Demand, filed September 26, 2019 ....................... A8

Defendant The Rector and Visitors of George Mason University's
    Motion to Dismiss Count I, dated December 20, 2019 ................. A170

Memorandum of Points and Authorities in Support of Defendant
    The Rector and Visitors of George Mason University's Motion
    to Dismiss Count I, dated December 20, 2019 ............................ A173

        Exhibit 1 to Memorandum -
        Notice of Investigation, dated December 4, 2018 .................. A205

        Exhibit 1A to Memorandum -
        George Mason University Sexual Misconduct Policy
        for Academic Year 2006-2014 ................................................ A209

        Exhibit 1B to Memorandum -
        George Mason University Sexual Misconduct Investigation
        Procedures for Academic Year 2006-2014 ............................ A212

        Exhibit 2 to Memorandum -
        Notice of Investigation, dated December 4, 2018 .................. A216

        Exhibit 2A to Memorandum -
        George Mason University Sexual Misconduct Policy for
        Academic Year 2006-2014 ...................................................... A219

        Exhibit 2B to Memorandum -
        George Mason University Sexual Misconduct Investigation
        Procedures for Academic Year 2006-2014 ............................ A222

**Table of Contents**
**(Continued)**

**Page**

Exhibit 3 to Memorandum -
Notice of Investigation, dated December 4, 2018 ................... A226

Exhibit 3A to Memorandum -
George Mason University Sexual Misconduct Policy
for Academic Year 2014-2015 ................................................ A230

Exhibit 3B to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2014-2015 ............................ A239

Exhibit 3C to Memorandum -
George Mason University Sexual Misconduct Policy
for Academic Year 2015-2016 ................................................ A243

Exhibit 3D to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2015-2016 ............................ A252

Exhibit 4 to Memorandum -
Notice of Investigation, dated December 4, 2018 ................... A257

Exhibit 4A to Memorandum -
George Mason University Sexual Misconduct Policy for
Academic Year 2016-2017 ...................................................... A261

Exhibit 4B to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2016-2017 ............................ A279

Exhibit 4C to Memorandum -
George Mason University Sexual Misconduct Policy for
Academic Year 2017-2018 ...................................................... A284

Exhibit 4D to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2017-2018 ............................ A301

ii

# **Table of Contents**
## **(Continued)**

**Page**

Exhibit 5 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A307

Exhibit 6 to Memorandum -
Letter of Determination, dated February 21, 2019 ................. A310

Exhibit 7 to Memorandum -
Letter of Determination, dated February 22, 2019 ................. A313

Exhibit 8 to Memorandum -
Letter of Determination, dated February 22, 2019 ................. A317

Exhibit 9 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019 ................................................. A321

Exhibit 10 to Memorandum -
IDVSA Voice, Season 2013 .................................... A324

Exhibit 11 to Memorandum -
"Sexual assault remains under-reported on campus
despite growing awareness", *The Daily Texan*,
published on November 4, 2013 ............................. A348

Exhibit 12 to Memorandum -
Excerpts from "Myths, Realities, and Common Sense at
Texas", *Minding the Campus*, November 6, 2013 ................. A357

Exhibit 13 to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015 .......... A361

Exhibit 14 to Memorandum -
"Students Release Sexual Assault Demands",
*Fourth Estate*, December 5, 2016 ........................... A367

**Table of Contents**
**(Continued)**

**Page**

Exhibit 15 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019 ................................................................... A371

Defendants Jennifer Hammat, Julian Williams, Keith Renshaw,
Ann Ardis and S. David Wu's Motion to Dismiss Counts II-IV,
dated December 20, 2019 ............................................................. A375

Memorandum of Points and Authorities in Support of Defendants
Jennifer Hammat, Julian Williams, Keith Renshaw, Ann Ardis
and S. David Wu's Motion to Dismiss Counts II-IV,
dated December 20, 2019 ............................................................. A379

**Volume II**

Exhibit 1 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019
(Reproduced Herein at pages A372 to A374)

Exhibit 2 to Memorandum -
Letter from CHSS Grievance Committee to
Appellant, dated June 19, 2019 ................................................. A407

Exhibit 3 to Memorandum -
Email from CHSS Grievance Committee to Todd Kashdan,
dated August 8, 2019 ................................................................... A413

Exhibit 4 to Memorandum -
Excerpts from George Mason University's Faculty
Handbook, dated July 1, 2018 ................................................... A423

Exhibit 5 to Memorandum -
Offer Letter from Deborah A. Boehm-Davis,
dated August 14, 2014, with Attachment A ............................. A428

**Table of Contents**
**(Continued)**

**Page**

Exhibit 6 to Memorandum -
Email from Ann L. Ardis to Catherine Gallagher and
Jenna M. McGwin, dated September 16, 2019 ...................... A433

Plaintiff's Memorandum of Law in Opposition to Defendant
George Mason University's Motion to Dismiss Plaintiff's
Title IX Claim Pursuant to Federal Rule 12(b)(6),
dated January 22, 2020 ................................................. A434

Exhibit 1 to Memorandum -
Revised Sexual Harassment Guidance: Harassment of
Students By School Employees, Other Students, Or
Third Parties, dated January 2001 ........................................ A466

Exhibit 2 to Memorandum -
First Amendment: Dear Colleague, dated July 28, 2003 ........ A515

Exhibit 3 to Memorandum -
Q & A on Campus Sexual Misconduct,
dated September 2017 ............................................... A518

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018, with Attachments .......................... A526

Exhibit 5 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018, with Attachments .......................... A536

Exhibit 6 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments .................................................... A545

Exhibit 7 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments .................................................... A574

v

**Table of Contents**
**(Continued)**

**Page**

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ........................................................... A621

Exhibit 9 to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019 ........................................................... A626

Exhibit 10 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ........................................................... A631

Exhibit 11 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ........................................................... A636

Exhibit 12 to Memorandum -
Order Granting in Part and Denying in Part Defendants'
Motion for Summary Judgment in *Doe v. Grinnell College,
et al.*, so ordered July 9, 2019 ................................................. A642

Exhibit 13 to Memorandum -
Todd Kashdan's Complaint Against Complainant for
Possible Act of Misconduct Under Student Conduct
Code and Violation of Section X of Policy 1202 .................... A685

Exhibit 14 to Memorandum -
Dear Colleague Letter on Title IX Coordinators,
dated April 24, 2015 ............................................................... A693

Exhibit 15 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A322 to A323)

**Table of Contents**
**(Continued)**

**Page**

Exhibit 16 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019
(Reproduced Herein at pages A372 to A374)

Exhibit 17 to Memorandum -
Letter from CHSS Grievance Committee,
dated June 19, 2019
(Reproduced Herein at pages A408 to A412)

Exhibit 18 to Memorandum -
IDVSA Voice, Season 2013
(Reproduced Herein at pages A325 to A347)

Exhibit 19 to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015
(Reproduced Herein at pages A362 to A366)

Exhibit 20 to Memorandum -
Excerpts from "Myths, Realities, and Common Sense at
Texas", Minding the Campus, November 6, 2013
(Reproduced Herein at pages A358 to A360)

Exhibit 21 to Memorandum -
"Sexual Assault Investigation", *Fourth Estate*,
October 24, 2016 ...................................................................... A702

Exhibit 22 to Memorandum -
"A Title IX Report Alleged Harassment by Student Body
President", *Fourth Estate*, April 29, 2018 .............................. A707

Exhibit 23 to Memorandum -
"Corrections Request: Title IX Article Published on 4/30",
*Fourth Estate*, May 16, 2018 .................................................. A716

**Table of Contents**
**(Continued)**

**Page**

Exhibit 24 to Memorandum -
"Students Release Sexual Assault Demands",
*Fourth Estate*, December 5, 2016 ........................................... A722

Exhibit 25 to Memorandum -
"Pledges of Continued Vigilance", *Inside Higher Ed*,
September 8, 2017 ..................................................................... A728

Exhibit 26 to Memorandum -
(i) Letter from Faculty Senate Executive Committee to
President Cabrera, *et al.*, dated May 15, 2019 ....................... A738
(ii) Letter from S. David Wu and Carol D. Kissal to
Faculty Senate Executive Committee, dated May 21, 2019 ... A744

Exhibit 27 to Memorandum -
Complainant 4 Text Messages and Email .............................. A746

Exhibit 28 to Memorandum -
Communications between Appellant and Complainant 1 ....... A755

Exhibit 29 to Memorandum -
Communications between Appellant and Complainant 3 ....... A763

Exhibit 30 to Memorandum -
Letter from CHSS Grievance Committee to Todd Kashdan,
dated September 10, 2019 ....................................................... A769

Exhibit 31 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019 ....................................................... A772

Exhibit 32 to Memorandum -
Peer Evaluation of Teaching Form, dated April 2, 2013 ........ A776

## Table of Contents
### (Continued)

**Page**

Plaintiff's Memorandum of Law in Opposition to the Individual
Defendants' Motion to Dismiss Plaintiff's Due Process and
First Amendment Claims Pursuant to Federal Rule 12(b)(6),
dated January 22, 2020 ................................................................ A779

    Exhibit A to Memorandum -
    Letter from CHSS Grievance Committee to Todd Kashdan,
    dated September 10, 2019
    (Reproduced Herein at pages A770 to A771)

    Exhibit B to Memorandum -
    Letter from Dr. Keith Renshaw to Todd Kashdan,
    dated May 31, 2019
    (Reproduced Herein at pages A372 to A374)

    Exhibit C to Memorandum -
    Notice of Investigation (Complainant 1),
    dated December 4, 2018, with Attachments
    (Reproduced Herein at pages A527 to A535)

    Exhibit D to Memorandum -
    Notice of Investigation (Complainant 2),
    dated December 4, 2018, with Attachments
    (Reproduced Herein at pages A537 to A544)

    Exhibit E to Memorandum -
    Email from Megan R. Simmons, dated January 11, 2019,
    with Attachments
    (Reproduced Herein at pages A546 to A574)

    Exhibit F to Memorandum -
    Email from Megan R. Simmons, dated January 11, 2019,
    with Attachments
    (Reproduced Herein at pages A575 to A620)

**Table of Contents**
**(Continued)**

Page

Exhibit G to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019
(Reproduced Herein at pages A773 to A775)

**Volume III**

Exhibit H to Memorandum -
George Mason University's Faculty Handbook,
dated July 1, 2018 ................................................................... A812

Exhibit I to Memorandum -
Q & A on Campus Sexual Misconduct,
dated September 2017
(Reproduced Herein at pages A519 to A525)

Exhibit J to Memorandum -
Department of Human Resource Management Policies
and Procedures Manual-Policy Number: 6:05-Personnel
Records Disclosure, revised July 1, 2005  .............................. A873

Exhibit K to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019
(Reproduced Herein at pages A622 to A625)

Exhibit L to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019
(Reproduced Herein at pages A627 to A630)

Exhibit M to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019
(Reproduced Herein at pages A632 to A635)

# Table of Contents
## (Continued)

**Page**

Exhibit N to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019
(Reproduced Herein at pages A637 to A641)

Exhibit O to Memorandum -
(i) Letter from Faculty Senate Executive Committee to
President Cabrera, *et al*., dated May 15, 2019
(Reproduced Herein at pages A739 to A742)
(ii) Letter from S. David Wu and Carol D. Kissal to
Faculty Senate Executive Committee, dated May 21, 2019
(Reproduced Herein at pages A744 to A745)

Exhibit P to Memorandum -
"A Title IX Report Alleged Harassment by Student Body
President", *Fourth Estate*, April 29, 2018
(Reproduced Herein at pages A708 to A715)

Exhibit Q to Memorandum -
"Corrections Request: Title IX Article Published on 4/30",
*Fourth Estate*, May 16, 2018
(Reproduced Herein at pages A717 to A721)

Exhibit R to Memorandum -
"Sexual Assault Investigation", *Fourth Estate*,
dated October 24, 2016
(Reproduced Herein at pages A703 to A707)

Exhibit S to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015
(Reproduced Herein at pages A362 to A366)

**Table of Contents**
**(Continued)**

**Page**

    Exhibit T to Memorandum -
    Letter from Julian R. Williams to Todd Kashdan,
    dated April 11, 2019
    (Reproduced Herein at pages A322 to A323)

    Exhibit U to Memorandum -
    Letter from CHSS Grievance Committee,
    dated June 19, 2019
    (Reproduced Herein at pages A408 to A412)

Reply Brief in Support of Defendant The Rector and Visitors of
    George Mason University's Motion to Dismiss Count I,
    dated February 5, 2020 ................................................................. A877

Reply Brief in Support of Defendants Jennifer Hammat,
    Julian Williams, Keith Renshaw, Ann Ardis and S. David Wu's
    Motion to Dismiss Counts II-IV, dated February 5, 2020 ............. A899

Memorandum Opinion and Order of the Honorable Liam O'Grady,
    so ordered on April 23, 2020, Appealed From ............................. A921

Notice of Appeal, dated April 29, 2020 ................................................. A965

**Volume IV**

**Documents Filed Under Seal**

Memorandum of Points and Authorities in Support of Defendant
    The Rector and Visitors of George Mason University's Motion
    to Dismiss Count I, dated December 20, 2019
    (Omitted Herein and Reproduced at page A173 to A204)

    Exhibit 1 to Memorandum -
    Notice of Investigation (Complainant 1),
    dated December 4, 2018 ......................................................... A968

**Table of Contents**
**(Continued)**

**Page**

Exhibit 2 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018 ........................................................... A976

Exhibit 3 to Memorandum -
Notice of Investigation (Complainant 3),
dated December 4, 2018 ........................................................... A983

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 4),
dated December 4, 2018 ........................................................... A1009

Exhibit 5 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ........................................................... A1054

Exhibit 6 to Memorandum -
Letter of Determination (Complainant 2),
dated February 21, 2019 ........................................................... A1056

Exhibit 7 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ........................................................... A1058

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ........................................................... A1061

Exhibit 9 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019 ........................................................... A1064

Plaintiff's Memorandum of Law in Opposition to Defendant
    George Mason University's Motion to Dismiss Plaintiff's
    Title IX Claim Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020
    (Omitted Herein and Reproduced at pages A434 to A465)

# **Table of Contents**
## **(Continued)**

**Page**

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018
(Reproduced Herein at pages A968 to A975)

Exhibit 5 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018
(Reproduced Herein at pages A976 to A982)

Exhibit 6 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ................................................................... A1066

Exhibit 7 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ................................................................... A1095

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ......................................................... A1142

Exhibit 9 to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019 ......................................................... A1147

Exhibit 10 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ......................................................... A1152

Exhibit 11 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ......................................................... A1157

**Table of Contents**
**(Continued)**

**Page**

Exhibit 13 to Memorandum -
Todd Kashdan's Complaint Against Complainant 4 for
Possible Act of Misconduct Under Student Conduct
Code and Violation of Section X of Policy 1202 ................... A1163

Exhibit 15 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
Reproduced Herein at pages A1064 to A1065)

Exhibit 27 to Memorandum -
Complainant 4 Text Messages and Email ............................. A1171

Exhibit 28 to Memorandum -
Communications between Todd Kashdan
and Complainant 1 ................................................. A1180

Exhibit 29 to Memorandum -
Communications between Todd Kashdan
and Complainant 3 ................................................. A1188

Exhibit 31 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019 ...................................... A1194

Plaintiff's Memorandum of Law in Opposition to the Individual
    Defendants' Motion to Dismiss Plaintiff's Due Process and
    First Amendment Claims Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020
    (Omitted Herein and Reproduced at pages A779 to A811)

Exhibit C to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018, with Attachments .......................... A1198

**Table of Contents**
**(Continued)**

**Page**

Exhibit D to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018, with Attachments ..........................    A1208

Exhibit E to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments
(Reproduced Herein at pages A1067 to A1094)

Exhibit F to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments
(Reproduced Herein at pages A1096 to A1141)

Exhibit G to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019
(Reproduced Herein at pages A1195 to A1197)

Exhibit K to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019
(Reproduced Herein at pages A1143 to A1146)

Exhibit L to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019
(Reproduced Herein at pages A1148 to A1151)

Exhibit M to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019
(Reproduced Herein at pages A1153 to A1156)

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019
(Reproduced Herein at pages A1158 to A1162)

Exhibit T to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A1064 to A1065)

APPEAL,CLOSED,JURY

## U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:19-cv-01249-LO-MSN

| | |
|---|---|
| Doe v. George Mason University et al | Date Filed: 09/26/2019 |
| Assigned to: District Judge Liam O'Grady | Date Terminated: 04/23/2020 |
| Referred to: Magistrate Judge Michael S. Nachmanoff | Jury Demand: Plaintiff |
| Case in other court: 4th Circuit, 20-01509 | Nature of Suit: 448 Civil Rights: |
| Cause: 20:1681 Civil Rights Education Amendments Act 1972 | Education |
| | Jurisdiction: Federal Question |

**Plaintiff**

**John Doe**                              represented by **Joshua Tyler Farmer**
Farmer Legal PLLC
5030 Sadler Place
Suite 205
Glen Allen, VA 23060
(804) 325-1441
Fax: (804) 510-0224
Email: josh@farmerlegalhelp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**George Mason University**              represented by **Eli Samuel Schlam**
*TERMINATED: 04/23/2020*                 George Mason University
4400 University Dr
Legal Dept
Fairfax, VA 22030-4444
703-993-2619
Fax: 703-993-2340
Email: eschlam@gmu.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Rector and Board of Visitors of**  represented by **Eli Samuel Schlam**
**George Mason University**              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jennifer Renee Hammat**                represented by **Eli Samuel Schlam**
*in her official and individual capacity* (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

# A2

**Defendant**

**Julian Robert Williams**                    represented by    **Eli Samuel Schlam**
*in his official and individual capacity*                       (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Keith David Renshaw**                       represented by    **Eli Samuel Schlam**
*in his official and individual capacity*                       (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Ann Louise Ardis**                          represented by    **Eli Samuel Schlam**
*in her official and individual capacity*                       (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Szuyung David Dwu**                         represented by    **Eli Samuel Schlam**
*in his official and individual capacity*                       (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | clear | Docket Text |
|---|---|---|---|
| 09/26/2019 | 1 | ☐ 1.45MB | Complaint ( Filing fee $ 400, receipt number 0422-6858167.), filed by John Doe.(Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 2 | ☐ 193.60KB | First MOTION in Limine *PLAINTIFF'S MOTION TO PROCEED BY PSEUDONYM* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 3 | ☐ 104.01KB | Proposed Summons *ANN LOUISE ARDIS* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 4 | ☐ 108.48KB | Proposed Summons *GEORGE MASON UNIVERSITY* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 5 | ☐ 102.18KB | Proposed Summons *JENNIFER RENEE HAMMAT* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 6 | ☐ 102.17KB | Proposed Summons *JULIAN ROBERT WILLIAMS* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 7 | ☐ 103.73KB | Proposed Summons *KEITH DAVID RENSHAW* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 8 | ☐ 104.82KB | Proposed Summons *SZUYUNG DAVID DWU* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |

| 09/26/2019 | 9 □ 108.47KB | Proposed Summons *THE RECTOR AND BOARD OF VISITORS* by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
|---|---|---|
| 09/26/2019 | 10 □ 0.61MB | First Motion to appear Pro Hac Vice by ANDREW T. MILTENBERG and Certification of Local Counsel JOSHUA T. FARMER Filing fee $ 75, receipt number 0422-6858297. by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | 11 □ 2.01MB | First Motion to appear Pro Hac Vice by KARA LYNN GORYCKI and Certification of Local Counsel JOSHUA T. FARMER Filing fee $ 75, receipt number 0422-6858324. by John Doe. (Farmer, Joshua) (Entered: 09/26/2019) |
| 09/26/2019 | | Initial Case Assignment to District Judge Liam O'Grady and Magistrate Judge Michael S. Nachmanoff. (acha, ) (Entered: 09/27/2019) |
| 09/27/2019 | | Notice of Correction re 1 Complaint. The filing user has been notified to file a Civil Cover Sheet. (acha, ) (Entered: 09/27/2019) |
| 09/27/2019 | | Notice of Correction re 2 First MOTION in Limine *PLAINTIFF'S MOTION TO PROCEED BY PSEUDONYM*. The filing user has been notified to file a Notice of Hearing or a Notice of Waiver or Oral Argument. (acha, ) (Entered: 09/27/2019) |
| 09/27/2019 | 12 □ 500.06KB | Summons Issued as to Ann Louise Ardis, Szuyung David Dwu, George Mason University, Jennifer Renee Hammat, Keith David Renshaw, The Rector and Board of Visitors of George Mason University, Julian Robert Williams. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (Attachments: # 1 Notice to Attorney)(acha, ) (Entered: 09/27/2019) |
| 09/27/2019 | 13 □ 82.77KB | ORDER granting 11 First Motion to appear Pro Hac Vice by KARA LYNN GORYCKI and Certification of Local Counsel JOSHUA T. FARMER. Signed by District Judge Liam O'Grady on 09/27/2019. (jlan) (Entered: 09/29/2019) |
| 09/27/2019 | 14 □ 80.37KB | ORDER granting 10 First Motion to appear Pro Hac Vice by ANDREW T. MILTENBERG and Certification of Local Counsel JOSHUA T. FARMER. Signed by District Judge Liam O'Grady on 09/27/2019. (jlan) (Entered: 09/29/2019) |
| 10/18/2019 | 15 □ 146.71KB | WAIVER OF SERVICE Returned Executed by John Doe. Ann Louise Ardis waiver sent on 9/27/2019, answer due 11/26/2019. (Farmer, Joshua) (Entered: 10/18/2019) |
| 10/18/2019 | 16 □ 148.13KB | WAIVER OF SERVICE Returned Executed by John Doe. Szuyung David Dwu waiver sent on 9/27/2019, answer due 11/26/2019. (Farmer, Joshua) (Entered: 10/18/2019) |
| 10/18/2019 | 17 □ 146.72KB | WAIVER OF SERVICE Returned Executed by John Doe. Jennifer Renee Hammat waiver sent on 9/27/2019, answer due 11/26/2019. (Farmer, Joshua) (Entered: 10/18/2019) |

| 10/18/2019 | 18 □ 147.27KB | WAIVER OF SERVICE Returned Executed by John Doe. Julian Robert Williams waiver sent on 9/27/2019, answer due 11/26/2019. (Farmer, Joshua) (Entered: 10/18/2019) |
|---|---|---|
| 10/18/2019 | 19 □ 148.07KB | WAIVER OF SERVICE Returned Executed by John Doe. Keith David Renshaw waiver sent on 9/27/2019, answer due 11/26/2019. (Farmer, Joshua) (Entered: 10/18/2019) |
| 10/18/2019 | 20 □ 147.06KB | WAIVER OF SERVICE Returned Executed by John Doe. The Rector and Board of Visitors of George Mason University waiver sent on 9/27/2019, answer due 11/26/2019. (Farmer, Joshua) (Entered: 10/18/2019) |
| 10/21/2019 | | Notice of Correction: Attorney has been notified to contact the clerk's office. re 18 Waiver of Service Executed, 20 Waiver of Service Executed, 16 Waiver of Service Executed, 17 Waiver of Service Executed, 15 Waiver of Service Executed, 19 Waiver of Service Executed (lcre, ) (Entered: 10/21/2019) |
| 10/23/2019 | 21 □ 473.88KB | Summons Returned Unexecuted by John Doe as to All Defendants. (Farmer, Joshua) (Entered: 10/23/2019) |
| 10/23/2019 | 22 □ 133.14KB | Consent MOTION for Extension of Time to File Answer by John Doe. (Farmer, Joshua) Modified on 10/25/2019 (cmar, ). (Entered: 10/23/2019) |
| 10/25/2019 | 23 □ 38.37KB | CONSENT ORDER SETTING BRIEFING SCHEDULE FOR DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO MOTION TO PROCEED BY PSEUDONYM re: 22 Motion for Extension of Time to File. Signed by Magistrate Judge Michael S. Nachmanoff on 10/25/19. (cmar, ) (Entered: 10/25/2019) |
| 12/03/2019 | 24 □ 205.46KB | Joint MOTION for Extension of Time to File Response/Reply as to 23 Order on Motion for Extension of Time to File by John Doe. (Attachments: # 1 Proposed Order Proposed Consent Order)(Farmer, Joshua) (Entered: 12/03/2019) |
| 12/04/2019 | 25 □ 142.09KB | ORDER granting 24 Motion for Extension of Time to File Response/Reply. Signed by District Judge Liam O'Grady on 12/4/2019. (rban, ) (Entered: 12/04/2019) |
| 12/20/2019 | 26 □ 142.13KB | MOTION to Dismiss for Failure to State a Claim by George Mason University, The Rector and Board of Visitors of George Mason University. (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 27 □ 15.59MB | Memorandum in Support re 26 MOTION to Dismiss for Failure to State a Claim filed by George Mason University, The Rector and Board of Visitors of George Mason University. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15) (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 28 | |

| | | | |
|---|---|---|---|
| | | ☐<br>116.79KB | Notice of Hearing Date re 27 Memorandum in Support, 26 MOTION to Dismiss for Failure to State a Claim (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 29 | ☐<br>142.67KB | MOTION to Dismiss for Failure to State a Claim by Ann Louise Ardis, Szuyung David Dwu, Jennifer Renee Hammat, Keith David Renshaw, Julian Robert Williams. (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 30 | ☐<br>4.07MB | Memorandum in Support re 29 MOTION to Dismiss for Failure to State a Claim filed by Ann Louise Ardis, Szuyung David Dwu, Jennifer Renee Hammat, Keith David Renshaw, Julian Robert Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 31 | ☐<br>117.33KB | Notice of Hearing Date re 29 MOTION to Dismiss for Failure to State a Claim , 30 Memorandum in Support, (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 32 | ☐<br>1.02MB | Opposition to 2 First MOTION in Limine *PLAINTIFF'S MOTION TO PROCEED BY PSEUDONYM* filed by Ann Louise Ardis, Szuyung David Dwu, George Mason University, Jennifer Renee Hammat, Keith David Renshaw, The Rector and Board of Visitors of George Mason University, Julian Robert Williams. (Attachments: # 1 Exhibit 1) (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 33 | ☐<br>123.11KB | MOTION to Seal by Ann Louise Ardis, Szuyung David Dwu, George Mason University, Jennifer Renee Hammat, Keith David Renshaw, The Rector and Board of Visitors of George Mason University, Julian Robert Williams. (Schlam, Eli) (Entered: 12/20/2019) |
| 12/20/2019 | 34 | ☐<br>96.00KB | Notice of Filing Sealing Motion LCvR5(C) by Ann Louise Ardis, Szuyung David Dwu, George Mason University, Jennifer Renee Hammat, Keith David Renshaw, The Rector and Board of Visitors of George Mason University, Julian Robert Williams re 33 MOTION to Seal (Schlam, Eli) (Entered: 12/20/2019) |
| 12/23/2019 | | | Set Deadlines as to 29 MOTION to Dismiss for Failure to State a Claim , 26 MOTION to Dismiss for Failure to State a Claim . Motion Hearing set for 3/6/2020 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Liam O'Grady. (dvanm, ) (Entered: 12/23/2019) |
| 01/20/2020 | 35 | ☐<br>255.74KB | MOTION for Extension *of Page Limit, pursuant to Local Civil Rule 7 (F)* by John Doe. (Attachments: # 1 Proposed Order Proposed Order Granting Plaintiff's Motion for Leave)(Farmer, Joshua) (Entered: 01/20/2020) |
| 01/21/2020 | 36 | ☐<br>95.06KB | ORDER denying 35 MOTION for Extension of Page Limit, pursuant to Local Civil Rule 7(F). Signed by District Judge Liam O'Grady on 1/21/2020. (See order for further details). (acha, ) (Entered: 01/22/2020) |
| 01/22/2020 | 37 | ☐<br>8.34MB | RESPONSE in Support re 2 First MOTION in Limine *PLAINTIFF'S MOTION TO PROCEED BY PSEUDONYM* filed by John Doe. (Attachments: # 1 Exhibit 1-OCR Guidance (2017), # 2 Exhibit 2-Notice of Investigation, # 3 Exhibit 3-Faculty Senate Memo, # 4 |

| | | | |
|---|---|---|---|
| | | | Exhibit 4-OCR Guidance (2001))(Farmer, Joshua) (Entered: 01/22/2020) |
| 01/22/2020 | 38 | ☐ 40.09MB | Memorandum in Opposition re 26 MOTION to Dismiss for Failure to State a Claim filed by John Doe. (Attachments: # 1 Exhibit 1-OCR Guidance (2001), # 2 Exhibit 2-Dear Colleague Letter (2003), # 3 Exhibit 3-OCR Guidance (2017, # 4 Exhibit 4-GMU Complaint, # 5 Exhibit 5-GMU Complaint, # 6 Exhibit 6-Notice of Investigation, # 7 Exhibit 7-Notice of Investigation, # 8 Exhibit 8-Letter of Determination, # 9 Exhibit 9-Letter of Determination, # 10 Exhibit 10-Letter of Determination, # 11 Exhibit 11-Letter of Determination, # 12 Exhibit 12-Doe v. Grinnell College, # 13 Exhibit 13-GMU Complaint, # 14 Exhibit 14-Dear Colleague Letter (2015), # 15 Exhibit 15-Appeal Letter, # 16 Exhibit 16-Sanction Letter, # 17 Exhibit 17-Grievance Letter, # 18 Exhibit 18-IDVSA Voice Newsletter, # 19 Exhibit 19-Williams Interview, # 20 Exhibit 20-Minding Campus, # 21 Exhibit 21-Williams Fourth Estate, # 22 Errata 22-Fourth Estate, # 23 Exhibit 23-Williams Response, # 24 Exhibit 24-Hammat Response, # 25 Exhibit 25-Hammat Inside Higher Ed., # 26 Exhibit 26-Faculty Senate Memo, # 27 Exhibit 27-Grievance Letter, # 28 Exhibit 28-GMU Complaint, # 29 Exhibit 29-GMU Complaint, # 30 Exhibit 30-Faculty Grievance, # 31 Exhibit 31-Renshaw Disaffiliation, # 32 Exhibit 32-Peer Evaluation) (Farmer, Joshua) (Entered: 01/22/2020) |
| 01/22/2020 | 39 | ☐ 96.14KB | RESPONSE in Support re 33 MOTION to Seal filed by John Doe. (Farmer, Joshua) (Entered: 01/22/2020) |
| 01/22/2020 | 40 | ☐ 187.07KB | MOTION to Seal by John Doe. (Attachments: # 1 Proposed Order) (Farmer, Joshua) (Entered: 01/22/2020) |
| 01/22/2020 | 41 | ☐ 114.00KB | Memorandum in Support re 40 MOTION to Seal filed by John Doe. (Farmer, Joshua) (Entered: 01/22/2020) |
| 01/22/2020 | 42 | ☐ 71.46KB | Notice of Filing Sealing Motion LCvR5(C) by John Doe (Farmer, Joshua) (Entered: 01/22/2020) |
| 01/22/2020 | 43 | ☐ 22.22MB | Memorandum in Opposition re 29 MOTION to Dismiss for Failure to State a Claim filed by John Doe. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit)(Farmer, Joshua) (Entered: 01/22/2020) |
| 01/23/2020 | 44 | ☐ 396.27KB | EXHIBIT *A to Sealing Memorandum* by John Doe.. (Attachments: # 1 Exhibit B to Sealing Memorandum)(Farmer, Joshua) (Entered: 01/23/2020) |
| 02/05/2020 | 45 | ☐ 213.53KB | REPLY to Response to Motion re 26 MOTION to Dismiss for Failure to State a Claim filed by George Mason University, The Rector and Board of Visitors of George Mason University. (Schlam, Eli) (Entered: 02/05/2020) |
| | | | |

| | | | |
|---|---|---|---|
| 02/05/2020 | 46 | ☐ 211.30KB | REPLY to Response to Motion re 29 MOTION to Dismiss for Failure to State a Claim filed by Ann Louise Ardis, Szuyung David Dwu, Jennifer Renee Hammat, Keith David Renshaw, Julian Robert Williams. (Schlam, Eli) (Entered: 02/05/2020) |
| 02/21/2020 | 47 | ☐ 0.85MB | Letter *Response to Defendant's (2/11/20) Correspondence*. (Attachments: # 1 Exhibit 1)(Farmer, Joshua) (Entered: 02/21/2020) |
| 03/02/2020 | 48 | ☐ 162.11KB | Letter *re: Plaintiff's Feb 21, 2020 letter*. (Schlam, Eli) (Entered: 03/02/2020) |
| 03/03/2020 | | | Per LO chambers motions set for 3/6/2020 on the pleadings (clar, ) (Entered: 03/03/2020) |
| 04/23/2020 | 49 | ☐ 1.93MB | MEMORANDUM OPINION AND ORDER- For the reasons stated above, Plaintiff's Motion to Proceed by Pseudonym, Dkt 2 , is hereby DENIED. Further the improperly named Defendant "George Mason University, is hereby DISMISSED. Further still, Defendant's Motion to dismiss, Dkt 26 and 29 are hereby GRANTED, and the complaint is hereby DISMISSED WITH PREJUDICE. Signed by District Judge Liam O'Grady on 4/23/2020. (See order for further details). (acha, ) (Entered: 04/23/2020) |
| 04/29/2020 | 50 | ☐ 84.93KB | NOTICE OF APPEAL by John Doe. Filing fee $ 505, receipt number 0422-7182481. (Farmer, Joshua) (Entered: 04/29/2020) |
| 04/29/2020 | 51 | ☐ 131.28KB | Transmission of Notice of Appeal to US Court of Appeals re 50 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (acha, ) (Entered: 04/29/2020) |
| 04/30/2020 | 52 | ☐ 13.33KB | USCA Case Number 20-1509 4th Circuit, C. Bennett, Case Manager for 50 Notice of Appeal filed by John Doe. (acha, ) (Entered: 04/30/2020) |

[View Selected]

or

[Download Selected]

Total filesize of selected documents (MB): [_____]
Maximum filesize allowed (MB): 60

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/07/2020 09:05:29 | | |
| **PACER Login:** | phpappeals10east:2616006:0 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** 1:19-cv-01249-LO-MSN |
| **Billable Pages:** | 6 | **Cost:** 0.60 |

# A8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

Civil Case No.: _____

JOHN DOE,

      Plaintiff,

               v.

GEORGE MASON UNIVERSITY, THE RECTOR
AND BOARD OF VISITORS OF GEORGE MASON
UNIVERSITY, JENNIFER RENEE HAMMAT, in her
official and individual capacities, JULIAN ROBERT
WILLIAMS, in his official and individual capacities,
KEITH DAVID RENSHAW, in his official and individual
capacities, ANN LOUISE ARDIS, in her official and
individual capacities, and SZUYUNG DAVID DWU, also
known as S. David Wu, in his official
and individual capacities.

               Defendants.

---

## COMPLAINT AND JURY DEMAND

---

    Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff"), by his attorneys Farmer Legal,

PLLC and Nesenoff & Miltenberg, LLP, as and for his complaint against Defendants George

Mason University, The Rector and Board of Visitors of George Mason University (collectively

"GMU or the University"), Jennifer Renee Hammat, Julian Robert Williams, Keith David

Renshaw, Ann Louise Ardis and Szuyung David Dwu, also known as S. David Wu (collectively

the "Defendants") respectfully alleges as follows:

## THE NATURE OF THE ACTION

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

Case 1:19-cv-01249-LO-MSN   Document 1   Filed 09/26/19   Page 2 of 162 PageID# 2

1.      This action arises out of GMU's flawed and gender-biased Title IX proceedings against Plaintiff and the resulting violations of Plaintiff's Fourteenth and First Amendment rights and violations of state law.

2.      Plaintiff, who has taught courses and conducted research concerning human sexuality, abnormal behavior and cultural norms at the University for over 15 years, has long been held in the highest esteem by students and colleagues alike, having achieved the highest levels of success in his field and received numerous awards and accolades over the course of his career.

3.      Plaintiff held his tenured position without incident until December, 2018 when he was notified of years-old, false allegations of sexual harassment reported against him by a graduate student whom he had recently fired from his lab, and her three friends, two of whom had already graduated from GMU at the time their reports were made.

4.      The complaints—some of which dated back to 2013—primarily concerned topics Plaintiff discussed in his classes, comments made by Plaintiff in the course of class discussion or, on occasion, outside of the classroom but pertaining to topics he taught and scientifically researched at the University. The remaining allegations were disproven by witness statements that supported Plaintiff's account of various events, or evidence submitted by Plaintiff which contradicted the allegations, including that the complainants had suffered harm, or been denied access to their education in any way.

5.      On the contrary, at each complainant's request, Plaintiff provided assistance with writing and consulting opportunities, provided recommendations for job opportunities and grants and, in one case, Plaintiff sat on the complainant's dissertation committee. Understandably, Plaintiff was surprised to learn that the same women who had given him unsolicited praise for his teaching and research, and sought him out for assistance with academics and their careers, now

**A10**

alleged that he had created a "hostile environment." The Defendants did not question that these women were all friends (Complainants 3 and 4 were roommates) or that they had waited years to complain. None of the Defendants questioned the motives of the graduate student who had been fired for poor performance.

6.      Instead, Defendants pursued a baseless investigation of allegations that were timed out under the applicable GMU policies and procedures, ignored that the majority of the allegations concerned protected academic discourse, and deprived Plaintiff of even the most minimal due process protections including notice, cross-examination and the right to review the evidence against him, even though he faced termination as a potential sanction. No hearing was held. No faculty were involved. The Title IX Coordinator, who had a conflict of interest, solely determined the outcome of the case. Her supervisor, alone, decided Plaintiff's appeal. That decision was final.

7.      During the time in which Plaintiff's case was investigated and decided, GMU was already facing intense public pressure due to two civil rights investigations concerning its failure to adequately respond to the complaints of female students, an exposé in The Washington Post and The Atlantic about a professor who made sexual advances toward a number of his students over a span of years, and student outcry over the University's decision to hire "controversial" Supreme Court Associate Justice Brett Kavanaugh.

8.      The Title IX staff assigned to Plaintiff's case were biased against Plaintiff. Their backgrounds are in advocacy for women's rights, and they have made public statements indicating bias against male respondents. Certain statements made by Defendants Hammat and Williams in correspondence to Plaintiff suggested that they employed stereotypical views of males and females in their decision-making process when evaluating Plaintiff's case.

3

Case 1:19-cv-01249-LO-MSN   Document 1   Filed 09/26/19   Page 4 of 162 PageID# 4

9.    The Title IX investigator assigned to Plaintiff's case, Megan Simmons ("Ms. Simmons"), was removed from the case due to bias. This occurred after the investigator conducted the complainant interviews and, upon information and belief, interviewed the majority of witnesses in the case. Neither Defendant Hammat nor Defendant Williams considered that the evidence gathered by Ms. Simmons could be tainted due to her bias against Plaintiff.

10.   Defendant Hammat erroneously found Plaintiff responsible for sexual and gender-based harassment, adding new allegations and charges to the letters conveying her findings to Plaintiff, to which Plaintiff had no opportunity to respond during the investigation. Further, the evidence did not support the findings.

11.   Defendant Williams denied Plaintiff's appeal, in part finding that Plaintiff had provided no new evidence in support of his appeal. In fact, Plaintiff provided new evidence that utterly refuted a number of the complainants' allegations. He also pointed to a number of procedural errors—including a lack of due process in the proceedings and bias on the part of Defendant Hammat and Ms. Simmons—that warranted reversal of the findings.

12.   As a result of the finding, Defendant Renshaw imposed severe restrictions on Plaintiff's contact with graduate students, including teaching and research positions for an indefinite period of time because the lifting of said restrictions is left to Dr. Renshaw's discretion.

13.   Defendants publicly released information about Plaintiff's case to faculty members in Plaintiff's program, even before any outcome had been determined, causing rumors to spread and harming his reputation. Defendants also released confidential Title IX documents to the faculty in Plaintiff's program without his knowledge, resulting in the sharing of this information to graduate students, who were then discouraged from working with Plaintiff. The faculty then filed a grievance against Plaintiff which resulted in Plaintiff's disaffiliation from his program.

4

14.    Plaintiff was heavily pressured to discuss the case at a faculty meeting even though he had made clear to his supervisor, Defendant Renshaw, that he had no intention of discussing the case. The meeting was with the same individuals who filed the grievance against him. While he did not provide the details of the case that were repeatedly demanded by the faculty (the majority of whom were female) at that meeting, he did sit through an attack on his character, speculation and surmise about what had happened, and statements to the effect that his colleagues had little concern about what harm may occur to his reputation.

15.    As a result of Defendants' misconduct in violating the University's own policies and failing to provide Plaintiff with a fundamentally fair process, Plaintiff has, among other things, suffered irreparable harm to his career and reputation. Several faculty explicitly mentioned in the meeting that the Plaintiff's reputation has already been ruined.

16.    As fully set forth below, Plaintiff alleges claims against Defendants for: violations of Title IX of the Education Amendments of 1972; violation of Plaintiff's right to procedural due process under the Fourteenth Amendment of the United States Constitution; violation of the due process clause of the Constitution of the Commonwealth of Virginia; and violation of Plaintiff's right to free speech under the First Amendment of the United States Constitution.

## THE PARTIES

17.    Plaintiff is a natural person and a resident of the Commonwealth of Virginia.

18.    Defendant George Mason University ("GMU" or the "University") is a public university with its principal place of business located in the Commonwealth of Virginia.

19.    Defendant The Rector and Board of Visitors of George Mason University (the "Board of Visitors") is a corporation operating under the laws of the Commonwealth of Virginia. It is the policy-making and oversight authority for the University.

20.    Defendant Jennifer Renee Hammat ("Dr. Hammat") is a natural person and, upon information and belief, a resident of Indiana. Defendant Hammat was the Title IX Coordinator at GMU during all relevant times herein.

21.    Defendant Julian Robert Williams ("Mr. Williams") is a natural person and a resident of the Commonwealth of Virginia. Mr. Williams was the Vice President for Compliance. Diversity and Ethics ("CDE") at GMU during all relevant times herein.

22.    Defendant Keith David Renshaw ("Dr. Renshaw") is a natural person and a resident of the Commonwealth of Virginia. Dr. Renshaw, a GMU professor, was Plaintiff's supervisor during all relevant times herein.

23.    Ann Louise Ardis ("Dean Ardis") is a natural person and a resident of the Commonwealth of Virginia. Dean Ardis became the Dean of Plaintiff's College in or around February 2019.

24.    Szuyung David Dwu, also known as S. David Wu ("Provost Wu") is a natural person and a resident of the Commonwealth of Virginia and at all relevant times was GMU's Provost.

## JURISDICTION AND VENUE

25.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) the claims arise under statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

26.    This Court has personal jurisdiction over Defendants Williams, Renshaw, Ardis and Dwu, because they are residents of the Commonwealth of Virginia. These Defendants are also employed by GMU in Virginia and committed acts injurious to Plaintiff in the Commonwealth of

Virginia. This Court has personal jurisdiction over Defendant Hammat because she committed acts injurious to Plaintiff in the Commonwealth of Virginia while employed by GMU.

27.     Venue properly lies in this Court under 28 U.S.C. §1391. The Defendant is a public school created under Virginia Code Title 23.1, Subtitle IV, Chapter 15, incorporated in and with its principal place of business in the Commonwealth of Virginia, and is considered to reside in this judicial district. In addition, the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

<u>**FACTS RELEVANT TO ALL CLAIMS**</u>

**I.**     <u>**Plaintiff's Background**</u>

28.     Plaintiff received his Ph.D. in 2004. He obtained tenure at GMU in 2008, and became a Full Professor in 2014. Plaintiff has worked at GMU for over fifteen (15) years. During that time, and until December 2018, Plaintiff was subject to no disciplinary action and had a stellar track record with his students, including student course evaluations and peer evaluations.

29.     Plaintiff has published over 185 articles in peer-reviewed journals and is the author of two books, which have been published in over 15 languages. He has also received a number of awards and accolades, and research grants over the course of his career. Plaintiff's groundbreaking research has been featured in hundreds of newspaper and magazines.

30.     Much of Plaintiff's research focuses on sex, human sexuality and cultural norms.

31.     Plaintiff has received continuing support from former and current students and colleagues, men and women alike, who have had positive experiences with Plaintiff. Despite these positive working relationships and the spotless record Plaintiff amassed in his over 15 years at GMU, GMU caved in to pressure surrounding the social and political climate at GMU and

conducted a unilateral and biased investigation, resulting in severe and unwarranted sanctions against Plaintiff which have significantly impacted his research and his career.

**II.    The United States Department of Education's Various Guidance Documents and Proposed Regulations**

**A.  The United States Department of Education's 2001 Guidance Concerning Sexual Harassment Complaints Against Faculty**

32.    In January 2001, the United States Department of Education's Office for Civil Rights ("OCR") issued a Title IX Guidance addressing "Harassment of Students By School Employees, Other Students or Third Parties" (the "2001 Guidance"). The Guidance remains in effect today and is applicable in cases in which faculty members are accused of sexually harassing students. *Id.* at iv.

33.    The 2001 Guidance stressed "[i]t is important that schools not overreact to behavior that does not give rise to the level of sexual harassment." *Id.* at iii.

34.    Per the 2001 Guidance, gender-based harassment is not covered by Title IX unless it is "*sufficiently serious* to deny or limit a student's ability to participate in or benefit from" an educational program." *Id.* at v. The 2001 Guidance defines gender-based harassment as harassing a student on the basis of that student's failure to conform to stereotyped notions of masculinity and femininity." *Id.* The 2001 Guidance further defines gender-based harassment as "acts of verbal, non-verbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping but not involving conduct of a sexual nature." *Id.* at 3.

35.    The 2001 Guidance defines sexual harassment as:

[U]welcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature…. Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal…will not be considered sexual harassment.

36.    In the case of "hostile environment harassment" an assessment is required of "whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program." *Id.* at 5. "Conduct that is not severe will not create a hostile environment." *Id.* at 16.

37.    If a student "actively participates in sexual banter and discussions and gives no indication that he or she objects"—and later lodges a complaint—"the evidence generally will not support a conclusion that the conduct was unwelcome." *Id.* at 8.

38.    According to the 2001 Guidance, Title IX applies to harassment that (i) is carried out in the context of an employee's performance of his or her responsibilities in relation to students, including teaching, supervising and advising students and (ii) denies or limits a student's ability to participate in or benefit from a school program on the basis of sex.

39.    As further noted, "a school should be aware of the confidentiality concerns of an accused employee or student. Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused." *Id.* at 18.

40.    "OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for…[a]dequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence." *Id.* at 20.

41.    As mandated in the 2001 Guidance, "OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees." *Id.* at 17. "A public school's employees have certain due process rights under the United States Constitution… The rights established under Title IX must be interpreted consistent with any federally guaranteed

9

due process rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment." *Id.*

42.    The 2001 Guidance *did not* set forth a burden of proof, such as the preponderance of the evidence standard, to be used by colleges and universities in Title IX proceedings—whether against faculty or students.

43.    As mandated in the 2001 Guidance, "the protections of the First Amendment must be considered if issues of speech or expression are involved. Free speech rights apply in the classroom (e.g. classroom lectures and discussions) and in all other education programs and activities of public schools…. In addition, First Amendment rights apply to the speech of students and teachers." *Id.* at 22.

44.    "Title IX is intended to protect students from sex discrimination, not to regulate the content of speech." *Id.* OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, *is not a legally sufficient basis to establish a sexually hostile environment under Title IX.*" *Id.* (emphasis added).

45.    The 2001 Guidance contains the following example of protected speech:

> Example 1: In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do to respond?

> Answer: Academic discourse in this example is protected by the First Amendment even if it offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

46.    On July 28, 2003, the OCR issued a "Dear Colleague Letter" to confirm its position "regarding a subject which is of central importance to our government, our heritage of freedom,

and our way of life: the First Amendment to the U.S Constitution." *Id.* at 1. The Letter reiterated

the OCR's position in the 2001 Guidance that "[i]n order to establish a hostile environment,

harassment must be sufficiently serious (i.e., severe, persistent or pervasive) as to limit or deny a

student's ability to participate in or benefit from an educational program." It continued:

> Some colleges and universities have interpreted OCR's prohibitions of
> 'harassment' as encompassing all offensive speech regarding sex, disability, race
> or other classifications. Harassment, however, to be prohibited by the statutes
> within OCR's jurisdiction must include something beyond the mere expression of
> views, words, symbols or thoughts that some person finds offensive. Under OCR's
> standard, the conduct must also be considered sufficiently serious to deny or limit
> a student's ability to participate in or benefit from the educational program. Thus,
> OCR's standards require that the conduct be evaluated from the perspective of a
> reasonable person in the alleged victim's position, considering all the
> circumstances, including the alleged victim's age.[2]

47.    GMU did not apply the standards set forth in the 2001 Guidance, or 2003 Dear

Colleague Letter to Plaintiff's case. Nor do GMU's grievance procedures for addressing sexual

harassment complaints against faculty comport with the 2001 Guidance.

**B.  The United States Department of Education's 2011 Title IX Guidance
     Concerning Sexual Harassment Complaints Against Students**

48.    On April 4, 2011, the OCR sent a "Dear Colleague Letter" to colleges and

universities (hereinafter referred to as the "2011 Dear Colleague Letter"). As stated in the 2011

Dear Colleague Letter:

> This letter focuses on peer sexual harassment and violence. Schools' obligations
> and the appropriate response to sexual harassment and violence committed by
> employees may be different from those described in this letter. Recipients should
> refer to the 2001 Guidance for further information about employee harassment of
> students. *Id.* at p. 2, n. 8.

49.    GMU willfully ignored this distinction, electing to apply the requirements set forth

in the 2011 Dear Colleague Letter to student respondents and faculty respondents alike, and

---

[2] The complainants in this case were all graduate students in their mid- to late twenties.

**A19**

adopting a uniform sexual harassment policy and grievance procedures that afforded less rights to tenured faculty respondents than to students.

50.    Indeed, GMU students are permitted to review the evidence gathered in a given case and are provided with a hearing. In contrast, faculty have no such rights—the evidence gathered is withheld from them and the Title IX Coordinator determines whether a policy violation has occurred. There is no hearing.

51.    The 2011 Dear Colleague Letter advised recipients that sexual violence, such as sexual assault, constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." 2011 Dear Colleague Letter at p. 4. This combined approach to sexual harassment and acts of sexual violence, which was adopted by GMU in response to the April 2011 Dear Colleague Letter, blurred any distinction between speech that could be potentially harmful and the most aggressive acts of sexual violence, eliminating any spectrum upon which such acts should be measured.

52.    The 2011 Dear Colleague Letter relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." 2011 Dear Colleague Letter, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault.[3]

53.    Relying on these faulty numbers, the 2011 Dear Colleague Letter minimized due process protections for the accused by, among other things, eschewing any presumption of

---

[3] http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

12

innocence, mandating a preponderance of the evidence standard,[4] limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

54.    The April 2011 Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

55.    The 2011 Dear Colleague Letter stated that schools should "minimize the burden on the complainant," and suggested that schools focus more on victim advocacy. It required schools to give both parties the right to appeal a decision, which amounted to double jeopardy.

56.    The Obama Administration, through the OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

57.    In February 2014, Catherine Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education, told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

58.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the

---

[4] Recent District Court decisions in Title IX cases involving student respondents have held that the preponderance of the evidence standard is not the proper standard for university sexual misconduct proceedings given the significant consequences. *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (Sept. 20, 2018) (Doc. No. 36), at p. 3 ("the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion"). *See Doe v. DiStefano*, 2018 WL 2096347, at *6 (May 7, 2018) ("'[T]here is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations such as the one that led to Plaintiff's expulsion.'").

procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

59.    In April 2014, the White House issued a report entitled "*Not Alone*", which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report also suggested that college and universities undergo "trauma-informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

60.    The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual misconduct.

61.    In June 2014, Lhamon testified at a Senate hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools,

my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee that if OCR cannot secure voluntary compliance from a recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the Department of Justice.

62.    In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce."[5]

63.    As a result of the issuance of the 2011 Dear Colleague Letter, hundreds of colleges and universities, public and private alike, have been investigated by the OCR for violations of Title IX.

64.    On September 12, 2016, OCR launched a Title IX investigation into GMU's alleged mishandling of a female student's sexual assault complaint. Upon information and belief, this investigation is pending.

65.    On March 29, 2018, OCR launched a second Title IX investigation into GMU's alleged mishandling of a sexual harassment complaint which was, upon information and belief, made by a female student. Upon information and belief, this investigation is pending.

---

[5] Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

  **C.**  **The U.S. Department of Education Rescinds the 2011 Dear Colleague Letter**

  66.  On September 7, 2017 the United States Secretary of Education, Betsy DeVos ("DeVos") gave a Title IX speech at GMU's Antonin Scalia Law School. The speech received national attention and was also featured in GMU's student newspaper. In her speech, DeVos personally thanked GMU's President, Angel Cabrera ("President Cabrera"), for his leadership.

  67.  In her speech, DeVos vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both accusers and the accused. DeVos stated that "one person denied due process is one too many."[6]

  68.  The failure of educational institutions to provide fair and impartial policies and procedures led DeVos to declare that "the current approach isn't working. Washington has burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate. Where does that leave institutions, which are forced to be judge and jury?" Moreover, DeVos stated, "It's no wonder so many call these proceedings 'kangaroo courts.' Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

  69.  Significantly, DeVos proclaimed that the "era of 'rule by the letter' is over." The "April 2011 Dear Colleague Letter" has failed students and their institutions. "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated.

  70.  One week after DeVos' speech, President Cabrera publicly launched a new Title IX website and informed the GMU community that the university would be closely monitoring any forthcoming changes in the Title IX regulations.

---

[6] https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement

71.     On September 22, 2017, the OCR rescinded the 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

72.     The OCR noted that the 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*.'" *Id.* (citation omitted) (emphasis added).[7]

73.     The OCR noted that it would continue to rely on the 2001 Guidance, referenced *supra*.

74.     On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "2017 Guidance").[8] The 2017 Guidance suggested that it may apply in circumstances other than cases involving student, peer-on-peer sexual misconduct noting "the Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning sexual misconduct, *including* peer-on-peer sexual harassment." *Id.* at 1 (emphasis added).

75.     The 2017 Guidance requires colleges and universities to respond to sexual misconduct that is "so severe, persistent or pervasive as to *deny or limit a student's ability to participate in or benefit from* the school's programs or activities." *Id.* (emphasis added).

76.     The 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

77.     The 2017 Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or

---

[7] *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf
[8] *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

investigative techniques that "apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; and (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation. The 2017 Guidance also permits schools to apply the clear and convincing evidence standard in sexual misconduct proceedings. *Id.* at p. 5.

78.     The 2017 Guidance remains in effect. GMU's grievance procedures for faculty, including in Plaintiff's case, do not align with this Guidance.

> **D.**     <u>**The United States Department of Education's Proposed Title IX Regulations**</u>

79.     In or around November 2018, the United States Department of Education issued proposed, amended Title IX regulations for public comment. Introductory statements to the proposed regulations noted that DeVos:

> identified problems with the current state of Title IX's application in schools and colleges, including overly broad definitions of sexual harassment, lack of notice to the parties, lack of consistency regarding both parties' right to know the evidence relied on by the school investigator and right to cross-examine parties and witnesses, and adjudications reached by school administrators operating under a federal mandate to apply the lowest possible standard of evidence.[9] *Id.* at p. 12.

80.     The introductory statements also noted other criticisms of the previous guidance, including that "those guidance documents pressured schools and colleges to forego robust due process protections; captured too wide a range of misconduct, resulting in infringement on academic freedom and free speech and government regulation of consensual, noncriminal sexual activity; and removed reasonable options for how schools should structure their grievance

---

[9] https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf

processes to accommodate each school's unique pedagogical mission, resources, and educational community." *Id.*

81.    The proposed amendments to the Title IX regulations are intended to apply to sexual harassment by students, employees and third parties. The Department of Education presented the following directed question to commenters:

> The Department seeks the public's perspective on whether there are any parts of the proposed rule that will prove unworkable in the context of sexual harassment by employees, and whether there are any unique circumstances that apply to processes involving employees that the Department should consider. *Id.* at 3.

82.    With respect to grievance procedures, proposed regulation 34 CFR 106.45(a)-(b)(1) requires: i) a presumption of innocence for the respondent; ii) the objective evaluation of all evidence; iii) no conflicts of interest or bias on the part of Title IX Coordinators, investigators or decision-makers; and iv) no discipline without due process protections. *See* Background & Summary of the Education Department's Proposed Title IX Regulations, at 5.[10]

83.    Proposed regulation 34 CFR 106.45(b)(2)-(b)(3) mandates that schools provide "equal access to review all the evidence that the school investigator has collected, including the investigation report, giving each party equal opportunity to respond to that evidence before a determination is made." *Id.* For colleges and universities, a final determination must be made at a live hearing, and cross-examination must be allowed. *Id.*

84.    Pursuant to proposed regulation 34 CFR 106.45(b)(4), the determination of responsibility must be made by a decision-maker who *is not* the same person as the Title IX Coordinator or investigator. *Id.* Schools may also apply either the preponderance of the evidence standard or the clear and convincing evidence standard. *Id.* at 6.

---

[10] https://www2.ed.gov/about/offices/list/ocr/docs/background-summary-proposed-ttle-ix-regulation.pdf

19

85.     Proposed regulation 34 CFR 106.6 expressly states that nothing in the regulations requires any school to restrict rights that are protected under the First Amendment or the Due Process Clauses. *Id.* at 6.

86.     The proposed regulations have not yet been implemented but serve to highlight the glaring flaws in GMU's grievance procedures governing sexual harassment complaints against faculty, which are discussed in more detail below.

### III.    The American Association of University Professors' Position On Sexual Harassment Complaints Against Faculty

87.     The American Association of University Professors ("AAUP"), founded in 1915, is a non-profit organization of over 40,000 faculty, librarians, graduate students, and academic professionals, a significant number of whom are public sector employees.

88.     The mission of the AAUP is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, post-doctoral fellows, and all those engaged in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good.[11]

89.     The AAUP's policies have been recognized by the United States Supreme Court and are widely respected and followed in American colleges and universities. *See, e.g., Bd. of Regents v. Roth*, 408 U.S. 564, 579 n. 17 (1972); *Tilton v. Richardson*, 403 U.S. 672, 681-682 (1971).

90.     In its 2016 report *The History, Uses and Abuses of Title IX*, the AAUP warned that "[o]verly broad interpretations of what constitutes a 'hostile environment' are increasingly

---

[11] *See* https://www.aaup.org/about-aaup.

undermining academic freedom."[12] In a discussion about trigger warnings, the AAUP noted that "'the presumption that students need to be protected rather than challenged in a classroom is at once infantilizing and anti-intellectual.'"[13] The AAUP further noted that this can be particularly troubling for professors who teach about topics involving sex and sexuality, causing self-censorship by faculty members in order to avoid accusations of sexual harassment and unreasonable investigations of same.[14] Harvard Law Professor Jeannie Suk Gersen has written extensively about the challenges faced by professors teaching sensitive subject matter in today's classrooms, noting in regard to classes teaching rape law, "a dozen new teachers of criminal law at multiple institutions have told me that they are not including rape law in their courses, arguing it's not worth the risk of complaints of discomfort by students….Both men and women teachers seem frightened of discussion, because they are afraid of injuring others or being injured themselves."[15]

91.    The AAUP has written extensively about the obligation of universities to protect the due process rights of faculty members when investigating, and determining the outcome of, sexual harassment complaints. For example, the AAUP has urged OCR to do away with the "preponderance of the evidence standard" in Title IX cases involving faculty members, noting that a "clear and convincing standard" is more suitable in cases where the administration needs to show cause for imposing a severe sanction and the accusations—whether true or false—have the potential to ruin a faculty member's career.[16]

---

[12] *The History, Uses and Abuses of Title IX*, at p. 75, *available at* https://www.aaup.org/file/TitleIXreport.pdf.
[13] *Id.* at p. 83.
[14] *Id.* at pp. 83-84.
[15] https://www.newyorker.com/news/news-desk/trouble-teaching-rape-law
[16] Bradley, G., *Sexual Harassment Guidelines*, Academe, November/December 2011, *available at* https://www.aaup.org/article/sexual-harassment-guidelines#.XIauFChKg2w.

92.     In *Sexual Harassment: Suggested Policy and Procedures for Handling Complaints*, the AAUP noted that "it is incumbent upon a university or college to provide due process for those accused of harassment."[17] In order to accomplish this, the AAUP recommends that universities first attempt to informally resolve sexual harassment complaints and, if unsuccessful, that complaints be reviewed by a *faculty committee*, through a hearing at which the complainant and respondent may confront any adverse witnesses.[18] "In dealing with cases in which sexual harassment is alleged, as in dealing with all other cases in which a faculty member's fitness is under question, the protections of academic due process are necessary for the individual, for the institution, and for the principles of academic freedom and tenure."[19]

93.     In *The History, Uses and Abuses of Title IX* the AAUP once again called for due process protections for faculty members through the adoption of university Title IX procedures that require faculty committee review, including a hearing.[20] Referencing a case in which Bard College investigated and sanctioned a professor, without disclosing the investigation report and related evidence, the AAUP questioned the propriety of educational institutions circumventing existing grievance procedures to "conduct secret Title IX investigations, and impose sanctions based on a star-chamber-like process."[21] The AAUP also again called for the application of a clear and convincing evidence standard in the handling of Title IX complaints against faculty.[22]

94.     In the same report, the AAUP pointed to a number of problems with the current application of Title IX to cases involving faculty:

---

[17] https://www.aaup.org/report/sexual-harassment-suggested-policy-and-procedures-handling-complaints.
[18] *Id.*
[19] *Due Process in Sexual-Harassment Complaints*, *available at* https://www.aaup.org/report/due-process-sexual-harassment-complaints
[20] https://www.aaup.org/report/history-uses-and-abuses-title-ix. *See* Part IV.
[21] *Id.* at p. 87.
[22] *Id.*, Part IV.

**A30**

- The failure to make meaningful distinctions between conduct and speech or otherwise to distinguish between "hostile-environment" sexual harassment and sexual assault.
- The use of overly broad definitions of hostile environment to take punitive employment measures against faculty members for protected speech in teaching, research, and extramural contexts.
- The tendency to treat academic discussion of sex and sexuality as contributing to a hostile environment.
- The adoption of lower evidentiary standards in sexual-harassment hearings (the "preponderance of evidence" instead of the "clear and convincing" standard).
- The increasing corporatization of the university, which has framed and influenced the implementation of Title IX by colleges and universities.
- The failure to address gender inequality in relationship to race, class, sexuality, disability, and other dimensions of social inequality.

The contemporary interpretation, implementation, and enforcement of Title IX threatens academic freedom and shared governance in ways that frustrate the statute's stated goals. This occurs in part because the current interpretative scope of Title IX has narrowed to focus primarily on sexual harassment and assault on campus. This narrow focus is inconsistent with the original intent of the legislation, which Congress envisioned as protecting a range of educational opportunities for women, including access to higher education, athletics, career training and education, education for pregnant and parenting students, employment, the learning environment, math and science education, standardized testing, and technology.

Critically, the current focus of Title IX on sexual violations has also been accompanied by regulation that conflates sexual misconduct (including sexual assault) with sexual harassment based on speech. This has resulted in violations of academic freedom through the punishment of protected speech by faculty members. Recent interpretations of Title IX are characterized by an overly expansive definition of what amounts and kinds of speech create a "hostile environment" in violation of Title IX.

95.     In January 2019, AAUP submitted comments to the Department of Education which addressed the impact of the proposed, amended Title IX regulations on faculty. Per the AAUP, the proposed regulations did not go far enough to protect free speech or the due process rights of the accused.

96.     Accordingly, AAUP recommended: 1) applying sexual harassment policies in ways that "distinguish between speech protected by academic freedom and conduct that consists of unwelcome actions or unprotected speech;" 2) requiring that Title IX Coordinators have

knowledge and training concerning First Amendment issues and the knowledge and experiences of the faculty; 3) using a "clear and convincing evidence" standard to cases involving faculty to protect their due process rights; and 4) endorsing the role of shared governance in the development and implementation of Title IX policies.[23]

97.     As detailed below, the policies and procedures adopted by GMU to address sexual harassment complaints against faculty failed to consider, or protect, the First Amendment and due process rights of the accused, including Plaintiff. In fact, over time, with the input of Dr. Hammat, GMU revised its policies and procedures in a manner that deliberately eroded these rights.

**IV.    GMU's Campus Climate**

98.     A university's campus climate—including pressure from negative publicity, campus activism and federal investigations—can provide evidence of gender bias supporting a claim for sex discrimination under Title IX.

99.     Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students provides a "backdrop" for gender bias. *Doe v. Baum*, 903 F.3d 575, 586-587 (6th Cir. 2018) (external pressure combined with hearing board's credibility determinations in favor of females on a cold record raised plausible inference of gender bias). *See also Doe v. Miami U.*, 882 F.3d 579, 592-93 (6th Cir. 2017) (plausible inference of gender bias where *inter alia* university faced pressure to zealously "prosecute" male respondents after facing lawsuit by female student); *Doe v. Columbia U.*, 831 F.3d 46, 57 (2d Cir. 2016) (gender bias inferred where university was motivated to accept female accusation of sexual assault and reject male's claim of consent to avoid further public criticism that it did not protect

---

[23] https://www.aaup.org/sites/default/files/AAUP%20title%20IX%20exec%20summary_0.pdf

24

female students); *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 584 (E.D. Va. Mar. 14, 2018) (influence of Dear Colleague Letter and political pressure acknowledged by senior official one factor in plausibly alleging gender bias); *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university was under federal pressure to convict male respondents regardless of guilt or innocence, combined with flawed proceedings and statements of university officials supported plausible inference of gender bias).

100.    In the recent decision of *Menaker v. Hofstra University*, 2019 WL 3819631, at *5 (2d Cir. Aug. 15, 2019), which involved a university employee, the United States Court of Appeals for the Second Circuit explained the correlation between press coverage, public pressure and gender bias:

> We agree that '[p]ress coverage of sexual assault at a university does not automatically give rise to an inference that a male who is terminated because of allegations of inappropriate or unprofessional conduct is the victim of [sex] discrimination.' But this does not mean that the press coverage or public pressure must reach a particular level of severity. On the contrary, when combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination. *Id.*

101.    In the years leading up to, and during, the time period in which the allegations against Plaintiff were investigated, and an outcome decided, GMU was under pressure from the federal government, the State of Virginia, constant negative publicity, and campus activism to aggressively protect female students from sexual misconduct at the expense of the rights of the male accused.

102.    On August 21, 2014, the Governor of Virginia created a Task Force on Combating Campus Sexual Violence, of which GMU's President Cabrera was a member. Media reports described the Governor as ordering a "top-to-bottom" review of college sexual assault policies after a number of state schools were subject to OCR investigations, and demonstrating his

commitment to "aggressively combating sexual violence on college campuses."[24] President Cabrera created a corresponding task force at GMU.

103.    On May 28, 2015 the Governor's Task Force issued a lengthy report of final recommendations. One recommendation, which was adopted by GMU, was to employ a trauma-informed approach to Title IX investigations.

104.    Upon information and belief, GMU trained its sole investigator, Megan Simmons ("Ms. Simmons") and Title IX Coordinator, Dr. Hammat, to use the trauma-informed approach in Title IX investigations, including Plaintiff's.

105.    A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that allegedly directly affect the individual's actions during the event as well as her memory of the event.

106.    Thus, investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of sexual misconduct as opposed to an indicator that the complainant's story may lack credibility. Such training has recently come under fire from scientists and courts alike.[25]

---

[24] https://www.huffpost.com/entry/virginia-campus-sexual-assault-mcauliffe_n_5697683. *See also* https://www.washingtonpost.com/local/education/gov-mcauliffe-forms-task-force-to-combat-sexual-violence-at-virginia-colleges/2014/08/20/947c6c64-2874-11e4-86ca-6f03cbd15c1a_story.html

[25] *See* "The Bad Science Behind Campus Response to Sexual Assault" *at* https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/. *See also Norris v. U. of Colorado, Boulder*, 2019 WL 764568 at * 9 (D. Colo. 2019) (among other things, trauma-informed training supported plausible allegations of gender bias in Title IX proceedings); *Doe v. The Regents of the University of California*, Case No. RG16843940, Order Awarding Petitioner's Attorneys' Fees, at pp. 2-3, *available at* https://kcjohnson.files.wordpress.com/2018/04/uscb-attorney-fees.pdf (unacceptable risk that Title IX investigator was "not unbiased" where his evaluation of credibility was based on trauma-informed approach).

107.    The Association of Title IX Administrators ("ATIXA") recently issued a position statement to colleges and universities warning that a complainant's perceived trauma must not be used as evidence that the alleged sexual misconduct has occurred. ATIXA further warned that the improper use of trauma-informed methods, such as to interpret evidence is junk science and must be avoided.[26]

108.    On October 24, 2016, GMU's student newspaper, Fourth Estate, published an article about the OCR investigation commenced at GMU in September 2016, noting "[s]tudents received an email Sept. 16 alerting the community to the launch of an investigation surrounding a sexual assault case filed by a female student on campus."[27] Per the article, the OCR complainant, a female student, alleged that GMU failed to respond promptly and equitably to her complaint of sexual assault, creating a "sexually hostile environment."

109.    Mr. Williams was interviewed for the article and stated that the OCR would be interested in seeing GMU's training materials and "who is in some of the roles to respond to these issues." Williams noted that GMU had to comply with Title IX because it is a recipient of federal funding. *Id.* Mr. Williams also said "[t]he biggest sort of power [OCR] would yield would be one of the egregious cases where they could limit a university's ability to accept financial aid funding."

110.    On December 5, 2016, GMU's Women and Gender Studies Department released a list of sexual assault prevention demands to GMU's administration, which was published in the student newspaper.[28] One of the individuals responsible for creating the list of demands met with Dr. Hammat at around the same time. Dr. Hammat had recently been hired by GMU. Dr. Hammat confirmed that the list of demands was being addressed. The list of demands included the

---

[26] https://cdn.atixa.org/website-media/atixa.org/wp-content/uploads/2019/08/20123741/2019-ATIXA-Trauma-Position-Statement-Final-Version.pdf
[27] http://gmufourthestate.com/2016/10/24/sexual-assault-investigation/
[28] http://gmufourthestate.com/2016/12/05/students-release-sexual-assault-demands/

implementation of a trauma-informed approach in victim reporting, investigation and adjudication procedures employed by the University in Title IX cases. *Id.*

111.    On April 26, 2017, former Vice President Joe Biden gave a speech on campus as part of the "It's On Us campaign."[29] The visit was reported in The Washington Post[30] and The Huffington Post.[31] In his speech Biden urged the men on campus to take responsibility in doing their part to change the culture of sexual violence against women on college campuses. *Id.*

112.    In September 2017, Inside Higher Education interviewed Dr. Hammat about Secretary DeVos' remarks concerning the 2011 Dear Colleague Letter and proposed regulations. Dr. Hammat was referred to in the resulting September 8, 2017 article as noting that some sexual assault survivors "do not understand DeVos's remarks, and may interpret them as her devaluing them, or wanting to roll back their protections."[32] She added that "some students will react quickly to a sense that DeVos is making it more difficult to file complaints. "I think you might have some of those secondary types of issues, where there's panic." *Id.*

113.    In mid-October 2017, the #MeToo movement re-emerged nationwide as a women's movement against sexual harassment and sexual violence, the primary purpose of which was not only to vocalize women's experiences but to publicly identify alleged male perpetrators to be dealt with in the court of public opinion. The #MeToo movement caused the public downfall of a number of men in high profile jobs and positions of power—sometimes without due process or a process of any kind. The public outcry of the movement does not always include any sense of

---

[29] https://www.itsonus.org/. *See* http://gmufourthestate.com/2017/05/05/stopping-sexual-assault/
[30] https://www.washingtonpost.com/news/grade-point/wp/2017/04/26/biden-calls-on-students-to-change-the-culture-to-fight-college-sexual-assault/?noredirect=on
[31] https://www.huffpost.com/entry/joe-biden-rape-and-sexual-assault-are-not-about-sex-theyre-about-power_n_5900c2d3e4b0af6d718abe2d
[32] https://www.insidehighered.com/news/2017/09/08/campus-administrators-reassure-students-protections-after-title-ix-announcement

proportionality to the punishments called for against alleged male perpetrators, making no distinction between acts considered offensive or improper versus violent assaults.[33]

114.    On November 13, 2017, the Chronicle of Higher Education published an article about the impact of the #MeToo movement on higher education:

> The galvanizing momentum of the #metoo campaign has forced many industries to confront widespread sexual harassment and assault in their midsts. Academe is no exception. Propelled by admiration for those who have spoken out, fear that what happened to them could happen to others, and anger at how long abusers have gone unpunished, women have come forward in droves to report instances of sexual assault….Campus officials have struggled to determine how to punish abusive employees….But the new wave of revelations and accusations has raised the stakes, and the fury of the #metoo movement has tapped into could have a longstanding impact on higher education.[34]

115.    On December 1, 2017, a former professor turned blogger published an open source spreadsheet "Sexual Harassment in the Academy," upon which anonymous posters could list instances of alleged sexual harassment at universities. This was described by the media as "a viral #MeToo list." The list garnered national attention, and was reported on in The Washington Post[35] and The Wall Street Journal.[36] A women's blog, Jezebel.com, referred to the list as "Academia's Shitty Men List."[37] A number of entries on the list concerned GMU professors.[38]

---

[33] *See, e.g.*, Stephens, B., *When #MeToo Goes Too Far*, *at* https://www.nytimes.com/2017/12/20/opinion/metoo-damon-too-far.html. *See also* Merkin, D., *Publicly We Say MeToo, Privately We Have Misgivings*, *at* https://www.nytimes.com/2018/01/05/opinion/golden-globes-metoo.html. One year after the emergence of #MeToo, *The New York Times* reported "at least 200 prominent men have lost their jobs after public allegations of sexual harassment. A few… face criminal charges…. And nearly half of the men who have been replaced were succeeded by women." Carlsen, A. et al., *#MeToo Brought Down Nearly 201 Powerful Men. Nearly Half of Their Replacements are Women,* at https://www.nytimes.com/interactive/2018/10/23/us/metoo-replacements.html?nl=top-stories&nlid=72995439ries&ref=cta

[34] *See* Gluckman N., Read, B., Mangan, K., and Quilantan, B., *Sexual Assault in Higher Ed*, at https://www.chronicle.com/article/Sexual-HarassmentAssault/241757.

[35] https://www.washingtonpost.com/local/education/academias-metoo-moment-women-accuse-professors-of-sexual-misconduct/2018/05/10/474102de-2631-11e8-874b-d517e912f125_story.html

[36] https://www.wsj.com/articles/allegations-of-groping-lewd-comments-and-rape-academias-metoo-moment-1515672001

[37] https://jezebel.com/academias-shitty-men-list-has-around-2-000-entries-deta-1821991028

[38] https://docs.google.com/spreadsheets/d/1S9KShDLvU7C-KkgEevYTHXr3F6InTenrBsS9yk-8C5M/edit#gid=1530077352

116.    On January 1, 2018, the OCR published an updated list of colleges and universities that were under investigation. The September 2016 complaint against GMU was on the list. The list was later updated to include a second OCR investigation, opened in March 2018, involving a complaint concerning sexual harassment.[39]

117.    On April 30, 2018, the Fourth Estate published an article "How a Title IX report in Student Government dragged on for over a year."[40] The article, which used a pseudonym for the complainant, but named the male student, outlined sexual harassment allegations against the male student, who had run for student body president one year earlier. Certain allegations dated back to the time period before both students attended GMU. According to the article, GMU failed to respond to the female student's report about the sexual harassment, her grievance with the student government election committee, or to investigate her Title IX complaint for over one year. The male student in question was elected student body president and completed his term in March 2018. *Id.*

118.    One criticism in the article was that the Title IX office only had two employees assigned to handle investigations for 35,000 students and three campuses—Dr. Hammat and Ms. Simmons. Dr. Hammat was interviewed and quoted: "If we're working on 14 cases at once, that could elongate all of those processes…I'd love to tell you that I have ten hours a week to write nothing but investigation reports, but I am lucky if I get even a few hours a week to write those reports." The article also referenced the 2016 OCR investigation, pending at the time, which attributed GMU's lack of response to creating a sexually hostile environment for a female student. *Id.*

---

[39] Plaintiff was unable to find any public information about the basis of the complaint. It appears that GMU did not announce the second investigation.
[40] http://gmufourthestate.com/2018/04/29/how-a-title-ix-report-in-student-government-dragged-on-for-over-a-year/

**A38**

119.    On May 3, 2018, Mr. Williams and Rose Pascarell, the Vice President of University Life, demanded that Fourth Estate correct the article because it contained "several incorrect statements of fact and inconsistencies, starting with the headline."[41] Mr. Williams and Ms. Pascarell stated that "Mason has been and remains thoroughly committed to eradicating sexual violence in all forms. As a result of the Sexual Assault and Interpersonal Violence Task Force that President Cabrera commissioned in 2015, 18 recommendations have been implemented on campus…We would never want a message conveyed to our community that suggests a student would not be listened to or receive a timely response."

120.    On May 10, 2018, Mr. Williams sent a follow-up to the Fourth Estate which outlined the manner in which GMU responded to the female student's allegations. Mr. Williams noted that the "article as written is replete with inaccuracies and reflects a lack of understanding of the Title IX reporting process. It sends a message to the campus community that is factually incorrect." *Id.* This correspondence was published in Fourth Estate on May 16, 2018. *Id.*

121.    On August 18, 2018, The Washington Post published an article, "George Mason professor retires amid sexual harassment allegations," which detailed termination proceedings against a communications professor—who was the director of GMU's nationally acclaimed forensics team—amid accusations that he had sexually harassed a student, which "prompted others to come forward and say they had been harassed."[42]

122.    Per the article, a male student alleged that the professor made sexual advances when the two were alone in a hotel room after a night of heavy drinking. The article noted that "[t]he allegations against the George Mason professor come amid a larger national conversation about

---

[41] http://gmufourthestate.com/2018/05/16/corrections-request-title-ix-article-published-on-430/
[42] https://www.washingtonpost.com/local/education/george-mason-professor-retires-amid-sexual-harassment-allegations/2018/08/18/683e60d8-9055-11e8-bcd5-9d911c784c38_story.html

sexual harassment and misconduct that has reverberated across the academy." Per the article, GMU included allegations in the Title IX investigation that concerned students who had already graduated and incidents that allegedly occurred after they were no longer students.

123.    GMU confirmed to The Washington Post that the Title IX records turned over to the newspaper were authentic. The professor in question acknowledged having an inappropriate conversation with the student but denied the remaining allegations. He retired after GMU started termination proceedings. A GMU official told The Washington Post that the Title IX documents provided to the newspaper show that GMU took "swift, decisive action on this matter."

124.    On August 21, 2018, The Washington Post reported that the same professor turned himself into the GMU police department in regard to charges of embezzlement, which "came to light during the investigation into the harassment claims."[43] The charges were later dropped.

125.    On October 15, 2018, President Cabrera was interviewed by Fourth Estate and discussed Title IX issues and Brett Kavanaugh's confirmation to the United States Supreme Court on October 6th. President Cabrera noted "many victims of sexual violence have had a hard time through this whole period. We are registering many more reports of sexual violence over the last two weeks….. It is very, very important that we continue to send a message…. If you are a victim of sexual violence we are here to help."[44]

126.    On October 28, 2018, GMU held a "Chapter Next: Ending Sexual Violence" event. The student newspaper reported that female members of the forensics team were present at the event, noting that the team's director was accused of sexual harassment. At the end of the event,

---

[43] https://www.washingtonpost.com/news/grade-point/wp/2018/08/21/former-george-mason-professor-accused-of-sexual-harassment-is-now-facing-embezzlement-charges/
[44] http://gmufourthestate.com/2018/10/15/a-one-on-one-with-president-cabrera/

Dr. Hammat read GMU's Pledge to End Sexual Violence, which was recited by audience members including President Cabrera.

127.    On March 26, 2019, The Atlantic published an exposé about the GMU professor and forensics team director, discussed *supra*, who was accused of sexual harassment, "A #MeToo Nightmare in the World of Competitive College Speech."[45]

128.    In late March 2019, it was announced that GMU had hired Supreme Court Justice Brett Kavanaugh to teach a course at a GMU campus of the Antonin Scalia Law School in the United Kingdom. This sparked protests from thousands of GMU students.[46] Despite the protests, Justice Kavanaugh was not terminated from the position.

129.    GMU's students held a town hall and presented more than 10,000 signatures petitioning school administrators to fire Kavanaugh over the sexual assault allegations leveled against him in 2018 by Dr. Christine Blasey Ford. *Id.* The decision to hire Justice Kavanaugh sparked media attention nationwide. The media coverage largely focused on student reactions to GMU's decision-making. One student was quoted saying "In hiring Kavanaugh, to what extent did you consider the mental health of the survivors on campus and how that might affect them and their education?" *Id.* Another protestor said the university is disregarding sexual assault survivors. "A blatantly obvious response by GMU (would be one) that states that first they do not believe Dr. Blasey Ford's testimony and second do not care about the safety of their students." *Id.*

130.    The University's decision to hire Kavanaugh was so divisive that a petition was started by a group called "Mason 4 Survivors" which to date has over 15,000 signatures.[47] The

---

[45] https://www.theatlantic.com/education/archive/2019/03/students-accuse-gmu-forensics-coach-sexual-harassment/585211/

[46]    https://www1.cbn.com/cbnnews/us/2019/april/gmu-will-allow-brett-kavanaugh-to-teach-despite-backlash-from-student-protesters

[47] https://www.washingtonpost.com/nation/2019/04/09/kick-kavanaugh-off-campus-students-decry-george-masons-decision-hire-supreme-court-justice/

petition asked University administrators to remove Kavanaugh and issue a formal apology to victims of sexual assault. It also called for the public release of documents related to the judge's hire, including "emails, donor agreements, and contracts." *Id.* The petition also yielded separate forms for parents and alumni to pledge that they will not donate to the university so long as Kavanaugh is teaching. *Id.*

131.    On April 8, 2019, The College Fix reported that GMU's Faculty Senate, of which Dr. Renshaw was a member, called for an investigation of Kavanaugh, noting there was mounting pressure to fire the Supreme Court Justice. President Cabrera rejected the idea of investigating Kavanaugh, stating that the University had done its due diligence.[48]

132.    On April 19, 2019, local press reported that GMU approved funding to double the number of it Title IX staff by hiring two new Title IX coordinators before the 2019 Fall semester.[49] The decision was made in "the wake of an outcry from students who opposed the university's hiring of U.S. Supreme Court Justice Brett Kavanaugh." The article noted that the Mason 4 Survivors' petition prompted the decision.

133.    On June 25, 2019, The Huffington Post published an article about President Cabrera, "GMU Students Rip Departing President Over Brett Kavanaugh's Hire."[50] In the article, Mason 4 Survivors accused President Cabrera of having "a lack of compassion for survivors of sexual assault" and "disdain…for the well-being of Mason students." The article further speculated that GMU had no choice but to hold its ground on the Kavanaugh hiring decision because it had

---

[48] https://www.thecollegefix.com/gmu-faculty-want-new-probe-of-kavanaugh-there-has-not-been-a-full-investigation/. *See also* https://www.washingtonpost.com/nation/2019/04/09/kick-kavanaugh-off-campus-students-decry-george-masons-decision-hire-supreme-court-justice/.
[49] http://www.fairfaxtimes.com/articles/gmu-approves-funding-for-two-added-title-ix-coordinators/article_dbc3a0be-62db-11e9-a5a5-172f8820e14f.html
[50] https://www.huffpost.com/entry/george-mason-university-brett-kavanaugh-angel-cabrera-sexual-assault_n_5d12309de4b0aa375f53c67c

received assistance from the Federalist Society with respect to an anonymous $20 million gift made to the University in 2016.

134.    On August 22, 2019, GMU's Title IX Coordinator gave a presentation on the Title IX process at student orientation, which included faculty and students from Plaintiff's Department. During her presentation, the Title IX Coordinator very clearly stated that GMU *suspends due process* during Title IX proceedings.

135.    On August 26, 2019, an article was published in the Fourth Estate in which a sexual assault survivor criticized GMU as being "more negligent in Title IX reform compared to other public universities in Virginia due to the office being understaffed and a standing history of lack of coordination among necessary resources."[51]

**V.    Overview of the Biased and Procedurally Deficient Process GMU Employed in Plaintiff's Case**

136.    On December 4, 2018, Plaintiff received four (4) emails from Dr. Hammat, the Title IX Coordinator at the time, notifying him that four current and former graduate students, "Complainant 1," "Complainant 2," "Complainant 3," and "Complainant 4,"[52] had filed Title IX complaints against him for sexual harassment.

137.    As discussed in extensive detail *infra* Point VII, Complainants 1-4, all graduate students (two of whom had already graduated), alleged that Plaintiff created a hostile environment through: statements he made on two occasions during one class that he taught in 2013 and one class in 2014; in conversations he had with his lab students about human sexuality; comments made during social interactions with his lab students; by inviting Complainant 3 to view a widely received presentation at a professional conference; by referring to the same presentation during

---

[51] http://gmufourthestate.com/2019/08/26/new-title-ix-coordinator-who-this/
[52] Plaintiff is using pseudonyms in place of the students' names to protect their privacy.

one class; by electing to attend an outing organized by Complainant 4 at a famous dive bar when he and some of his graduate lab students attended a professional conference; and when briefly hugging Complainant 4 in a passing social interaction in a public place. Almost all of the allegations occurred years prior to when they were reported.

138.    Dr. Hammat's emails to Plaintiff concerning the four complaints contained no recitation of the specific charges against Plaintiff or the specific policy provisions that applied to the allegations in question. Nor was Plaintiff notified as to whether the investigation would be conducted under GMU's 2018 grievance procedures for sexual misconduct cases or those in effect at the time in which the alleged events occurred.

139.    Dr. Hammat appears to have improperly applied the policies and procedures in place in December 2018, even though Dr. Hammat appended numerous copies of older policies and procedures to each email sent to Plaintiff, making it virtually impossible for him to discern which policies and procedures applied to his case.

140.    Complainants 1-4 were close friends; Complainant 3 and 4 were roommates. Plaintiff was not informed of the origin of the complaints but believes that Complainant 4 solicited her friends into reporting Plaintiff to Title IX under a false theory of sexual harassment because Plaintiff fired Complainant 4 from his laboratory, for poor performance, a few months prior to Plaintiff receiving notice of the Title IX complaints.

141.    GMU investigated the four complaints together, even though the allegations of Complainants 3 and 4 were factually distinct from each other and from the allegations of Complainants 1 and 2.

142.    The allegations of Complainants 1 and 2 dated back over **five years**. These complaints were timed out under the applicable procedures and should not have been investigated.

36

Moreover, Complainants 1 and 2 had already graduated from GMU and there was no policy or procedure which permitted the *post hoc* investigation of complaints alleged by former students. Regardless, as discussed below, the allegations made by Complainants 1 and 2 were flatly contradicted by evidence Plaintiff submitted to Dr. Hammat during the Title IX investigation, the statements of other students, and new evidence submitted as part of Plaintiff's appeal.

143.    The allegations made by Complainant 3 concerned events that occurred **at least two years** prior and were, thus, timed out under the applicable sexual misconduct procedures. As discussed below, these allegations were also contradicted by evidence that Plaintiff submitted during the investigation and on appeal.

144.    The majority of Complainant 4's allegations were also timed out under the applicable procedures. As discussed below, these allegations were also flatly contradicted by evidence that Plaintiff submitted during the investigation and on appeal.

145.    For purposes of GMU's investigation into the allegations, Plaintiff was interviewed on three occasions.

146.    The first interview was conducted on January 15, 2018 by GMU's Title IX investigator at the time,[53] Ms. Simmons. Ms. Simmons operated under a presumption that Plaintiff was guilty, which was apparent from her demeanor when interviewing Plaintiff. She was hostile and menacing towards Plaintiff, and seemed disinterested in ensuring that she gathered all relevant information from Plaintiff in response to the sexual harassment allegations against him.

147.    Ms. Simmons has a lengthy background of advocacy on behalf of female victims of sexual violence, as well as adversarial investigations of men accused of sex crimes. Her background includes working as a federal agent. She also represented law enforcement on various

---

[53] Ms. Simmons left GMU shortly after being removed from Plaintiff's investigation due to bias.

**A45**

committees tasked with finding holistic approaches to ending violence against women in the Navy. Ms. Simmons left GMU during the investigation into allegations against Plaintiff to work for a non-profit that advocates for the prevention of violence against women. While at GMU, Ms. Simmons gave guest lectures for the Women and Gender Studies Department. She continues to do so.

148.    Dr. Hammat, the Title IX Coordinator at the time, removed Ms. Simmons from Plaintiff's case after Plaintiff complained that Ms. Simmons was biased. However, upon information and belief, Ms. Simmons had already conducted the witness interviews that were later relied upon in reaching a determination in Plaintiff's case in a biased manner, thereby tainting the process. Ms. Simmons further compromised the reliability of the evidence gathered in Plaintiff's case by failing to name the complainants when interviewing witnesses about the allegations against Plaintiff.

149.    Dr. Hammat replaced Simmons and conducted the second and third interviews with Plaintiff, which took place on January 22, 2019 and January 24, 2019. Dr. Hammat had a conflict of interest because she was the Title IX Coordinator and was also responsible for determining the outcome of Plaintiff's case. Dr. Hammat was also demonstrably biased against Plaintiff. During the interviews, Dr. Hammat alluded to false, unrelated allegations against Plaintiff and suggested that he was involved in a consensual, romantic relationship with an unnamed student. The Plaintiff denied this never before mentioned allegation and asked for the evidence for such a serious claim. Dr. Hammat stated that Complainant 3 never saw anything but heard a rumor from another unnamed student. The allegation was untrue.[54]

---

[54] Shortly after deciding Plaintiff's case Dr. Hammat left GMU.

150.    Dr. Hammat, the sole individual tasked with deciding the outcome of the allegations against Plaintiff, has in recent years been publicly vocal about the fact that she is a survivor of a sexual assault that happened on a college campus.[55] This occurred when she was a student, and a member of a sorority. In an interview for a women's advocacy group's newsletter Dr, Hammat recounted that in college she started a "pledge patrol group" which "wouldn't leave a party until we had gone into every room, kicked down doors, got all our girls out." *Id.* Dr. Hammat also referenced speaking at fraternity houses where she told fraternity members to "be this angry and protective of every female that walks in this house." Dr. Hammat's statements suggest that Dr. Hammat holds stereotypical views of men and women and that her views potentially influenced her decision-making in sexual misconduct cases against male respondents at GMU, including in Plaintiff's case.

151.    Dr. Hammat has been publicly criticized for statements that she made while acting as Title IX Coordinator for the University of Texas, prior to joining GMU.[56] In an interview with the Daily Texan, published in November 2013, Dr. Hammat stated that, according to national statistics concerning sexual assault, "For a campus population of 50,000 [students], that means we should be seeing 12,500 cases a year. And we're not."[57] This quote garnered criticism that Dr. Hammat was "such an ideologue that she's incapable of interpreting statistical data that contradicts her preconceived worldview" and that she has "redefined (and broadened) the meaning of rape and sexual assault to such an extent that it bears no relationship to how these commonly referenced terms are defined…under most states' criminal law."[58]

---

[55] http://www.ncdsv.org/images/IDVSA_Voice-v08-i01_2013.pdf. *See* pages 7-8.
[56] https://www.mindingthecampus.org/2013/11/06/myths_realities_and_common_sen/
[57] https://www.dailytexanonline.com/news/2013/11/03/sexual-assault-remains-under-reported-on-campus-despite-growing-awareness
[58] https://www.mindingthecampus.org/2013/11/06/myths_realities_and_common_sen/

152.    In April 2016, while employed at GMU as Title IX Coordinator, Dr. Hammat participated in an event that the Clearinghouse on Women's Issues listed as a "DC Area Feminist Event," "How Equity Advocates Can Support High Expectations for Title IX and Title IX Coordinators."[59] As part of the event, Hammat was to provide her "wish list" of how women's advocates could assist her with Title IX enforcement. This is yet another example of Dr. Hammat publicly taking a biased position on the side of women's rights when she was required to make *impartial* determinations of responsibility in GMU's sexual misconduct cases.

153.    As part of the investigation, Plaintiff provided a list of witnesses to Dr. Hammat but, upon information and belief, Dr. Hammat and/or Ms. Simmons declined to interview a number of those witnesses. Dr. Hammat did not inform Plaintiff of the identities of the witnesses interviewed in his case.

154.    Plaintiff provided Dr. Hammat with over 150 pages of email communications and text messages with the complainants, course evaluations, social media postings and photographs which contradicted the allegations.

155.    During the investigation, Plaintiff was denied access to all evidence collected concerning the four complaints including but not limited to: a) any and all written complaints filed with the Title IX office; b) witness statements; c) interview memoranda and/or audio recordings; d) text, email, photographic or other evidence gathered during the investigation; e) a copy of any investigation report or memorandum created by the investigator; and f) summaries of the interviews in which he participated. Plaintiff's inability to review or respond to the evidence against him impeded his ability to fully defend himself against the allegations.

---

[59] https://womensclearinghouse.org/files/8814/6117/5463/CWI_April_2016__News4-19-16.pdf

156.    No hearing was held. Plaintiff had no opportunity to cross-examine his accusers, or any other witnesses. The determinations made by Dr. Hammat required her to make credibility assessments making this deprivation even more significant.

157.    Plaintiff recently learned that his colleague, a co-mentor of Complainant 4, was interviewed by Dr. Hammat and raised questions about Complainant 4's credibility and motives, and the veracity of the harassment allegations against Plaintiff. Upon information and belief, Dr. Hammat ignored this testimony, simply accepting Complainant 4's allegations as true. Plaintiff also learned after the proceedings that at least one female student was interviewed who adamantly refuted the allegations made by Complainant 4. Again, this contradictory evidence was ignored by Dr. Hammat.

158.    Dr. Hammat was solely responsible for determining whether Plaintiff violated any applicable sexual misconduct policies.

159.    Prior to any decision being made in Plaintiff's case, Dr. Hammat directed Dr. Renshaw to prohibit Plaintiff from taking on graduate research assistants for the Fall 2019 semester. There was no policy in place which gave Dr. Hammat, or any other representative from CDE the authority to take such actions during ongoing Title IX investigations. As a result, Plaintiff was directed to reject six student applicants whom he had already interviewed for positions in his lab.

160.    On February 22, 2019, Plaintiff received four (4) emails from Dr. Hammat notifying him of the determinations that she made with respect to each complainant (the "Letters of Determination"). In each case, Plaintiff was found responsible for "Sexual or Gender-Based Harassment," but the Letters of Determination did not define the conduct, state which version of

University Policy 1202 was applied, or how the allegations supported a violation of any given version of the Policy.

161.    The Letters of Determination did not state whether the preponderance of the evidence standard was relied upon by Dr. Hammat. Rather, in each case Dr. Hammat simply stated "CDE did find enough factual information" to find a policy violation, suggesting that she did not apply the preponderance of the evidence standard.

162.    The Letters of Determination stated that Plaintiff had a right to appeal the determinations to Mr. Williams, the Vice President of CDE, who was solely responsible for deciding the appeal. The Letters of Determination further stated that Mr. Williams' determination was final and "Deans, Directors or Department Chairs [could] not reject investigative findings and recommendations of corrective actions in complaints against employees." This was not stated in any of the GMU Grievance Procedures provided to Plaintiff. While Dr. Hammat stated that such a process avoids "biases in the adjudicatory process" the failure to provide for a level of faculty review, including a hearing, when Plaintiff faced termination as a potential outcome, served to reinforce the bias that existed in the investigative process.

163.    Neither the Letters of Determination nor the various iterations of the Grievance Procedures provided to Plaintiff identified the specific process through which sanctions would be determined. The Letters of Determination did not set forth any sanctions.

164.    Each Letter of Determination contained new allegations—which Dr. Hammat erroneously found supported violations of University policy—that had not been disclosed to Plaintiff. He had no opportunity to respond to these allegations, which were vague and unsubstantiated, at any time before Dr. Hammat found he violated the University policy with respect to each complainant.

165.    On March 28, 2019, Plaintiff submitted a 38-page appeal to Mr. Williams with hundreds of pages of exhibits—including new evidence—with contradicted the allegations against him.[60]

166.    Mr. Williams has made public statements to the effect that campus administrators have a moral obligation to protect and care for female students, and to make them feel safe, by, in part, investigating and responding to issues of sexual assault and sexual harassment.[61] Williams also publicly discussed the challenges of Title IX, stating "[r]egardless of the results of the hearing, we still hear you, we still care about you. Just because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying." *Id.*

167.    On April 11, 2019, Mr. Williams denied Plaintiff's appeal and upheld Dr. Hammat's Letters of Determination in their entirety.

168.    On April 25, 2019, Plaintiff notified Mr. Williams that the confidentiality of the Title IX proceedings had been violated when a university administrator disclosed to GMU students—who then approached Plaintiff—that Plaintiff had been prohibited from taking on graduate students in Fall 2019. In response, Plaintiff was advised that GMU could not impose "gag orders" on parties to prevent them from sharing information. Mr. Williams did not address the leaking of confidential information by GMU administrators.

169.    On May 31, 2019, Dr. Renshaw imposed sanctions on Plaintiff which barred him from conducting the majority of his responsibilities as a Professor and researcher for at least two years. The time period for lifting the sanctions was left indefinite because Plaintiff could only be

---

[60] Plaintiff had been granted an extension of time in which to submit his appeal due to a medical issue.
[61] http://info.vassar.edu/news/features/2014-2015/150401-julian-williams.html

reinstated to his full teaching and research responsibilities after further evaluation at the discretion of his Department Chair.

170.    In the May 31, 2019 sanction letter, Plaintiff was also notified for the first time that GMU's Human Resources Department was conducting a covert investigation of Plaintiff to determine whether he violated other university policies. To date, Plaintiff has not been provided any further information about the Human Resource investigation, including the specific allegations against him and whether they are identical to those alleged in the Title IX investigation.

171.    On June 10, 2019, Plaintiff filed a grievance with the relevant Faculty Grievance Committee against Dr. Renshaw, Mr. Williams and GMU.

172.    On June 19, 2019, the Committee reviewed the grievance with respect to Dr. Renshaw and upheld the sanctions imposed against Plaintiff. Plaintiff was not afforded a hearing before the Faculty Grievance Committee nor would the Committee consider the various due process concerns repeatedly raised by Plaintiff throughout the Title IX proceedings and thereafter.

173.    On August 8, 2019, Plaintiff received notice of a grievance that had been filed against him by several professors, seeking to force Plaintiff to disaffiliate from his program. It is unclear why or how the professors came to learn of the confidential Title IX proceedings and outcome against Plaintiff but these professors were not within the scope of GMU administrators to whom such information could be disclosed.

174.    On August 13, 2019, Plaintiff submitted a response, objecting to the grievance and declining the demand that he disaffiliate from his program.

175.    On August 23, 2019, the Grievance Committee asked Plaintiff to answer a series of questions concerning whether he should be held to the ethical standards of conduct of a professional organization related to his profession—the very basis of the grievance against him. It

was clear that the Grievance Committee was seeking admissions from Plaintiff that could cause further damage to his career.

176.    Plaintiff called the professional organization directly and asked whether GMU could lose its accreditation because of the Title IX findings against Plaintiff, or whether there was any duty to report the findings. Plaintiff learned that GMU's accreditation was not in jeopardy because of the Title IX findings and that there was no duty to report. Accordingly, the professors—motivated by bias against him—created a sham basis for attempting to force him to disaffiliate from his program.

177.    On September 10, 2019, the Grievance Committee issued a decision recommending that Plaintiff disaffiliate from the program, or that Dr. Renshaw require his disaffiliation.

178.    On September 10, 2019, the Grievance Committee sent the decision to the Dean of Plaintiff's Department, Ann L. Ardis ("Dean Ardis").

179.    On September 16, 2019, Dean Ardis "concurred" with the decision and recommended disaffiliation even though she was not authorized to do so by the Faculty Handbook.

180.    On September 17, 2019, Dr. Renshaw disaffiliated Plaintiff from his program "at least until" all students currently enrolled as of the 2019-2020 academic year are no longer enrolled in the program.

VI.    **The Policies and Procedures At Issue in Plaintiff's Title IX Proceedings**

181.    Attached to each of the four emails that Dr. Hammat sent to Plaintiff concerning the allegations made by Complainants 1-4, were a number of different sexual misconduct policies and grievance procedures—she did not specify which policies and procedures would apply/were applied to determine the outcome in Plaintiff's case. Plaintiff was left to try to make sense of what

definitions and procedures were applied by Dr. Hammat from the time the complaints were received, through the time in which Dr. Hammat determined that Plaintiff violated "Policy 1202."

A.    **The Various Iterations of GMU's Sexual Misconduct Policy**

1.    **Policy 2006-14**

182.    With respect to Complainants 1 and 2, Dr. Hammat provided Plaintiff with what she referred to as "University Policy Number 1202: Sexual Harassment Policy 2006-14." ("Policy 2006-14"). This version of GMU's Sexual Harassment Policy was effective as of April 20, 2006 and defined sexual harassment as follows:

> Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:
>
> 1. Sexual Assault
>
> 2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment…
>
> 3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression.
>
> *Note: Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason's educational mission.

2.    **The 2014-2015 and 2015-2016 Sexual Misconduct Policies**

183.    With respect to Complainant 3, Dr. Hammat provided Plaintiff with two versions of University Policy 1202: (i) University Policy 1202: Sexual Harassment and Misconduct 2014-

15 (the "2014-2015 Sexual Misconduct Policy"); (ii) University Policy 1202: Sexual Harassment and Misconduct 2015-16[62] (the "2015-2016 Sexual Misconduct Policy").

184.    A cover memo to the 2014-2015 Sexual Misconduct Policy stated that "the policy now describes Sexual Misconduct more fully as a form of Sexual Harassment under Title IX…and sets out the process of investigation in cases of Sexual Misconduct."

185.    The definition of Sexual Harassment in the 2014-2015 Sexual Misconduct Policy is identical to that set forth in Policy 2006-14, set forth *supra*.

186.    The 2014-2015 Sexual Misconduct Policy defined Sexual Misconduct more broadly to include sexual harassment and beyond the requirements of the OCR's 2001 Guidance applicable to faculty and employees as:

> A range of behaviors, including but not limited to sexual harassment, sexual assault, domestic violence, dating violence and sexual exploitation, It includes unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature that (a) is sufficiently severe, persistent, or pervasive as to limit a student or employee's ability to participate in or benefit from an education program; or (b) explicitly or implicitly affects an individual's employment or academic environment, unreasonably interferes with an individual's academic or work performance, or creates an intimidating, hostile, or offensive academic or work environment. *Id.* at IV.

Under GMU's expanded definition, which far exceeded the 2001 Guidance, any conduct could constitute sexual misconduct.

187.    Per the 2014-2015 Sexual Misconduct Policy:

a.    "[m]embers of the University community *accused* of sexual misconduct *will be* subject to disciplinary action." *Id.* at III.A (emphasis added).

b.    "Employees who violate this policy will be subject to discipline, up to and including termination of employment." *Id.* at III.C.

c.    With regard to Title IX proceedings, "only people who need to know will be told and information will be shared only as necessary with investigators, hearing board members, administrators, witnesses and the respondent." *Id.* at III.B.

---

[62] Though Dr. Hammat referenced this document as the 2015-2016 Policy, the copy provided to Plaintiff was revised as of August 15, 2014.

188.    The 2015-2016 Sexual Misconduct Policy defined Sexual Harassment identically to Policy 2006-14 and the 2014-2015 Sexual Misconduct Policy. *Id.* at II.

189.    The 2015-2016 Sexual Misconduct Policy defined Sexual Misconduct identically to the 2014-2015 Sexual Misconduct Policy. *Id.* at V.

190.    Per the 2015-2016 Sexual Misconduct Policy:

a.      "[m]embers of the University community *accused* of sexual misconduct *will be* subject to disciplinary action." *Id.* at III (emphasis added).

b.      "Employees who violate this policy will be subject to discipline, up to and including termination of employment." *Id.* at IV.B.

c.      With regard to Title IX proceedings, "only people who need to know will be told and information will be shared only as necessary with investigators, hearing board members, administrators, witnesses and the respondent. *Id.* at IV.A.

### 3.    The 2016-2017 and 2017-2018 Sexual Misconduct Policies

191.    With respect to Complainant 4, Dr. Hammat provided Plaintiff with two copies of University Policy 1202: (i) University Policy 1202: Sexual Harassment and Misconduct 2016-2017 (the "2016-2017 Sexual Misconduct Policy"); and (ii) University Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence 2017-2018 (the "2017-2018 Sexual Misconduct Policy").

192.    The cover memo for the 2016-2017 Sexual Misconduct Policy indicated that Dr. Hammat participated in the policy revision process.

193.    Per the 2016-2017 Sexual Misconduct Policy, "the University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities." *Id.* at II.

194.    Per the 2016-2017 Sexual Misconduct Policy, "each set of procedures" is "guided by the same principles of fairness and respect for Complainants and Respondents," provides for "prompt and equitable response to reports of Prohibited Conduct" and "thorough and impartial

48

investigations that afford *all parties* notice and an opportunity to present witnesses and evidence and *to view the information that will be used in determining whether a policy violation has occurred*." *Id.* at III (emphasis added). Plaintiff was denied these rights.

195.    The 2016-2017 Sexual Misconduct Policy requires the application of the "Preponderance of the Evidence" standard, which "means that it is more likely than not that a policy violation has occurred." *Id.*

196.    Per the 2016-2017 Sexual Misconduct Policy, an "[e]mployee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. *Id.*

197.    Per the 2016-2017 Sexual Misconduct Policy, the Title IX Coordinator—who is responsible for determining the outcome of Title IX complaints against faculty—is "charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects." *Id.* at IV.

198.    Per the 2016-2017 Sexual Misconduct Policy, "[t]here is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University." *Id.* at V.D.

199.    The 2016-2017 Sexual Misconduct Policy significantly expanded the definition of Sexual Harassment and included a category of Prohibited Conduct referred to as Gender-Based Harassment. *Id.* at VI.E.

200.    The 2016-2017 Sexual Misconduct Policy defines Sexual Harassment and Gender-

Based Harassment are defined as follows:

> **Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical or otherwise, when the conditions outlined in (1) and/or (2), below, are present.
>
> **Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (1) and/or (2), below, are present.
>
> (1) Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or
>
> (2) Such conduct creates a hostile environment: A 'hostile environment' exists when the conduct is *sufficiently severe, persistent or pervasive that it unreasonably interferes with, limits or deprives an individual from participating in or benefiting from the University's education or employment programs and/or activities.* Conduct must be deemed severe, persistent, or pervasive from both a subjective *and an objective perspective*. In evaluating whether a hostile environment exists, the University will consider the totality of the known circumstances, including but not limited to:
>
> - The frequency, nature and severity of the conduct;
> - Whether the conduct was physically threatening;
> - The effect of the conduct on the Complainant's mental or emotional state;
> - Whether the conduct was directed at more than one person;
> - Whether the conduct arose in the context of other discriminatory conduct;
> - *Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities*; and
> - *Whether the conduct implicates concerns related to academic freedom or protected speech*.

50

> A hostile environment can be created by persistent or pervasive conduct or by a single, isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of Sexual Assault, for example, may be sufficiently severe to constitute a hostile environment. *In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment. Id.* at VI.E. (emphasis added).

201.    The 2016-2017 Sexual Misconduct Policy placed an obligation on all parties to provide truthful information:

> All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct and subject to disciplinary sanctions under the University's Code of Conduct and disciplinary action under the appropriate disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are no later substantiated. *Id.* at X.

202.    The 2017-2018 Misconduct Policy was released on August 21, 2017. The cover memo provided to Plaintiff noted that Dr. Hammat initiated revisions to the policy to "broaden the policy's application beyond only intimate partner violence to violence between cohabitants and family members" and to "clarif[y] the definition of sexual and gender-based harassment."

203.    Per the 2017-2018 Sexual Misconduct Policy, "the University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities." *Id.* at II.

204.    Per the 2017-2018 Sexual Misconduct Policy, "each set of procedures" is "guided by the same principles of fairness and respect for Complainants and Respondents," provides for "prompt and equitable response to reports of Prohibited Conduct" and "thorough and impartial investigations that afford *all parties* notice and an opportunity to present witnesses and evidence

51

**A59**

and *to view the information that will be used in determining whether a policy violation has occurred.*" *Id.* at III (emphasis added). Plaintiff was denied these rights.

205. The 2017-2018 Sexual Misconduct Policy requires the application of the "Preponderance of the Evidence" standard, which "means that it is more likely than not that a policy violation has occurred." *Id.*

206. Per the 2017-2018 Sexual Misconduct Policy, an "[e]mployee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. *Id.*

207. Per the 2017-2018 Sexual Misconduct Policy, the Title IX Coordinator—who is responsible for determining the outcome of Title IX complaints against faculty—is "charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects." *Id.* at IV.

208. Per the 2017-2018 Sexual Misconduct Policy, "[t]here is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University." *Id.* at V.

209. The 2017-2018 Sexual Misconduct Policy once again expanded the definition of sexual harassment and collapsed the definition of gender-based harassment into the same definition as follows:

E. SEXUAL OR GENDER-BASED HARASSMENT

Sexual or Gender-Based Harassment includes:

52

1. Unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or electronic conduct of a sexual nature that creates a hostile, intimidating or abusive environment;

2. Verbal, physical, or electronic conduct based on Sex, Gender, Sexual Orientation, or sex-stereotyping that creates a hostile, intimidating, or abusive environment, even if those acts do not involve conduct of a sexual nature, or

3. Harassment for exhibiting what is perceived as a stereotypical characteristic for one's Sex or for failing to conform to stereotypical notions of masculinity and femininity, regardless of the actual or perceived Sex, Gender, Sexual Orientation, Gender Identity, or Gender Expression of the individuals involved.

a) **Harassment** is a type of discrimination that occurs when verbal, physical, electronic, or other conduct based on an individual's Protected Status…interferes with that individual's (a) educational environment (e.g. admission, academic standing, grades, assignment); (b) work environment (e.g., hiring, advancement, assignment); (c) participation in a University program (e.g. campus housing); or (d) receipt of legitimately requested services (e.g. disability or religious accommodations), thereby creating Hostile Environment Harassment or Quid Pro Quo Harassment, as defined below.

i. **Hostile Environment Harassment**
Unwelcome conduct based on Protected Status that is so severe, persistent, or pervasive that it alters the conditions of education, employment, or participation in a University program or activity, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive. An isolated incident, unless sufficiently severe, does not amount to Hostile Environment Harassment.

ii. **Quid Pro Quo Harassment**
Unwelcome conduct based on Protected Status where submission to or rejection of such conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education, employment, or participation in a University program or activity.

b) **Additional Guidance about Discrimination and Harassment**
Consistent with the definitions provided above, conduct that constitutes Discrimination and Harassment:

- May be blatant and involve an overt action, threat or reprisal; or may be subtle and indirect, with a coercive aspect that is unstated but implied.
- May or may not include intent to harm.
- May not always be directed at a specific target.
- May be committed by anyone, regardless of Protected Status, position, or authority. While there may be a power differential between the Complainant and the Respondent—perhaps due to differences in age or educational,

employment, or social status—Discrimination and Harassment can occur in any context.

- May be committed by a stranger, an acquaintance, or someone with whom the Complainant has a current or previous relationship, including a romantic or sexual relationship.
- May be committed by or against an individual or against an organization or group.
- May occur in the classroom, the workplace, in residential settings, or in any other setting.
- May be a pattern of behavior or, if sufficiently severe, a one-time event.
- May be committed in the presence of others, when the Complainant and Respondent are alone, or through remote communications, including email, text messages, or social media.
- May take the form of threats, assault, property damage, economic abuse, and violence or threats of violence.
- May include harassing or retaliatory behavior directed to a sexual or romantic partner, family member, friend, or pet of the Complainant.

*Id.* at VI.E.

210.    The 2017-2018 Sexual Misconduct Policy excluded prior protections for academic discourse and free speech including the requirement that allegations be viewed objectively, and based on the totality of circumstances. *Compare* 2016-2017 Sexual Misconduct Policy at VI.E.

211.    The 2017-2018 Sexual Misconduct Policy placed an obligation on all parties to provide truthful information:

> All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct and subject to disciplinary sanctions under the University's Code of Conduct and disciplinary action under the appropriate disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are no later substantiated. *Id.* at X.

**B.    The Various Iterations of the Grievance Procedures in Cases Against Faculty**

212.    Dr. Hammat provided Plaintiff with six (6) different versions of GMU's Equal Opportunity/Affirmative Action procedures, none of which sufficiently protected the due process

rights of faculty. It was never specified what procedures applied/were applied in Plaintiff's Title IX proceedings.

### 1.   Equal Opportunity/Affirmative Action Grievance Procedure 2006-14

213.    With respect to Complainants 1 and 2, Dr. Hammat provided Plaintiff with what she referred to as Equal Opportunity/Affirmative Action Grievance Procedures 2006-14 (the "2006-14 Grievance Procedures").

214.    Pursuant to the 2006-14 Grievance Procedures a written complaint was required to be filed within 180 days of the most recent incident. *Id.* at III.

215.    Pursuant to the 2006-14 Grievance Procedures, "a full investigation is conducted by [CDE] complete with written findings." If a violation is found, CDE would recommend "corrective actions." The determination is final.

216.    The 2006-14 Grievance Procedures did not require a hearing, a right of cross-examination or similar right of confrontation, did not provide for the respondent's review of evidence related to the investigation, and provided no right of appeal.

217.    Per the 2006-14 Grievance Procedures, [CDE] was "committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals." With respect to all parties, the Procedures stated "all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved." *Id.* at IV.

### 2.   The 2015 and 2016 Grievance Procedure

218.    With respect to Complainant 3, Dr. Hammat provided Plaintiff with GMU's January 2015 Equal Opportunity/Affirmative Action Grievance Procedure (the "2015 Grievance Procedure") and the February 2016 Equal Opportunity/Affirmative Action Grievance Procedure

(the "2016 Grievance Procedure").[63] Dr. Hammat also attached a copy of the 2016 Grievance Procedure to the email concerning Complainant 4.

219.    Per the 2015 Grievance Procedure, GMU "reserve[d] the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims." *Id.* at II.

220.    The 2015 Grievance Procedure required that a written complaint be filed within 180 days. Requests to extend the period would be considered "where the complainant can show he or she needed additional time due to circumstances beyond his or her control. *Id.* at III.

221.    The 2015 Grievance Procedure required the respondent to be notified of the complaint "within 10 working days after it is filed." *Id.*

222.    The 2015 Grievance Procedure did not require a hearing, a right of cross-examination or similar right of confrontation, and did not provide for the respondent's review of evidence related to the investigation. *Id.*

223.    Per the 2015 Grievance Procedure, "[a] full investigation is conducted by CDE with written findings. If a violation is found, the Office will recommend corrective actions." *Id.*

224.    The 2015 Grievance Procedure allowed either party to appeal a finding. *Id.* "A party may appeal a decision based on the discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding…general dissatisfaction with the decision will not be sufficient." *Id.* The appeal determination was final. *Id.*

---

[63] Dr. Hammat also purported to send the 2013 Grievance Procedure to Plaintiff but it was not attached to the email concerning Complainant 3.

**A64**

225.    The 2015 Grievance Procedure warned all parties against disclosure of the nature of the proceedings, or the identity of those involved, outside the scope of the investigation. *Id.* at IV.

226.    Per the 2016 Grievance Procedure, GMU "reserve[d] the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims." *Id.* at II.

227.    The 2016 Grievance Procedure permitted a written or verbal complaint, and required a complaint to be filed within 180 calendar days of the most recent incident unless the reporting party could "show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior." *Id.* at III. The Procedure did not define what constituted a pattern.

228.    Per the 2016 Grievance Procedure "[a]ll complaints of discrimination and harassment will be treated in the strictest confidence possible under the particular circumstances." *Id.*

229.    The 2016 Grievance Procedure provided for "a full investigation" consisting of interviews of the reporting party, responding party and any material witnesses identified, as well as a review of any relevant documentation. *Id.* at III. The reporting party and responding party will also be "given the opportunity to provide any additional relevant information to the investigator." *Id.*

230.    The 2016 Grievance Procedure did not provide for a hearing, cross-examination or other right of confrontation, or permit the respondent to review and/or respond to the evidence gathered during the investigation. This conflicted with the 2016-2017 Sexual Misconduct Policy

**A65**

which permitted the respondent to review all of the evidence. *See supra* Paragraph 194. Plaintiff

was not permitted to review any evidence in the case against him.

231.    The 2016 Grievance Procedure required CDE to issue a final written determination

at the conclusion of its investigation. *Id.* at III. The determination was to state whether there was

a violation of "this policy" and was to be provided to the "appropriate supervisor" "Human

Resources" and "other pertinent university officials as necessary to ensure proper resolution and

follow-up." *Id.* "CDE's involvement in the matter concludes when the final written determination

is issued." *Id.*

232.    The 2016 Grievance Procedure defined the "preponderance of the evidence"

standard used in investigations as follows:

> Under this standard, individuals are not presumed to have engaged in the alleged
> conduct unless a 'preponderance of the evidence' supports a finding that the
> conduct occurred. This 'preponderance of the evidence' standard *requires that the
> evidence supporting each finding be more convincing than the evidence offered in
> opposition to it*." *Id.* (emphasis added).

233.    Sanctions that could be imposed on a faculty member for violations of University

policy included dismissal. *Id.* Sanctions were required to be "commensurate with the severity

and/or frequency of the conduct. And shall be adequate and sufficient to prevent such conduct in

the future." *Id.*

234.    The 2016 Grievance Procedure also permitted appeals based on new evidence or a

significant irregularity in the procedural process which could affect the outcome." *Id.* The

determination on appeal, made by the Vice President of CDE, was final.

235.    The 2016 Grievance Procedure cautioned all parties not to publicize or divulge the

nature of the proceedings, or the identity of those involved. *Id.* at IV.

**A66**

### 3. The 2017 Grievance Procedure

236.    With respect to Complainant 4, Dr. Hammat provided Plaintiff with the 2016 Grievance Procedure discussed *supra* as well as the December 2017 Equal Opportunity/Affirmative Action Grievance Procedure (the "2017 Grievance Procedure").

237.    Per the 2017 Grievance Procedure, GMU "reserve[d] the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims." *Id.* at II.

238.    The 2017 Grievance Procedure permitted a written or verbal complaint, and required a complaint to be filed within 180 calendar days of the most recent incident unless the reporting party could "show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior." *Id.* at III. The Procedure did not define what constituted a pattern.

239.    The 2017 Grievance Procedure contained the following new language:

The Reporting Party will meet with a member from CDE to discuss their concerns. *Assuming the complete veracity of the allegation(s)*, CDE will make a threshold determination as to whether the allegation(s) contained in the complaint *constitute* a violation of university policy….If the threshold determination indicates that an investigation is required, CDE will determine the appropriate investigation process, and an investigator from CDE assigned to the complaint will notify the Reporting Party…and Responding Party…that said investigation is under way. *Id.* at III. (emphasis added).

240.    The 2017 Grievance Procedure provided for "[a]n investigation" consisting of interviews of the reporting party, responding party and any material witnesses identified, as well as a review of any relevant documentation. *Id.* at III. The reporting party and responding party will also be "given the opportunity to provide any additional relevant information to the investigator." *Id.*

241.    The 2017 Grievance Procedure did not provide for a hearing, cross-examination or other right of confrontation, or permit the respondent to review and/or respond to the evidence gathered during the investigation. This conflicted with the 2017-2018 Sexual Misconduct Policy which permitted the respondent to review all of the evidence. *See supra* Paragraph 204. Plaintiff was not permitted to review any evidence in the case against him.

242.    Per the 2017 Grievance Procedure CDE "may" issue a final written determination at the conclusion of its investigation. *Id.* at III. The determination was to state whether there was a violation of "this policy" and was to be provided to the "appropriate supervisor" "Human Resources" and "other pertinent university officials as necessary to ensure proper resolution and follow-up." *Id.* "CDE's involvement in the matter concludes when a final determination is made."

243.    The 2017 Grievance Procedure defined the "preponderance of the evidence" standard used in investigations as follows:

> Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a 'preponderance of the evidence' supports a finding that the conduct occurred. This 'preponderance of the evidence' standard *requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it*." *Id.* (emphasis added).

244.    Sanctions that could be imposed on a faculty member for violations of University policy included dismissal. *Id.* Sanctions were required to be "commensurate with the severity and/or frequency of the conduct. And shall be adequate and sufficient to prevent such conduct in the future." *Id.*

245.    The 2017 Grievance Procedure also permitted appeals based on new evidence or a significant irregularity in the procedural process which could affect the outcome." *Id.* The determination on appeal, made by the Vice President of CDE, was final.

246.    The 2017 Grievance Procedure cautioned all parties not to publicize or divulge the nature of the proceedings, or the identity of those involved. *Id.* at IV.

**VII.    The Allegations Against Plaintiff**

**A.  Complainant 1**

**1.  The Allegations and Lack of Supporting Evidence**

247.    Complainant 1 graduated from a GMU doctoral program prior to making a report against Plaintiff. Complainant 1's allegations stemmed from one graduate school course taught by Plaintiff in Spring 2013 ("Course A") and a second graduate school course taught by Plaintiff in Spring 2014 ("Course B"). Certain classes taught by Plaintiff in each class involved discussions concerning human sexuality, abnormal behavior, and cultural norms.

248.    Under the applicable Grievance Procedure 2006-14—which required complaints to be filed within 180 days—these allegations should not have been pursued by CDE. The allegations, which concerned class discussions that occurred over five (5) years prior, should have been questioned for that reason—they were not.

249.    Per Dr. Hammat's email to Plaintiff on December 4, 2018, Complainant 1's allegations concerned "potential violations" of Policy 2006-14. Complainant 1 alleged—without specifying whether a particular incident occurred in Course A or Course B—that:

- During class, Plaintiff provided a detailed description with the students of a sexual encounter wherein he performed oral sex upon a woman at a party where others were "packed around" and able to see him perform oral sex;

- During class, Plaintiff discussed a then recent event that occurred while traveling to the middle east and described having an erotic and adventurous experience in the middle of the desert while he watched a woman with notability and a connection to power "skinny dipping" while he relaxed and watched her. You told the students how erotic the experience was without actually having sex with the woman;

61

- During class, also emphasized to the students in the class (a cohort) that they "needed to get naked together to really get to know each other." To that end, Plaintiff repeatedly mentioned Spa World (a spa where people are often naked in the common areas) and encouraged the cohort to go together to really get to know each other.

- During class, Plaintiff asked the students who they thought would end up "sleeping with who" in the cohort. Plaintiff also indicated, "Grad students typically end up being incestuous with each other."

- During class, Plaintiff bragged about presenting his new findings at a conference in a presentation that used the term "fuck."

- During class, if a student expressed that they were offended, uncomfortable, or frustrated by the topic of discussion, Plaintiff would dismiss those concerns as being "emotional," "irrational," or "weak."

- During class, Plaintiff stated, on Baumeister Day "if you want to argue that men and women are equal, it is up to you to provide empirical evidence that men and women are equal."

- Graduate students in the program often warned new students to "not get on [Plaintiff's] bad side, because if [Plaintiff] liked you, you would get ample opportunities for publications, collaborations, and very reasonable feedback as a committee member. If [Plaintiff] did not like you, interactions were very uncomfortable."

- Through favoritism, Plaintiff made it clear to his students that opportunities and teaching was dependent on liking them and having sexually stimulating conversations with them.

250.    Complainant 1 did not allege that she was harmed as a result of the incidents alleged or that she was denied access to her education or any other benefits. Indeed, Complainant 1 had already graduated from a GMU graduate program at the time her complaint was made. None of the above-cited policies, *supra* Point VI, permitted GMU to pursue such *post hoc* complaints.

251.    During the Title IX investigation, Plaintiff was not permitted to review the written complaint or any evidence collected in regard to Complainant 1's allegations. Without specifics, Plaintiff conducted an exhaustive search of his course syllabi, teaching evaluations and communications with Complainant 1 and others about the courses and topics in question. As a

**A70**

result of this search, he provided Dr. Hammat with substantial evidence that contradicted Complainant 1's allegations.

252.    With respect to Complainant 1's allegation that Plaintiff discussed a personal story about performing oral sex on a woman at a party, Plaintiff did not deny sharing this story in class but provided Ms. Simmons and Dr. Hammat with context demonstrating the relevance of the story and how it fit into Plaintiff's pedagogical approach of utilizing examples, stories, case studies, and interesting scientific research so that students better understand and remember what they are being taught.

253.    As explained during his interview concerning these allegations, the example that Plaintiff gave was part of a single class that he taught that semester on sexuality and sexual disorders. One set of disorders that the class discussed was paraphilias. As Plaintiff explained, a person is diagnosed with a paraphilia when his or her sexual arousal is dependent on objects, situations or nonconsenting individuals as opposed to consensual sexual activity. When discussing exhibitionism, which is sexual gratification from the exposure of one's genitals to non-consenting others, and voyeurism, which is sexual gratification from observing unsuspecting others, Plaintiff offered concrete examples. Plaintiff offered case studies, discussed scientific research and stories from clinical experiences, news stories, and personal experiences.

254.    One such example was a woman Plaintiff met at a party who could only get sexual gratification when orally pleasured in public. No sexual details were provided in Plaintiff's discussion about this woman other than that Plaintiff performed oral sex on her. It was a concrete example of exhibitionism because she invited others to watch. This example was directly relevant to the topic being taught—sexual disorders.

255.    When viewed in context, Plaintiff's recounting of the story was an appropriate pedagogical tool and constituted protected academic discourse under the First Amendment of the U.S. Constitution and the 2001 Guidance. Moreover, the policy in place in Spring 2013, Policy 2006-14, expressly stated:

> Sexual harassment *does not* include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission. (emphasis added).

Thus, under the University's sexual harassment policy in place at the time, the story complained of by Complainant 1 did not constitute sexual harassment.

256.    There is, further, no evidence that Plaintiff's story contributed in any way to a hostile environment. On the contrary, Plaintiff's student evaluations for Course A demonstrated that students were pleased with the class and his teaching. 100% of the students rated his teaching as a 5 out of 5. For Item #5 on the evaluation, "The instructor showed respect for students" every student but one rated Plaintiff a 5 out of 5. That student rated Plaintiff a 4 out of 5. Those ratings were higher than the means for Plaintiff's department, college and the University. Three students provided positive, optional feedback including a request that Plaintiff teach Course B. In fact, Plaintiff ended up teaching Course B—which Plaintiff had never taught before— because every student in the class—including Complainant 1 and Complainant 2—asked Plaintiff to teach the course so they could have him as an instructor for the second time.

257.    When preparing his appeal, Plaintiff came across a peer evaluation of the exact class which was the subject of Complainant 1's allegations, written by a professor who observed the class. Plaintiff included this evaluation with his appeal. The evaluation noted "[g]iven the sensitive nature of the materials and some strong opinions in the class, [Plaintiff] worked very well to keep an atmosphere of mutual respect and fact based discussion throughout the class." The

evaluator further noted "[o]verall, the discussion was very lively and interesting. Plaintiff's teaching style was positive and encouraging, and allowed the students to voice a range of thoughts and opinions in a highly supportive environment." The professor who observed the class did not even mention the story raised by the Complainant 1 and Complainant 2. Each statement about the Plaintiff's teaching and interactions with students in the objective, written peer evaluation was positive.

258.    After Plaintiff taught Course A, Complainant 1 raised no complaints about the class discussion or example about oral sex, to Plaintiff, other students, or the administration. On the contrary, shortly after Plaintiff taught the course, in July 2013, Complainant 1 solicited Plaintiff's participation in her second-year project. During the investigation, Plaintiff submitted an email communication concerning this topic to Dr. Hammat.

259.    Complainant 1 subsequently took Course B and she and Plaintiff continued to have positive interactions, including her praise of Plaintiff's teaching, request for Plaintiff to be on her dissertation committee and request for Plaintiff to provide a reference letter for her internships. In her request for a reference letter, Complainant 1 pointed to Plaintiff's position as her instructor in Course A as one of their "primary interactions." Complainant 1 and Plaintiff also collaborated on a number of research articles, which she pointed out in her request. As for Complainant 1's request for Plaintiff to be on her dissertation committee, there are many faculty members in Plaintiff's Department who could, and likely would have, served on her dissertation committee. In fact, other Department faculty members were more qualified than Plaintiff because they studied topics relevant to her dissertation topic. Complainant 1's request that Plaintiff serve on her dissertation committee was evidence of her positive relationship with him and her preference for Plaintiff over other qualified faculty members. This evidence was ignored by Dr. Hammat and Mr. Williams.

260.    Complainant 1's next allegation, that during class Plaintiff discussed a trip to the Middle East in which Plaintiff either watched a woman "skinny dipping" or went "skinny dipping" with her was contradicted by Plaintiff and other student-witness' statements (as Plaintiff learned in Dr. Hammat's Notice of Determination). According to Complainant 1's Notice of Determination, discussed in more detail *infra*, student witnesses interviewed during the investigation confirmed that Plaintiff *did not* reference skinny dipping in class, raising questions about Complainant 1's credibility, and motives, in making this unfounded, stale allegation against Plaintiff.

261.    Plaintiff further informed Dr. Hammat during the investigation that one of the important themes in Course B was cultural differences (*e.g.*, an example of different systems that influence emotions, thoughts, and behavior). Plaintiff taught two classes related to this issue. The purpose of these classes was to teach students how people are influenced by situations, culture, or contexts. To illustrate this point, Plaintiff discussed science along with concrete examples and stories.

262.    One such story was from Plaintiff's travels to the Middle East to speak at a conference. Plaintiff's female acquaintance invited Plaintiff to her house and had a female member of her staff serve as Plaintiff's tour guide throughout his trip. The tour guide answered all of Plaintiff's questions about cultural differences compared to the United States. Women are not allowed to wear swimsuits in the country in question. The tour guide took Plaintiff to a beach where she could swim in a bathing suit. She also showed Plaintiff an area of the country that was populated by illegal mistresses living in chateaus. To conclude the tour, the tour guide and Plaintiff went to a particular road known as "love street". Young people are not allowed to date because arranged marriages are still the norm. But they come to the street, park, and if they see someone

they like, they throw a burner phone into their car and hope they call back to arrange a date. Plaintiff told the class this story to initiate a conversation about dominant culture and counter cultures, and how people respond, with an emphasis on dissent. Plaintiff never discussed skinny dipping or any other sexual activity with his guide because there was no sexual activity.

263.   Apart from the lack of factual foundation to support the "skinny dipping" allegation, the Middle East story was yet another example of protected academic discourse that cannot be construed as sexual harassment under either the 2001 Guidance, or Policy 2006-14.

264.   During the Spring 2014 Semester, Complainant 1 praised Course B in an email to Plaintiff which copied Complainant 2, stating "[t]his semester has rocked. Our awesomeness has now ruined you for all following cohorts. Conversely, the rest of our classes will now be terrible in comparison."

265.   Like Course A, Plaintiff received outstanding student evaluations for Course B. On Question #5 "The instructor showed respect for students," 4 out of 5 students rated Plaintiff a 5 out of 5, with one student rating Plaintiff a 3 out of 5. Once again, the facts did not support a hostile environment claim and were explained during Plaintiff's interviews and in his appeal.

266.   Complainant 1's allegation "during class, [Plaintiff] bragged about presenting his new findings at a conference in a presentation which included the word "fuck" in the title also failed to substantiate a claim for sexual harassment. Notably the use of the word "bragged" demonstrates bias against Plaintiff, and it is unknown whether the word was used by Complainant 1 or by the investigator, as there was only a vague recitation of allegations included in Dr. Hammat's email to Plaintiff.

267.   As Plaintiff explained during the investigation, it was Plaintiff's recollection that during the sexuality class he taught for Course A, Plaintiff used a PowerPoint presentation which

referenced data from professional presentations Plaintiff gave concerning human sexuality. The students learned about Plaintiff's scientific research in this area. The names of the articles Plaintiff relied on for the PowerPoint presentation, which have been presented at conferences and published in peer-reviewed journals, were provided to Dr. Hammat and Mr. Williams. The presentation has utilized "fuck" in the title, when presented to hundreds of people—including at GMU, without complaint.

268.    These allegations, again, did not support a violation of Policy 2006-14 because they concerned protected academic discourse under the Policy and 2001 Guidance.

269.    Complainant 1 next alleged that on Baumeister Day Plaintiff said "If you want to argue that men and women are equal, it is up to you to provide empirical evidence that men and women are equal." Plaintiff explained to Dr. Hammat that he never said this.

270.    Plaintiff referred to one class as Baumeister Day because the two readings had Roy Baumeister as the lead author. The topic of the class was not the equality of men and women. That has not been discussed in any of Plaintiff's classes over the course of Plaintiff's 15-plus years of teaching at the University. The Baumeister articles put forth a theory that women's sexual attitudes and behavior are more responsive to sociocultural influences than men. The two articles present a wide range of data to support this position. This is what was discussed in class.

271.    In class, Plaintiff mentioned that if anyone wanted to argue that men and women show the same level of reactivity to cultural influences, they must provide evidence to challenge the data presented in the readings. Plaintiff's class was about critical thinking, which trained students how to think and argue. Students could not just say they disagree with the readings; they had to provide a rationale.

**A76**

272.   In preparing his appeal, Plaintiff came across email correspondence between him and his graduate students which discussed the Baumeister readings ahead of class. The correspondence demonstrated Plaintiff's approach to the readings and the students' reaction to them, refuting Complainant 1's allegations. Plaintiff submitted this correspondence with his appeal.

273.   This evidence raised questions about Complainant 1's credibility as there were no readings and no discussions about the "equality" of men and women. The use of quotes in Complainant 1's allegations as to what was said during class also raised credibility concerns because it was unlikely that Complainant 1 could recite, verbatim, what was discussed approximately five years earlier. This was one of several false statements made by Complainant 1, disproven by Plaintiff's evidence, that raised questions about both her credibility and motives.

274.   Complainant 1 also alleged, in quotes, that Plaintiff stated in class that graduate students "needed to get naked together to really get to know each other" and repeatedly mentioned Spa World (a spa where people are often naked in the common areas) and encouraged the cohort to go together to really get to know each other." These allegations were false. Plaintiff never recommended that his students "get naked together." Moreover, there is nothing sexual about Spa World. As Plaintiff stated during his appeal, Spa World does not allow nudity in its common areas. There is one private bathing pool for women which permits nudity and one private bathing pool for men. This is not the case for any other part of the facility. As he told Dr. Hammat during the investigation, Plaintiff frequently recommended restaurants, activities and venues to his students, in part to alleviate the stress of graduate school. To the extent that he may have recommended Spa World to any of his students, it would have been as a place to relax.

275.    Complainant 1 also alleged that Plaintiff called students "emotional, irrational, or weak." Plaintiff learned from Dr. Hammat's Letter of Determination, discussed *infra*, that a witness stated that Plaintiff called one student's *arguments* emotional—not the student. Plaintiff's email communications concerning Baumeister Day demonstrated Plaintiff's approach to students engaged in passionate discussion about challenging topics, and contradicted Complainant 1's allegations. There was no mention of this in the "objective" peer evaluation conducted during the class about which Complainant 1 complained, nor was it borne out in student evaluations.

276.    The statement that a student is basing his or her arguments on emotion also has no relationship to sex or gender and, as such, did not support a finding of sexual, or gender-based, harassment. Any student, regardless of gender or gender identity, can base their arguments on what emotions are being felt when taking a position on a topic of discourse.

277.    Complainant 1 also made the false allegation that, during class, Plaintiff asked the students who they thought would end up "sleeping with who" in the cohort and Plaintiff also indicated, "Grad students typically end up being incestuous with each other." Plaintiff denied these allegations and no evidence was uncovered during the investigation to support these statements. To the extent that Plaintiff made any reference to students dating each other, a number of graduate students that had classes with Plaintiff were dating each other. References to students dating did not support an allegation of sexual harassment, or even gender-based harassment, because general statements concerning relationships between students of all gender identities and sexual orientations to students of all identities and orientations do not constitute sex discrimination.

      **2.  <u>Dr. Hammat's Erroneous Finding</u>**

278.    On February 22, 2019, Dr. Hammat emailed Plaintiff a "Letter of Determination" with respect to Complainant 1. Whereas Dr. Hammat's December 4, 2018 email to Plaintiff

referenced "potential violations" of ***Policy 2006-14***, her Letter of Determination found Plaintiff "engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason's University's ***Policy 1202****: Sexual or Gender-Based Harassment and Other Interpersonal Violence*." Dr. Hammat did not specify which version of the policy was applied in Plaintiff's case and failed to provide the precise definitions applicable to the findings.

279.    As discussed *supra* Point VI, GMU's policies and procedures were revised a number of times—including by Dr. Hammat—and eroded the rights of the faculty and expanded the definition of sexual harassment to include nearly any form of conduct that a person found offensive, without regard to principles of academic freedom or the 2001 Guidance. Even so, Complainant 1's allegations did not fit within any definition of sexual or gender-based harassment and, even if they could, were contradicted by witnesses and evidence.

280.    Dr. Hammat failed to apply the preponderance of the evidence standard even though Plaintiff was purportedly found responsible under Policy 1202. Under Policy 1202, and the 2016-2017 Grievance Procedures the 'preponderance of the evidence' standard "requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it." *See supra* Paragraphs 232, 243. Dr. Hammat merely found "enough factual information to sustain the allegation that" Plaintiff engaged in "conduct that qualifies as Sexual or Gender-based Harassment."

281.    Dr. Hammat's finding was based on: i) Plaintiff's discussion of voyeurism and paraphilias in Course A (which received a positive peer evaluation); ii) Plaintiff's recommendations about Spa World; iii) Plaintiff "jesting" about graduate students dating each other; and iv) Plaintiff calling one student "emotional." As discussed *supra* these allegations were unsupported and did not support the finding.

282.    Dr. Hammat added new allegations to the Letter of Determination that *did not* appear in her December 4, 2018 email to Plaintiff: i) that "Complainant 1 indicated that the interactions with [Plaintiff] included regular and gratuitous stories detailing sexual encounters, disparaging comments and actions regarding stereotypical female traits (e.g. being emotional); and ii) that Plaintiff cautioned students about sharing the stories told in class outside of class. Plaintiff did not have the opportunity to refute these allegations during the investigation.

283.    The Letter of Determination did not provide any information about sanctions, or who would determine the same.

284.    Dr. Hammat's letter was vague as to the reasoning for the determination. Although alluding to conversations and interviews with others, or documents gathered through the investigative process, Plaintiff was not privy to any such information or "evidence," making it extremely difficult to fully appeal the finding. Names of witnesses were not divulged. Plaintiff was told he could appeal the determination in writing to Mr. Williams.

B.    **Complainant 2**

1.    **The Allegations and Lack of Supporting Evidence**

285.    Complainant 2 graduated from a GMU graduate program prior to making a complaint against Plaintiff. Complainant 2 was good friends with Complainant 1 (as well as Complainants 3 and 4). Complainant 2's allegations also concerned graduate Course A, which Plaintiff taught in Spring 2013, and graduate Course B, which Plaintiff taught in Spring 2014.

286.    Under the applicable Grievance Procedure 2006-14—which required complaints to be filed within 180 days—these allegations should not have been pursued by CDE. The allegations, which concerned class discussions that occurred over five (5) years prior, should have been questioned for that reason—they were not.

287.    As with Complainant 1, Dr. Hammat's email to Plaintiff dated December 4, 2018, stated that Complainant 2's allegations concerned "potential violations" of Policy 2006-14. Complainant 2 alleged:

   a.    that Plaintiff provided a "detailed description with the students of a sexual encounter wherein [Plaintiff] performed oral sex upon a woman at a party;"

   b.    During class Plaintiff "shared with students the number of sexual partners he had;"

   c.    During class Plaintiff "discussed 'skinny dipping' with a woman who was not your wife with the students in the class;"

   d.    During class Plaintiff "recounted [his] visits to a Spa World, a Korean Spa in Centreville, VA, allegedly known for human trafficking and public nudity, and encouraged the students of the class to go together."

288.    As discussed *supra* Paragraph 252, Plaintiff's discussion about oral sex within the context of exhibitionism and paraphilias was protected academic discourse, was not detailed, and was observed by another professor conducting a peer evaluation who gave Plaintiff a positive review of his teaching and interactions with students.

289.    The reference to Plaintiff's wife as part of the "skinny dipping" allegation evidences bias, and potential gender bias, on the part of either Complainant 2 or Dr. Hammat depending on the origin of the precise wording. The allegation suggests that Plaintiff was expected to comport with traditional notions of marriage, fidelity and monogamy or else be branded a sexual harasser. As discussed with respect to Complainant 1's nearly identical allegation, this allegation was disproven by witnesses that confirmed that Plaintiff did not discuss skinny dipping. Plaintiff also provided Dr. Hammat with stellar student evaluations for Course B.

290.    The Spa World allegation, which referred to "human trafficking" also evidences bias against Plaintiff, implying that he had knowledge of, or participated in, human trafficking.

One need only conduct a Google search of Spa World to see that it is a legitimate business. While conducting a Google search in preparation for his appeal, Plaintiff found that there were allegations against the spa for human trafficking that came to light *after* Complainants 1 and 2 took Plaintiff's classes.[64] When recommending Spa World to students Plaintiff had no knowledge of these alleged activities. As discussed *supra* Paragraph 274, Plaintiff recommended a variety of activities and business to students, including with respect to managing the stresses of graduate school.

291.    After Complainant 2 took Course A and Course B, she and Plaintiff maintained a cordial, professional relationship. In July 2014, Complainant 2 emailed Plaintiff "quick favor? I owe you a beer" in which she asked Plaintiff to resubmit a letter of recommendation for a funding application for her research. Upon being asked by Complainant 2, Plaintiff had also written a recommendation letter for her first submission. This email was provided to Dr. Hammat.

292.    Omitted from Complainant 2's allegation that Plaintiff shared the number of sexual partners he had was any context, including that *Complainant 2* asked Plaintiff to disclose that information during class. This conversation took place on the last day of Course A. On the first day of class, Plaintiff told students that as a return favor for them sharing personal information throughout the semester, through discussions and thought papers, on the last day of class they could ask Plaintiff anything they wanted. In response to Complainant 2's question, Plaintiff responded with nothing more than a number.

293.    Complainant 2 provided no evidence of harm, or that her access to her education or GMU activities were impacted by the alleged incidents. At most, Complainant 2 expressed to Dr. Hammat discomfort with the subject matter discussed in class. As noted in a 2003 Dear Colleague

---

[64] https://wjla.com/news/crime/court-documents-report-mistreatment-at-spa-world-in-virginia-104749.

Letter issued by the OCR, sexual harassment "must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive."[65]

    **2.**    **Dr. Hammat's Erroneous Finding**

294.    On February 22, 2019, Dr. Hammat emailed Plaintiff a "Letter of Determination" with respect to Complainant 2's allegations. As with Complainant 1, on December 4, 2018 Dr. Hammat informed Plaintiff of potential violations of Policy 2006-14 but found that Plaintiff violated "University Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence."

295.    As with Complainant 1, Dr. Hammat failed to apply the preponderance of the evidence standard, merely stating "CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-Based Harassment."

296.    Dr. Hammat's finding was based on: i) Plaintiff's discussion of exhibitionism and paraphilias in Course A (which received a positive peer evaluation); ii) Plaintiff's recommendations about Spa World; iii) Plaintiff's discussion of cultural differences in the Middle East and going to a beach with his female tour guide, which Dr. Hammat described as an "intimate encounter" even though "student witnesses…did not recall 'the skinny-dipping' element of the story;" and iv) the conversation, prompted by Complainant 2, about the number of Plaintiff's sexual partners.

297.    As with Complainant 1, Dr. Hammat added allegations to the Letter of Determination including Complainant 2's statement that "[Plaintiff's] behavior is an issue of the [Department] and it contributed to a toxic environment where learning is more difficult. While [Plaintiff] is not responsible for anyone's behavior but his own, the fact that he is unaware of what

---

[65] *See* https://www2.ed.gov/about/offices/list/ocr/firstamend.html

transpires in his lab or if aware does not take meaningful steps to intervene, is grossly negligent as an educator." Plaintiff had no opportunity to respond to these allegations during the course of the investigation. Complainant 2 only took Courses A and B with Plaintiff and, apart from their few interactions during that time, Complainant 2 and Plaintiff had no individual contact. Complainant 2 spent *no time* in Plaintiff's lab. This was never questioned.

298.    The Letter of Determination provided no information about sanctions, including about who would determine same.

299.    Dr. Hammat's letter was vague as to the reasoning for the determination. Although alluding to conversations and interviews with others, or documents gathered through the investigative process, Plaintiff was not privy to any such information or "evidence," making it extremely difficult to fully appeal the finding. Names of witnesses were not divulged. Plaintiff was told he could appeal the determination in writing to Mr. Williams.

**C.    Complainant 3**

**1.    The Allegations and Lack of Supporting Evidence**

300.    On December 4, 2018 Dr. Hammat emailed Plaintiff concerning Complainant 3's allegations, addressing the email to "Complainant 3" as opposed to Plaintiff.

301.    The email noted "potential violations" of the 2014-2015 and 2015-2016 Sexual Misconduct Policies. The allegations dated as far back as November 2014.

302.    The 2015 and 2016 Grievance Procedure required complaints to be filed within 180 days absent a showing of extenuating circumstances. Thus, Complainant 3's allegations—reported in 2018—were timed out and should not have been investigated. The delay in reporting was never questioned by Dr. Hammat or Mr. Williams.

303.    Complainant 3 alleged as follows:

- At a professional conference on November 21-23, 2014, Plaintiff gave the presentation that Complainant 1 had complained about, *which was about human sexuality*, at which Plaintiff discussed working at a pornography store, and made "explicit reference to sexual acts" and utilized slides containing "images of naked women." Plaintiff "invited [Complainant 3] to attend this talk, knowing she was a first year graduate student and had been an undergraduate in his classes previously."[66]

- At the same conference, Plaintiff pulled Complainant 3's boyfriend aside (who was also Plaintiff's graduate student) and made a derogatory remark to the boyfriend about whether he was having sex with Complainant 3. Plaintiff then high-fived Complainant 3's boyfriend when learning the two were in a committed relationship.

- At a happy hour soon after the conference, Plaintiff approached Complainant 3, said he knew about her relationship with her fellow graduate student, hugged her and congratulated her. Plaintiff then told Complainant 3 he "knew how to keep secrets" and bought her a drink on his tab.

- In mid-February 2015, Plaintiff hosted a party at his home for graduate students in his lab and commented on the penis size of Complainant 3's boyfriend.

- In Spring 2016, while attending a professional conference, Plaintiff hugged Complainant 3 and told her he overheard a conversation with her companion. Plaintiff told Complainant 3 "she didn't have to worry because he knew how to keep secrets" and would not tell her boyfriend what he overheard.

- In Spring 2016, when Complainant 3 broke up with her boyfriend and fellow graduate student, Plaintiff stopped her in the hallway, hugged her and said "I'm not mad and I still think highly of you." Plaintiff indicated that he wanted to work with her in the future and commented that she was intelligent, attractive and creative and expressed that he hoped they could work together on projects, despite the breakup.

304.    With respect to Complainant 3's first allegation about the November 2014 conference, there was a factual error because Complainant 3 was never an undergraduate student in any of Plaintiff's courses. The allegation also demonstrates biased thinking—that it would somehow be inappropriate for a male professor to invite an adult, female graduate student to attend a public presentation about human sexuality that is grounded in peer-reviewed research. Plaintiff

---

[66] Notably, first-year graduate students are typically over 21 years of age.

stated during the investigation that he had no recollection of specifically inviting Complainant 3 to the presentation, but even if he had this would not be a ground for a claim of sexual harassment.

305.    Plaintiff's presentation was not aimed at a particular audience, nor was it directed at Complainant 3. Plaintiff made the presentation to hundreds of people at multiple organizations (including at a large conference at GMU) without a negative comment or complaint. The slides in the presentation did not focus on "naked women" but couples involved in intimate moments. The images were no more revealing than one would see in fashion advertisements or advertisements for perfume or cologne.

306.    Regarding Complainant 3's allegation that Plaintiff made derogatory comments about her to her boyfriend while at the conference, Plaintiff explained to Dr. Hammat, and in his appeal, that he did not recall making the derogatory comments. Nor did Plaintiff recall high fiving Complainant 3's boyfriend. Plaintiff also did not recall having a conversation of this nature in Complainant 3's presence. Plaintiff and Complainant 3's boyfriend often engaged in banter of a personal nature about their relationships and other topics. Plaintiff still has a close working relationship with him, and he did not mention that he was offended or disturbed by any conversations Plaintiff had with him while he was dating Complainant 3. Had Plaintiff known that any offense was taken by anything Plaintiff said, Plaintiff would have remedied the situation. If such a conversation took place in front of Complainant 3, and had Plaintiff known she was offended by it, Plaintiff also would have taken steps to remedy the situation, including by apologizing.

307.    With respect to Complainant 3's allegation about the subsequent happy hour, no evidence was uncovered during the course of the investigation to support this allegation, which

Plaintiff did not recall this ever happening. Dr. Hammat confirmed in her Letter of Determination, discussed *infra* that there was no corroborating evidence to support this allegation.

308.    With respect to Complainant 3's allegation that at a party in mid-February 2015 Plaintiff commented on her boyfriend's penis size, neither Plaintiff nor Complainant 3's boyfriend recalled such a conversation occurring (as per the Letter of Determination).

309.    Plaintiff presented evidence to Dr. Hammat that, on the Monday after the party, Complainant 3 reached out to Plaintiff and said:

> You're [sic] research has even invaded the yuppie/hippie filled aisles of Whole Foods! Spread the word. Thanks again for having us to your house on Friday! Lovely house and adorable children. See you soon.

The tenor of this email contradicts that anything occurred at the party that made Complainant 3 uncomfortable. Notably, in February 2015, she was not a student of Plaintiff's and there was no need for her to send this email.

310.    With respect to Complainant 3's allegations concerning the Spring 2015 conference, Plaintiff told Dr. Hammat that Plaintiff's recollection was that he was at a restaurant with multiple colleagues from around the United States. One table away, sitting on the same side facing Plaintiff were Complainant 3 and another person. Complainant 3 asked Plaintiff to come over and meet her friend. Plaintiff did not hear what she was talking about because there was a row of people between them. Plaintiff did not say anything about what she said to her friend or say anything about Complainant 3's boyfriend.

311.    Even if the uncorroborated allegation about what Plaintiff said to Complainant 3 at the Spring 2016 conference were true, it would not support a finding of sexual or gender-based harassment. While Complainant 3, who was not a student of Plaintiff's at the time, claimed to be "very uncomfortable" from the alleged conversation, she subsequently asked Plaintiff whether she

could be part of one of Plaintiff's lab's research projects and asked Plaintiff for letters of reference for a grant, which she obtained. Complainant 3's actions once again contradicted her claims. Accordingly, her conduct should have discredited any allegation of sexual harassment.

312.    With respect to Complainant 3's allegation concerning Plaintiff's conversation about her breakup in Spring 2016, Plaintiff did not recall any conversation with Complainant 3 in which Plaintiff referenced her appearance or called her "attractive." As Plaintiff told Dr. Hammat, and noted in his appeal, Plaintiff did not recall any conversations in his 15 years at the University in which he told any graduate student that he or she was attractive. Plaintiff said it was possible that he hugged Complainant 3 briefly, as had happened as a quick greeting with some students in the past. For example, when Plaintiff's graduate students came over to his house, it was customary for them to hug each other hello or goodbye. Complainant 3 regularly hugged Plaintiff, Plaintiff's wife, and numerous other people when visiting Plaintiff's house. Plaintiff served on the dissertation committees of 18 doctoral students, including Complainant 1. Plaintiff briefly hugged male and female students when congratulating them on the completion of their dissertations. Many of the faculty on these committees did the same.

**2.    Dr. Hammat's Erroneous Finding**

313.    As in the cases of Complainants 1 and 2, Dr. Hammat's Letter of Determination with respect to Complainant 3 changed the policy under which Plaintiff was found responsible. Dr. Hammat's December 4, 2018 email referenced the 2014-2015 and 2015-2016 Sexual Misconduct Policies, while the Letter of Determination stated that it was alleged that Plaintiff "engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence."

314.   Dr. Hammat again failed to apply the preponderance of the evidence standard, stating "CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment," without specifying the definitions that were applied, or which version of Policy 1202 was relied upon.

315.   The Letter of Determination included references to *uncorroborated* evidence to *support* the finding such as:

      i.   witnesses provided "differing details" as to whether Plaintiff made a derogatory comment to Complainant 3's boyfriend at the November 2014 conference;

      ii.   "[d]ue to [a] lack of corroborating witnesses, the investigator was unable to confirm" whether Plaintiff "hugged [Complainant 3] at a bar and offered to buy her a beer on your tab;" and

      iii.   The graduate student who was dating Complainant 3 did not recall a conversation at a party in February 2015 where Plaintiff referenced his penis size, though he recalled the details of other conversations that occurred.

316.   The Letter of Determination also altered the original allegations against Plaintiff, stating that Complainant 3 had alleged that, in Spring 2016, when Plaintiff allegedly stopped Complainant 3 in the hallway to discuss the breakup with her boyfriend, he "hugged her tightly and for too long."

317.   The Letter of Determination also stated that "[a] non-student witness confirmed that [Complainant 3] told her about this interaction in real time, corroborating this interaction." It is unclear what the "non-student witness" corroborated. Plaintiff did not have an opportunity to address that witness's statement because the University withheld this evidence from him.

318.   The Letter of Determination also changed the  allegations concerning the discussion that Plaintiff had with Complainant 3 and her friend at the conference in Spring 2016:

      Complainant 3 alleged that…after enjoying a dinner with her colleague and venting about her relationship she realized you were sitting behind her. When she introduced you to her colleague, she said you hugged her and whispered that you

heard what she said about [Complainant 3's boyfriend] but that, her secret was safe with you and that you knew how to keep secrets. Complainant 3 said this was the first time you made it seem like secrets between the two of you were a good thing. She said that made her very uncomfortable. During the investigation, you said you were facing [Complainant 3] and she saw you the whole time. A non-student witness provided photo evidence of you sitting behind [Complainant 3].

319.   During the investigation, Plaintiff was not provided a copy of the photograph referred to in the Letter of Determination or given an opportunity to respond to the new allegations. Plaintiff expressed concern to Mr. Williams that an anonymous "non student witness" was taking photographs of Plaintiff at the conference which were then provided to the University *over two years later* as some form of evidence of alleged wrongdoing. Upon information and belief, GMU's Title IX investigators did not question this disturbing fact. Regardless, even if there were a discrepancy in Plaintiff's testimony about where he was sitting at a dinner over two years earlier, this fact was irrelevant to what was allegedly discussed. Complainant 3's allegations did not support a claim of sexual or gender-based harassment.

320.   The Letter of Determination contained the following new allegation of which Plaintiff was not previously notified:

> [Complainant 3] felt that when you included her 'attractiveness' in the 'reasons' provided for wanting to work with her, she felt like that was a grooming behavior.

321.   In his appeal, Plaintiff' response to this allegation was that the language used, here, suggested that Complainant 3 was coached by a third party when preparing her statement to CDE. As previously noted, to Plaintiff's recollection he did not reference Complainant 3's appearance or "attractiveness" at any point in time. Assuming that Plaintiff had referenced her attractiveness, the phrase "grooming behavior" is defined as psychological and emotional manipulation utilized by an abuser against a vulnerable victim, most frequently a child, with the

**A90**

aim of carrying out a sexual relationship in private. None of the complainants, including Complainant 3, alleged that Plaintiff made any sexual advances towards them because Plaintiff did not. Moreover, Complainant 3's allegations—that Plaintiff allegedly noted her attractiveness, hugged her on two occasions, 2 years apart in public places, and made offensive comments to her boyfriend—do not fit within the definition of grooming behavior.

322.    The Letter of Determination also added the following new allegations of which Plaintiff was not previously notified:

> She recalls deliberately removing herself from future research opportunities with you based on these concerning behaviors. She stressed it was hard to describe the number of times when she felt offended, objectified and demeaned as a result of chronic sexual harassment from you. [Complainant 3] stated, '[t]he impact [Plaintiff] had on my productivity and curriculum are disturbing. I turned down a grant opportunity, that same grant for which he wrote a letter of recommendation, because I could not spend another year in this program. The abusive tactics [Plaintiff] used only exacerbated the helplessness I felt across all of the situations described above here.

This appears to be from a written statement, which Plaintiff was not permitted to review during the course of the investigation.

323.    As part of his appeal, Plaintiff submitted evidence demonstrating that this allegation of harm was wholly inaccurate:

> a.    There were no research opportunities on which Plaintiff and Complainant 3 had planned to work together. Complainant took one class with Plaintiff for one semester in Fall 2014.

> b.    From November 2015 to December 31, 2015, Complainant 3 was 1 of approximately 9 students Plaintiff funded for a project that involved writing short literature reviews (10,000 words each). Complainant 3 worked with Complainant 4 on one literature review. Plaintiff's contact with Complainant 3 took place by email or in a group setting. There were no one-on-one meetings.

> c.    In December 2015, post-dating a number of the events alleged by Complainant 3, she emailed Plaintiff about the project "[i]t was a great experience, especially learning to write for a different audience. I really appreciated your feedback along the way and am grateful that I got to be involved with such a good

group of people!" In this email, Complainant 3 asked to be paid more because she believed she took more of a lead role over Complainant 4 when drafting a particular chapter. Complainant 3 was the only student who made such a request.

d.      In 2016, a graduate student "JD," who joined Plaintiff's graduate program the same year as Complainant 3 in the fall of 2014, switched labs so that Plaintiff could be his mentor. For the first two years of the program, JD and Complainant 3 worked together in another professor's lab. When JD switched labs, he continued a project with Complainant 3 and his previous mentor. They asked Plaintiff to come on board to avoid it being awkward for JD to continue the research with the advisor he left. Plaintiff was copied on some emails and read a few documents, such as an internal George Mason grant submission for graduate students. Plaintiff only met with JD, who was now working in Plaintiff's lab and meeting with Plaintiff weekly about research. Plaintiff did not meet with Complainant 3. Plaintiff does not know what happened to the project. As part of his appeal, Plaintiff provided Mr. Williams with the last email Plaintiff received about the project in July 2017. Plaintiff did not respond because he was not actively involved or interested in the project.

e.      In November 2016, Complainant 3 contacted Plaintiff and asked Plaintiff if she could be part of his research team for a particular study. Complainant 3 heard about the research through her boyfriend, who suggested to Plaintiff that they bring Complainant 3 on board because she was interested in the area of research. At the time, they had enough people working on the project and Plaintiff told Complainant 3 as much. Complainant 3 was not asked to be on any of Plaintiff's lab teams, nor did she ever work in Plaintiff's lab. Accordingly, she could not have decided to turn down or "remove herself" from future research opportunities with Plaintiff.

f.      In July 2017 Complainant 3 asked Plaintiff to write her a letter of recommendation for a second submission for a predoctoral grant. Plaintiff had also written a recommendation letter for her first submission. Plaintiff was not part of the planned project. Complainant 3 intended to conduct research with her mentor. It was Plaintiff's understanding that Complainant 3 was seeking the grant to pursue an area of study in which Plaintiff was not conducting research.

g.      Complainant 3's statement about turning down the grant because she could not "spend another year in the program" was also easily discredited by the fact that her mentor told the faculty that Complainant 3 was not interested in pursuing a research career. Along with the rest of the faculty, Plaintiff was informed by Complainant 3's mentor that she turned down the grant for this reason. That occurred at a faculty meeting that took place during the 2017-2018 academic year. Had Complainant 3 wished to pursue a research career, she could have used the grant money for the Fall 2018 and Spring 2019 semesters, as it did not stipulate that she would have had to stay an additional year in the program.

Complainant 3's allegations of harm were clearly contradicted by this evidence, which was explained at length in Plaintiff's appeal. Her statement should have been discredited. There was no evidence to support a sexual or gender-based harassment claim against Plaintiff with respect to Complainant 3.

### D. Complainant 4

324.    Complainant 4 is a female graduate student who worked in Plaintiff's lab, co-authored a number of published papers with Plaintiff, and, with Plaintiff's assistance, secured a prominent internship that resulted in her full-time employment in the private sector after she graduated from a GMU doctoral program in May 2019.

325.    Complainant 4 volunteered herself as the lab's social director. She organized a number of events for the lab, including while she, Plaintiff and other students were away at professional conferences.

326.    As a researcher who studies sexuality, and as part of months of work with Complainant 4 on presentations and a publication related to a research study of pleasurable and intimate sexual intercourse, Plaintiff and Complainant 4, and students in his lab, talked about sexuality. Plaintiff talked about sexuality with students working with him on sexuality-related scientific research, including Complainant 4. Plaintiff and Complainant 4 had hundreds of hours of conversations, only a small portion of which concerned sexuality-related topics.

327.    In May 2016, Complainant 4 wrote a letter to a fellow graduate student recounting her experiences after one year in Plaintiff's lab. This letter was an exemplar of Complainant 4's communication style as a graduate student, with Plaintiff and others in the lab. The opening greeting to her colleague was "Dude/chief/yo bitch." The letter was also laden with expletives and

intimate associations that Complainant 4 subjectively attributed to working in the lab. Complainant 4 talked about sex from the time of her graduate interview onward.

328.    Complainant 4 touted the research she and Plaintiff conducted on sexuality on social media. She regularly praised the lab and its culture. She told Plaintiff that she was "unbelievably proud and grateful to be part of this lab family." In a self-evaluation in April 2018, Complainant 4 wrote that the lab provided her with the opportunity to "understand and be understood," skills that "will serve me in my career to change people's lives," "Friends with whom I can discuss anything" and "unforgettable memories." When interviewing for jobs in Spring 2018, Complainant 4 texted Plaintiff "thank you so much. I wouldn't even be interviewing at these places if it weren't for you and the badass experiences we get as grad students through you. And more yet to come."

329.    During the course of her studies, and at Complainant 4's request, Plaintiff met her parents. Complainant 4 asked the Plaintiff to meet her mother when she visited the campus, and her father when he visited the campus.

330.    While a member of Plaintiff's lab, Complainant 4 was often criticized by her colleagues for seeking more credit than she deserved and not always pulling her weight in the lab. Criticisms of Complainant 4's work came from other graduate students in the Plaintiff's lab, graduate students in other labs including Complainant 3, and Complainant 4's co-mentor, who met with her dozens of times.

331.    Plaintiff had a close, professional and positive relationship with Complainant 4 until September 2018, when Plaintiff removed Complainant 4 from his lab. As her interests waned from clinical research and moved towards working in the private sector, Complainant 4's lab contributions suffered and she encountered disagreement from her colleagues with respect to co-

authorship and participation. Complainant 4 failed to deliver work-related products for quite some time before and during this transition period and Plaintiff and Complainant 4's co-mentor thought it best that she no longer participate in lab activities. Complainant 4's potential removal was discussed at length with lab personnel and a decision was made by Plaintiff to remove Complainant 4 from the lab. Complainant 4 was asked to leave the lab because she had been focusing all of her attention on her new job and her work for the lab was suffering. Complainant 4 agreed with this assessment in person and in electronic communications. Plaintiff did not hear from Complainant 4 after that.

332.    A short time after she was terminated, Complainant 4 and her friends filed Title IX complaints against Plaintiff. This was not questioned by Dr. Hammat or Mr. Williams.

**1. The Allegations and Lack of Supporting Evidence**

333.    The December 4, 2018 email from Dr. Hammat to Plaintiff stated that Complainant 4 alleged "potential violations" of the 2016-2017 and 2017-2018 Sexual Misconduct Policies. Dr. Hammat then incorrectly stated that Plaintiff "shared information during your instruction in [Course A during] the spring semester of 2013 in and during the instruction of [Course B] in the spring semester of 2014." Complainant 4's allegations did not concern these courses.

334.    With the exception of allegations concerning events that occurred in August 2018, the remainder of Complainant 4's allegations were also timed out under the applicable 2016 and 2017 Grievance Procedures, which require reports to be made within 180 days. There was no evidence of circumstances beyond Complainant 4's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

335.    Complainant 4 alleged:

- On December 9, 2016, Plaintiff invited the students from his lab to his home for drinks and hot tubbing. Plaintiff shared stories about his experience at a brothel in Germany.

- On January 20, 2017, while attending a professional conference, Plaintiff and his graduate students went to dinner and then to the bar for drinks. Plaintiff left the bar with another woman attending the conference and then provided explicit sexual details about that encounter the next day to his graduate students;

- During the first week of class in the fall of 2017, Plaintiff gathered the graduate students from the lab for a gathering at Oh George! Tables & Taphouse with Complainant 4 and several other students. Plaintiff discussed an erotic massage he experienced in Thailand;

- During the spring of 2018, Plaintiff asked a student "Student 1[67]" what kind of pornography she liked/watched while at Oh George! Tables & Taphouse and asked her repeatedly to provide an answer when she tried to avoid the conversation;

- While attending a conference in March of 2018, after going to dinner with his graduate students, Plaintiff took his graduate students to a strip club called the Clermont Lounge. A fellow student bought a lap dance for Complainant 4, which Plaintiff took a photo of and made reference to future blackmail against her;

- On August 6, 2018, while attending an academic conference with graduate students (Complainant 4 and others), Plaintiff shared the details of a sexual experience he had in "Hanoi, Thailand" with a 24-year old woman while presenting a professional workshop. Plaintiff also told his students his wife had "given [him] a free pass" to have sex with whomever he wanted while in Hanoi.[68]

- While in the campus laboratory setting, Plaintiff engaged students in frequent conversations about sex and the pursuit of women as sexual vessels;

- Through favoritism, Plaintiff made it clear to his students that opportunities for research, supervision, and consulting was dependent on how Plaintiff viewed them and if they were willing to engage in sexual conversations with him.

---

[67] Plaintiff is using "Student 1" to protect this student's identity.
[68] As with other allegations discussed *supra*, the reference to Plaintiff's wife—either by Complainant 4 or Dr. Hammat—is evidence of bias against Plaintiff.

- Plaintiff created a toxic, verbally abusive environment, using profanity and demeaning language with his graduate students tasked with lab management. These occurred in person, over email, and through the Slack messaging system.

336.    Concerning the allegation that Plaintiff engaged students in frequent conversations about sex and the pursuit of women as sexual vessels, completely overlooked by Dr. Hammat in electing to investigate this allegation was the fact that such conversations about sex, and attitudes around sex, were part of the research conducted in the lab. Complainant 4 assisted Plaintiff in conducting research for a number of articles about human sexuality, including physically pleasurable sexual activity, including orgasms, and the influence of physical touch, intimate and non-intimate, on human emotions. Plaintiff provided references to the articles co-authored by Complainant 4 to Dr. Hammat and Mr. Williams.

337.    Regarding Complainant 4's allegation that Plaintiff "repeatedly" asked Student 1 about pornography during a conversation at a bar, Plaintiff did not specifically recall Student 1 having a negative reaction to the discussion. Notably, Student 1 did not file a complaint against Plaintiff.

338.    Plaintiff explained to Dr. Hammat, and in his appeal to Mr. Williams, that he and his students were having a group discussion about pornography because Plaintiff and his colleague were trying to obtain access to data from Pornhub.com for future research. They were discussing pornography as a useful methodological tool to capture people's true sexual interests, a method that they found to be far better than the questionnaires they used in the past, specifically the research that Plaintiff had recently conducted, and published, with Complainant 4. They were discussing ways to improve upon this work. They also discussed recent books that were published on the science of pornography. This was a typical conversation about the research conducted in Plaintiff's laboratory. In fact, one of the reasons Plaintiff and Complainant 4 attended the

professional conference on August 6, 2018 (of which Complainant 4 also complained) was to listen to talks by leading researchers on pornography. Complainant 4 specifically asked Plaintiff to get her one of three graduate student invitations Plaintiff was allowed. Most relevant, Plaintiff and Complainant 4 published an article on how physical intimacy leads to meaning the next day. Complainant 4 initiated interest in conducting another study from the same dataset on whether watching pornography on a given day influences the frequency and quality of real-world sexual activity. This led to a conversation on whether the existing assessment of pornography use was too rudimentary because it failed to measure what people watched. To illustrate this point, a discussion ensued about the sheer variety of porn people are interested in and whether content influences real-world sexual activity.

339.    Once again, CDE mischaracterized protected academic discourse about ongoing research as sexual harassment. There was no evidence that Student 1 alleged any harm from what was discussed, nor was there any evidence that Plaintiff did anything more than ask her a question within the context of their discussion about research. The conversation was not aimed at students of a particular gender, sexual orientation or gender expression, nor could asking Student 1 a question about pornography in the context in which it was asked constitute sufficiently severe and pervasive conduct to create a hostile environment that harmed *Complainant 4*.

340.    In June 2019, Student 1, a graduate student of Plaintiff's, approached Plaintiff and told him that she had been interviewed during the Title IX investigation and that she denied that anything Plaintiff had discussed with her was problematic. She told Plaintiff that, during her interview, she said that Complainant 4's allegation about Plaintiff repeatedly asking Student 1 about pornography was untrue. Student 1 further told Plaintiff that she did everything in her power to stop the "nonsense" and the false allegations against Plaintiff.

341.    Regarding the allegation that Plaintiff discussed his experience at a brothel while "hot tubbing," in December 2016 Plaintiff invited his graduate students to his home for dinner to celebrate the end of the semester. Plaintiff explained to Dr. Hammat and Mr. Williams that having people in a hot tub, in their swimsuits, is no different than being in a pool. There was never a point of time where anyone was alone in the hot tub with anyone else.

342.    Plaintiff acknowledged that he discussed his trip to Germany as part of a larger discussion with his lab students, who were involved in research concerning human sexuality at the time, about many different topics. Complainant 4 actively participated in the conversation. She made multiple comments about being glad to hang out with the lab in this manner. The three other students that participated in this conversation should have been able to corroborate Complainant 4's active participation in the conversation, as well as the dynamic that existed when the five of them were together discussing a multitude of topics while socializing. Plaintiff does not believe the investigators asked them questions about this. He had no way of knowing since he was denied access to evidence that could confirm this.

343.    Within days of attending the party, Complainant 4 sent Plaintiff an unsolicited email stating that she was "unbelievably proud and grateful to be part of this lab family. [H]aving you as a mentor has change the course of my entire life…thank you for being you. with love, [Complainant 4]." This directly contradicts Complainant 4's allegation, made nearly two years later, that her participation in this social gathering harmed her in any way or that she was uncomfortable with the conversation which covered a range of topics, not just the discussion about Plaintiff's trip to Germany.

344.    Regarding the conversations that took place at the conference in January 2017, Plaintiff informed Dr. Hammat that at the conference there was a mutual and voluntary group

discussion with his graduate students about sexual encounters that occurred on the trip. At the time, Plaintiff did not have the impression that anyone was uncomfortable discussing their sexual activities. Nor did Complainant 4, who regularly volunteered information about her sex life to the group, allege that she experienced any discomfort or harm as a result of participating in the conversation.

345.    Regarding Complainant 4's allegations that during a conference in March 2018 Plaintiff took his graduate students to a strip club called the Clermont Lounge. Plaintiff agreed that he went to the Clermont Lounge and received a lap dance. What Complainant 4 left out of her narrative is that she—not Plaintiff—organized the trip to the Clermont Lounge.

346.    The Clermont Lounge is a kitschy place that can be found in most mainstream travel books on the best of Atlanta. It has been operating for over fifty years and is an old establishment that is part bar, part karaoke bar, and is known as a relic. It is part of the tapestry of Atlanta and as such was featured on The Travel Channel when Anthony Bourdain explored Atlanta in Season 2, Episode 4 of The Layover.[69] It also appeared on CNN's best places to eat and drink in Atlanta.[70]

347.    While at the conference, Complainant 4—an Atlanta native—invited Plaintiff and three other graduate students in Plaintiff's lab to go out after dinner to what Complainant 4 described as a "seedy" Atlanta bar. Plaintiff provided evidence that Complainant 4 was the organizer of the trip. Complainant 4 selected the location because no one else was familiar with Atlanta. Complainant 4 went on her smartphone and looked up the Clermont Lounge, explained that the place is on lists of the best places to visit in Atlanta, and organized/ordered Uber rides. While at the bar, which had a strip club component, Complainant 4 purchased a lap dance for

---

[69] https://www.travelchannel.com/shows/the-layover/episodes/atlanta
[70] https://www.cnn.com/travel/amp/atlanta-neighborhoods/index.html

92

**A100**

another graduate student. That graduate student refused the lap dance. When the woman said it was already paid for, Complainant 4 directed the lap dance to Plaintiff. Plaintiff took a photo of Complainant 4 getting a lap dance and the two did joke about Plaintiff using the photo for blackmail. There was no evidence that Plaintiff had, or ever would, use such a photo against Complainant 4 or that it was anything other than the two joking around.

348.    In a group chat the day after the trip, Complainant 4 stated "Thanks for dinner and everything last night…everything I could have hoped for in a first titty bar." In the same chat, one of the graduate students thanked Complainant 4 "for taking us out. Always a good time."

349.    In an email Complainant 4 sent to Plaintiff less than two months after the conference, Complainant 4 referred to "seedy Atlanta bars (and their bathrooms)" as "bonus" "unforgettable memories" from her time in the lab.

350.    Plaintiff received no explanation as to how his agreement to participate in a plan to go to the Clermont Lounge, organized by Complainant 4, and her purchase of a lap dance for him, accompanied by mutual joking around, constituted sexual harassment. As part of his appeal, Plaintiff acknowledged that once he realized that Complainant 4 had taken the group to the Clermont Lounge *because of* its strip club component that he should have bowed out and returned to his hotel. However, Plaintiff denied engaging in discriminatory behavior towards Complainant 4.

351.    Prior to submitting his appeal, Plaintiff learned from a graduate student that Complainant 4 often organized sex-related activities for her colleagues while they were at conferences. On a trip that Complainant 4 took to Tokyo and Japan with her colleagues, including graduate students in Plaintiff's lab, several of whom were witness names that Plaintiff provided to Dr. Hammat, Complainant 4 appointed herself the tour guide and took students to a sex shop.

While at the shop, she proceeded to violate rules about restricted access to certain areas of the shop.

352.    This was yet another example of Complainant 4's behavior within the context of the graduate program, demonstrating that she was comfortable with such activities, and undermining her credibility with respect to any alleged offense upon hearing the few stories Plaintiff shared with his lab students within the context of discussions related to sexuality. Like the trip to the Clermont Lounge, Complainant 4 listed Japan as an unforgettable memory in an email to Plaintiff in April 2018. Complainant 4's credibility was not questioned by Dr. Hammat or Mr. Williams.

353.    Regarding Plaintiff's conversation with graduate students about an experience he had in Hanoi, Vietnam, Plaintiff acknowledged that during the course of the August 2018 conference he and his graduate students engaged in several hours of discussion and that his experience in Hanoi arose as a topic of conversation. Complainant 4 expressed no discomfort with the subject matter. After the conference she sent out a group chat volunteering information about a romantic relationship she was in.

354.    Regarding Complainant 4's allegation that, during a Fall 2017 gathering at a local bar, Plaintiff discussed an erotic massage he received in Thailand, Plaintiff denied this allegation because he has never received an erotic massage in Thailand.

355.    The hundreds of pages of documents and communications, that Plaintiff provided to Dr. Hammat, and in support of his appeal—including Complainant 4's own words—flatly contradicted Complainant 4's allegations concerning favoritism, or that Plaintiff created a toxic environment in the lab.

2.  **Dr. Hammat's Erroneous Finding**

94

**A102**

356.    On February 22, 2019, Dr. Hammat emailed Plaintiff a Letter of Determination with respect to Complainant 4's allegations. Like the other Letters, Dr. Hammat stated that it was "alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason's University *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*."

357.    Dr. Hammat did not apply the requisite preponderance of the evidence standard as indicated by her statement that "CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment."

358.    The allegations in the Letter of Determination were expanded upon, and Plaintiff had no opportunity to respond during the investigation.

359.    Regarding the dinner party at Plaintiff's house in December 2016, Complainant 4 embellished her allegations:

> [Complainant 4] said she felt "stuck" and unable to leave the conversation discreetly. She said she felt extremely uncomfortable with the conversation, given the setting. During the investigation, you confirmed that you invited your graduate students (from the lab) to your home for an end-of-the-semester gathering for drinks and food. You also confirmed that you and your graduate students ended up in the hot tub, discussing life, wellness, research, and a recent sexual experience you personally had in Germany.  This was corroborated by several student witnesses.

Plaintiff submitted a wealth of evidence regarding Complainant 4's manner of communication with Plaintiff and the other graduate students which contradicted her allegations of discomfort, including Complainant 4's unsolicited email within days of the party stating "[H]aving you as a mentor has changed the course of my entire life…thank you for being you. with love, [Complainant 4]." This email was provided to Mr. Williams as part of Plaintiff's appeal.

360.    The Letter of Determination further embellished Complainant 4's allegations concerning the January 2017 conference, stating that Plaintiff solicited information from his graduate students about their sexual encounters at the conference:

> [Complainant 4] alleged that while attending the…conference… you and several graduate students met up with other attendees from the conference and took them back to your respective hotel rooms. She said the next morning, you and the other students discussed in detail what happened the night before. You asked for explicit details about their sexual encounters. You confirmed that you met someone at the conference and that you and your graduate students discussed the prior evening's sexual activity the next morning at breakfast. Several student witnesses and one non-student witness corroborated this event.

361.     Plaintiff was not given access to the evidence, and was unable to respond to the statement of the "non-student" witness. Nor was it clear exactly what facts were corroborated. However, Plaintiff reiterated in his appeal that the conversation that took place was mutual, voluntary and only a small part of the conversations had during the conference. Complainant 4 routinely volunteered personal information about her sex life with the group and it is unclear how a mutual conversation of a sexual nature, amongst individuals researching human sexuality, constituted sexual harassment with respect to Complainant 4.

362.     Complainant 4's allegations concerning the fall 2017 happy hour were also amended. First, Complainant 4 alleged that Plaintiff said he had an erotic massage in Thailand. In the Letter of Determination, it was alleged that Plaintiff talked about a "happy ending" erotic massage that he received in Sri Lanka. In his appeal, Plaintiff stated that these allegations were untrue because he had never had an erotic massage in Thailand or Sri Lanka and would, accordingly, not have discussed this subject.

363.     The Letter of Determination stated that several students corroborated Plaintiff's account that he discussed "research trends, wellness, disfunction, and sex" with his graduate students. The Letter of Determination—ignoring that Plaintiff researched sex extensively with those graduate students—also stated that one student offered "[Plaintiff]likes to talk about sex. A lot."

364.     The Letter of Determination further stated for the first time:

[Complainant 4] said having time away from the lab and the opportunity to work in a professional environment that would never tolerate the conversation or circumstances she experienced while working for [Plaintiff]. Only now does she feel able to articulate how inappropriate the power imbalance of [Plaintiff's] mentorship was. She conveyed that the way [Plaintiff] viewed her (including her sexual behaviors) had an effect on his decisions for how he handled graduate assistantships, authorship on papers, and consulting opportunities.

365.    It does not appear that Complainant 4 referenced the fact that she was fired in the context of her sudden realization that harm had allegedly occurred as a result of working in Plaintiff's lab. Regardless, Plaintiff submitted a wealth of evidence in support of his appeal which directly contradicted Complainant 4's allegations that Plaintiff's alleged behavior had any impact on her academic and career opportunities, including:

a.      Over the course of the approximately two years that she worked in Plaintiff's lab, [Complainant 4] was given credit as a co-author on five published articles and three conference presentations. Complainant 4 never earned first authorship because she never completed any project that she led.

b.      During the time that she worked in Plaintiff's lab, [Complainant 4] also received funding from 2 consulting projects to conduct research. As her interests waned from clinical research and moved towards working in the private sector, her lab contributions suffered and she encountered disagreement from her colleagues with respect to co-authorship and participation.

c.      [Complainant 4] obtained an internship for Summer 2018 because of her work in Plaintiff's lab. Plaintiff wrote her primary reference for that job. Nearly her entire curriculum vitae was populated with accomplishments tied to her work with Plaintiff. This should have raised questions about whether [Complainant 4] had motive to tarnish Plaintiff's reputation with false allegations of harassment in order to prevent Plaintiff from discussing Complainant 4's poor performance with her current or future employers.

d.      In response to [Complainant 4's] new allegations of harm, Plaintiff submitted their relevant text and email communications from April 2018 through August 2018, when they attended the conference at which Plaintiff discussed Hanoi. The correspondence showed that after [Complainant 4] began working at her new job in May 2018, she continued to communicate with Plaintiff enthusiastically, including about attending the conference, as well as catching up in person about her new job. In August 2018, [Complainant 4] told Plaintiff that the company for which she interned offered her a job after graduation, making a six-figure salary. Around the same time, she and Plaintiff communicated about

removing [Complainant 4] from a paper they had been working on, to which she agreed, stating "I have a different perspective on priority right now and basically need to crank on all things that get me graduated, which the…paper is not." In September 2018, Plaintiff asked [Complainant 4] to leave the lab because she was not conducting the research required for the projects to which she was assigned. At that point, she told the lab team that her interests in the research had waned and she was interested only in doing what was required of her to graduate.

## VIII.    **The Complainants' Bad Faith Reporting**

366.    Section X of the 2018-2019 Sexual Misconduct Policy, and previous versions,

required that allegations of sexual harassment or sexual misconduct be made in good faith:

> All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under the University's Student Code of Conduct and disciplinary action under the appropriate Employee disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

367.    In his appeal, dated March 28, 2019, Plaintiff outlined evidence showing that the

complainants acted in bad faith when filing Title IX complaints against Plaintiff:

- The student evaluations and peer-review evaluation demonstrate that Plaintiff engaged in no conduct that created a hostile environment while teaching Course A in Spring 2013.

- Student witnesses refuted the allegation that Plaintiff discussed "skinny-dipping" with a while teaching Course Bin Spring 2014.

- Student evaluations for Course B demonstrated that Plaintiff engaged in no conduct which created a hostile environment. As did Complainant 1's and Complainant 2's conduct in the months after class had ended.

- Complainant 1's allegations regarding "Baumeister Day" were proven to be completely unfounded.

- Complainant 4's allegations of harm were completely unfounded as evidenced by her consistent praise of the lab, its culture and the unforgettable memories she made while being a part of it. Her time line of when she allegedly discovered that she

experienced harm did not fit with the nature of text messages she sent to Plaintiff in August 2018.

- Complainant 4's communications with Plaintiff and members of the lab, including the social activities she organized for the group to strip clubs and sex shops, contradicted any allegation that she was uncomfortable with discussing topics of a sexual nature and that, instead, she actively pursued such discussions and activities. Without prompting, Complainant 4 expressed interest in leading a research study with existing lab data on whether pornography use influences the frequency and quality of real-world sexual activity.

- Complainant 4 was terminated from the lab group because she was not meeting expectations in fulfilling her obligations to the lab. Less than two months later she filed a report against Plaintiff for sexual harassment, seeming to change her allegations as the investigation progressed.

- Complainant 3's allegations of harm were utterly contradicted by her conduct in seeking letters of reference from Plaintiff and sending him unsolicited emails, including one praising the party at which she claimed he made her uncomfortable. Her mentor's statements to the faculty—made well before any report was made against Plaintiff—show that she turned down a research grant for reasons wholly unrelated to any alleged discomfort with remaining in the program.

- Complainant 3's unfounded allegation, introduced verbally, as a surprise, by Dr. Hammat in the second interview with Plaintiff, that Plaintiff had sexual relations with students. When Plaintiff asked about this, Dr. Hammat said Complainant 3 did not witness it, only heard it in gossip from another student, and did not want to reveal who the student was and had no behavioral evidence. There was no evidence to support this.

368.    In Plaintiff's appeal, he urged CDE to investigate whether any of the complainants acted in bad faith in making allegations against him that were readily disproven by the evidence. Upon information and belief, CDE failed to consider this.

369.    On April 1, 2019, Plaintiff filed a conduct complaint against Complainant 4, under the Student Conduct Code and the 2018-2019 Sexual Misconduct Policy, for "providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct." Plaintiff's complaint outlined the various falsehoods, contradictions and inconsistencies in Complainant 4's allegations, as well as Plaintiff's

belief that Complainant 4—who was upset by being fired—solicited her friends to file complaints against Plaintiff. GMU took no action with respect to Plaintiff's complaint.

## IX.   Mr. Williams Denies Plaintiff's Appeal

370.    On or about March 28, 2019, Plaintiff submitted a comprehensive appeal to Mr. Williams, outlining the significant procedural irregularities in the Title IX process. The procedural irregularities included: i) the Title IX process employed by the University denied Plaintiff of the due process protections Plaintiff should have been afforded as a tenured member of the faculty; ii) the Title IX investigators erroneously equated speech protected by the First Amendment with sexual harassment; iii) the investigators made numerous errors with respect to each report alleged; and iv) CDE made determinations against Plaintiff that were not supported by the evidence.

371.    As discussed *supra*, Plaintiff also questioned whether, based on the lack of credible evidence supporting the complainants' allegations, the University should have investigated whether certain complainants should be disciplined for violating Section X of University Policy 1202 for submitting false or misleading information about Plaintiff in bad faith or with a view toward personal gain.

372.    Plaintiff submitted new evidence on appeal that refuted the findings made in the Letters of Determination, a number of which were based on allegations of which Plaintiff had no notice as they appeared in the Letters of Determination for the first time.

373.    On April 11, 2019, Mr. Williams denied Plaintiff's appeal. His response letter failed to address the majority of Plaintiff's arguments, new evidence, and questions regarding the complainants' violations of the Policy.

374.    For the first time, Plaintiff learned that GMU had interviewed "12 individuals including [Plaintiff]." Mr. Williams did not disclose the identities of those individuals or state why their statements and other evidence had not been shared with Plaintiff during the investigation.

375.    Mr. Williams discounted the fact that "the reporting parties and others participated in the sexually-charged environment" because of the "objective" negative effects of "hyper-sexual conversations/interactions between a faculty member and graduate students under his supervision and instruction." Mr. Williams' analysis appeared to occur in a vacuum, failing to account for the explicit subject matter that Plaintiff and his students were discussing and researching. The categorization of the environment as "hyper-sexual" and disregard of the evidence showing that Complainant 4 in particular was an initiator and organizer of conversations and activities that centered around sex, also demonstrated bias against Plaintiff.

376.    Mr. Williams further stated that students "explained that they felt as if they had to participate [in sexual conversations] to remain in your favor." Yet, as outlined *supra*, certain of the complainants who reported this false allegation were not students in Plaintiff's lab, and/or had minimal contact with Plaintiff other than taking Course A and/or Course B. Thus, there would be no reason for them to be in Plaintiff's "favor." There was no allegation, or evidence, that Complainants 1-3 participated in sexual conversations. The evidence also showed that Plaintiff assisted Complainants 1-4 with their professional advancement, whether through recommendations, consulting projects, or co-authorship. All of the Complainant sent Plaintiff *unsolicited* emails—some when they were no longer his students—praising his work and mentorship.

377.    With respect to Complainant 4, any allegation that favoritism was based on sexual conversations with students was disproven by the evidence submitted by Plaintiff demonstrating a

number of opportunities that Complainant 4 received commensurate with the level of work she put into each project. Complainant 4 had issues with others in the lab which had to do with her lack of work ethic—not whether or not she participated in discussions about sex. Evidence submitted by Plaintiff during the investigation, and on appeal, showed that Complainant 4 was "hyper-sexual" with the entire lab team, organized sex tours in Japan and to a strip club (and then lied about Plaintiff organizing the trip), and communicated with colleagues using profanity and sexual language on a regular basis. That Dr. Hammat and Mr. Williams attributed the regular, overtly sexual behavior of an adult woman in her mid-twenties to Plaintiff—despite any evidence of a correlation—suggests that their assumptions were based on gender bias, including the idea that Complainant 4, as a female, was incapable of behaving in such a manner absent the coercion of a male authority figure.

378.    It is clear that Mr. Williams never questioned the complainants' motives.

379.    Included in Mr. Williams' reasons for upholding Dr. Hammat's findings were: i) "[n]umerous conversations between you, and graduate students under your supervision and instruction, about sex;" ii) "occasions where students under your supervision visited your home hot tub;" and iii) "you asking probing questions about pornography preferences and the dating/sex lives of students." Mr. Williams did not explain why having students swim in a hot tub constitutes sexual harassment or a hostile environment[71] and rejected Plaintiff's numerous assertions that much of the allegations concerned protected academic discourse. Mr. Williams' letter upholding Dr. Hammat's decision declared "occasions" where students visited Plaintiff's hot tub when in fact, there was only a single time.

---

[71] Indeed, members of the faculty, including a female professor, regularly invite students to their homes for pool parties.

380.    Mr. Williams' also mischaracterized Plaintiff's discussion of his sexual encounters as "frequent,"[72] when Plaintiff stated on more than one occasion that he spent hundreds of hours with the graduate students in his lab and only a small percentage of that time involved discussions about sex. Mr. Williams also found Plaintiff responsible for taking "a trip to a strip club with students during a professional conference"—ignoring that it was not Plaintiff who took the graduate students but Complainant 4—who omitted that detail from her account to the investigator. Plaintiff acknowledged that he should have left upon realizing that the outing involved the strip club component of the Clermont Lounge which Complainant 4 had described as a "seedy dive bar."

381.    The tone of Mr. Williams' response to Plaintiff's appeal insinuated that female graduate students in their mid-twenties are in need of parenting by professors, and that they should not be held accountable for participating in the activities in question. Yet the OCR's 2001 Guidance clearly states that when a student "actively participates in sexual banter and discussions and gives no indication that he or she objects"—and later lodges a complaint—"the evidence generally *will not support a conclusion that the conduct was unwelcome*." *Id.* at p. 8 (emphasis added).

382.    On April 25, 2019, Plaintiff's counsel informed Mr. Williams that Plaintiff had been approached by students asking whether the University punished him for engaging in sexual

---

[72] At a mandatory workshop for faculty and students which took place in 2017, the University's facilitator discussed his personal sex life, including his BDSM practices, including being a submissive and the use of whips. Unlike the conversations that Plaintiff engaged in with his students, the information shared by the facilitator had no relevance to the topics being discussed. No one took issue with this presentation. In August 2019, GMU included a "Sexual Chocolate" event in its orientation programming for first year undergraduate students, run by the Student Support and Advocacy Center, which included a post-party with "complimentary chocolate cake, a tutorial on how to use dildos, and take away prizes of squeeze toys modeled as eggplant and peaches." https://www.thecollegefix.com/university-hosts-sexual-chocolate-sex-ed-event-as-part-of-freshman-orientation/. This type of "hyper-sexual" discourse with students, who were under the impression that attendance was mandatory, was University approved. A female facilitator ran the event.

misconduct. At that point, no sanctions had been issued. The students asked Plaintiff whether he had been prohibited from taking on new graduate students for the upcoming year. Plaintiff's counsel informed Mr. Williams that there was no basis in any University policy for informing the complainants or any faculty about the prohibition that Dr. Renshaw had imposed (albeit improperly).

383.    On April 26, 2019, Mr. Williams responded to Plaintiff's counsel stating "we cannot impose 'gag orders' on parties to prevent them from sharing information." Mr. Williams further "advised" that "Title IX regulations" recommend that "sanctions that are directly related to the complainants, be shared."

384.    The 2017 Guidance states that for "proceedings not covered by the Clery Act such as those arising from allegations of harassment…the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and any other steps that the school has taken to eliminate the hostile environment, if the school found one to exist." An example of a sanction that could be disclosed to a reporting party per the 2017 Guidance is a no-contact order. Thus, GMU's disclosure of Dr. Renshaw's prohibition against Plaintiff taking on graduate research assistants to any complainant would not have been in keeping with the 2017 Guidance, and violated Plaintiff's right to privacy as an employee of the University.

**X.    GMU Faculty Members Confirm Faculty Proceedings Lack Due Process**

385.    On May 15, 2019, multiple members of the GMU faculty, among them Dr. Renshaw, sent a letter to University President Angel Cabrera, Provost Wu, and Senior Vice President Carol Kissal. The faculty members sent the letter to express their "grave concerns

**A112**

regarding the handling of cases of allegations made against faculty members and to request immediate actions." Although the letter's authors did not name the specific faculty members they were concerned about, stating that they would protect their confidentiality, they explained that they were sending the letter outlining their broader concerns, based on their review of cases of complaints about alleged faculty misconduct that were submitted to CDE via the Title IX office and to HR.

386.    Upon information and belief, the letter and recommendations were prompted by the mishandling of Plaintiff's Title IX proceedings, which afforded him no due process protections. The concerns raised in the letter confirmed that the Title IX proceedings to which Plaintiff was subjected violated his right to due process as a tenured faculty member.

387.    The letter's authors noted several ways in which faculty members have not been afforded procedural due process in the handling of these allegations, having reviewed extensive documentation provided by multiple faculty members.

388.    The letter's authors further pointed out that the violations of due process were inconsistent with Section 2.10.2 of the Faculty Handbook, which asserts that all parties involved in such allegations have a right to procedural due process, as well as principles of institutions such as the American Association of University Professors (https://www.aaup.org/issues/appointments-promotions-discipline/faculty-misconduct-and-discipline-2005) and the Foundation for Individual Rights in Education (https://www.thefire.org/research/fire-guides/fires-guide-to-due-process-and-campus-justice/fires-guide-to-due-process-and-fair-procedure-on-campus-full-text/).

389.    Additionally, the letter's authors pointed out, the violations "are reflective of a general lack of clearly specified processes and procedures for handling such allegations, such as those that exist in Faculty Handbook Sections 2.6.2, 2.9.3, 2.10.9, and 2.11.2, as well as those that

exist in the context of other University policies (e.g., https://diversity.gmu.edu/about/grievance-procedures)."

390.    The letter's authors listed ways in which due process appears to have been violated in the cases they reviewed, as well as specific requests they make. The list was as follows:

1. <u>Lack of appropriate notification of allegations brought to HR</u>. In cases involving allegations to HR, faculty members were not informed of the existence of allegations before a meeting – rather, they came to the meeting completely unprepared to have allegations verbally levied against them. We note that, in the case of allegations made to Title IX, faculty members have received general notification that allegations had been made when receiving a meeting request.

2. <u>Inadequate opportunity to respond to allegations</u>. First, *in several cases, faculty members received no written description of allegations upon notification or even prior to being interviewed about the allegations*. This is more variable in Title IX cases, with some faculty receiving formal, written descriptions and others receiving only an informal email summary of allegations, after requesting such a summary (and after having been interviewed). In HR cases, faculty members either never received a formal written summary of allegations or received a written summary only after a formal letter substantiating the allegations was inserted in their personnel file. Moreover, in at least one HR case, the faculty member was never formally interviewed with an opportunity to fully respond to the allegations.

3. <u>Presumption of guilt/Biased investigations</u>. In at least one HR case, a faculty member was removed from all contact with staff and students *during an investigation* (and without following procedures specified in Faculty Handbook Section 2.10.9). *In multiple HR cases, the faculty members provided evidence from other parties that contradicted the allegations, but we saw no indication that such exculpatory evidence was addressed in the ultimate findings.*

4. <u>Attempts to coerce confessions</u>. In HR cases, faculty members reported multiple instances during which supervisors or representatives of HR tried to "force" them to admit to the allegations, including statements that things would be "easier" if they did confess.

5. <u>Lack of timely communication</u>. In HR cases, email records indicate that faculty members frequently received no response to their requests for updates, or that such updates came only after inordinately long periods of time.

6. <u>Lack of clarity in presenting evidence that supports decisions</u>. The standard for making a decision in Title IX cases is stated as the "preponderance of evidence," *but evidence provided in letters of determination is minimal*. There is no established standard for making a decision in HR cases, nor is there clear evidence provided in supporting decisions.

7. <u>Inadequate appeal process</u>. In line with the fact that there are no clear published policies or procedures to guide investigation of allegations made to HR, there was no clear indication of an opportunity to appeal the findings of the HR investigations. *In the case of appeals of Title IX findings, the individual who reviews the appeal **is** the VP of CDE, who is the direct supervisor of the Title IX office. This would seem to present a lack of independent objectivity in reviewing appeals.*

8. <u>Lack of consistency in processes and sanctions</u>. The handling of potential removal from duties during an investigation is inconsistent across cases. Moreover, the severity of sanctions varies greatly across cases as well, with little relation to variation in the severity of allegations.

*Id.* (emphasis added).

391.    The letter's authors proposed following potential remedies:

1. Representatives from HR, CDE, and other relevant administrative offices work with representatives of the Faculty Senate to establish a clear set of guidelines and procedures for handling allegations against faculty members that will protect the rights of both complainants and respondents. This work should utilize external consultants as needed, and draw on best practices at other universities and in other relevant offices. The guidelines and procedures should address all of the problems described above and any other identified issues, including but not limited to:

> a. The authorization under which Human Resources is charged with conducting an investigation of faculty behavior should be clearly described in writing.

> b. The completed set of guidelines and procedures under which the investigations are to be conducted should be published in writing.

> c. Respondents in cases should be notified in writing that they may have an advisor present during all meetings.

>  d. A set of guidelines and procedures for appealing a determination should be published in writing. Appeals should be reviewed by an independent set of individuals who have not yet been involved in the case.

2. Representatives from HR, CDE, and other relevant administrative offices work with representatives of the Faculty Senate to establish a clear set of guidelines and procedures for issuing sanctions other than dismissal (which is already addressed in the Faculty Handbook). This work should utilize external consultants as needed, and draw on best practices at other universities and in other relevant offices.

3. For all investigations of alleged faculty misconduct that are ongoing or that have been concluded within the last two years, the administration work with faculty representatives (designated by the Faculty Senate) to evaluate whether findings of investigations were impacted by any of the issues enumerated above, and if so, reopen those investigations if desired by the respondent for that case. This work should utilize external consultants as needed.

4. Upon completion of guidelines and procedures for issuing sanctions and renewals (see #2), for all cases in which sanctions of faculty members are currently in place, the administration work with faculty representatives (designated by the Faculty Senate) to evaluate whether those sanctions are consistent with the newly established guidelines and procedures. If not, that group should work to realign the sanctions with the newly established guidelines.

5. If the volume of work for #3 and #4 above is large enough to warrant it, faculty representatives involved in the work should be compensated for their time through either course releases or stipends that are commensurate with the workload.

392.    On May 21, 2019, Provost Wu and Executive Vice President Carol Kissal responded to the Faculty Senate Executive Committee that GMU was requesting the University Auditor to conduct a formal internal audit to determine if GMU's policies and procedures concerning faculty misconduct allegations are in alignment with "Commonwealth law, our bylaws, faculty and employee handbooks, and other requirements." The University Auditor would also compare GMU's policies and procedures to those at other universities. Dr. Renshaw was appointed to a "multi-constituent committee" tasked with assessing how to improve existing procedures.

**XI.    Dr. Renshaw Imposes Sanctions Tantamount to Dismissal**

393.    On May 31, 2019, Plaintiff received a letter from Dr. Renshaw outlining the disciplinary sanctions to be imposed on Plaintiff (the "Sanctions"). The Sanctions included:

1. Plaintiff's participation in sexual harassment prevention training, to be identified by CDE.
2. From the date of the letter until **August 15, 2021**:
   a. Plaintiff will be restricted in his mentorship, supervision, and teaching of graduate students in the following ways:
      i.   Graduate students currently conducting research under Plaintiff's mentorship and supervision will be asked to meet with the Department Chair to discuss their experience working with Plaintiff and be given the opportunity to switch to a different mentor/supervisor, while Plaintiff is not permitted to discuss the meeting or the students' decision with those students at any time;
      ii.  Plaintiff will be ineligible to recruit new graduate students to work under his mentorship or supervision; and
      iii. Plaintiff will be ineligible to teach graduate courses.

b.  Plaintiff will be restricted in his mentorship, supervision, and professional relationship with any graduate or undergraduate students who elect to remain under such mentorship/supervision in the following ways:

    i.  Plaintiff may only communicate with GMU students through GMU email and servers, with such communications subject to review at any time by the University;

    ii.  Plaintiff may only meet with students on campus in an open setting. If he engages in meetings with students at professional conferences or at another academic site, these must occur in an open setting, and must be reported in advance (or, if arranged on an impromptu basis, as soon as possible afterward). Any meetings that occur off-campus (except for those at professional conferences or other academic settings that are reported to the Chair) may result in additional disciplinary actions; and

    iii.  Plaintiff may only interact with students, if outside of meetings, at department and professional events where other faculty members are present. Any interaction outside of such events may result in additional disciplinary action.

3.  Plaintiff will further be under regular review of his conduct with students throughout the probationary period and such reviews may include random assessment of his interactions with students and solicitation of feedback from students. By the end of the Fall 2020 semester, Plaintiff's Department Chair, in consultation with the Dean, will make a determination based on the reviews, about whether there has been sufficient behavioral change to allow Plaintiff to resume graduate teaching and/or mentorship or supervision of graduate students in Fall 2021. If a positive decision is made, the decision will be subject to change if any violations of the terms described above are subsequently revealed.

4.  If Plaintiff is allowed to resume teaching, mentoring, and/or supervising graduate students at any point in the future, Plaintiff's Department Chair, in consultation with the Dean, will make the determination if any continuing restrictions or conduction are necessary.

394.    A copy of the sanction letter was permanently placed in Plaintiff's personnel file. The sanctions imposed on Plaintiff were vague without definitive end-dates, burdens to meet, or prescribed guidelines for Plaintiff to follow. Essentially, Plaintiff was left to wonder if he will ever

be able to resume his teaching and research efforts in any meaningful way. The sanctions are tantamount to dismissal because they have effectively prevented Plaintiff from fulfilling his duties as a full professor and there are so many conditions in effect that Plaintiff could be prevented from ever teaching, or conducting research with graduate students, again.

395.    The sanctions required Dr. Renshaw to solicit commentary from Plaintiff's existing graduate students, during meetings at which he would ask whether they want to change advisors, compromising the confidentiality of the Title IX proceedings and raising questions that would not have otherwise been present in the minds of Plaintiff's students.

396.    The restrictions imposed on Plaintiff's teaching and research will have a long lasting, chilling effect on his work because he has been deemed ineligible to recruit new graduate students to work under his mentorship or supervision, or to teach graduate courses until at least Fall 2021.

397.    The sanctions also include vague monitoring and reporting requirements which have necessitated a number of conversations about the manner in which Plaintiff must comply with them, and in fact are solely in Dr. Renshaw's discretion. The monitoring and reporting requirements are excessive and involve every circumstance in which Plaintiff encounters, meets with, or even has a phone conversation with any GMU student. They are also vague enough that it will be easy for Dr. Renshaw to argue that a violation occurred, even if it was not clear from the language of the letter. Consequently, Plaintiff is in near constant communication with Dr. Renshaw regarding the minutiae of Plaintiff's daily work to ensure a violation will not occur.

398.    At the end of Dr. Renshaw's letter, he suggested that the disciplinary measures taken against Plaintiff could be indefinite: "If you are allowed to resume teaching, mentoring,

and/or supervision of graduate students in the future, your Department Chair, in consultation with the Dean, will make the determination if any continuing restrictions are necessary."

399.    Plaintiff's compensation has also been affected by the erroneous findings and resulting sanctions. He is ineligible for salary increases, as well as any merit-based pay raises, for an indefinite period of time.

XII.    **Plaintiff Files A Grievance Regarding Violations of His Constitutional Rights**

400.    On June 7, 2019, Plaintiff filed a grievance with the applicable Faculty Grievance Committee against GMU, Mr. Williams, and Dr. Renshaw for violating Plaintiff's rights under the First Amendment and Fourteenth Amendment of the United States Constitution, as well as for imposing "severe and unwarranted restrictions and monitoring requirements" concerning Plaintiff's teaching and supervision of graduate students, which – as explained above – are tantamount to dismissal of his teaching position (hereinafter, "Plaintiff's Grievance"). Notably, the procedure for filing such a grievance, as well as the person to whom said grievance should be submitted were not posted on any GMU website and Plaintiff's counsel had to seek direction from GMU's counsel. The Faculty Grievance Procedures available online, and which are still in effect, date back to 2009. The Committee members listed on the University's website were also outdated.

401.    As explained in Plaintiff's Grievance, CDE and Mr. Williams ignored the issues of academic freedom raised by stale (in some cases over five years old) allegations, relying on the protected academic discourse to find Plaintiff responsible for violating University Policy concerning sexual and gender-based harassment. Instead, Mr. Williams simply dismissed the discourse as "non-pedagogical" despite Plaintiff's evidence to the contrary. As Plaintiff restated for the Grievance Committee, the CDE findings should have been reversed by Mr. Williams due

to the numerous procedural errors, clear bias, and lack of any credible evidence that Plaintiff violated the Policy.

402.    As Plaintiff explained in his Grievance, Mr. Williams mischaracterized the complained-of statements, as well as the context in which the statements were made, despite the high volume of contradictory behavioral evidence Plaintiff had submitted. Mr. Williams did so in order to fit into the narrative of a "hostile environment."

403.    Furthermore, as Plaintiff explained, Mr. Williams disregarded the fact that Plaintiff was given no time to review the evidence against him nor cross-examine his accusers, and he overlooked the fact that witness testimony contradicted the complainants' allegations with respect to what was discussed in Plaintiff's classroom.

404.    Plaintiff further reiterated the violations to his due process rights which he previously outlined in his appeal, including: (i) lack of faculty involvement in the Title IX proceedings against him; (ii) no recitation of specific charges against Plaintiff or notification of which policies and procedures applies and/or were being employed by CDE; (iii) adding allegations to the Notices of Determination that were not the basis of the original complaints while failing to provide Plaintiff any opportunity to respond to them; (iv) investigating allegations that went well beyond the 180-day limit set forth in the applicable policies and involved students who no longer attended GMU; (v) investigating under a presumption of guilt; (vi) withholding from Plaintiff all of the evidence collected during the investigation, and (vii) failing to inform Plaintiff of the manner in which sanctions would be determined.

405.    Plaintiff also explained the ways in which Dr. Renshaw violated Plaintiff's due process rights, as well as the conditions of Plaintiff's employment, by banning Plaintiff from taking on graduate student research assistants for the Fall 2019 semester *before* the Letters of

Determination had been issued or Plaintiff's appeal had been decided. Furthermore, Dr. Renshaw directed Plaintiff to reject the students he had already interviewed for a previously approved position to work in Plaintiff's lab in Fall 2019, which subsequently raised questions and concerns and compromised the confidentiality of the Title IX process.

406.    Additionally, Plaintiff explained in his Grievance that Dr. Renshaw violated Plaintiff's conditions of employment through the restrictions he imposed on Plaintiff. Plaintiff discovered that Dr. Renshaw was the individual designated by the University to impose disciplinary action on Plaintiff as a result of CDE's determination. However, there was no transparency in the process and no information was provided to Plaintiff by the University as to how sanctions or other "corrective measures" would be decided or imposed. Upon information and belief, Dr. Renshaw was unable to review the evidence against Plaintiff, reverse the findings, or request Faculty Committee involvement in the proceedings or sanctioning decision.

407.    On June 19, 2019, Plaintiff received a response from the Grievance Committee, which read that the committee found that no prima facie case existed with respect to Plaintiff's allegations against Dr. Renshaw because his decision to prohibit Plaintiff from taking on graduate students in Fall 2019—before any decision was made in Plaintiff's case—fell "within the period of investigation and its aftermath."

408.    The Grievance Committee then relied on the CDE Grievance Procedures implemented in March 2019, to find that Dr. Renshaw was the appropriate party to formulate "corrective actions."

409.    The Grievance Committee also relied on the March 2019 Grievance Procedures— which post-dated the allegations and CDE's investigation and findings—to note "the University

may also take corrective action even if no discrimination and/or unlawful harassment is found, but the Responding Party is found to have engaged in inappropriate workplace behavior."

410.    The Grievance Committee then found that Plaintiff was not entitled to confidentiality concerning the sanctions or the Title IX proceedings during Dr. Renshaw's meetings with students because Dr. Renshaw's actions were not "governed by CDE investigation procedures." The Grievance Committee then stated, without specifying the policies, that Dr. Renshaw's actions were in keeping with "CDE publicly available policy."

411.    In deciding Plaintiff's Grievance, the Grievance Committee ignored that the due process and First Amendment issues raised by Plaintiff were also raised several weeks earlier by the Faculty Senate.

XIII.    **Plaintiff's Colleagues File Grievance Against Plaintiff**

412.    In June 2019, during a meeting with Student 1, also discussed *supra* Paragraphs 340, Plaintiff was informed by Student 1 that faculty in the Department were telling their students about the Title IX proceedings and sanctions against Plaintiff. Student 1 reported this to Dr. Renshaw who denied that this was occurring, even though Student 1 provided Dr. Renshaw with the name of a male student who told Student 1 that he had learned about the allegations against Plaintiff from a faculty member. Student 1 told Plaintiff that "several" faculty members were spreading rumors about what had occurred.

413.    On July 23, 2019, a female professor in charge of one of the programs within Plaintiff's Department ("Professor 1")[73] asked for a meeting with Plaintiff and Dr. Renshaw to discuss "pressing business."

---

[73] Plaintiff is referring to this professor by pseudonym so that his identity is not disclosed by association with this individual.

114

414.    The three met the next day, on July 24, 2019. At the meeting, Professor 1 told Plaintiff that, because of the Title IX finding, he would need to disaffiliate from the program, otherwise the program would lose its accreditation. Professor 1 minimized the impact that disaffiliation would have on Plaintiff's career.

415.    Professor 1 told Plaintiff that she had spoken anonymously with the organization providing the accreditation and confirmed that Plaintiff's disaffiliation was recommended. Professor 1 stated that Plaintiff would not be able to re-affiliate with the program until after the last currently enrolled student left for internship (approximately 5-6 years).

416.    As explained in more detail *infra*, Plaintiff subsequently spoke anonymously with the Director of the Office of Program Consultation and Accreditation at the organization providing the accreditation where the director stated "there is not an accreditation requirement that an individual come forward" and there are "no mandatory reporting requirements." Thus, the Plaintiff learned that the statements about the organization made by Professor 1 were not true.

417.    Apart from her dishonesty, Professor 1 had no authority to unilaterally amend the sanctions already imposed on Plaintiff by Dr. Renshaw under any University policy, or otherwise.

418.    On July 29, 2019 Plaintiff informed Professor 1 by email that he was not disaffiliating from the program, noting, among other things, that this was not part of the sanction issued by Dr. Renshaw, and the fact that all three of his existing graduate students (two females, one male) expressed interest in continuing their research with Plaintiff.

419.    In response, led by Professor 1, On August 8, 2019, a group of Plaintiff's colleagues (7 female professors and 1 male professor) filed a grievance against Plaintiff and Dr. Renshaw (the "Program Grievance") with the same Faculty Grievance Committee that declined to proceed with Plaintiff's Grievance. Notably, the Faculty Handbook states in Section 2.11.2.1.a., "Grievance

115

Procedures," that "No grievance may be heard on behalf of a third party or group." Notably, a number of the female professors named in the grievance had strongly protested against GMU's hiring of Brett Kavanaugh.

420.    In a letter to Plaintiff, the Grievance Committee summarized the grievance as follows:

1.  Whether sufficient disciplinary action was taken by Dr. Renshaw in response to the findings that [Plaintiff] violated University Policy, 1202 "sexual and gender-based harassment and other interpersonal violence."  More specifically, whether Dr. Renshaw has, in his authority per the Office of Compliance, Diversity and Ethics, acted appropriately to protect the…Program …including its faculty, students, and ethical responsibilities.

2.  Whether your (Plaintiff's) unprofessionalism (established by findings of violations of University Policy 1202 "sexual and gender-based harassment and other interpersonal violence") potentially places the …Program… including its faculty, students, and ethical responsibilities, at risk.

421.    First and foremost, it was wholly inappropriate and a violation of GMU's Policy that confidential proceedings were divulged to Plaintiff's colleagues. Plaintiff was not aware that his colleagues had been informed about the Title IX investigation and outcome, which were communicated to Plaintiff to be confidential proceedings.

422.    The Program Grievance requested new, additional sanctions to be added to existing sanctions following the Title IX office's investigation of the allegations. Per the Grievance Committee's statement in response to Plaintiff's Grievance, which cited the March 2019 Grievance Procedures, only Plaintiff's supervisor was responsible for determining "corrective actions." On this ground, alone, the Grievance Committee should have declined to review the Program Grievance.

423.    The Program Grievance requested that Plaintiff disaffiliate from the program. The new request went far beyond what was asked of Plaintiff following receipt of the Title IX office

116

sanctions. A request to disaffiliate was the opposite of reintegration, which was the aim of the sanctions imposed by Dr. Renshaw. Disaffiliation could be viewed as a form of banishment from a program that Plaintiff heavily contributed to and helped establish. Disaffiliation was a particularly harsh punishment in light of the due process violations detailed in Plaintiff's appeal and Plaintiff's Grievance, and reiterated to his colleagues in his August 13, 2019 response to the Program Grievance.

424.    Plaintiff also learned that the foundation of the Program Grievance—the program's accreditation with a national organization—was untrue. Plaintiff called the organization anonymously, as had Professor 1, and learned that the organization expected universities to rely upon internal disciplinary regulations and procedures to handle allegations of "unethical" behavior or misconduct. Plaintiff spoke to two representatives at the organization, one is the current Director of the Office of Program Consultation and Accreditation, who told him that the Title IX finding and resulting sanctions did not put the University's accreditation at risk. The organization looked at whether a program had policies and procedures in place, including whether those policies and procedures ensured due process for faculty and students alike—the Program Grievance ignored the lack of due process in Plaintiff's case, instead electing to rely on the erroneous findings of Dr. Hammat. The Program Grievance also mischaracterized the allegations, and evidence, at issue in the Title IX proceedings.

425.    The Program Grievance failed to address the three graduate students who wished to continue their work with Plaintiff. These students met with Dr. Renshaw as part of the sanction and were asked if they wanted to switch mentors—they said no. Notably, each of the three graduate students overlapped with Complainant 4 and her allegations of a hostile environment. All three graduate students contradicted this allegation of a hostile environment and chose to continue

117

working with Plaintiff. Upon information and belief, two of these students were interviewed as witnesses in the Title IX investigation and their testimony, which refuted any allegation of a hostile environment, was ignored.

426.    The only graduate students who had shown interest in Plaintiff's research at GMU are in the program led by Professor 1. The primary reason for Plaintiff's productivity and success has been his graduate students. The Program Grievance filed against Plaintiff to disaffiliate was a disastrous proposition for Plaintiff's research program at GMU and the graduate students who are devoted to his research.

427.    On August 12, 2019, Plaintiff met with Dr. Renshaw to plan for his attendance at upcoming faculty meetings, including with the professors who had filed the Program Grievance. At that meeting, Plaintiff learned from Dr. Renshaw that Professor 1 was able to obtain copies of the Title IX findings—and potentially more documentation—from CDE without Plaintiff's knowledge or consent. Upon information and belief, Professor 1 also shared those documents with the professors who filed the Program Grievance. Despite this conversation with Plaintiff, Dr. Renshaw continued to insist that faculty learned information about Plaintiff's case through the complainants.

428.    At the meeting, Plaintiff and Dr. Renshaw discussed ways in which *Plaintiff* might quell the hostile environment that had been created by the faculty against him in response to the one-sided misinformation being spread around the Department. In a subsequent email to Human Resources, Dr. Renshaw acknowledged the "difficult working environment" that Plaintiff was being subjected to and asked for a Human Resources representative to assist Plaintiff with any plans to address the faculty with respect to the Title IX findings.

429.    The faculty meeting with Professor 1 and colleagues was scheduled to take place on August 29, 2019. A Human Resources representative emailed Plaintiff after work hours on the evening of August 28. By that point Plaintiff had decided that he was not interested in having a discussion with the faculty about what had happened, and that he had no obligation to explain anything to his colleagues during the pendency of a grievance against him. He expressed this to Dr. Renshaw, who said he would speak to Professor 1, because they needed a "plan in place" for the meeting.

430.    At the last minute, Professor 1 "cancelled" the planned faculty meeting and then held a meeting without Plaintiff. Upon information and belief, the Title IX findings and sanctions were discussed at this meeting.

431.    A second program faculty meeting was organized by Professor 1 and held on September 4, 2019. Shortly prior to the meeting, Professor 1 informed Plaintiff that she requested that an HR representative attend the meeting. Professor 1 made clear that the faculty was not interested in questioning him about the investigation which she asserted was "conducted by qualified investigators who heard both sides and a decision was rendered."

432.    On September 4, 2019, Plaintiff attended the meeting with Professor 1, Dr. Renshaw, and the other faculty members behind the Program Grievance. At the meeting, Plaintiff gave a brief statement that he disagreed with the findings and that he had provided a wealth of evidence to CDE which contradicted the allegations. Plaintiff did not go into details about the case.

433.    During his statement, Plaintiff was interrupted by a female professor who had previously attempted to interfere with Plaintiff's promotion to full professor (and had mentored Complainant 1 prior to her graduation). This professor threatened to resign from the program if

Plaintiff was not disaffiliated and attacked Plaintiff's character and reputation, saying that he should not be allowed near students. Plaintiff did not respond to the rage-filled tirade.

434.    A male professor told Plaintiff that some students were disinterested in working with Plaintiff because they had heard rumors.

435.    Later in the meeting, a second female professor said he should not be allowed near students and also said she could not work in the program if Plaintiff remained affiliated. She told Plaintiff he was selfish for not agreeing to disaffiliate from the program, his reputation was already shattered and staying in the program would only make it worse. This professor also referenced a Facebook post on Plaintiff's personal page from Fall 2018 (shortly before the Title IX complaints were filed) that had "offended faculty and students" because it referred to a published article using a sexual metaphor. During the Title IX investigation, Plaintiff had posited to Dr. Hammat, and to Mr. Williams on appeal, that the Facebook post caused faculty who disagreed with Plaintiff's political ideology, and even the subject matter of his research and teachings, to solicit complaints from female students to create a false narrative of sexual harassment.

436.    Several professors at the meeting mentioned that they were afraid of litigation and saying or doing the wrong thing. Others said that Plaintiff must be planning a legal action or else he would be trying to show them that he was innocent.

437.    On September 10, 2019, the Faculty Grievance Committee found against Plaintiff with respect to the Program Grievance. In doing so, the Grievance Committee relied on Section 2.10.2 of the Faculty Handbook as follows "Faculty members must also adhere to the ethical standards of their respective professional associations and to university policies related to professional ethics." The portion of Section 2.10.2 that the Grievance Committee overlooked states "*In all cases*, all parties have a right to due process." (emphasis added).

438.    With respect to the Program Grievance, no hearing was held, and Plaintiff had no right to question Professor 1 or any other witnesses concerning the purported risk to the program if Plaintiff remained affiliated. Moreover, the Grievance Committee improperly took jurisdiction over a grievance brought by a group, and issued a final decision about an issue that would further damage Plaintiff's career and jeopardize his tenure.

439.    The Grievance Committee found:

a.    If determination(s) of violation(s) of University Policy 1202 by a faculty member affiliated with the…program occurred, then the faculty member [Plaintiff] should act in accordance with the Faculty Handbook Section 2.10.2 and disaffiliate from the …Program to prevent harm to the program and to prevent violations of Section 2.10.2 for himself and other faculty;

b.    If determination(s) of violation(s) of University Policy 1202 by a faculty member affiliated with the…program occurred, and that faculty member does not voluntarily disaffiliate, the onus to take corrective actions lie with the supervisor [Dr. Renshaw] per *Compliance, Diversity and Ethics Grievance Procedure Corrective Actions*. Corrective actions should require, if they do not already, the disaffiliation of that faculty member from the …Program."

c.    Then disaffiliation should occur after all appeals applicable to violation(s) of University Policy 1202 have been exhausted within the University (including direct appeals of determination made by…CDE and any review of CDE investigative procedures by the Provost's Office.")

440.    Upon review of the Committee's correspondence, Plaintiff was surprised to see the reference to the "review of CDE investigative procedures by the Provost's Office" as an avenue for appeal. The documentation received from Mr. Williams denying his appeal, and the Grievance Procedures provided to him that referenced a right of appeal stated that CDE's decision on appeal was final.

441.    Plaintiff's counsel conferred with GMU's counsel in regard to this matter, who confirmed that Plaintiff had exhausted all avenues of appeal for CDE's determination. GMU's

**A129**

counsel further stated "Please note that the Committee is an internal faculty body and does not speak or act for the University."

442.    On September 16, 2019, Plaintiff met with Dr. Renshaw and informed him that he was not going to voluntarily disaffiliate from his program. Dr. Renshaw informed Plaintiff that Dean Ardis would be making a final decision with respect to the Faculty Grievance Committee's recommendation. At the meeting, Plaintiff and Dr. Renshaw discussed Plaintiff's continuing objection to Dr. Hammat's erroneous determinations against him.

443.    Dr. Renshaw informed Plaintiff that even though the complainants gave Plaintiff positive course evaluations, praised him in emails and maintained positive relationships with him, "you never know what a student is thinking."

444.    Dr. Renshaw acknowledged that the #metoo movement may have impacted Plaintiff's case, and that the complainants likely looked back and "reframed" Plaintiff's conduct as sexual harassment.

445.    Dr. Renshaw also told Plaintiff that Complainants 1-4 had been informed of the sanctions imposed on him and were upset that they were too light.

446.    Dr. Renshaw acknowledged that the Department had no clear guidelines for spending time with graduate students and that many faculty continued to drink with their graduate students and invite them to their homes. GMU's faculty committees were working on guidelines for socializing with graduate students.

447.    On September 16, 2019, the head of the Faculty Grievance Committee emailed Plaintiff and cited Section 11 of their 2009 operating procedures as the basis for having forwarded the Committee's recommendation to the Dean of Plaintiff's Department. This email forwarded the Dean's email to the Committee which stated that the Dean concurred with the Grievance

122

Committee's recommendation that Dr. Renshaw take action to disaffiliate Plaintiff from his program.

448.   For the first time Plaintiff learned from the Dean's email that, on July 30, 2019, Provost Wu sent a letter to the Faculty Senate Executive Committee, of which Dr. Renshaw is a member, stating that the Provost would not be conducting a re-evaluation of CDE's substantive findings in Plaintiff's case. Plaintiff was not given notice of any request to the Provost's Office regarding his case or any request from the Faculty Senate Executive Committee for the Provost to conduct such a review.

449.   By letter dated September 17, 2019, Dr. Renshaw disaffiliated Plaintiff from his program, acknowledging that the basis for disaffiliation was the sham reasoning set forth in the Program Grievance concerning the program's accreditation:

> On August 1, 2019, multiple faculty members in the clinical psychology program filed a grievance with the College…Grievance Committee against me in my role as Department Chair, for failing to take what they saw as necessary steps to protect the accreditation of that program. Specifically, they suggested that, in four separate cases, you were found to have violated University Policy 1202, which is the university's policy prohibiting sexual or gender-based harassment. They then described ways in which they believed that having a core faculty member of the program with substantiated claims of sexual harassment would put the program in violation of the …standards of accreditation for graduate programs in health service psychology (which includes clinical psychology). They concluded by requesting that, if you did not voluntarily "disaffiliate" from the clinical program, I compel your disaffiliation from the program.

450.   Dr. Renshaw's letter justified Dean Ardis' decision pursuant to Section 2.11.2.2.2b of the Faculty Handbook, which "indicates that, when a grievance is filed against an academic administrator below the level of the a [sic] Dean, the college-level grievance committee makes a recommendation to the Dean, whose decision on the matter is considered final."

451.   However, the Faculty Handbook did not authorize the Dean to take action on the Faculty Grievance Committee's decision. Per Section 2.11.2.2.2a of the program, "[i]f the grievance is against a fellow faculty member, the committee is charged to investigate the facts of the case and determine an appropriate resolution. The grievance committee's decision is final."

452.   Because, as pointed out by GMU's counsel, the Faculty Grievance Committee did "not speak for the University," and could only make recommendations about the Program Grievance (which was made by a group and should not have been heard). Neither Plaintiff nor Dr. Renshaw were required to follow those recommendations.

453.   Accordingly, the Committee, the Dean and Dr. Renshaw improperly stretched the meaning well beyond the written word of the Faculty Handbook to come up with a mechanism through which to more severely punish Plaintiff in the wake of the complainants' (and female faculty members') outcry that he received too lenient a punishment.

454.   Dr. Renshaw's letter also referenced the Provost's July 30th letter to the Faculty Senate Executive Committee, and informed Plaintiff that he received additional information from Senior Vice President Kissal regarding the "status of the Provost's Office review of investigative procedures in an email from Senior Vice President Carol Kissal on September 16, 2019." Dr. Renshaw did not share this email with Plaintiff. This portion of the letter suggests that the Faculty Senate Executive Committee had raised the lack of due process in Plaintiff's case with the Provost's Office and that the Provost Wu elected not to protect Plaintiff's clearly established right to due process as a tenured faculty member.

455.   Dr. Renshaw elected to disaffiliate Plaintiff from his program for the period recommended by Professor 1—*5-6 years*—even though the duration of his original sanctions, which remained in place, permitted re-evaluation of Plaintiff and reinstatement of his teaching and

mentoring of graduate students in 2021. Per Dr. Renshaw "the following actions [would] accompany this change:

> 1. Your name and information will be removed from listings of core faculty members in … program materials (e.g., brochure, handbook) and on the website
>
> 2. You should no longer attend … program faculty meetings or participate in … program decision making
>
> 3. You should not participate in … program related student training, which includes:
>     a. Teaching courses or seminars ….
>     b. Participating in … program brown bags
>     c. Conducting program-related research …with doctoral students in the …program
>     d. Serving on … student committees (e.g., comps, second year projects, dissertation)
>     e. Serving as a … mentor for doctoral students in the … program
>
> 4. You should not participate in other work related to the clinical program (e.g., serving on committees related to the program's functioning).
>
> To facilitate these actions, I will send a letter to [Professor 1], instructing her that you are no longer to be considered a core faculty member in the … program. In that letter, I will request that she remove your information from program materials. I will also ask her to identify all program-related student committees and faculty committees on which you are currently a member, so that we can identify replacements. In addition, based on the preferences you expressed during our meeting on September 16, 2019, I will contact the three doctoral students in … whom you are currently mentoring … to set up meetings with each of them individually. I will conduct these meetings with [Professor 1]. Together, we will inform the students that you can no longer act as their primary research mentor, and work with them to identify new advisors in line with their research interests. We will make it clear that this decision was not made by you, but we will not disclose the specific nature of the reasons for this change….

456.   Thus, even though 3 students (2 female, 1 male)—who had contradicted the allegations that Plaintiff created a hostile environment—wanted to continue working with Plaintiff they were forced to separate from his mentorship.

457.   Dr. Renshaw's new, more severe penalty of disaffiliation, was the final blow to Plaintiff's research and professorship, preventing from working within the program he created for "at least" 5-6 years. On this basis, the new, severe sanctions imposed on Plaintiff rendered his position untenable, and were the equivalent of termination without a hearing.

458. On September 18, 2019, Dr. Renshaw led a meeting of the full faculty in Plaintiff's Department at which Plaintiff's Title IX case was discussed in detail. Dr. Renshaw had previously represented to Plaintiff that he would make no mention of the case to the full faculty. At the meeting, the faculty also discussed changes to the Faculty Handbook and Department bylaws to address violations of professional ethics and notification to the faculty about their colleagues' violations.

459. At no stage of the process—Title IX, appeal, sanctioning, or before the Faculty Grievance Committee, was Plaintiff provided with evidence, a hearing, a right of cross-examination or to question witnesses. At all times, including with respect to Professor 1, was the female complainant or grievant deemed more credible, even in the face of contradictory evidence—including that Plaintiff's program would *not* lose its accreditation as a result of the findings and sanctions. Upon information and belief, Complainants 1-4, dissatisfied with the outcome, sought more severe sanctions through their mentors in the program, who filed the Program Grievance.

<u>**COUNT I**</u>
**Violation of Title IX of the Education Amendments of 1972**
**Erroneous Outcome/Selective Enforcement**
**(Against George Mason University and Board of Visitors of George Mason University)**

460. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

461. Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

462.    Title IX applies to all public and private educational institutions that receive federal funding, which includes a public university such as GMU.

463.    Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017); *Kadiki v. Virginia Commonwealth U.*, 892 F. Supp. 746, 749 (E.D. Va. 1995).

464.    The 2001 Guidance stressed "[i]t is important that schools not overreact to behavior that does not give rise to the level of sexual harassment." *Id.* at iii.

465.    Per the 2001 Guidance, gender-based harassment is not covered by Title IX unless it is "*sufficiently serious* to deny or limit a student's ability to participate in or benefit from" an educational program." *Id.* at v. The 2001 Guidance defines gender-based harassment as harassing a student on the basis of that student's failure to conform to stereotyped notions of masculinity and femininity." *Id.* The 2001 Guidance further defines gender-based harassment as "acts of verbal, non-verbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping but not involving conduct of a sexual nature." *Id.* at 3.

466.    The 2001 Guidance defines sexual harassment as:

> [U]nwelcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature…. Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal…will not be considered sexual harassment.

467.    In the case of "hostile environment harassment" an assessment is required of "whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program." *Id.* at 5. "Conduct that is not severe will not create a hostile environment." *Id.* at 16.

127

468.   If a student "actively participates in sexual banter and discussions and gives no indication that he or she objects"—and later lodges a complaint—"the evidence generally will not support a conclusion that the conduct was unwelcome." *Id.* at 8.

469.   As mandated in the 2001 Guidance, "OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees." *Id.* at 17. "A public school's employees have certain due process rights under the United States Constitution… The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment." *Id.*

470.   The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." 2001 Guidance, at 20.

471.   As mandated in the 2001 Guidance, "the protections of the First Amendment must be considered if issues of speech or expression are involved. Free speech rights apply in the classroom (e.g. classroom lectures and discussions) and in all other education programs and activities of public schools…. In addition, First Amendment rights apply to the speech of students and teachers." *Id.* at 22.

472.   "Title IX is intended to protect students from sex discrimination, not to regulate the content of speech." *Id.* OCR recognizes that the offensiveness of a particular expression as

perceived by some students, standing alone, *is not a legally sufficient basis to establish a sexually hostile environment under Title IX*." *Id.* (emphasis added).

473.    Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." 2011 DCL at 7; August 2015 Dear Colleague Letter at 2-3.

474.    The 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

475.    The 2017 Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; and (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation. The 2017 Guidance also permits schools to apply the clear and convincing evidence standard in sexual misconduct proceedings. *Id.* at p. 5.

476.    Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).

477.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the

**A137**

flawed outcome and gender bias. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994); *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 583 (Ed. Va. 2018).

478.    Articulable doubt in the accuracy of the outcome of a disciplinary proceeding can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Marymount U.*, 297 F. Supp. 3d at 584. *See Yusuf*, 35 F. 3d at 715.

479.    Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf*, 35 F. 3d at 715. For instance, "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Doe v. Columbia U.*, 831 F.3d at 57.

480.    Outdated and discriminatory views of sexuality and gender on the part of a key decisionmaker in a Title IX proceeding will also show that the proceeding was infected with gender bias. *Marymount U.*, 297 F. Supp. 3d at 586. *See also Doe v. Grinnell College*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at pp. 22-28. A university's denial of the opportunity for cross-examination in a case where credibility is at stake is also a fact sufficient to cast articulable doubt on the accuracy of the outcome. *Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018).

481.    Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students provides a "backdrop" for gender bias. *See, e.g. Marymount U.*, 297 F. Supp. 3d at 584 (influence of Dear Colleague Letter and political

130

pressure acknowledged by senior official one factor in plausibly alleging gender bias); *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university was under federal pressure to convict male respondents regardless of guilt or innocence, combined with flawed proceedings and biased statements of university officials supported plausible inference of gender bias). "[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Menaker*, 2019 WL 3819631, at *5.

482.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding, erroneously found responsible for violating University Policy 1202: GMU's Sexual and Gender-Based Harassment Policy, and gender was a motivating factor behind this erroneous outcome.

483.    Plaintiff was deprived of due process in all respects, including a fair and impartial process with regard to the sexual harassment complaints alleged against him, because without limitation:

a.    GMU's 2017 Grievance Procedures required Ms. Simmons and Dr. Hammat to assume the "complete veracity" of the complainants' allegations prior to investigating them. *Id.* at III.

b.    Dr. Hammat's December 2018 notification emails to Plaintiff contained no recitation of the specific charges against Plaintiff or the specific policy provisions that applied to the allegations in question. Plaintiff was not notified whether the investigator employed the Grievance Procedures relevant to each time period, or those in effect at the time that the reports were made.

c.    Complainant 1 and Complainant 2's allegations concerned events that took place in Spring 2013 and Spring 2014 – over five years prior to when they reported them. These allegations were reported well beyond the 180-day time limit set forth in the applicable Grievance Procedures. These allegations should not have been investigated. Upon information and belief, the significant delay in reporting was not questioned by the Title IX Office nor the investigators.

131

d.      Not only were Complainant 1's and Complainant 2's allegations timed out, both complainants had already left the University, their degrees having been conferred months prior to the making of their reports. There is no University policy provision which permits such *post-hoc* complaints.

e.      Complainant 3's allegations were also timed out under the 2015 and 2016 Grievance Procedures, which required reports to be made within 180 days, because they involved events that took place at least two years prior to when they were reported. There was no evidence of circumstances beyond Complainant 3's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

f.      With the exception of allegations concerning events that occurred in August 2018, the remainder of Complainant 4's allegations were also timed out under the applicable Grievance Procedures, which require reports to be made within 180 days. There was no evidence of circumstances beyond Complainant 4's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

g.      Dr. Hammat's December 2018 emails to Plaintiff used quoted statements that Plaintiff purportedly made years ago, calling those allegations into question, as it is unlikely direct quotes would be remembered accurately years later.

h.      There was no information provided to Plaintiff concerning the motivation behind the four complainants coming forward at the same time, nor does it appear that this was questioned by the Title IX Office or the investigators.

i.      Upon information and belief, the four complaints were investigated together, which tainted the information gathering process. The first investigator, Ms. Simmons, also conducted the investigation under the presumption that Plaintiff was guilty of the allegations. This was apparent to Plaintiff from the rude and hostile manner in which she acted towards Plaintiff during the investigation. Upon information and belief, Defendant Simmons' presumption of guilt influenced the manner in which she questioned the complainants and witnesses, and tainted the information gathering process. To the extent that Ms. Simmons' replacement, Dr. Hammat, relied upon the evidence gathered and conclusions drawn by Ms. Simmons, the investigation was irreparably tainted.

j.      Dr. Hammat, who took over the investigation for Ms. Simmons after Plaintiff complained that she was biased, was also demonstrably biased. Throughout the interview, Dr. Hammat alluded to allegations that were not part of the case and suggested incorrectly that Plaintiff was involved in a consensual relationship with

an unnamed student. It was clear that she also presumed that Plaintiff was guilty, and that her decision making was impacted by false and unsubstantiated rumors.

k.      As the Title IX Coordinator, Dr. Hammat also had a conflict of interest, and should not have been tasked with determining responsibility.

l.      Plaintiff was denied access to all evidence collected concerning the four complaints including but not limited to: a) any and all written complaints filed with the Title IX office; b) witness statements; c) interview memoranda and/or audio recordings; d) text, email, photographic or other evidence gathered during the investigation; e) a copy of any investigation report or memorandum created by the investigators; and f) summaries of the interviews in which Plaintiff participated. Plaintiff's inability to review or respond to the evidence against him impeded his ability to fully defend himself against the allegations.

m.      There was no hearing.

n.      Plaintiff had no opportunity to cross-examine the complainants, nor to ask questions of any of the witnesses. Many of the allegations required Dr. Hammat to make credibility determinations and, thus, this deprivation was even more significant.

o.      Upon information and belief, the names of the complainants were withheld from the witnesses interviewed as part of the investigation, prejudicing the process because the witnesses could not accurately answer questions posed to them.

p.      The allegations stated in the Letters of Determination differed from the allegations set forth in Dr. Hammat's December 2018 emails to Plaintiff, as did the cited sexual misconduct policy in each case.

q.      The Letters of Determination added charges of gender-based harassment to the original charges of sexual harassment. Plaintiff had no awareness of, or opportunity to respond to these charges during the Title IX investigation.

r.       The Letters of Determination contained allegations that had not been disclosed to Plaintiff during the interview process and, therefore, Plaintiff had no opportunity to defend himself against them.

s.      The Letters of Determination did not state the specific policy provisions applied by Dr. Hammat to find that Plaintiff engaged in sexual or gender-based harassment.

t.      The evidence gathered, to the extent it was cited in each Letter of Determination, did not support a policy violation. In determining that a policy violation occurred in each case, Dr. Hammat found against the weight of the evidence, suggesting bias in the process.

u.      Dr. Hammat's statement in the Letters of Determination that "CDE did find enough factual information" to find a policy violation differs from the preponderance of the evidence standard. There was also a startling lack of factual evidence to support the findings against Plaintiff as opposed to the subjective thoughts or reactions of the complainants posed as "facts."

v.      The Letters of Determination failed to provide any and all relevant definitions of Sexual or Gender Based Harassment and an explanation of how the evidence supported a finding of misconduct against Plaintiff under those definitions. The Determination Letters did not specify which policy definitions were at issue for each complaint, which alleged conduct and events during differing time periods, and instead cited only to "Policy 1202."

w.      The Letters of Determination stated that the determination of the appeal was final and "Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees." This was not stated in the Grievance Procedures. While Dr. Hammat stated that such a process avoids "biases in the adjudicatory process," the failure to provide for a level of faculty review, including a <u>hearing</u>, potentially reinforced any bias in the investigative process, which was instead left to a single investigator.

x.      Neither the Grievance Procedures nor the Letters of Determination referred to the specific process through which sanctions are determined for tenured faculty members found responsible for violations of the University's Sexual Misconduct Policies.

y.      Prior to the issuance of the Letters of Determination, and before Plaintiff was notified of the outcome of the investigation, CDE directed the Chair of Plaintiff's Department to prohibit Plaintiff from taking on graduate research assistants. There is no policy provision which gives CDE authorization to take such actions. Before Plaintiff's appeal was taken, and any sanctions imposed, Plaintiff was directed to reject the six students Plaintiff interviewed for a previously approved position to work in his lab in Fall 2019.

z.      Plaintiff's appeal was decided by Mr. Williams, Assistant Vice President of CDE, who had a conflict of interest due to his administrative responsibility to enforce GMU's policies.

484.    Apart from GMU's violations of Plaintiff's due process rights, resulting in a flawed proceeding, the pressure that GMU was under, combined with these violations suggest that gender bias was a motivating factor in the findings against Plaintiff. In the years leading up to, and during, the time period in which the allegations against Plaintiff were investigated, and an outcome

decided, GMU was under pressure from the federal government, the State of Virginia, constant negative publicity, and campus activism to aggressively protect female students from sexual misconduct at the expense of the rights of the male accused:

a. Beginning in 2014, GMU's President Cabrera belonged to the Governor's task force to aggressively combat sexual assault. A corresponding task force was created at GMU;

b. At the recommendation of the task force, GMU implemented trauma-informed training for Title IX investigations. The use of the trauma-informed approach in assessing the evidence in a case can lead to the belief that a female complainant is always telling the truth, and that any discrepancies or credibility issues can be explained away by her trauma. Upon information and belief, Ms. Simmons and Dr. Hammat were trained to use the trauma-informed approach in Title IX investigations. GMU's 2017 Grievance Procedures reflected this approach, requiring Title IX administrators to assume "the complete veracity" of sexual misconduct allegations in deciding whether to conduct an investigation;

c. In 2016, Dr. Hammat met with members of the Women and Gender Studies Department and agreed to implement their demands into GMU's Title IX process, including the use of a trauma-informed approach;

d. During the time period in which Plaintiff's investigation occurred the OCR was conducting two separate investigations at GMU, one involved a female student's complaint that GMU mishandled her sexual misconduct complaint and created a "sexually hostile environment" for her;

e. In discussing the 2016 OCR investigation, Mr. Williams—who decided Plaintiff's appeal—noted that GMU's funding could be limited by OCR as a result of an investigation;

f. Shortly after Betsy DeVos spoke at GMU in September 2017, President Cabrera announced a new Title IX initiative;

g. Dr. Hammat, publicly stated that sexual assault survivors could panic as they believed Secretary DeVos was "devaluing them" and "rolling back" protections;

h. On December 1, 2017, a former professor turned blogger published an open source spreadsheet "Sexual Harassment in the Academy," upon which anonymous posters could list instances of alleged sexual harassment at universities. This was described by the media as "a viral #MeToo list." The list garnered national attention, and was reported on in The Washington Post

and The Wall Street Journal. A women's blog, Jezebel.com, referred to the list as "Academia's Shitty Men List." A number of entries on the list concerned GMU professors.

i.  In April 2018, the student newspaper published an article about a sexual misconduct case that "dragged on" for a year. The article criticized GMU for failing to respond to the female student's sexual harassment complaint. In the article, Dr. Hammat was quoted as saying "I'd love to tell you that I have ten hours a week to write nothing but investigation reports, but I am lucky if I get even a few hours a week to write those reports." The article received an aggressive response from Mr. Williams, who made clear that GMU was committed to eradicating sexual violence. His response was published in the student newspaper.

j.  In August 2018, The Washington Post published an article concerning the director of GMU's forensics team making a number of sexual advances towards students. GMU ensured to tell The Washington Post that it took "swift, decisive action" with respect to the professor. This was publicized again in March 2019, in a piece in The Atlantic, "A #MeToo Nightmare in the World of Competitive College Speech."

k.  Between March 2019 and June 2019, GMU faced a public outcry against its hiring of Brett Kavanaugh, including accusations that it did not care about sexual assault survivors.

485.  The decisionmakers in Plaintiff's case had backgrounds which suggest that gender bias was a motivating factor in the outcome in Plaintiff's case:

a.  Ms. Simmons had a lengthy background of advocacy on behalf of female victims of sexual violence and the prosecution of the male accused. Ms. Simmons left GMU after Dr. Hammat removed her from Plaintiff's case for bias and went to work at a non-profit that advocates for the prevention of violence against women. While at GMU Ms. Simmons gave guest lectures for the Women and Gender Studies Department. Ms. Simmons acted in a hostile manner towards Plaintiff, and operated under a presumption of guilt during the Title IX investigation. Upon information and belief, Ms. Simmons conducted all of the witness interviews relating to the allegations against Plaintiff, and her bias tainted the investigation.

b.  Dr. Hammat has been publicly vocal in women's advocacy publications about the fact that she is a survivor of sexual assault and that she put together a sorority pledge patrol that "kicked down doors" to get "girls out" of fraternity houses. She believed that male students should be angry and protective of female students.

c.  Dr. Hammat has been criticized by Title IX scholars as being an "ideologue" with "a preconceived worldview" who has "broadened" the definitions of sexual misconduct. Dr. Hammat drafted GMU's Sexual Misconduct Policies which, as discussed *supra*, decreased the rights of faculty with each iteration and expanded the definition of sexual harassment to include nearly any word or action imaginable.

d.  Dr. Hammat has participated in "DC Area Feminist Events" for the Clearinghouse on Women's Issues including a program in which she presented a "wish list" for how women's advocates could help her with meeting their "high expectations for Title IX Coordinators.

e.  In Plaintiff's case, Dr. Hammat acted in a manner that was biased against Plaintiff during his interview—including by raising false allegations that he was involved in a relationship with a student. She ignored contradictory evidence, including witness statements that *supported* Plaintiff's account of what occurred. Dr. Hammat failed to question the changing allegations of the complainants, to which she gave Plaintiff no opportunity to respond, the extensive delay in reporting, or their motives. Upon information and belief, Dr. Hammat provided the complainants with opportunities to respond to Plaintiff's account of what occurred, whereas she denied Plaintiff access to all of the evidence in the case, including the Complainant's written statements.

f.  Dr. Hammat's email notifications and Letters of Determination contained statements that reflected gender bias based on stereotypical views of relationships between men and women: i) in her December 2018 email to Plaintiff concerning Complainant 2's allegations, Dr. Hammat included the fact that Plaintiff allegedly told a story (five years earlier) about "skinny-dipping" with a woman who was not his wife, which suggested that Plaintiff was expected to comport with traditional notions of marriage, fidelity and monogamy or else be branded a sexual harasser; ii) the Spa World allegation referenced "human trafficking" with respect to the spa, even though there was no credible evidence that Plaintiff had knowledge of any such allegation against the spa during the relevant time period; and iii) with respect to Complainant 3, Dr. Hammat included the allegation that Plaintiff invited her to see a sexually explicit professional presentation "knowing she was a first year graduate student," suggesting that it was inappropriate or corrupt for a male professor to invite an adult, female graduate student to attend a public presentation about human sexuality that is grounded in peer-reviewed research.

g.  Mr. Williams made public statements in the past that campus administrators have a moral obligation to protect and care for female students and to make them feel safe when investigating and responding to allegations of sexual

assault and sexual harassment and that, regardless of the outcome, they are to be believed as telling the truth.

h. Mr. Williams' mischaracterization of the evidence in deciding Plaintiff's appeal was indicative of gender bias: i) Mr. Williams' seemed outraged by Plaintiff allowing students to swim, with bathing suits, in a hot tub; ii) Mr. Williams elected to ignore evidence concerning Complainant 4's organization of sex-related activities (and lie about Plaintiff taking students to a strip club when she organized the trip), use of "hyper-sexual" language, and unprompted, voluntary discussion of sex-related topics suggests that Mr. Williams assumed that an adult female in her mid-twenties was incapable of behaving in such a manner absent the coercion of a male authority figure; and iii) Mr. Williams categorized all discussions about sex as creating a hostile environment—ignoring that this was the subject of Plaintiff's research with his graduate students.

i. Mr. Williams upheld Dr. Hammat's erroneous findings despite the hundreds of pages of evidence that contradicted the allegations, including the absence of any impact on the Complainants' access to their education or activities. Like Dr. Hammat, Mr. Williams' failed to question the motives of the Complainants, all friends, one of whom had recently been fired by Plaintiff.

486. GMU also engaged in selective enforcement. A "selective enforcement" claim asserts that, regardless of the respondent's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the respondent's gender. *See Yusuf*, 35 F.3d at 715.

487. Upon information and belief, GMU has engaged in a pattern of unfair investigations and adjudications resulting in unduly severe sanctions being imposed on males accused of sexual or gender-based harassment.

488. Upon information and belief, GMU engaged in selective enforcement because, unlike Plaintiff, female professors accused of sexual or gender-based harassment have not been formally investigated by Title IX administrators.

489. Upon information and belief, to the extent that GMU has pursued the investigation of reports of sexual and gender-based harassment against female professors, and found them

138

responsible for violating University policy, GMU imposed far less severe sanctions than against male professors found responsible for similar violations.[74]

490.    GMU also engaged in selective enforcement with respect to Complainant 4. GMU assumed the "complete veracity" of Complainant 4's allegations, and pursued a formal investigation against Plaintiff. When Plaintiff filed a complaint against Complainant 4 for violating the Sexual Misconduct Policy by making a bad faith, false report against Plaintiff, GMU took no action.

491.    Plaintiff was subjected to a sex-biased, prejudiced and unfair process in violation of Title IX. This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

492.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

493.    Plaintiff is also entitled to an injunction directing GMU to: i) vacate the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) remove all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliate Plaintiff with his program; iv) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's

---

[74] A number of courts have allowed Title IX claims to proceed to discovery where information concerning sexual misconduct proceedings, including the gender of the respondents, is exclusively in the possession of a college or university. *See Doe v. The Trustees of the U. of Penn.*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017) (selective enforcement claim could proceed to discovery where complaint alleged that comparator information was in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met *Twombly* standard).

personnel records and all other locations in which they are kept; v) open an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) grant Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

<u>**COUNT II**</u>
**42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process**
**(Against Defendants Hammat, Williams, Renshaw, Ardis and Wu)**

494.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

495.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

496.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

497.    Defendants Hammat, Williams, Renshaw, Ardis and Wu were acting under color of state law when they deprived Plaintiff of his constitutional rights under the Fourteenth Amendment.

498.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings. Tenured faculty, such as Plaintiff, have significant property and liberty interests such that the University must afford them heightened due process protections in any University proceedings that threaten those interests. *Cleveland v. Bd. of Ed. v. Loudermill*, 470

140

U.S. 532, 546 (1985); *Abatena v. Norfolk State U*., 2014 WL 1819665, at **10-11 (E.D. Va. 2014);

*Dear v. the Rector and Visitors of George Mason U*., 1992 WL 884775 (Va. Cir. Ct. 1992).

499.    The OCR's 2001 Guidance also requires due process, "A public school's

employees have certain due process rights under the United States Constitution… The rights

established under Title IX must be interpreted consistent with any federally guaranteed due process

rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and

their legal responsibilities to individuals accused of harassment." *Id.*

500. To satisfy due process in the context of any disciplinary proceeding against a faculty

member, the University is required to provide notice of the charges against the faculty member, an

explanation of the evidence against him or her, and an opportunity to present his side of the story.

*Abatena*, 2014 WL 1819665, at *11. Tenured faculty are entitled to a hearing before they can be

terminated. *Dear*, 1992 WL 884775 at *1.

501.    Recent cases involving public universities have held that individuals accused of

sexual misconduct have a right to cross-examination in cases where credibility is at stake. For

example, the United States Court of Appeals for the Sixth Circuit held:

> Due process requires cross-examination in circumstances like these because it
> is 'the greatest legal engine ever invented' for uncovering the truth…Not only
> does cross-examination allow the accused to identify inconsistencies in the other
> side's story, but it also gives the fact-finder an opportunity to assess a witness's
> demeanor and determine who can be trusted…So if a university is faced with
> competing narratives about potential misconduct, the administration must
> facilitate some form of cross-examination in order to satisfy due process.

*Doe v. Baum*, 903 F.3d. 575, 581 (6th Cir. 2018).[75]

---

[75] While this case addressed student respondents in Title IX cases, faculty respondents, who also have significant interests at stake, should be afforded the same right of cross-examination in cases where credibility determinations must be made by the Title IX investigator.

502.   Plaintiff has a significant liberty interest in his good name and reputation and significant property interest in his tenured position as full professor. *Abatena*, 2014 WL 1819665, at **10-11.

503.   Dr. Hammat placed a stigma on Plaintiff's reputation by publishing the false and erroneous Letters of Determination by sending them to Dean Ardis, who had not been involved in the Title IX proceedings. As detailed *supra* the Letters contained a number of false, unsupported and mischaracterized statements about Plaintiff.

504.   Upon information and belief, Mr. Williams placed a stigma on Plaintiff's reputation when he disclosed Dr. Hammat's notification emails and Letters of Determination to Professor 1, who shared the information with at least 9 professors in Plaintiff's program. Faculty also spread the false information to graduate students in Plaintiff's program and encouraged them not to work with Plaintiff.

505.   Mr. Williams further placed a stigma on Plaintiff's reputation when Plaintiff informed him that a member of the faculty had been disseminating information around the Department about the confidential Title IX proceedings and Mr. Williams made no effort to stop the dissemination of this information.

506.   Upon information and belief, Mr. Williams and/or Dr. Renshaw also placed a stigma on Plaintiff when they informed Complainants 1-4 of the various sanctions imposed on Plaintiff as a result of the false statements, mischaracterizations and errors made by Dr. Hammat and Mr. Williams. The applicable OCR Guidance required only the disclosure of sanctions directly relevant to the Complainants, such as a no contact order. Thus, disclosure of the restrictions placed on Plaintiff's employment was unwarranted and an egregious violation of his right to privacy in personnel matters.

507.    Dr. Renshaw made statements to members of the faculty—beyond those who "needed to know"—about the details of the erroneous determinations and restrictions placed on Plaintiff's employment which the faculty then shared with graduate students in Plaintiff's program.

508.    Dr. Renshaw also assisted Professor 1 with organizing a program faculty meeting at which, upon information and belief, the false and erroneous Title IX findings against Plaintiff were discussed outside Plaintiff's presence because Plaintiff was excluded from that meeting after he informed Dr. Renshaw and Professor 1 that he did not wish to speak about the case.

509.    Dr. Renshaw also assisted Professor 1 with organizing a second faculty meeting, which Dr. Renshaw attended, at which Plaintiff was attacked by members of the program faculty about the Title IX findings, and at which he was told that his reputation was already destroyed by the false information that had already been disseminated around the Department.

510.    Dr. Renshaw led a third meeting with the full faculty of Plaintiff's Department with a focused discussion on the details of Plaintiff's case.

511.    As a result of Dr. Hammat's, Mr. Williams' and Dr. Renshaw's actions in publishing this information, Plaintiff's colleagues attacked him and he was disaffiliated from his program.

512.    Plaintiff's constitutionally protected property interest in his tenured position at GMU and to be free from overburdensome, unwarranted sanctions tantamount to dismissal from his professional position arises from his appointment letter, the Faculty Handbook.

513.    Pursuant to Section 2.1.1 of the Faculty Handbook, "[t]enure is a major safeguard of academic freedom, of the quality of the education offered [at the University], and stability of the institution. For the faculty member on whom tenure is conferred, it is a privilege granted by

the University to those who have consistently demonstrated their value to the institution over an extended period of time."

514.    Pursuant to Section 2.9 of the Faculty Handbook, tenured faculty may not be terminated without cause and after the University follows "procedures…designed to ensure due process in termination of appointment proceedings." The procedures include a full hearing with a right of cross-examination and full examination of the evidence.

515.    Pursuant to Section 2.10.2, in cases where faculty members are accused of "unethical or unprofessional conduct" procedures must be employed which protect "*all parties*…right to procedural due process." (emphasis added).

516.    Plaintiff had obeyed all institutional rules when he was wrongly determined to have violated University Policy by Dr. Hammat and had sanctions imposed upon him by Dr. Renshaw.

517.    The procedures employed by Ms. Simmons and Dr. Hammat when investigating and determining the outcome of the Title IX allegations against Plaintiff deprived him of even the most minimal due process protections:

a.      Plaintiff faced dismissal from the GMU as a potential outcome of the Title IX investigation.

b.      GMU's 2017 Grievance Procedures required Ms. Simmons and Dr. Hammat to assume the "complete veracity" of the complainants' allegations prior to investigating them. *Id.* at III.

c.      Dr. Hammat's December 2018 notification emails to Plaintiff contained no recitation of the specific charges against Plaintiff or the specific policy provisions that applied to the allegations in question. Plaintiff was not notified whether the investigator employed the Grievance Procedures relevant to each time period, or those in effect at the time that the reports were made.

d.      Complainant 1 and Complainant 2's allegations concerned events that took place in Spring 2013 and Spring 2014 – over five years prior to when they reported them. These allegations were reported well beyond the 180-day time limit set forth in the applicable Grievance Procedures. These allegations should not have

been investigated. Upon information and belief, the significant delay in reporting was not questioned by the Title IX Office nor the investigators.

e.        Not only were Complainant 1's and Complainant 2's allegations timed out, both complainants had already left the University, their degrees having been conferred months prior to the making of their reports. There is no University policy provision which permits such post-hoc complaints.

f.        Complainant 3's allegations were also timed out under the 2015 and 2016 Grievance Procedures, which required reports to be made within 180 days, because they involved events that took place at least two years prior to when they were reported. There was no evidence of circumstances beyond Complainant 3's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

g.        With the exception of allegations concerning events that occurred in August 2018, the remainder of Complainant 4's allegations were also timed out under the applicable Grievance Procedures, which require reports to be made within 180 days. *2016 Grievance Procedures and 2017 Grievance Procedures*. There was no evidence of circumstances beyond Complainant 4's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

h.        Upon information and belief, the four complaints were investigated together, which tainted the information gathering process. The first investigator, Ms. Simmons, also conducted the investigation under the presumption that Plaintiff was guilty of the allegations. This was apparent to Plaintiff from the rude and hostile manner in which she acted towards Plaintiff during the investigation. Upon information and belief, Defendant Simmons' presumption of guilt influenced the manner in which she questioned the complainants and witnesses, and tainted the information gathering process. To the extent that Ms. Simmons' replacement, Dr. Hammat, relied upon the evidence gathered and conclusions drawn by Ms. Simmons, the investigation was irreparably tainted.

i.        Dr. Hammat, who took over the investigation for Ms. Simmons after Plaintiff complained that she was biased, was also demonstrably biased. Throughout the interview, Dr. Hammat alluded to allegations that were not part of the case and suggested incorrectly that Plaintiff was involved in a consensual relationship with an unnamed student. It was clear that she also presumed that Plaintiff was guilty, and that her decision making was impacted by false and unsubstantiated rumors.

j.        As the Title IX Coordinator, Dr. Hammat also had a conflict of interest, and should not have been tasked with determining responsibility.

145

k.        Plaintiff was denied access to all evidence collected concerning the four complaints including but not limited to: a) any and all written complaints filed with the Title IX office; b) witness statements; c) interview memoranda and/or audio recordings; d) text, email, photographic or other evidence gathered during the investigation; e) a copy of any investigation report or memorandum created by the investigators; and f) summaries of the interviews in which Plaintiff participated. Plaintiff's inability to review or respond to the evidence against him impeded his ability to fully defend himself against the allegations.

l.        There was no hearing.

m.        Plaintiff had no opportunity to cross-examine the complainants, nor to ask questions of any of the witnesses. Many of the allegations required Dr. Hammat to make credibility determinations and, thus, this deprivation was even more significant.

n.        Upon information and belief, the names of the complainants were withheld from the witnesses interviewed as part of the investigation, prejudicing the process because the witnesses could not accurately answer questions posed to them.

o.        The allegations stated in the Letters of Determination differed from the allegations set forth in Dr. Hammat's December 2018 emails to Plaintiff, as did the cited sexual misconduct policy in each case.

p.        The Letters of Determination added charges of gender-based harassment to the original charges of sexual harassment. Plaintiff had no awareness of, or opportunity to respond to these charges during the Title IX investigation.

q.        The Letters of Determination contained allegations that had not been disclosed to Plaintiff during the interview process and, therefore, Plaintiff had no opportunity to defend himself against them.

r.        The Letters of Determination did not state the specific policy provisions applied by Dr. Hammat to find that Plaintiff engaged in sexual or gender-based harassment.

s.        The evidence gathered, to the extent it was cited in each Letter of Determination, did not support a policy violation. In determining that a policy violation occurred in each case, Dr. Hammat found against the weight of the evidence, suggesting bias in the process.

t.        Dr. Hammat's statement in the Letters of Determination that "CDE did find enough factual information" to find a policy violation differs from the preponderance of the evidence standard. There was also a startling lack of factual

evidence to support the findings against Plaintiff as opposed to the subjective thoughts or reactions of the complainants posed as "facts."

u.        The Letters of Determination failed to provide any and all relevant definitions of Sexual or Gender Based Harassment and an explanation of how the evidence supported a finding of misconduct against Plaintiff under those definitions. The Determination Letters did not specify which policy definitions were at issue for each complaint, which alleged conduct and events during differing time periods, and instead cited only to "Policy 1202."

v.        The Letters of Determination stated that the determination of the appeal was final and "Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees." This was not stated in the Grievance Procedures. While Dr. Hammat stated that such a process avoids "biases in the adjudicatory process," the failure to provide for a level of faculty review, including a <u>hearing</u>, potentially reinforced any bias in the investigative process, which was instead left to a single investigator.

w.        Neither the Grievance Procedures nor the Letters of Determination referred to the specific process through which sanctions are determined for tenured faculty members found responsible for violations of the University's Sexual Misconduct Policies.

x.        Prior to the issuance of the Letters of Determination, and before Plaintiff was notified of the outcome of the investigation, CDE directed the Chair of Plaintiff's Department to prohibit Plaintiff from taking on graduate research assistants. There is no policy provision which gives CDE authorization to take such actions. Before Plaintiff's appeal was taken, and any sanctions imposed, Plaintiff was directed to reject the six students Plaintiff interviewed for a previously approved position to work in his lab in Fall 2019.

y.        Plaintiff's appeal was decided by Mr. Williams, Assistant Vice President of CDE, who had a conflict of interest due to his administrative responsibilities to enforce GMU's policies.

518.    Dr. Hammat, who participated in drafting GMU's Sexual Misconduct Policy and Grievance Procedures, was, as Title IX Coordinator, aware that Title IX procedures are required to provide due process at public universities. Rather than acting to protect the rights of the accused, she acted to erode those rights by designing a process through which due process was denied.

519.    Dr. Hammat chose to cherry-pick from the various policies provided to Plaintiff— as well as later versions that were not provided to him—provisions that benefited the

complainants' rights over Plaintiff's. She further ignored policy provisions that provided minimal protections to Plaintiff. For example, the 2016-2017 and 2017-2018 Sexual Misconduct Policies permitted all parties to review the evidence that would be used to determine whether a policy violation occurred. Dr. Hammat did not afford Plaintiff this right while, upon information and belief, this right was afforded to Complainants 1-4. These actions violated Plaintiff's clearly established right to due process.

520.    Mr. Williams, as Vice President of CDE knew, or should have known, that Title IX guidance required due process in Title IX proceedings at public universities. Mr. Williams also knew, or should have known, that the Faculty Handbook required due process in cases where faculty members faced dismissal from the University as a potential sanction. Though Mr. Williams had authority to grant Plaintiff's appeal based on procedural flaws in the Title IX process, and though Plaintiff's 38-page appeal laid out myriad flaws, Mr. Williams elected to affirm Dr. Hammat's biased, erroneous determinations.

521.    As a result of these deprivations, Plaintiff had no meaningful opportunity to be heard with respect to the evidence against him, or to test the credibility of the complainants or unnamed witnesses. As a result of the erroneous finding, and denial of Plaintiff's appeal, by Dr. Hammat and Mr. Williams—each of whom were biased—the matter was referred to Dr. Renshaw for sanctions.

522.    Dr. Renshaw was aware of the egregious violations of due process and the bias present in the Title IX proceedings. As a member of the faculty, Dr. Renshaw, knew that GMU faculty were entitled to due process in misconduct proceedings. Dr. Renshaw elected to ignore these issues (*e.g.*, despite receiving a copy of Plaintiff's appeal he explicitly said in an email that he did not read it), and place conditions on Plaintiff's employment that are so restrictive that they

148

are tantamount to dismissal. The conditions placed on Plaintiff may only be lifted in Dr. Renshaw's discretion and are, in effect, an indefinite suspension of Plaintiff's right to teach or conduct research, or to fulfill the duties and responsibilities of his tenured position of full professor.

523.  In its memorandum dated May 15, 2019, GMU's Faculty Senate, of which Dr. Renshaw was a member, raised "grave concerns" to Provost Wu about the lack of due process in faculty misconduct proceedings, and pointed to a number of the violations referenced above.

524.  Provost Wu, aware of these grave concerns, declined to investigate CDE's investigation and findings in Plaintiff's case specifically, choosing to reject the Faculty Senate Executive Committee's request for his office to investigate the lack of due process protections afforded to Plaintiff. Provost Wu was, due to his position, aware that GMU's faculty had a clearly established right to due process in all proceedings in which they faced dismissal from the University as an outcome.

525.  Plaintiff was also denied due process with respect to the Program Grievance, as the Committee elected to hear a group grievance, in violation of the Faculty Handbook. Plaintiff was not afforded a hearing, right of cross-examination or to present witnesses, or right to examine the Faculty Grievance Committee's investigation documents and evidence in support of Professor 1's sham arguments about accreditation. Given that the outcome was Plaintiff's disaffiliation from his program he had a right to due process. This was also clearly stated in Section 2.10.2 of the Faculty Handbook.

526.  Dean Ardis had no authority under University policies to effectuate the recommendations of the Faculty Grievance Committee. As the Dean of Plaintiff's College, she knew or should have known that faculty have a right to due process in proceedings concerning alleged ethics violations, as set forth in Section 2.10.2 of the Faculty Handbook. Dean Ardis

violated Plaintiff's clearly established rights when she issued a "concurring" decision that Dr. Renshaw should effectuate Plaintiff's disaffiliation from his program. Dean Ardis improperly stretched the plain language of the Faculty Handbook to grant her permission to effectuate a more severe punishment on Plaintiff through a concurrence in the Faculty Grievance Committee's decision with respect to Dr. Renshaw.

527.   Dr. Renshaw was aware that Dean Ardis was not authorized to effectuate the Faculty Grievance Committee's recommendations, as evidence by the sentence in his letter that the Faculty Handbook "indicates" that the Dean's decision was final with respect to a "grievance filed against an academic administrator." Dr. Renshaw ignored that the Dean did not have a level of review with respect to a grievance filed against a faculty member. Moreover, neither the Faculty Grievance Committee nor Dean Ardis proposed that Plaintiff be disaffiliated from the program for a period of "at least" 5-6 years. Upon information and belief, Dr. Renshaw elected to impose the most severe restriction on Plaintiff—which exceeded the vague, indefinite sanctions already imposed on him—at the urging of Plaintiff's detractors, including Professor 1. The disaffiliation restrictions served as a final blow to Plaintiff's research and teaching, and his obligations as a full professor at GMU. Like the Title IX sanctions, Plaintiff's re-affiliation with the program was discretionary.

528.   Based on the foregoing, Defendants Hammat, Williams, Renshaw, Ardis and Wu violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution with respect to the Title IX investigation, determination of responsibility, denial of Plaintiff's appeal, sanctions imposed on Plaintiff and his disaffiliation from his program. Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4;

ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and v) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

529.    As a result of the actions of Defendants Simmons, Hammat, Williams, Renshaw, Ardis and Wu, acting in their individual capacities, in violating Plaintiff's constitutional right to due process, Plaintiff suffered substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

530.    As a result, Plaintiff is entitled to damages against these Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT III
**Violations of the Due Process Clause of the Virginia Constitution**
**(Against Defendants Hammat, Williams, Renshaw, Ardis and Wu)**

531.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

532.    The Virginia Constitution states that "no person shall be deprived of his life, liberty, or property without due process of law." Va. Const. art. I, § 11.

533.    For the reasons stated in Count II, the University deprived Plaintiff of his property interest without due process of law.

534.    Defendants Hammat, Williams, Renshaw, Ardis and Wu violated the rights and guarantees set forth in the due process clause of the Virginia Constitution in the investigation, determination of responsibility, denial of Plaintiff's appeal and sanctions imposed on Plaintiff. Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

535.    As a result of the actions of Defendants Hammat, Williams, Renshaw, Ardis and Wu, acting in their individual capacities, in violating Plaintiff's constitutional right to due process, Plaintiff suffered substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

536.    As a result, Plaintiff is entitled to damages against these Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT IV**
**42 U.S.C. §1983: Denial of First Amendment Free Speech**
**(Against Defendants Hammat, Williams and Renshaw)**

537.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

538.    The First Amendment to the United States Constitution bars Congress from passing any law "abridging the freedom of speech…"

539.    The protections of the First Amendment extend to the campuses of state colleges and universities. *Healy v. James*, 408 U.S. 169, 180 (1972). Free speech rights apply in all educational programs and activities of public schools (*e.g.,* classroom, public meetings and speakers on campus, campus debates, student publications, school presentations, and other events). *See* 2001 Guidance, at p. 22. *See e.g.,* George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); *see Iota XI Chapter of Sigma Chi Fraternity v. George Mason University* (4th Cir. 1993) 993 F.2d 386 (offensive fraternity skit constituted student expression).

540.    The protection of academic discourse is a "special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

541.    The United States Supreme Court has determined that the question of whether a public employee's speech is constitutionally protected turns upon the "public" or "private" nature of such speech. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The

153

distinction is based upon the principle that "speech on public issues occupies the highest rung of the heirarchy [sic] of First Amendment values, and is entitled to special protection." *Id.* at 145, 103 S.Ct. 1684. To determine whether an employee's speech addresses a matter of public concern, the court must look to the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. Speech that relates "to any matter of political, social, or other concern to the community" touches upon matters of public concern. *Id.* at 146, 103 S.Ct. 1684.

542.    Plaintiff engaged in constitutionally protected expression and was severely disciplined in response to his exercise of constitutional rights. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Plaintiff's ability to engage in protected academic discourse is itself an issue of public concern protected by the First Amendment. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

543.    In drafting policies defining sexual harassment and regulating the conduct of students to prevent or redress discrimination prohibited by Title IX, schools must be cognizant of free speech rights. While Title IX is intended to protect students from sex discrimination, it is *not* meant to regulate the content of speech. The OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX. 2001 Guidance, at p. 22. In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment. 2001 Guidance, at iii.

544.    According to the 2001 Guidance, sexually explicit discourse in the classroom is protected by the First Amendment. The OCR's July 28, 2003 Dear Colleague Letter specified:

> Some colleges and universities have interpreted OCR's prohibitions of 'harassment' as encompassing all offensive speech regarding sex, disability, race or other classifications. Harassment, however, to be prohibited by the statutes within OCR's jurisdiction must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive. Under OCR's standard, the conduct must also be considered sufficiently serious to deny or limit a student's ability to participate in or benefit from the educational program. Thus, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances, including the alleged victim's age.

545.    The University's Sexual Misconduct Policies, and/or the manner in which they are interpreted, have evolved away from this requirement even though this federal guidance has not been withdrawn, to infringe on the First Amendment rights of University faculty, including Plaintiff.

546.    As set forth *supra* Paragraphs 182, 185, 188, 200, 210, until it released its 2017-2018 Sexual Misconduct Policy, GMU's Sexual Misconduct Policies and Grievance Procedures took protected academic discourse into account when evaluating sexual harassment complaints against faculty.

547.    Upon information and belief, the removal of this protection from the 2017-2018 Sexual Misconduct Policy, and subsequent iterations, was at the urging of Dr. Hammat, who had recently joined GMU as its Title IX Coordinator and was responsible for revising GMU's Title IX policies and procedures, as well as determining the outcome of harassment cases against faculty.

548.    As explained *supra* Paragraphs 252-273, 288-289, 292, 304-205, 336-340, 342, and 353, Plaintiff's discussions, both inside and outside the classroom, with his graduate students concerned human sexuality, relationships and cultural taboos, topics directly related to the research Plaintiff and his graduate students were conducting at the time and were, accordingly, matters of

public concern. There was no concern present that the graduate students participating in these lectures and discussions would be exposed to material that was inappropriate for their level of maturity because such concerns are "not implicated in the graduate school context." *Scallet v. Rosenblum*, 911 F. Supp. 999, 1011 (W.D. Va. 1996).

549.    Nor were any concerns raised, or complaints made, at the time Plaintiff engaged in the protected speech—whether by students or faculty. Instead, Defendants Hammat, Williams and Renshaw elected to later view the protected speech as harassment, in some cases over five years after the statements were made. First Amendment principles cannot be cast aside simply by labeling speech as "harassment or discriminatory," as there is no categorical "harassment exception to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

550.    Plaintiff's interest as a public citizen educating his graduate students through the use of pedagogical tools, including real world examples relevant to their areas of research in human sexuality and related topics, outweighed the University's interest in forbidding the occasional use of sexual or profane language by its faculty. *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968); *Hardy v. Jefferson Cmty. Coll.*, 260 F. 3d 671 (2001). There was, further, no evidence that Plaintiff's discussions about sexuality and cultural taboos caused any disruption to GMU's pedagogical mission or within his department at the time. *Id. See also Scallet,* 911 F. Supp. at 1012-1013.

551.    The allegations made against Plaintiff by Complainants 1 and 2 predominantly concerned statements made by Plaintiff that constituted protected speech under the First Amendment. The remaining allegations were unsubstantiated, contradicted by evidence, and did not constitute sexual harassment. Although the policies and procedures in place at the time the statements were made, and which were provided to Plaintiff, included protections for academic

discourse, Dr. Hammat ignored these protections in determining that Plaintiff was responsible for sexual harassment in the cases of Complainants 1 and 2. Mr. Williams affirmed this erroneous decision. Dr. Renshaw ignored these errors when placing severely restrictive conditions on Plaintiff's employment which were tantamount to dismissal because of their severe, negative impact on Plaintiff's ability to fulfill his obligations as full professor.

552.    With respect to Complainant 3, a number of allegations concerned speech protected by the First Amendment. Again, the policies and procedures in place at the time, and provided to Plaintiff, included protections for academic discourse. The remaining allegations were unsubstantiated, contradicted by evidence, and did not constitute sexual harassment. Dr. Hammat ignored the First Amendment in determining that Plaintiff was responsible for sexual harassment in the case of Complainant 3. Mr. Williams affirmed this erroneous decision. Dr. Renshaw ignored these errors when placing severely restrictive conditions on Plaintiff's employment, which were tantamount to dismissal because of their severe, negative impact on Plaintiff's ability to fulfill his obligations as full professor.

553.    With respect to Complainant 4, a number of allegations concerned speech protected by the First Amendment. The remaining allegations were unsubstantiated, contradicted by evidence, and did not constitute sexual harassment. Dr. Hammat ignored the First Amendment in determining that Plaintiff was responsible for sexual harassment in the case of Complainant 3. Mr. Williams affirmed this erroneous decision. Dr. Renshaw ignored these errors when placing severely restrictive conditions on Plaintiff's employment which were tantamount to dismissal because of their severe, negative impact on Plaintiff's ability to fulfill his obligations as full professor.

554.    Had Dr. Hammat not ignored the First Amendment in investigating and determining the outcome of Plaintiff's case and had Mr. Williams not done so in denying Plaintiff's appeal, then Plaintiff would not have received the severe and unwarranted discipline imposed by Dr. Renshaw, including Plaintiff's disaffiliation from his program, which was grounded in the erroneous Title IX findings which purportedly threatened the accreditation of Plaintiff's program.

555.    Dr. Hammat, as Title IX Coordinator and drafter of GMU policies, was or should have been aware of Plaintiff's clearly established right to free speech under the First Amendment as set forth in the OCR's 2001 Guidance. Mr. Williams, as an Assistant Vice President, should also have been aware of this right. As a member of the faculty, and individual responsible for imposing sanctions resulting from violations of GMU's Sexual Misconduct Policy, Dr. Renshaw should also have been aware of Plaintiff's right to free speech on matters of public concern, as discussed in the 2001 Guidance.

556.    Based on the foregoing, Defendants Hammat, Williams and Renshaw violated the rights and guarantees set forth in the First Amendment of the United States Constitution with respect to the Title IX investigation, determination of responsibility, denial of Plaintiff's appeal and sanctions imposed on Plaintiff. Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy,

in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

557.    As a result of the actions of Defendants Hammat, Williams and Renshaw, acting in their individual capacities, in violating Plaintiff's constitutional right of free speech pursuant to the First Amendment, Plaintiff suffered substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

558.    As a result, Plaintiff is entitled to damages against these Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    As to Count I against Defendants George Mason University and Board of Visitors of George Mason University for violations of Title IX of the Education Amendments of 1972, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as an injunction directing Defendant George Mason University to: i) vacate the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) remove all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliate Plaintiff with his program; iv) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) open an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) grant Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester;

(ii)    As to Count II against Defendants Hammat, Renshaw, Williams, Ardis and Wu for 42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process, in their official capacities

an injunction: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester. Against Defendants Hammat, Renshaw, Williams, Ardis and Wu in their individual capacities, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   As to Count III against Defendants Hammat, Williams, Renshaw, Ardis and Wu for violations of the Due Process Clause of the Virginia Constitution, an injunction Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iv) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester; and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)   As to Count IV against Defendants Hammat, Renshaw, and Williams for 42 U.S.C. §1983: Denial of First Amendment Freedom of Speech, in their official capacities an injunction: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester. Against Defendants Hammat, Renshaw and Williams, in their individual capacities, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    An injunction directing Defendant George Mason University to: i) vacate the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) remove all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliate Plaintiff with his program; iv) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) open an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) grant Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

(vi)    Awarding punitive damages.

(vii)    Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:

Respectfully Submitted,

FARMER LEGAL, PLLC

By:    /s/ *Joshua T. Farmer*
       Joshua T. Farmer
5030 Sadler Place, #205
Glen Allen, VA 23060
(804)325-1441
josh@farmerlegalhelp.com

NESENOFF & MILTENBERG, LLP

By:    /s/ *Andrew T. Miltenberg*
Andrew T. Miltenberg (*pro hac vice* admission pending)
Kara L. Gorycki (*pro hac vice* admission pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-cv-01249 |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANT THE RECTOR AND VISITORS OF
<u>GEORGE MASON UNIVERSITY'S MOTION TO DISMISS COUNT I</u>**

Defendant The Rector and Visitors of George Mason University ("Mason"), by and

through counsel, moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Count I of Plaintiff's

Complaint with prejudice.

The grounds for the motion are as follows:

1.  Count I asserts a Title IX claim against Mason under both an "erroneous outcome"

    and "selective enforcement" theory.

2.  In order to state a claim based on an erroneous outcome theory Plaintiff must "allege

    particular facts sufficient to cause some articulable doubt on the outcome of the

**A171**

disciplinary proceeding" and "particular circumstances suggesting that gender bias

was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d

709 (2d Cir. 1994). Plaintiff's complaint fails to plead either element of an erroneous

outcome theory. To the contrary, the allegations in Plaintiff's complaint demonstrate

that there was no gender bias and that the outcome was correct.

3. In order to state a claim based on a selective enforcement theory, Plaintiff had to

   identify a similarly situated individual of a different gender who was treated

   differently than Plaintiff. *Doe v. Fairfax County Sch. Bd.*, __ F. Supp. 3d ___, 2019

   U.S. Dist. LEXIS 170577, at *11 (E.D. Va. 2019). Plaintiff fails to do so.

The legal arguments outlined above are set forth at length in the accompanying

Memorandum of Points and Authorities. This motion is based on the Complaint filed in this

action, this motion, the accompanying memorandum of points and authorities and exhibits

thereto, any subsequently filed reply brief and any oral argument presented by the Defendants

during the hearing for this motion.

December 20, 2019                          RESPECTFULLY SUBMITTED

                                   _____/s/_____
                                   Eli S. Schlam, Asst. Atty. Gen.
                                   Virginia Bar Number 92987
                                   George Mason University
                                   4400 University Drive,
                                   MS 2A3
                                   Fairfax, VA 22030
                                   Phone: (703) 993-2619
                                   Fax: (703) 993-2340
                                   eschlam@gmu.edu

                                   *Attorney for The Rector and Visitors of George
                                   Mason University*

Case 1:19-cv-01249-LO-MSN   Document 26   Filed 12/20/19   Page 3 of 3 PageID# 245

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of December 2019, I will electronically file

the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to counsel of record in this case.

        \_\_\_\_\_/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

3

Case 1:19-cv-01249-LO-MSN   Document 27   Filed 12/20/19   Page 1 of 32 PageID# 550

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA**

JOHN DOE,                              )
                                       )
                                       )
        *Plaintiff*,                   )
                                       )
                                       )
    v.                                 )        Civil Action No.: 1:19-cv-01249
                                       )
GEORGE MASON UNIVERSITY, *et al.*      )
                                       )
                                       )
        *Defendants*.                  )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT THE RECTOR AND VISITORS OF
<u>GEORGE MASON UNIVERSITY'S MOTION TO DISMISS COUNT I</u>**

Plaintiff was found responsible for sexual harassment after an investigation into complaints made by four graduate students about Plaintiff's numerous sexually explicit statements and actions.  Plaintiff's sole claim against The Rector and Visitors of George Mason University ("Mason")[1] is that it violated Title IX when it found him responsible.  Plaintiff's primary theory is an "erroneous outcome" theory, which requires Plaintiff to plead both facts sufficient to create doubt in the outcome of his case and facts demonstrating that the outcome of his case was motivated by gender bias.  While Plaintiff has made many allegations (558 paragraphs, to be exact), there are three glaring holes in Plaintiff's complaint.  *First,* Plaintiff was required to allege specific statements or actions by the decision makers that demonstrate a gender bias.  Despite scouring the internet for such statements, Plaintiff came up with nothing that indicates they have a gender bias.  Instead, he alleges statements that, at most, demonstrate a commitment by Mason and its employees to combatting sexual misconduct on campus, regardless of the gender of the accused or complainant.  Courts have repeatedly rejected attempts to conflate a commitment to addressing sexual misconduct with anti-male gender bias.  Even more problematic for Plaintiff is that his own allegations disprove his claim by demonstrating that the decision makers in this case and Mason as an institution do not harbor or make decisions based on gender stereotypes or biases.

*Second,* Plaintiff cannot show that the outcome was erroneous because he ***admits that most of the findings against him are correct.***  Throughout the Complaint, Plaintiff admits that he, *inter alia,* shared stories with graduate students about his personal sexual experiences, asked a graduate student about her pornography preferences, visited a strip club with students, and

---

[1]Pursuant to Virginia Code § 23.1-1500(A) George Mason University operates under the corporate name "The Rector & Visitors of George Mason University."  The Parties have agreed to dismiss George Mason University as a defendant.

spent time in a hot tub with students talking about his experience at a brothel.   The outcome of the investigation cannot be "erroneous" when the Plaintiff admits that the key underlying factual findings are correct.  Here too, Plaintiff's own allegations demonstrate that he has no claim.

*Third*, while Plaintiff tries to cast doubt on the outcome of his case by asserting that he was denied due process during the investigation, he admits that he was given notice and four opportunities to be heard—more than what due process requires.  For a third time, Plaintiff's own allegations disprove his claim.

Plaintiff also asserts a "selective enforcement" theory under Title IX but devotes only five out of 558 paragraphs to this claim.  For his selective enforcement claim, Plaintiff needed to allege that Mason treated a similarly situated female faculty member differently.  Plaintiff does not identify any such faculty member; indeed, he admits that he has no such factual allegations and begs the Court to ignore federal pleading standards and allow him to go on a fishing expedition.  Once again, Plaintiff's own complaint demonstrates that he has no claim.

In short, Plaintiff's 162 page complaint is a prime example of why "[m]ore is not necessarily better under the Federal Rules." *Northern Trust Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995)  Not only has he failed to allege the necessary elements of his claim, but he "plead[ed] himself out of court by unnecessarily alleging facts which . . . demonstrate that he has no legal claim." *Id.*

## FACTUAL BACKGROUND

As this motion only addresses Plaintiff's Title IX claims, this section will be limited to the events relevant to that claim, i.e., the Title IX investigation and adjudication.  A description of subsequent events relevant to Plaintiff's other claims is included in the Individual Defendants' Motion to Dismiss.  As required for a motion to dismiss, Mason assumes the truth of the factual

# A176

allegations in the Complaint unless contradicted by documents incorporated by reference into the

Complaint.[2]  *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

While Plaintiff's voluminous complaint might give the false impression that this case has

a long or complicated factual background, the relevant events are actually quite simple.  Plaintiff

is currently a tenured full professor at Mason.  *See* Compl. ¶ 502.  On December 4, 2018,

Mason's Office of Compliance, Diversity, and Ethics ("CDE") notified Plaintiff that "four

former and current graduate students . . . had filed Title IX complaints against him for sexual

harassment."  *Id.* ¶ 136.  These notices listed the allegations against Plaintiff and provided him

with the applicable policies and procedures based on the school year when the alleged

harassment occurred.  Exs. 1-4 (incorporated by reference, Compl. ¶ 136).   In summary, the

allegations against Plaintiff were that over a five-year period he made sexually inappropriate

comments, shared personal sexual experiences, and asked graduate students about their sexual

preferences.  *Id.*  The complainants alleged that these comments made them feel uncomfortable

and interfered with their educational experience.[3]

---

[2] On a Rule 12(b)(6) motion to dismiss a court may consider "documents incorporated into the complaint by reference."  *Tallabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

[3] To understand these allegations, it is important to recognize the power dynamic between a faculty member, such as Plaintiff, and graduate students, such as Complainants 1-4.  A faculty member has a great deal of power and authority over a graduate student in his department.  Unlike undergraduate students who take classes with many different faculty members during their time at a university, graduate students work closely with a few faculty member mentors in classes and on their research.  Faculty mentors have the ability to exert a strong influence over the graduate students' ability to conduct their research, obtain funding for that research, present at conferences and publish their research, complete their graduate work, and obtain future employment in academia or other fields.  Indeed, Plaintiff notes providing recommendations for and assistance obtaining jobs and research grants to graduate students.  *See* Compl. ¶ 5.

3

Per Mason's policies and procedures, CDE conducted an investigation of the allegations. As part of that investigation, Plaintiff was interviewed three times, *see* Compl. ¶ 145, twice by Dr. Hammat, Mason's then-Title IX Coordinator and "the sole individual tasked with deciding the outcome of the allegations against Plaintiff." *Id.* ¶¶ 149, 150, 158.  During those interviews Plaintiff, while represented by counsel, had the opportunity to respond to the evidence and present his side of the story.  *See, e.g.*, *id.* ¶252-53 (had the opportunity to explain the context of the story told during class about him performing oral sex on a woman in public); ¶ 269 (had the opportunity to deny statements attributed to him); ¶ 309-10 (had the opportunity to present evidence of communications with Complainant 3 and about incident alleged by her); ¶ 338 (had the opportunity to respond to allegation that while at a bar he asked a graduate student about what type of pornography she liked to watch); ¶ 341 (had the opportunity to explain why he believed there was nothing wrong with "hot tubbing" with graduate students).  He also had the opportunity to "provide a list of witnesses" and "over 150 pages" of documents to support his side of the story.  *Id.* ¶¶ 153-54.

During the course of the investigation, Plaintiff admitted to many of the alleged statements and conduct—as he does again in the Complaint.  For example, Plaintiff admitted to (1) spending time with his graduate students in his hot tub during which he discussed his visit to a brothel in Germany, *id.* ¶ 341-42; (2) asking a graduate student what type of pornography she liked, *id.* ¶ 337-38; (3) visiting a strip club with graduate students, taking a photograph of one of the students getting a lap dance, and making a statement about using the photograph for blackmail, *id.* ¶ 347; (4) discussing with graduate students, while at a conference, "sexual encounters that occurred on the trip," *id.* ¶ 344; (5) sharing with graduate students a story about an intimate sexual experience Plaintiff had in Vietnam, *id.* ¶ 353; (6) sharing the number of

4

sexual partners he had during one of his classes, *id.* ¶ 292; and (7) sharing a story during class about a time that Plaintiff performed oral sex on a woman in public at a party, *id.* ¶ 252.

Based on Plaintiff's own admissions and testimony from eleven other witnesses, *id.* ¶ 374, Dr. Hammat determined that Plaintiff had engaged in conduct that violated Mason's sexual misconduct policy, and on February 22, 2019 sent Letters of Determination to Plaintiff stating her findings. *See* Exs. 5-8 (incorporated by reference, Compl. ¶ 160). Notably, where Dr. Hammat did not find sufficient evidence to support a specific allegation against Plaintiff she either so noted in the Letters of Determination, *see, e.g.*, Ex. 7 (Complainant 3 Letter of Determination) (stating that "[d]ue to lack of corroborating witnesses, the investigator was unable to determine whether" allegation about Plaintiff hugging Complainant 3 and offering to buy her a beer was true), or omitted that allegation from the findings, *compare* Ex. 1 (Complainant 1 Notice) (containing allegations that Plaintiff told graduate students that "they needed to get naked together" and that Plaintiff made comments in class that suggested that men and women were not equal) *with* Ex. 5 (Complainant 1 Letter of Determination) (not including these allegations in findings of investigation).

Per Mason's procedures, Plaintiff had another opportunity to present his story through an appeal of Dr. Hammat's decision to the Vice-President of CDE, Julian Williams. Plaintiff "submitted a 38-page appeal to Mr. Williams with hundreds of pages of exhibits." Compl. ¶ 165. Mr. Williams denied Plaintiff's appeal finding that the "investigation into the reports uncovered numerous instances of non-pedagogical discussions of sex, sexual encounters, and a sexually-charged environment, in general" and that Plaintiff "confirmed most of this conduct during the investigation." Ex. 9 (incorporated by reference, Compl. ¶ 373).

**A179**

The determination in Plaintiff's case was provided to his supervisor, Dr. Renshaw, who determined the appropriate sanctions based on the findings. Dr. Renshaw required Plaintiff to undergo sexual harassment training and placed him on a four-semester probationary period during which he could not teach or mentor new graduate students, was only allowed to meet with students on campus or in public settings, and could only communicate with students through Mason approved methods (e.g., official Mason email). *See* Compl. ¶ 393. Plaintiff was not terminated and remains a tenured full professor at Mason. *Id.*

Plaintiff now claims that Mason violated Title IX. As demonstrated below, Plaintiff has not properly pled a Title IX claim.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must allege sufficient facts regarding each count to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 555 U.S. at 556.

Courts "must consider the complaint in its entirety, as well as . . . documents incorporated in the complaint by reference, and matters of which a court may take judicial notice." *Tallabs*, 551 U.S. at 322. A court "need not accept as true mere legal conclusions couched as factual allegations." *Assa'ad-Faltas v. Virginia*, 738 F. Supp. 982, 985 (E.D. Va. 1989). A court also should not accept as true allegations that are contradicted by documents incorporated by reference into a complaint. *See Veney*, 293 F.3d at 730. Finally, a plaintiff can "plead himself

6

out of court" by alleging facts that "demonstrate that he has no legal claim." *Northern Trust*, 69 F.3d at 129.

**ARGUMENT**

Plaintiff's only claim against Mason is for violation of Title IX related to the determination that he engaged in sexual harassment against four students. Plaintiff asserts an "erroneous outcome" theory and then tacks on as an afterthought a "selective enforcement" theory. Both claims must be dismissed as a matter of law.

**I. PLAINTIFF'S TITLE IX ERRONEOUS OUTCOME CLAIM MUST BE DISMISSED.**

A Title IX "erroneous outcome" claim was first recognized in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). In *Yusuf*, the Second Circuit concluded that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* at 715. Therefore, in order to state an erroneous outcome claim, a plaintiff must both "allege particular facts sufficient to cause some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*

Notably, Plaintiff's erroneous outcome claim is limited to the determination that he engaged in sexual harassment; the decisions by his department chair as to what sanction to impose and by the faculty to disaffiliate him from an academic program are not at issue in this claim. Nor has Plaintiff made any allegations that Dr. Renshaw, Dean Ardis, or Provost Wu have a gender bias. Therefore the sole issues are whether Plaintiff has sufficiently alleged particular facts demonstrating (1) that gender bias was a motivating factor in the determination that Plaintiff violated Mason's sexual misconduct policy and (2) some articulable doubt as to whether Plaintiff did engage in conduct that violated the sexual misconduct policy.

7

# A181

**A. Plaintiff Has Not Made Particularized Allegations Showing a Causal Connection Between the Outcome of the Title IX Investigation and Gender Bias.**

Plaintiff's erroneous outcome claim fails because he has not pled facts sufficient to show that gender bias motivated the outcome of the Title IX investigation. As *Yusuf* instructed "conclusory allegation[s] of gender discrimination [are] not sufficient to survive a motion to dismiss" and that "particularized allegations relating to a causal connection between the flawed outcome and gender bias" are required. 35 F.3d at 715. Plaintiff must plead "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that [ ] tend to show the influence of gender." *Id.* Plaintiff's attempts to meet this requirement fall into two categories, (1) allegations about Mason officials involved in investigating and deciding his Title IX matter and (2) allegations about general "pressure" Mason (and every other university) face on issues related to addressing sexual misconduct. But none of Plaintiff's allegations actually demonstrate gender bias; rather, they demonstrate that Mason officials are committed to the important goal of addressing sexual misconduct on campus.

1. Plaintiff Has Failed to Allege Any Statements by University Officials Demonstrating Gender Bias.

As the court in *Doe v. Marymount Univ.* recently explained, "a Title IX plaintiff successfully alleges gender bias if he or she points to statistical evidence of gender bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias." 297 F. Supp. 3d 573, 585 (E.D. Va. 2018). Here, Plaintiff has made no allegations of statistical evidence of gender bias or policies and procedures that are designed to reach gender-specific outcomes; he instead rests his claim on his allegations of statements made by Dr. Hammat and Mr. Williams.

In order to try to satisfy this element, Plaintiff appears to have engaged in an exhaustive internet search for statements made by Dr. Hammat and Mr. Williams, going so far as to include

8

statements made by them ***more than five years ago***.[4]  Despite this effort, Plaintiff came up with

nothing.  *Marymount* provides a helpful example of the kind of statement by a university official

that could evidence gender bias.  In that case, plaintiff alleged that the adjudicator had expressed

incredulousness that a male was not aroused by a female touching his genitals without consent.

The court concluded that this allegation sufficiently pled that the adjudicator's "decision-making

was infected with impermissible gender bias, namely [his] discriminatory view that males will

always enjoy sexual contact even when that contact is not consensual."  *Id.* at 585-86.

Here, on the other hand, Plaintiff has not alleged any statement by Dr. Hammat or Mr.

Williams that indicate gender bias.  At most (and even this is questionable), Plaintiff has alleged

facts suggesting that they may have a bias against perpetrators of sexual misconduct or in favor

of victims of sexual misconduct.  But, as Judge Williams of this Court recognized over twenty

years ago and Judge Trenga reconfirmed this year, "bias against people accused of sexual

harassment and in favor of victims . . . indicate[s] nothing about gender discrimination."  *Haley*

*v. VCU*, 948 F. Supp. 573, 579 (E.D. Va. 1996); *Doe v. Fairfax Cnty. Sch. Bd.*, __ F. Supp. 3d

___, 2019 U.S. Dist. LEXIS 170577, at *19 (E.D. Va. 2019) ("Courts have widely held that

vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those

accused of misconduct, is not evidence of anti-male bias."); *see also Sahm v. Miami Univ.*, 110

F. Supp. 3d 774, 778 (S.D. Ohio 2015) (collecting cases).  Plaintiff's allegations, however, do

not even demonstrate that Dr. Hammat or Mr. Williams are biased against perpetrators of sexual

---

[4] In addition to the statements alleged by Plaintiff not demonstrating gender bias, the
Court should not countenance Plaintiff's attempt to meet his pleading requirement by cherry-
picking isolated statements made by Dr. Hammat and Mr. Williams years before Plaintiff's Title
IX matter arose.  The large temporal gap between the alleged statements and the investigation at
issue negates any "causal connection" between such statements and the outcome of the
investigation.

misconduct. Rather, his allegations demonstrate that they are committed to the laudable goals of preventing sexual misconduct on campus and providing a fair process to all involved parties.

<u>Allegations about Statements by Dr. Hammat</u>

- Plaintiff selectively quotes and misrepresents[5] a 2013 interview of Dr. Hammat in which she disclosed that she is a survivor of sexual assault and explained that after she disclosed to her sorority that she had experienced sexual assault, her sorority (not her alone, as Plaintiff incorrectly alleges) formed a group where they agreed to not leave a party without all of the members of the group. *See* Ex. 10 at 8-9 (incorporated by reference, Compl. ¶ 150, n.55). She also states that when she shared her experience with fraternities, they often became angry and wanted to know the name of her assailant. *Id.* Instead of disclosing the name, she instead would tell them that "I'm not saying that this has ever happened in this frat house, but I need you to be this angry and this protective of every female that walks in this house because you never know." *Id.* Plaintiff cannot seriously be claiming that Dr. Hammat being a survivor of sexual assault or Dr. Hammat's sorority sisters deciding to take common-sense safety precautions when attending parties (notably not limited to fraternity parties) makes Dr. Hammat biased against men. And her statement to the fraternities actually cuts against Plaintiff's claim by demonstrating that Dr. Hammat is not biased against men as she explicitly states that she is ***not*** assuming that sexual assaults occur in all fraternity houses and recognizes that many men will want to take actions to prevent sexual misconduct.

- Plaintiff also references an article in the UT-Austin school newspaper from 2013 in which Dr. Hammat cited national statistics about the percentage of women ***and men*** who are likely to be the victim of sexual assault before they leave college and explained that the number of reported sexual assaults at UT-Austin (where she worked at the time) was significantly less than what would be expected based on those statistics and the student population. *See* Ex. 11 at 2 (incorporated by reference, Compl. ¶ 151, n.57). This statement by Dr. Hammat does not indicate any gender-bias, to the contrary

---

[5] For example, Plaintiff incorrectly asserts with regard to this interview that "Dr. Hammat has been publicly vocal in women's advocacy publications . . . ." Compl. ¶ 485(b). First, Plaintiff has only alleged one publication in which she made these statements, not multiple publications. Second, the publication where Dr. Hammat made these statements is not a women's advocacy publication, it is a journal published by the Institute on Domestic Violence & Sexual Assault (IDVSA) at the University of Texas at Austin. The mission of that organization is to "advance the knowledge of domestic violence and sexual assault in an effort to end interpersonal violence" regardless of the gender of the parties. *See* Ex. 10 at 1 ("Our Mission").

**A184**

it demonstrates that Dr. Hammat understands that both males and females can be the victim of sexual assault. Perhaps realizing that Dr. Hammat's comments by themselves don't demonstrate any gender-bias, Plaintiff cites "criticism" of Dr. Hammat by a single ideological internet blogger.[6] Comments by someone else do not demonstrate that Dr. Hammat is gender-biased. To the extent it has any relevance, the criticism of Dr. Hammat was that she couldn't interpret statistical information or has an overly broad understanding of what constitutes sexual assault, neither of which have any bearing on whether Dr. Hammat is biased against males (or made a misjudgment here since this case does not involve sexual assault).

- Plaintiff references Dr. Hammat's participation in an event titled "How Equity Advocates Can Support High Expectations for Title IX and Title IX Coordinators" in which Dr. Hammat and other DC-area Title IX coordinators were asked to share their "wish list for support from Equity Advocates." Compl ¶ 152. Dr. Hammat's participation in such an event does not demonstrate any gender bias; it demonstrates an interest in engaging with parties interested in Title IX issues. Plaintiff fails to make any allegation that Dr. Hammat said anything or included anything on her "wish list" that demonstrated she was biased against men. Plaintiff makes the conclusory and purely speculative allegation that this event "is yet another example of Dr. Hammat publicly taking a biased position on the side of women's rights," but Plaintiff has no idea (and therefore cannot allege) what Dr. Hammat said or what positions she took at that event.

- Plaintiff complains that during his interview Dr. Hammat asked him about an allegation that he was involved in a relationship with a student. Compl. ¶ 485(e). Plaintiff does not explain, nor could he, how Dr. Hammat asking him about this allegation demonstrates gender bias. The purpose of the interview was to give Plaintiff an opportunity to respond to allegations made against him. To the extent it demonstrates anything, this allegation shows that Dr. Hammat conducted a thorough investigation. Had Dr. Hammat not asked him about the allegation and given him the opportunity to respond, Plaintiff would undoubtedly be claiming that was a due process violation.

- Finally, Plaintiff claims that Dr. Hammat exhibited gender bias by including certain details in her description of the allegations against Plaintiff. Again, had Dr. Hammat not included these details in the notices, Plaintiff would surely be claiming that Mason did not provide him with adequate notice. Plaintiff also does not provide any explanation for how Dr. Hammat

---

[6] The criticism was by KC Johnson, an internet blogger who frequently complains about Title IX issues on college campuses and is the author of "The Campus Rape Frenzy: The Attack on Due Process at American Universities." *See* Ex. 12 (incorporated by reference, Compl. ¶ 151, n.56).

11

providing Plaintiff with the allegations ***made by other people*** demonstrates that Dr. Hammat has a gender bias.  Regardless, the details identified by Plaintiff do not demonstrate gender bias.  *First*, Dr. Hammat noting that the alleged story Plaintiff told about skinny-dipping involved a woman who was not Plaintiff's wife does not demonstrate that Dr. Hammat expected Plaintiff to comport with traditional notions of marriage; it is merely a detail in the alleged story.  Also, even if Plaintiff were correct that Dr. Hammat has a bias towards traditional notions of marriage that would have no relevance to whether she has an anti-male bias.  *Second*, Plaintiff complains that Dr. Hammat included a reference to human trafficking with respect to the allegation about Spa World.  Plaintiff once again provides no explanation, nor could he, for how Dr. Hammat including a reference to human trafficking demonstrates gender bias.  *Third*, Plaintiff complains that Dr. Hammat noted that Complainant 3 alleged that Plaintiff invited her to a sexually explicit conference presentation "knowing she was a first year graduate student."  Once again, this statement does not indicate gender bias; if anything it demonstrates a bias about the maturity of first-year graduate students.

<u>Allegations about Statements by Mr. Williams</u>

- The only allegation Plaintiff makes about statements by Mr. Williams are from a single 2014 or 2015 interview about Vassar's (where Mr. Williams worked at the time) Title IX process.  Plaintiff's allegations blatantly misrepresent Mr. Williams' statements by inserting the word "female" into a statement that was gender neutral.  Plaintiff alleges that Mr. Williams said that "campus administrators have a moral obligation to protect and care for female students" but what Mr. Williams actually said was "So at Vassar we want to meet not only our legal obligations under Title IX but, more importantly, our moral obligation to protect and care for our students and our community."  Ex. 13 at 2 (incorporated by reference, Compl. ¶ 166 n.61).  The statement Mr. Williams actually made is plainly gender neutral.

- Plaintiff also references and again misrepresents another statement in that interview.   In the interview Mr. Williams explained that "[j]ust because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying." Ex. 13 at 4.  As an initial matter, nothing in this statement indicates gender bias, since both male and female students can be complainants in Title IX cases.  The statement Plaintiff quotes actually cuts against his argument that Mr. Williams is biased because it demonstrates that Mr. Williams understands that even if he believes that a victim of sexual misconduct is telling the truth, a policy violation can only be found if there is sufficient information to corroborate the allegations.  As Mr. Williams states in the next sentence, "We must operate within our

standard of proof and our policy definitions, but we care about all the students who go through this process." Ex. 13.

Plaintiff's allegations of specific statements by Mr. Williams and Dr. Hammat fall far short of demonstrating that either of them harbor impermissible gender biases. Plaintiff's other attempts to demonstrate gender bias, *see* Compl. ¶ 485 (c), (e), (h), and (i), similarly fail.[7] For example, Plaintiff's disagreement with how Mr. Williams and Dr. Hammat weighed the evidence does not indicate any gender bias, as this court already held in *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 734 (E.D. Va. 2015) ("*GMU*"). There, the plaintiff similarly alleged that the original decision maker "made a decision against the weight of the

---

[7] Plaintiff also makes allegations about the initial investigator, Megan Simmons, who was removed from the case after Plaintiff's initial interview based on complaints by him about her. Ms. Simmons, therefore, had limited involvement with the investigation and was not involved in deciding the outcome of Plaintiff's case or appeal. Regardless, Plaintiff has not alleged any facts that show Ms. Simmons had a gender bias. He asserts that she "had a lengthy background of advocacy on behalf of female victims of sexual violence and the prosecution of males accused." Compl. ¶ 485(a). But elsewhere in the Complaint, Plaintiff contradicts this conclusory allegation by pleading only that Ms. Simmons' background included "working as a federal agent" and "represent[ing] law enforcement on various committees tasked with finding holistic approaches to ending violence against women in the Navy." Compl. ¶ 147. Even if Ms. Simmons did previously work on issues related to violence against women, that does not mean she has an anti-male gender bias. *See Doe v. Loh*, PX-16-3314, 2018 U.S. Dist. LEXIS 53619, at *29 (D. Md. March 29, 2018) *aff'm* 767 Fed. Appx. 489 (4th Cir. 2019) ("[S]imply because [university official], in the past, had taken up the cause of female victims does not render her hopelessly biased against men."). Nor does Plaintiff's allegations that Ms. Simmons left Mason to work "for a non-profit that advocates for the prevention of violence against women" or that she "gave guest lectures for the Women and Gender Studies Department," in any way demonstrate that she is biased against men. At most, these allegations demonstrate that Ms. Simmons has an interest in combatting violence against women (regardless of who commits it). Finally, Plaintiff alleges that Ms. Simmons "was hostile and menacing towards Plaintiff," and that based on this "demeanor" Plaintiff believes she "operated under a presumption that Plaintiff was guilty." Compl. ¶ 146. Whether or not Ms. Simmons was nice to Plaintiff has no bearing on whether she harbors a gender bias. There are plenty of plausible reasons why Ms. Simmons might have been hostile to Plaintiff, including that he admits to engaging in inappropriate conversations and actions with his students. *See GMU*, 132 F. Supp. 3d at 733 (explaining that there may be any number of non-discriminatory reasons for how a school official treats an accused individual and that in "in the absence of any specific factual allegation pointing to such a bias," "it cannot be said that the discriminatory motive explanation is plausible rather than conceivable").

**A187**

evidence," the appellate officer "summarily affirmed the erroneous decision," and "'the only possible explanation' is bias against the plaintiff because of his 'status as a male accused of sexual misconduct.'"  *Id.*  As the court in *GMU* explained in rejecting this argument, "this conclusion does not *necessarily* follow from the facts alleged.  Gender neutral concerns might well have easily—and more plausibly—motivated the challenged actions."  *Id.*

Some of Plaintiff's allegations are both hyperbolic and fail to demonstrate gender bias. For example, Plaintiff's allegation that "Dr. Hammat drafted GMU's Sexual Misconduct Policy which  . . . decreased the rights of faculty with each iteration and expanded the definition of sexual harassment to include nearly any word or action imaginable," Compl. ¶ 485(c), is unnecessary hyperbole because the policy clearly does not make "any word or action imaginable" sexual harassment. *See* Exs. 4A at 13-14, 4C at 12-13 (defining sexual harassment). Even if this allegation were true, it might indicate that Dr. Hammat has a broad understanding of sexual harassment or is biased against faculty members, but it provides no support for Plaintiff's assertion that Dr. Hammat is biased against men.  *See Loh*, 2018 U.S. Dist. LEXIS 53619, at *27 (policy which is written in a "facially neutral manner" and applies to all allegations of sexual misconduct "without regard to gender" does not demonstrate gender bias).  Plaintiff also asserts that in deciding his appeal Mr. William's "seemed outraged by Plaintiff allowing students to swim, with bathing suits, in a hot tub."  Compl. ¶ 485(h).  The only statement Mr. Williams made in his appeal decision about the hot tub is that the investigation revealed "[o]ccasions where students under your supervision visited your home hot tub."  Ex. 9.  If Plaintiff or his counsel actually believe that statement demonstrates "outrage," they do not understand what that word means.  Regardless, even if true, Mr. Williams being concerned about a faculty member

14

being in a hot tub with his graduate students does not demonstrate gender bias, it demonstrates

he has the good judgment that Plaintiff apparently lacks.

Despite scouring the internet for statements by Mr. Williams and Dr. Hammat, Plaintiff

has failed to allege any statement or action by either that even hints at an anti-male or pro-female

bias, let alone constitute the required "particularized allegations relating to a causal connection

between the flawed outcome and gender bias." *Yusuf*, 35 F.3d at 715.  Instead Plaintiff's

complaint rests on the fallacy that support for sexual assault victims and a commitment to

eradicating sexual misconduct from college campuses is the same as anti-male bias.  As courts

regularly recognize, it is not the same, and allegations, such as those made by Plaintiff here, are

not sufficient to plead an erroneous outcome claim.  *See Haley*, 948 F. Supp. at 579; *Fairfax

Cnty. Sch. Bd.*, 2019 U.S. Dist. LEXIS 170577, at *19.  As such, Plaintiff's erroneous outcome

claim must be dismissed.

2.  Plaintiff's Allegations of "Pressure" Are Insufficient to Plead Gender Bias

As demonstrated above, Plaintiff has failed to plead "statements by members of the

disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making

that also tend to show the influence of gender," *Yusuf*, 35 F.3d at 715, and, therefore, his

erroneous outcome claim must be dismissed.  Recognizing that he has failed to meet this

requirement of his claim, Plaintiff wastes pages of his complaint with allegations about supposed

"pressure" Mason faces on the issue of sexual assault.  Even if those allegations demonstrated

pressure on Mason to act against men (they do not), they would still be insufficient to state a

claim absent the concrete allegations demonstrating gender bias required by *Yusuf*.  Plaintiff

concedes this point by stating in his complaint that his allegations of "pressure" at most provide a

"'backdrop' for gender bias."  Compl. ¶ 481 (quoting cases where courts found that allegations

15

of pressure *plus* biased statements by university officials were sufficient to state an erroneous outcome claim).

In addition to being insufficient to meet the pleading standard for an erroneous outcome claim, Plaintiff's allegations of "pressure" fail to demonstrate that Mason has an anti-male bias. Courts have regularly held that allegations, such as those made by Plaintiff, about "pressure from the federal government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—say nothing about the University's alleged desire to find men responsible because they are men." *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017); *Loh,* 2018 U.S. Dist. LEXIS 53619, at *26 ("Doe's allegation of general pressure that the Dear Colleague letter supposedly exerted on *all* universities does not allow the inference that UMCP succumbed to such pressure, and that the pressure rendered a biased outcome in Doe's case."); *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 956 (N.D. Ill. 2017) (rejecting argument that "OCR previously investigat[ing] CCC regarding Title IX complaints, and subsequent publicity from that investigation pressured CCC to investigate and punish males more harshly"); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) ("[I]t is not reasonable to infer that UC has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding."); *Messeri v. Univ. of Colo*., 18-cv-2658, 2019 U.S. Dist. LEXIS 162010, *41 (D. Colo. Sept. 23, 2019) ("[S]crutiny and criticism from the student newspaper does not say anything about the University's desire to find men responsible because they are men."). Courts also reject attempts to use a university "rais[ing] the awareness of its faculty and staff to sexual assault" as a basis to allege gender bias against men. *Univ. of Cincinnati*, 173 F. Supp. 3d at 602; *see also*

16

*Columbia Coll. Chi.*, 299 F. Supp. 3d at 955 (rejecting argument that events "such as 'Take Back the Night' and other public awareness events[ ] are anti-male").

Plaintiff's other allegations about Mason similarly fail to even suggest the possibility of anti-male bias. Plaintiff has not offered a single allegation about a time in which Mason favored a female complainant at the expense of an accused male. To the contrary, Plaintiff's factual allegations all relate to addressing sexual misconduct regardless of the gender of the perpetrator and victim. Some of Plaintiff's allegations are just silly. For example, how could Mason's former president joining a task force to combat sexual assault; or the Secretary of Education giving a speech at Mason on sexual assault on campuses; or the Vice President of CDE making the true statement that OCR could limit federal funds if it found a Title IX violation; or Dr. Hammat expressing her opinion about how sexual assault survivors (of all genders) might feel about new Title IX regulations, in any way demonstrate gender bias against men? All of these examples fail because, as noted above, they incorrectly equate addressing sexual assault with bias in favor of females. Likewise, Plaintiff's allegations about the use of trauma-informed investigation methods do not demonstrate gender bias given that both males and females can be victims of sexual assault.[8] *See Messeri*, 2019 U.S. Dist. LEXIS 162010, *44 ("[T]he investigator's training in trauma-informed investigations is not inherently pro-female or anti-male.").

---

[8] One of Plaintiff's allegations is that "Dr. Hammat met with members of the Women and Gender Studies Department and agreed to implement their demands into GMU's Title IX process, including the use of a trauma informed approach" Compl. ¶ 484(c). This allegation is based on an article in Mason's student newspaper which is cited in Plaintiff's complaint, *see* Compl. ¶ 110, and is attached as Ex. 14. The article lists the demands being made which contain no references to the gender of the parties involved in sexual misconduct cases and have no anti-male or pro-female biases. The demands are also concerned with a fair process for all. For example, one of the demands is that "the hearing process be equitable, realistic in its needs, and trauma informed." *Id* at 2.

**A191**

Plaintiff's allegations not only fail to demonstrate anti-male bias, they undercut Plaintiff's position.  Plaintiff notes a Washington Post article reporting on another Mason professor accused of making sexual advances towards students.  But the complaining student in that case was a man.  *See* Compl. ¶ 122.  To the extent that incident put any pressure on Mason, it was to address sexual misconduct by professors towards students regardless of the gender of the parties.  Even more problematic for Plaintiff are the allegations he makes about Mason's decision to hire Justice Kavanaugh as an adjunct law school professor.  The allegations about Mason's response to pressure to fire Justice Kavanaugh disprove Plaintiff's claim that Mason has a gender bias against male faculty members accused of sexual misconduct.  Even though Justice Kavanaugh was a male publicly accused of sexual assault on a female, Mason not only hired Justice Kavanaugh but "h[e]ld its ground on the Kavanaugh hiring decision," Compl. ¶ 133, in the face of pressure from faculty and students.  Plaintiff has pled himself out of a claim by including in his complaint allegations that demonstrates clearly that Mason is not biased against males and is not succumbing to public pressure to punish males accused of sexual misconduct.[9]

Plaintiff's own allegations also demonstrate that to the extent that Mason is under any pressure to protect sexual assault victims (which as explained above is not the same thing as being anti-male), it is under an equal if not greater pressure to ensure that individuals accused of sexual misconduct are provided with a fair, bias-free process—as Plaintiff was here, *see infra*.  As the Complaint alleges, under the current administration, the Department of Education has

---

[9] To the extent the allegations about Justice Kavanaugh could support Plaintiff's position, Plaintiff has a temporal problem.  Justice Kavanaugh hiring was publicly announced in "late March 2019," Compl. ¶ 128, more than a month after the letters of determination in Plaintiff's case were issued.  Therefore any "pressure" resulting from protests against his hiring could not have impacted the decision in Plaintiff's case.

made clear through its new proposed Title IX regulations that it is focused on ensuring that the accused receive a fair grievance process. *See* Compl. ¶ 79, 80. Likewise, Plaintiff's complaint details how the AAUP, the leading union for university faculty, has advocated to ensure universities provide a fair process to faculty accused of misconduct, *see id.* ¶¶ 87-96, and how Mason's own faculty has pressured Mason on this issue, *id.* ¶¶ 385-92. And Plaintiff's lawsuit itself is indicative of the primary Title IX related litigation universities face: lawsuits by individuals found responsible for sexual misconduct claiming Title IX and due process violations. *See Marymount*, 297 F. Supp. 3d at 582 (noting the "spate of actions where a male student accused of sexual assault sues his university or college alleging gender discrimination in violation of Title IX"). Therefore, taken as a whole, the Complaint alleges that Mason was facing pressure to protect both sexual misconduct victims and the rights of those accused of sexual misconduct, like Plaintiff. No reasonable inference of a bias against men can be made from any of these allegations.

\* \* \*

Plaintiff has failed to allege any facts that demonstrate gender bias on the part of Mason. To the contrary, his complaint contains allegations that explicitly contradict this necessary element of his claim. As such, Plaintiff has both failed to plead facts sufficient to state an erroneous outcome claim and has "pled himself out" of such a claim.

**B. Plaintiff Has Not Alleged Particular Facts Casting Doubt on the Outcome of the Title IX Investigation; To the Contrary the Complaint Confirms that the Outcome Was Correct.**

Even if Plaintiff had alleged sufficient facts to demonstrate that gender bias caused the outcome of his Title IX case, his claim would still fail because he has not pled facts casting doubt on the outcome. Plaintiff tries to satisfy this prong by arguing (1) that the outcome of his case was incorrect and (2) that he "was deprived of due process in all respects." Compl. ¶ 482-

19

**A193**

83.  To the contrary, his complaint admits that most of the finding of the investigation are correct and that he received due process.

        1.  <u>The Complaint Admits That Most of the Factual Findings Are True.</u>

An erroneous outcome claim is not a basis for a court to second guess the internal processes of universities to investigate and adjudicate violations of Title IX.  "We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming.  If no doubt exists based on the record before the disciplinary tribunal, the claim must fail."  *Yusuf*, 35 F.3d at 715.  The Court need look no further than Plaintiff's own complaint to see that the "evidence of the offense . . . is overwhelming."  *Id.*  While the Complaint spends a great deal of ink trying to explain away Plaintiff's comments and actions, Plaintiff ultimately concedes that most of the factual findings of the Title IX investigation are true.[10]  Those admissions are fatal to his claim. *See Armstrong v. James Madison Univ.*, No. 16-cv-00053, 2017 U.S. Dist. LEXIS 25014, at \*21 (W.D. Va. Feb 23, 2017) (dismissing erroneous outcome claim where plaintiff "readily admits that he made unsolicited advances on two student-employees"); *Marshall v. Ohio Univ.*, No. 15-cv-775, 2015 U.S. Dist. LEXIS 155291, at \*16 (S.D. Ohio Nov. 17, 2015) (dismissing erroneous outcome claim where Plaintiff "affirmatively allege[d]" that he sent inappropriate text messages and as such "no doubt is cast about the determination that [plaintiff] violated the Policy").

---

[10] The Complaint also conflates *allegations* with the *actual findings* of the investigation. Plaintiff spends a great deal of time disputing the *allegations* that were made, *see e.g.*, Compl. ¶¶ 266-77, many of which were not included in the findings of the Title IX investigation because there was insufficient evidence to corroborate the allegation, *see, e.g.,* ¶ 307 (acknowledging that Mason indicated in the letter of determination when there was not corroborating evidence to support an allegation).  These allegations are irrelevant because allegations that were not included in the factual findings cannot be the basis of an erroneous outcome claim.

The Complaint admits that the following factual findings of the investigation regarding

Plaintiff's conduct are correct:

- The Letter of Determination for Complainant 4 found that Plaintiff "confirmed that you and your graduate students ended up in [Plaintiff's] hot tub, discussing life, wellness, research, and a recent sexual experience you personally had in Germany." Ex. 8. The Complaint concedes that Plaintiff spent time in his hot tub with his graduate students at his home and shared a story about his experience at a brothel in Germany. *See* Compl. ¶ 341-42.

- The Letter of Determination for Complainant 4 found that Plaintiff admitted that while at a bar he asked a graduate student what kind of pornography she liked to watch. Ex. 8. The Complaint concedes that this occurred. *See* Compl. ¶ 337-38.

- The Letter of Determination for Complainant 4 found that Plaintiff went to a strip club with his graduate students and took a photograph of Complainant 4 receiving a lap dance. Ex. 8. The Complaint concedes that this occurred (the Complaint also admits that Plaintiff "joked" about blackmailing Complainant 4 with the photograph). *See* Compl. ¶ 347.

- The Letter of Determination for Complainant 4 found that at a conference, Plaintiff had a conversation with graduate students about the prior evening's sexual activity. Ex. 8. The Complaint concedes that at the conference Plaintiff had a "discussion with his graduate students about sexual encounters that occurred on the trip." Compl. ¶ 344.

- The Letter of Determination for Complainant 4 found that while at a conference Plaintiff discussed with students an intimate sexual encounter he had with a woman in Hanoi. Ex. 8. The Complaint concedes that this conversation occurred. *See* Compl. ¶ 353.

- The Letter of Determination for Complainant 4 found that Plaintiff often discussed sex with his graduate students. Ex. 8. The Complaint concedes that Plaintiff spoke about sexuality with his graduate students. Compl. ¶ 326.

- The Letters of Determination for Complainants 1 and 2 found that Plaintiff shared a story with his class about performing oral sex in public. Exs. 5 & 6. The Complaint concedes that Plaintiff told a story during class about him performing oral sex on a woman at a party. Compl. ¶ 252.

- The Letter of Determination for Complainant 2 found that Plaintiff "shared a conversation with the class regarding the number of sexual partners" he

has had. Ex. 6. The Complaint concedes that Plaintiff shared this information during class. Compl. ¶ 292.

- The Letter of Determination for Complainant 2 found that Plaintiff shared a story about a trip to Kuwait that involved swimming in the ocean and was described by other students in the class as "erotic."[11] Ex. 6. The Complaint concedes that Plaintiff told a story about a trip to Kuwait that included erotic components. Compl. ¶ 262 (describing story shared in class about trip to Middle East that involved a visit to an area "populated by illegal mistresses" and a road "known as 'love street'").

- The Letter of Determination for Complainant 3 found that at a conference Plaintiff made comments to Complainant 3's then-boyfriend about the two of them dating. Ex. 7. The Complaint concedes that Plaintiff and "Complainant 3's boyfriend often engaged in banter of a personal nature about their relationships and other topics." Compl. ¶ 306.

In short, the Plaintiff has pleaded himself out of an erroneous outcome claim by admitting in his complaint to exactly the conduct for which he was found responsible—repeated instances of inappropriate sexual conversations and activities with graduate students. *See Armstrong*, 2017 U.S. Dist. LEXIS 25014, at *21; *Marshall*, 2015 U.S. Dist. LEXIS 155291, at *16; *see also Northern Trust Co.*, 69 F.3d at 129 ("[A] party can plead himself out of court by unnecessarily alleging facts which . . . demonstrate that he has no legal claim.").

Unable to dispute the truth of the findings, the Complaint makes a number of irrelevant allegations in an attempt to distract from his admissions. The Complaint attacks the credibility of the complainants, but as detailed above Plaintiff has admitted to most of the conduct for which he was found responsible. The Complaint incredibly tries to claim that the sexual conversations were pedagogical or research related, but it is plain on the face of the Complaint that discussing personal sexual activity outside of the classroom, asking a student what type of pornography she enjoys while at a bar, visiting strip clubs with students, and spending time in a hot tub with

---

[11] The original allegation was that the story involved "skinny-dipping." Ex. 2. This part of the allegation was not corroborated as noted in the Letter of Determination. Ex. 6.

**A196**

students have no pedagogical or research value.  Moreover, the reason Plaintiff engaged in this conduct is irrelevant; the question for an erroneous outcome claim is whether Mason erroneously concluded that the conduct occurred.  Here, Plaintiff's own complaint concedes that it did occur. As such, Plaintiff cannot successfully plead an erroneous outcome claim.

2.  Plaintiff Received Due Process.

Plaintiff also tries to establish this element of his claim by alleging a list of supposed procedural flaws with Mason's investigation that deprived him of due process.  *See* Compl. ¶ 483.  The first problem for Plaintiff is that even if Mason ran a flawed process, ***he has admitted in his complaint to most of the findings of the investigation.***  Therefore, regardless of the allegations about the process, there is no question that the outcome was correct.

Plaintiff is also incorrect that there were procedural irregularities or a deprivation of due process.  His list of supposed due process violations, *see* Compl. ¶ 483, consists of misrepresentations about the process and conclusory allegations.  It also demonstrates that Plaintiff has a gross misunderstanding of what is required under due process jurisprudence when an employment action is taken against a public employee.  The Supreme Court has made clear that in the case of ***termination*** the "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). As the Fourth Circuit has noted, *Loudermill*'s list of the due process required "was meant to be exhaustive." *Curtis v. Montgomery County Pub. Schs.*, 242 Fed. Appx. 109, 111 (4th Cir. 2007).

Here, however, Plaintiff was not terminated.  The only sanctions imposed on Plaintiff

was a required sexual harassment training and a four-semester probationary period.[12]  *See*

Compl. ¶ 393; Ex. 15.  Plaintiff continues to be a tenured member of Mason's faculty and has the

ability to teach undergraduates, conduct research, and participate in University governance like

all other members of the faculty. Therefore, since Plaintiff's sanctions fall far short of

termination, it is questionable whether the due process described in *Loudermill* was

constitutionally required.  *See Gilbert v. Homar*, 520 U.S. 924, 929 (1997) ("[W]e have not had

occasion to decide whether the protections of the Due Process Clause extend to discipline of

tenured public employees short of termination.").  Notwithstanding whether it was required,

there is no question that Plaintiff was given the due process described in *Loudermill*.

Plaintiff was provided notices of the specific charges against him and provided with the

applicable University policies and procedures.  *See* Exs. 1-4; *Linton v. Frederick Cnty. Bd. of

Cnty. Comm'rs*., 964 F.2d 1436, 1439 (4th Cir. 1992) (quoting *Gniotek v. City of Philadelphia*,

808 F.2d 241, 244 (3d Cir. 1986)) ("Notice is sufficient [ ] if it apprises the vulnerable party of

the nature of the charges and general evidence against him.").  In *Loh*, 2018 U.S. Dist. LEXIS

53619, at *20, the court rejected an inadequate notice argument where the "Complaint and the

incorporated attachments show that [plaintiff] presented to [the hearing officer] all of the

arguments and defenses of which he now claims to have been deprived."  Plaintiff has identified

no argument he was prevented from making because of inadequate notice.

---

[12] Plaintiff's conclusory allegations that the sanctions imposed here are "tantamount to dismissal," Compl. ¶ 394, need not be credited particularly when the Complaint pleads contrary facts and references a document showing that Plaintiff was not dismissed and continues to be able to engage in many of his duties as a professor.  *See* Compl. ¶ 393, *see also* Motion to Dismiss of Individual Defendants Part II.A; *Jeffery M. Brown Assocs. v. Rockville Ctr., Inc.*, 7 Fed. Appx. 197, 202 (4th Cir. 2001) (Court need not "accept as true . . . conclusory allegations in the complaint that are contradicted by the attachments.").

To the contrary Plaintiff alleges that he had the opportunity to present his arguments on several occasions.  The Complaint acknowledges that he was interviewed "on three occasions," Compl. ¶ 145, twice by Dr. Hammat, "the sole individual tasked with deciding the outcome of the allegations against Plaintiff." *Id.* ¶¶ 149, 150, 158.  The Complaint goes into great detail about how during these interviews, Plaintiff, while represented by counsel, had the opportunity to respond to the evidence and present his side of the story.  *See, e.g.*, *id.* ¶253 (had the opportunity to explain the context of the story told during class about him performing oral sex on a woman in public); ¶ 269 (had the opportunity to deny statements attributed to him); ¶ 309-10 (had the opportunity to present evidence of communications with Complainant 3 and about incident alleged by her); ¶ 338 (had the opportunity to respond to allegation that while at a bar he asked a graduate student about what type of pornography she liked to watch); ¶ 341 (had the opportunity to explain why he believed there was nothing wrong with "hot tubbing" with graduate students).  He also had the opportunity to "provide a list or witnesses" and "over 150 pages" of documents to support his side of the story.  *Id.* ¶¶ 153-54.  After Plaintiff was provided with Mason's findings, Plaintiff had another opportunity to be heard when he "submitted a 38-page appeal to Mr. Williams with hundreds of pages of exhibits."  *Id.* ¶ 165.  All of this occurred *before* any sanctions were imposed.  After sanctions (which did not include termination) were imposed, Plaintiff had an opportunity to, and did, grieve the sanctions to a faculty grievance committee (which affirmed the sanctions).  *Id.* ¶¶ 400-10.  The Complaint clearly demonstrates that Plaintiff was given an opportunity to be heard.

Unable to deny that he received notice and several opportunities to be heard, Plaintiff tries to nit-pick the investigation in a futile attempt to distract from this inconvenient truth.  A similar strategy was rejected in *Loh* where the plaintiff also alleged "multiple procedural 'due

25

process' violations."  2018 U.S. Dist. LEXIS 53619, at *16.   The *Loh* court rejected the

erroneous outcome claim because the complaint demonstrated that plaintiff "received adequate

notice, a meaningful investigatory process, and sufficient opportunity to be heard by an

independent decision making body" and therefore could "not plausibly allege[] a 'procedural or

otherwise flawed proceeding."  2018 U.S. Dist. LEXIS 53619, at *20, 23, 25, *aff'm* 767 Fed.

Appx. 489 (4th Cir. 2019).

Similarly here, nothing in Plaintiff's list, Compl. ¶ 483, demonstrate that he was denied

due process or that Mason failed to follow its investigatory procedures.  Several of Plaintiff's

complaints are just wrong.  For example, he was given notices that listed the specific alleged

violations and the applicable policies (¶ 483(b)) and he had an opportunity to be heard (¶

483(m)).  *See supra.*  Plaintiff is incorrect that Mason's procedures prohibited investigating

conduct that occurred more than 180 days prior to the complaint (¶ 483(c)-(f)) or imposing

interim measures while the investigation progressed (¶ 483(y)); both are allowed by the

applicable policies.  *See, e.g.,* Exs. 1B, 3B, 4B, 4D (stating that complaints "should" be filed

within 180 days, not that they *must* be filed in that time frame); Exs.4B & 4D (authorizing

"interim emergency action until the conclusion of the investigation").

Plaintiff also misrepresents Mason's policy when he claims that it required the Title IX

coordinator to "assume the 'complete veracity' of the complainants' allegations prior to

investigating them."  (¶ 483(a)).  What the procedures actually say—which Plaintiff well knows

because he quotes it in full in paragraph 239 of the Complaint—is "[a]ssuming the complete

veracity of the allegations(s), CDE will make a threshold determination as to whether the

allegations contained in the complaint constitute a violation of university policy . . . If the

threshold determination indicates that an investigation is required, CDE will determine the

appropriate investigation process."  In other words, Mason does exactly what this Court does

when evaluating a motion to dismiss.  Not only is this step not a due process violation, it actually

protects accused parties from having to defend against facially meritless accusations.

Other "allegations" are nothing more than Plaintiff's *ipse dixit*, such as alleging without

an iota of support that Mr. Williams and Dr. Hammat had a conflict of interest (¶ 483(k), (z)) or

that the joint investigation of all the complaints somehow tainted the information gathering

process (¶ 483(i)).  Some just rehash Plaintiff's claims that the individuals involved were biased

(¶ 483(i), (j)) or Plaintiff's disagreement with the outcome (¶ 483(t)).  As demonstrated above,

*see infra* Parts I.A, I.B.1, Plaintiff has failed to allege bias and has admitted to many of the

findings.  Regardless, Plaintiff's disagreement with the outcome is not a basis to find a due

process violation or a procedural irregularity.  Plaintiff also quibbles with the word choice in the

Letters of Determination, complaining that Dr. Hammat used the phrase "CDE did find enough

factual information" instead of "preponderance of the evidence" (¶ 483(u)), without explaining

how the meaning of those two phrases differ or alleging that Dr. Hammat actually did not apply

the preponderance of the evidence standard.

Finally, other assertions are based on a process that Plaintiff appears to have invented

which bears no resemblance to Mason's procedures or what is required for due process in

employment matters.  *See Armstrong*, 2017 U.S. Dist. LEXIS 25014, at *22 (finding plaintiff's

claim of procedural irregularities "rings hollow" where claims were based on procedures that did

not apply to plaintiff).  For example, Plaintiff complains that he was not allowed to cross

examine witnesses (¶ 483(n)), but "[i]t is well settled that the accused is not entitled to 'trial-like'

rights of confrontation or cross examination at disciplinary proceedings." *See Loh*, 2018 U.S.

Dist. LEXIS 53619, at *22.  Similarly, Plaintiff complains that he was not given access to all

**A201**

evidence collected during the investigation (¶ 483(l)), but "[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive explanation be afforded as to permit [plaintiff] to identify the conduct giving rise to the dismissal and thereby enable him to make a response." *Linton*, 964 F.2d at 1440. Plaintiff's gripes about the contents of the determination letters are equally unavailing because there are no due process requirements for what must be in a decision (¶ 483(p)-(s), (u)-(x)). And some of the assertions simply make no sense, for example claiming that it was somehow a due process violation or a procedural irregularity for Mason to "use[ ] quoted statements" in the notice of investigation (¶ 483(g)).

In short, Plaintiff has not alleged a single way in which Mason deprived Plaintiff of due process or deviated from its established process for investigating allegations of sexual misconduct by employees. *See Marshall*, 2015 U.S. Dist. LEXIS 155291, at *16 (dismissing erroneous outcome claim where plaintiff failed to "allege[] that OU failed to follow its disciplinary proceeding procedures"). Plaintiff may wish that Mason had a different process, but absent some allegation of an actual deprivation of due process Plaintiff cannot state an erroneous outcome claim—especially when the outcome has been confirmed by Plaintiff's own admissions.

## II.    PLAINTIFF'S TITLE IX SELECTIVE ENFORCEMENT CLAIM MUST BE DISMISSED.

Plaintiff's entire selective enforcement claim consists of five paragraphs tacked on at the end of Count I. *See* Compl. ¶ 486-90. Plaintiff's selective enforcement claim is based on pure speculation that Mason has treated female professors accused of sexual misconduct differently than male professors accused of sexual misconduct. Plaintiff does not allege a single fact to support his claim. This failure is fatal to Plaintiff's claim because this Court has previously recognized that a comparator is required to sustain a selective enforcement claim. "[A] male

28

plaintiff' must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the school." *Fairfax Cnty.*, 2019 U.S. Dist. LEXIS 170577, at *10-11; *see also Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 932 (W.D. Va. 2017) (dismissing selective enforcement claim where plaintiff did not allege similarly situated person "was treated more favorably by the University").

Plaintiff does not identify any female Mason professor accused of sexual harassment of students who was treated more favorably. Indeed, he admits that he has no such allegations and begs the Court to allow him to proceed to discovery because he does not have the information to properly plead his claim. *See* Compl. ¶ 489 n.74. "The Federal Rules of Civil Procedure do not permit such a fishing expedition." *Everett v. Redmon*, No. 16-CV-323-D, 2017 U.S. Dist. LEXIS 80876, at *17 (E.D.N.C. May 26, 2017) (rejecting argument that plaintiff should be allowed to proceed to discovery because "he cannot know whether the Housing Authority's termination of other employees was racially motivated" without discovery). "Allowing [plaintiff] to proceed to discovery . . . in the hope of finding a similarly situated [individual] on which to base his claim, would authorize the kind of fishing expedition *Iqbal* and *Twombly* meant to avoid." *Streno*, 278 F. Supp. 3d at 931 ("informational disadvantage does not excuse [plaintiff] from plausibly alleging causation").

The only comparator that Plaintiff does allege is Complainant 4, against whom Plaintiff filed a complaint for bad faith reporting. *See* Compl. ¶ 490. But Plaintiff's attempt to assert a selective enforcement claim based on Mason's treatment of Complainant 4 fails because he is a faculty member and she is a graduate student so they are not similarly situated. Additionally, the "two individuals must have engaged in the same conduct." *Fairfax County Sch. Bd.*, 2019 U.S. Dist. LEXIS 170577, at *11 (emphasis omitted). The only allegation about Complainant 4 is

29

Plaintiff's dubious (given his own admissions) and self-serving accusation that Complainant 4 made a bad faith report; Plaintiff, on the other hand, was found to have engaged in sexual harassment.  There are no similarities.  The selective enforcement claim must be dismissed.

### III.    Count I Should Be Dismissed With Prejudice.

As demonstrated above, despite filing a 162 page complaint, Plaintiff has failed to allege the necessary elements of a Title IX claim against Mason.  He has also affirmatively pled himself out of such a claim by alleging facts that demonstrate that (1) gender bias played no role in the outcome of his case, (2) the outcome in his case was not erroneous, (3) he received due process, and (4) he has no basis to assert selective enforcement.  Given Plaintiff's own allegations there is no way that he can replead to properly state a Title IX claim.  Therefore, Mason respectfully requests that the Court dismiss Count I with prejudice.

### CONCLUSION

For the foregoing reasons, Plaintiff's claim against Mason (Count I) should be dismissed with prejudice.

December 20, 2019                    RESPECTFULLY SUBMITTED,

_____/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

*Attorney for The Rector and Visitors of George Mason University*

30

### CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record in this case.

\_\_\_\_\_/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

# EXHIBIT 1

**A206**

## Notice of Investigation

### Jennifer R Hammat

Tue 12/4/2018 4:52 PM

**To:** Plaintiff

**Cc:** Keith D Renshaw <krenshaw@gmu.edu>; Shernita Rochelle Parker <srochell@gmu.edu>

**Bcc:** Heather M Madnick <hmadnick@gmu.edu>; Gillian Lancaster <glancast@GMU.EDU>

📎 2 attachments (240 KB)

EO AA Grievance Procedures 2006.pdf; Policy 1202 2006.pdf;



**Compliance Diversity and Ethics**

4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730 Fax: 703-993-8899 Web: http://diversity.gmu.edu

December 4, 2018

Plaintiff

George Mason University

Fairfax, VA 22030

Dear Dr. Plaintiff ,

The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE). The complaint, filed by Complainant 1 , alleges potential violations of George Mason University's Sexual Harassment Policy 2006-2014. Specifically, the allegations state that you shared the below information during your instruction of Course the spring semester of 2013 in and during the instruction of Course in the spring semester of 2014 in:

- During class, you provided a detailed description with the students of a sexual encounter wherein you performed oral sex upon a woman at a party where others were "packed around" and able to see you perform oral sex;
- During class, you discussed a then recent event that occurred while traveling to the middle east and you described having an erotic and adventurous experience in the middle of the desert while you watched a woman with notability and a connection to power "skinny dipping" while you relaxed and watched her. You told the students how erotic the experience was without actually having sex with the woman;
- During class, also emphasized to the students in the class (a cohort) that they "needed to get naked together to really get to know each other." To that end, you repeatedly mentioned Spa World (a spa where people are often naked in the common areas) and encouraged the cohort to go together to really get to know each other.
- During class, you asked the students who they thought would end up "sleeping with who" in the cohort. You also indicated, "Grad students typically end up being incestuous with each other."
- During class, you bragged about presenting your new findings at a conference in a presentation entitled, "Can you fuck the pain away?"
- During class, if a student expressed that they were offended, uncomfortable, or frustrated by the topic of discussion, you would you dismiss those concerns as being "emotional," "irrational," or "weak."

# A207

Case 1:19-cv-01249-LO-MSN   Document 27-1   Filed 12/20/19   Page 3 of 11 PageID# 280

- o During class, you stated, on Baumeister Day "if you want to argue that men and women are equal, it is up to you to provide empirical evidence that men and women *are* equal."
- o Graduate students in the program often warned new students to "not get on ██████ bad side, because if ██████ liked you, you would get ample opportunities for publications, collaborations, and very reasonable feedback as a committee member. If ██████ did not like you, interactions were very uncomfortable."
- o Through favoritism, you made it clear to your students that opportunities and teaching was dependent on liking them and having sexually stimulating conversations with them.

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter. The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:
- University Policy 1202: Sexual Harassment Policy 2006-14
- Equal Opportunity/Affirmative Action Grievance Procedures 2006-14

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu. Your cooperation in this process is appreciated.


Sincerely,

Dr. Jennifer R. Hammat
University Title IX Coordinator
George Mason University


CC:    Dr. Keith Renshaw, Department Chair
       Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**
University Title IX Coordinator
Compliance, Diversity, and Ethics
George Mason University
4400 University Drive, MS 2C2
Fairfax, VA 22030
703-993-8730
[titlenine.gmu.edu]titlenine.gmu.edu

# EXHIBIT 1A

**George Mason University Sexual Misconduct Policy**

**For Academic Year 2006 – 2014**

Case 1:19-cv-01249-LO-MSN   Document 27-1   Filed 12/20/19   Page 6 of 11 PageID# 283

**GEORGE MASON UNIVERSITY**

**University Policy Number 1202**

**Subject:** Sexual Harassment Policy

**Responsible Parties:** Office of Equity and Diversity Services

**Procedures:** Equal Opportunity/Affirmative Action Grievance Procedures

**Related University Policies:** Policy 1201: Non-Discrimination Policy

---

## I.    SCOPE

This policy applies to all George Mason University faculty, staff, students, university contractors, and visitors.

## II.    POLICY STATEMENT

It is the policy of University to provide an academic and work environment free from sexual harassment. Sexual harassment is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated.  Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures.[*]

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1. Sexual assault

2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

---

[*] Note: Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

1

    3. Repetitive sexual comments, questions, jokes, gestures or other forms of
       sexually explicit expression

Any student, faculty member, or staff employee, who believes he or she is the victim of
sexual harassment, should report the incident promptly in the manner most comfortable
to him or her. The Equal Opportunity/Affirmative Action Grievance Procedures,
University Policy 1204 list the various ways to file a complaint.

Retaliation against an individual who has raised claims of illegal discrimination or has
cooperated with an investigation of such claims is prohibited.

Note that supervisors and managers who become aware of sexual harassment or other
potentially discriminatory behavior must contact the Office of Equity and Diversity
Services.


## III.    RESPONSIBLE PARTIES

The Office for Equity and Diversity Services is responsible for administering and
monitoring George Mason University's sexual harassment policy.


## IV.    COMPLIANCE

Inquiries about or complaints alleging violation of the University's sexual harassment
policy should be directed to the Office of Equity and Diversity Services. Mason Hall
D105, MS 2C2, Fairfax, VA  22030. Phone (703) 993-8730. TTY: (703) 993-8787.


## V.    EFFECTIVE DATE AND APPROVAL

The policies herein are effective April 3, 2006. This Administrative Policy shall be
reviewed and revised, if necessary, annually to become effective at the beginning of the
University's fiscal year, unless otherwise noted.

Approved: _____        _____
          Senior Vice President            Provost

Date approved: _____

2

# EXHIBIT 1B

## George Mason University

## Sexual Misconduct Investigation Procedures

## For Academic Year 2006 - 2014

**A213**

Subject: **Equal Opportunity/Affirmative Action Grievance Procedure**
**(This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment)**

I.    **Scope**

   This procedure applies to all George Mason University faculty, staff, students, university contractors, and visitors.

II.   **Policy Statement**

   The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of the Office of Equity and Diversity Services (OEDS).  The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. The OEDS may amend this process as necessary. Any student, faculty member, staff employee, or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, religion, sex, national origin, sexual orientation, ancestry, age, marital status, physical or mental disability, or veteran status should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the University reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

   **Retaliation**

   The OEDS also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process.  Retaliation is prohibited whether or not the charging party prevails in the original charge. No agent of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations and will be investigated by the OEDS.  Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

### III.  Filing Process

Complainants will be asked to complete a form describing the alleged discrimination and/or harassment. Assistance will be arranged, if needed.

A complaint should be filed within 180 days of the most recent incident.

The complainant will meet with a representative from the Office of Equity and Diversity Services to discuss options (informal, formal) for proceeding.

**Options:**

*Informal*.  Discuss allegations and concerns with respondent (the accused) and attempt to resolve the situation.  The respondent is reminded that George Mason University expects all to adhere to our equal opportunity policies.  Respondent is put on notice that behavior has been questioned, and informal resolution sought, if possible. If attempts to resolve the situation are not successful, the complainant may pursue a formal complaint.  The Office reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

*Formal*.  A full investigation is conducted by the Office complete with written findings. If a violation is found, the Office will recommend corrective actions.  The determination of the Office of Equity and Diversity Services is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a complainant may file their complaint with the appropriate external agencies.  A complete list of agencies, along with contact information, is available from the Office of Equity and Diversity Services, Mason Hall D105, MS 2C2, Fairfax, VA  22030.  Phone (703) 993-8730. TTY: (703) 993-8787

**Time Line for Investigation Process**

The Office of Equity and Diversity Services will complete its investigations as expeditiously as possible.  Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including lack of cooperation from the complainant, the respondent, or witnesses.  The Office of Equity and Diversity Services will maintain contact with the Complainant and Respondent throughout the course of the investigation to keep them up to date on the process.

### IV.  Confidentiality

The OEDS takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the respondent, the complainant, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

**A215**

V.    **Right to Advisor**

The complainant and the respondent each has the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to the Office of Equity and Diversity Services at least 72 hours prior to the meeting. If either the complainant or the respondent's advisor is a person degreed or qualified in law, the Office of Equity and Diversity Services must be notified.

VI.   **Responsibilities and Jurisdiction of the Office of Equity and Diversity Services**

Consistent with federal and state laws and university policies related to nondiscrimination, the OEDS only investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex (including sexual harassment), national origin, age, disability, veteran status, or sexual orientation. The OEDS investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

**Transfer of Function**

If a complaint, whether informal or formal, is directed against the Office of Equity and Diversity Services, the functions assigned to the Office by these procedures will transfer to the Office of the President or to the president's designee. If a complaint, whether informal or formal, is directed against the President, the functions assigned to the Office by these procedures will transfer to the Board of Visitors

# EXHIBIT 2

Case 1:19-cv-01249-LO-MSN   Document 27-2   Filed 12/20/19   Page 2 of 10 PageID# 290

**Notice of Investigation**

**Jennifer R Hammat**

Tue 12/4/2018 4:50 PM

**To:** ▮Plaintiff▮
**Cc:** Keith D Renshaw <krenshaw@gmu.edu>; Shernita Rochelle Parker <srochell@gmu.edu>
**Bcc:** Heather M Madnick <hmadnick@gmu.edu>; Gillian Lancaster <glancast@GMU.EDU>

📎 2 attachments (240 KB)
EO AA Grievance Procedures 2006.pdf; Policy 1202 2006.pdf;



### Compliance Diversity and Ethics

**4400 University Drive, MS 2C2, Fairfax, Virginia 22030**
**Phone: 703-993-8730 Fax: 703-993-8899 Web: http://diversity.gmu.edu**

December 4, 2018

▮Plaintiff▮
George Mason University
Fairfax, VA 22030

Dear Dr. ▮Plaintiff▮,

The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE). The complaint, filed by ▮Complainant 2▮, alleges potential violations of George Mason University's Sexual Harassment Policy 2006-14. Specifically, the allegations state that you shared the below information during your instruction of ▮Course▮ the spring semester of 2013 in and during the instruction of ▮Course▮ in the spring semester of 2014 in:

- o During class you provided a detailed description with the students of a sexual encounter wherein you performed oral sex upon a woman at a party;
- o During class you shared with the students the number of sexual partners you had;
- o During class you discussed "skinny dipping" with a woman who was not your wife with the students in the class;
- o During class you recounted your visits to a Spa World, a Korean Spa in Centreville, VA, allegedly known for human trafficking and public nudity, and encouraged the students of the class to go together.

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter. The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential

# A218

witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:
- University Policy 1202: Sexual Harassment Policy 2006-14
- Equal Opportunity/Affirmative Action Grievance Procedures 2006-14

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu.  Your cooperation in this process is appreciated.

Sincerely,

Dr. Jennifer R. Hammat
University Title IX Coordinator
George Mason University

CC:     Dr. Keith Renshaw, Department Chair
        Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**
University Title IX Coordinator
Compliance, Diversity, and Ethics
George Mason University
4400 University Drive, MS 2C2
Fairfax, VA 22030
703-993-8730
[titlenine.gmu.edu]titlenine.gmu.edu

# EXHIBIT 2A

**George Mason University Sexual Misconduct Policy**

**For Academic Year 2006 – 2014**

**GEORGE MASON UNIVERSITY**

**University Policy Number 1202**

**Subject:** Sexual Harassment Policy

**Responsible Parties:** Office of Equity and Diversity Services

**Procedures:** Equal Opportunity/Affirmative Action Grievance Procedures

**Related University Policies:** Policy 1201: Non-Discrimination Policy

---

## I.    SCOPE

This policy applies to all George Mason University faculty, staff, students, university contractors, and visitors.

## II.    POLICY STATEMENT

It is the policy of University to provide an academic and work environment free from sexual harassment. Sexual harassment is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated.  Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures.[*]

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1. Sexual assault

2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

---

[*] Note: Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

1

3.  Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

Any student, faculty member, or staff employee, who believes he or she is the victim of sexual harassment, should report the incident promptly in the manner most comfortable to him or her. The Equal Opportunity/Affirmative Action Grievance Procedures, University Policy 1204 list the various ways to file a complaint.

Retaliation against an individual who has raised claims of illegal discrimination or has cooperated with an investigation of such claims is prohibited.

Note that supervisors and managers who become aware of sexual harassment or other potentially discriminatory behavior must contact the Office of Equity and Diversity Services.

## III.   RESPONSIBLE PARTIES

The Office for Equity and Diversity Services is responsible for administering and monitoring George Mason University's sexual harassment policy.

## IV.   COMPLIANCE

Inquiries about or complaints alleging violation of the University's sexual harassment policy should be directed to the Office of Equity and Diversity Services. Mason Hall D105, MS 2C2, Fairfax, VA  22030. Phone (703) 993-8730. TTY: (703) 993-8787.

## V.   EFFECTIVE DATE AND APPROVAL

The policies herein are effective April 3, 2006. This Administrative Policy shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

Approved: _____    _____
Senior Vice President                                  Provost

Date approved: _____

2

# EXHIBIT 2B

**George Mason University**

**Sexual Misconduct Investigation Procedures**

**For Academic Year 2006 - 2014**

**A223**

Subject: **Equal Opportunity/Affirmative Action Grievance Procedure**
**(This procedure replaces all previous procedures for investigation of complaints of**
**discrimination and sexual harassment)**

I.    **Scope**

This procedure applies to all George Mason University faculty, staff, students, university
contractors, and visitors.

II.   **Policy Statement**

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of the
Office of Equity and Diversity Services (OEDS).  The procedure assists the university in
carrying out its responsibilities in administering and enforcing applicable federal and state
laws and university policies related to nondiscrimination and investigation of complaints.
The OEDS may amend this process as necessary. Any student, faculty member, staff
employee, or visitor who feels he or she is the victim of harassment or other form of
discrimination on the basis of race, religion, sex, national origin, sexual orientation,
ancestry, age, marital status, physical or mental disability, or veteran status should follow
the grievance procedures outlined below. Consistent with George Mason University's duty
to provide a work and academic environment free from unlawful harassment or
discrimination, the University reserves the right to investigate any allegation of harassment
or discrimination upon receipt of sufficient evidence to sustain such claims.

**Retaliation**

The OEDS also investigates and resolves allegations of retaliation against individuals who
have raised claims of discrimination based on the above factors or who have cooperated in
an investigative process in some manner. Retaliation is a negative action taken against an
individual as a result of a complaint being filed or after an individual has cooperated with
an investigative process.  Retaliation is prohibited whether or not the charging party
prevails in the original charge. No agent of the university may harass, coerce, intimidate, or
discriminate against an individual who has filed an Equal Opportunity complaint or
participated in the Equal Opportunity complaint resolution process. Charges of retaliation
will be treated as separate and distinct from the original charges and allegations and will be
investigated by the OEDS.  Those in a supervisory position must monitor the academic or
work environment to ensure that it is free from retaliation.

### III.  Filing Process

Complainants will be asked to complete a form describing the alleged discrimination and/or harassment. Assistance will be arranged, if needed.

A complaint should be filed within 180 days of the most recent incident.

The complainant will meet with a representative from the Office of Equity and Diversity Services to discuss options (informal, formal) for proceeding.

**Options:**

*Informal*.  Discuss allegations and concerns with respondent (the accused) and attempt to resolve the situation.  The respondent is reminded that George Mason University expects all to adhere to our equal opportunity policies.  Respondent is put on notice that behavior has been questioned, and informal resolution sought, if possible. If attempts to resolve the situation are not successful, the complainant may pursue a formal complaint.  The Office reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

*Formal*.  A full investigation is conducted by the Office complete with written findings. If a violation is found, the Office will recommend corrective actions.  The determination of the Office of Equity and Diversity Services is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a complainant may file their complaint with the appropriate external agencies.  A complete list of agencies, along with contact information, is available from the Office of Equity and Diversity Services, Mason Hall D105, MS 2C2, Fairfax, VA  22030.  Phone (703) 993-8730. TTY: (703) 993-8787

**Time Line for Investigation Process**

The Office of Equity and Diversity Services will complete its investigations as expeditiously as possible.  Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including lack of cooperation from the complainant, the respondent, or witnesses.  The Office of Equity and Diversity Services will maintain contact with the Complainant and Respondent throughout the course of the investigation to keep them up to date on the process.

### IV.  Confidentiality

The OEDS takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the respondent, the complainant, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

**V.    Right to Advisor**

The complainant and the respondent each has the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to the Office of Equity and Diversity Services at least 72 hours prior to the meeting. If either the complainant or the respondent's advisor is a person degreed or qualified in law, the Office of Equity and Diversity Services must be notified.

**VI.   Responsibilities and Jurisdiction of the Office of Equity and Diversity Services**

Consistent with federal and state laws and university policies related to nondiscrimination, the OEDS only investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex (including sexual harassment), national origin, age, disability, veteran status, or sexual orientation. The OEDS investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

**Transfer of Function**

If a complaint, whether informal or formal, is directed against the Office of Equity and Diversity Services, the functions assigned to the Office by these procedures will transfer to the Office of the President or to the president's designee. If a complaint, whether informal or formal, is directed against the President, the functions assigned to the Office by these procedures will transfer to the Board of Visitors

# EXHIBIT 3

## Notice of Investigation

### Jennifer R Hammat

Tue 12/4/2018 4:52 PM

**To:** ▮Plaintiff▮

**Cc:** Keith D Renshaw <krenshaw@gmu.edu>; Shernita Rochelle Parker <srochell@gmu.edu>

**Bcc:** Heather M Madnick <hmadnick@gmu.edu>; Gillian Lancaster <glancast@GMU.EDU>

🔗 4 attachments (4 MB)

EO AA Grievance Procedure 2015.pdf; EO AA Grievance Procedure 2016.pdf; Policy 1202 2014.pdf; Policy 1202 2015.pdf;



**Compliance Diversity and Ethics**

4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730 Fax: 703-993-8899 Web: http://diversity.gmu.edu

December 4, 2018

▮Plaintiff▮
George Mason University
Fairfax, VA 22030

Dear Dr. ▮Plaintiff▮ ,

The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE). The complaint, filed by ▮Complainant 3▮ , alleges potential violations of George Mason University's Sexual Harassment and Misconduct Policy (2014-15 and 2015-16). Specifically, the allegations state that:

- Over the November 21-23, 2014 weekend, while attending the annual Association for Behavioral and Cognitive Therapy conference, you opened a conference discussion, attended by ▮Complainant 3▮ , with a graphic description of your time working at a pornography store, images of naked women within in the slides, and several explicit reference to sexual acts. You invited ▮Complainant 3▮ to attend this talk, knowing she was a first year graduate student and had been an undergraduate student in your classes previously.
- At the same conference listed above, after the talk, you pulled graduate student ▮Student▮ aside and said, "Yo, are you plowing that chick?"(Referencing ▮Complainant 3▮ ) and ▮Student▮ indicated he was in a committed relationship with ▮Complainant 3▮ . You then looked at ▮Complainant 3▮ again and then "high fived" ▮Student▮ .
- At the next lab Happy Hour, you approached ▮Complainant 3▮ and told her you knew about her relationship with ▮Student▮ , then hugged her, and congratulated her on the relationship. You also told her you "knew how to keep secrets" and then you ordered her a drink and put it on your tab.
- Around mid-February 2015, while hosting a lab party for graduate students at your home, you commented on ▮Student▮ penis size (▮Complainant 3▮' boyfriend at the time) in reference to him dating ▮Complainant 3▮ . You further commented on ▮Student▮ lack of sexual experience and made a comparative statement about ▮Complainant 3▮ appearance (▮Student▮ must have a big dick to be dating you. Like, just look at you.")
- During the spring of 2016, while attending the Association for Behavioral and Cognitive Therapies conference, in Chicago, Illinois, you hugged ▮Complainant 3▮ at a restaurant and told her you had overheard her conversation with her companion. You told ▮Complainant 3▮ she "didn't have to worry because you knew how to keep secrets. I won't tell ▮Student▮ what I overheard."

- In the spring of 2016, [Complainant 3] and [Student] broke up. [Complainant 3] said you stopped her in the hallway of the psychology building, hugged her, and said, "I'm not mad and I still think highly of you." You indicated that you wanted to work with her in the future and commented that she was intelligent, attractive and creative and expressed that you hoped you could work together on projects, despite the breakup.

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter.  The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Based on the information in this allegation, you are to have no further contact with [Complainant 3]. This includes any contact in person, by phone, text, email, instant messenger, written notes, social media (such as Facebook, Twitter, Snapchat, Google Hangout), or any other method of communication. No one (you, your friends, your family, or your colleagues) is to contact the [Complainant 3], her friends, her family, or her colleagues on your behalf. This "No Contact" order will remain in effect until the conclusion of the investigation. It may also be extended beyond the investigative timeframe.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:
- University Policy 1202: Sexual Harassment and Misconduct Policy 2014-15
- University Policy 1202: Sexual Harassment and Misconduct Policy 2015-16
- Equal Opportunity/Affirmative Action Grievance Procedures 2013 version
- Equal Opportunity/Affirmative Action Grievance Procedures January 2015 version
- Equal Opportunity/Affirmative Action Grievance Procedures February 2016 version

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu.  Your cooperation in this process is appreciated.


Sincerely,

Dr. Jennifer R. Hammat
University Title IX Coordinator
George Mason University


CC:     Dr. Keith Renshaw, Department Chair
        Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**
University Title IX Coordinator
Compliance, Diversity, and Ethics
George Mason University
4400 University Drive, MS 2C2
Fairfax, VA 22030
703-993-8730
[titlenine.gmu.edu]titlenine.gmu.edu

# EXHIBIT 3A

**George Mason University Sexual Misconduct Policy**

**For Academic Year 2014 – 2015**

**A231**

Case 1:19-cv-01249-LO-MSN   Document 27-3   Filed 12/20/19   Page 6 of 31 PageID# 304

 **M E M O R A N D U M**
COMPLIANCE, DIVERSITY, AND ETHICS
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730; Fax: 703-993-8899

To:            Tom Moncure, University Counsel
               J.J. Wagner Davis, Senior Vice President for Administration and
                    Finance
               S. David Wu, Provost and Executive Vice President

From:          Elizabeth I. Woodley, University Policy Manager

Date:          July 30, 2014

Subject:       University Policy 1202: Sexual Harassment and Misconduct

---

Enclosed please find a revision of University Policy 1202, Sexual Harassment and
Misconduct.  This revision was initiated by Compliance, Diversity, and Ethics to ensure
that the policy complies with Title IX and the Campus SaVE Act. The policy now describes
Sexual Misconduct more fully as a form of Sexual Harassment under Title IX, defines the
SaVE Act's four categories of Sexual Misconduct (domestic violence, dating violence,
sexual assault, and stalking), and sets out the process of investigation in cases of Sexual
Misconduct. The policy also provides a list of resources for incidents of Sexual Misconduct.
The revision was completed with assistance from Rory Muhammad, Herbertia Gilmore,
Brent Ericson, Hortense Rascoe, Andre Clanton, Mary Ann Sprouse, Juliet Blank, and
David Drummey, among others.

After your review, please include your signature of approval on the final page of the policy,
if appropriate.  Please also initial where indicated below and forward to the next office for
administrative review.

If you have any questions or concerns, please do not hesitate to contact me at 3-5115 or
ewoodley@gmu.edu.

Thank you.

- Legal Department Review
- Approval and Signature of Senior Vice President
- Approval and Signature of Provost

- Return to University Policy Manager – Elizabeth Woodley, MSN 2C2



University Policy #1202
*Sexual Harassment and Misconduct*

---

**Categorized: General Policies**

**Responsible Office:**
> Compliance, Diversity, and Ethics

**Policy Procedures:**
> Equal Opportunity/Affirmative Action Grievance Procedures
> Code of Student Conduct Procedures

**Related Law & Policy:**
> Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
> Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
> University Policy 1201: Non-Discrimination Policy
> Code of Student Conduct
> Student Rights and Responsibilities (from University Catalog)

---

I.    SCOPE

This policy applies to all George Mason University *(Mason)* faculty, staff, students, university contractors, and visitors.

II.   POLICY STATEMENT

It is the policy of the University to provide an academic and work environment free from sexual harassment. Sexual harassment, a form of gender discrimination, is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated. Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures. Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1. Sexual assault

2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

1

III.   ADDRESSING AND PREVENTING SEXUAL MISCONDUCT

Sexual misconduct, which is a form of gender discrimination and incorporates a range of behaviors, is contrary to the standards and mission of the university. The University recognizes a need to establish a *comprehensive* policy that addresses campus sexual misconduct, which includes but is not limited to, sexual assaults, domestic violence, dating violence, stalking and sexual exploitation. In this context, Mason reaffirms its commitment to maintain a campus environment emphasizing the dignity and worth of all members of the university community; to foster a community that promotes prompt reporting of all types of sexual misconduct; and, to resolve sexual misconduct complaints in a fair, impartial and timely manner.

The University will respond promptly and decisively to all reports of sexual misconduct. Members of the university community accused of sexual misconduct will be subject to disciplinary action when the alleged incident has occurred on campus, off campus or materially affects the learning environment or operations of the university.

A. Sexual Misconduct Reporting Options

All reports of sexual misconduct, sexual harassment and gender discrimination made to any University employee must be reported to the University's Title IX Coordinator, Rory Muhammad, in Compliance Diversity and Ethics (CDE). In addition, any person who believes he or she has been subject to sexual misconduct, sexual harassment or gender discrimination may contact the Title IX Coordinator directly. The telephone number for CDE is (703) 993-8730 and email is rmuhamma@gmu.edu.   The Title IX Coordinator, in consultation with Human Resources and University Life, will ensure complaints are addressed by appropriate University entities and will assist complainants in receiving any medical, mental health, or other services that may be warranted. The Title IX Coordinator will also facilitate any interim administrative action necessary to protect the complainant in the institutional setting while the disciplinary or investigative process is taking place. Such action may be taken when, in the professional judgment of University officials, a threat of imminent harm to persons or property exists.  Interim administrative action is not a sanction. Actions may include, but are not limited to, interim suspension, alternate housing or academic accommodations, alternate transportation on campus, no contact directives, workspace relocation, or temporary change of reporting structure.

Complaints against students are handled by the Office of Student Conduct and are governed by the Code of Student Conduct (See at http://studentconduct.gmu.edu/university-policies/code-of-student-conduct/). Complaints against faculty and staff are handled by Compliance Diversity and Ethics and are governed by Equal         Opportunity/Affirmative         Action         Grievance         Procedures         at http://integrity.gmu.edu/compliance/grievanceprocedures.cfm.  The Title IX Coordinator will decide which grievance procedure to apply in cases where the respondent is a student and employee.  In addition to filing internal complaints, the University encourages individuals to report incidents of sexual misconduct to the University Police at (703) 993-4111 or local law enforcement at 911.

Anonymous reports can be used to initiate the student conduct process and employee conduct investigations. Under federal law the University is required to investigate all incidents of sexual harassment and gender discrimination, including sexual assaults, about which the University knows or has reason to know to protect the health and safety of the University community. The University will undertake an investigation even in those cases in which the complainant chooses not to cooperate. In those cases, the University may be limited in the scope of its investigation due to the availability of information. Third party or anonymous reports alleging sexual misconduct will be accepted by the University through Compliance Diversity and Ethics.

Any information provided anonymously or formally will be used in compliance with *The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act* for data collection.

B. Confidentiality and Reporting

The University will protect the identity of persons who report having been victims of sexual assault, domestic violence, dating violence, stalking or sexual exploitation to the fullest extent possible or required by law. However, when accessing university resources, individuals should be aware of the University's

2

confidentiality and mandatory reporting obligation in order to make informed choices. Some on-campus resources offer confidentiality, sharing options and advice without having an obligation to tell anyone unless the complainant wants them to. This is limited to counselors in Counseling & Psychological Services (CAPS) and staff members in Student Health Services (SHS) and Wellness, Alcohol and Violence Education Services (WAVES). In addition, complainants may speak on- or off-campus with members of the clergy and chaplains who will keep reports made to them confidential.

Complainants are encouraged to speak to officials of the University to make reports of incidents (e.g., Deans, Directors, Vice Presidents, Department Chairs, Faculty, University Police, Human Resources staff, Resident Director and Advisors, etc.). The University considers these people to be *"responsible employees."* Notice to them is official notice to the University. Complainants have the right and can expect to have incidents of sexual misconduct taken seriously by the University when reported, and to have those incidents investigated and properly resolved through appropriate administrative procedures. Only people who need to know will be told and information will be shared only as necessary with investigators, hearing boards members, administrators, witnesses and the respondent.

## C. Sanctions

University sanctions, up to and including separation from the university, may be imposed upon those determined to have violated this policy. For students, some form of sexual misconduct, such as, sexual assault, domestic violence, dating violence, stalking and sexual exploitation are violations of the Code of Student Conduct, subjecting the respondent to disciplinary sanctions up to and including expulsion and suspension from the university. Employees who violate this policy will be subject to discipline, up to and including termination of employment. Sexual assault, domestic violence, and stalking are criminal acts which also may subject the respondent to criminal and civil penalties under federal and Virginia state law.

## D. Campus Emergency, Medical, Counseling, Advocacy Support Resources

**University Title IX Coordinators**
**Rory Muhammad**, Associate Director/Chief Investigator & Title IX Coordinator
**Herbertia Gilmore**, Equal Opportunity Specialist & Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Mason Hall, D201
Phone: (703) 993-8730
E-mail: rmuhamma@gmu.edu and hwillia9@gmu.edu
Website: http://integrity.gmu.edu/compliance/titleIX.cfm

**Wellness, Alcohol and Violence Education and Services (WAVES)** — Provides students with *confidential* help and support to develop and maintain healthy lifestyles. Topics include: relationships, stress management, sexual assault, drugs/alcohol.
Mary Ann Sprouse, Director
Phone: (703) 993-3687
E-mail: msprouse@gmu.edu
WAVES Office Phone: (703) 993-9999
WAVES 24 Hour Sexual and Intimate Partner Violence Crisis Line: (703) 380-1434

**Counseling and Psychological Services (CAPS)** — Provides *confidential* counseling services to students in crisis and non-emergency situations. Crisis Intervention Assistance is provided to members of the University community who are experiencing crises which affect their ability to function in the community.
- For consultation or emergency assistance during office hours call 703-993-2380.
- For assistance during non-office hours, call University Police at 703-993-4357.
- For life threatening emergencies call 911.
Barbara Meehan, Director
Phone: (703) 993-2380
E-mail: bmeehan@gmu.edu

**Student Health Services (SHS)** — Provides *confidential* health care to enrolled students in emergency and non-emergency circumstances on the Fairfax, Arlington and Prince William campuses. If there is a medical emergency and Student Health Services (SHS) is closed, please contact the free after-hours nurse ((703) 993-2831), a hospital emergency room, an urgent care facility, or call 911.

3

Fairfax Campus                    **Arlington** Campus              Prince William Campus
SUB 1, Suite 2300                 **Founders** Hall, B              102 Occoquan Bldg, Room 229
703-993-2831                      703-993-4863                     703-993-8374
Fax: 703-993-4365                 Fax: 703-993-9425                Fax: 703-993-1948
Wagida Abdalla, MD and Carol Filak, PhD, RN, Directors
Email: wabdalla@gmu.edu and cfilak@gmu.edu

**University Police**
Police Phone Numbers/Information
Emergency: 911
Non-Emergency: (703) 993-2810
**Reporting a Crime (Crime Solvers Anonymous** Tip Hot-Line): (703) 993-4111
**Mason Police Website:** http://police.gmu.edu/
Eric Heath, Chief of Police
Phone: (703) 993-3840
E-mail: cheath2@gmu.edu

**University Life (UL)** — The Offices of University Life oversee the academic and non-academic adjudication process and help students and faculty resolve grievances by mapping out resources and explaining policies. In addition to fostering campus and community engagement through a myriad of student clubs and organizations, University Life offices promote health and wellness, learning services, diversity education, and career readiness. University Life seeks to enhance the university experience by helping students, staff, and faculty find their place in the George Mason University community.
Pam Patterson, Assistant Vice President and Dean of Students
Phone: (703) 993-2884
Email: ppater2@gmu.edu

**Lesbian, Gay, Bisexual, Transgender, Queer and Questioning Resource Office (LGBTQ)** — Provides students of all genders and sexual orientations a safe, **supportive**, confidential space **for advocacy, guidance and mentorship**, community building, educational **programming**, resources, and co**ordination** of **the Safe Zone Program.**
Ric Chollar, Director
Phone: (703) 993-2702
Email: rchollar@gmu.edu
Website: http://lgbtq.gmu.edu/

**Student Support and Case Management (OSSCM)** — Provides comprehensive service to students of concern. Working in cooperation with the Dean of Students **Office**, OSSCM serves as the primary resource for managing referrals and student issues related to crisis inter**vention.** The office will make referrals to the Campus Assessment & Intervention Team, as necessary. Individuals concerned about a Mason student are encouraged to share their concerns if they:
- Ob**serve behavior which could** reasonably lead one to be concerned for the student's safety, or for the **safety of those around him/**her;
- Feel threatened by the student, whether by action or direct verbal threat;
- Observe new behavior, different from a previously established pattern of behavior that causes concern to the observer.
Margaret Olszewska, Director
Office Phone: (703) 993-5376
E-mail: molszews@gmu.edu
Website: http://osscm.gmu.edu/

**Office of Student Conduct (OSC)** — Provides **primarily** responsible for resolving allegations of misconduct in a timely and consistent manner. Cases **related** to Title IX are heard, and decided, on an **individual** basis taking each situation's circumstances into account. Ad**ditional** information reg**arding the hearing** process can be found at Resolution of **Alleged** Sexual **Misconduct** (http://studentconduct.gmu.edu/our-process/resolution-of-alleged-sexual-assault/).
Brent Ericson, Assistant Dean and Director
Phone: (703) 993-6209
E-mail: bericson@gmu.edu

4

**Intercollegiate Athletics (ICA)** — ICA is available to assist individuals and to address the challenges of our student-athletes at George Mason University.
Nena Rogers, Associate Athletic Director, Student Services, Intercollegiate Athletics
Phone: (703) 993-3594
Email: nrogers1@gmu.edu

**Human Resources and Payroll's Employee Relations Team (HR&P)** — Provides assistance to university employees and their supervisors to help identify and resolve work related problems or proactively avoid potential problems, including but not limited to, sexual misconduct issues in the workplace. Resources for faculty and staff can be found here.
Pat Donini, Director
Phone: (703) 993-3878
E-mail: pdonini@gmu.edu

**Office of Housing and Residential Life (OHRL)** — Provides a student-centered community that supports the academic mission of the university. They promote student success, encourage engagement with the university community, and promote appreciation for diversity among our residents. Professional and student staff are available around the clock to assist students and ensure safety.
Michelle Coleman, Associate Director of Community Development, Housing & Residence Life
Phone: (703) 993-2720
E-mail: mcolem11@gmu.edu

**E. External Emergency, Medical, Counseling, Advocacy Support Resources**

**Office for Women and Domestic and Sexual Violence Services (OFWDSVS)** — Provides comprehensive state-accredited programs for women, men, teens and children who have been affected by domestic and sexual violence and stalking. OFWDSVS promotes safety, responsibility, awareness and equality by offering a 24-hour hotline, free counseling, group sessions, and referrals.
Fairfax County Government Center, 12000 Government Center Pkwy, Suite 339, Fairfax, VA 22035
Phone: (703) 324-5730 and TTY: (703) 324-5706
24 hour Hotline/Helpline: 703-360-7273 and TTY (703) 435-1235

**Domestic Violence Action Center (DVAC)** — Provides services to individuals experiencing domestic violence or stalking and their families who reside in Fairfax County or were assaulted and/or stalked in the county. Referrals for offender services are also available through the intake telephone number only *(no offender walk-ins)*.
Fairfax County Historic Courthouse, 4000 Chain Bridge Road, Suite 2702, Fairfax, VA 22035
Information and Intake Phone: 703-246-4573
Walk-In Intake Hours: 10 a.m. to 3 p.m., Monday through Friday

**Rape, Abuse and Incest National Network (RAINN)** — Among its programs, RAINN operates the National Sexual Assault Hotline at (800)656-HOPE. This nationwide partnership of more than 1,100 local rape treatment hotlines provides victims of sexual violence with free, confidential services around the clock.
Phone: (800) 656-HOPE
Website: www.rainn.org

IV.    **DEFINITIONS**

A.    *Sexual Misconduct* is a range of behaviors, including but not limited to, sexual harassment, sexual assault, domestic violence, dating violence, stalking and sexual exploitation.   It includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that (a) is sufficiently severe, persistent, or pervasive to limit a student or employee's ability to participate in or benefit from an education program, or (b) explicitly or implicitly affects an individual's employment or academic environment, unreasonably interferes with an individual's academic or work performance, or creates an intimidating, hostile, or offensive academic or work environment.

B.    *Consent* is clear, knowing and voluntary. Consent is active, not passive. Silence, in and of itself, cannot be interpreted as consent. Consent can be given by words or actions, as long as those words or actions create mutually understandable clear permission regarding willingness to engage in (and the condition of) sexual activity. Consent to any one form of sexual activity cannot automatically imply consent to other forms of

5

sexual activity. Previous relationships or prior consent cannot imply consent to future sexual acts. Consent can be withdrawn at any time.

If any of the following are present, consent cannot be given:
1. *Force* is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and coercion that overcome resistance or produce consent.
2. *Coercion* is unreasonable pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another.
3. *Incapacitation* is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction). Sexual activity with someone who you should know to be – or based on the circumstances should reasonably have known to be – mentally or physically incapacitated (by alcohol or other drug use, unconsciousness or blackout), constitutes a violation of university policy. University policy covers a person whose incapacity results from mental disability, sleep, involuntary physical restraints, or from taking drugs or other substances.

C. *Sexual Assault* is any unwanted, non-consensual sexual contact against any individual by another. Sexual assault can occur either forcibly (against a person's will) or when a person cannot give consent (under the age of consent, intoxicated, developmentally disabled, mentally/physically unable to consent, etc.). Sexual assault can include non-consensual touching or fondling of a sexual nature, which can include touching of breasts, buttocks and/or genitalia.

D. *Domestic Violence* includes violence committed by a current or former spouse or intimate partner of the complainant, by a person with whom the complainant shares a child in common, by a person who is cohabitating with or has cohabitated with the complainant as a spouse or intimate partner, by a person similarly situated to a spouse of the complainant under the domestic or family violence laws of the Commonwealth of Virginia, or by any other person against an adult or youth complainant who is protected from that person's acts under the domestic or family violence laws of the Commonwealth of Virginia.

E. *Dating Violence* is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant. The existence of such relationship shall be determined based on a consideration of three factors: (1.) The length of the relationship; (2.) The type of relationship; and (3.) The frequency of interaction between the persons involved in the relationship.

F. *Stalking* includes any behavior directed at another person, on more than one occasion, that the stalker intends, knows, or reasonably should know, places the other person in reasonable fear of his or her safety or the safety of others or causes them to suffer substantial emotional distress. Examples of stalking behaviors include, but are not limited to, the following: non-consensual communication, including face-to-face, telephone calls, voice messages, email, texts, written letters; unwanted gifts; threatening or obscene gestures; pursuing or following; surveillance or other observation; trespassing; vandalism; and non-consensual touching.

G. *Sexual Exploitation* occurs when a person takes non-consensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute one of other sexual misconduct offenses. Examples of sexual exploitation include, but are not limited to, invasion of sexual privacy; prostituting another person; non-consensual recording or broadcast of sexual activity; going beyond the boundaries of consent (such as letting someone hide in the closet to watch another have consensual sex); engaging in voyeurism; knowingly transmitting an STD or HIV to another person; exposing one's genitals in non-consensual circumstances – inducing another to expose their genitals; and sexually-based stalking, bullying and cyber-bullying.

## V.    PROTECTION AGAINST RETALIATION

Any member of the Mason community has the right to raise concerns about or complain of, sexual harassment or misconduct without fear of reprisal. Retaliation against any person related to any portion of this policy may result in disciplinary action up to and including termination or expulsion by Mason. Retaliation against any person who is the alleged victim of sexual harassment or misconduct is prohibited as well.

6

**A238**

## VI.    TRAINING, EDUCATION AND PREVENTION PROGRAMS

The University's Wellness, Alcohol, Violence and Education Services (WAVES) and Compliance, Diversity and Ethics (CDE), are responsible for developing and implementing a comprehensive, institution-wide education and prevention campaign for students and employees related to prevention of sexual assaults, domestic violence, dating violence, stalking and sexual exploitation as well as training on this policy. These programs will inform the university community about the risks and myths that contribute to incidents of sexual misconduct and strategies for bystander intervention.

## VII.    COMPLIANCE

Inquiries about or complaints alleging violation of the University's Sexual Harassment and Misconduct Policy should be directed to the Title IX Coordinator in Compliance Diversity and Ethics (Mason Hall D201, Mailstop 2C2, Fairfax, VA 22030 Phone (703) 993-8730).

## VIII.    RESPONSIBLE PARTIES

Compliance, Diversity, and Ethics is responsible for administering and monitoring George Mason University's equal opportunity/affirmative action policies and procedures.

## IX.    DATES:

A.    **Effective Date and Approval**

This policy will become effective upon the date of approval by the Provost and Senior Vice President for Administration and Finance.

B.    **Timetable for Review**

The policy, and any related procedures, shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

## X.    SIGNATURES

**Approved:**

Senior Vice President for Administration and Finance

Date: 8/8/2014

**Approved:**

Provost and Executive Vice President

Date: 8/5/14

7

# EXHIBIT 3B

**George Mason University**

**Sexual Misconduct Investigation Procedures**

**For Academic Year 2014 – 2015**



GEORGE
**MASON** | Compliance, Diversity,
UNIVERSITY | and Ethics



# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. CDE may amend this process as necessary. Any student, faculty member, staff employee, or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, color, religion, retaliation, sex (including sexual harassment), national origin, sexual orientation, age, physical or mental disability, veteran status, marital status, pregnancy status, or genetic information (GINA) should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the University reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the charging party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.





## III. Filing Process

<u>Complaints</u>

Complaints must be filed with CDE. Complainants will be asked to complete an intake form describing the alleged discrimination and/or harassment. Assistance will be arranged, if needed.

A complaint should be filed within 180 calendar days of the most recent incident. The University will consider requests to extend this period where the complainant can show he or she needed additional time due to circumstances beyond his or her control.

The complainant will meet with a representative from Compliance, Diversity and Ethics to discuss options (informal, formal) for proceeding. The Title IX and Age Discrimination in Employment Act (ADEA) Coordinator is the Associate Director/Chief Investigator in Compliance, Diversity and Ethics, located in Research Hall, Room 344, 703-993-8730, CDE@gmu.edu.  The complainant is not required to follow the informal procedure before filing a formal complaint. The respondent (the individual accused of discrimination) will be notified of the complaint within 10 working days after it is filed.

<u>Options</u>

**Informal**. Discuss allegations and concerns with respondent (the accused) and attempt to resolve the situation. The respondent is reminded that George Mason University expects all to adhere to our equal opportunity policies. Respondent is put on notice that behavior has been questioned, and informal resolution sought, if possible. If attempts to resolve the situation are not successful, the complainant may pursue a formal complaint. The Office reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

**Formal**. A full investigation is conducted by CDE complete with written findings. If a violation is found, the Office will recommend corrective actions. These may include a directive to stop any ongoing discrimination, harassment, or retaliation; disciplinary or other corrective action against the respondent or others; relief for the complainant to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.** A finding may be appealed in writing to the Vice President of Compliance, Diversity by either party within 10 working days of receipt of CDE's determination. A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding. The appellant should be as specific as possible in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination Compliance, Diversity and Ethics is final.





**GEORGE MASON** UNIVERSITY | Compliance, Diversity, and Ethics

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a complainant may file their complaint with the appropriate external agencies. A complete list of agencies, along with contact information, is available from Compliance, Diversity and Ethics, Research Hall, Room 344, MS 2C2, Fairfax, VA 22030;  Phone (703) 993-8730;  Fax (703) 993-8899.

<u>Time Line for Investigation Process</u>

Compliance, Diversity and Ethics will complete its investigations as expeditiously as possible. The investigation shall normally be completed within 45 working days from the filing of a formal complaint, including notification of the parties of the outcome of the investigation. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. Compliance, Diversity and Ethics will maintain contact with the Complainant and Respondent throughout the course of the investigation to keep them up to date on the process.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the respondent, the complainant, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The complainant and the respondent each have the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to Compliance, Diversity and Ethics at least 72 hours prior to the meeting. If either the complainant or the respondent's advisor is a person degreed or qualified in law, Compliance, Diversity and Ethics must be notified.

## VI. Responsibilities and Jurisdiction of the Office of Equity and Diversity Services

Consistent with federal and state laws and university policies related to nondiscrimination, the CDE only investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex, national origin, sexual orientation, age, marital status,  pregnancy status,  genetic information, physical or mental disability, or veteran status.  CDE investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

Updated 1/26/2015

# EXHIBIT 3C

**George Mason University Sexual Misconduct Policy**

**For Academic Year 2015 – 2016**



# University Policy #1202
## *Sexual Harassment and Misconduct*

**Categorized: General Policies**

**Responsible Office:**
Compliance, Diversity, and Ethics

**Policy Procedures:**
Equal Opportunity/Affirmative Action Grievance Procedures
Code of Student Conduct Procedures

**Related Law & Policy:**
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
University Policy 1201: Non-Discrimination Policy
Code of Student Conduct
Student Rights and Responsibilities (from University Catalog)

## I.    SCOPE

This policy applies to all George Mason University *(Mason)* faculty, staff, students, university contractors, and visitors.

## II.    POLICY STATEMENT

It is the policy of the University to provide an academic and work environment free from sexual harassment. Sexual harassment, a form of gender discrimination, is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated. Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures. Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other forms of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or unreasonably creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1. Sexual assault

2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

III.   ADDRESSING AND PREVENTING SEXUAL MISCONDUCT

Sexual misconduct, which is a form of gender discrimination and incorporates a range of behaviors, is contrary to the standards and mission of the university. The University recognizes a need to establish a *comprehensive* policy that addresses campus sexual misconduct, which includes but is not limited to, sexual assault, domestic violence, dating violence, stalking and sexual exploitation. In this context, Mason reaffirms its commitment to maintain a campus environment emphasizing the dignity and worth of all members of the university community; to foster a community that promotes prompt reporting of all types of sexual misconduct; and, to resolve sexual misconduct complaints in a fair, impartial and timely manner.

The University will respond promptly and decisively to all reports of sexual misconduct. Members of the university community accused of sexual misconduct will be subject to disciplinary action when the alleged incident has occurred on campus, off campus or materially affects the learning environment or operations of the university.

IV.   REPORTING SEXUAL MISCONDUCT

The University strongly encourages prompt reporting of sexual misconduct. A report may be made by
- A person who believes they experienced sexual misconduct (a "Complainant"); or
- A person who has information that sexual misconduct may have been committed by a university student, employee or participant in a university program (a "Reporter").

If the Reporter or Complainant chooses not to participate in the University's review of the report, the University may pursue the report without that person's participation.

All reports to any University employee must be reported to the University's Interim Title IX Coordinator, Herbertia Gilmore, in Compliance Diversity and Ethics (CDE). Reports made to any other non-confidential University employee, including, but limited to, the University's Deputy Title IX Coordinators for Athletes (Nena Rogers) and Mason Korea (Kent Zimmerman) will be referred to the Title IX Coordinator for further review.

The Title IX Coordinator, in consultation with Human Resources and University Life, will ensure complaints are addressed by appropriate University entities and will assist complainants in receiving any medical, mental health, or other services that may be warranted. The Title IX Coordinator will also facilitate any interim administrative action necessary to protect the complainant in the institutional setting while the disciplinary or investigative process is taking place. Such action may be taken when, in the professional judgment of University officials, a threat of imminent harm to persons or property exists.  Interim administrative action is not a sanction. Actions may include, but are not limited to, interim suspension, alternate housing or academic accommodations, alternate transportation on campus, no contact directives, workspace relocation, or temporary change of reporting structure.

Complaints against students are governed by the Code of Student Conduct (See at http://studentconduct.gmu.edu/university-policies/code-of-student-conduct/).  The Office of Student Conduct handles those complaints except for students studying at the Mason Korea campus.  Complaints against faculty, staff, and students studying at the Mason Korea campus are handled by Compliance Diversity and Ethics.  The Equal Opportunity/Affirmative Action Grievance Procedures  are available at http://integrity.gmu.edu/compliance/grievanceprocedures.cfm.  The Title IX Coordinator will decide which grievance procedure to apply in cases where the respondent is a student and employee.  In addition to filing internal complaints, the University encourages individuals to report incidents of sexual misconduct to the University Police at (703) 993-4111 or local law enforcement at 911.

Anonymous reports can be used to initiate the student conduct process and employee conduct investigations. Under federal law the University is required to investigate all incidents of sexual harassment and gender discrimination, including sexual assaults, about which the University knows or has reason to know to protect the health and safety of the University community. The University will undertake an investigation even in those cases in which the complainant chooses not to cooperate. In those cases, the University may be limited in the scope of its investigation due to the availability of information. Third party or anonymous reports alleging sexual misconduct will be accepted by the University through Compliance Diversity and Ethics.

All crimes and other emergencies should be immediately reported to the George Mason University Department of Police & Public Safety (Mason Police) or local police and fire authorities by dialing 9-1-1. For the Mason

Korea Campus, crimes and other emergencies should be immediately reported to local police and fire authorities by dialing 1-1-2 or 1-1-9. After receiving information concerning a crime or an emergency, the University will ensure an effective investigation and appropriate follow-up actions, which may include issuing timely warning notifications to alert the campus community about crimes that pose a serious or continuing threat to safety, or issuing emergency notification and evacuation procedures to alert the campus community about significant emergencies or dangerous situations. Reporting all incidents to Mason Police also allows for accurate reporting of crime statistics in public disclosures such as the Annual Security and Fire Safety Report and the daily Crime and Fire Log in compliance with *The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act.* See University Policy #1404 for more information (http://universitypolicy.gmu.edu/policies/reporting-of-crimes-accidents-fires-and-other-emergencies/)."

### A. Confidentiality and Reporting

The University will protect the identity of persons who report having been victims of sexual assault, domestic violence, dating violence, stalking or sexual exploitation to the fullest extent possible or required by law. However, when accessing university resources, individuals should be aware of the University's confidentiality and mandatory reporting obligation in order to make informed choices. Some on-campus resources offer confidentiality, sharing options and advice without having an obligation to tell anyone unless the complainant wants them to. This is limited to staff in Counseling and Psychological Services, Office of the Ombudsman, Student Health Services and Wellness, Alcohol and Violence Education Services.

Complainants and Reporters are encouraged to speak to officials of the University to make reports of incidents (e.g., Deans, Directors, Vice Presidents, Department Chairs, Faculty, University Police, Human Resources staff, Resident Director and Advisors, etc.). The University considers these people to be *"responsible employees."* Notice to them is official notice to the University. Complainants have the right and can expect to have incidents of sexual misconduct taken seriously by the University when reported, and to have those incidents investigated and properly resolved through appropriate administrative procedures. Only people who need to know will be told and information will be shared only as necessary with investigators, hearing board members, administrators, witnesses and the respondent.

If the Complainant requests confidentiality or asks that the report of sexual misconduct not be pursued, the University will, generally before taking any further investigative steps, forward that information, along with all available information about the report, to a review panel. The review panel will consist of the Title IX Coordinator and staff members. These panel members will represent the interests of the University, law enforcement, survivors of sexual misconduct, persons accused of sexual misconduct, and/or other offices as deemed necessary and appropriate under the circumstances.

### B. Sanctions

University sanctions, up to and including separation from the university, may be imposed upon those determined to have violated this policy. For students, some forms of sexual misconduct, such as, sexual assault, domestic violence, dating violence, stalking and sexual exploitation are violations of the Code of Student Conduct, subjecting the respondent to disciplinary sanctions up to and including expulsion and suspension from the university. Employees who violate this policy will be subject to discipline, up to and including termination of employment. Sexual assault, domestic violence, and stalking are criminal acts which also may subject the respondent to criminal and civil penalties under federal and Virginia state law.

### C. Campus Emergency, Medical, Counseling, Advocacy Support Resources

**University Title IX Coordinators**
**Herbertia Gilmore,** Interim Title IX Coordinator
Compliance, Diversity and Ethics
373 Aquia Building (*From July 2015 until October 2015, our office will be temporarily located in Research Hall, 3rd Floor, Room 344.)*
Phone: (703) 993-8730
E-mail: hwillia9@gmu.edu
Website: http://integrity.gmu.edu/compliance/titleIX.cfm

**Deputy Title IX Coordinator for Athletics –** Nena Rogers nrogers1@gmu.edu

**Deputy Title IX Coordinator for Mason Korea –** Kent Zimmerman

**Wellness, Alcohol and Violence Education and Services** — Provides students with *confidential* help and support to develop and maintain healthy lifestyles. Topics include: relationships, stress management, sexual assault, drugs/alcohol.
Mary Ann Sprouse, Director
Phone: (703) 993-3687
E-mail: msprouse@gmu.edu
WAVES Office Phone: (703) 993-9999
WAVES 24 Hour Sexual and Intimate Partner Violence Crisis Line: (703) 380-1434

**Counseling and Psychological Services** —Provides free, *confidential* counseling services to students in crisis and non-emergency situations.
- For consultation or urgent assistance during business hours, call CAPS at 703-993-2380.
- For assistance after hours, call George Mason University Police at 703-993-2810.
- For life threatening emergencies, dial 911.
Barbara Meehan, Ph.D., Executive Director
Phone: (703) 993-2380

**Student Health Services** — Provides *confidential* health care to enrolled students in emergency and non-emergency circumstances on the Fairfax, Arlington and Prince William campuses.  If there is a  medical emergency and Student Health Services is closed, please contact the free after-hours nurse ((703) 993-2831), a hospital emergency room, an urgent care facility, or call 911.

| Fairfax Campus | Arlington Campus | Prince William Campus |
|---|---|---|
| SUB 1, Suite 2300 | Founders Hall, B | 102 Occoquan Bldg, Room 229 |
| 703-993-2831 | 703-993-4863 | 703-993-8374 |
| Fax: 703-993-4365 | Fax: 703-993-9425 | Fax: 703-993-1948 |

Wagida Abdalla, MD and Carol Filak, PhD, RN, Directors
Email: wabdalla@gmu.edu and cfilak@gmu.edu

**Office of the Ombudsman** — Provides *confidential* services for students to discuss any concerns and complaints, and serves as a safe space to facilitate conflict resolution. The Office of the Ombudsman does not accept notice on behalf of the University.
J. Fernando Caetano, University Ombudsman
Phone: (703) 993-3306
E-mail: jcaetano@gmu.edu
Website: http://ombudsman.gmu.edu

**University Police**
Police Phone Numbers/Information
Emergency: 911
Non-Emergency: (703) 993-2810
Reporting a Crime (Crime Solvers Anonymous Tip Hot-Line): (703) 993-4111
Mason Police Website: http://police.gmu.edu/
Thomas Longo, Interim Chief of Police
E-mail: tlongo@gmu.edu

**University Life** — The Offices of University Life oversee the academic and non-academic adjudication process and help students and faculty resolve grievances by mapping out resources and explaining policies. In addition to fostering campus and community engagement through a myriad of student clubs and organizations, University Life offices promote health and wellness, learning services, diversity education, and career readiness. University Life seeks to enhance the university experience by helping students, staff, and faculty find their place in the George Mason University community.
Pam Patterson, Assistant Vice President and Dean of Students
Phone: (703) 993-2884
Email: ppater2@gmu.edu

**Lesbian, Gay, Bisexual, Transgender, Queer and Questioning Resource Office** — Provides students of all genders and sexual orientations a safe, supportive, confidential space for advocacy, guidance and mentorship, community building, educational programming, resources, and coordination of the Safe Zone Program.

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                4

# A248

Ric Chollar, Director
Phone: (703) 993-2702
Email: rchollar@gmu.edu
Website: http://lgbtq.gmu.edu/

**Office of Student Support** — Provides comprehensive service to students of concern. Student Support serves as the primary resource for managing referrals and student issues related to crisis intervention. The office will make on and off campus referrals as necessary. Individuals concerned about a Mason student are encouraged to share their concerns if they:
- Observe behavior which could reasonably lead one to be concerned for the student's safety, or for the safety of those around him/her;
- Feel threatened by the student, whether by action or direct verbal threat;
- Observe new behavior, different from a previously established pattern of behavior that causes concern to the observer.

Margaret Olszewska, Director
Office Phone: (703) 993-5376
E-mail: molszews@gmu.edu
Website: http://osscm.gmu.edu/

**Office of Student Conduct** — Provides primarily responsible for resolving allegations of misconduct in a timely and consistent manner. Cases related to Title IX are heard, and decided, on an individual basis taking each situation's circumstances into account. Additional information regarding the hearing process can be found at Resolution of Alleged Sexual Misconduct (http://studentconduct.gmu.edu/our-process/resolution-of-alleged-sexual-assault/).
Brent Ericson, Assistant Dean and Director
Phone: (703) 993-6209
E-mail: bericson@gmu.edu

**Intercollegiate Athletics** — ICA is available to assist individuals and to address the challenges of our student-athletes at George Mason University.
Nena Rogers, Associate Athletic Director, Student Services, Intercollegiate Athletics
Phone: (703) 993-3594
Email: nrogers1@gmu.edu

**Human Resources and Payroll's Employee Relations Team** — Provides assistance to university employees and their supervisors to help identify and resolve work related problems or proactively avoid potential problems, including but not limited to, sexual misconduct issues in the workplace. Resources for faculty and staff can be found here.
Pat Donini, Director
Phone: (703) 993-3878
E-mail: pdonini@gmu.edu

**Office of Housing and Residential Life** — Provides a student-centered community that supports the academic mission of the university. They promote student success, encourage engagement with the university community, and promote appreciation for diversity among our residents. Professional and student staff are available around the clock to assist students and ensure safety.
Michelle Coleman, Associate Director of Community Development, Housing & Residence Life
Phone: (703) 993-2720
E-mail: mcolem11@gmu.edu

**E. External Emergency, Medical, Counseling, Advocacy Support Resources**

**Office for Women and Domestic and Sexual Violence Services** — Provides comprehensive state-accredited programs for women, men, teens and children who have been affected by domestic and sexual violence and stalking. OFWDSVS promotes safety, responsibility, awareness and equality by offering a 24-hour hotline, free counseling, group sessions, and referrals.
Fairfax County Government Center, 12000 Government Center Pkwy, Suite 339, Fairfax, VA 22035
Phone: (703) 324-5730 and TTY: (703) 324-5706
24 hour Hotline/Helpline: 703-360-7273 and TTY (703) 435-1235

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    5

**Domestic Violence Action Center** — Provides services to individuals experiencing domestic violence or stalking and their families who reside in Fairfax County or were assaulted and/or stalked in the county. Referrals for offender services are also available through the intake telephone number only *(no offender walk-ins)*.
Fairfax County Historic Courthouse, 4000 Chain Bridge Road, Suite 2702, Fairfax, VA 22035
Information and Intake Phone: 703-246-4573
Walk-In Intake Hours: 10 a.m. to 3 p.m., Monday through Friday

**Rape, Abuse and Incest National Network** — Among its programs, the network operates the National Sexual Assault Hotline at (800)656-HOPE. This nationwide partnership of more than 1,100 local rape treatment hotlines provides victims of sexual violence with free, confidential services around the clock.
Phone: (800) 656-HOPE
Website: www.rainn.org

V.   **DEFINITIONS**

A.  *Sexual Misconduct* covers a range of behaviors, including but not limited to, sexual harassment, sexual assault, domestic violence, dating violence, stalking and sexual exploitation, that can create a hostile academic and/or work environment. It includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that (a) is sufficiently severe, persistent, or pervasive to limit a student or employee's ability to participate in or benefit from an education program, or (b) explicitly or implicitly affects an individual's employment or academic environment, unreasonably interferes with an individual's academic or work performance, or creates an intimidating, hostile, or offensive academic or work environment.

B.  *Consent* is clear, knowing and voluntary permission. Consent is active, not passive. Silence, in and of itself, cannot be interpreted as consent. Consent can be given by words or actions, as long as those words or actions create mutually understandable clear permission regarding willingness to engage in (and the condition of) sexual activity. Consent to any one form of sexual activity cannot automatically imply consent to other forms of sexual activity. Previous relationships or prior consent cannot imply consent to future sexual acts. Consent can be withdrawn at any time.

If any of the following are present, consent cannot be given:
1.  *Force* is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and coercion that overcome resistance or produce consent.
2.  *Coercion* is unreasonable pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another.
3.  *Incapacitation* is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction). Sexual activity with someone who you should know to be – or based on the circumstances should reasonably have known to be – mentally or physically incapacitated (by alcohol or other drug use, unconsciousness or blackout), constitutes a violation of University policy. University policy covers a person whose incapacity results from mental disability, sleep, involuntary physical restraints, or from taking drugs or other substances.

C.  *Sexual Assault* is any unwanted, non-consensual sexual contact against any individual by another. Sexual assault can occur either forcibly (against a person's will) or when a person cannot give consent (under the age of consent, incapacitated, developmentally disabled, mentally/physically unable to consent, etc.). Sexual assault can include non-consensual touching or fondling of a sexual nature, which can include touching of breasts, buttocks and/or genitalia.

D.  *Domestic Violence* includes violence committed by a current or former spouse or intimate partner of the complainant, by a person with whom the complainant shares a child in common, by a person who is cohabitating with or has cohabitated with the complainant as a spouse or intimate partner, by a person similarly situated to a spouse of the complainant under the domestic or family violence laws of the Commonwealth of Virginia, or by any other person against an adult or youth complainant who is protected from that person's acts under the domestic or family violence laws of the Commonwealth of Virginia.

E.  *Dating Violence* is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant. The existence of such relationship shall be determined based on a

consideration of three factors: (1.) The length of the relationship; (2.) The type of relationship; and (3.) The frequency of interaction between the persons involved in the relationship.

F.   *Stalking* includes any behavior directed at another person, on more than one occasion, that the stalker intends, knows, or reasonably should know, places the other person in reasonable fear of his or her safety or the safety of others or causes them to suffer substantial emotional distress. Examples of stalking behaviors include, but are not limited to, the following: non-consensual communication, including face-to-face, telephone calls, voice messages, email, texts, written letters; unwanted gifts; threatening or obscene gestures; pursuing or following; surveillance or other observation; trespassing; vandalism; and non-consensual touching.

G.   *Sexual Exploitation* occurs when a person takes non-consensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute one of other sexual misconduct offenses. Examples of sexual exploitation include, but are not limited to, invasion of sexual privacy; prostituting another person; non-consensual recording or broadcast of sexual activity; going beyond the boundaries of consent (such as letting someone hide in the closet to watch another have consensual sex); engaging in voyeurism; knowingly transmitting an STD or HIV to another person; exposing one's genitals in non-consensual circumstances – inducing another to expose their genitals; and sexually-based stalking, bullying and cyber-bullying.

H.   *Retaliation* is an adverse action taken against an individual because he or she has or is believed to have: (1.) reported or opposed conduct which reasonably and in good faith believes is discrimination, harassment or retaliation; (2.) participated in a discrimination, harassment or retaliation investigation or hearing; or (3.) assisted someone in reporting or opposing discrimination, harassment or retaliation.

## VI.   PROTECTION AGAINST RETALIATION

Any member of the Mason community has the right to raise concerns about or complain of sexual harassment or misconduct without fear of reprisal. Retaliation against any person related to any portion of this policy may result in disciplinary action up to and including termination or expulsion by Mason. Retaliation against any person who is the alleged victim of sexual harassment or misconduct is prohibited as well.

## VII.   TRAINING, EDUCATION AND PREVENTION PROGRAMS

The University's Wellness, Alcohol, Violence and Education Services and Compliance, Diversity and Ethics are responsible for developing and implementing a comprehensive, institution-wide education and prevention campaign for students and employees related to prevention of sexual assaults, domestic violence, dating violence, stalking and sexual exploitation as well as training on this policy. These programs will inform the university community about the risks and myths that contribute to incidents of sexual misconduct and strategies for bystander intervention.

## VIII.   COMPLIANCE

Inquiries about or complaints alleging violation of the University's Sexual Harassment and Misconduct Policy should be directed to the Title IX Coordinator in Compliance Diversity and Ethics (Aquia Building, Room 373, Mailstop 2C2, Fairfax, VA 22030 Phone (703) 993-8730).

## IX.   RESPONSIBLE PARTIES

Compliance, Diversity, and Ethics is responsible for administering and monitoring George Mason University's equal opportunity/affirmative action policies and procedures.

## X.   DATES:

A.   **Effective Date and Approval**

This policy will become effective upon the date of approval by the Provost and Executive Vice President and Senior Vice President for Administration and Finance.

B.   **Timetable for Review**

The policy, and any related procedures, shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

XI.   SIGNATURES

Approved:

_____
Senior Vice President for Administration and Finance

_____
Provost and Executive Vice President

Date approved: April 20, 2006

Revision Approved: August 15, 2014

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                          8

A252

# EXHIBIT 3D

**George Mason University**

**Sexual Misconduct Investigation Procedures**

**For Academic Year 2015 – 2016**

**A253**

Case 1:19-cv-01249-LO-MSN   Document 27-3   Filed 12/20/19   Page 28 of 31 PageID# 326

 **Compliance, Diversity & Ethics**

*Updated February 2016*

# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, vendors and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. CDE may amend this process as necessary. Any student, faculty member, staff employee, contractor or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, color, religion, retaliation, sex (including sexual harassment), national origin, sexual orientation, age, physical or mental disability, veteran status, marital status, pregnancy status, or genetic information (GINA) should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the university reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the Reporting Party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal

1

**A254**

Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

## III. Filing Process

<u>Complaints</u>

If a member of the George Mason University community believes that he or she has been the victim of discrimination or discriminatory harassment or has information about discrimination/harassment in the university community, he or she may promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to CDE, located on the Fairfax Campus, Aquia Building, Suite 373. They may also email the office at <u>cde@gmu.edu</u>, or call the office at (703) 993-8730. This report initiates a complaint. Alternatively, a member of the university community may report the situation to his or her immediate supervisor, department head, or Dean, who will immediately notify CDE of the report. This report will also initiate a complaint. Supervisors must immediately report any complaints they receive or incidents of alleged harassment or discrimination they witness to the Office of Compliance, Diversity and Ethics.

A complaint should be filed within 180 calendar days of the most recent incident. The university will consider requests to extend this period where the Reporting Party can show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior. Matters which are determined not to require further investigation or follow-up by CDE may be referred to a representative from the Office of Human Resources or the applicable supervisor.  All complaints of discrimination and harassment will be treated in the strictest confidence possible under the particular circumstances.

The Reporting Party will meet with a representative from Compliance, Diversity and Ethics to discuss options (informal, formal) for proceeding. The Reporting Party is not required to follow the informal procedure before filing a formal complaint. The Responding Party (the individual accused of discrimination) will be notified of the complaint within five (5) working days after it is filed.

<u>Options</u>

**Informal**. Discuss allegations and concerns with Responding Party (the accused) and attempt to resolve the situation. The Responding Party is reminded that George Mason University expects all to adhere to our equal opportunity policies. Responding Party is put on notice that behavior has been questioned, and informal resolution is sought, if possible. If attempts to resolve the situation are not successful, the Reporting Party may pursue a formal complaint. CDE reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

**Formal**. A full investigation is conducted by CDE complete with interviews of the Reporting Party, the Responding Party, and any material witnesses identified, as well as a review of any

2

relevant documentation. The Reporting Party and the Responding Party will be kept apprised of the progress of the investigation and will be given the opportunity to provide any additional relevant information to the investigator, including the names of additional witnesses to contact and/or additional documents to review before the investigation is closed. At any time before the conclusion of the investigation, the appropriate supervisor to which the Responding Party is assigned may take interim emergency action until the conclusion of the investigation.

At the conclusion of its investigation CDE will issue a final written determination. The final written determination will state whether, based on CDE's investigation, there was a violation of this policy. The final written determination will be provided to the Reporting Party, the Responding Party, and the appropriate supervisor. A copy of the written determination will also be provided to Human Resources and other pertinent university officials as necessary to ensure proper resolution and follow-up regarding the matter. CDE's involvement in the matter concludes when the final written determination is issued.

The investigator's findings of fact will be made using the "preponderance of the evidence" standard. Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct occurred. This "preponderance of the evidence" standard requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it.

If the investigation finds that discrimination or harassment occurred, the university will determine appropriate corrective action, up to and including dismissal. The university may also take corrective action if no discrimination or harassment is found, but Responding Party is found to have engaged in inappropriate workplace behavior.

The Responding Party's appropriate supervisor, Human Resources, or any other pertinent university official shall promptly notify CDE of any corrective action imposed, if any.

Sanctions imposed on those individuals who have been found to be in violation of the university's Equal Opportunity Policy or its Discriminatory Harassment Policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

Corrective actions may include a directive to stop any ongoing discrimination, harassment, or retaliation; disciplinary or other corrective action against the Responding Party or others; relief for the Reporting Party to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.** A finding may be appealed in writing to the Vice President of Compliance, Diversity and Ethics in CDE by either party within 10 working days of receipt of CDE's determination. A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding. The appellant should be as specific as possible in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination of the VP/CDE is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a Reporting Party may file their complaint with the appropriate external agencies, such as the Department

3

of Education Office of Civil Rights (OCR) or the Equal Employment Opportunity Commission (EEOC), within applicable time limits. In addition, any person who is dissatisfied with GMU's internal procedures utilized for handling complaints, or who is dissatisfied with the result of the investigation or the sanctions imposed, may seek redress through the EEOC, to the extent allowed by law. The Reporting Party should be aware that filing a complaint with CDE or other university resources does not extend or postpone the deadline for filing with external agencies. In the event that a complaint is filed with an external agency or court, the university reserves the right to determine, at its discretion, whether the university's internal complaint resolution procedure should be discontinued or continued separately.

<u>Time Line for Investigation Process</u>

CDE will complete its investigations as expeditiously as possible. The investigation shall normally be completed within 45 working days from the filing of a formal complaint, including notification of the parties of the outcome of the investigation. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. CDE will maintain contact with the Reporting Party and Responding Party throughout the course of the investigation to keep them up to date on the process.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the Responding Party, the Reporting Party, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The Reporting Party and the Responding Party each have the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to CDE at least 72 hours prior to the meeting. If either the Reporting Party or the Responding Party's advisor is a person degreed or qualified in law, CDE must be notified.

## VI. Responsibilities and Jurisdiction of Compliance, Diversity and Ethics

Consistent with federal and state laws and university policies related to nondiscrimination, CDE investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex, national origin, sexual orientation, age, marital status, pregnancy status, genetic information, physical or mental disability, or veteran status. CDE investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

# EXHIBIT 4

## Notice of Investigation

### Jennifer R Hammat

Tue 12/4/2018 4:51 PM

**To:** ▉Plaintiff▉
**Cc:** Keith D Renshaw <krenshaw@gmu.edu>; Shernita Rochelle Parker <srochell@gmu.edu>
**Bcc:** Heather M Madnick <hmadnick@gmu.edu>; Gillian Lancaster <glancast@GMU.EDU>

📎 4 attachments (3 MB)
EO AA Grievance Procedure 2016.pdf; EO AA Grievance Procedure December 2017.pdf; Policy 1202 2016.pdf; Policy 1202 2017.pdf;



**Compliance Diversity and Ethics**
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730 Fax: 703-993-8899 Web: http://diversity.gmu.edu

December 4, 2018

▉Plaintiff▉
George Mason University
Fairfax, VA 22030

Dear Dr. ▉Plaintiff▉,

The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE). The complaint, filed by ▉Complainant 4▉, alleges potential violations of George Mason University's Sexual Harassment and Misconduct Policy (2016-17) and the Sexual and Gender-Based Harassment and Other Interpersonal Violence Policy (2017-18). Specifically, the allegations state that you shared the below information during your instruction of ▉Course▉ the spring semester of 2013 in and during the instruction of ▉Course▉ in the spring semester of 2014 in:

- o On December 9, 2016, you invited the graduate students from your lab to your house, for drinks and hot tubbing at your home. You shared stories about your sexual experiences at a large brothel house in Germany.
- o On January 20, 2017, while attending the annual Society of Personality and Social Psychology conference, in San Antonio, Texas, you and your graduate students went to dinner and then to the bar, Howl at the Moon, for drinks. You left the bar with another woman attending the conference and then provided explicit sexual details about that encounter the next day at the conference with your graduate students;
- o During the first week of class in the fall of 2017, you gathered the graduate students from the lab for a gathering at Oh George! Tables & Taphouse with ▉Complainant 4▉ and several other students. You discussed an erotic massage you experienced in Thailand;
- o During the spring of 2018, you asked student ▉Student▉ what kind of pornography she liked/watched while at Oh George! Tables & Taphouse and asked her repeatedly to provide an answer when she tried to avoid the conversation;
- o While attending a conference for the Society of Personality and Social Psychology in March of 2018, after going to dinner with your graduate students, you took your graduate students to a strip club called the Clermont Lounge. A fellow student bought a lap dance for ▉Complainant 4▉, which you took a photo of and made reference to future blackmail against her;

**A259**

- On August 6, 2018, at the Double Tree Hotel in Santa Ana, California, while attending an academic conference with graduate students (Complainant 4 and others), you shared the details of a sexual experience you had in Hanoi, Thailand with a 24-your old woman while you were presenting a professional workshop. You also told your students your wife had "given you a free pass" to have sex with whomever you wanted while in Hanoi;
- While in the campus laboratory setting, you engaged students in frequent conversations about sex and the pursuit of women as sexual vessels;
- Through favoritism, you made it clear to your students that opportunities for research, supervision, and consulting was dependent on how you viewed them and if they were willing to engage in sexual conversations with them.
- You created a toxic, verbally abusive environment, using profanity and demeaning language with your graduate students tasked with lab management. These occurred in person, over email, and through the Slack messaging system;

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter. The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:
- University Policy 1202: Sexual Harassment and Misconduct Policy 2016-17
- University Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence 2017-18
- Equal Opportunity/Affirmative Action Grievance Procedures February 2016 version
- Equal Opportunity/Affirmative Action Grievance Procedures December 2017 version

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu. Your cooperation in this process is appreciated.

Sincerely,

**Dr. Jennifer R. Hammat**
**University Title IX Coordinator**
**George Mason University**

CC:      Dr. Keith Renshaw, Department Chair
          Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**
University Title IX Coordinator
Compliance, Diversity, and Ethics
George Mason University
4400 University Drive, MS 2C2
Fairfax, VA 22030
703-993-8730
[titlenine.gmu.edu]titlenine.gmu.edu

# EXHIBIT 4A

**George Mason University Sexual Misconduct Policy**

**For Academic Year 2016 - 2017**



**M E M O R A N D U M**

COMPLIANCE, DIVERSITY, AND ETHICS
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730; Fax: 703-993-8899

To:        Tom Moncure, University Counsel
           J.J. Wagner Davis, Senior Vice President for Administration and
              Finance
           S. David Wu, Provost and Executive Vice President

From:      Elizabeth I. Woodley, University Policy Manager

Date:      August 24, 2016

Subject:   University Policy 1202: Sexual Harassment and Misconduct

---

Enclosed please find a revision of University Policy 1202, Sexual Harassment and
Misconduct.  The revision was completed with input from Jennifer Hammat, Herbertia
Gilmore, Juliet Blank-Godlove, Brent Ericson, and David Drummey, among others.

After your review, please include your signature of approval on the final page of the policy,
if appropriate.  Please also initial where indicated below and forward to the next office for
administrative review.

If you have any questions or concerns, please do not hesitate to contact me at 3-5115 or
ewoodley@gmu.edu.

Thank you.

- Legal Department Review
- Approval and Signature of Senior Vice President
- Approval and Signature of Provost

- Return to University Policy Manager – Elizabeth Woodley, MSN 2C2



# DRAFT Policy 1202: Sexual Harassment and Misconduct

**Responsible Office:**

Compliance, Diversity, and Ethics

**Procedures:**

- Appendix A: Investigating Reports of Prohibited Conduct Committed by Students
- Appendix B: Adjudicating Reports of Prohibited Conduct Committed by Students
- Appendix C: Equal Opportunity/Affirmative Action Grievance Procedures
- Appendix D: Training, Prevention, and Awareness Programs
- Appendix E: Resource Guide for Students & Employees

**Related Law & Policy:**

- Policy 1201: Non-Discrimination Policy
- Policy 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct
- Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
- Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
- 20 U.S.C. § 1092(f): Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1998
- Virginia Code §23-9.2:15. Reporting of acts of sexual violence
- Violence Against Women Act's Amendments to Clery Act Regulations
- Code of Student Conduct
- Student Rights and Responsibilities (from University Catalog)

## I.    Scope

This policy applies to Students who are registered or enrolled for credit or non-credit-bearing coursework ("Students"); University employees, consisting of all full-time and part-time faculty, University Staff, wage (including temps), professional research staff, and post-doctoral fellows ("Employees"); and contractors, vendors, visitors, guests or other third parties ("Third Parties").

1

This policy pertains to acts of Prohibited Conduct committed by or against Students, Employees and Third Parties when:

> (1) the conduct occurs on campus or other property owned or controlled by the University;
>
> (2) the conduct occurs in the context of a University employment or education program or activity, including, but not limited to, University-sponsored study abroad, research, on-line, or internship programs; or
>
> (3) the conduct occurs outside the context of a University employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for Students, Employees or Third Parties while on University campus or other property owned or controlled by the University or in any University employment or education program or activity.

## II.    Policy Statement

George Mason University, consisting of its 12 schools and colleges located throughout six campuses, Fairfax, Arlington, Science and Technology, Mason in Loudon, Smithsonian-Mason School of Conservation, and Mason Korea (collectively, the "University") is committed to providing a safe and non-discriminatory  learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities. To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ("Title IX"); Title VII of the Civil Rights Act of 1964 ("Title VII"); and/or the Virginia Human Rights Act. Such behavior also requires the University to fulfill certain obligations under the Violence Against Women Reauthorization Act of 2013 ("VAWA") and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act").

The University prohibits Sexual Assault, Sexual Exploitation, Intimate Partner Violence, Stalking, Sexual or Gender-Based Harassment, Complicity in the commission of any act prohibited by this policy, and Retaliation against a person for the good faith reporting of any of these forms of conduct or participation in any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). These forms of Prohibited Conduct are unlawful, undermine the character and purpose of the University, and will not be tolerated.

The University adopts this policy with the intention of:
- Eliminating, preventing, and addressing the effects of Prohibited Conduct;
- Creating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct;
- Providing a prompt, fair, and impartial process for all parties; and
- Identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed.

Employees or Students who violate this policy may face disciplinary action up to and including termination or expulsion. The University will take prompt and equitable action to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The University conducts

2

ongoing prevention, awareness, and training programs for Employees and Students to facilitate the goals of this policy. It is the responsibility of every member of the University community to foster an environment free of Prohibited Conduct. All members of the University community are encouraged to take reasonable and prudent actions to prevent or stop an act of Prohibited Conduct. The University will support and assist community members who take such actions.

### III.   Applicable Procedures under this Policy

The specific procedures for reporting, investigating, and resolving Prohibited Conduct are based upon the nature of the Respondent's relationship to the University (Student, Employee, or Third Party). Each set of procedures referenced below is guided by the same principles of fairness and respect for Complainants and Respondents. "Complainant" means the Student, Employee or Third Party who presents as the victim of any Prohibited Conduct under this policy, regardless of whether that person makes a report or seeks action under this policy. "Respondent" means the Student, Employee or Third Party who has been accused of violating this policy.

A Student or Employee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. Third Parties who commit Prohibited Conduct may have their relationships with the University terminated and/or their privileges of being on University premises withdrawn.

The procedures referenced below provide for prompt and equitable response to reports of Prohibited Conduct. The procedures designate specific timeframes for major stages of the process and provide for thorough and impartial investigations that afford all parties notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred. The University applies the Preponderance of the Evidence standard when determining whether this policy has been violated. "Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

A. <u>WHERE THE RESPONDENT IS A STUDENT</u>
The procedures for responding to reports of Prohibited Conduct committed by Students are detailed in Appendix A: Investigating and Resolving Reports of Prohibited Conduct Committed by Students.

B. <u>WHERE THE RESPONDENT IS AN EMPLOYEE</u>
The procedures for responding to reports of Prohibited Conduct committed by Employees are detailed in Appendix B: Equal Opportunity/Affirmative Action Grievance Procedures.

C. <u>WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE</u>
- The Student-Respondent procedures (Appendix A) will apply if the Respondent is a full-time Student but not a full-time Employee;
- The Employee-Respondent procedures (Appendix B) will apply if the Respondent is a full-time Employee but not a full-time Student; or
- If there is a question as to the predominant role of the Respondent, the University's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates in the context of the Prohibited Conduct).

3

Further, where a Respondent is both a Student and an Employee, the Respondent may be subject to any of the sanctions applicable to Students or Employees.

D. <u>WHERE THE RESPONDENT IS A THIRD PARTY</u>

The University's ability to take appropriate corrective action against a Third Party will be determined by the nature of the relationship of the Third Party to the University. The Title IX Coordinator will determine the appropriate manner of resolution consistent with the University's commitment to a prompt and equitable process consistent with federal law, federal guidance, and this policy.

IV.     **Title IX Coordinator**

Under Title IX:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

The Title IX Coordinator is charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures. The University has also designated Deputy Title IX Coordinators who may assist the Title IX Coordinator in the discharge of these responsibilities. The Title IX Coordinator and Deputy Title IX Coordinators receive appropriate training to discharge their responsibilities.

Concerns about the University's application of Title IX, VAWA, Title VII, the Clery Act, or the Virginia Human Rights Act may be addressed to the Title IX Coordinator; the United States Department of Education, Clery Act Compliance Division (at clery@ed.gov); the United States Department of Education, Office for Civil Rights (at OCR@ed.gov or (800) 421-3481); and/or the Equal Employment Opportunity Commission (at info@eeoc.gov or (800) 669-4000).

The Title IX Coordinator and Deputy Title IX Coordinators can be contacted by telephone, email, or in person during regular office hours:

**Jennifer Hammat**
University Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: jhammat@gmu.edu

**Herbertia Gilmore**

4

Equal Opportunity Specialist/Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: hwillia9@gmu.edu

**Elizabeth Woodley**
University Policy Manager / Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: ewoodley@gmu.edu

**Nena Rogers**
Senior Associate Athletic Director, Student Services / Deputy Title IX Coordinator
Intercollegiate Athletics
Phone: (703) 993- 3594
Email: nrogers1@gmu.edu

**Kent Zimmerman**
Professor of Information Technology / Deputy Title IX Coordinator
Mason Korea
Email: dzimmer2@gmu.edu

## V.    Resources and Reporting Options

The University offers a wide range of resources for all Students and Employees to provide support and guidance in response to any incident of Prohibited Conduct. For comprehensive information on accessing University and community resources, including emergency and ongoing assistance; health, mental health, and victim-advocacy services; options for reporting Prohibited Conduct to the University and/or law enforcement; and available support with academics, housing, and employment, review the Resource Guide for Students or the Resource Guide for Employees.

### A. REMEDIAL AND PROTECTIVE MEASURES

The University offers a wide range of resources for Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the initiation, investigation, and resolution of a report of Prohibited Conduct. The University will offer reasonable and appropriate measures to protect a Complainant and facilitate the Complainant's continued access to University employment or education programs and activities. These measures may be both remedial (designed to address a Complainant's safety and well-being and continued access to educational opportunities) or protective (involving action against a

5

Respondent). Remedial and protective measures, which may be temporary or permanent, may include no-contact directives, residence modifications, academic modifications and support, work schedule modifications, interim disciplinary suspension, suspension from employment, and pre-disciplinary leave (with or without pay).

Remedial measures are available regardless of whether a Complainant pursues a complaint or investigation under this policy. The University will maintain the privacy of any remedial and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures. The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a Complainant or Respondent to address any concerns about the provision of interim measures.

The University will provide reasonable remedial and protective measures to Third Parties as appropriate and available, taking into account the role of the Third Party and the nature of any contractual relationship with the University.

B. PRIVACY AND CONFIDENTIALITY

**Employee Responsibility to Report Disclosures or Information about Prohibited Conduct:** Every Employee is either a "Confidential Employee" or a "Responsible Employee."

A **"Confidential Employee"** is (1) any Employee who is a licensed medical, clinical or mental-health professional (e.g., physicians, nurses, physicians' assistants, psychologists, psychiatrists, professional counselors and social workers, and those performing services under their supervision), when acting in that professional role in the provision of services to a patient who is a Student ("health care providers"); and (2) any Employee providing administrative, operational and/or related support for such health care providers in their performance of such services. A Confidential Employee will not disclose information about Prohibited Conduct to the University's Title IX Coordinator without the Student's permission (subject to the exceptions set forth in the Confidentiality section of this policy).

A **"Responsible Employee"** is any University Employee who is not a Confidential Employee. A Responsible Employee is required to report to the University's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of Prohibited Conduct that involves any Student as a Complainant, Respondent, and/or witness, including dates, times, locations, and names of parties and witnesses. Responsible Employees include Resident Assistants, Graduate Teaching Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees. Responsible Employees are not required to report information disclosed (1) at public awareness events (e.g., "Take Back the Night," candlelight vigils, protests, "survivor speak-outs" or other public forums in which students may disclose incidents of Prohibited Conduct; collectively, "Public Awareness Events"), or (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"). The University may provide information about Students'

6

Title IX rights and about available University and community resources and support at Public Awareness Events, however, and Institutional Review Boards may, in appropriate cases, require researchers to provide such information to all Student subjects of IRB Research.

**Responsibility to Report Prohibited Conduct Where Either the Complainant or the Respondent Is an Employee:** Under this policy, supervisors, management and human resources professionals are required to report to the University's Title IX Coordinator all relevant details about an incident of Prohibited Conduct where either the Complainant or the Respondent is an Employee. Reporting is required when such supervisors, management and human resource professionals know (by reason of a direct or indirect disclosure) or should have known of such Prohibited Conduct. For academic faculty, supervisors include department chairs, deans, and other unit administrators.

**Reporting of Any Prohibited Conduct on Certain University Property:** Consistent with the requirements of Va. Code § 23-9.2:15 (the "Virginia Reporting Statute"), Responsible Employees are also required to report to the Title IX Coordinator all information obtained, from any source, about alleged Prohibited Conduct that occurs anywhere on University campus (including residence halls); on any contiguous (off-campus) property owned or controlled by the University; on any property controlled by a Student organization (including fraternity houses) or frequently used by Students, wherever located; and public property (including streets, sidewalks and parking facilities) that is within or immediately adjacent to, and accessible from, campus.

**Reporting to Law Enforcement:** Under the Virginia Reporting Statute, the University is required to report information about certain allegations of Prohibited Conduct to the law enforcement agencies and the prosecuting authorities who would be responsible, respectively, for investigating and prosecuting such allegations.

**Clery Act Reporting:** Pursuant to the Clery Act, the University includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education in a manner that does not include any personally identifying information about individuals involved in an incident. The Clery Act also requires the University to issue timely warnings to the University community about certain crimes that have been reported and may continue to pose a serious or continuing threat to the campus community. Consistent with the Clery Act, the University withholds the names and other personally identifying information of Complainants when issuing timely warnings to the University community. See University Policy Number 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct for more information about Clery Act Reporting.

C. <u>CONFIDENTIAL RESOURCES</u>

Consistent with the definition of Confidential Employees and licensed community professionals, there are a number of resources off campus where Students and Employees can obtain confidential, trauma-informed counseling and support. Please review the Resource Guide for

7

Employees or the Resource Guide for Students for a list of available on- and off-campus confidential resources.

D. <u>REPORTING</u>

There are multiple channels for reporting Prohibited Conduct. A Complainant may choose to report to the University, to law enforcement, to both, or to neither. These reporting options are not exclusive. Complainants may simultaneously pursue criminal and disciplinary action. The University will support Complainants in understanding, assessing and pursuing these options.

**1. Law Enforcement**

Complainants have the right to notify or decline to notify law enforcement. In keeping with its commitment to taking all appropriate steps to eliminate, prevent, and remedy all Prohibited Conduct, the University urges Complainants to report Prohibited Conduct immediately to local law enforcement by contacting:

- 911 (for emergencies in Virginia)
- 119 (for emergencies at Mason Korea)
- University Police ((703) 993-2810) (for non-emergencies)
- Fairfax County Police ((703) 691-2131) (for non-emergencies)
- Fairfax City Police ((703) 385-7924) (for non-emergencies)
- Manassas Police ((703) 257-8000) (for non-emergencies)
- Arlington County Police ((703) 558-2222) (for non-emergencies)

Police have unique legal authority, including the power to seek and execute search warrants, collect forensic evidence, make arrests, and assist in seeking Emergency Protective Orders. Although a police report may be made at any time, Complainants should be aware that a one-year statute of limitations may apply to certain misdemeanors in Virginia. The University will assist Complainants in notifying law enforcement if they choose to do so.

**2. The University**

The University also urges anyone who becomes aware of an incident of Prohibited Conduct to report the incident immediately to the University through the following reporting options:

- **Title IX Coordinator** — Title IX protects any person from sex-based discrimination, including sexual assault. Call 703-993-8730, email cde@gmu.edu, or complete the intake form online at https://diversity.gmu.edu/intake-form.
- **Office of Student Conduct** — Responsible for resolving allegations of misconduct under the Code of Student Conduct, including sexual misconduct. Call 703-993-6209. http://studentconduct.gmu.edu/.

8

- **Office of Housing and Residential Life** — Professional and student staff are available 24 hours a day to assist students and ensure safety. For 24-hour, nonemergency line, call 703-993-2720. https://housing.gmu.edu/.
- **Employee Relations** — Provides assistance to university employees and their supervisors to help identify and resolve work-related problems and proactively avoid potential problems. Call 703-993-3878.
- **Student Support and Advocacy Center** — Provides comprehensive services for students in an effort to foster the safety and well-being of the Mason community. Call 703-993-3686. http://waves.gmu.edu.  Call 703-380-1434 for the 24-hour sexual and intimate partner violence helpline.

There is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University. If the Respondent is no longer a Student or an Employee, the University will provide reasonably appropriate remedial measures, assist the Complainant in identifying external reporting options, and take reasonable steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.

The University will not pursue disciplinary action against Complainants or witnesses for disclosure of illegal personal consumption of drugs or alcohol where such disclosures are made in connection with a good faith report or investigation of Prohibited Conduct. Complainants may simultaneously pursue criminal and University complaints.

VI.     **Prohibited Conduct Under this Policy**

Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the Complainant or Respondent. Prohibited Conduct includes the following specifically defined forms of behavior: Sexual Assault, Sexual Exploitation, Intimate Partner Violence, Stalking, Sexual or Gender-Based Harassment, Complicity, and Retaliation.

A. SEXUAL ASSAULT

Sexual Assault consists of (1) Sexual Contact and/or (2) Sexual Intercourse that occurs without (3) Affirmative Consent.

**1. Sexual Contact** is:

- Any intentional sexual touching
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

9

Sexual Contact includes (a) intentional touching of the breasts, buttocks, groin or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

**2. Sexual Intercourse** is:

- Any penetration
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

Sexual Intercourse includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue, or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

**3. Affirmative Consent** is:

- Informed (knowing)
- Voluntary (freely given)
- Active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity

Affirmative Consent cannot be obtained by Force. Force includes (a) the use of physical violence, (b) threats, (c) intimidation, and/or (d) coercion.

a) Physical violence means that a person is exerting control over another person through the use of physical force. Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

b) Threats are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

c) Intimidation is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

d) Coercion is the use of an unreasonable amount of pressure to gain sexual access. Coercion is more than an effort to persuade, entice, or attract another person to have sex. When a person makes clear a decision not to participate in a particular form of Sexual Contact or Sexual Intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can be coercive. In evaluating whether coercion was used, the University will

10

consider: (i) the frequency of the application of the pressure, (ii) the intensity of the pressure, (iii) the degree of isolation of the person being pressured, and (iv) the duration of the pressure.

Affirmative Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated. Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity.

A person who is incapacitated is unable, temporarily or permanently, to give Affirmative Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

The University offers the following guidance on Affirmative Consent and assessing incapacitation:

A person who wants to engage in a specific sexual activity is responsible for obtaining Affirmative Consent for that activity. Lack of protest does not constitute Affirmative Consent. Lack of resistance does not constitute Affirmative Consent. Silence and/or passivity also do not constitute Affirmative Consent. Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

Affirmative Consent to one form of sexual activity does not, by itself, constitute Affirmative Consent to another form of sexual activity. For example, one should not presume that Affirmative Consent to oral-genital contact constitutes Affirmative Consent to vaginal or anal penetration. Affirmative Consent to sexual activity on a prior occasion does not, by itself, constitute Affirmative Consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Affirmative Consent.

Affirmative Consent may be withdrawn at any time. An individual who seeks to withdraw Affirmative Consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once Affirmative Consent is withdrawn, the sexual activity must cease immediately.

In evaluating Affirmative Consent in cases of alleged incapacitation, the University asks two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated? and if not, (2) Should a sober, reasonable person in the same situation have

known that the other party was incapacitated? If the answer to either of these questions is "YES," Affirmative Consent was absent and the conduct is likely a violation of this policy.

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or using drugs. The impact of alcohol and other drugs varies from person to person.

One is not expected to be a medical expert in assessing incapacitation. One must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs include slurred or incomprehensible speech, unsteady gait, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?" "Do you know how you got here?" "Do you know what is happening?" "Do you know whom you are with?"

One should be cautious before engaging in Sexual Contact or Sexual Intercourse when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether Affirmative Consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to forego all sexual activity.

Being impaired by alcohol or other drugs is no defense to any violation of this policy.

B. SEXUAL EXPLOITATION

Sexual Exploitation is purposely or knowingly doing any of the following:

• Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give Affirmative Consent to sexual activity;
• Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images) without consent of all parties;
• Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy);
• Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
• Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
• Prostituting another person; or
• Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

C. INTIMATE PARTNER VIOLENCE

12

Intimate Partner Violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship.[1] Intimate Partner Violence may include any form of Prohibited Conduct under this policy, including Sexual Assault, Stalking, and Physical Assault (as defined below).

Physical Assault is threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person. Physical Assault will be addressed under this policy if it involves Sexual or Gender-Based Harassment, Intimate Partner Violence, or is part of a course of conduct under the Stalking definition.

D. STALKING[2]

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

Course of conduct means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Substantial emotional distress means significant mental suffering or anguish.

Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

E. SEXUAL OR GENDER-BASED HARASSMENT

**Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions outlined in (1) and/or (2), below, are present.

**Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (1) and/or (2), below, are present.

---

[1] Intimate Partner Violence includes "dating violence" and "domestic violence," as defined by VAWA. Consistent with VAWA, the University will evaluate the existence of an intimate relationship based upon the Complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.
[2] This definition is consistent with VAWA.

(1) Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or

(2) Such conduct creates a hostile environment. A "hostile environment" exists when the conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education or employment programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective. In evaluating whether a hostile environment exists, the University will consider the totality of known circumstances, including, but not limited to:

• The frequency, nature and severity of the conduct;
• Whether the conduct was physically threatening;
• The effect of the conduct on the Complainant's mental or emotional state;
• Whether the conduct was directed at more than one person;
• Whether the conduct arose in the context of other discriminatory conduct;
• Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities; and
• Whether the conduct implicates concerns related to academic freedom or protected speech.

A hostile environment can be created by persistent or pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of Sexual Assault, for example, may be sufficiently severe to constitute a hostile environment. In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment.

F. RETALIATION

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

G. COMPLICITY

Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of Prohibited Conduct by another person.

14

## VII.    Violations of Law

Behavior that violates this policy may also constitute a crime under the laws of the jurisdiction in which the incident occurred. For example, the Commonwealth of Virginia criminalizes and punishes some forms of Sexual Assault, Intimate Partner Violence, Sexual Exploitation, Stalking, and Physical Assault. The criminal statutes that may apply in cases of Physical Assault and Intimate Partner Violence are found in various sections of Chapter 4, Articles 1 (Homicide) and 4 (Assaults and Bodily Woundings), of Title 18.2 of the Code of Virginia. The criminal statutes relating to Sexual Assault are found in Sections 18.2-61 to 18.2-67.10 of the Code of Virginia. Section 18.2-60.3 of the Code of Virginia defines and identifies the penalty for criminal stalking. Finally, Sections 18.2-386.1 and 18.2-386.2 of the Code of Virginia provide for criminal penalties in some cases of Sexual Exploitation. This compilation of criminal statutes is not exhaustive, but is offered to notify the University community that, some forms of Prohibited Conduct may also constitute crimes under Virginia law, which may subject a person to criminal prosecution and punishment in addition to any sanctions under this policy.

## VIII.    Prevention and Awareness Programs

The University is committed to the prevention of Prohibited Conduct through regular and ongoing education and awareness programs. Incoming Students and new Employees receive primary prevention and awareness programming as part of their orientation, and returning Students and current Employees receive ongoing training and related education. For a description of the University's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, see Appendix C.

## IX.    Training

The University provides training to Students and Employees to ensure they understand this policy and the topics and issues related to maintaining an education and employment environment free from harassment and discrimination. For a description of the University's training related to this policy, see Appendix C.

## X.    Obligation to Provide Truthful Information

All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under the University's Student Code of Conduct and disciplinary action under the appropriate Employee disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

15

**A278**

XI.     **Forms**

      o   **CSA Crime Statistics Reporting Form:** http://police.gmu.edu/clery-act-reporting/csa-form/
      o   **Compliance, Diversity, and Ethics Intake Form:** https://diversity.gmu.edu/intake-form

XII.    **Dates:**

A.  **Effective Date:**

This policy will become effective upon the date of approval by the Senior Vice President for Administration and Finance and the Provost and Executive Vice President.

B.  **Date of Most Recent Review:**

N/A.

XIII.   **Timetable for Review**

The University will review and update this policy, as appropriate, by October 31 of each year. The University will evaluate, among other things, any changes in legal requirements, existing University resources, and the resolution of cases from the preceding year (including, but not limited to, timeframes for completion and sanctions and remedies imposed). The Title IX Coordinator shall certify to the State Council of Higher Education for Virginia that this policy has been reviewed and updated, as appropriate, in accordance with Virginia law.

XIV.    **Signatures**

**Approved:**

_____
Senior Vice President for
Administration and Finance

10/10/2016
_____
Date

**Approved:**

_____
Provost and Executive Vice President

10/10/16
_____
Date

16

# EXHIBIT 4B

**George Mason University**

**Sexual Misconduct Investigation Procedures**

**For Academic Year 2016 - 2017**

 **Compliance, Diversity & Ethics**

*Updated February 2016*

## Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

### I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, vendors and visitors.

### II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. CDE may amend this process as necessary. Any student, faculty member, staff employee, contractor or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, color, religion, retaliation, sex (including sexual harassment), national origin, sexual orientation, age, physical or mental disability, veteran status, marital status, pregnancy status, or genetic information (GINA) should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the university reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

### Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the Reporting Party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal

1

**A281**

Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

### III. Filing Process

<u>Complaints</u>

If a member of the George Mason University community believes that he or she has been the victim of discrimination or discriminatory harassment or has information about discrimination/harassment in the university community, he or she may promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to CDE, located on the Fairfax Campus, Aquia Building, Suite 373. They may also email the office at cde@gmu.edu, or call the office at (703) 993-8730. This report initiates a complaint. Alternatively, a member of the university community may report the situation to his or her immediate supervisor, department head, or Dean, who will immediately notify CDE of the report. This report will also initiate a complaint. Supervisors must immediately report any complaints they receive or incidents of alleged harassment or discrimination they witness to the Office of Compliance, Diversity and Ethics.

A complaint should be filed within 180 calendar days of the most recent incident. The university will consider requests to extend this period where the Reporting Party can show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior. Matters which are determined not to require further investigation or follow-up by CDE may be referred to a representative from the Office of Human Resources or the applicable supervisor.  All complaints of discrimination and harassment will be treated in the strictest confidence possible under the particular circumstances.

The Reporting Party will meet with a representative from Compliance, Diversity and Ethics to discuss options (informal, formal) for proceeding. The Reporting Party is not required to follow the informal procedure before filing a formal complaint. The Responding Party (the individual accused of discrimination) will be notified of the complaint within five (5) working days after it is filed.

<u>Options</u>

**Informal**. Discuss allegations and concerns with Responding Party (the accused) and attempt to resolve the situation. The Responding Party is reminded that George Mason University expects all to adhere to our equal opportunity policies. Responding Party is put on notice that behavior has been questioned, and informal resolution is sought, if possible. If attempts to resolve the situation are not successful, the Reporting Party may pursue a formal complaint. CDE reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

**Formal**. A full investigation is conducted by CDE complete with interviews of the Reporting Party, the Responding Party, and any material witnesses identified, as well as a review of any

# A282

relevant documentation.  The Reporting Party and the Responding Party will be kept apprised of the progress of the investigation and will be given the opportunity to provide any additional relevant information to the investigator, including the names of additional witnesses to contact and/or additional documents to review before the investigation is closed. At any time before the conclusion of the investigation, the appropriate supervisor to which the Responding Party is assigned may take interim emergency action until the conclusion of the investigation.

At the conclusion of its investigation CDE will issue a final written determination.  The final written determination will state whether, based on CDE's investigation, there was a violation of this policy. The final written determination will be provided to the Reporting Party, the Responding Party, and the appropriate supervisor.  A copy of the written determination will also be provided to Human Resources and other pertinent university officials as necessary to ensure proper resolution and follow-up regarding the matter.  CDE's involvement in the matter concludes when the final written determination is issued.

The investigator's findings of fact will be made using the "preponderance of the evidence" standard.  Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct occurred.  This "preponderance of the evidence" standard requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it.

If the investigation finds that discrimination or harassment occurred, the university will determine appropriate corrective action, up to and including dismissal.  The university may also take corrective action if no discrimination or harassment is found, but Responding Party is found to have engaged in inappropriate workplace behavior.

The Responding Party's appropriate supervisor, Human Resources, or any other pertinent university official shall promptly notify CDE of any corrective action imposed, if any.

Sanctions imposed on those individuals who have been found to be in violation of the university's Equal Opportunity Policy or its Discriminatory Harassment Policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

Corrective actions may include a directive to stop any ongoing discrimination, harassment, or retaliation; disciplinary or other corrective action against the Responding Party or others; relief for the Reporting Party to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.** A finding may be appealed in writing to the Vice President of Compliance, Diversity and Ethics in CDE by either party within 10 working days of receipt of CDE's determination. A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding. The appellant should be as specific as possible in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination of the VP/CDE is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a Reporting Party may file their complaint with the appropriate external agencies, such as the Department

3

of Education Office of Civil Rights (OCR) or the Equal Employment Opportunity Commission (EEOC), within applicable time limits. In addition, any person who is dissatisfied with GMU's internal procedures utilized for handling complaints, or who is dissatisfied with the result of the investigation or the sanctions imposed, may seek redress through the EEOC, to the extent allowed by law. The Reporting Party should be aware that filing a complaint with CDE or other university resources does not extend or postpone the deadline for filing with external agencies. In the event that a complaint is filed with an external agency or court, the university reserves the right to determine, at its discretion, whether the university's internal complaint resolution procedure should be discontinued or continued separately.

Time Line for Investigation Process

CDE will complete its investigations as expeditiously as possible. The investigation shall normally be completed within 45 working days from the filing of a formal complaint, including notification of the parties of the outcome of the investigation. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. CDE will maintain contact with the Reporting Party and Responding Party throughout the course of the investigation to keep them up to date on the process.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the Responding Party, the Reporting Party, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The Reporting Party and the Responding Party each have the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to CDE at least 72 hours prior to the meeting. If either the Reporting Party or the Responding Party's advisor is a person degreed or qualified in law, CDE must be notified.

## VI. Responsibilities and Jurisdiction of Compliance, Diversity and Ethics

Consistent with federal and state laws and university policies related to nondiscrimination, CDE investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex, national origin, sexual orientation, age, marital status, pregnancy status, genetic information, physical or mental disability, or veteran status. CDE investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

4

# EXHIBIT 4C

**George Mason University Sexual Misconduct Policy**

**For Academic Year 2017 – 2018**



# MEMORANDUM

## COMPLIANCE, DIVERSITY, AND ETHICS
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730; Fax: 703-993-8899

| | |
|---|---|
| **To:** | Brian Walther, University Counsel<br>J.J. Wagner Davis, Senior Vice President for Administration and Finance<br>S. David Wu, Provost and Executive Vice President |
| **From:** | Elizabeth I. Woodley, University Policy Manager |
| **Date:** | August 21, 2017 |
| **Subject:** | University Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence |

---

Enclosed please find a revision of University Policy 1202, Sexual and Gender-Based Harassment and Other Interpersonal Violence. This revision was initiated by the Title IX Coordinator to broaden the policy's application beyond only intimate partner violence to violence between cohabitants and family members. The revision also clarifies the definition of sexual and gender-based harassment. The revision was completed with input from Jennifer Hammat, Brent Ericson, and Brian Walther, among others.

After your review, please include your signature of approval on the final page of the policy, if appropriate. Please also initial where indicated below and forward to the next office for administrative review.

If you have any questions or concerns, please do not hesitate to contact me at 3-5115 or ewoodley@gmu.edu.

Thank you.

- Legal Department Review
- Approval and Signature of Senior Vice President
- Approval and Signature of Provost
- Return to University Policy Manager – Elizabeth Woodley, MSN 2C2



University Policy #1202
*Sexual and Gender-Based Harassment and*
*Other Interpersonal Violence*

---

**Categorized: General Policies**

**Responsible Office:**
> Compliance, Diversity, and Ethics

**Policy Procedures:**
> Appendix A: Investigating and Resolving Reports of Prohibited Conduct Committed by Students
> Appendix B: Equal Opportunity/Affirmative Action Grievance Procedures
> Appendix C: Student Conduct Sexual Misconduct Resolutions 2016-2017
> Appendix D: Resources and Reporting Guide for Students & Employees
> Appendix E: Training, Prevention and Awareness Programs

**Related Law & Policy:**
> Policy 1201: Non-Discrimination Policy
> Policy 1204: Consensual Relationships
> Policy 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct
> Code of Student Conduct
> Student Rights and Responsibilities (from University Catalog)
> Virginia Code § 23.1-806. Reporting of acts of sexual violence
> Virginia Code § 23.1-900. Academic transcripts; suspension, permanent dismissal, or withdrawal
>> from institution.
> Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
> Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
> Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1998, 20 U.S.C. § 1092(f)
> Violence Against Women Reauthorization Act of 2013 amendments to the Clery Act, Pub. L. 113–4

---

## I.    SCOPE

This policy applies to Students who are registered or enrolled for credit or non-credit-bearing coursework ("Students"); University employees, consisting of all full-time and part-time faculty, University Staff, wage (including temps), professional research staff, and post-doctoral fellows ("Employees"); and contractors, vendors, visitors, guests or other third parties ("Third Parties").

This policy pertains to acts of Prohibited Conduct committed by or against Students, Employees and Third Parties when:

(1) the conduct occurs on campus or other property owned or controlled by the University;

(2) the conduct occurs in the context of a University employment or education program or activity, including, but not limited to, University-sponsored study abroad, research, on-line, or internship programs; or

(3) the conduct occurs outside the context of a University employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for Students, Employees or Third Parties while on University campus or other property owned or controlled by the University or in any University employment or education program or activity.

## II.    POLICY STATEMENT

George Mason University, consisting of its 10 schools and colleges located throughout four campuses, Fairfax, Arlington, Science and Technology, and George Mason University Korea, as well as instructional sites elsewhere, (collectively, the "University") is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities. To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ("Title IX"); Title VII of the Civil Rights Act of 1964 ("Title VII"); and/or the Virginia Human Rights Act. Such behavior also requires the University to fulfill certain obligations under the Violence Against Women Reauthorization Act of 2013 ("VAWA") and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act").

The University prohibits Sexual Assault, Sexual Exploitation, Interpersonal Violence, Stalking, Sexual or Gender-Based Harassment, and Complicity in the commission of any act prohibited by this policy, and Retaliation against a person for the good faith reporting of any of these forms of conduct or participation in any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). These forms of Prohibited Conduct are unlawful, undermine the character and purpose of the University, and will not be tolerated.

The University adopts this policy with the intention of:

- Eliminating, preventing, and addressing the effects of Prohibited Conduct;
- Creating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct;
- Providing a prompt, fair, and impartial process for all parties; and
- Identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed.

Employees or Students who violate this policy may face disciplinary action up to and including termination or expulsion. The University will take prompt and equitable action to eliminate Prohibited Conduct, prevent its   recurrence, and remedy its effects. The University conducts ongoing prevention, awareness, and training programs for Employees and Students to facilitate the goals of this policy. It is the responsibility of every member of the University community to foster an environment free of Prohibited Conduct. All members of the University community are encouraged to take reasonable and prudent actions to prevent or stop an act of Prohibited Conduct. The University will support and assist community members who take such actions.

## III.    APPLICABLE PROCEDURES UNDER THIS POLICY

The specific procedures for reporting, investigating, and resolving Prohibited Conduct are based upon the nature of the Respondent's relationship to the University (Student, Employee, or Third Party). Each set of procedures referenced below is guided by the same principles of fairness and respect for Complainants and Respondents. "Complainant" means the Student, Employee or Third Party who

# A288

presents as the victim of any Prohibited Conduct under this policy, regardless of whether that person makes a report or seeks action under this policy. "Respondent" means the Student, Employee or Third Party who has been accused of violating this policy.

A Student or Employee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. Third Parties who commit Prohibited Conduct may have their relationships with the University terminated and/or their privileges of being on University premises withdrawn.

The procedures referenced below provide for prompt and equitable response to reports of Prohibited Conduct. The procedures designate specific timeframes for major stages of the process and provide for thorough and impartial investigations that afford all parties notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred. The University applies the Preponderance of the Evidence standard when determining whether this policy has been violated. "Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

## A. WHERE THE RESPONDENT IS A STUDENT

The procedures for responding to reports of Prohibited Conduct committed by Students are detailed in Appendix A: Investigating and Resolving Reports of Prohibited Conduct Committed by Students.

## B. WHERE THE RESPONDENT IS AN EMPLOYEE

The procedures for responding to reports of Prohibited Conduct committed by Employees are detailed in Appendix B: Investigating and Resolving Reports of Prohibited Conduct Committed by Employees.

## C. WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE

- The Student-Respondent procedures (Appendix A) will apply if the Respondent is a full-time Student but not a full-time Employee;
- The Employee-Respondent procedures (Appendix B) will apply if the Respondent is a full-time Employee but not a full-time Student; or
- If there is a question as to the predominant role of the Respondent, the University's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates in the context of the Prohibited Conduct). Further, where a Respondent is both a Student and an Employee, the Respondent may be subject to any of the sanctions applicable to Students or Employees.

## D. WHERE THE RESPONDENT IS A THIRD PARTY

The University's ability to take appropriate corrective action against a Third Party will be determined by the nature of the relationship of the Third Party to the University. The Title IX Coordinator will determine the appropriate manner of resolution consistent with the University's commitment to a prompt and equitable process consistent with federal law, federal guidance, and this policy.

## IV.   TITLE IX COORDINATOR

Under Title IX:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                         3 of 15

**A289**

The Title IX Coordinator is charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures. The University has also designated Deputy Title IX Coordinators who may assist the Title IX Coordinator in the discharge of these responsibilities. The Title IX Coordinator and Deputy Title IX Coordinators receive appropriate training to discharge their responsibilities.

Concerns about the University's application of Title IX, VAWA, Title VII, the Clery Act, or the Virginia Human Rights Act may be addressed to the Title IX Coordinator; the United States Department of Education, Clery Act Compliance Division (at clery@ed.gov); the United States Department of Education, Office for Civil Rights (at OCR@ed.gov or (800) 421-3481); and/or the Equal Employment Opportunity Commission (at info@eeoc.gov or (800) 669-4000).

The Title IX Coordinator and Deputy Title IX Coordinators can be contacted by telephone, email, or in person during regular office hours:

**Jennifer Hammat**

University Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: jhammat@gmu.edu

**Elizabeth Woodley**

University Ethics Officer and Policy Manager / Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: ewoodley@gmu.edu

**Nena Rogers**

Senior Associate Athletic Director, Student Services / Deputy Title IX Coordinator
Intercollegiate Athletics
Phone: (703) 993-3594
Email: nrogers1@gmu.edu

**Kent Zimmerman**

Professor of Information Technology / Deputy Title IX Coordinator
Mason Korea
Email: dzimmer2@gmu.edu

## V.    RESOURCES AND REPORTING OPTIONS

The University offers a wide range of resources for all Students and Employees to provide support and guidance in response to any incident of Prohibited Conduct. For comprehensive information on accessing University and community resources, including emergency and ongoing assistance; health, mental health, and victim-advocacy services; options for reporting Prohibited Conduct to the University and/or law enforcement; and available support with academics, housing, and employment, review the Resources and Reporting Guide for Students & Employees (Appendix D).

A. REMEDIAL AND PROTECTIVE MEASURES

The University offers a wide range of resources for Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the initiation, investigation, and resolution of a report of Prohibited Conduct. The University will offer reasonable and appropriate measures to protect a Complainant and facilitate the Complainant's continued access to University employment or education programs and activities. These measures may be both remedial (designed to address a Complainant's safety and well-being and continued access to educational opportunities) or protective (involving action against a Respondent). Remedial and protective measures, which may be temporary or permanent, may include no-contact directives, residence modifications, academic modifications and support, work schedule modifications, interim disciplinary suspension, suspension from employment, and pre-disciplinary leave (with or without pay).

Remedial measures are available regardless of whether a Complainant pursues a complaint or investigation under this policy. The University will maintain the privacy of any remedial and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures. The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a Complainant or Respondent to address any concerns about the provision of interim measures. For a full list of interim measures, please review Appendix D: Resources and Reporting Guide for Students and Employees.

The University will provide reasonable remedial and protective measures to Third Parties as appropriate and available, taking into account the role of the Third Party and the nature of any contractual relationship with the University.

B. PRIVACY AND CONFIDENTIALITY

For any report under this Policy, every effort will be made to respect and safeguard the privacy interests of all individuals involved in a manner consistent with the need for a careful assessment of the allegation and any necessary steps to eliminate the conduct, prevent its recurrence, and address its effects. Privacy and confidentiality have distinct meanings under this Policy.

### 1. Privacy

Information related to a report under this Policy will only be shared with those University employees who need to know in order to assist in the active review, investigation, or resolution of the report. If the decision is made to pursue disciplinary action against a Respondent, information related to the report will be shared with the Respondent. Information regarding a report will not be shared with either the Complainant or Respondent's parents or guardians unless: the party is a minor (and sharing is permissible under the Family Education Rights and Privacy Act (FERPA)); the party has signed a waiver that is compliant with FERPA; or there is an articulable threat to the health or safety of the party or other individuals.

### 2. Confidentiality

Information shared with *Confidential Resources* (specially designated campus or community professionals) will only be disclosed with the individual's express written permission, unless there is a continuing threat of serious harm to the patient/client or to others or there is a legal obligation to reveal such information (e.g., where there is suspected abuse or neglect of a minor).

### 3. Records

The Compliance, Diversity, and Ethics office will maintain records of all reports under this Policy and their outcomes.

# A291

### 4. Release of Information

If a report of *Prohibited Conduct* discloses a serious and immediate threat to the campus community, GMU Department of Police and Public Safety will issue a timely notification to protect the health or safety of the community as required by the Clery Act. The notification will not include identifying information about a Reporting Party.

Pursuant to the Clery Act and the 2013 Amendments to the Violence Against Women Act, anonymous statistical information regarding reported criminal incidents must be shared with GMU Department of Police and Public Safety for inclusion in the Daily Crime Log. This information will also be included in the University's Annual Security Report (http://police.gmu.edu/annual-security-report/). The University may also share aggregate and not personally identifiable data about reports, outcomes, and sanctions.

No information, including the identity of the parties, will be released from such proceedings except as required or permitted by law or University policy.

**Employee Responsibility to Report Disclosures or Information about Prohibited Conduct:**
Every Employee is either a "Confidential Employee" or a "Responsible Employee."

**A "Confidential Employee"** is (1) any Employee who is a licensed medical, clinical or mental-health professional (e.g., physicians, nurses, physicians' assistants, psychologists, psychiatrists, professional counselors and social workers, and those performing services under their supervision), when acting in that professional role in the provision of services to a patient who is a Student ("health care providers"); and (2) any Employee providing administrative, operational and/or related support for such health care providers in their performance of such services. A Confidential Employee will not disclose information about Prohibited Conduct to the University's Title IX Coordinator without the Student's permission (subject to the exceptions set forth in the Confidentiality section of this policy).

**A "Responsible Employee"** is any University Employee who is not a Confidential Employee. A Responsible Employee is required to report to the University's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of Prohibited Conduct that involves any Student as a Complainant, Respondent, and/or witness, including dates, times, locations, and names of parties and witnesses. Responsible Employees include Resident Assistants, Graduate Teaching Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees. Responsible Employees are not required to report information disclosed (1) at public awareness events (e.g., "Take Back the Night," candlelight vigils, protests, "survivor speak- outs" or other public forums in which students may disclose incidents of Prohibited Conduct; collectively, "Public Awareness Events"), or (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"). The University may provide information about Students' Title IX rights and about available University and community resources and support at Public Awareness Events, however, and Institutional Review Boards may, in appropriate cases, require researchers to provide such information to all Student subjects of IRB Research.

**Responsibility to Report Prohibited Conduct Where Either the Complainant or the Respondent Is an Employee:** Under this policy, supervisors, management and human resources professionals are required to report to the University's Title IX Coordinator all relevant details about an incident of Prohibited Conduct where either the Complainant or the Respondent is an Employee. Reporting is required when such supervisors, management and human resource professionals know (by reason of a direct or indirect disclosure) or should have known of such Prohibited Conduct. For academic faculty, supervisors include department chairs, deans, and other unit administrators.

**Reporting of Any Prohibited Conduct on Certain University Property:** Consistent with the requirements of Va. Code § 23-9.2:15 (the "Virginia Reporting Statute"), Responsible Employees are also required to report to the Title IX Coordinator all information obtained, from any source, about alleged Prohibited Conduct that occurs anywhere on University campus (including residence halls); on

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    6 of 15

any contiguous (off-campus) property owned or controlled by the University; on any property controlled by a Student organization (including fraternity houses) or frequently used by Students, wherever located; and public property (including streets, sidewalks and parking facilities) that is within or immediately adjacent to, and accessible from, campus.

**Reporting to Law Enforcement:** Under the Virginia Reporting Statute, the University is required to report information about certain allegations of Prohibited Conduct to the law enforcement agencies and the prosecuting authorities who would be responsible, respectively, for investigating and prosecuting such allegations.

**Clery Act Reporting:** Pursuant to the Clery Act, the University includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education in a manner that does not include any personally identifying information about individuals involved in an incident. The Clery Act also requires the University to issue timely warnings to the University community about certain crimes that have been reported and may continue to pose a serious or continuing threat to the campus community. Consistent with the Clery Act, the University withholds the names and other personally identifying information of Complainants when issuing timely warnings to the University community. See University Policy Number 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct for more information about Clery Act Reporting.

## C. CONFIDENTIAL RESOURCES

Consistent with the definition of Confidential Employees and licensed community professionals, there are a number of resources off campus where Students and Employees can obtain confidential, trauma-informed counseling and support. Please review Appendix D: Resources and Reporting Guide for Students & Employees for a list of available on- and off-campus confidential resources.

## D. REPORTING

There are multiple channels for reporting Prohibited Conduct. A Complainant may choose to report to the University Title IX Coordinator, to law enforcement, to both, or to neither. These reporting options are not exclusive. Complainants may simultaneously pursue criminal and disciplinary action. The University will support Complainants in understanding, assessing and pursuing these options. For a full list of reporting options, please review Appendix D: Resources and Reporting Guide for Students and Employees.

### 1. Law Enforcement

Complainants have the right to notify or decline to notify law enforcement. In keeping with its commitment to taking all appropriate steps to eliminate, prevent, and remedy all Prohibited Conduct, the University urges Complainants to report Prohibited Conduct immediately to local law enforcement by contacting:

- 911 (for emergencies in Virginia)
- 119 (for emergencies at Mason Korea)
- University Police ((703) 993-2810) (for non-emergencies)
- Fairfax County Police ((703) 691-2131) (for non-emergencies)
- Fairfax City Police ((703) 385-7924) (for non-emergencies)
- Manassas Police ((703) 257-8000) (for non-emergencies)
- Arlington County Police ((703) 558-2222) (for non-emergencies)

Police have unique legal authority, including the power to seek and execute search warrants, collect forensic evidence, make arrests, and assist in seeking Emergency Protective Orders. Although a police report may be made at any time, Complainants should be aware that a one-year statute of limitations

may apply to certain misdemeanors in Virginia. The University will assist Complainants in notifying law enforcement if they choose to do so.

### 2. The University

The University also urges anyone who becomes aware of an incident of Prohibited Conduct to report the incident immediately to the University through the following reporting options:

- **Title IX Coordinator** — Title IX protects any person from sex-based discrimination, including sexual assault. Call 703-993-8730, email cdc@gmu.edu, or complete the intake form online at https://diversity.gmu.edu/intake-form.

- **Student Support and Advocacy Center** — Provides comprehensive services for students in an effort to foster the safety and well-being of the Mason community. Call **703-993-3686.** http://ssac.gmu.edu. Call 703- 380-1434 for the 24-hour **sexual and intimate partner** violence helpline. (CONFIDENTIAL)

- **Office of Housing and Residence Life** — Professional and student staff are available 24 hours a day to assist students and ensure safety. For 24-hour, non-emergency line, Call 703-993-2720. https://housing.gmu.edu/.

- **Employee Relations** — Provides assistance to university employees and their supervisors to help identify and resolve work-related problems and proactively avoid potential problems. Call 703-993-3878. http://hr.gmu.edu/emp_relations/.

There is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University. If the Respondent is no longer a Student or an Employee, the University will provide reasonably appropriate remedial measures, assist the Complainant in identifying external reporting options, and take reasonable steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.

The University will not pursue disciplinary action against Complainants or witnesses for disclosure of illegal personal consumption of drugs or alcohol where such disclosures are made in connection with a good faith report or investigation of Prohibited Conduct. Complainants may simultaneously pursue criminal and University complaints.

## VI.    PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the Complainant or Respondent. Prohibited Conduct includes the following specifically defined forms of behavior: Sexual Assault, Sexual Exploitation, Interpersonal Violence, Stalking, Sexual or Gender-Based Harassment, Complicity, and Retaliation.

### A. SEXUAL ASSAULT

Sexual Assault consists of (1) Sexual Contact and/or (2) Sexual Intercourse that occurs without (3) Affirmative Consent.

1. **Sexual Contact** is:

- Any intentional sexual touching
- However slight
- With any object or body part (as described below)

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                          8 of 15

- Performed by a person upon another person

Sexual Contact includes (a) intentional touching of the breasts, buttocks, groin or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

2. **Sexual Intercourse** is:

- Any penetration
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

Sexual Intercourse includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue, or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

3. **Affirmative Consent** is:

- Informed (knowing)
- Voluntary (freely given)
- Active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity

Affirmative Consent cannot be obtained by Force. Force includes (a) the use of physical violence, (b) threats, (c) intimidation, and/or (d) coercion.

a) Physical violence means that a person is exerting control over another person through the use of physical force.
Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

b) Threats are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

c) Intimidation is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

d) Coercion is the use of an unreasonable amount of pressure to gain sexual access. Coercion is more than an effort to persuade, entice, or attract another person to have sex. When a person makes clear a decision not to participate in a particular form of Sexual Contact or Sexual Intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can be coercive. In evaluating whether coercion was used, the  University will consider: (i) the frequency of the application of the pressure, (ii) the intensity of the pressure, (iii) the degree of isolation of the person being pressured, and (iv) the duration of the pressure.

Affirmative Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated. Incapacitation  means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity.

A person who is incapacitated is unable, temporarily or permanently, to give Affirmative Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    9 of 15

activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

The University offers the following guidance on Affirmative Consent and assessing incapacitation:

A person who wants to engage in a specific sexual activity is responsible for obtaining Affirmative Consent for that activity. Lack of protest does not constitute Affirmative Consent. Lack of resistance does not constitute Affirmative Consent. Silence and/or passivity also do not constitute Affirmative Consent. Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

Affirmative Consent to one form of sexual activity does not, by itself, constitute Affirmative Consent to another form of sexual activity. For example, one should not presume that Affirmative Consent to oral-genital contact constitutes Affirmative Consent to vaginal or anal penetration. Affirmative Consent to sexual activity on a prior occasion does not, by itself, constitute Affirmative Consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Affirmative Consent.

Affirmative Consent may be withdrawn at any time. An individual who seeks to withdraw Affirmative Consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once Affirmative Consent is withdrawn, the sexual activity must cease immediately.

In evaluating Affirmative Consent in cases of alleged incapacitation, the University asks two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated? And if not, (2) Should a sober, reasonable person in the same situation have known that the other party was incapacitated? If the answer to either of these questions is "YES," Affirmative Consent was absent and the conduct is likely a violation of this policy.

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or using drugs. The impact of alcohol and other drugs varies from person to person.

One is not expected to be a medical expert in assessing incapacitation. One must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs include slurred or incomprehensible speech, unsteady gait, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?" "Do you know how you got here?" "Do you know what is happening?" "Do you know whom you are with?"

One should be cautious before engaging in Sexual Contact or Sexual Intercourse when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether Affirmative Consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to forego all sexual activity.

Being impaired by alcohol or other drugs is no defense to any violation of this policy.

## B. SEXUAL EXPLOITATION

Sexual Exploitation is a form of Sexual or Gender-Based Harassment that involves purposely or knowingly doing one or more of the following without Affirmative Consent :

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    10 of 15

1. taking sexual advantage of another person;
2. taking advantage of another's sexuality; or
3. exceeding the boundaries of consensual Sexual Contact without the knowledge of the other individual.

Sexual Exploitation may be committed for any purpose, including sexual arousal or gratification, financial gain, or other personal benefit.

Examples include, but are not limited to:

- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give Affirmative Consent to sexual activity;
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images) without consent of all parties;
- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy);
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Threatening to disclose an individual's Sexual Orientation, Gender Identity, or Gender Expression;
- Prostituting another person;
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge; or
- Knowingly failing to use contraception, or deliberately removing or compromising contraception (Stealthing) without the other party's knowledge

### C. INTERPERSONAL VIOLENCE

Interpersonal Violence (commonly referred to as intimate partner violence, dating violence, domestic violence, and relationship violence), can encompass a broad range of abusive behavior committed by a person who is or has been:

- In a romantic or intimate relationship with the Complainant (of the same or different sex);
- The Complainant's spouse or partner (of the same or different sex);
- The Complainant's family member; or
- The Complainant's cohabitant or household member within the past 12 months, including a roommate.

Whether there was such a relationship will be gauged by its length, type, and frequency of interaction. Reports of Interpersonal Violence that do not involve one of the specified relationships or do not involve an individual's Protected Status (Protected Statuses are listed in University Policy 1201, Non-Discrimination) will be resolved under the Code of Student Conduct or, for employees, applicable policies.

Interpersonal Violence includes physical violence, emotional abuse, sexual assault, economic control and neglect that a reasonable person in similar circumstances and with similar identities would find intimating, frightening, terrorizing, or threatening. Such behaviors may include threats of violence to one's self, one's family member, or one's pet.

### D. STALKING

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person in similarly circumstances and with similar identities to fear bodily injury or to experience substantial emotional distress.

Course of conduct means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Substantial emotional distress means significant mental suffering or anguish, or creating a hostile, intimidating, or abusive environment for a reasonable person in similar circumstances with similar identities. Stalking may involve individuals who are known to one another, who have a current or previous relationship, or who are strangers.

Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

### E. SEXUAL OR GENDER-BASED HARASSMENT

Sexual or Gender-Based Harassment includes:

1. Unwelcome sexual advances, requests for sexual favors and other verbal, physical, or electronic conduct of a sexual nature that creates a hostile, intimidating, or abusive environment;
2. Verbal, physical, or electronic conduct based on Sex, Gender, Sexual Orientation, or sex-stereotyping that creates a hostile, intimidating, or abusive environment, even if those acts do not involve conduct of a sexual nature, or
3. Harassment for exhibiting what is perceived as a stereotypical characteristic for one's Sex or for failing to conform to stereotypical notions of masculinity and femininity, regardless of the actual or perceived Sex, Gender, Sexual Orientation, Gender Identity, or Gender Expression of the individuals involved.

a) **Harassment** is a type of Discrimination that occurs when verbal, physical, electronic, or other conduct based on an individual's Protected Status (Protected Statuses are listed in University Policy 1201, Non-Discrimination) interferes with that individual's (a) educational environment (e.g., admission, academic standing, grades, assignment); (b) work environment (e.g., hiring, advancement, assignment); (c) participation in a University program or activity (e.g., campus housing); or (d) receipt of legitimately-requested services (e.g., disability or religious accommodations), thereby creating Hostile Environment Harassment or Quid Pro Quo Harassment, as defined below.

#### i. Hostile Environment Harassment

Unwelcome conduct based on Protected Status that is so severe, persistent, or pervasive that it alters the conditions of education, employment, or participation in a University program or activity, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive. An isolated incident, unless sufficiently severe, does not amount to Hostile Environment Harassment.

#### ii. Quid Pro Quo Harassment

Unwelcome conduct based on Protected Status where submission to or rejection of such conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education, employment, or participation in a University program or activity.

**b) Additional Guidance about Discrimination and Harassment**

Consistent with the definitions provided above, conduct that constitutes Discrimination and Harassment:

- May be blatant and involve an overt action, threat, or reprisal; or may be subtle and indirect, with a coercive aspect that is unstated but implied.
- May or may not include intent to harm.
- May not always be directed at a specific target.
- May be committed by anyone, regardless of Protected Status, position, or authority. While there may be a power differential between the Complainant and the Respondent – perhaps due to differences in age or educational, employment, or social status – Discrimination and Harassment can occur in any context.
- May be committed by a stranger, an acquaintance, or someone with whom the Complainant has a current or previous relationship, including a romantic or sexual relationship.
- May be committed by or against an individual or by or against an organization or group.
- May occur in the classroom, in the workplace, in residential settings, or in any other setting.
- May be a pattern of behavior or, if sufficiently severe, a one-time event.
- May be committed in the presence of others, when the Complainant and Respondent are alone, or through remote communications, including email, text messages, or social media.
- May take the form of threats, assault, property damage, economic abuse, and violence or threats of violence.
- May include harassing or retaliatory behavior directed to a sexual or romantic partner, family member, friend, or pet of the Complainant.

F. RETALIATION

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

G. COMPLICITY

Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of Prohibited Conduct by another person.

VII.   VIOLATIONS OF LAW

Behavior that violates this policy may also constitute a crime under the laws of the jurisdiction in which the incident occurred. For example, the Commonwealth of Virginia criminalizes and punishes some forms of Sexual Assault, Interpersonal Violence, Sexual Exploitation, Stalking, and Physical Assault. The criminal statutes that may apply in cases of Physical Assault and Intimate Partner Violence are found in various sections of Chapter 4, Articles 1 (Homicide) and 4 (Assaults and Bodily Woundings), of Title 18.2 of the Code of Virginia. The criminal statutes  relating to Sexual Assault are found in Sections 18.2-61 to 18.2-67.10 of the Code of Virginia. Section 18.2-60.3 of the Code of Virginia defines and identifies the penalty for criminal stalking. Finally, Sections 18.2-386.1 and 18.2-386.2 of the Code of Virginia provide for criminal penalties in some cases of Sexual Exploitation. This compilation of criminal statutes is not exhaustive, but is offered to notify the University community that, some forms of Prohibited Conduct may also constitute crimes under Virginia law, which may

subject a person to criminal prosecution and punishment in addition to any sanctions under this policy.

## VIII.    PREVENTION AND AWARENESS PROGRAMS

The University is committed to the prevention of Prohibited Conduct through regular and ongoing education and awareness programs. Incoming Students and new Employees receive primary prevention and awareness programming as part of their orientation, and returning Students and current Employees receive ongoing training and related education. For a description of the University's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, see Appendix E: Training, Prevention, and Awareness Programs.

## IX.    COMPLIANCE

The University provides training to Students and Employees to ensure they understand this policy and the topics and issues related to maintaining an education and employment environment free from harassment and discrimination. For a description of the University's training related to this policy, see Appendix E: Training, Prevention, and Awareness Programs.

## X.    OBLIGATION TO PROVIDE TRUTHFUL INFORMATION

All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under the University's Student Code of Conduct and disciplinary action under the appropriate Employee disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

## XI.    FORMS

**CSA Crime Statistics Reporting Form**
**Compliance, Diversity, and Ethics Intake Form**

## XII.    DATES:

### A. **Effective Date**

This policy will become effective upon the date of approval by the Provost and Executive Vice President and Senior Vice President for Administration and Finance.

### B. **Date of Most Recent Review**

8/25/2016.

## XIII.    TIMETABLE FOR REVIEW

The University will review and update this policy, as appropriate, by October 31 of each year. The University will evaluate, among other things, any changes in legal requirements, existing University resources, and the resolution of cases from the preceding year (including, but not limited to,

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    14 of 15

timeframes for completion and sanctions and remedies imposed). The Title IX Coordinator shall certify to the State Council of Higher Education for Virginia that this policy has been reviewed and updated, as appropriate, in accordance with Virginia law.

XIV.   SIGNATURES

   **Approved:**

_____
Senior Vice President for Administration and Finance

_____
Provost and Executive Vice President

   Date approved: April 20, 2006

   Revision Approved: August 15, 2014

   Revised: March 25, 2015

   Revision Approved: September 11, 2015

   Revised: June 22, 2016

   Revision Approved: August 25, 2016

   Revised: February 14, 2017

# EXHIBIT 4D

**George Mason University**

**Sexual Misconduct Investigation Procedures**

**For Academic Year 2017 – 2018**

**A302**



# Compliance, Diversity and Ethics

December 2017

# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, vendors and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of such complaints. CDE may amend this procedure as necessary. Any student, faculty, staff, contractor, vendor or visitor who feels she or he is the victim of discrimination on the basis of race, color, religion, national origin, sex, physical or mental disability, status as a protected veteran, sexual orientation, gender identity, age (40 or older), marital status, pregnancy status, or genetic information, should follow the complaint procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the university reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the Reporting Party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity

**A303**

complaint investigative process.  Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE.  Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

## III. Filing Procedure

<u>Complaints</u>

If a member of the George Mason University community believes that she or he has been the victim of discrimination or discriminatory harassment or has information about discrimination/harassment in the university community, she or he may promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to CDE, located on the Fairfax Campus, Aquia Building, Suite 373.  They may also email the office at cde@gmu.edu, or call the office at (703) 993-8730.  Alternatively, a member of the university community may report the situation to her or his immediate supervisor, department head, or Dean, who will immediately notify CDE of the report.  Supervisors must immediately report any complaints they receive or incidents of alleged discrimination they witness to the CDE Office.

A complaint should be filed within one hundred eighty (180) calendar days of the most recent incident.  The university will consider requests to extend this period where the Reporting Party can show she or he needed additional time due to circumstances beyond her or his control, or a pattern of ongoing discriminatory behavior.  All complaints of discrimination will be treated in the strictest confidence possible under the particular circumstances.

The Reporting Party will meet with a member from CDE to discuss their concerns.  Assuming the complete veracity of the allegation(s), CDE will make a threshold determination as to whether the allegation(s) contained in the complaint constitute a violation of university policy.  This threshold determination will be made within three (3) business days of the initial meeting with a CDE member.  Where appropriate, CDE may conduct a preliminary inquiry to determine whether an investigation is required.  If the threshold determination indicates that the allegation(s) in the complaint do not constitute a violation of university policy, either with or without a preliminary investigation, the Reporting Party will be notified that no further action will be taken with regard to the complaint.  If the threshold determination indicates that an investigation is required, CDE will determine the appropriate investigation process, and an investigator from CDE assigned to the complaint will notify the Reporting party and Responding party (the individual accused of discrimination) that said investigation is under way.

<u>Types of Investigations</u>

**Informal.**  Discuss allegations and concerns with Responding Party (the accused) and attempt to resolve the situation.  The Responding Party is reminded that George Mason University expects all to adhere to our Equal Opportunity policies.  Responding Party is put on notice that behavior has been questioned, and informal resolution is sought, if possible.  CDE reserves the right to pursue a Formal investigation in to any allegations brought forth during the Informal Procedure should those allegations be indicative of a serious or continuing violation of the Equal Opportunity policies.

**Formal**.  An investigation is conducted by CDE complete with interviews of the Reporting Party, the Responding Party, and any material witnesses identified, as well as a review of any relevant documentation.  The Reporting Party and the Responding Party will be given the opportunity to provide any additional relevant information to the investigator, including the names of additional witnesses to contact and/or additional documents to review before the investigation is closed.  At any time before the conclusion of the investigation, the appropriate supervisor to which the Responding Party is assigned may take interim emergency action until the conclusion of the investigation.

At the conclusion of its investigation CDE may issue a final written determination.  The final written determination will state whether, based on CDE's investigation, there was a violation of this policy.  The final determination will be shared with the Reporting Party, the Responding Party, and the appropriate supervisor.  A copy of the written determination may be provided to Human Resources and other pertinent university officials as necessary to ensure proper resolution and follow-up regarding the matter.  CDE's involvement in the matter concludes when a final determination is made.

The investigator's findings of fact will be made using the "preponderance of the evidence" standard.  Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct occurred.  This "preponderance of the evidence" standard requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it.

If the investigation finds that discrimination occurred, the university will determine appropriate corrective action, up to and including dismissal.  The university may also take corrective action if no discrimination and/or unlawful harassment is found, but Responding Party is found to have engaged in inappropriate workplace behavior.

The Responding Party's appropriate supervisor, Human Resources, or any other pertinent university official shall promptly notify CDE of any corrective action imposed, if any.

Sanctions imposed on those individuals who have been found to be in violation of George Mason University's Equal Opportunity policy or its Discriminatory Harassment policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

Corrective actions may include a directive to stop any ongoing discrimination, unlawful harassment, or retaliation; disciplinary or other corrective action against the Responding Party or others; relief for the Reporting Party to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.**  A finding may be appealed in writing to the Vice President of CDE by either Party within ten (10) business days of receipt of CDE's determination.  A Party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding.  The appellant should be as specific as possible

in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient.  The determination of the VP/CDE is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a Reporting Party may file their complaint with the appropriate external agencies, such as the Department of Education Office of Civil Rights (OCR) or the Equal Employment Opportunity Commission (EEOC), within applicable time limits.  In addition, any person who is dissatisfied with George Mason University's internal procedures utilized for handling complaints, or who is dissatisfied with the result of the investigation or the sanctions imposed, may seek redress through the EEOC, to the extent allowed by law.  The Reporting Party should be aware that filing a complaint with CDE or other university resources does not extend or postpone the deadline for filing with external agencies.  In the event that a complaint is filed with an external agency or court, the university reserves the right to determine, at its discretion, whether the university's internal complaint resolution procedure should be discontinued or continued separately.

<u>Time Line for Investigations</u>

CDE will complete its investigations as expeditiously as possible.  The investigation shall normally be completed within forty five (45) business days (excluding holidays and university closings) from the determination that an investigation will ensue, including notification to the parties of the investigation outcome.  In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period.  All parties will be notified if such an extension is necessary.  Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved.  CDE may notify respective parties upon nearing conclusion of an investigation.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals.  Note that all those involved (the Responding Party, the Reporting Party, and the witnesses) have privacy interests.  Therefore, outside the scope of the investigation, all parties are highly cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The Reporting Party and the Responding Party each have the right to bring an advisor to the investigative meeting.  If either Party chooses to exercise this option, CDE asks that you submit the name and relationship of the advisor (e.g., legal counsel), in writing, at least 72 business hours prior to the meeting.

**VI. Responsibilities and Jurisdiction of Compliance, Diversity and Ethics Office**

Consistent with federal and state laws and university policies related to nondiscrimination, CDE investigates complaints of unlawful harassment and/or discrimination on the basis of race, color, religion, national origin, sex, physical or mental disability, status as a protected veteran, sexual orientation, gender identity, age (40 or older), marital status, pregnancy status, or genetic information.  CDE investigates such complaints of discrimination at George Mason University and renders a determination following such investigations.

# EXHIBIT 5



Compliance Diversity and Ethics
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu

LETTER OF DETERMINATION
Confidential

February 22, 2019

Plaintiff

George Mason University
Fairfax, VA 22030

Dear Plaintiff,

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by Complainant 1 whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also considered the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence.***

Complainant 1 alleged that during the spring 2013 Course on April 2, 2013, that you provided a detailed personal description to students of performing oral sex on a woman at a party. During the investigation, you confirmed sharing this story in class. Student witnesses confirmed and corroborated this information.

Complainant 1 also alleged that during this same course, you cautioned them about sharing the stories told in class outside of the course. During the investigation, you indicated you could not recall warning your class about not share the stories you told in class. Student witnesses confirmed and corroborated that you made it clear it would be better if they did not share your stories outside of class.

Complainant 1 alleged that you encouraged students in your class to get to know each other outside of class and stated that going to Spa World would be a great way to do so. During the investigation, you said you shared many resources with students during class. You indicated that graduate school was stressful and that Spa World was a place where you can get a massage and there were bathing pools as well. You said you suggested it was a place where they could meet and relax. One student witness stated, "I remember him mentioning Spa World multiple times. I don't remember if it was in one of these classes but I wouldn't be surprised." You also acknowledged that you "jested" about graduate students often dating each other and you provided the personal example, that your first mentor married his post doc as an example that some of them would probably end up dating. Student witnesses confirmed and corroborated that you told them not to let "other" faculty members know if they were dating each other.

Complainant 1 alleged that in class you often called students emotional, irrational, or weak. During the investigation, you said you absolutely did not tell students they were being emotional, irrational, or weak. Student witnesses confirmed you did tell at least one student their arguments were emotional.

Complainant 1 indicated that the interactions with you included regular and gratuitous stories detailing sexual encounters, disparaging comments and actions regarding stereotypical female traits (e.g., being emotional).

Investigation found that these repeated instances of sexual conversations with students you supervise and teach indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the classroom.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to Complainant 1 to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions. Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat
University Title IX Coordinator

CC:   Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology
      Dr. Anne L. Ardis, Dean, College of Humanities and Social Sciences
      Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life
      Julian Williams, Vice President for Compliance, Diversity and Ethics

# EXHIBIT 6



**Compliance Diversity and Ethics**
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu

LETTER OF DETERMINATION
Confidential

February 21, 2019

Plaintiff

George Mason University
Fairfax, VA 22030

Dear Plain iff ,

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by Complainant 2 whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also considered the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-Based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence*.**

Complainant 2 alleged that during the spring 2013 Course , on April 2, 2013, that you provided a detailed personal description to students of performing oral sex on a woman at a party. You indicated this was a concrete personal example that would help them remember the material. This story was also confirmed and corroborated by student witnesses from that class.

Complainant 2 also alleged that the spring 2013 Course you shared a conversation with the class regarding the number of sexual partners you have had during a class discussion. Multiple witnesses corroborated this conversation occurred.

Complainant 2 also alleged that you told a story in class about an intimate encounter on a then recent trip. During the investigation, you disputed the factual accuracy of the allegation that you shared a conversation about skinny-dipping with a woman on a business trip. You stated this allegation was a false recall of a story your told students for pedagogical reasons. You indicated you did not "skinny dip" with the woman, but rather went swimming in the ocean with her on a trip to Kuwait and she served as your escort. Student witnesses from the class remembered this story and described it as "erotic," "serene," and "a moment of awe," but did not recall the "skinny-dipping" element of the story.

Complainant 2 alleged that your encouraged students in your class to get to know each other outside of class and stated that going to Spa World would be a great way to do so. During the investigation, you confirmed that you shared many resources with students during class. You indicated that graduate school was stressful and that Spa World was a place where you can get a massage and there were bathing pools as well. You said you suggested it was a place where they could meet and relax. One student witness

indicated, "I remember him mentioning Spa World multiple times. I don't remember if it was in one of these classes but I wouldn't be surprised."

▮Complainant 2▮ indicated that she felt your stories and personal examples from your own sex life made her uncomfortable and made it a difficult environment in which to learn. She also feared being labeled as a "narc" and did not feel she had the power to stand up to your unprofessional and inappropriate sexual comments ▮Complainant 2▮ indicated that the behavior you exhibit for your graduate students encouraged them to be inappropriate and verbally harassing of other students. She states, "Dr. ▮Plaintiff▮ behavior is an issue of the ▮Program▮ and it contributed to a toxic environment where learning is more difficult. While ▮Plaintiff▮ is not responsible for anyone's behavior but his own, the fact that he is unaware of what transpires in his lab, or if aware does not take meaningful steps to intervene, is grossly negligent as an educator."

Investigation found that these repeated instances of sexual conversations with students you supervise and teach indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the classroom.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to ▮Complainant 2▮ to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions. Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,
Dr. Jennifer R. Hammat
University Title IX Coordinator

CC:    Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology
       Dr. Anne L. Ardis, Dean, College of Humanities and Social Sciences
       Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life
       Julian Williams, Vice President for Compliance, Diversity and Ethics

# EXHIBIT 7



Compliance Diversity and Ethics
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu

LETTER OF DETERMINATION
Confidential

February 22, 2019



Dear Dr. ███████,

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by ███████████ whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also considered the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence.***

███████████ alleged that while attending the Association for Behavioral and Cognitive Therapy conference (November 21-23, 2014), after learning she was dating another graduate student, you approached him and asked him about it. He reported you asked him if he was "pumping" or "plowing" that "chick" and gave him a high-five when he said "yes." During the investigation, you indicated that you used different language and that you did not "high-five" him. Although details differ, student witness confirmed and corroborated a conversation of this nature.

███████████ alleged that after the conference you hugged her at the bar and offered to buy her a beer on your tab. During the investigation, you indicated you did not recall this ever happening. Due to lack of corroborating witnesses, the investigator was unable to determine whether this occurred.

███████████ alleged that at a party in your home in February of 2015, as she and ███████ were leaving, while looking at ███████████ you said to your wife, "███████ must have a big dick to be dating you. Like, just look at you." ███████████ said this was the first of many comments you made about her appearance.

During the investigation, you said you did not recall being involved in that conversation. ███████ said there was lots of alcohol consumed that evening, and that his memory from that evening is not very good and that ███████████ recollection of the night is much better. He said he was mostly upset when you got drunk and hinted that that they were not "really happy" because you said that about their relationship in front of several people from the lab.

Complainant 3 alleged that while attending the Association of Behavioral and Cognitive Therapies conference in Chicago, Illinois, after enjoying a dinner with her colleague and venting about her relationship she realized you were sitting behind her. When she introduced you to her colleague, she said you hugged her and whispered that you heard what she said about Student but that, her secret was safe with you and that you knew how to keep secrets. Complainant 3 said this was the first time you made it seem like secrets between the two of you were a good thing. She said that made her very uncomfortable. During the investigation, you said you were facing Complainant 3 and she saw you the whole time. A non-student witness provided photo evidence of you sitting behind Complainant 3 .

Complainant 3 also alleged that after the break up, she ran into you in the hallway in Psychology. She said you approached her, hugged her tightly and for too long, and told her you were not mad at her and still thought highly of her. She said you made a comment about how she was intelligent, attractive, creative, driven, and skilled and you expressed hope that the two of you could work together on projects. During the investigation, you said you had no recollection of that interaction. A non-student witness confirmed that Complainant 3 told her about this interaction in real time, corroborating this interaction.

Complainant 3 said when you included her attractiveness in the "reasons" provided for wanting to work with her, she felt like that was a grooming behavior. She recalls deliberately removing herself from future research opportunities with you based on these concerning behaviors. She stressed it was hard to describe in detail the number of times when she felt offended, objectified, invalidated, and demeaned as a result of chronic sexual harassment from you. Complainant 3 stated, "The impact Plaintiff had on my productivity and my curriculum are disturbing. I turned down a grant opportunity, that same grant for which he wrote a letter of recommendation, because I could not spend another year in this program. The abusive tactics Plaintiff used only exacerbated the helplessness I felt across all of the situations described here, and numerous others."

Investigation found that these repeated instances of sexual conversations and physical interactions with students Plaintiff supervises and teaches indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the program.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to Complainant 3 to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions.  Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat
University Title IX Coordinator


CC:     Julian Williams, Vice President for Compliance, Diversity and Ethics

# EXHIBIT 8



Compliance Diversity and Ethics
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu

LETTER OF DETERMINATION
Confidential

February 22, 2019

<span style="background:black">Plaintiff</span>
George Mason University
Fairfax, VA 22030

Dear <span style="background:black">Plaintiff</span>

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by <span style="background:black">Complainant 4</span>, whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence.* CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also took into account the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence.***

<span style="background:black">Complainant 4</span> alleged that while attending a party at your home on December 9, 2018, you invited the students into your hot tub. She stated you shared an elaborate, sexual story about your sexual experience at a large brothel house while traveling in Germany. The conversation was described as lasting a least one hour in length, and described as going into very intimate details about sexual acts performed, how long the sex lasted, how you selected the women with whom you were engage in the sex acts, and what criteria you used to select the sex partners.

<span style="background:black">Complainant 4</span> said she felt "stuck" and unable to leave the conversation discreetly. She said she felt extremely uncomfortable with the conversation, given the setting. During the investigation, you confirmed that you invited your graduate students (from the lab) to your home for an end-of-the-semester gathering for drinks and food. You also confirmed that you and your graduate students ended up in the hot tub, discussing life, wellness, research, and a recent sexual experience you personally had in Germany. This was corroborated by several student witnesses.

<span style="background:black">Complainant 4</span> alleged that while attending the Society of Personality and Social Psychology conference, January 20, 2017, in San Antonio, Texas, you and several graduate students met up with other attendees from the conference and took them back to your respective hotel rooms. She said the next morning, you and the other students discussed in detail what happened the night before. You asked for explicit details about their sexual encounters. You confirmed that you met someone at the conference and that you and your graduate students discussed the prior evening's sexual activity the next morning at breakfast. Several student witnesses and one non-student witness corroborated this event.

Complainant 4 alleged that on another occasion you shared intimate details about a "happy ending" erotic massage you told a story about at a gathering at Oh! George in the fall of 2017. Investigation confirms a conversation with students about an erotic massage you received in Sri Lanka in 2017.

Complainant 4 alleged that during a different gathering at Oh! George, in the fall of 2017, you repeatedly asked a graduate student what type of porn she liked to watch. During the investigation, you stated you did ask a graduate student what kind of pornography she liked to watch.

Complainant 4 alleged that while attending the March 2018 Society of Personality and Social Psychology Conference, you and a group of graduate students went to the Claremont Lounge, a strip club in Atlanta, Georgia. Investigation confirmed at least one student received a lap dance, and you took a photo of that, and you received a lap dance. Witnesses told investigators that at least one student had so much to drink that they threw up in the bathroom. During the investigation, you agreed that you attended the strip club with the students and received a lap dance.

During the investigation you confirmed that while attending the August 6, 2018, academic conference in Santa Ana, California, you discussed with students an intimate sexual encounter you had with a woman (for over 10 hours) while you were out of the country presenting a professional workshop in Hanoi, Thailand. Student witnesses corroborated this conversation.

During the investigation, you said you discuss a number of things with your graduate students. You said you discussed research trends, wellness, disfunction, and sex. Several student witnesses confirmed this fact, one offering, "Plaintiff likes to talk about sex. A lot."

Complainant 4 said having time away from the lab and the opportunity to work in a professional environment that would never tolerate the conversation or circumstances she experienced while working for Plaintiff. Only now does she feel able to articulate how inappropriate the power imbalance of Plaintiff mentorship was. She conveyed that the way Plaintiff viewed her (including her sexual behaviors) had an effect on his decisions for how he handled graduate assistantships, authorship on papers, and consulting opportunities.

Investigation found that these repeated instances of explicit sexual conversations with students you supervise and teach indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the classroom, the laboratory and at professional conferences.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with

CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to ████████ to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions. Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat
University Title IX Coordinator

CC:    Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology
       Dr. Anne L. Ardis, Dean, College of Humanities and Social Sciences
       Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life
       Julian Williams, Vice President for Compliance, Diversity and Ethics

# EXHIBIT 9

 **Compliance Diversity and Ethics**
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730 Fax: 703-993-8899 Web: http://diversity.gmu.edu

April 11, 2019

Dr. [Plaintiff],

Please be advised that I have thoroughly reviewed your appeal submitted on March 28, 2019.

On February 22, 2019, the Compliance, Diversity, and Ethics Office (CDE) closed its investigation into allegations of sexual harassment by you, reported [Complainants] [Complainants]

The February 22, 2019, determination letters stated that after investigation, CDE determined by a preponderance of the evidence that the factual information uncovered during the investigation substantiated the allegations against you.

Pursuant to George Mason University Equal Opportunity/Affirmative Action Grievance procedures:

> A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process, which could affect the outcome of a finding. The appellant should be as specific as possible in setting out the basis for appeal; general dissatisfaction with the decision will not be sufficient.

Your appeal raises concerns about your initial interview with Megan Simmons, Title IX Investigator. Upon being alerted to these concerns by Mr. Miltenberg, Ms. Simmons was replaced as lead investigator.

During investigation into this matter, the investigators followed Mason policies and procedures, interviewing more than 12 individuals including yourself. You were also provided the opportunity to present information on your own behalf, which was thoroughly reviewed prior to any determination being made.

Your appeal discusses the extent that the reporting parties and others participated the sexually-charged environment and the fact that you received positive teaching evaluations. While these factors are relevant, also relevant are the "objective" negative effects of hyper-sexual conversations/interactions between a faculty member and graduate students under his supervision and instruction.

The investigator(s) determined that there was enough factual information to determine that this conduct was "sufficiently serious enough to deny or limit the student's ability to participate in or benefit from the program." I concur with this determination. Students expressed uneasiness with the sexually-charged nature of working under your supervision and instruction, but explained that they felt as though they had to participate in order to remain in your favor.

Faculty are expected to maintain and set professional standards for students under their supervision. While you assert that your research and teaching touches upon sex and sexuality, investigation into the reports uncovered numerous instances of non-pedagogical discussions of sex, sexual encounters, and a sexually-charged environment, in general.

Investigation revealed:
- Numerous conversations between you, and graduate students under your supervision and instruction, about sex;
- Frequent recounting to students of your sexual encounters, with explicit detail;
- A trip to a strip club with students during a professional conference;
- Explicit discussions with students about sexual encounters you had with women during professional travel;
- Occasions where students under your supervision visited your home hot tub;
- You asking probing questions about pornography preferences and the dating/sex lives of students;

You confirmed most of this conduct during the investigation. Fact-finding into this matter revealed an apparent lack of professional boundaries between yourself and graduate students under your supervision and instruction.

After a thorough and exhaustive review of your appeal I did not find any new information or significant procedural irregularities, which affected the outcome of the original finding of the investigator(s).

Because of these factors, your appeal is denied. This determination is final.

Julian R. Williams
Vice President, Compliance, Diversity & Ethics

# EXHIBIT 10



# IDVSA VOICE

**VOLUME 8, ISSUE 1**                    **SEASON 2013**

### OUR MISSION

*To advance the knowledge of domestic violence and sexual assault in an effort to end interpersonal violence. IDVSA accomplishes this through research, education and training, technical assistance, and collaboration with university and practitioner communities, and the community at large.*

### INSIDE THIS ISSUE:

From The Editor                    2

A Shared Vision                    3-4

A Voice from a Student             5

A Voice From the Field             6

Affiliate Profile                  7-10

IDVSA Project Updates              11-14

Staff Notes                        14

New Resources                      15

Resiliency Project                 16-19
(Continued from pg 2)

Transitions                        20

News About Our Partners            21

Mark Your Calendars                22

**Published by
Institute on Domestic Violence
& Sexual Assault**

# IDVSA WRAPS UP WORK ON THE RESILIENCY PROJECT

## Training soon available nationwide

IDVSA recently completed its work on the Resiliency Project, an effort that started four years ago, and promises to continue to have an impact on child abuse organizations nationwide through training scheduled for release later this year.

The project sought to address a gap in the child abuse field: organizations knew that the work affected their staff and volunteers but did not know what they could do as an agency to address the symptoms of compassion fatigue, burnout and other stress-related problems.

The Resiliency Project addressed that gap with funding from the Office for Victims of Crime (OVC), Office of Justice Programs, U.S. Department of Justice, through a grant awarded to The University of Texas at Austin School of Social Work, Center for Social Work Research. IDVSA managed the two-year project, and with OVC's support, developed, implemented and evaluated an organizational resiliency model specifically designed for child abuse professionals.

One of the major training and technical assistance products is an evidence-based, 3-day training curriculum, which identifies strategies that organizations could use to build strengths in child abuse staff and volunteers through policy, supervision and training.

Since the pilot project ended, IDVSA has been collaborating with OVC Program Manager Bethany Case and the OVC Training and Technical Assistance Center (OVC TTAC) to shape the original curriculum into a dynamic, blended learning experience which combines a variety of educational forms including webinars and on-site training. In its Report to the Nation, OVC announced that it will soon be making the blended learning training available to child abuse organizations nationwide upon request.

"We are honored to have been part of this project and bring this resource to the field," said Noël Busch-Armendariz, Director of IDVSA, and principal investigator of the Resiliency Project. "Addressing the impact of the work is necessary to sustain those professionals who are working with traumatized or victimized people. Otherwise you have this revolving door, and you never really build the depth of capacity that you need in those organizations."

Busch-Armendariz says the Resiliency Project also strengthened the link between resilience in workers and better services for children.

"If we're the facilitator for that professional and that professional feels empowered, and resilient, and competent, and well taken care of, they can translate that pretty easily to how they interact with this child who needs them to be competent, and powerful, and empowered and empathetic, and present with them."

The Resiliency Project has been a good fit for IDVSA since it dovetails with two of its operating principles: engaging the field, and bringing research to practitioners.

*(Continued on page 16)*

# From the Editor

## by Karen Irene Kalergis, MA



This is my last column as Editor of IDVSA Voice. After 22 years with the State of Texas and then UT, I am collecting my retirement and heading into what I like to call my re-alignment days.

My work in victim services started in 1991, when Governor Ann Richards gave me the opportunity to serve as Director of the Texas Crime Victim Clearinghouse. One of the Governor's memorable lines was "dance with the ones that brung you." Over the years, I have been "brung up" by some of the best in the victim services field, and have had the opportunity to work (and sometimes dance) with those same folks today at IDVSA. As I put this last issue to bed, I am moved by how much has been accomplished since those days.

Back then – resources to train law enforcement on interacting with victims were scarce. We were pretty excited when a UT film student produced "A Miranda for Victims" as her class project. I have a copy of it on VHS that of course I can't play anymore, and was thrilled when I spoke at the Fort Worth coalition and was handed a copy on DVD! Today, there's the law enforcement toolkit produced by IDVSA with funding from the Governor's Office. One of the major items in the toolkit is a catalog of videos, trainings and other publications, amazing resources on how law enforcement can engage with victims.

In 1991, what would become known as the Clery Act had just taken effect, changing how colleges and universities reported crime on campus. Today, the re-authorization of VAWA puts a finer point on how to address campus sexual assault, as UT's Jennifer Hammat outlines in our Affiliate Profile. And IDVSA's longtime partner, TAASA, is working with the Crime Victims' Institute (another of the names on my old business cards) to increase awareness on responding to sexual assault on campus.

In the 90s, crime victims' compensation claims consistently took months to process, and there was a limited number of benefits for crime victims. Today, system automation has brought the average time for the first payment for all claims (both victims and sexual assault exam reimbursements) to law enforcement to an average of 45.5 days. Closer collaboration between CVC and the field resulted in almost 40% of all victim applications received being completed with the victim directly assisted by a victim advocate or a victim service provider.

When I started … SCR 26 provided for evidence of the abuse suffered by domestic violence victims to be raised in pardon reviews, but no incarcerated victim was released. Now, expert witness training helps the court understand the dynamics of domestic violence. And as you'll see in this article by IDVSA's co-investigator Jeana Lungwitz, the Parole Project at the Domestic Violence Clinic in the School of Law offers hope to incarcerated survivors of domestic abuse imprisoned for a crime related to the abuse they suffered.

In those days, research was not as accessible to us as we wrote curriculum or developed programs. Our cover story on The Resiliency Project is a great example of how our training and technical assistance products combine research and practice wisdom to better serve the field and victims.

One of the greatest lessons I learned from Governor Ann was the importance of thank you notes. To all of you who have taught me, supported me, nudged me to where I needed to go, a great big thanks for being with me on this journey. A very special thanks to Noël and my gecko pals at IDVSA. I am truly blessed to have been able to work with all of you, and I look forward to the dances ahead.

# A Shared Vision

## By Noël Busch-Armendariz, PhD, LMSW, MPA



Most of you know, **October is Domestic Violence Awareness Month**.  Domestic Violence Awareness Month evolved from the first Day of Unity observed in October, 1981 by the National Coalition Against Domestic Violence. Every October we recognize Domestic Violence Awareness Month because of the thousands of survivors, friends and family members, and offenders that we serve every day in Texas.

> According to the NCADV Website, the intent was to connect battered women's advocates across the nation who were working to end violence against women and their children. The Day of Unity soon became a special week when a range of activities were conducted at the local, state, and national levels.

> In October 1987, the first Domestic Violence Awareness Month was observed. That same year the first national toll-free hotline began. In 1989 the first Domestic Violence Awareness Month Commemorative Legislation. (http://www.ncadv.org/takeaction/DomesticViolenceAwarenessMonth.php)

October has also become an important month for anti-slavery efforts in Central Texas.  For the third year ALLIES Against Slavery will hold events throughout the month such as **The Free Austin Summit** on October 19, 2013 to raise awareness of modern day slavery.  For more information go to www.FreeAustin.org.

I was asked to speak at the statewide Texas Human Trafficking Prevention Task Force-Statewide Meeting on September 6, 2013.  In that address I began by recognizing State Representative Thompson, Senator Van de Putte, and Attorney General Abbott for their continuous commitment to anti-slavery efforts in Texas. From their important leadership positions, they form a formidable team against slavery and are models for our citizens and the nation about how to take a stand and make significant and enduring change. Members of the Statewide Task Force also deserve our thanks and recognition for their work for the last many years.

My remarks focused on our statewide research agenda for human trafficking.  It is likely that we need one, three, five and ten year benchmarks because our understanding of and tools to eradicate the trafficking in people in our State needs both a short and long term vision.  There are a great many people who deserve credit for these ideas and priorities because they have emerged after thoughtful conversations over the last years and months with professionals in the field, policy makers, and others concerned about this issue.

There are a couple of things to say about the relationship between researcher and practitioner and university and field. As I see it, the work of practitioners in the field, whether it be as an investigator, prosecutor or immigration lawyer, social worker, medical doctor, representative from labor, or policy maker, etc. is of service to the victims of this crime and ultimately to hold offenders accountable. As researchers, I believe that we should be in service to you. Research is only useful if it translates to practice and to meet the needs of practitioners and to inform policy. Research for research sake is not particularly interesting, but research that is relevant and translatable is meaningful. So, I hope you know that in this way, the university resources are intended for your consumption and are at your service.

You might have heard that the National Institute of Justice recently released a report called "The Sentinel Event Initiative." It was released as an innovative approach to improving criminal justice outcomes through research. In the NIJ context the sentinel event was a viewed as a significant event with a negative outcome that signaled an underlying weakness in the system or process and that likely resulted in compounded errors. It's a retrospective research approach with the main goal to learn not blame. Wrongful convictions would be an example of this perspective.

# A Shared Vision

(Continued from pg 3)

By definition of sentinel means to watch over, as a guard. Like many of you, I have been involved in anti-trafficking efforts since we began in Texas, so in that sense we are the sentinels. We have already been watching guard. The research generated then should document the productivity, the critical thinking, the dedicated resources, the compassion, the commitment, and the direction of our State to stamp out this crime, to serve victims, to hold accountable those who violate our most agreed upon human rights.

And so to continue to do this, to continue to watch over, we could use some reliable data. That is information that will forge the way or that will open the door to a dark place and shed some light. These might be our priorities:

1. First, the development of a Slavery Profile for Texas (this is definitely a poached term). I think most of us agree that the numbers and our understanding of the numbers are still elusive, both across the nation and in Texas. Although we have a national database about investigations; we also know that those details do not fully describe the efforts or the extent of the problem. It's a deeply hidden crime. I know that from my own experience by someone close to me recently describing what is likely labor trafficking. Sometimes the victims are hidden away and sometimes they are hidden in plain sight. Defining the scope and understanding it fully should be a priority.

2. Second, we need a statewide compendium that details our efforts at multiple levels (local, state, federal, governmental, NGO, faith based, etc.). This would include information about the organizations working in the anti-human trafficking, their mission, costs related to achieving that mission with the expressed goal to increase collaboration, communication and efficiency. A geo map of these efforts to understand their relationships and interrelationships will help coordinate those efforts.

3. Third, we need to continue to develop tools for criminal justice. For example, what could we learn investigatively if we document and detail the pathway of a domestic minor brought to Austin or any city in Texas by her pimp? How many days did she spend in what cities and what were the activities of her pimp to exploit her? Could we make connections across Texas and perhaps across the US that would help us understand the network of traffickers? And how can we build models that close the gap between investigation and prosecution where in Texas prosecutors have the tools to hold offenders accountable? What does this mean for victim engagement, as most of us understand that victims are afraid or reluctant to engage or stay engaged in the criminal justice system.

4. Fourth, there is much more we need to understand to better serve victims. For example, we don't have yet have best practice models for domestic minors and we don't fully understand the long range needs of domestic or international victims. These victims deserve exemplary services for full recovery and we don't yet know what that looks like.

5. Finally, there is work to be done that focuses on the dedicated professionals working in this field. We need to recruit and retain the most seasoned and committed professionals recognizing that this is difficult work often misunderstood by those outside it.

In August, 2013 IDVSA staff hosted the first of many research agenda setting round table meetings on human trafficking. I invite you to be a part of that process If you are interested in getting involved please be in touch.

I hope this modest list doesn't imply that our tasks before us are simple. Operationalizing your work into researchable questions isn't easy, because your work is complex. This crime and it's after effects are complex. But, I am confident, as I am sure you are, that we will strategize innovative ways ask good questions and be revolutionary in our approaches. And in the process continue to stand guard. As advocates, practitioner, researchers, survivors, and funders we have *stood guard* on issues related to domestic violence for more than fifty years. The anti-trafficking movement has lessons to learn from this committed group of individuals and advocates.

*I hope that our collective efforts might result in a day when we only have a historical remembrance of Domestic Violence and Human Trafficking awareness months.*

*Noël Busch-Armendariz is the Associate Dean for Research in the School of Social Work, Full Professor, and Director for the Institute on Domestic Violence & Sexual Assault at the University of Texas at Austin. She can be reached at nbusch@austin.utexas.edu.*

# A Voice From A Student

## By Melinda A. Lemke



As a former high school social studies teacher and fourth-year PhD student in Educational Policy and Planning, I understand that educational practitioners, leaders, and researchers must be literate about policy processes and concomitant institutional power dynamics. Overall, my life's work has been dedicated to social justice. However, in a non-union state, this goal can be complicated, at best – and at worst, it is constantly under fire.

As a member of the Women's and Gender Studies (WGS) Portfolio Program, I have the privilege to un-complicate this goal. Whenever possible I introduce feminist and queer legal theoretical discussions to mainstream educational policy discourses that do not fully embrace these paradigms. I volunteer with groups specializing in sexual violence like the School of Social Work's Institute on Domestic Violence & Sexual Assault (IDVSA). I also collaborate with peers on social justice-themed research and projects. Reaffirming my life-long commitment to a world free from sexual violence, economic exploitation, and marginalization, these experiences demonstrate that there is no limit to what energetic, motivated, and social-justice minded individuals can do.

Yet, existential academic experiences are only meaningful in a real world sense, if they transcend the Academy to reach those in marginalized spaces. I therefore try to direct all of my educational policy and gender studies research towards bridging internal and interdisciplinary divides between theory and practice. As a small step towards this kind of academic activism, I recently participated on the panel, *Sexual Violence and Marginality*, presented at UT's 20th Annual WGS Conference, *The Feeling Body—Feeling the Body*. Our panel explored individual and institutional sexual violence, as well as the implications of that violence on particular bodies. This panel brought together the scholarship of five UT Austin graduate students including: Letisha Brown (PhD, Sociology), Caity Collins (PhD, Sociology), Emily Freeman (MFA in Drama and Theatre), Pamela Neumann (Moderator; PhD, Sociology), and myself.

Our panel was unique because each of took Sociology of Sexual Violence, a course taught by Dr. Gloria González-López, Associate Professor in the Department of Sociology. Our research and panel grew out of a uniquely collective feminist experience that took place during the course. Speaking to this Caity Collins stated, "It was both a tribute to the feminist space Gloria created for us and an opportunity to dialogue about a topic that receives little attention in academic circles."

Although we explored disparate topics, each of us relied on a feminist and/or queer theoretical approach to illuminate intersections across our research and suggestions for future scholarship. Our individual presentations covered divergent local, state, national, and international issues, which simultaneously were interrelated because of the indiscriminate nature of sexual violence within all political economies. My research for example, covered international, U.S., and Texas commercial sexual exploitation of youth (CSEY) policy, as well as relevant discourses, support structures, and (dis)connections with public education. Although the other presentation topics included conservative presidential election discourses on rape and abortion (Collins), LGBTQ narratives within elementary school (Freeman), and Black female body image and eating disorders (Brown), collectively we addressed the significance of historical context, competing ideologies, hyper-marginalization, and the need for divergent policy tools to address sexual violence. Despite shifts in social consciousness and policy aimed at eliminating sexual violence, CSEY and related policy remain sites of struggle, resistance, and as I found with public education, nonexistence.

Also integral to our research is the activist stance we each take towards building community dialogue that addresses the multiple and often hidden ways institutions and policy perpetuate sexual violence. Commenting on this Emily Freeman said, "In an academic environment that celebrates objectivity, studying violence and marginality requires an intentional engagement in emotional subjectivity." The dynamic conversation that occurred with the audience at the conclusion of our panel is one of many steps needed to build humanistic spaces that empower and liberate rather than violate and marginalize. We invite the reader to join this conversation. For more information about our research and/or building this kind of space please feel free to contact me at, lemke79@hotmail.com.

Contributed by: Melinda A. Lemke, Educational Policy and Planning PhD student and Institute on Domestic Violence & Sexual Assault, Center for Social Work Research Fellow

VOLUME 8, ISSUE I                                                                                    PAGE 6



# A Voice From the Field

## By Sue Snyder

Working in programs specializing in interpersonal violence brings us face to face with the pervasive impact of trauma and the resulting symptoms we who do this work know all too well.  Our clients who have experienced sexual assault or domestic violence have, obviously, undergone most grievous boundary violations.  This might be the everyday wear and tear of domestic violence, or the "take it for granted my body is not my own phenomena" of childhood sexual abuse, or the sudden shock of rape by a stranger, while doing something that should be perfectly safe.   Each category of violence has its own trauma footprint.  Working with survivors, we do what we can to assist them in rebuilding, restoring and renegotiating life. Doing so requires hard work.  We study, read the research, go to conferences, devour new books and then practice to hone our skills.  Mostly we 'just' be with those who have been violated.

There's a constant search to find ways to do it better. While searching, I came across the approach, Somatic Experiencing, when a friendly therapist I trusted recommended Dr. Peter Levine's book, *Waking the Tiger*.  I quickly recognized Somatic Experiencing (SE) would fit congruently with the Feminist Relational foundation of my work.  It empowers by teaching self-regulation of the nervous system, resulting in a greater sense of personal power and efficiency.   My increasing understanding how the nervous system works provided by SE training helped explain the whys of phenomena I'd seen for years.  "Ahhh, yes!" I kept saying to myself during the training. I began to understand that using SE could help facilitate a person's healthy nervous system (which had lost its natural ability to self-regulate due to trauma) to come back into a natural pattern of regulation. This may lead to deep shifts in habitual responses, rather than the continual looping of previous behaviors and patterns. Clients are grateful for the psycho-educational approach which helps with understanding behaviors they'd previously found confusing.  What a relief for people who had previously experienced flooded emotional experience, numbed absent reactions, or going alternatively between flooding and numbing.

Clients learn ways to work with flooded emotional responses, by very slowly tapping into emotionally charged material, only a little bit at a time, so as not to cause even more overwhelm to the nervous system.  It can be a difficult intervention for people accustomed to charging ahead to help them to slow down.  And so important to learn, paradoxically, that actually there is more progress to be had by taking it in slow, small increments.  Perhaps even more significantly, and often with even greater difficulty, it is possible for people who had stayed in a numbed states for years to begin to regain access to their own physical sensations. Again, this is facilitated by just gently tapping into the world of physical sensation, slowly and gently, so as not overwhelm a tender person who has been deeply hurt by another.  For example, it would be common for a client to tell me she didn't feel her body at all.  Of course, numbing out is honored as a coping mechanism when that is the best available.  However, going beyond our first step in naming this reaction as a normal reaction to an abnormal situation leaves us with the on-going need for the person to be able to come into feeling all their bodily sensations in real and present time.  This can be particularly important in working with clients for whom there are on-going safety concerns.  Neither numbed out nor hyper vigilant are the optimum positions from which we assess risk.  Using SE, people who cannot feel their bodily sensation relearn how to do so, giving fuller access to what they are seeing, hearing, feeling, knowing, sensing, deep in their bones and restoring the innate ability we all have to overcome the effects of trauma.  SE can facilitate a gentle, safe path for people to regain a felt sense of their natural state of being.

*Sue Snyder Pederson,  MS MSSW, LCSW, Somatic Experiencing Practitioner, is delighted and honored to have worked for thirty years in the field of domestic violence/sexual assault, currently in private practice providing counseling and clinical supervision and assisting in the SE training program in various locations in the US and Australia.  She is a graduate of the MSSW program at UT, recipient of the 2000 Field Instructor of the Year Award from SSW UT Austin and is adjunct faculty for the School.*

# Affiliate Profile



## Jennifer Hammat Brings Life Experience To The Job

### By Karen Kalergis and Sarah M. Melecki

It might be said that Jennifer Hammat was destined to work on a college campus. Seated behind her desk at The University of Texas at Austin in the Office of the Vice-President for Student Affairs, she points to a picture of herself as a two-year-old in a play pen.

"I was born into a frat house, and was raised the first two years of my life by a bunch of fraternity boys," she said. "My dad was the house dad for his fraternity, and my mom was working on her master's degree in counseling. I'm third generation campus student affairs. I have always been on college campuses, so I feel comfortable in this world."

That comfort combined with a keen eye makes her quick to identify what needs changing. "My freshman year at college, I was a student ambassador and did all the campus tours. I felt that some of the information being given was wrong," said Hammat. "I was a student journalist, so I did some interviews, and then went to the tour person and said we had some parts of our tour information that are wrong. When the program director asked if I wanted to update the information, I said, 'I'd love to!' "

Today, Hammat is the Assistant Vice President for Student Affairs at The University of Texas at Austin where she's worked for six years. Though her portfolio has changed over the years, the one thing that has been a constant is that she is responsible for the annual campus security report required under the Clery Act.

Hammat said the Clery Act got the conversation started about addressing sexual assault on campus. "This position originally started out as risk management and has evolved heavily into policy and compliance," said Hammat.

The main purpose of the Clery Act was for college campus security authorities to provide information for timely warnings as well as crime statistics. The re-authorization of the Clery Act, and the re-authorization of the Violence Against Women Act or VAWA, add more provisions related to sexual assault that are part of Hammat's responsibilities as the university's Title IX coordinator. "I think it's important that we make our campuses safer, and that we are communicating and being transparent about the safety of our campuses and our facilities," Hammat said. But what I want students to know is that if something happens, they can find us and we are here to help."

Hammat said that the majority of reports about sexual assault come from students, and she focuses on making sure those students get the services they need. "Most students find their way to the student emergency office because they are having life adjustment issues and can't get to class," Hammat explained. "Every advisor on campus knows to tell students that if you can't go to class because something happened to you, call the dean of students."

Hammat said that when her office receives a call, she contacts the student emergency services office, a program she credits with taking a victim-centered approach. "I feel so badly for places that don't have student emergency services like ours," said Hammat. "They are the one stop shop where we can say, 'Here are all the resources available to you.' That includes community resources if you're not comfortable being on campus."

Hammat said the Counseling and Mental Health Center on campus also has a fund to help students with immediate expenses, as well as provide referrals for crime victims' compensation.

When Hammat learns about gaps in services, she attacks them with the same zeal with which she revamped that campus tour information many years ago.

A telling example is when Hammat found out what is involved in a forensic exam, one of the major ways evidence for a possible prosecution of a sexual assault is gathered.  "I sat through one of the trainings our Voices Against Violence group did for University Health Services last year," she recalled. "I learned what having a rape kit done really entails, the length of time it takes, and the fact that there's only one place where that exam can be done."

Hammat thought of the number of times she told survivors that if they wanted to press charges, they'd have to have a rape kit done.  "Now when I refer a student to have a SANE exam done, I am more clear and deliberate in how I describe the process to them," she said. "And I'm asking our campus resource folks a bunch of questions about what do we need to do to have our own certified nurse to do these exams, so we can reduce the stress on survivors."  questions about what do we need to do to have our own certified nurse to do these exams, so we can reduce the stress on survivors."

Another experience that informs Hammat's work is that she is a survivor of a sexual assault that happened on a college campus.  She did not tell anyone about her assault until she learned that another woman had been sexually assaulted under circumstances similar to hers. She realized the only way she could reach out to her was through one of her sorority's educational programs.  "They opened the meeting saying, 'Jenny has an announcement,' " she recalled. "I said actually it's our educational program for the night. I told them that I had been sexually assaulted and if it could happen to me then it could happen to anyone."

"I'm a women of decent stature, pretty outspoken, I took on anyone anytime, and so part of what I was saying was that even loud extroverted personalities can be in situations that they didn't anticipate.

"It was very powerful when I said that I know there are other people in the room that this has happened to. I said I have people here that if you think this has happened to you, a friend, a sister, and you need someone to talk to, these counselors are here for you."

(Continued on page  7)

# Background on the Clery Act

The _Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act_ **(20 USC § 1092(f))** is the landmark federal law, originally known as the Campus Security Act, that requires colleges and universities across the United States to disclose information about crime on and around their campuses. It was named after nineteen-year-old Jeanne Clery who was raped and murdered in her dorm room at Lehigh University in 1986. Her parents, Connie and Howard Clery, learned after her death that there had been a number of sexual assaults on the campus. Alarmed by the lack of information provided students and families about the rapid increase of violent and non-violent incidents on campuses, the Clerys realized that while crimes were being reported to campus authorities, administrators often failed to provide adequate warnings about those incidents. In 1987, the Clerys formed Security On Campus, Inc., a nonprofit 501 (c)(3) organization dedicated to safe campus communities nation-wide, and took their fight to Capitol Hill. In 1990, Congress approved the Crime Awareness and Campus Security Act.

The Act took effect in 1991, and was renamed in 2008 in Jeanne's memory. It requires colleges and universities to disclose their security policies, keep a public crime log, publish an annual crime report and provide timely warnings to students and campus employees about a crime posing an immediate or ongoing threat to students and campus employees. The law is tied to an institution's participation in federal student financial aid programs and it applies to most institutions of higher education both public and private. The Act is enforced by the United States Department of Education. A new set of amendments including updated emergency response and warning procedures, and hate crime standards were added in 2008.

# Affiliate Profile

Hammat said the room went into what is called "chapter silence" where everyone closes their eyes and bows their head, and people who need to can leave the room. A number of young women talked to counselors that night, and that was the outcome Hammat wanted.  "A lot of people came to talk to me, too, and I told them I should have said this sooner," she recalled. "My guilt was if I had talked about this when it happened than theoretically I could have helped someone else before it happened to someone else three months later."  But her speaking out led to a new effort on campus, a sorority version of the Marine motto, "No man left behind."

"We immediately started a pledge patrol group where my pledge sisters agreed we wouldn't leave a party until we had gone into every room, kicked down doors, got all our girls out," she said. "That was the only way we knew how to ensure to best of our ability that everybody left together and were safe."

That effort led to other conversations including ones with fraternities where Hammat saw the impact of hearing a survivor speak out. "When I spoke at fraternities, you could feel the visceral reaction of nerves in the room. They wanted to know who it was."

Though Hammat would not name her assailant, she had a message for those who wanted to do something.  "I told them, I'm not saying that this has ever happened in this frat house, but I need you to be this angry and this protective of every female that walks in this house because you never know."

That message about watching out for each other is one she carries into her work today.  "Let's say that someone notices that the roommate is not eating, not sleeping. She's crying at night," said Hammat. "That is not going to lead the student to think that their roommate has been sexually assaulted, but we want them to notice that the roommate is in trouble. And let's make sure they understand the services we have on campus through the dean of students' office."

Providing a nurturing environment for students and giving them the time they need is important.  "The majority of students who do come forward and talk about what happened to them do not have a vendetta against the person who assaulted them," she said. "What the vast majority wants is an adult to tell whoever did it that what they did was wrong and they shouldn't ever do it again."

For Hammat, the major change she sees from her college days to today is the need to increase awareness about the nature of sexual assault and the part everyone plays in preventing it.

Hammat's own experience certainly shows the power of having survivors' voices be part of our effort to end sexual violence on campus. But she said it's not just survivors' voices that need to be heard.  "If you see behavior that is troubling to you, what is your responsibility to act?" she asks. "If you're made aware of something, tell someone. We work with students here, someone always knows, a best friend, a roommate, maybe it's the really close guy friend from home.

"I love the work we are doing at UT Austin related to 'Get Sexy, Get Consent,'" Hammat said, referring to a prevention program being conducted by Voices Against Violence.  "Being able to talk about what it means to get consent helps us better understand that the very nature of sexual assault is that there was no consent."

Hammat is encouraged by what she sees.

"I continue to be amazed by the pockets here that are working for good. We have so many places here where we can support students," said Hammat. "There are so many places, the counseling center, Voices Against Violence, everyone has a little drum."

Hammat recognizes that "beating the drum" means more instances of sexual assault may be reported. And that's an outcome she thinks is important to look at.  "This is one of those areas where we have to be very clear about managing expectations," she explained. "The crime of sexual assault is always underreported, so any numbers we have are really the tip of the iceberg. Part of the messaging piece for me is to shift the culture, so that students can come forward, and be supported."

Hammat understands that creating a culture for students to come forward may result in an increase in reports, but she sees it as a two-part process that can also reduce the incidence of sexual assault.

"If you create a culture where that type of behavior is not tolerated then it will have an impact of reducing the number of incidences long term, but you're not going to see that for at least a decade," she said. "In the meantime, we will have more reports because we've changed the culture to where survivors can come forward."

Hammat points to a new Texas law that allows survivors of sexual assault to have a rape kit done in the immediate aftermath of an assault, but wait up to two years to decide whether to report the incident to law enforcement. She is working with the Voices Against Violence group on a toolkit for survivors that outlines resources and options for them.

Hammat said that from her experience the ones who do go through the process more often than not are the ones that have had some distance away from the event. Her main goal has been achieved though.

"At least by getting the survivor in the door, we can make resources available to help their healing," she said. "And that's how we want students to look at this program – it's a starting point to healing."

*Karen Kalergis, MEd is the previous Associate Director for Education and Communications for the Institute on Domestic Violence & Sexual Assault; Karen.Kalergis@gmail.com. Sarah Melecki is a graduate student at the LBJ School of Public Affairs at The University of Texas at Austin; sarahmalecki@gmail.com.*

# Resources

Jennifer Hammat, Ed.D.
Assistant Vice President for Student Affairs – University of Texas at Austin
Website: www.utexas.edu/student-affairs/policies/title-ix
Phone: (512) 471-1133
The University of Texas at Austin's Title IX Coordinator oversees and investigates violations of Title IX, including instances of sexual harassment, sexual assault and sexual violence. .

UT Counseling and Mental Health Center
Website: www.cmhc.utexas.edu
Phone: (512) 471-3515
The Counseling and Mental Health Center offers a variety of services to students at the University of Texas at Austin, including individual and group counseling, workshops and outreach, and Voices Against Violence.

Voices Against Violence (VAV)
Website: http://www.cmhc.utexas.edu/vav.html
Voices Against Violence is an initiative of the UT Austin Counseling and Mental Health Center. The group offers peer educators, theatre for dialogue, printed materials, and workshops on the UT Austin campus.

The Clery Center for Security on Campus
Website: www.clerycenter.org
Phone: (484) 580-8754
The Clery Center is a nationwide nonprofit dedicated to preventing violence, substance abuse, and other crimes on college campuses. The Clery Center provides advocacy, education and training, and public policy support.

Texas Association Against Sexual Assault (TAASA)
Website: http://www.taasa.org/
Phone: (512) 474-7190
TAASA is a statewide coalition of organizations working to end sexual assault in Texas. TAASA offers resources, trainings, and public policy advocacy. It is a proponent of a statewide Task Force on Campus Sexual Assault.

Know Your IX
Website: http://knowyourix.org/
Know Your IX is a nonprofit that was recently started by students from universities across the nation who want to empower other students to know their rights under Title IX and the Clery Act. Title IX and the Clery Act both have provisions about how university administrations must react when sexual violence occurs on campus and ways that universities must act to prevent sexual violence from occurring on campus.

# IDVSA Project Updates

## SAK Project

### By Sapana Donde

*Strategic Approaches to Sexual Assault Kit Evidence (SAK)* is an action-research project funded by the National Institute of Justice that seeks to (a) understand the underlying factors that contribute to the high number of sexual assault kits that have not been requested for forensic analysis and (b) to identify a sustainable, model strategy for handling sexual assault kits and making the most effective use of testing results.

The NIJ grant was awarded to two jurisdictions: Detroit and Houston.

IDVSA is a member of the SAK working group in Houston which includes the Houston Police Department (HPD) adult and juvenile sex crimes investigative units, the Forensic Biology section of the HPD crime laboratory division, the Harris County District Attorney's Office, The Houston Area Women's Center, Sam Houston State University, Memorial Hermann Hospital, and Harris County Hospital District.

The IDVSA Project Team includes Principal Investigator Noël Busch-Armendariz and current Project Director Caitlin Sulley. IDVSA has been working on two key components of this project.

(1) IDVSA has been developing a sensitive and thoughtful victim notification protocol for cases that have been reopened as a result of testing of sexual assault kits that have yielded DNA evidence to advance the case through the criminal justice system. To identify the needs of victims as well as the appropriate and viable mechanisms for victim notification, IDVSA has completed individual and focus group interviews with 42 victims and 27 victim advocates and sexual assault nurse examiners (SANEs). IDVSA also interviewed victims about their experiences interfacing with professionals along the trajectory of the criminal justice system (e.g., SANEs, victim advocates, law enforcement, and prosecutors).

(2) The IDVSA research team held several meetings with Crime Lab personnel and the SANE program directors to help foster interdisciplinary dialogue regarding sexual assault kit process and procedures and to develop a survey tool designed to extract information from case files for data analysis. IDVSA conducted a review of a small sample of sexual assault kits to examine policies and procedures between SANEs and the Crime Lab. The purpose of this review is to improve systems of communication and operation related to sexual assault kit evidence collection. Data from 49 cases reviewed using the survey tool are currently being analyzed.

In the next phase of the project, IDVSA will be tracking the benefits and challenges of establishing a victim notification protocol using a victim advocate who will work alongside law enforcement on those "cold cases" that have been reopened as a result of sexual assault kit testing and are moving forward in the criminal justice system. Additionally, IDVSA and the SAK Working Group will be evaluating the impact of specialized sexual assault training for law enforcement.

*Written by Sapana Donde, PhD, Dean's Post Doctoral Fellow in Neuroscience and Mental Health at The University of Texas at Austin School of Social Work. Dr. Donde received her PhD in Clinical Psychology, with a concentration in Clinical Child Psychology from George Washington University in Washington, D.C. Her research and clinical interests include the neurobiology of trauma, trauma-informed mental health practice, and child welfare.*

USCA4 Appeal: 20-1509    Doc: 23    Filed: 08/12/2020    Pg: 355 of 425

**A336**

# IDVSA Project Updates

## Law Enforcement Toolkit Now Available

### By Laurie Cook Heffron, MSSW

In a webinar hosted by the Texas Association Against Sexual Assault, IDVSA introduced a new resource to the field: a law enforcement toolkit for use in sexual assault cases. Funded by a grant from the Criminal Justice Division of the Office of the Governor of Texas, the purpose of the toolkit is to improve law enforcement response to sexual assault victims and better engage survivors in the criminal justice system.



Laurie Cook Heffron and Noël Busch-Armendariz introduce Toolkit during TAASA webinar

In a sexual assault needs assessment study done in 2011, IDVSA found that one of the main reasons most perpetrators of sexual assault are not held accountable for their crime is because victims are reluctant to engage fully in the criminal justice system. In large part, victim hesitancy has to do with the complexity of this crime in their lives and the need for law enforcement to refine their skills in victim-centered approaches.

The toolkit is based on the idea that by making pivotal changes in their interactions with victims, law enforcement can better engage survivors of sexual assault and increase their motivation to participate in the criminal justice process. These changes can have a reverberating impact on a victim's post-assault experience.

The Law Enforcement Toolkit was developed in partnership with law enforcement professionals in Texas and other states.

Tools designed specifically for law enforcement include an assessment for the agency to start the process by looking at current practices in sexual assault cases. Strategies for taking action and an extensive catalog of resources such as training videos and publications round out the toolkit.

The toolkit is available for downloading on the ***IDVSA web site***



*Laurie Cook Heffron, MSSW, is a doctoral student in the School of Social Work at the University of Texas at Austin. As Associate Director for Research at the Institute on Domestic Violence & Sexual Assault, she has served as project director on numerous studies involving human trafficking, sexual assault, domestic violence, and refugee services.*

# IDVSA Project Updates

## Health Clinic for Human Trafficking Survivors

**By Sherrie Margiotta, RN**

The University of Texas Southwestern OB/GYN Residency Program, Refugee Services of Texas and the University of Texas School of Social Work has organized a multi-disciplinary evening clinic to evaluate and address the unique medical and social needs of human trafficking survivors and their family members. In collaboration with Seton Healthcare, the clinic will be located in a Community Care clinic in an area of Austin where many survivors live. To our knowledge, no other clinic like this exists in the U.S. or globally. Our goal is to create a model, evidence-based clinic that is tailored to meet human trafficking survivor's needs in a way that is empowering, dignified, and yields positive total health outcomes. Most importantly, we are committed to meeting the needs expressed by our local survivor population in Austin.

Melinda McNiel, MD, from the University of Texas Southwestern OB/GYN Residency Program will be one of the physicians providing medical services for the patients. Her involvement began while she was working at an OB/GYN office and was discussing her interest in working with victimized women with one of the physicians.

"I wanted to address patients' comprehensive health situations--including emotional, mental, and physical needs," said McNiel. She was told that Texas has a problem with human trafficking and that one of the nuns who works with Seton Healthcare has been interested in supporting a project that would reach out to this population.

After researching the issue of human trafficking survivors, McNiel realized just how important it is for medical providers to be aware of this issue and to find a way to provide for these patients in a sensitive and comprehensive manner.

"My faculty mentor, Dr. Ted Held, is very interested in social medicine," recalled McNiel. "He whole-heartedly supported my interest in working with this patient population and creating a different kind of clinic that would work better to serve their many significant needs. He helped me network within the community and, through his work with UT, we met people in the School of Social Work that would partner with us to create an interdisciplinary, holistic clinic."

Held has been instrumental in operationalizing the many moving parts of the clinic. He is working closely with Noël Busch-Armendariz, Director and Principal Investigator of IDVSA, to develop research to improve our understanding of the needs of survivors. Although there has been increased awareness and attention to the crime of human trafficking, much less is understood specifically about how to meet the medical and social needs of the victims.

Research indicates that trafficking victims are subjected to severe physical and psychological trauma, and while their needs are incredibly complex (Williamson et al., 2010) they often do not engage with conventional medical and social structures long term (Oram et al., 2012) for a variety of reasons. Headaches, chronic pain, gynecological problems, lack of prenatal care, gastrointestinal problems, dental problems, poor nutrition, memory loss (Oram et al., 2012; Williamson et al., 2010), post-traumatic stress disorder, depression, anxiety, and substance abuse are all cited as consequences of victimization (Clawson et al., 2008; Williamson et al., 2010).

As it exists now in Central Texas, healthcare for survivors of human trafficking is offered either in acute care settings or through fragmented visits with providers who are rarely trained in addressing the needs of this high-risk patient population.

The clinic will provide a medical home where survivors and their families can receive medical, psychological and social services. These services will include medical exams, mental health assessments and referrals, dental services, group therapy, life skills training, nutrition and cooking classes, relaxation techniques, and therapeutic childcare services. An important goal of the clinic is continuous, long-term assessment of the survivor's needs to ensure continued holistic care.

Coordination of services provided by the clinic will be the responsibility of the clinic coordinator, Refugee Services of Texas. RST's Case Manager Veronica Conde, MSSW, will act as the point of contact for all appointments and serve as a liaison between patients and service providers. Eligibility for services will be determined by Refugee Services of Texas.

The clinic plans to open its doors this spring. Initially, the clinic will be open twice a month in the evenings. For more information, please contact Veronica Conde at (512)472-9472.

*Sherrie Margiotta, RN, is a graduate student in the School of Nursing at The University of Texas at Austin. Specializing in Public Health Nursing, she selected IDVSA as the organization she wanted to work with as part of her program development project in public health. With Noël Busch-Armendariz as her preceptor, Ms. Margiotta is part of the working committee for the clinic and is assisting in conducting needs assessments and contributing to program development of medical and social services.*

## IDVSA Staff Notes

**Noël Busch-Armendariz** has been named Associate Dean for Research in the Center for Social Work Research in the School of Social Work. She was also promoted to full professor. Noel remains involved as principal investigator in the research projects outlined in this issue, notably the NIJ sexual assault kit project and new human trafficking crime. Noel and Melissa Hamilton have taken the expert witness training on the road, presenting at conferences sponsored by previous attendees Kamisha Dumas in Collin County and Jackie Borcherding Williamson County.

**Laurie Cook Heffron** is moving into her third year in the School of Social Work's doctoral program, slowly inching closer to launching her dissertation research related to the role violence against women plays in migration from Central America to the United States. Laurie is teaching an undergraduate course, Foundations of Social Justice. Laurie continues to be actively involved in IDVSA' research fellows program related to human trafficking in addition to the local and statewide responses to human trafficking. Together with the IDVSA team and collaborators across the country, Laurie has just finished developing the Law Enforcement Toolkit related to non-stranger sexual assault cases. She is part of the team working on a new multi-site project exploring the experiences of Congolese refugee women resettled to the United States.

The American Journal of Nursing has accepted for publication an article titled, "Time to Decide: Initial Verdict of a Non-Report Sexual Assault Examination Policy," authored by Laurie, Noël B. Busch-Armendariz, Shetal Vohra-Gupta, Regina Jones Johnson, and TAASA's Victoria Camp.

**Karen Kalergis** has been presenting on the Resiliency Project with partners from this effort to develop an organizational resiliency model for child abuse professionals. Deedra Baker from Texas CASA and Shamele Hill from Voices of St Louis joined Karen at the National CASA conference in Anaheim, California. OVC Program Manager Bethany Case co-presented at the National Children's Alliance conference held in Washington, DC. Karen also presented on Resiliency in Social Justice Work at TAASA and with Keep Austin Housed. She also completed work on the fifth national expert witness training where a grant from OVW provided scholarships for 43 attendees from around the country.

**Annell Neale** also had a big part putting together the national expert witness training in May. Her talents with the web site increase IDVSA's online presence. She is also creating a database of IDVSA contacts that will allow us to send targeted messages by interest, such as human trafficking, domestic violence, etc

**Caitlin Sulley** proudly graduated from UT's School of Social Work with an MSSW degree in August. Her final class was Dr. Arlene Montgomery's Neurobiology & Social Work Practice, which helped to improve her understanding of the impact of trauma on the brain for victims of interpersonal violence. Caitlin then transitioned from Graduate Research Assistant at IDVSA to Research Project Director. She is currently working on the Houston-based project, "Strategic Approaches to Sexual Assault Kit Evidence: Action Research." Caitlin brings both her research experience and field experience as a Victim Services Counselor to the position. She is excited to remain a member of the IDVSA team.

**Karin Wachter** is starting her second year as a doctoral student in the School of Social Work at UT and is enjoying her work at IDVSA. Karin supports the Affilia: Journal of Women and Social Work and helps to lead a study on the experiences of Congolese refugee women resettled to the United States in partnership with the United Nations High Commissioner for Refugees (UNHCR) and a number of resettlement agencies.

# New Resources

## Domestic Violence Clinic's Parole Project Secures the Release of Survivor in Prison

**By Jeana Lungwitz, Clinical Professor and Domestic Violence Clinic Director**

The Domestic Violence Clinic at the University of Texas School of Law allows law students to apply what they've spent learning in the classroom to the courtroom, while being supervised by a licensed attorney. The Clinic represents survivors who cannot afford private attorneys. Since opening its doors in the fall of 1997, the Clinic has focused on representing survivors of domestic violence in civil cases – protective orders, divorce, custody, personal injury suits, etc. In the fall of 2010, however, the Clinic broadened its advocacy to include the preparation of parole packets for incarcerated survivors of domestic abuse imprisoned for a crime related to the abuse they suffered. This effort became known as the Parole Project.

The Parole Project was made possible by a fellowship funded by Debevoise & Plimpton, LLP, an international law firm with a home office in New York. Kaitlin Farrell, who graduated from UT Law School in May of 2010 and had participated as a student attorney in the Clinic, was interested in continuing her advocacy on behalf of survivors after law school. The law firm gave her the option of either beginning her job with the firm after graduation, or deferring her start date for one year for the purpose of practicing in the area of the public interest while being paid by the firm. She chose to defer her work with the firm for one year and participate in public interest lawyering by continuing her work in the Domestic Violence Clinic.

Kaitlin began the Parole Project by researching issues surrounding the incarceration of survivors of domestic abuse – particularly victims who have killed their perpetrators. One of the goals of this project was to assure its continuation after the fellowship ended. With this goal in mind, Kaitlin memorialized what she learned by writing a paper that detailed the issues surrounding incarcerated survivors of domestic violence and providing a step-by-step guide on how to prepare a parole packet and advocate with the Texas Board of Pardons and Parole on behalf of survivors.

The Clinic partnered with the Texas Civil Rights Project to identify inmates who were survivors of interpersonal violence. Student attorneys were then assigned to survivor inmates whose crimes were related to their abuse. Student attorneys went to the prisons and interviewed inmates. After returning from the prison student attorneys began preparing parole packets. Only a handful of inmates have completed the parole process since the project began.

In 2012, the Clinic celebrated the first Parole Project victory by securing the release of Maria (not her real name), a non-English speaking woman convicted of a felony committed by her English-speaking abusive partner who blamed her for the crime. Until she was in front of a judge pleading guilty for the offense, Maria was not provided an interpreter – not even for consultation with her attorney who did not speak her native language. With the help of student attorney Hannah Liddell, Maria was paroled and has returned home to be with her children and other extended family members.

The fellowship ended in 2011, but the Parole Project is alive and well. Each semester every student attorney in the Clinic is assigned one parole case. The project has become so popular among inmates that the Clinic has been swamped with letters requesting help. Due to this overwhelming need the University of Texas School of Law is initiating a pro bono project in the fall of 2013 so that law students who are not enrolled in the Clinic can assist in preparing parole packets after qualified inmates are interviewed by student attorneys of the Clinic.

Who knows where this will lead - to law students graduating to go to work on behalf of incarcerated survivors, or advocating on behalf of those charged with crimes, or creating safe and healthy transitions from prison to the free world? Although there is still plenty of work to do, the Parole Project is a step in the right direction. Survivors who have been victimized twice – once by their abusive partners and then again by the criminal justice system that should protect them – receive the advocacy and support of energetic, smart and motivated law students.

*Jeana Lungwitz, JD, is a Clinical Professor at the University of Texas School of Law and Director and Co-Founder of the Domestic Violence Clinic. She was appointed by the Texas Supreme Court to the Supreme Court Protective Order Taskforce on September 9, 2003. A graduate of the Texas Tech School of Law, Professor Lungwitz is the former Legal Services Director for the Women's Advocacy Project, Inc., a non-profit legal corporation now known as the Texas Advocacy Project.*

# Resiliency Project

(continued from Page 1)

End users from CASA programs, children advocacy centers and child welfare agencies were engaged in the development of the organizational resiliency model itself, and the Gecko Guide, a handbook of activities and lessons learned from the pilot.

"We had end users involved in developing all of the products from A-Z," said Karen Kalergis, Project Director, and Associate Director for Education and Communications at IDVSA.

"We called them resiliency coaches because it was going to be their job to come to the training, learn what the model is, learn how to implement it, and then go back into their agency and be resiliency coaches," said Kalergis.

Kalergis said IDVSA has always worked to bring research to practitioners, and each of the strategies offered were based in either research or practice wisdom.

"The resiliency coaches tried out our research-based strategies, and then they also took what they learned about our program model of the five core elements, and invented some of their own," said Kalergis. "All of the material we provided OVC comes from people who are in the trenches, and now the efforts and experiences of those end users is available for other child abuse professionals in the blended learning curriculum."

The pilot sites implemented the model for eight months, beginning in September 2010. Findings show that 80% found training and technical assistance useful, 95% believe it is highly likely program will continue, and said turnover would have been greater without the efforts from the pilot program.

"The gap that once existed has been filled – there is now a set of tools that organizations can use to match their interest in helping workers," said Laurie Cook Heffron, who oversaw the pre- and post-tests of participant knowledge as IDVSA's Associate Director of Research. "The knowledge base has been greatly advanced by the work done in this project as all products presented to the field for evaluation were highly evidence-informed."

Cook Heffron said IDVSA's two-way process translated knowledge from the research into strategies that practice expertise indicated would be useful to the field. Knowledge gained from practitioners informed the theory that was being tested in the process of creating an evidence-based program.

## Organizational Resiliency Model



IDVSA conducted a nationwide survey and extensive literature review to understand the current state of research and best practices on resiliency. The Project Team then designed the organizational resiliency model around the five core elements of resiliency laid out in a strength-based curriculum developed for the National Victim Assistance Academy (NVAA). The five core elements are based on research that indicated people who are resilient had strengths in these areas: Self-knowledge and Insight, Sense of Hope, Healthy Coping, Strong relationships, and Personal Perspective and Meaning.  The NVAA curriculum offered strategies for *individuals* to use to build resilience in the five core elements. The Resiliency Project model offers strategies *organizations* can use to build resiliency in others through policy, supervisory techniques, and competency-based training.

# RESILIENCY PROJECT



IDVSA reached out to its national partners, the National Children's Alliance and National CASA to select the 12 pilot sites. Six of the sites were children's advocacy centers, four were CASA programs, one had both a CAC and CASA program, and one was a state child protective services agency. The pilot sites represented rural, suburban and highly urban areas including the nation's capital. Two people from each pilot site were designated as "resiliency coaches," recognizing that resiliency champions often work in isolation, and a team approach could support their efforts as change agents. The 24 resiliency coaches have a collective 374 years in children's services, the pilot sites together served more than 16,000 children under the age of 17 who had experienced or witnessed violence.

# Resiliency Project

## Sources of Evidence and Expert Judgment That Support Strategies for Self-Knowledge and Insight

| Strategy | Component | Reference | Implementation Type | Summary |
|---|---|---|---|---|
| Recruitment strategies target fitness for the job | Self-Esteem | Bednar, S. G. (2003). Elements of satisfying organizational climates in child welfare agencies. *Families in Society-the Journal of Contemporary Human Services, 84* (1), 7-12. | Supervisory Technique | Workers most likely to remain in their position despite burnout were those who came to the work with a sense of personal and professional mission, were either well-matched to their position, or had flexibility to move to a more suitable position, and enjoyed supportive relationships with supervisors who relate to them in a consultative manner. |
| Identify strengths and challenges; do resiliency snapshot | Self-Esteem | Farrington, E. L. (2009). Tips for cultivating resiliency in the workplace. *Women in Higher Education*, 18(12), 29-30. | Competency-Based Training | Visualization is a powerful means of reminding us of strengths we have, and allowing us to connect with that strength when we need it. |
| Identify themes associated with discomfort | Sense of Control | Maslach, C., & Leiter, M. P. (2005). Reversing burnout: How to rekindle your passion for your work. *Stanford Social Innovation Review*, 43-49. | Supervisory Technique & Competency-Based Training | Identifying burnout as an occupational hazard for many employees, authors recommend a two-fold strategy for healing burnout: an individual path and an organizational path. Both require individual action but may focus on self-care … |

Strategies that supported each of the five core elements were culled from both evidence-based and practice wisdom. IDVSA went across campus and across the country in its literature search, drawing on the work of several University of Texas researchers including Holly Bell, Shanti Kulkarni, Dnika Travis, and Kristen Neff. Strategies also drew on the work of Emmy Werner, considered the "mother of resiliency" and Martin Seligman, the father of positive psychology. Pilot sites were asked to spend 2-to-4 hours a month implementing strategies in their action plans.

# Resiliency Project



Why a gecko? IDVSA's research took us to western and eastern, traditional and spiritual sources for resiliency. We discovered that in the Mayan totem, the gecko is a symbol of intuition. The gecko recognizes when it may be in trouble and takes steps to address the danger, from camouflaging itself to re-growing a lost tail. The Resiliency Project encouraged organizations to be geckos and use their intuition and ability to change to protect their own well-being as well as that of their colleagues. The gecko became a symbol of the project, and the resiliency coaches were often referred to as geckos or gecko pilots.

In addition to the curriculum, one other product of the pilot is The Gecko Guide – a Handbook for Child Abuse Managers. This booklet captures the lessons learned from the 12 pilot sites as they implemented the organizational resiliency model. The design of the handbook reflects the philosophy of resiliency building, that it is indeed a journey. Before setting out to a new place where one has never been before, people generally talk to people who have been there to find out what they thought of the trip and their recommendations on what to see and do. The handbook is thus a guide book for those making the journey to an organizational resiliency program with each of the five core elements seen as stops along the way. Reflections from the resiliency coaches tell the story of their journey through the five core elements, the changes in themselves and their organizations, and what advice they have for "fellow travelers." Activities, policies, and resources related to the core element are included in each section.  The Gecko Guide can be found on IDVSA's web site.



OVC arranged for a number of videos to be produced to include in the blended learning curriculum. IDVSA coordinated with OVC TTAC and Video/Action Founder and President Robin Smith to interview the resiliency coaches and have them share their experiences in the videos. The first production took place in Washington, DC, where a number of resiliency coaches were attending the National CASA conference.

National CASA, the National Children's Alliance and resiliency coaches continue to be involved in the effort to bring the Resiliency Project to the field in the blended learning. IDVSA is honored to have partnered with them, OVC and OVC TTAC, on the Resiliency Project which will result in better services to children who have been abused.

To receive updates about the availability of "Building Resiliency in Child Abuse Organizations," email training@ovcttac.org to be added to the mailing list.

The Resiliency Project Team

- OVC – Bethany Case, Program Manager
- IDVSA—Noël Busch-Armendariz, Karen Kalergis, Laurie Cook Heffron
- Consultants—Barbara Jones, Janice Harris Lord, Kevin O'Brien, Vicki Packheiser, Dnika Travis
- End User Advisors—Deedra Baker, Tammy Snortum, Abyssinia Washington
- Resiliency Huddle—Frances Cox, Stephanie Frogge, Martha Ramos Duffer, Dnika Travis, Sapana Donde

# Transitions

**Karen Kalergis retired from IDVSA** effective August 31, 2013. Karen served as the Associate Director for Education and Communications for IDVSA for 6 years. Beginning with her work for Governor Ann Richards, she was employed by the State of Texas for 16 years. She has been a tireless advocate for victim rights and resiliency in individuals and organizations, among countless other critical social issues. Her creativity and wide range of skills, including strategic planning and communications, and her deep commitment to IDVSA will be sorely missed.

We are certainly sad to see Karen move on but we are also deeply happy for her. Karen will get to spend more time with her family and her house and continue to advocate for those whose voices may not be as strong.

Note: Just after Karen left we received an email from her announcing that she has been nominated for a National Crime Victim Services award in the category of Innovations.



*Karen Kalergis with Dean Luis Zayas, Noel Busch-Armendariz and Gene McCleskey at Going Away Gathering  August 26, 2013*

**IDVSA also bids farewell to Sapana Donde**, who has been a friend and colleague in many major projects for us. Sapana joined us as a volunteer and worked on the launch of the Resiliency Project. She then became Project Director on our evaluation of the 24-hour contact initiative, El Paso's innovative project designed to increase domestic violence prosecutions. Most recently she was project director for the NIJ Sexual Assault Kit project. Sapana is moving into a position that truly is a fit for her wisdom and enthusiasm, as participants at the expert witness training will tell you.

She was offered a position by the school of Social Work Dean Luis H. Zayas as the Dean's Post-Doctoral Fellow in Neuroscience and Mental Health. The purpose of the fellowship is to develop a content area of expertise in the areas of neuroscience and mental health, namely the neurobiology of trauma. As part of the fellowship, she will be working on several research projects with faculty mentors in the Department of Psychology and obtaining experience with neuroimaging methodologies and data analysis.

## GRADUATES

Amy Jones, Nicole Levy, Caitlin Sulley, and Leeann Terwilliger graduated with their MSSW this past Spring.

Congratulations and Good Luck!

# News From Our Partners

## Justice Department Honors TAASA

The Department of Justice recognized the Texas Association Against Sexual Assault (TAASA) for outstanding advocacy and innovative programming on behalf of sexual assault victims. Attorney General Eric Holder presented the program with an award during the National Crime Victims' Rights Week awards ceremony on Wednesday, April 24, 2013 in Washington, D.C.

"TAASA is one of our longest-running partners," said Noel Busch-Armendariz, Director of IDVSA. "We are so grateful for TAASA's mission and the dedication of and strategic thinking of its employees. This honor tells the country what we always knew – TAASA is the best!"

TAASA received the Ronald Wilson Reagan Public Policy Award for supporting legislation favorable to victims and advocates, which increased funding for sexual assault programs at both the federal and state levels. In 2007, TAASA successfully advocated to fund sexual assault services through a $5 customer fee at strip clubs that permit the sale or consumption of alcohol. The first $25 million raised over a two-year period was directed toward sexual assault services. In 2011, the Texas Supreme Court upheld the $5 fee and the U.S. Supreme Court declined to challenge the decision. TAASA's bold action in pushing this public policy laid the groundwork for other states and advanced Texas closer to the goal of a sustainable source of funding for rape crisis centers and support for sexual assault survivors in their recovery.

A full descriptive narrative and videos of the contributions of all recipients from this year's NCVRW are available at OVC's Gallery.

## JOYE FROST  NEW OVC DIRECTOR



President Obama appointed Joye E. Frost to Director of OVC.

Frost has served OVC since 1997, previously holding the titles of Principal Deputy Director,

Acting Director, and Program Specialist.

During her tenure at OVC, Frost—

- Launched the Vision 21: Transforming Victim Services initiative.
- Forged closer ties with State Victims of Crime Act administrators.
- Championed the integration of innovation with research in OVC's efforts to build capacity in the field.
- Fostered a groundbreaking partnership between OVC and the Department of Defense to strengthen support to military victims of sexual assault.
- Expanded OVC's work to assist victims in Indian Country.

IDVSA is appreciative of Frost's contributions to the field both at OVC and her many years  in victim assistance, healthcare and disability advocacy throughout the United States and Europe.

We also celebrate her great Texas roots! Frost began her career as a Child Protective Services caseworker in South Texas. She is a graduate of The University of Texas at Austin and Mary Hardin-Baylor.

# Mark Your Calendars

## OCTOBER IS DOMESTIC VIOLENCE AWARENESS MONTH

For more information see Noël's article "A Shared Vision" or go to: http://www.ncadv.org/takeaction/DomesticViolenceAwarenessMonth.php

**\*\*\***

## The Free Austin Summit

### Friday, October 19, 2013

Sponsored by ALLIES Against Slavery.

This is a one-day conference on how to use your unique sphere of influence to end slavery.

You can register at www.FreeAustin.org

**\*\*\***

## Policy Leadership in the Anti-Trafficking Movement: How Texas' New Laws Combat Slavery

### Friday, October 25, 2013

### 10:00 am to 11:30 am

**Sponsored by :** Institute on Domestic Violence & Sexual Assault, School of Social Work and the William Wayne Justice Center for Public Interest Law at the School of Law, The University of Texas at Austin and Allies Against Slavery/Free Austin

**Location:** Francis Auditorium in the School of Law, 727 E. Dean Keeton Street (TNH 2.114)

**Speakers:**    Office of the Attorney General of Texas
Senator Leticia Van de Putte, Texas Senate
Kirsta Melton, Assistant Criminal District Attorney, Bexar County

**For more information, go to: www.utexas.edu/ssw/cswr/institutes/idvsa/**



It is the vision of **IDVSA** that its multi-disciplinary, researcher-practitioner, collaborative approach will enhance the quality and relevance of research efforts and their application in service provision. That vision has been realized in our recent research focus in the areas of human trafficking, sexual assault, domestic violence intervention and resiliency.

Our efforts are supported through generous contributions from the RGK Foundation, the Hogg Foundation for Mental Health, the Shield-Ayres Foundation, Alice Kleberg Reynolds Foundation,  The University of Texas School of Social Work and the School of Law.



Visit us at **www.utexas.edu/ research/cswr/idvsa/**

## IDVSA STAFF

**Noël Bridget Busch-Armendariz, PhD, LMSW, MPA**
**Director and Principal Investigator**
nbusch@austin.utexas.edu

**Karen Kalergis, MA**
**Associate Director for Education and Communications**
Karen.Kalergis@austin.utexas.edu

**Laurie Cook Heffron, LMSW**
**Associate Director for Research**
lcookheffron@austin.utexas.edu

**Karin Wachter, MEd**
**Project Director**
karin.wachter@utexas.edu

**Caitlin Sulley, MSSW**
**Research Project Director**
csulley@gmail.com

**Annell Neale**
**Education, Communications and Research Coordinator**
aneale@austin.utexas.edu

### Co-Principal Investigators

**Regina Jones Johnson, Dr PH, MSN, RN**
**The University of Texas at Austin**
**School of Nursing**
rjohnson@nur.utexas.edu

**Bruce Kellison, PhD**
**Associate Director**
**The University of Texas at Austin**
**Bureau of Business Research**
**IC2 Institute**
kellison@ic2.utexas.edu

**Jeana Lungwitz, JD**
**The University of Texas at Austin**
**School of Law**
jlungwitz@law.utexas.edu

## CONTRIBUTORS

**Melinda A. Lemke; Educational Policy and Planning PhD student and Institute on Domestic Violence and Sexual Assault, Center for Social Work Research Fellow**

**Sue Snyder Pederson, MS MSSW, LCSW; Somatic Experiencing Practitioner**

**Sarah Melecki; Graduate student at the LBJ School of Public Affairs at The University of Texas at Austin**

**Sapana Donde, PhD, Dean's Post Doctoral Fellow in Neuroscience and Mental Health at The University of Texas at Austin School of Social Work**

**Sherrie Margiotta, RN; Graduate student in the School of Nursing at The University of Texas at Austin.**

**Jeana Lungwitz, JD; Clinical Professor at the University of Texas School of Law and Director and Co-Founder of the Domestic Violence Clinic**

**Photo Credit:  Carrie H. Stephens**

**A348**

# EXHIBIT 11

12/5/2019                  Sexual assault remains under-reported on campus despite growing awareness | The Daily Texan

Login

Search the Daily Texan                                    SEARCH

# THE DAILY TEXAN

NEWS        SPORTS        LIFE&ARTS        OPINION        MULTIMEDIA        SPECIAL PROJECTS

HOUSING        DONATE

## Sexual assault remains under-reported on campus despite growing awareness



**Photo Credit:** Zachary Strain (/author/zachary-strain) | Daily Texan Staff

TAGS

# A350

Published on November 3, 2013 at 10:26 pm

Last update on November 4, 2013 at 7:57 am

BY JORDAN RUDNER (/AUTHOR/JORDAN-RUDNER)

Fifteen months ago, Kaila Schedeen was sexually assaulted by someone she knew.

The incident changed the course of her life, but on paper, it was statistically typical. More than 80 percent of rapes involve a perpetrator known to the victim, and roughly 70 percent involve alcohol — both true in Schedeen's case.

There was something uncommon in Schedeen's story: she reported the crime to authorities. When she returned to campus at the end of the summer, she also reached out to UT Counseling and Mental Health Center for help. The vast majority of sexually assaulted UT students will never take either step.



Hear Me Roar

"If you look at the national statistics, they'll say one in four college women is likely to be a victim of sexual assault by the time they complete college, and for men it's one in six," said Jennifer Hammat, institutional Title IX coordinator and assistant vice president for student affairs. "For a campus population of 50,000 [students], that means we should be seeing 12,500 cases a year. And we're not."

There were only 18 forcible sexual offenses reported in 2012, including those occurring on campus properties, residence halls, non-campus buildings and adjacent public property, according to the University's Annual

# A351

Erin Burrows, a Voices Against Violence health education coordinator, said these low statistics should not be interpreted to mean UT students experience radically lower rates of sexual assault compared to students at other universities.

Burrows said survivors face many barriers when deciding whether or not to report to police. Those barriers are often personal and psychological and are aspects of the culture of silence surrounding sexual assault.



(http://imgur.com/0Fepucd)

"They include a fear of not being believed … or that the disciplinary action at the end of the process will not be worth the process itself," Burrows said.

Students might have grounds for being skeptical of the reporting process. In the past two years, several public and private universities across the country have come under fire for their handling of sexual assault cases.

At the University of North Carolina at Chapel Hill, the former assistant dean of students recently filed a

# A352

Earlier this year, 13 students from the University of Southern California filed a federal Title IX complaint alleging campus administrators had failed to respond to claims of sexual violence on campus. One student said administrators dissuaded her from filing a report with the police, saying the detectives would be tough on her, and that she wasn't technically assaulted because "he didn't orgasm."

Psychology sophomore Lauren La Riva, another survivor of sexual assault, said the cultural stigmas surrounding sexual assault meant she didn't identify as a survivor until she came to college.

When she was a freshman in high school, someone she thought was a good friend took her outside after school to show her what he called a"pretty area," according to La Riva. Soon, he was on top of her.

"I said no," La Riva said. "I was crying. But he didn't stop."

La Riva said she didn't realize she had been assaulted for months following the incident.

"I kept asking myself, 'Why didn't I do more to stop it?'" La Riva said. "I didn't want to feel like a rape statistic."

Eventually, she recounted the story to a friend, who told her the experience sounded like rape.

It wasn't until her first Voices Against Violence meeting this year — almost five years after her assault — that someone told her she was a survivor.



For a campus population of 50,000 [students], that means we should be seeing 12,500 cases a year. And we're not.

—Jennifer Hammat,
Institutional Title IX coordinator and assistant vice president for student affairs

(http://imgur.com/wUUKySs)

La Riva said her sexual assault has had a lasting effect on her, but she's become more comfortable with

According to Burrows, experiences such as La Riva's are not unusual. People often don't realize they've been assaulted because there are many culture-wide misunderstandings about the meaning of consent and such a skewed picture of what most rapes look like, Burrows said.

Jane Bost, associate director for the University's Counseling and Mental Health Center, said the key is to spread awareness of what consent is as widely as possible. If someone tells a group of friends about an assault, Bost hopes at least one of them will have heard about the resources the University offers.

"We want people to know we're here," Bost said. "But talking about sexual assault at all is very new and really has only happened for the past 50 years, so we're only at the beginning of a very long journey."

When Schedeen falls back into depression, or has a bad day — the kind of bad day she says she never had before her assault — Schedeen said she remembers a metaphor the center's social worker, Laura Dannenmaier, provided her.

"Healing from this trauma isn't a straight line," Schedeen said. "It's more like a mountain you're climbing around. Sometimes you'll end up at that same rough point in the mountain, months or even years later, and you'll feel like you haven't progressed — but you're still higher than you were."

Voices Against Violence also helps survivors through the Survivor's Emergency Fund, which covers costs that survivors may encounter as a result of being sexually assaulted. This includes situation-specific costs such as changing the locks in a student's apartment or paying for a medical examination a student might not want to show up on his or her parents' insurance.

Schedeen used the fund to help pay for new glasses after her old pair was smashed during her assault.

"It was one less thing I had to think about," Schedeen said. "They just took care of it for me."

Hammat said the University is working with the federal government to expand and clarify the people charged with "mandatory reporting." Mandatory reporting legally requires certain University employees to report incidents of sexual assault they're told about.

That list currently includes deans, department chairs and residential assistants, among others, but some responsibilities aren't clearly defined.

Burrows said it's unclear if a teaching assistant must report incidents of sexual assault to the University if told

Despite efforts to move away from the culture of silence, the conversation about sexual assault remains difficult for some survivors.

"I usually don't tell people my story," La Riva said. "I don't want to make you feel uncomfortable."

For Schedeen, silence is largely a mechanism of self-preservation.

"People never know what to say," Schedeen said. "They try to empathize or tell me they understand, but if you haven't been sexually assaulted, you just can't understand. You just don't know what it's like."

Schedeen said a professor she admires told her not to mention her assault on her applications to graduate school.

"He said they would think I was mentally unstable," Schedeen said. "And he's right. There is a conflation of mental illness with surviving sexual assault — and that's awful."

But in telling her story, Schedeen said she wants people to realize they should take ownership of their experiences.

"If you're an assault survivor, that isn't your fault, it is in no way your fault," Schedeen said. "I want to stop feeling ashamed about my story."

Burrows says people who work on sexual assault prevention wrap themselves in kind of a "cloak of contradictions" — they want to hear about more assault even as they want to reduce the assaults that occur.

"The more assaults I hear about, the more I know I'm doing my job right," Burrows said. "But that also shows me just how much further we have to go."

Though Schedeen still struggles, she said she's moving on. She said she still has bad days, days when she can't get out of bed, days when she doesn't care about being alive. But they occur less and less now. Schedeen said she's not the person she was 15 months ago before she was assaulted, but she's doing all right.

"I'm moving up the mountain," she said. "That's progress."

---------------------------------------------------------------------------------------------------------------------

# A355



*If you've experienced sexual assault and want to share your story with The Daily Texan, please* _click here._ *(https://docs.google.com/forms/d/1RzEdkiiI8HyqgYZqWXzsGCcYwQPHPdmNLDQSX9ghvnc/viewform)*

_Resources if you want help:_

**UT Counselling and Mental Health Services:** (512) 471- 3515

**National Dometic Violence Hotline:** 1-800-799-7233

---

**0 Comments**     **The Daily Texan**     🔴 **Login**  ▾

♡ **Recommend**     🐦 **Tweet**     f **Share**          Sort by Newest ▾

Start the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ?

Name

Be the first to comment.

✉ Subscribe    Ⓓ Add Disqus to your siteAdd DisqusAdd

Site design ©2011-2019 Texas
Student Media.

All images and content ©Texas
Student Media.

Questions about the site? Email
webmaster[at]dailytexanonline.com

Comments about articles or images?
Email editor[at]dailytexanonline.com

# EXHIBIT 12

Search …                                                          Search



f   t   r

(https://www.mindingthecampus.org/feed)

MINDING THE CAMPUS
REFORMING OUR UNIVERSITIES
(https://www.mindingthecampus.org/)

Home (https://www.mindingthecampus.org) » Articles (https://www.mindingthecampus.org/category/articles/) »
Myths, Realities, and Common Sense at Texas

# Myths, Realities, and Common Sense at Texas



**By KC Johnson** (https://www.mindingthecampus.org/author/kcjohnson/)
🕐 **November 6, 2013 (https://www.mindingthecampus.org/2013/11/06/)**

12/5/2019 Case 1:19-cv-01249-LO-MSN Document 27-12 Filed 12/20/19 Page 3 of 4 PageID# 432

"We should be seeing 12,500 cases a year."

So spoke Jennifer Hammat (http://www.dailytexanonline.com/news/2013/11/03/sexual-assault-remains-under-reported-on-campus-despite-growing-awareness), Title IX coordinator for the University of Texas. As FIRE's Peter Bonilla tweeted, "That quote put differently: 'we should be seeing 250-300 rapes/sexual assaults per week.'" Does anyone (apart, it seems, from Hammat) believe that there are 300 rapes each week at UT?

To provide some statistical context, consider that FBI crime figures for the most recent year (2012) indicate that in New York state (population 19.5 million) there were 2848 instances of forcible rape. In the state of Texas–including the university, of course, and with a total population of 26.1 million–there were 7711 instances of forcible rape. Nationally, there were 84,376 rapes in the United States. So according to Hammat, her campus–all by itself–experienced an amount equivalent to around 15 percent of the alleged sexual assaults *in the entire United States*. Coming from a crank on the street, such a claim would be laughed off. But Hammat is a high-ranking policymaking figure. She earns just under $100,000 anually (http://www.texastribune.org/library/data/government-employee-salaries/search/?q=hammat&x=7&y=11), and serves as the University of Texas employee responsible for coordinating the institution's handling of Title IX complaints (http://www.utexas.edu/equity/policies/title-ix).

It's distressing but not surprising that Hammat's assertion passed without challenge from *Daily Texan* reporter Jordan Rudner. (The article provides no statistical context, either, beyond allowing Hammat to cite unspecified "national studies" claiming 25 percent of college women–and 16.7 percent of college men–are raped.) Far too often reporters simply accept at face value such preposterous assertions from campus anti-due process activists.

Three possible explanations exist for Hammat's odd public statement:

(1) The University of Texas is the violent crime capital of the United States.

(2) Hammat is such an ideologue that she's incapable of interpreting statistical data that contradicts her preconceived worldview.

(3) Hammat–and the activists that she cites–have redefined (and broadened) the meaning of rape and sexual assault to such an extent that it bears no relationship to how these commonly referenced terms are defined either under most states' criminal law, or in most media/cultural portrayals.

# A360

For the record: I don't believe the University of Texas is the violent crime capital of the United States.

By the way, empowering Title IX coordinators is one of the key demands of the Office for Civil Rights, both in the 2011 "Dear Colleague" letter (which orders colleges to erode due process protections for students accused of sexual assault on campus) and in the Montana "blueprint" (which seeks, among other things, to institute a requirement that colleges report to the government protected speech, both inside the classroom and anyplace else on campus, if that protected speech deals with a sexual topic and prompts even one person to file a complaint).

It's not reassuring, therefore, to see that the point person at one of the nation's leading public universities is a figure who seems incapable of honestly presenting data related to the issues with which she's supposed to deal.



## KC Johnson (https://www.mindingthecampus.org/author/kcjohnson

(https://www.mindingthecampus.org/author/kcjohnson/)

KC Johnson is a history professor at Brooklyn College and the City University of New York Graduate Center. He is the author, along with Stuart Taylor, of The Campus Rape Frenzy: The Attack on Due Process at America's Universities.

2 thoughts on "Myths, Realities, and Common Sense at Texas"

**Jay** says: November 7, 2013 at 2:07 pm (https://www.mindingthecampus.org/2013/11/06/myths_realities_and_common_sen/#comment-9689)

KC, Xander,

It might be fun as a bit of monkeywrenching to see a group strive for just one thing: a sidebar next to the USA Today college review articles listing campuses with the most rapes as determined by the 1:4 calculation.

Or even an ad on USA Today whichever week they print those sorts of reviews.

# EXHIBIT 13

12/5/2019                  A Conversation with Julian Williams, Vassar's Title IX Officer - Features - News - Vassar college

## Emergency Numbers

- On Campus - 24/7
  (845) 437-7333*
  Campus Response Center (CRC)
  *\* On-campus can omit 437-*

- Off Campus
  911
  Dutchess County 911 Center
  (Police/Fire/EMS)

- Safety and Security
  Non-Emergency (845) 437-5221

  Emergency (845) 437-7333

- Building Maintenance Emergencies
  Weekdays 7:30-5pm (845) 437-5999

  Evenings, weekends, holidays (CRC) (845) 437-5221

- Weather Hotline
  For college delays or closures due to inclement weather

  (845) 437-7755 or (845) 437-7756

- College Main Number
  (845) 437-7000

### Emergency Response Information
Alert information for members of the Vassar community. ⊙ READ MORE

⌃ Emergency Info

# vassar **info**

# ← vassar college

# News

Home / News / 2014-2015

## A Conversation with Julian Williams, Vassar's Title IX Officer

# A363

Julian R. Williams, Esq., is the director of the Office of Equal Opportunity and Affirmative Action at Vassar College. As the college's Title IX officer, Williams is responsible for conducting investigations of alleged violations of Affirmative Action/Equal Opportunity policies. Williams holds a BA in English from the University of Michigan, Ann Arbor, and a JD from Michigan State University College of Law. He has worked as a civil trial attorney in cases involving discrimination, harassment, and violations of the Family and Medical Leave Act. Before coming to Vassar in 2012, Williams served as the director of the Office of Equity and Diversity at Monmouth University in New Jersey.

**What is Title IX and what does it encompass?**



*Jullian R. Williams, Esq.*

Title IX is a very short statute that was passed in 1972 to address gender discrimination on college campuses. At the time, the statute was used to address issues of gender equity in admissions policies and in athletics—making sure that schools had a similar number of male and female sports teams and that those teams had equal access to facilities and resources. In many ways, Title IX was always designed to grow and expand. Today, the statute is also being used to address issues of sexual assault and dating violence. These matters are under the purview of the Department of Education, Office of Civil Rights. Presently, colleges and universities are being asked to look at whether the environment on their campuses fosters gender inequality and sexual misconduct. If you have an environment where these issues are going unchecked, what barriers does this create on your campus? If you don't have an environment that is investigating and responding to issues of sexual assault and sexual harassment, female students on your campus may not feel safe, and they may not feel like they belong. So at Vassar we want to meet not only our legal obligations under Title IX but, more importantly, our moral obligations to protect and care for our students and our community.

**How do institutions go about meeting their obligations under Title IX?**

Title IX compliance looks different on every campus. Every school is mandated to have a Title IX officer or coordinator, but not every school can afford to have that person focus exclusively on Title IX issues. Some of my peers at other institutions are faculty members; some work in a variety of other administrative capacities. Every school is also mandated to have an equitable process that balances the

# A364

rights of both parties and that investigates matters as they come to the attention of the institution, but how that process is structured differs from school to school. We've been evaluated by external experts who do this work, such as Peter Lake and Scott Lewis of the NCHERM Group LLC, and it is clear that in terms of policies and procedures and support, Vassar is a model that other institutions are trying to emulate. That doesn't mean that we have it all figured out, but it does mean that we approach these issues with a high degree of care, a high degree of attention to detail, and a high degree of respect for students on all sides of an issue.

**What does this mean for students at Vassar?**

It means that there are policies and procedures and support mechanisms in place. Even before a student says, "I want to make a formal report," there is somewhere for that student to go to talk through what their options are. What we aim to do is reach out and support everyone involved in the process— students who have reported an alleged violation and responding students—understanding that a student who comes forward has been through a trauma, and we want to have the resources in place to support them. If a student on this campus comes forward and says, "I was the victim or the survivor of an incident of sexual misconduct or sexual assault," we have counselors readily available. We have confidential resources who can walk the student through what the reporting process might look like. I have a lot of faith in the people we have working directly with students on these issues—the people in our Counseling Center, our Sexual Assault and Violence Prevention team, our Sexual Assault Response Team.

**What is the process if a student decides to make a formal report?**

Every formal allegation is investigated. We have three Title IX investigators on campus, one in Safety and Security and two in Residential Life. In July 2015 we will be adding a full-time Title IX investigator, which should allow for some additional flexibility in terms of investigative support, community outreach, and education. These are expertly trained fact gatherers who meet with the reporting student and the responding student and any witnesses. Their job is to gather as much information as possible in a way that doesn't traumatize or re-victimize the parties involved. Then they draft an investigative report that will help the adjudicators in making a determination as to whether there is enough information to conclude that there has been a policy violation.

**How do you know that our process is working?**

In the two and a half years that I've been here, over 70 percent of the sexual misconduct cases that have gone on to a hearing have resulted in findings of responsibility, and within that 70 percent, there have been a handful of expulsions and suspensions. There have also been some cases where there has not been enough information to find a policy violation. And that is an indication that we have a robust

system. If that number were 100 percent, I would say that we have a problem. If it were zero, I would say that we have a problem. But what those numbers say to me is that we have a process that encourages students to report and that these matters are being handled delicately, swiftly, and fairly.

**What do you find the most challenging about working on these issues?**

What I find most challenging is that so much of how we think about Title IX and so much of how students experience it is results-based. So whether you are the reporting party or the responding party, how you experience this process will be determined by what the end result is. The challenge for me is to try to get across to the community and to the students involved in these issues that we want to be there to support students on either side. Regardless of the results of the hearing, we still hear you, we still care about you. Just because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying. We must operate within our standard of proof and our policy definitions, but we care about all the students who go through this process.

**Are there things we should be doing differently?**

I think we can always learn more, even those of us who are working in this field professionally, and we can always do better. There is a national conversation on these, and Vassar is a part of that conversation and trying to lead on these issues. We continually strive to improve, but we have a process where people care, we have one that works, we have one that takes these matters very seriously and that really wants to do the right thing for every student involved.

*Posted by* <u>Office of Communications</u> *Wednesday, April 1, 2015*

- <u>Alerts</u>
- <u>Announcements</u>
- <u>Feature Stories</u>
- <u>In the Media</u>
- <u>Archive</u>

Share



- ✉ <u>Webmail</u>
- ⚙ <u>Ask Banner</u>
- 🌐 <u>Moodle</u>
- 🏠 <u>Vassar</u>



## connect

*Friend, follow, subscribe. Keep up on Vassar news.*

-
-
-

## explore *vassar*

- Vassar Home
- Admissions
- Alumnae/i
- Athletics

- Departments
- Families
- Make a Gift
- Library

## send a *postcard*

*Visit the Postcards site to send a Vassar "hello" to friends and family.*

## info at vassar college

124 Raymond Ave., Box 9, Poughkeepsie, NY 12604-0009

- Office: Main Building 2nd Floor
- (845) 437-7400
- Contact

- Departments
- Admissions
- © Vassar College

# EXHIBIT 14

ABOUT    ADVERTISING    CONTACT    GET INVOLVED    OPINION SECTION SUBMISSIONS

    

NEWS   /   CULTURE   /   OPINION   /   SPORTS   /   THE VOICE OF GMU KOREA   /   ETC.   /   FIND YOUR COPY   /

## Students release sexual assault demands

DECEMBER 5, 2016   /   0 COMMENTS   /   852 VIEWS

Facebook   10        Twitter        LinkedIn        Email

BY GRACE ZIPPERER, STAFF WRITER

During Patriots in Action Week, which ran from Nov. 28 to Dec. 2, student government helped spread the word about the Women and Gender Studies department's sexual assault prevention demands for the Mason administration. This event was part of an ongoing effort to involve more students in the pledge to end sexual assault on campus.

Patriots in Action Week is a student government project that looks to prevent sexual assault and educate the community on gender violence, according to student government's website.

Pablo Ramírez Uribe, the secretary for Diversity and Multicultural Affairs for Student Government, was heavily involved in organizing the events of the week and has been the primary student government contact in overseeing the demands.

"The events [last] week all had the purpose of helping students understand, in an institutional sense, what they can be involved in and what they can expect from the university administration and student government," Uribe said.

Ramírez Uribe said that during the "Vigil and What's Next" show, the last event of Patriots in Action held Friday evening, the demands were discussed in more detail.

"The Vigil centered on highlighting the events of the week, having a moment of remembrance for sexual assault survivors and pledging to continue the fight against sexual assault. After Patriots in Action we need to continue to provide tools to end sexual violence on campus," Ramírez Uribe said.

Ramírez Uribe added that student government has a critical role to play in continuing to check on the demands.

"They are an accumulation of work-in-the-making for a long time," Ramírez Uribe said.

The demands were first presented to the university Oct. 4 during a nationwide event called Take Back the Night where Ramírez Uribe was co-master of ceremony. According to the Take Back the Night Foundation's website, the event focuses on ending all kinds of sexual violence.

Ramírez Uribe said that the event was the perfect place to release the demands.

"The name of the event refers to the night as a space where fear of being alone and the fear of rape is especially uncomfortable for women and victims of sexual assault," Ramírez Uribe said. "The night can apply to any space metaphorically where comfort is taken away because of lack of closure, justice and societal understanding towards victims of sexual violence."

However, there has been a gap in communication with university administration since the official release of the demands. Ramírez Uribe confirmed that while the administration had heard about the demands, they were not directly given to them.

"It ended up working out that during Patriots in Action, I was able to meet with Rose Pascarell [the University Life Vice President] to discuss the demands and establish direct communication. We talked about how all of the demands are already in the works and being addressed in one upcoming policy or another," Ramírez Uribe said.

Mary Ann Vega, one of the creators of the demands and co-MC of Take Back the Night, also met with the new Title IX coordinator, Jennifer Hammat, during Patriots in Action to discuss the demands.

## SEARCH

Search

## SPONSOR



## TWITTER FEED

 @IVEstate
Student-run news outlet for daily updates and in-depth coverage of George Mason University. ·Ads are not endorsements· Find us online at https://t.co/XcwS8mEYmU

RT @IVEstate_Sports: Check out @NatalieHeavren's recap of @MasonWBB's win over American U yesterd...
Sat 23rd Nov 19 16:23

RT @IVEstate_Sports: .@MasonMBB lost their first game of the season against No.6 Maryland. Here...
Sat 23rd Nov 19 16:23

Our Panda Express fundraiser is TODAY! Stop by and show our flyer to the cashier until 8:00 tonig...
Fri 22nd Nov 19 13:29

RT @IVEstate_Sports: Don't forget to follow @NatalieHeavren for live coverage of the Mason-Mary...
Fri 22nd Nov 19 13:29

This week in #Opinion: Yes, The Equal Rights Amendment Matters https://t.co/hBaaC4n7fs
Fri 22nd Nov 19 13:00

Recent    Popular    Comments

12/5/2019                                  Students release sexual assault demands | The Fourth Estate

According to Mason's Compliance, Diversity and Ethics website, Mason is in compliance with Title IX of the Education Amendments of 1972 which states "Sexual assault and sexual harassment are forms of sex discrimination [and are] prohibited [at the university]."

Hammat's job as the Title IX coordinator is to assist any student, staff or faculty member who is concerned about "sex discrimination or sexual misconduct" as well as assist in policy implementation.

"All of the items on the list are being addressed in one form or another by the Sexual Assault and Interpersonal Violence implementation team and out of the Title IX shop here in Compliance, Diversity and Ethics, in collaboration with other campus partners," Hammat said.

One of the demands that requested a campus survey has already been implemented. A Task Force on Sexual Assault and Interpersonal Violence was created by President Cabrera in 2014 and is made up of Mason faculty, staff, students and community members. In their Final Report published Feb. 28, 2015, the force's eighth recommendation stated the university should initiate a campus climate survey on sexual assault.

The "Mason Speaks: Sexual Violence Survey" was sent Oct. 23 through the official university email server. The White House Task Force to Protect Students from Sexual Assault and the Department of Education's Office for Civil Rights have identified these surveys as the best practice to generate data on sexual violence on campuses, according to the United States Department of Justice's website.

"By seeing the results of this confidential survey," Ramírez Uribe said, "sexual assault on campus becomes more tangible in our minds. Sexual assault is so prevalent, but we [as a society] are so resistant to get to the bottom of it."

Ramírez Uribe said he is confident there will be opportunities for student government to continue to work closely with Pascarell and others in continuing the goals of the demands.

Sara Alhariri, an attendee of Take Back the Night who has experienced sexual assault, said she one hundred percent agrees with the demands because she believes it is crucial to have a supportive environment in the university's administration.

"[The way Mason] can help get rid of the victim stigma in society," Alhariri said, is "by allowing victims to become something more beautiful: survivors."

Here is the List of Demands:

We demand that sexual assault prevention experts/experts on sexual violence should not only be consulted during the policy making process, but their opinion should be a vital part of the decision making process.

We demand the release of regular updates on what progress is being made on the recommendations released by the Sexual Assault and Interpersonal Violence Task Force.

We demand the implementation of sexual assault prevention programming that students can participate in annually during their academic career.

We demand a reporting system that takes into account the fear victims of sexual assault experience when reporting to police/the university.

We demand that the waiver used by the Mason Police Department be removed as it makes it harder for advocates to work with students while they are in crisis and the use of the waiver can suggest that advocates do not have confidential relationship with the student.

We demand for all departments that interact with victims during the reporting process to be trained in trauma informed responses to sexual assault disclosures.

We demand that the hearing process be designed alongside experts in sexual violence prevention or scholars who focus on sexual violence.

We demand the hearing process be equitable, realistic in its needs, and trauma informed.

We demand policies in place to provide financial support for students who have been sexually assaulted and need to drop out of school.

We demand trigger warnings on all timely warnings sent out about sexual violence.

We demand a staff member for Counseling and Psychological Services that has experience in providing support to victims of sexual violence and intimate partner violence.

We demand an updated statement on the availability of resources and options for victims of sexual assault and interpersonal violence for use by faculty.

We demand sustained funding support and emphasis on sexual assault service provision since Wellness, Alcohol and Violence Education and Services has been absorbed by Student Support Services.


Mason improves to 9-1 in a lackluster performance ...
DECEMBER 5, 2019


Women's Basketball Falls to 4-5 in Wednesday Matin...
DECEMBER 4, 2019


Women's Basketball drops to 4-2 after a clos...
NOVEMBER 27, 2019


Mason Loses First Game of the Season to Top-Ten Ma...
NOVEMBER 23, 2019


Women's Basketball Improves to 3-1 on the Season...
NOVEMBER 22, 2019

FOURTH ESTATE WEEKLY

Shelf by Issuu
11.18.19 - Fourth Estate



FOLLOW IVE ON SOCIAL MEDIA

12/5/2019                 Students release sexual assault demands | gmufourthestate



The list of demands and where to sign if you so choose can also be found at the following link:

https://docs.google.com/forms/d/e/1FAIpQLSfkIhuf3vsOL4OlYQxuPbiGhPhfFCEMwxGz7AOtgolmRNyKFA/viewform

📁  campus

🏷️  patriots in action week   prevention   sexual assault   women and gender studies

About jennifershaskan
View all posts by jennifershaskan →

‹ Read Previous                          Read Next ›
Coursicle Comes to Mason               Sexual offender on campus again

Mason Hosts Fifth Annual Chapter        Consent Carnival Continues In Second
Next: Ending Sexual Violence Program    Year
NOVEMBER 11, 2019                       SEPTEMBER 16, 2019



New Title IX Coordinator, Who This?
AUGUST 26, 2019

gmufourthestate.com/2016/12/05/students-release-sexual-assault-demands/                                          3/5

# EXHIBIT 15

**A372**



Department of Psychology

4400 University Drive, MS 3F5, Fairfax, Virginia 22030-4444
Phone: 703-993-1384; Fax: 703-993-1359

May 31, 2019

Todd Kashdan, Ph.D.
Professor, Department of Psychology
College of Humanities and Social Sciences
2048 David J. King Hall, MS 3F5

Dear Dr. Kashdan:

On February 22, 2019, you received notification from Compliance, Diversity, and Ethics (CDE) of the conclusion of its investigation into the four complaints filed alleging you had engaged in sexual or gender-based harassment, in violation of George Mason University's *Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence*. The determination letters informed you that CDE's investigation "sustained the allegation that you engaged in conduct that qualifies as sexual or gender-based harassment in violation of Policy 1202."

In addition to violating University policy, the conduct described in those letters, much of which you corroborated, demonstrates a disregard for the professional boundaries that must be observed in interactions between faculty/mentors and students. Your conduct ignored the significant power dynamic that is a part of the relationship with students whom you taught, supervised, and mentored.

As the Chair of the Psychology Department, I am responsible for determining and implementing the appropriate disciplinary sanctions to address the behavior that violated policy, clarifying behavioral expectations, and supporting behavioral change. After careful consideration and consultation with the Dean of CHSS, the VP of Human Resources, and the University Counsel's Office, I am issuing this letter of censure to acknowledge and document that the allegations against you were sustained and to outline actions to ensure that your behavior in the future is professional, appropriate, and consistent with University policy.

To facilitate the required change in behavior and prevent future violations of Policy 1202, the following actions are being taken:

1. You are being required, no later than October 1, 2019, to participate in sexual harassment prevention training focused on heightening your awareness and understanding of how your inappropriate conversations, remarks, and unwanted physical contact created an environment of sexual and gender-based harassment - leaving students subjected to an environment they described as hostile. The training will be identified by CDE. A member of the CDE office will contact you regarding details about the date and time such a training program will be offered, both to coordinate and to confirm your attendance. Your participation or lack thereof will be communicated to me.

2. The following constraints will be placed on your work with Mason students from the date of this letter through the end of Summer 2021 semester, August 15, 2021:

    a. You will be restricted in your mentorship, supervision, and teaching of graduate students in the following ways:

      i.   Graduate students currently conducting research under your mentorship and supervision will be asked to meet with the Department Chair to discuss their experience working with you and will be offered the opportunity to switch to another mentor/supervisor. You are not permitted to discuss this meeting or the students' decisions with those students at any time before or after the meeting.

      ii.   You will be ineligible to recruit new graduate students to work under your mentorship or supervision during this period.

      iii.   You will be ineligible to teach graduate courses during this period.

  b.  For any graduate or undergraduate students who elect to remain under your mentorship or supervision, and for any other students with whom you have a professional relationship (e.g., undergraduate students in your courses), the following restrictions will be put in place:

      i.   Written communication with Mason students must occur only through Mason-specific means (Mason email and servers). These communications will be subject to review at any time by the University. Communication must not occur via personal email accounts (e.g., Gmail), texts, or other group chat applications (Slack, WhatsApp, GroupMe or others). Any communication with Mason students that occurs outside of Mason-specific means may result in additional disciplinary actions.

      ii.   All meetings with students must occur on campus in an open setting. If you engage in meetings with students at professional conferences or at another academic site, these must occur in an open setting, and must be reported in advance (or, if arranged on an impromptu basis, as soon as possible afterward) to your Department Chair. Any meetings that occur off-campus (except for those at professional conferences or other academic settings that are reported to the Chair) may result in additional disciplinary actions.

      iii.   Any interactions with students outside of meetings must be limited to department and professional events, where other faculty members are present. Any interaction outside of such events may result in additional disciplinary actions.

3.  There will be regular review of your conduct with students throughout this probationary period. This review may include random assessment of your interactions with students and solicitation of feedback from students. By the end of the Fall 2020 semester, your Department Chair, in consultation with the Dean, will make a determination, based on these reviews, about whether there has been sufficient behavioral change to allow you to resume graduate teaching and/or mentorship or supervision of graduate students in Fall 2021. If a positive decision is made, the decision will be subject to change if any violations of the terms described above are subsequently revealed.

4.  If you are allowed to resume teaching, mentoring, and/or supervising of graduate students in the future, your Department Chair, in consultation with the Dean, will make the determination if any continuing restrictions or conditions are necessary.

**A374**

In addition, I note that a number of other complaints about your communication with students have been brought to the department or have emerged in the context of this investigation, which indicate possible violations of University Policy 2208 *Workplace Violence* and the Virginia Department of Human Resource Management (DHRM) Policy 2.35 *Civility in the Workplace*. University Policy 2208 states: "George Mason University is committed to providing a safe learning, living, and working environment for all members of the University community." The policy prohibits specific forms of behavior, including "engaging in behavior that creates a reasonable fear of injury or substantial emotional stress to another person, and other abusive conduct in the workplace that an objectively reasonable person would find hostile, offensive, and unrelated to the University's legitimate interests, which causes substantial emotional distress (e.g., bullying)." DRHM Policy 2.35 states: "The Commonwealth strictly forbids harassment (including sexual harassment), bullying behaviors, and threatening or violent behaviors of employees, applicants for employment, customers, clients, contract workers, volunteers, and other third parties in the workplace. Behaviors that undermine team cohesion, staff morale, individual self-worth, productivity, and safety are not acceptable." Please be aware that HR/Employee Relations will be following up to ascertain if there have been violations of University Policy 2208 and VA DHRM Policy 2.35.

It is imperative you change your behavior and acknowledge the need to implement and observe more appropriate boundaries with your students to prevent future students being negatively impacted. Violations of the terms described above, and/or repeated inappropriate behavior, will require our immediate attention and possibly additional disciplinary sanctions. Depending on the severity of violations or repeated misconduct, those sanctions could include an extension of the probationary period, permanent changes to work assignments related to work with graduate students or other domains, and/or termination of appointment for cause (see Faculty Handbook, Section 2.9.3).

As outlined in the Faculty Handbook, Section 2.11.2, you have the opportunity to grieve the actions that are being taken by the department as a result of CDE's findings.

A copy of this letter will be placed in your personnel file. If you have questions, please contact me or Shernita Rochelle Parker, Interim Vice President, Human Resources and Payroll, at srochell@gmu.edu or 703-993-2606. I recognize this has undoubtedly been a very challenging time, and I hope we can focus on the path forward.

Sincerely,

Keith Renshaw, PhD
Chair & Associate Professor
Department of Psychology


cc: Ann Ardis, Dean, College of Humanities and Social Sciences
    Shernita Rochelle Parker, Interim VP, Human Resources and Payroll

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-cv-01249 |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS JENNIFER HAMMAT, JULIAN WILLIAMS, KEITH RENSHAW,
ANN ARDIS, AND S. DAVID WU'S MOTION TO DISMISS COUNTS II-IV**

Defendants Jennifer Hammat, Julian Williams, Keith Renshaw, Ann Ardis, and S. David Wu (collectively the "Individual Defendants"), by and through counsel, moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Count II-IV of Plaintiff's Complaint with prejudice.

The grounds for the motion are as follows:

1. Count II asserts a claim under 42 U.S.C. § 1983 against the Individual Defendants for violations of the due process clause.  This claim fails because Plaintiff has failed to plead that he was deprived of a constitutionally protected property or liberty interest.  Additionally, even if he was, Plaintiff has failed to plead that any of the Individual Defendants deprived him of constitutionally required process.

2.  Count III asserts an identical due process claim under the Virginia Constitution
    against the Individual Defendants.  "Virginia state courts have consistently held that
    the [due process] protections afforded under the Virginia Constitution are co-
    extensive with those in the United States Constitution."  *Doe v. Fairfax Cnty. Sch.
    Bd.*, 384 F. Supp. 3d 598, 612 (E.D. Va. 2019).  Therefore, Count III fails for the
    same reasons as Count II.

3.  Count IV asserts a claim under 42 U.S.C. § 1983 against Dr. Hammat, Mr. Williams,
    and Dr. Renshaw for violations of the First Amendment.  This claim fails because
    Plaintiff's statements were not "on matters of public concern" and were not made in
    Plaintiff's capacity as an employee not in his capacity as a "private citizen."  *Urofsky
    v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000) (en banc).

4.  The Individual Defendants, as state employees, have Eleventh Amendment immunity
    from monetary damages asserted against them in their official capacity under 42
    U.S.C. § 1983.  *See Huang v. Bd. of Govs. of Univ. of N.C.*, 902 F.2d 1134, 1139 (4th
    Cir. 1990).

5.  Assuming, *arguendo*, that Plaintiff has stated a valid due process or First Amendment
    claim, the Individual Defendants are entitled to qualified immunity because their
    "conduct [did] not violate clearly established statutory or constitutional rights within
    the knowledge of a reasonable person."  *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th
    Cir. 2013)

The legal arguments outlined above are set forth at length in the accompanying

Memorandum of Points and Authorities. This motion is based on the Complaint filed in this

action, this motion, the accompanying memorandum of points and authorities and exhibits

2

thereto, any subsequently filed reply brief and any oral argument presented by the Defendants during the hearing for this motion.


December 20, 2019                               RESPECTFULLY SUBMITTED


                                    _____/s/_____
                                    Eli S. Schlam, Asst. Atty. Gen.
                                    Virginia Bar Number 92987
                                    George Mason University
                                    4400 University Drive,
                                    MS 2A3
                                    Fairfax, VA 22030
                                    Phone: (703) 993-2619
                                    Fax: (703) 993-2340
                                    eschlam@gmu.edu

                                    *Attorney for the Individual Defendants*

3

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of December 2019, I will electronically file

the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to counsel of record in this case.

_____/s/_____
Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

4

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-cv-01249 |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANTS JENNIFER HAMMAT, JULIAN WILLIAMS, KEITH RENSHAW,**
**ANN ARDIS, AND S. DAVID WU'S MOTION TO DISMISS COUNTS II-IV**

**A380**

Defendants, Jennifer Hammat (George Mason University's ("Mason") former Title IX Coordinator), Julian Williams (Mason's Vice President of Compliance Diversity and Ethics), Keith Renshaw (the chair of Mason's Psychology Department), Ann Ardis (Dean of Mason's College of Humanities and Social Sciences) and S. David Wu (Mason's Provost) (collectively the "Individual Defendants") file this separate motion to dismiss Plaintiff's three claims against them in their individual and official capacities. Plaintiff has asserted a federal and state due process claim against all of the Individual Defendants and a First Amendment claim against Dr. Hammat, Mr. Williams, and Dr. Renshaw. All three claims fail as a matter of law.

As to the due process claims, Plaintiff has failed to plead that he was deprived of either a property or liberty right. The fundamental flaw in Plaintiff's claim is that ***he was not terminated*** and, therefore, cannot assert a due process claim based on either deprivation of a property right in his employment or a liberty right based on reputation. Additionally, assuming *arguendo*, that Plaintiff had alleged a deprivation of a constitutionally protected right, Plaintiff has not alleged that any of the Individual Defendants deprived him of the constitutionally required process. For some of the Individual Defendants (Dr. Renshaw, Dean Ardis, and Provost Wu), Plaintiff fails to even identify any constitutionally required process they were required to provide him. As to Dr. Hammat and Mr. Williams, Plaintiff's claims are based on a fundamental misunderstanding of what due process requires. Plaintiff's own complaint admits that he received notice and several opportunities to be heard before any sanctions were imposed on him.

Plaintiff has similarly pled himself out of his First Amendment claim. In order for Plaintiff's statements to be protected they must be "on matters of public concern" and Plaintiff must be speaking "in [his] capacity as [a] private citizen," not as an employee. *Urofsky v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000) (en banc). But he admits to making statements to

graduate students in the context of his classes and research about his personal sexual experiences and asking about their sexual preferences. Plaintiff's sexual dalliances are not a matter of public concern nor are the personal sexual preference of his graduate students. Even if they were, Plaintiff pleads that his comments were made in his role as a faculty member (i.e., in class or in the context of research) and not as a private citizen. As such, he has no First Amendment claim.

Finally, even if Plaintiff had properly pled his claims, they must be dismissed to the extent they seek monetary damages from the Individual Defendants in their official capacities because of Eleventh Amendment immunity and in their individual capacities because of qualified immunity.

## FACTUAL BACKGROUND

The Individual Defendants incorporate by reference the Factual Background section of Mason's Motion to Dismiss Count I ("Mason Motion"), which describes the investigation of the sexual misconduct allegations against Plaintiff, the determination that he engaged in prohibited conduct, and his appeal of that determination. The Individual Defendants provide the following additional factual background regarding events relevant to this motion and their involvement (or lack thereof) in Plaintiff's Title IX matter.

### I.    Dr. Renshaw Imposes Sanctions and Plaintiff's Grievance Thereof.

Per Mason's policy, the result of Plaintiff's Title IX matter was forwarded to his supervisor, Dr. Renshaw. During a May 31, 2019 meeting, Dr. Renshaw provided Plaintiff with a letter describing the disciplinary sanctions that Dr. Renshaw had decided to impose. *See* Compl. ¶ 393. In that letter, Dr. Renshaw stated that the purpose of the sanctions were to "facilitate the required change in behavior and prevent future violations of" Mason's sexual

misconduct policy.  Ex. 1 (incorporated by reference, Compl. ¶ 393).[1]  As Plaintiff

acknowledges, the "aim of the sanctions imposed by Dr. Renshaw" was his "reintegration" into

his department.  *Id.* ¶ 423.

The sanctions were limited to (1) required sexual harassment prevention training, (2) a

probationary period for four semesters.  Ex. 1.  During the probationary period, Plaintiff was

prohibited from recruiting new graduate students to work under his mentorship and supervision

and was ineligible to teach graduate courses.  *Id.*  Plaintiff's current graduate students would be

given the option to continue working with Plaintiff or switch to a new advisor.  *Id.*  Additionally,

he was required to communicate with Mason students through Mason email or other official

University methods and to have any meetings with students either on campus or in open, public

settings.  *Id.*  The letter also stated that there would be a review of Plaintiff's behavior

throughout the probationary period to determine if there had been significant behavioral change

to allow Plaintiff to resume teaching and mentoring graduate students at the end of the

probationary period.  *Id.*

Those are the only sanctions imposed by Dr. Renshaw on Plaintiff.  *Id.*  Plaintiff was not

terminated and the terms of the temporary probationary period do not prohibit him from, *inter

alia,* (1) teaching undergraduate classes, (2) mentoring and conducting research with

undergraduate students, (3) mentoring and conducting research with post-doctoral students, (4)

conducting research on his own, (5) collaborating and conducting research with other faculty

members at Mason or other universities, (6) participating in or giving presentations at

---

[1] On a Rule 12(b)(6) motion to dismiss a court may consider "documents incorporated
into the complaint by reference."  *Tallabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322
(2007); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

**A383**

conferences, (7) writing articles or books, (8) publishing his research, (9) applying for grants, (10) participating in university activities, or (11) serving on university committees. *Id.*

As permitted by Mason's Faculty Handbook, Plaintiff grieved Dr. Renshaw's sanction decision to his college's faculty grievance committee (which is made up of members of the faculty). *See* Compl. ¶ 400. Plaintiff also filed a grievance against Mason and Mr. Williams claiming that the investigation and determination of his Title IX matter violated his First and Fourteenth Amendment rights. *Id.* In his grievance, Plaintiff made many of the same procedural arguments that he makes in his Complaint. *See id.* ¶¶ 401-6. The faculty grievance committee rejected Plaintiff's arguments in total and upheld the sanctions imposed by Dr. Renshaw. *See* Ex. 2 (incorporated by reference Compl. ¶ 407).

## II.    Members of Plaintiff's Program File a Grievance against Plaintiff.

On August 8, 2019, faculty members in Plaintiff's academic program[2] filed a grievance against Plaintiff and Dr. Renshaw with the faculty grievance committee asserting that Plaintiff's continued affiliation with the program threatened the program's accreditation (the "Program Grievance"). *See id.* ¶ 419. These faculty members were acting pursuant to the same provision of the faculty handbook that allowed Plaintiff to file his grievance. The faculty members asserted that based on conversations with the organization that accredited the program, Plaintiff's continued association with the program threatened the program's accreditation and the organization recommended Plaintiff's disaffiliation from the program. *See id.* ¶ 415; *see also*

---

[2] The academic program is a voluntary group of faculty members within Plaintiff's department whose scholarship is in a particular sub-area within Plaintiff's field of study. (The Individual Defendants have not identified the specific program, in light of Plaintiff proceeding under a pseudonym.) There are several programs within Plaintiff's department. The grievance only dealt with Plaintiff's continued membership in one specific program that is accredited by an outside organization.

**A384**

Ex. 3, (incorporated by reference, Compl. ¶ 420). The grievance requested that Plaintiff be required to disaffiliate from the program or that if he refused to do so, Dr. Renshaw, as his supervisor, be required to disaffiliate him from the program. *See* Ex. 3. Under the grievance committee procedures, Plaintiff had fifteen days from being notified of the grievance to "submit a written response." Ex. 3.

On September 10, 2019, the faculty grievance committee (again, made up of members of the faculty)[3] found against Plaintiff and Dr. Renshaw and decided that Plaintiff should disaffiliate himself from the program and that if he refused to do so, Dr. Renshaw should disaffiliate Plaintiff from the program. *See id.* ¶¶ 437, 439. Under the Faculty Handbook, the decision as to the Plaintiff was a "final" decision because this was a grievance "against a fellow faculty member." Ex. 4 (incorporated by reference, Compl. ¶ 179) at 52.[4] Plaintiff, however, refused to comply with the determination of his peers that he disaffiliate from the program. *See* Compl. ¶ 442. As to the grievance against Dr. Renshaw, this was a "grievance against an academic administrator below the level of Dean," because Dr. Renshaw is the department chair. Ex. 4 at 52. Per the Faculty Handbook, in grievances against an academic administrator below the level of Dean, the grievance committee "recommend[s] a resolution, which is then forwarded to the Dean, whose decision is final." *Id.* The recommendation of the grievance committee as to Dr. Renshaw was forwarded to Dean Ardis, who concurred with the recommendation of the grievance committee that if Plaintiff did not voluntarily disaffiliate from the program, Dr.

---

[3] Notably, Plaintiff has not named any members of the grievance committee or the faculty members who filed the grievance as defendants in this lawsuit.

[4] The Individual Defendants have only attached as an exhibit the relevant pages of the Faculty Handbook. The full Faculty Handbook is available here: https://provost.gmu.edu/administration/policy

Renshaw should disaffiliate him.  *See* Compl. ¶ 447.  On September 17, 2019, Dr. Renshaw

disaffiliated Plaintiff from the program.  *See* Compl. ¶ 449.  Plaintiff remains a tenured full

professor and a member of his department.

STANDARD OF REVIEW

The Individual Defendants incorporate by reference the Standard of Review section of

Mason's Motion to Dismiss Count I.

ARGUMENT

Plaintiff asserts three claims against the Individual Defendants: (1) a claim under 42

U.S.C. § 1983 for denial of due process against all Individual Defendants, (2) a claim for denial

of due process under the Virginia Constitution also against all Individual Defendants, and (3) a

42 U.S.C. § 1983 claim for violation of the First Amendment against Dr. Hammat, Mr. Williams,

and Dr. Renshaw.  As demonstrated below all of these claims must be dismissed.

I.    **CLAIMS FOR DAMAGES AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY.**

"It is well settled that the Eleventh Amendment bars a suit by private parties to recover

money damages from the state or its alter egos acting in their official capacity.  *Huang v. Bd. of

Govs. of Univ. of N.C.*, 902 F.2d 1134, 1139 (4th Cir. 1990).  Mason "is a state-supported

university that is entitled to the same sovereign immunity as the Commonwealth of Virginia."

*Adkins v. Rector & Visitors of George Mason University*, No. 15cv879, 2015 U.S. Dist. LEXIS

128150, at *3-4 (E.D. Va. Sept. 23, 2105).  The Individual Defendants are all state employees or

former state employees,[5] *see* Compl. ¶ 20-24, and therefore enjoy Eleventh Amendment

---

[5] Dr. Hammat is a former employee of Mason, but all of her activities related to this case
occurred while she was a Mason employee.

**A386**

immunity in their official capacities.  Therefore, Plaintiff's claims for monetary damages against the individual defendants in their official capacity under 42 U.S.C. § 1983 must be dismissed.

## II.    PLAINTIFF HAS FAILED TO PLEAD A FEDERAL DUE PROCESS CLAIM.

In order to plead a procedural due process claim a plaintiff must allege "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action;' and (3) that the procedures employed were constitutionally inadequate."  *Iota Xi Chapter of Sigma Chi Frater. v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009).  Here, Plaintiff asserts that he "has a significant liberty interest in his good name and reputation and significant property interest in his tenured position as a full professor."  Compl. ¶ 502.  Defendants do not contest that Plaintiff has those interests, but Plaintiff has failed to allege that he was deprived of those interests by the Individual Defendants ***because he remains employed by Mason***.  Additionally, even if Plaintiff were deprived of those interests, the procedures employed in adjudicating his Title IX matter and determining sanctions gave him notice and several opportunities to be heard. As such, Plaintiff has not properly pled a due process claim.

### A.  Plaintiff Was Not Deprived of a Constitutionally Protected Property Interest.

Plaintiff correctly asserts that he has a property interest "in his tenured position as a full professor" at Mason.  *Id.*  But Plaintiff has not been deprived of that property interest; he remains a tenured full professor at Mason.  The Complaint never alleges that Plaintiff was terminated, nor could it.  Plaintiff, therefore, cannot assert a due process claim based on a property interest.  *See, e.g.*, *Huang*, 902 F.2d at 1141 (rejecting due process claim where plaintiff "remains a tenured full professor"); *Cominelli v. Rector & Visitors of the Univ. of Va.*, 589 F. Supp. 2d 706, 713 (W.D. Va. 2008) (even an intra-department demotion "cannot implicate a protectable property interest").

7

**A387**

The sanctions that were imposed on Plaintiff do not constitute a deprivation of a property interest. "To have a property interest . . ., a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The sanctions imposed on Plaintiff by Dr. Renshaw were limited to requiring participation in sexual harassment prevention training and a four-semester[6] probationary period during which he was (1) restricted in his mentoring and teaching of graduate students,[7] (2) restricted from communicating with students outside of established University channels (e.g., Mason email) or in non-public, off-campus settings, and (3) subject to review of his conduct with students. *See* Compl. ¶ 393. Plaintiff was also removed from a program within the Psychology Department— while remaining a tenured professor in that department—as a result of a grievance filed by other faculty members. Compl. ¶¶ 419, 439. Plaintiff does not allege any fact demonstrating that he has a property interest in being able to recruit and teach graduate students, communicating with students in private or through personal email, or being part of a specific academic program.

Nor could plaintiff allege any such property interest. Plaintiff asserts that his property interest "arises from his appointment letter [and] the Faculty Handbook." Compl. ¶ 512. Neither the Faculty Handbook, *see* Fn.4, nor Plaintiff's appointment letter, Ex. 5 (incorporated by reference, Compl. ¶ 512), give Plaintiff the right to recruit and teach graduate students, communicate with students in private or through personal email, or be part of a specific

---

[6] By the time this motion is heard, the first semester of Plaintiff's probationary period will have passed.

[7] Plaintiff was allowed to continue to work with existing graduate students conducting research under his mentorship, if those students chose to continue working with him.

8

academic program.  To the contrary, his appointment letter states "The University reserves the right to change your assignment, as well as your physical location, at any time during your employment, and you may be reassigned duties as determined by the University."  Ex. 5.

Unable to allege that he was terminated or that the sanctions imposed on him deprive him of a property interest, Plaintiff makes the conclusory—and incredible—claim that the sanctions imposed on him are "tantamount to dismissal because they have effectively prevented Plaintiff from fulfilling his duties as a full professor."  Compl. ¶ 394.  But a review of the sanctions imposed on Plaintiff, as alleged in the Complaint, demonstrate that this claim is facially false and need not be credited by the Court.  *See* Compl. ¶ 393.  As an initial matter, the sanctions imposed are limited to a temporary, four-semester probationary period and, therefore, bear no resemblance to a permanent termination or dismissal.  Indeed, Plaintiff admits that the "aim of the sanctions" was his "reintegration" into his department.  *Id.* ¶ 423.

Moreover, during the probationary period Plaintiff is still able to engage in nearly all aspects of being a faculty member.  Mason's Faculty Handbook states that "[f]aculty work assignments include some combination of teaching, research and scholarship, and/or service."  Ex. 4 at 47.  The sanctions imposed on Plaintiff do not prevent him from (1) teaching undergraduate classes, (2) mentoring and conducting research with undergraduate students, (3) mentoring and conducting research with post-doctoral students, (4) conducting research on his own, (5) collaborating and conducting research with other faculty members at Mason or other universities, (6) participating in or giving presentations at conferences, (7) writing articles or books, (8) publishing his research, (9) applying for grants, (10) participating in university activities, or (11) serving on university committees.  In other words, the restrictions only impact a tiny portion (working with graduate students) of a single element (teaching) of the broad range

of teaching, research, and service activities that Plaintiff can (and does) engage in as a professor at Mason.[8]

Finally, even if Plaintiff were correct that the sanctions prevent him from performing all of his duties as a faculty member, he would still be unable to establish a property interest based on the Fourth Circuit's holding in *Royster v. Board of Trustees*, 774 F.2d 618 (4th Cir, 1985). In *Royster*, the plaintiff was "relieved of his duties as superintendent effective immediately but with full pay and benefits" through the end of his contract. *Id.* at 619-20. The Fourth Circuit examined whether his "property interest, i.e., the legitimate expectancy in continued employment, included not only the right to receive the compensation guaranteed under the contract, but also the right to actively engage in and execute the duties of his office." *Id.* at 621. The Fourth Circuit held that it did not: "Royster has directed us to no authority which supports the proposition that a property interest in the continued expectation of public employment includes the right to physically possess a job, in defiance of the stated desire of the employer; nor has our own review revealed such authority." *Id.*; *see also Fields v. Durham*, 909 F.2d 94, 98

---

[8] It is questionable whether the allegation that the sanctions are "tantamount to dismissal" complies with Fed. R. Civ. P. 11. As noted, this allegation is facially false based on the allegations made in the Complaint. Moreover, while the Court cannot consider these facts on this motion to dismiss, Plaintiff's Counsel is certainly aware that (1) Plaintiff taught an undergraduate class at Mason during the Fall 2019 semester, (2) Plaintiff is scheduled to teach another undergraduate class during the Spring 2020 semester, (3) Plaintiff recently received a more than million dollar grant to support his research, *see* https://www2.gmu.edu/news/580271, (4) Plaintiff recently advertised that he is hiring two post-doctoral fellows to work in his lab, (5) next semester Mason is providing Plaintiff with additional research space to accommodate his asserted research needs, (6) Plaintiff continues to speak and participate in conferences, *see* https://instituteofcoaching.org/conferences-events/ioc-annual-conference; https://www.toddkashdan.com/speaking/, and (7) Plaintiff published five articles in 2019 and has four additional articles submitted for publication, https://www.toddkashdan.com/articles/by-date/ Given this information, Plaintiff's counsel should explain how the allegation that the sanctions have "effectively prevented Plaintiff from fulfilling his duties as a full professor," and are "tantamount to dismissal" Compl. ¶ 394, is consistent with their obligations under Rule 11.

**A390**

(4th Cir. 1990) ("[C]onstitutionally protected property interest in employment does not extend to the right to possess and retain a particular job or to perform a particular service."). Instead, "the property interest is more generally in continued employment, and no deprivation exists so long as the employee receives 'payment of the full compensation due under the contract.'" *Fields*, 909 F.2d at 98 (quoting *Royster*, 774 F.2d at 621). Plaintiff does not allege, nor could he, that Mason is failing to pay him his full salary and benefits under his employment contract. Therefore, even if Plaintiff had been relieved of all duties (which is not the case) under Fourth Circuit law he could not establish a property interest in being able to perform the duties of his job. *See id.*; *see also Royster*, 774 F.2d at 621, *Huang*, 902 F.2d at 1141 (faculty member had no property right in position in specific department).

### B. Plaintiff Was Not Deprived of a Constitutionally Protected Liberty Interest.

Plaintiff asserts that he "has a significant liberty interest in his good name and reputation." Compl. ¶ 502. Plaintiff's assertion of a due process claim based on reputation ignores clear Supreme Court jurisprudence that "reputation alone, apart from some more tangible interest such as employment," is neither "'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). "[F]or a liberty interest to have been implicated, some damage to [plaintiff's] employment status must have resulted from publication of the reasons for his demotion." *Johnson v, Morris*, 903 F.2d 996, 999 (4th Cir. 1990). In *Johnson*, the Fourth Circuit held that where an employee remained employed and had not alleged any "damage to his employment status" or the "opportunity for other gainful employment," no liberty interest is implicated. *Id.* ("[W]hen a police officer is suspended but not discharged he cannot complain that he has been made unemployable; he remains employed."). Here, Plaintiff has not alleged any deprivation of his

11

employment, either at Mason or elsewhere, and thus he cannot state a due process claim based on his reputation.

Moreover, the Fourth Circuit has held that to state a due process claim based on a reputational injury "a plaintiff must allege that the charges against him (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007). Here Plaintiff has not, and cannot, plead the second and third elements.

*First*, Plaintiff has not, and cannot, plead that the charges against him were made in conjunction with his termination or demotion. Plaintiff does not allege that he was terminated or demoted, to the contrary, the Complaint demonstrates that he continues to be a tenured professor. Again, absent some impact on Plaintiff's employment, his claim must be dismissed. *See Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 617 (E.D. Va. 2015) (no due process liberty claim where "Plaintiff's employment status has not changed"); *Cominelli*, 589 F. Supp. 2d 715 ("Because Plaintiff remained employed . . . the alleged defamation could not have occurred in the course of the termination of his employment, as is required to state a viable claim for deprivation of a liberty interest under the Due Process Clause."); *Echtenkamp v. Loudon Cnty. Pub. Schs.*, 263 F. Supp. 2d 1043, 1056 (E.D. Va. 2003) (dismissing liberty claim where "[a]t most, plaintiff has suffered some minor restriction on her freedom and authority as a result of her placement on probation and the increased supervision of her activities").

*Second*, Plaintiff has not, and cannot, plead that the charges against him were made public by his employer. The only allegations Plaintiff makes regarding disclosure are alleged disclosures internal to Mason, e.g., to the dean of his college and to other members of his department, or to the complainants in his case (which is required by Title IX regulations). *See*

12

Compl. ¶ 503-510.[9]  But such allegations of "statements and comments made only in internal memoranda, during private conversations, and at meetings not attended by the general public" are insufficient to demonstrate public disclosure.  *See Willis*, 90 F. Supp. 3d at 617; *Echtenkamp*, 263 F. Supp. 2d at 1056 (same) *Adler v. VCU*, 259 F. Supp. 3d 395, 409 (E.D. Va. 2017) (reports sent internally were not public disclosure); *Scott v. Va. Port Auth.*, No. 17cv176, 2018 U.S. Dist. LEXIS 53098, at *48 (E.D. Va. Feb 7, 2018) (allegation about statements made to former co-workers not sufficient to satisfy publication prong, allegation must be of dissemination to "prospective employers").

The Fourth Circuit has held that in order to state a claim under the Due Process Clause for a reputational injury, a plaintiff must allege "a likelihood that prospective employers (i.e. employers to whom he will apply) or the public at large will inspect his personnel file." *Sciolino*, 480 F. 3d at 650.  *Sciolino* further explains that a "plaintiff can meet this standard in two ways":  (1) "the employee could allege (and ultimately prove) that his former employer has a practice of releasing personnel files to all inquiring employers," or (2) "the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers." *Id.* Plaintiff has alleged neither.  Nor could he because Mason, as a state entity, is required to follow Virginia Department of Human Resource Management ("DHRM") Policy 6.05.  Per that policy only the employee's title, job classification, dates of employment, and annual salary can be disclosed to third parties without the consent of the employee; the employee's consent is required before any other employment information can be disclosed.  *See* VA DHRM Policy No. 6.05, available at

---

[9] Several of these allegations are false; neither Mason nor any of the Individual Defendants disclosed information about Plaintiff's case to other members of the faculty.

http://web1.dhrm.virginia.gov/itech/hrpolicy/pol6_05.html.  Plaintiff, therefore, cannot plead a

due process claim based on a "liberty" reputational injury.

### C. Plaintiff Received Due Process.

Even assuming, *arguendo*, that Plaintiff alleged the deprivation of a constitutionally

protected property or liberty interest, his claim would still fail as to each Individual Defendant

because he has failed to allege that any of them employed constitutionally inadequate

procedures.

### 1. Provost Wu Did Not Deprive Plaintiff of Due Process.

Plaintiff does not allege that Provost Wu had any role in investigating the alleged

misconduct, determining whether Plaintiff engaged in that conduct, deciding on sanctions, or

removing Plaintiff from the academic program.  The sole allegation regarding Provost Wu is that

he "declined to investigate CDE's investigation and findings in Plaintiff's case specifically,"

despite a request from the Faculty Senate that he review Plaintiff's case.  Compl. ¶ 524.  Even

assuming this allegation is true,[10] it is not sufficient to plead that Provost Wu deprived Plaintiff

of due process.  Such a review is not required under due process law—indeed appeals are not

even required by the due process clause in civil litigation.  *See Pennzoil Co. v. Texaco, Inc.*, 481

U.S. 1, 31 (1987) (Stevens, J. concurring).

### 2. Dr. Renshaw Did Not Deprive Plaintiff of Due Process.

The Complaint is also devoid of any allegations that even attempt to demonstrate that Dr.

Renshaw employed constitutionally inadequate procedures.  Dr. Renshaw's role in this matter is

---

[10] While the Court must credit Plaintiff's allegations on a motion to dismiss, this allegation is factually incorrect.  The Faculty Senate requested that the Provost review the process for investigating allegations of misconduct against faculty members generally and specifically questioned the results in three other faculty misconduct matters.  Plaintiff's case was not specifically raised by the Faculty Senate.

**A394**

that, as Plaintiff's supervisor, he determined the appropriate sanctions after it was determined by others that Plaintiff had violated Mason's sexual misconduct policy. Plaintiff does not allege any process required by due process jurisprudence (or Mason's procedures) that Dr. Renshaw failed to follow in determining the sanctions. Plaintiff's argument appears to be that Dr. Renshaw should not have imposed sanctions because he knew or should have known about the alleged procedural issues with the investigation conducted by others. *See* Compl. ¶ 522. That is not a due process violation.

      3. <u>Dean Ardis Did Not Deprive Him of Due Process.</u>

      Plaintiff similarly fails to allege a due process claim against Dean Ardis. The Complaint does not allege that Dean Ardis had any role in the investigation, adjudication, or sanction decision in Plaintiff's Title IX matter. The only allegation is that Dean Ardis "violated Plaintiff's clearly established rights when she issued a 'concurring' decision that Dr. Renshaw should effectuate Plaintiff's disaffiliation from his program" as recommended by the faculty grievance committee. Compl. ¶ 526. Plaintiff incorrectly contends that Dean Ardis had no authority to do so. The "Program Grievance" was filed against Plaintiff and Dr. Renshaw. *See id.* ¶ 419. The Faculty Handbook states that "[i]f a grievance is against an academic administrator below the level of Dean, the committee is charged to investigate the facts of the case and to recommend a resolution which is then forwarded to the Dean, whose decision is final." Ex. 4 at 52. Dr. Renshaw, as the Department Chair, is an academic administrator below the level of Dean. Therefore, as to Dr. Renshaw the decision of the grievance committee was only a recommendation to Dean Ardis, who was then required to make the final decision. Dean Ardis complied with the Faculty Handbook when she decided to accept the recommendation of

15

the grievance committee as to Dr. Renshaw.[11]  *See* Ex. 6 (incorporated by reference, Compl. ¶ 447) (stating that Dean Ardis concurred with "recommendation (b);" recommendation (b) related to Dr. Renshaw, *see* Compl. ¶ 439).

Regardless, even if Plaintiff's allegation were correct, it still would not state a due process claim.  Dean Ardis deciding whether or not to accept the recommendation of the grievance committee as to *Dr. Renshaw* does not implicate the due process clause, let alone Plaintiff's due process rights.  And assuming, *arguendo*, that the due process clause applies to Dean Ardis' decision, Plaintiff has identified no required process that Dean Ardis failed to provide.  Nor could he because Plaintiff was given notice of the grievance and an opportunity to respond.  *See* Ex. 3.  This is the most process that could possibly be required under the due process clause.  *See infra*.

4.  <u>Dr. Hammat and Mr. Williams Did Not Deprive Plaintiff of Due Process.</u>

The bulk of Plaintiff's due process allegations are aimed at Dr. Hammat and Mr. Williams who were involved in the investigation, adjudication, and appeal of the Title IX matter.  But these allegations demonstrate that Dr. Hammat and Mr. Williams employed a constitutionally adequate process in determining that Plaintiff had violated Mason's sexual misconduct policy.  Plaintiff incorrectly claims, "[t]o satisfy due process in the context of *any disciplinary proceeding* against a faculty member, the University is required to provide notice of the charges against the faculty member, an explanation of the evidence against him or her, and an

---

[11] It is actually Plaintiff who has violated the Faculty Handbook.  In addition to its finding against Dr. Renshaw, the grievance committee found that Plaintiff should disaffiliate himself from the academic program.  Plaintiff refused to do so, in violation of the Faculty Handbook which states that for grievances by one faculty member against a fellow faculty member, the "grievance committee's decision is final."  Ex. 4 at 52.

opportunity to present his side of the story." Compl. ¶ 500 (emphasis added).[12]  In the case of

**termination** a tenured public employee is entitled to this limited due process.  *See Cleveland Bd.*

*of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  As demonstrated above, however, Plaintiff

was not terminated and, therefore, Mason was not even required to provide him with the due

process described in *Loudermill*.  *See Gilbert v. Homar*, 520 U.S. 924, 929 (1997) ("[W]e have

not had occasion to decide whether the protections of the Due Process Clause extend to

discipline of tenured public employees short of termination."); *see Echtenkamp*, 263 F. Supp. 2d

at 1056 ("[P]laintiff cannot allege that she has been denied [due] process, as she has not yet been

terminated.").

Nonetheless, Dr. Hammat and Mr. Williams did provide Plaintiff with the due process

required by *Loudermill*.  As the Fourth Circuit has noted, *Loudermill*'s list of required due

process "was meant to be exhaustive." *Curtis v. Montgomery Cnty. Pub. Schs.*, 242 Fed. Appx.

109, 111 (4th Cir. 2007). Therefore, despite Plaintiff's list of complaints, the only issue for the

due process claim is whether Plaintiff was given "notice and an opportunity to respond."

*Loudermill*, 470 U.S. 546.  The allegations in Plaintiff's Complaint demonstrate that Plaintiff

was given notice and several opportunities to respond.  He was provided notices of the specific

charges against him and provided with the applicable University policies and procedures.  *See*

Compl. ¶ 136, *see also* Mason Motion Exs. 1-4; *Linton v. Frederick Cnty. Bd. of Cnty.*

*Comm'rs.*, 964 F.2d 1436, 1439 (4th Cir. 1992) ("Notice is sufficient [ ] if it apprises the

vulnerable party of the nature of the charges and general evidence against him."); *Doe v. Loh*,

---

[12] The case that Plaintiff cites for the proposition involved the termination of the faculty
member.  *See* Compl. ¶ 500 citing *Abatena v. Norfolk State Univ.*, No. 13cv699, 2014 U.S. Dist.
LEXIS 63249 (E.D. Va. May 7 2014).  It therefore does not support Plaintiff's contention that
these requirements apply to his case.

PX-16-3314, 2018 U.S. Dist. LEXIS 53619, at *20 (D. Md. March 29, 2018) (rejecting

inadequate notice argument) *aff'm* 767 Fed. Appx. 489 (4th Cir. 2019).  And Plaintiff admits that

he had four opportunities to be heard before sanctions were imposed and that during those

opportunities he responded to and presented his defenses to the allegations.  *See* Compl. ¶ 145

(interviewed three times during investigation); ¶¶ 252-533, 269-71, 309-10, 338, 341 (had

opportunity to respond to allegations); ¶ 153-54 (had opportunity to provide a list of witnesses

and "over 150 pages of documents); ¶ 165 (submitted 38-page appeal with "hundreds of pages of

exhibits"); *see also* Mason Motion at 24-25.[13]

Given Plaintiff's allegations showing that he received due process, it is not necessary for

the Court to wade through Plaintiff's list of supposed due process violations and alleged

deviations from Mason's procedures.  *See* Compl. ¶ 517.  To the extent the Court wishes to do

so, Plaintiff's assertions (which are duplicative of the "due process" allegations in paragraph 483

of Count I) are addressed in Mason's Motion to Dismiss Count I at 25-28.  In short, all of

Plaintiff's arguments that Mr. Williams and Dr. Hammat violated the due process clause are (1)

based on a fundamental misunderstanding of what the due process clause requires, (2)

conclusory allegations or *ipse dixit* that the Court need not consider, and/or (3) demonstrably (by

the Complaint and incorporated documents) wrong.[14]  Even if Plaintiff had alleged a deviation

from Mason's policy (he does not), "minor deviations from [university] procedures would not

support a claim under the Fourteenth Amendment and Section 1983."  *Abatena*, 2014 U.S. Dist.

---

[13] The Individual Defendant's incorporate by reference the due process section of
Mason's Motion to Dismiss Count I, Part I.B.2.

[14] The Individual Defendants stand ready to address during oral argument any specific
concerns or questions the Court has regarding any of these allegations and to explain why they
are not due process violations.

**A398**

LEXIS 63249, at *40. Rather, Plaintiff would need to show that the deviation from policy,

prevented him from receiving notice and opportunity to respond because "[w]hen the minimal

due process requirements of notice and hearing have been met, a claim that an agency's polices

or regulations have not been adhered to does not sustain an action for redress of procedural due

process violations." *Goodrich v. Newport News School Bd.*, 743 F.2d 225, 227 (4th Cir. 1984).

Plaintiff's own allegations demonstrate that he "received adequate notice, a specification of the

charges against [him], and [multiple] hearing[s] at which [he] was able to present [his] defense.

That is all [he] is entitled to under the federal Constitution." *Id.*; *see also Loh*, 2018 U.S. Dist.

LEXIS 53619, at *20, (rejected due process claim where the "Complaint and the incorporated

attachments show that [plaintiff] presented to [the hearing officer] all of the arguments and

defenses of which he now claims to have been deprived."), *aff'm* 767 Fed. Appx. 489 (4th Cir.

2019).

### III.    PLAINTIFF'S STATE LAW DUE PROCESS CLAIM FAILS AS WELL.

In Count III, Plaintiff asserts a claim for violation of the due process clause of the

Virginia Constitution. As an initial matter, Plaintiff can only assert this claim as to his alleged

property interest. "In order to enforce a private right of action under the Virginia Constitution,

the provision in question must be self-executing." *GMU*, 132 F. Supp. 3d at 728. The only part

of the Virginia due process clause that has been held to be self-executing is "with regard to

*property* deprivation." *Id.* Therefore, if the Court agrees that Plaintiff has not been deprived of a

constitutionally protected property right, *see* Part II.A, the state law claim must be dismissed.

Additionally, "Virginia state courts have consistently held that the [due process]

protections afforded under the Virginia Constitution are co-extensive with those in the United

States Constitution." *Doe v. Fairfax Cnty Sch. Bd.*, 384 F. Supp. 3d 598, 612 (E.D. Va. 2019)

**A399**

(internal quotation marks omitted). Therefore, Plaintiff's state due process claim fails for the same reasons as the federal due process claim. *See supra* Part II.

## IV.    PLAINTIFF'S FIRST AMENDMENT CLAIM MUST BE DISMISSED.

In Count IV Plaintiff asserts a claim under 42 U.S.C. § 1983 for a violation of the First Amendment against Dr. Hammat, Mr. Williams, and Dr. Renshaw. The basis of Plaintiff's claim is that these individuals violated the First Amendment when they found him responsible for sexual misconduct and sanctioned him based on statements he made "both inside and outside the classroom, with his graduate students concerning human sexuality, relationships, and cultural topics, topics directly related to research Plaintiff and his graduate students were conducting at the time." Compl. ¶ 548. In order for Plaintiff's statements to be protected they must be "on matters of public concern" and Plaintiff must be speaking "in [his] capacity as [a] private citizen," not as an employee. *Urofsky v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000) (en banc).

While Plaintiff makes the conclusory assertion that his statements were on a matter of public concern, a review of the statements demonstrates otherwise. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. The public-concern inquiry centers on whether the public or the community is likely to be truly concerned with or interested in the particular expression." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (internal quotation marks omitted). Plaintiff cannot seriously contend that the public is "truly concerned with or interested in" his personal sexual experiences such as performing oral sex at a party or visiting a brothel in Germany. *See, e.g.*, Compl. ¶¶ 252, 341-42; *see also id.* ¶ 344 (discussing sexual encounters by Plaintiff and graduate students); *id.* ¶ 292 (Plaintiff sharing his number of sexual partners); *id.* ¶ 353 (sharing story about sexual encounter in Hanoi). While Plaintiff clearly enjoys sharing his personal sexual experiences

**A400**

publicly, that does not make them a matter of public concern. *See Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 343 (4th Cir. 2017) ("[A] public employee's speech upon matters only of personal interest is not afforded constitutional protection"); *Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 822 (E.D. Va. 2006) (Speech that "addresses a personal interest . . . is not protected by the First Amendment"). And it is hard to imagine a more private topic than asking another person what type of pornography she enjoys. *Id.* ¶ 337. Plaintiff does not allege that he was punished for expressing his opinions on public issues related to "human sexuality, relationships, and cultural taboos," *id.* 548; rather he alleges only that he was punished for engaging in conversations about personal sexual experiences and preferences. As such, he has not pled a First Amendment claim.[15]

Even assuming that Plaintiff's discussions of his and other's sexual experiences were a matter of public concern, his claim would still fail under *Urofsky*. In *Urofsky*, the Fourth Circuit explained that in determining whether employee speech is protected, it is "critical" to determine whether "the speech is made primarily in the employee's role as citizen or primarily in his role as employee." 216 F.3d at 407. Where an employee speaks on a matter of public concern in their role as an employee, as opposed to a private citizen, that speech is not protected by the First Amendment even though it is on a matter of public concern. *See id.* Here, Plaintiff alleges that

---

[15] Additionally, Plaintiff alleges that several of the statements at issue were made during his classes. *See, e.g.*, Compl. ¶ 252 (sharing story in class about performing oral sex). "Curricular speech fails *per se* to be a matter of public concern." *Lee*, 418 F. Supp. 2d at 824. In *Boring v. Buncombe Cnty. Bd. of Educ.*, 146 F.3d 364 (4th Cir. 1996) (en banc), the Fourth Circuit held that the selection of a controversial play was part of the school curriculum and thus part of the teacher's employment. *Id.* at 368-69. As the court explained, the dispute "is nothing more than an ordinary employment dispute." *Id.*; *Lee*, 418 F. Supp. 2d at 824 ("[A]ny dispute over the content of the curriculum is a disagreement between the teacher and the employer-school that determines her employment duties."). While *Boring* was decided in the secondary school context, the analysis is the same. Whether Plaintiff can share sexually explicit personal stories in his classes is an internal matter regarding the curriculum in Mason's classes.

21

all of the relevant statements were made in the context of his teaching or research, both of which are part of Plaintiff's job. *See* Compl. ¶ 548. Plaintiff has thus admitted that the speech was "made in [his] role as employee," negating his First Amendment claim. *Urofsky*, 216 F.3d at 409; *see also German v. Fox*, No. 5:06CV00119, 2007 U.S. Dist. LEXIS 30895, at *22-23 (W.D. Va. Apr. 26, 2007) (no protection for emails sent as part of employee's official duties).

Finally, Plaintiff makes allusions to academic freedom in defense of his statements. The Fourth Circuit foreclosed this argument as well in *Urofsky*. There, the court traced the history of the concept of "academic freedom" and determined that "to the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." 216 F.3d at 410. The Court in *Urofsky* also explained that "the [Supreme] Court has never recognized that professors possess a First Amendment right of academic freedom to determine for themselves the content of their courses and scholarship, despite opportunities to do so." 216 F.3d at 414. Therefore, Plaintiff's position as a faculty member affords him no more First Amendment protection than any other state employee. As demonstrated above, Plaintiff can be disciplined for statements made by him in his role as a state employee and which are not on a matter of public concern.

## V.     THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013). "When properly applied it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Courts employ a

**A402**

two-step process for deciding whether qualified immunity applies. First the court asks "whether

a constitutional violation occurred." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir.

2017). As demonstrated above, Plaintiff has not properly pled a violation of the due process

clause or the First Amendment. That should be the end of the matter. However, if the Court

finds that Plaintiff has alleged a constitutional violation, it must proceed to the second step and

decide "whether the right violated was clearly established at the time of the official's conduct."

*Id.* Assuming, *arguendo*, that the Court does engage in the second step analysis, Plaintiff cannot

demonstrate that the right was clearly established.

For a right to be clearly established "[t]he unlawfulness of the official's conduct must be

apparent in light of pre-existing law." *Id.* (internal quotation marks omitted). "In conducting the

clearly established analysis, [a court] first examine[s] cases of controlling authority in this

jurisdiction—that is decisions of the Supreme Court, [the applicable] court of appeals, and the

highest court of the state in which the case arose." *Id.* (internal citations omitted). "Ordinarily"

courts "need not look any further," but courts may look to "a consensus of cases of persuasive

authority from other jurisdictions, if such exists." *Id.* at 539 (emphasis omitted).

Another key aspect of the qualified immunity analysis is to "define the right at the

appropriate level of specificity." *Id.* The Supreme Court has warned against "defin[ing] clearly

established law at a high level of generality" and explained that "general propositions, for

example that an unreasonable search or seizure violates the Fourth Amendment is of little help in

determining whether the violative nature of particular conduct is clearly established." *Ashcroft*,

563 U.S. at 742; *see also Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (right must

be defined at a "high level of particularity"). Following the Supreme Court's warning, here it

would be inappropriate to define the right at a high level of generality such as whether a faculty

23

member is entitled to due process in an employee discipline matter or whether a government

official can be punished for speaking as a private citizen on a matter of public concern.  Rather,

the correct analysis must be more specific to "the circumstances at hand;" i.e. whether there is

controlling law establishing that (1) an employee subject to disciplinary action short of

termination is entitled to due process, (2) each of the acts or omissions alleged in Compl. ¶ 517

are due process violations, and (3) an employer cannot discipline an employee for sharing

personal sexual stories and discussing sexual matters in the course of his employment.

*Campbell*, 483 F.3d at 271 (defining right as "whether a reasonable officer would have known

that [plaintiff]'s rambling thirteen-page memo . . . touched on a matter of public concern"); *see*

*also Doe v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 713 (W.D. Va. 2018) (granting qualified

immunity where "plaintiff has not pointed the court to any controlling authority sufficiently

similar to the situation confronted by" the defendants).

    The answer to all three questions is no.  With regard to the due process claim, there is no

controlling law stating that Plaintiff was entitled to due process in an employee discipline matter

that did not result in termination.  *See Gilbert*, 520 U.S. at 929 ("[W]e have not had occasion to

decide whether the protections of the Due Process Clause extend to discipline of tenured public

employees short of termination.").  In *Myers v. Shaver*, 245 F. Supp. 2d 805, 815 (W.D. Va.

2003), the court granted qualified immunity for a due process claim where the plaintiff was

suspended without pay but not terminated because "neither the United States Supreme Court nor

the Fourth Circuit has decided whether disciplinary action short of termination entitles an

employee to notice and a hearing before the employer acts."  Even if Plaintiff could overcome

**A404**

this hurdle, there is no controlling law supporting Plaintiff's asserted due process violations.[16]

Clearly established law is that, at most, Plaintiff was entitled to a notice and a hearing, which he

received.

Similarly, with regard to the First Amendment claim there is no controlling law holding

that Plaintiff's personal sexual storytelling in his role as a faculty member is protected.  As

demonstrated above, controlling law in the Fourth Circuit holds that it is not protected.  At most,

"the speech at issue in this case falls within the gray area between speech that clearly is a matter

of public concern and speech that clearly is *not* a matter of public concern," but such uncertainty

would require the granting of qualified immunity to the Individual Defendants.  *Campbell*, 483

F.3d at 271; *see also Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) ("[W]e have

emphasized repeatedly, 'officials are not liable for bad guesses in gray areas; they are liable for

transgressing bright lines.'").

At a minimum, the Individual Defendants are entitled to qualified immunity.

**VI.    Counts II, III, and IV Should Be Dismissed With Prejudice.**

As demonstrated above, Plaintiff has affirmatively pled facts that show he has no due

process or First Amendment claim.  No amendment of the Complaint can change the fact that (1)

Plaintiff was not terminated, (2) he received notice and several opportunities to be heard, and (3)

his statement were not on a matter of public concern and were made in his capacity as an

employee.  Counts II, III, and IV should, therefore, be dismissed with prejudice.

---

[16] To the extent Plaintiff tries to demonstrate controlling law to support his due process claim he would need to identify controlling law for each of his asserted due process violations. The Individual Defendants are entitled to qualified immunity for any claimed due process violation that cannot be supported by controlling law.

**A405**

## CONCLUSION

For the foregoing reasons, the Counts II, III, and IV should be dismissed with prejudice.


December 20, 2019                    RESPECTFULLY SUBMITTED


                                   _____/s/_____
                                   Eli S. Schlam, Asst. Atty. Gen.
                                   Virginia Bar Number 92987
                                   George Mason University
                                   4400 University Drive,
                                   MS 2A3
                                   Fairfax, VA 22030
                                   Phone: (703) 993-2619
                                   Fax: (703) 993-2340
                                   eschlam@gmu.edu

                                   *Attorney for Individual Defendants*

**A406**

### CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December 2019, I will electronically file

the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to counsel of record in this case.

_____/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu