**20-1509**

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

➤➤◄◄

TODD KASHDAN, f/k/a John Doe,

*Plaintiff-Appellant,*

*v.*

GEORGE MASON UNIVERSITY; RECTOR AND BOARD OF VISITORS OF GEORGE MASON UNIVERSITY; JENNIFER RENEE HAMMAT, in her official and individual capacity; JULIAN ROBERT WILLIAMS, in his official and individual capacity; KEITH DAVID RENSHAW, in his official and individual capacity; ANN LOUISE ARDIS, in her official and individual capacity; SZUYUNG DAVID DWU, in his official and individual capacity,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the Eastern District of Virginia at Alexandria*

## APPENDIX
## VOLUME II OF III
## Pages A407 to A811

TOBY JAY HEYTENS
OFFICE OF THE ATTORNEY GENERAL
   OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
804-786-7420

   *and*

ELI SAMUEL SCHLAM
GEORGE MASON UNIVERSITY
Merten Hall, Room 5400
4400 University Drive
Fairfax, Virginia 22030
703-993-2619

*Attorneys for Defendants-Appellees*

NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500

*Attorneys for Plaintiff-Appellant*

# **Table of Contents**

**Page**

## **Volume I**

District Court Docket Entries ................................................................ A1

Complaint and Jury Demand, filed September 26, 2019 ....................... A8

Defendant The Rector and Visitors of George Mason University's
    Motion to Dismiss Count I, dated December 20, 2019 ................. A170

Memorandum of Points and Authorities in Support of Defendant
    The Rector and Visitors of George Mason University's Motion
    to Dismiss Count I, dated December 20, 2019 ............................ A173

      Exhibit 1 to Memorandum -
      Notice of Investigation, dated December 4, 2018 .................. A205

      Exhibit 1A to Memorandum -
      George Mason University Sexual Misconduct Policy
      for Academic Year 2006-2014 ................................................ A209

      Exhibit 1B to Memorandum -
      George Mason University Sexual Misconduct Investigation
      Procedures for Academic Year 2006-2014 ............................ A212

      Exhibit 2 to Memorandum -
      Notice of Investigation, dated December 4, 2018 .................. A216

      Exhibit 2A to Memorandum -
      George Mason University Sexual Misconduct Policy for
      Academic Year 2006-2014 ...................................................... A219

      Exhibit 2B to Memorandum -
      George Mason University Sexual Misconduct Investigation
      Procedures for Academic Year 2006-2014 ............................ A222

# Table of Contents
## (Continued)

**Page**

Exhibit 3 to Memorandum -
Notice of Investigation, dated December 4, 2018 ................... A226

Exhibit 3A to Memorandum -
George Mason University Sexual Misconduct Policy
for Academic Year 2014-2015 ................................. A230

Exhibit 3B to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2014-2015 ............................ A239

Exhibit 3C to Memorandum -
George Mason University Sexual Misconduct Policy
for Academic Year 2015-2016 ................................. A243

Exhibit 3D to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2015-2016 ............................ A252

Exhibit 4 to Memorandum -
Notice of Investigation, dated December 4, 2018 ................... A257

Exhibit 4A to Memorandum -
George Mason University Sexual Misconduct Policy for
Academic Year 2016-2017 ....................................... A261

Exhibit 4B to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2016-2017 ............................ A279

Exhibit 4C to Memorandum -
George Mason University Sexual Misconduct Policy for
Academic Year 2017-2018 ....................................... A284

Exhibit 4D to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2017-2018 ............................ A301

**Table of Contents**
**(Continued)**

Page

Exhibit 5 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A307

Exhibit 6 to Memorandum -
Letter of Determination, dated February 21, 2019 .................. A310

Exhibit 7 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A313

Exhibit 8 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A317

Exhibit 9 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019 ................................................. A321

Exhibit 10 to Memorandum -
IDVSA Voice, Season 2013 ...................................... A324

Exhibit 11 to Memorandum -
"Sexual assault remains under-reported on campus
despite growing awareness", *The Daily Texan*,
published on November 4, 2013 ............................. A348

Exhibit 12 to Memorandum -
Excerpts from "Myths, Realities, and Common Sense at
Texas", *Minding the Campus*, November 6, 2013 .................. A357

Exhibit 13 to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015 .......... A361

Exhibit 14 to Memorandum -
"Students Release Sexual Assault Demands",
*Fourth Estate*, December 5, 2016 ........................... A367

**Table of Contents**
**(Continued)**

**Page**

    Exhibit 15 to Memorandum -
    Letter from Dr. Keith Renshaw to Todd Kashdan,
    dated May 31, 2019 .................................................. A371

Defendants Jennifer Hammat, Julian Williams, Keith Renshaw,
    Ann Ardis and S. David Wu's Motion to Dismiss Counts II-IV,
    dated December 20, 2019 ............................................ A375

Memorandum of Points and Authorities in Support of Defendants
    Jennifer Hammat, Julian Williams, Keith Renshaw, Ann Ardis
    and S. David Wu's Motion to Dismiss Counts II-IV,
    dated December 20, 2019 ............................................ A379

**Volume II**

    Exhibit 1 to Memorandum -
    Letter from Dr. Keith Renshaw to Todd Kashdan,
    dated May 31, 2019
    (Reproduced Herein at pages A372 to A374)

    Exhibit 2 to Memorandum -
    Letter from CHSS Grievance Committee to
    Appellant, dated June 19, 2019 ................................. A407

    Exhibit 3 to Memorandum -
    Email from CHSS Grievance Committee to Todd Kashdan,
    dated August 8, 2019 ............................................... A413

    Exhibit 4 to Memorandum -
    Excerpts from George Mason University's Faculty
    Handbook, dated July 1, 2018 ................................. A423

    Exhibit 5 to Memorandum -
    Offer Letter from Deborah A. Boehm-Davis,
    dated August 14, 2014, with Attachment A ........................... A428

iv

**Table of Contents**
**(Continued)**

**Page**

Exhibit 6 to Memorandum -
Email from Ann L. Ardis to Catherine Gallagher and
Jenna M. McGwin, dated September 16, 2019 ......................    A433

Plaintiff's Memorandum of Law in Opposition to Defendant
    George Mason University's Motion to Dismiss Plaintiff's
    Title IX Claim Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020 ...................................................    A434

Exhibit 1 to Memorandum -
Revised Sexual Harassment Guidance: Harassment of
Students By School Employees, Other Students, Or
Third Parties, dated January 2001 ...........................................    A466

Exhibit 2 to Memorandum -
First Amendment: Dear Colleague, dated July 28, 2003 ........    A515

Exhibit 3 to Memorandum -
Q & A on Campus Sexual Misconduct,
dated September 2017 ..............................................................    A518

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018, with Attachments ...........................    A526

Exhibit 5 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018, with Attachments ...........................    A536

Exhibit 6 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ....................................................................    A545

Exhibit 7 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ....................................................................    A574

# Table of Contents
## (Continued)

**Page**

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ........................................................... A621

Exhibit 9 to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019 ........................................................... A626

Exhibit 10 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ........................................................... A631

Exhibit 11 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ........................................................... A636

Exhibit 12 to Memorandum -
Order Granting in Part and Denying in Part Defendants'
Motion for Summary Judgment in *Doe v. Grinnell College,
et al.*, so ordered July 9, 2019 ................................................. A642

Exhibit 13 to Memorandum -
Todd Kashdan's Complaint Against Complainant for
Possible Act of Misconduct Under Student Conduct
Code and Violation of Section X of Policy 1202 .................... A685

Exhibit 14 to Memorandum -
Dear Colleague Letter on Title IX Coordinators,
dated April 24, 2015 ............................................................... A693

Exhibit 15 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A322 to A323)

**Table of Contents**
**(Continued)**

**Page**

Exhibit 16 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019
(Reproduced Herein at pages A372 to A374)

Exhibit 17 to Memorandum -
Letter from CHSS Grievance Committee,
dated June 19, 2019
(Reproduced Herein at pages A408 to A412)

Exhibit 18 to Memorandum -
IDVSA Voice, Season 2013
(Reproduced Herein at pages A325 to A347)

Exhibit 19 to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015
(Reproduced Herein at pages A362 to A366)

Exhibit 20 to Memorandum -
Excerpts from "Myths, Realities, and Common Sense at
Texas", Minding the Campus, November 6, 2013
(Reproduced Herein at pages A358 to A360)

Exhibit 21 to Memorandum -
"Sexual Assault Investigation", *Fourth Estate*,
October 24, 2016 ...................................................................... A702

Exhibit 22 to Memorandum -
"A Title IX Report Alleged Harassment by Student Body
President", *Fourth Estate*, April 29, 2018 .............................. A707

Exhibit 23 to Memorandum -
"Corrections Request: Title IX Article Published on 4/30",
*Fourth Estate*, May 16, 2018 .................................................. A716

**Table of Contents**
**(Continued)**

**Page**

Exhibit 24 to Memorandum -
"Students Release Sexual Assault Demands",
*Fourth Estate*, December 5, 2016 ........................................... A722

Exhibit 25 to Memorandum -
"Pledges of Continued Vigilance", *Inside Higher Ed*,
September 8, 2017 .................................................................... A728

Exhibit 26 to Memorandum -
(i) Letter from Faculty Senate Executive Committee to
President Cabrera, *et al*., dated May 15, 2019 ....................... A738
(ii) Letter from S. David Wu and Carol D. Kissal to
Faculty Senate Executive Committee, dated May 21, 2019 ... A744

Exhibit 27 to Memorandum -
Complainant 4 Text Messages and Email .............................. A746

Exhibit 28 to Memorandum -
Communications between Appellant and Complainant 1 ....... A755

Exhibit 29 to Memorandum -
Communications between Appellant and Complainant 3 ....... A763

Exhibit 30 to Memorandum -
Letter from CHSS Grievance Committee to Todd Kashdan,
dated September 10, 2019 ....................................................... A769

Exhibit 31 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019 ....................................................... A772

Exhibit 32 to Memorandum -
Peer Evaluation of Teaching Form, dated April 2, 2013 ........ A776

**Table of Contents**
**(Continued)**

Page

Plaintiff's Memorandum of Law in Opposition to the Individual
   Defendants' Motion to Dismiss Plaintiff's Due Process and
   First Amendment Claims Pursuant to Federal Rule 12(b)(6),
   dated January 22, 2020 .................................................................. A779

      Exhibit A to Memorandum -
      Letter from CHSS Grievance Committee to Todd Kashdan,
      dated September 10, 2019
      (Reproduced Herein at pages A770 to A771)

      Exhibit B to Memorandum -
      Letter from Dr. Keith Renshaw to Todd Kashdan,
      dated May 31, 2019
      (Reproduced Herein at pages A372 to A374)

      Exhibit C to Memorandum -
      Notice of Investigation (Complainant 1),
      dated December 4, 2018, with Attachments
      (Reproduced Herein at pages A527 to A535)

      Exhibit D to Memorandum -
      Notice of Investigation (Complainant 2),
      dated December 4, 2018, with Attachments
      (Reproduced Herein at pages A537 to A544)

      Exhibit E to Memorandum -
      Email from Megan R. Simmons, dated January 11, 2019,
      with Attachments
      (Reproduced Herein at pages A546 to A574)

      Exhibit F to Memorandum -
      Email from Megan R. Simmons, dated January 11, 2019,
      with Attachments
      (Reproduced Herein at pages A575 to A620)

**Table of Contents**
**(Continued)**

Page

Exhibit G to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019
(Reproduced Herein at pages A773 to A775)

**Volume III**

Exhibit H to Memorandum -
George Mason University's Faculty Handbook,
dated July 1, 2018 ..................................................................   A812

Exhibit I to Memorandum -
Q & A on Campus Sexual Misconduct,
dated September 2017
(Reproduced Herein at pages A519 to A525)

Exhibit J to Memorandum -
Department of Human Resource Management Policies
and Procedures Manual-Policy Number: 6:05-Personnel
Records Disclosure, revised July 1, 2005  ..............................   A873

Exhibit K to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019
(Reproduced Herein at pages A622 to A625)

Exhibit L to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019
(Reproduced Herein at pages A627 to A630)

Exhibit M to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019
(Reproduced Herein at pages A632 to A635)

**Table of Contents**
**(Continued)**

Exhibit N to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019
(Reproduced Herein at pages A637 to A641)

Exhibit O to Memorandum -
(i) Letter from Faculty Senate Executive Committee to
President Cabrera, *et al*., dated May 15, 2019
(Reproduced Herein at pages A739 to A742)
(ii) Letter from S. David Wu and Carol D. Kissal to
Faculty Senate Executive Committee, dated May 21, 2019
(Reproduced Herein at pages A744 to A745)

Exhibit P to Memorandum -
"A Title IX Report Alleged Harassment by Student Body
President", *Fourth Estate*, April 29, 2018
(Reproduced Herein at pages A708 to A715)

Exhibit Q to Memorandum -
"Corrections Request: Title IX Article Published on 4/30",
*Fourth Estate*, May 16, 2018
(Reproduced Herein at pages A717 to A721)

Exhibit R to Memorandum -
"Sexual Assault Investigation", *Fourth Estate*,
dated October 24, 2016
(Reproduced Herein at pages A703 to A707)

Exhibit S to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015
(Reproduced Herein at pages A362 to A366)

**Table of Contents**
**(Continued)**

**Page**

Exhibit T to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A322 to A323)

Exhibit U to Memorandum -
Letter from CHSS Grievance Committee,
dated June 19, 2019
(Reproduced Herein at pages A408 to A412)

Reply Brief in Support of Defendant The Rector and Visitors of
George Mason University's Motion to Dismiss Count I,
dated February 5, 2020 ................................................................. A877

Reply Brief in Support of Defendants Jennifer Hammat,
Julian Williams, Keith Renshaw, Ann Ardis and S. David Wu's
Motion to Dismiss Counts II-IV, dated February 5, 2020 ............. A899

Memorandum Opinion and Order of the Honorable Liam O'Grady,
so ordered on April 23, 2020, Appealed From ............................. A921

Notice of Appeal, dated April 29, 2020 ................................................. A965

**Volume IV**

**Documents Filed Under Seal**

Memorandum of Points and Authorities in Support of Defendant
The Rector and Visitors of George Mason University's Motion
to Dismiss Count I, dated December 20, 2019
(Omitted Herein and Reproduced at page A173 to A204)

Exhibit 1 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018 ......................................................... A968

**Table of Contents**
**(Continued)**

**Page**

Exhibit 2 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018 ........................................................... A976

Exhibit 3 to Memorandum -
Notice of Investigation (Complainant 3),
dated December 4, 2018 ........................................................... A983

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 4),
dated December 4, 2018 ........................................................... A1009

Exhibit 5 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ........................................................... A1054

Exhibit 6 to Memorandum -
Letter of Determination (Complainant 2),
dated February 21, 2019 ........................................................... A1056

Exhibit 7 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ........................................................... A1058

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ........................................................... A1061

Exhibit 9 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019 ............................................................... A1064

Plaintiff's Memorandum of Law in Opposition to Defendant
    George Mason University's Motion to Dismiss Plaintiff's
    Title IX Claim Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020
    (Omitted Herein and Reproduced at pages A434 to A465)

# **Table of Contents**
## **(Continued)**

**Page**

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018
(Reproduced Herein at pages A968 to A975)

Exhibit 5 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018
(Reproduced Herein at pages A976 to A982)

Exhibit 6 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ...................................................    A1066

Exhibit 7 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ...................................................    A1095

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 .........................................    A1142

Exhibit 9 to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019 .........................................    A1147

Exhibit 10 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 .........................................    A1152

Exhibit 11 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 .........................................    A1157

# **Table of Contents**
## **(Continued)**

**Page**

Exhibit 13 to Memorandum -
Todd Kashdan's Complaint Against Complainant 4 for
Possible Act of Misconduct Under Student Conduct
Code and Violation of Section X of Policy 1202 ..................   A1163

Exhibit 15 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
Reproduced Herein at pages A1064 to A1065)

Exhibit 27 to Memorandum -
Complainant 4 Text Messages and Email .............................   A1171

Exhibit 28 to Memorandum -
Communications between Todd Kashdan
and Complainant 1 .................................................   A1180

Exhibit 29 to Memorandum -
Communications between Todd Kashdan
and Complainant 3 .................................................   A1188

Exhibit 31 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019 ......................................   A1194

Plaintiff's Memorandum of Law in Opposition to the Individual
    Defendants' Motion to Dismiss Plaintiff's Due Process and
    First Amendment Claims Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020
    (Omitted Herein and Reproduced at pages A779 to A811)

Exhibit C to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018, with Attachments .........................   A1198

xv

**Table of Contents**
**(Continued)**

Page

Exhibit D to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018, with Attachments .......................... A1208

Exhibit E to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments
(Reproduced Herein at pages A1067 to A1094)

Exhibit F to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments
(Reproduced Herein at pages A1096 to A1141)

Exhibit G to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019
(Reproduced Herein at pages A1195 to A1197)

Exhibit K to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019
(Reproduced Herein at pages A1143 to A1146)

Exhibit L to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019
(Reproduced Herein at pages A1148 to A1151)

Exhibit M to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019
(Reproduced Herein at pages A1153 to A1156)

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019
(Reproduced Herein at pages A1158 to A1162)

Exhibit T to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A1064 to A1065)

# EXHIBIT 2

**A408**

CONFIDENTIAL



Todd B. Kashdan Ph.D.
Professor, Department of Psychology
Director, The Well-Being Lab
Senior Scientist, Center for the Advancement of Well-Being
George Mason University
Mail Stop 3F5
Fairfax, Virginia  22030

June 19, 2019

Dear Professor Kashdan:

The CHSS Grievance Committee has reviewed your appeal of June 7, 2019, that you submitted to me as Chair of the Grievance Committee.

The CHSS Grievance Committee is tasked with hearing faculty grievances against persons below the rank of Dean, per the Faculty Handbook and per Item 2.11.2.2, Grievance Procedures, CHSS Faculty Grievance Procedures, February 4, 2009. We unanimously conclude that your grievances against Vice President Julian Williams and George Mason University are beyond the purview of our committee. Similarly, we do not have authority to address processes or your appeal of Compliance, Diversity, and Ethics (CDE) actions (your appeal of March 28, and the CDE conclusions regarding your appeal of April 11).

Your complaint against Dr. Keith Renshaw, Chair of the Department of Psychology, is within the scope of this committee:

> 2.11.2.2, 3: If the grievance is against an administrator below the level of dean/director or associate/assistant dean/director, the committee is charged to investigate the facts of the case and to recommend a resolution which is then forwarded to the dean or institute director, whose decision is final.

1

More specifically, your claim that Dr. Renshaw's actions affect your conditions of employment and academic freedom is within this Committee's purview, per page 5, item II, of your letter (and Scope of CHSS Faculty Grievance Committee, Grievance Procedures, CHSS Faculty Grievance Procedures, Feb 4, 2009, (a) alleged violations of academic freedom and (b) alleged violations regarding conditions of employment, such as work assignments, salaries, facilities, and support services).

The committee examined each claim raised regarding Dr. Renshaw's corrective actions that you allege violated academic freedom or conditions of employment to assess whether a prima facie case exists ("A prima facie case exists if the petitioner's allegations, ***should they be proven true, constitute a violation that falls within the scope of the Committee,***" item 5, page 4, CHSS Faculty Grievance Procedures, February 4, 2009, emphasis ours).
Of question is:

1. Dr. Renshaw's instruction to ban the hiring by Dr. Kashdan of one or more doctoral students (the letter states that six were interviewed, though it is unclear how many were to be hired) for the Fall 2019 semester.

2. The conditions of employment imposed by Dr. Renshaw as a result of the CDE's findings regarding the complaints of four of Dr. Kashdan's former and current graduate students.

3. Whether Dr. Renshaw will violate Dr. Kashdan's right to confidentiality of CDE processes and findings when he meets with graduate students to discuss whether they wish to remain under the employment or mentorship of Dr. Kashdan.

The committee finds that no prima facie case exists in any of these allegations.

Regarding Question 1: You state in your letter that Dr. Renshaw banned you from "...taking on graduate students for Fall 2019 before the Letters of Determination had been issued or my appeal had been decided." The Committee notes that the letters of Determination from CDE were distributed on February 22, 2019, following initial notifications of Investigation supplied to you and Dr. Renshaw on December 4, 2018.

The committee finds no prima facie case in your claim of a violation of your academic freedom or your conditions of employment. According to documents you have provided, Dr. Renshaw's instruction not to hire new students appears reasonable and falls within the period of investigation and its aftermath. Although this instruction could have resulted in an inconvenient delay had all CDE investigations been found without merit, an inconvenient delay under these circumstances does not rise to the level of a violation of academic freedom or conditions of employment.

Regarding Question 2: Dr. Renshaw writes, in his letter of May 29, 2019, the following regarding your conditions of employment as a result of the four CDE Letters of Determination and the denial of your appeal to CDE Vice President, Julian Williams:

To facilitate the required change in behavior and prevent future violations of Policy 1202, the following actions are being taken:

1. You are being required, no later than October 1, 2019, to participate in sexual harassment prevention training focused on heightening your awareness and understanding of how your inappropriate conversations, remarks, and unwanted physical contact created an environment of sexual and gender-based harassment - leaving students subjected to an environment they described as hostile. The training will be identified by CDE. A member of the CDE office will contact you regarding details about the date and time such a training program will be offered, both to coordinate and to confirm your attendance. Your participation or lack thereof will be communicated to me [Dr. Renshaw].

2. The following constraints will be placed on your work with Mason students from the date of this letter through the end of Summer 2021 semester, August 15, 2021:

a. You will be restricted in your mentorship, supervision, and teaching of graduate students in the following ways:

i. Graduate students currently conducting research under your mentorship and supervision will be asked to meet with the Department Chair to discuss their experience working with you and will be offered the opportunity to switch to another mentor/supervisor. You are not permitted to discuss this meeting or the students' decisions with those students at any time before or after the meeting.

ii. You will be ineligible to recruit new graduate students to work under your mentorship or supervision during this period.

iii. You will be ineligible to teach graduate courses during this period.

b. For any graduate or undergraduate students who elect to remain under your mentorship or supervision, and for any other students with whom you have a professional relationship (e.g., undergraduate students in your courses), the following restrictions will be put in place:

i. Written communication with Mason students must occur only through Mason-specific means (Mason email and servers). These communications will be subject to review at any time by the University. Communication must not occur via personal email accounts (e.g., Gmail), texts, or other group chat applications (Slack, WhatsApp, GroupMe or others). Any communication with Mason students that occurs outside of Mason-specific means may result in additional disciplinary actions.

ii. All meetings with students must occur on campus in an open setting. If you engage in meetings with students at professional conferences or at another academic site, these must occur in an open setting, and must be reported in advance (or, if arranged on an impromptu basis, as soon as possible afterward) to your Department Chair. Any meetings that occur off-campus (except for those

at professional conferences or other academic settings that are reported to the Chair) may result in additional disciplinary actions.

iii. Any interactions with students outside of meetings must be limited to department and professional events, where other faculty members are present. Any interaction outside of such events may result in additional disciplinary actions.

3. There will be regular review of your conduct with students throughout this probationary period. This review may include random assessment of your interactions with students and solicitation of feedback from students. By the end of the Fall 2020 semester, your Department Chair, in consultation with the Dean, will make a determination, based on these reviews, about whether there has been sufficient behavioral change to allow you to resume graduate teaching and/or mentorship or supervision of graduate students in Fall 2021. If a positive decision is made, the decision will be subject to change if any violations of the terms described above are subsequently revealed.

4. If you are allowed to resume teaching, mentoring, and/or supervising of graduate students in the future, your Department Chair, in consultation with the Dean, will make the determination if any continuing restrictions or conditions are necessary.

The Committee finds that no prima facie case exists regarding Dr. Renshaw's actions as they relate to academic freedom, due process, or conditions of employment. CDE's public document "Compliance Diversity and Ethics: Equal Opportunity/Affirmative Action Grievance Procedure" of March 2019, clearly states that corrective action falls to the "Responding Party's designate supervisor." As the department chair, Dr. Renshaw is this supervisor and has discretion to formulate corrective actions.

The Committee finds that Dr. Renshaw's actions are in keeping with CDE's Grievance Procedure, item III, Corrective Action and Sanctions, which states:

> Sanctions imposed on those individuals who have been found to be in violation of George Mason University's Equal opportunity policy or its Discriminatory Harassment policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

> Corrective actions may include a directive to stop any ongoing discrimination, unlawful harassment or retaliation; disciplinary or other correction action against the responding Party or others…and any other action considered necessary to ensure that this or similar conduct will not happen again.

The Committee also notes, per item III, Corrective Actions and Sanctions (CDE's Grievance Procedure), that the University may also take corrective action even if no discrimination and/or unlawful harassment is found, but the Responding Party is found to have engaged in inappropriate workplace behavior.

**A412**

The Committee finds no prima facie case that this violates academic freedom, due process, or conditions of employment in light of the CDE findings and other concerns Dr. Renshaw has stated in his letter.

Regarding Question 3: Dr. Kashdan claims that Dr. Renshaw's changes to his conditions of employment will violate his right to confidentiality afforded in CDE investigations.  Of specific concern is the stipulation that all current graduate students meet with Dr. Renshaw to review and confirm their interest in continuing with Dr. Kashdan as their mentor.

Per CDE Grievance Procedures, the Respondents in CDE cases are afforded confidentiality; however, this is during the investigation phase. Dr. Renshaw's corrective actions are not governed by CDE investigation procedures since these investigations have been completed and the appeal has been heard and decided. The stipulation to meet with graduate students is in keeping with Dr. Renshaw's authority as supervisor and per CDE publicly available policy, and thus the Committee finds no prima facie case.

Per item 5, Standard Operating Procedures, CHSS Faculty Grievance Procedures, 2009, I submit this letter to you on behalf of the CHSS Grievance Committee and provide a copy to the CHSS Dean's Office.  Respondents named in your grievance will not receive a copy.

The Committee is further instructed, per item 9, to "…report to the Faculty of the college [CHSS]…about the Grievance and about the Committee's decision without revealing the individual identities of the Petitioner and Respondent(s)." I have been in contact with the Chair of the Faculty Senate and the University Counsel's Office.  To fulfill this requirement, I will provide a summary, year-end report of cases in the most general sense.  I am happy to answer any questions you have about this reporting requirement.

Sincerely,

*CAGallagher*

Catherine Gallagher, PhD
Chair of the Faculty Grievance Committee
College of Humanities and Social Sciences
George Mason University
MSN 4F4 Enterprise 303
4400 University Drive
Fairfax, Virginia 22030
cgallag4@gmu.edu

# EXHIBIT 3

# A414

| | |
|---|---|
| **From:** | Catherine Gallagher |
| **Sent:** | Thursday, December 05, 2019 11:49 AM |
| **To:** | Eli Schlam; Anne Gentry |
| **Subject:** | Fw: CONFIDENTIAL: CHSS GRIEVANCE COMMITTEE FINDINGS |
| **Attachments:** | Faculty Grievance.Clinical Psychology. 8-1-19.pdf |

**From:** Catherine Gallagher
**Sent:** Thursday, August 8, 2019 16:45
**To:** Todd Kashdan <kashdan@gmail.com>
**Subject:** CONFIDENTIAL: CHSS GRIEVANCE COMMITTEE FINDINGS

Dear Professor Kashdan:

The CHSS Grievance Committee has reviewed an allegation that names you and Dr. Renshaw as Respondents. A copy of the Grievance is attached to this email.

The Committee concludes that the case is within its purview. It further finds that a *prima facie* case exists. ("A prima facie case exists if the Petitioner's allegations, ***should they be proven true, constitute a violation that falls within the scope of the Committee…***" item 5, page 4,*CHSS Faculty Grievance Procedures*, February 4, 2009, emphasis ours).

In particular, the Committee was concerned with two claims. We summarize these as follows:

1. Whether sufficient disciplinary action was taken by Dr. Renshaw in response to the findings that Dr. Kashdan violated University Policy, 1202 "sexual and gender-based harassment and other interpersonal violence". More specifically, whether Dr. Renshaw has, in his authority per the Office of Compliance, Diversity and Ethics, acted appropriately to protect the PhD Program in Clinical Psychology, including its faculty, students, and ethical responsibilities.
2. Whether your (Dr. Kashdan) unprofessionalism (established by findings of violations of University Policy 1202 "sexual and gender-based harassment and other interpersonal violence") potentially places the PhD Program in Clinical Psychology, including its faculty, students, and ethical responsibilities, at risk.

At this point, the Committee is instructed to alert you (a Respondent) of this finding. Per the 2009 *CHSS Faculty Grievance Committee* Standard Operating Procedures (item 6, page 4) you "will have 15 business days to submit a written response to the chair or acting chair of the Committee." In your case, we are concerned with item 2 above, though you are welcome to address any aspect of the Petitioners' complaint. Please note that Dr. Esposito-Smythers has been identified by this committee as the representative of the Petitioners and has received notice of the Committee's findings.

It is possible, and anticipated by the Standard Operating Procedures, item 7, that a satisfactory solution may be reached among parties during this 15-day period. Should a satisfactory solution not occur, the Committee will decide whether and what further procedures on the claim are warranted.

**A415**

Please contact me if you have any questions.

On behalf of the Committee,

CAGallagher

Catherine Gallagher, PhD
Chair of the Faculty Grievance Committee
College of Humanities and Social Sciences
George Mason University
MSN 4F4 Enterprise 303
4400 University Drive
Fairfax, Virginia 22030
cgallag4@gmu.edu

# A416

Dear Dr. Gallagher,

Below please find a formal grievance which is being filed by faculty within the Clinical Psychology Doctoral Program, including the Program Director (Dr. Christianne Esposito-Smythers), Associate Program Director (Dr. Jerome Short), and other core clinical faculty (Drs. Sarah Fischer, Tara Chaplin, Lauren Cattaneo, June Tangney, Leah Adams, and Robyn Mehlenbeck). Core clinical faculty who are not filing this grievance include Drs. Renshaw, Kashdan, and Riskind. Dr. Renshaw is our Department Chair and is not allowed to participate in this grievance procedure due to his supervisory role over the subject of our grievance, Dr. Kashdan. To our knowledge, Dr. Riskind is unaware of the subject matter described in this grievance. With guidance on procedure provided by our Human Resources Office, we are filing this grievance in line with **section 2.11.2 of the Faculty Handbook**. Our grievance is specifically related: 1) to Dr. Todd Kashdan, currently a core clinical faculty member with the clinical psychology program, who has engaged in "**unprofessional and unethical conduct**" that renders him unfit for affiliation with our clinical program at this time; and 2) Dr. Renshaw, our Department Chair, whom to our knowledge, has not taken adequate steps to protect our program accreditation.

Based on information brought to us by doctoral students in our clinical program, we were made aware of the fact that Dr. Todd Kashdan was investigated by our Title IX office for <u>sexual and gender-based harassment</u> based on complaints filed by four students who are or were in our clinical psychology doctoral program. In all four cases, allegations were substantiated and Dr. Kashdan was found to have violated university policy, **1202 "sexual and gender-based harassment and other interpersonal violence.**" We understand that such violations are addressed by supervisors and we presume that Dr. Renshaw is addressing these concerns with regard to the broader psychology department. However, we believe that those steps may be insufficient in addressing Dr. Kashdan's affiliation with our clinical psychology doctoral program. To our knowledge, Dr. Kashdan is still a member of the core clinical psychology faculty and allowed to mentor and teach students in our clinical program. Notably, Dr. Renshaw was not allowed to consult with clinical faculty, including the Director, Dr. Esposito-Smythers, and Associate Director, Dr. Jerome Short, of the clinical program who are responsible for maintaining program accreditation, when making decisions about departmental sanctions. If he had been, we would have conveyed the concerns relayed in this grievance which may have impacted his decisions.  We presume that his decisions may not be reversed unless procedural actions, such as our grievance, are taken by the clinical faculty.

To provide context to this grievance, there are five concentrations within the doctoral degree offered by our psychology department, including clinical psychology, industrial organizational psychology, human factors, cognitive and behavioral neuroscience, and applied developmental psychology. The clinical psychology program is distinct from the four others in that it is accredited by the American Psychological Association (APA) and all affiliated members must follow the APA Ethical Principles of Psychologists Code of Conduct.  To our knowledge, Dr. Kashdan is still allowed to mentor and teach doctoral students in our clinical psychology program. Under such conditions, our clinical program violates multiple APA accreditation standards as well as ethical codes that govern our profession. The purpose of our grievance is to request the removal of Dr. Kashdan's affiliation with the clinical psychology program. It is

# A417

<u>not</u> to re-litigate the university administration response. Notably, we were advised by Human Resources to file a grievance with the CHSS grievance committee to address our program concerns and requests.

Below we first present our assessment of how Dr. Kashdan's substantiated misconduct represents violations of our APA Standards of Accreditation and the APA Ethical Principles of Psychologists Code of Conduct. We then present relevant information from our accreditation and ethics codes about how faculty in Health Service Psychology programs (which includes Clinical Psychology) and Psychologists are supposed to handle said violations to offer support for our approach. We close with our requests to address the stated violations, as well as the potential consequences of inaction, to our clinical program and our students.

**VIOLATIONS**

<u>Source: APA Ethical Principles of Psychologists Code of Conduct </u>(https://www.apa.org/ethics/code/)

Section 3: Human Relations

3.02. Sexual Harassment. Psychologists do not engage in *sexual harassment that occurs in connection with their roles*.

3.03. Other Harassment. Psychologists *do not knowingly engage in behavior that is harassing or demeaning to persons with whom they interact in their work based on factors such as those persons'* age, *gender*, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status.

3.04. Avoiding Harm. *Psychologists take reasonable steps to avoid harming their* clients/patients, *students, supervisees*, research participants, organizational clients, and others with whom they work.

**Dr. Kashdan has four substantiated cases of <u>sexual</u> and <u>gender-based</u> harassment against clinical psychology doctoral students. The sexual and gender-based harassment caused significant emotional distress to the doctoral students, which spurred the Title IX complaints. This behavior also caused distress for multiple clinical psychology doctoral students who witnessed the sexual and gender-based harassment, served as witnesses in the Title IX case, and testified against Dr. Kashdan. Thus, Dr. Kashdan's behavior puts our program in violation of sections 3.02, 3.03, and 3.04, of the APA Ethical Principles of Psychologists Code of Conduct.**

<u>Source: Standards of Accreditation for Programs in Health Service Psychology (Approved February 2015)</u>

Doctoral Programs

I. Institution and Program Context

A.1.c. Health Service Psychology. A program that is accredited in health service psychology must demonstrate that it contains the following elements: The program engages in actions that indicate *respect for and understanding of cultural and individual differences and diversity*.

**A418**

**Dr. Kashdan has four substantiated cases of sexual and <u>gender-based harassment</u> against clinical psychology doctoral students. <u>Thus, Dr. Kashdan's behavior puts our program in violation of section A.1.c., within the Institutional and Program Context section that applies to Doctoral Programs, of our Standards of Accreditation for Programs in Health Service Psychology</u>.**

**III. Students**

B. 1. Supportive Learning Environment. *They [faculty] serve as appropriate professional role models…*

**Dr. Kashdan has four substantiated cases of <u>sexual and gender-based harassment</u> against clinical psychology doctoral students.  As stated above, this behavior violates three of our ethical codes (3.02, 3.03, and 3.04) in our APA Ethical Principles of Psychologists Code of Conduct. This behavior reflects that Dr. Kashdan is not serving as an appropriate professional role model in our clinical psychology doctoral program. <u>Thus, Dr. Kashdan puts our program in violation of section B.1., within the Students section that applies to Doctoral Programs, of our Standards of Accreditation for Programs in Health Service Psychology</u>.**

B. 2.  The program recognizes the rights of *students* and faculty to be treated with *courtesy and respect*. In order to maximize the quality and effectiveness of students' learning experiences, *all interactions among students, faculty, and staff should be collegial and conducted in a manner that reflects the highest standards of the scholarly community and of the profession (**see the current APA Ethical Principles of Psychologists and Code of Conduct**)*. The program has an obligation to … *put procedures in place to promote productive interactions.*

**Dr. Kashdan has four substantiated cases of <u>sexual and gender-based harassment</u> against clinical psychology doctoral students.  As stated above, this behavior violates three of our ethical codes (3.02, 3.03, and 3.04) in our APA Ethical Principles of Psychologists Code of Conduct. This behavior reflects that Dr. Kashdan is not treating all students with courtesy and respect, and that his interactions with all students have not been collegial or conducted in a manner that reflects the highest standards of the scholarly community or the profession (per our APA Ethical Principles of Psychologists Code of Conduct). <u>Thus, Dr. Kashdan's behavior puts our program in violation of section B.2., within the Students section that applies to Doctoral Programs, of our Standards of Accreditation for Programs in Health Service Psychology</u>.**

C. Plans to Maximize Student Success

C.1. *The program minimizes preventable causes of attrition* (e.g., *unsupportive learning environments*).

C.2. Program Engagement. *The program engages in specific activities, approaches, and initiatives to implement and maintain diversity and ensure a supportive learning environment for all students.*

**Dr. Kashdan has four substantiated cases of <u>sexual and gender-based harassment</u> against clinical psychology doctoral students. The sexual and gender-based harassment caused significant emotional distress to the doctoral students, which spurred the Title IX complaints. This behavior also caused distress for multiple clinical psychology doctoral students who witnessed the sexual and gender-based**

**A419**

harassment, served as witnesses in the Title IX case, and testified against Dr. Kashdan.  Students have reported a climate of anxiety and fear with Dr. Kashdan in the clinical program which renders their learning environment unsupportive. **Thus, Dr. Kashdan's behavior puts our program in violation of sections C.1. and C.2., within the Students section that applies to Doctoral Programs, of our Standards of Accreditation for Programs in Health Service Psychology.**

**IV. Faculty**

1.e. Core Faculty. The program has an identifiable core faculty … who: *are available to function as appropriate role models for students in their learning and socialization into the discipline and profession*.

**Dr. Kashdan has four substantiated cases of** <u>sexual and gender-based harassment</u> **against clinical psychology doctoral students.  As stated above, this behavior violates three of our ethical codes (3.02, 3.03, and 3.04) in our APA Ethical Principles of Psychologists Code of Conduct. This behavior reflects that Dr. Kashdan is not serving as an appropriate professional role model for our clinical students in their learning and socialization into the discipline and profession. Thus, Dr. Kashdan puts our program in violation of section 1.e., within the Faculty section that applies to Doctoral Programs, of our Standards of Accreditation for Programs in Health Service Psychology.**

<div align="center">

**MANAGING AND REPORTING VIOLATIONS**

</div>

**Source: Standards of Accreditation for Programs in Health Service Psychology (Approved February 2015)**

**Section V. Communication Practices**

B. 2. Communication. *The program must inform the accrediting body in a timely manner of changes in its environment*, plans, resources, or operations *that could alter the program's quality*.

**As stated above, Dr. Kashdan's behavior has created an unsupportive learning environment in our clinical psychology doctoral program, which has altered our program's quality. *If our grievance is unsuccessful and Dr. Kashdan remains affiliated with our clinical psychology doctoral program, we will have to report our program to the APA Office of Consultation and Accreditation for violations of our APA Standards of Accreditation.* Dr. Esposito-Smythers anonymously consulted with the APA Office of Consultation of Accreditation and the APA Ethics Office. She was told that this situation could be reported by students or faculty to the APA Office of Consultation and Accreditation, and was provided with directions on where to file a report as well as what to include in a report. If a report is filed, it will be reviewed by the accreditation *Commission*. Our clinical program will have to respond to any requests from the *Commission*. The Commission may choose to issue an "educative letter" and a request for a special site visit. It was made clear that *any* result is possible. Notably, as any result is possible, this could include loss of our APA accreditation.**

**Source: American Psychological Association (APA) - Ethical Principles of Psychologists Code of Conduct** (https://www.apa.org/ethics/code/)

**A420**

**Section 1: Resolving Ethical Issues**

1.03 Conflicts Between Ethics and Organizational Demands

*If the demands of an organization with which psychologists are affiliated or for whom they are working are in conflict with this Ethics Code, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with the General Principles and Ethical Standards of the Ethics Code.*

1.05 Reporting Ethical Violations (relevant if this situation cannot be resolved within GMU)

*If an apparent ethical violation has substantially harmed or is likely to substantially harm a person or organization and is not appropriate for informal resolution under Standard 1.04, Informal Resolution of Ethical Violations, or is not resolved properly in that fashion, psychologists take further action appropriate to the situation. Such action might include referral to state or national committees on professional ethics,* to state licensing boards, or to the appropriate institutional authorities.

**To our knowledge, we are required by our Department to retain Dr. Kashdan's affiliation with our clinical psychology doctoral program, thus *our organizational demands are in conflict with our ethics code*. Consistent with section 1.03 of the APA Ethical Principles of Psychologists Code of Conduct, by filing this grievance, we are taking *reasonable steps to resolve the conflict* consistent with the General Principles and Ethical Standards of the Ethics Code. Further, Dr. Kashdan's ethical violations (3.02, 3.03, 3.04) have underlined substantially harmed four doctoral students, as evidenced by four substantiated allegations of sexual and gender-based harassment by our Title IX office. Cumulatively, the behaviors reported by students spanned 7 years, suggesting a prolonged and sustained pattern of "unprofessional and unethical conduct." In addition, there remains potential for additional harm of students until a prolonged period of behavior change has been demonstrated. Thus, consistent with our APA Ethical Principles of Psychologists Code of Conduct, section 1.05, we will have to report our program to the appropriate national committee (in our case the APA Office of Consultation and Accreditation) if our grievance is unsuccessful. As described above, this action could place our program accreditation at risk.**

**OUR REQUEST AND SUMMARY OF RATIONALE FOR OUR REQUEST**

Our request is specially related to Dr. Kashdan's affiliation with the clinical program, not any other activity within the Psychology Department. We are requesting that Dr. Kashdan no longer affiliate with our clinical psychology doctoral program and lose all rights granted to Core faculty in our clinical program. According to our **Standards of Accreditation for Programs in Health Service Psychology, "***Core faculty must be identified with the program and centrally involved in program development, decision making, and student training. "Identified with the program" means that each faculty member is included in public and departmental documents as such, views himself or herself as core faculty, and is seen as core faculty by the students. Core faculty activities directly related to the doctoral program include program-related teaching, research, scholarship, and/or professional activities; supervising students' research, students' dissertations, and students' teaching activities; mentoring students' professional*

*development; providing clinical supervision; monitoring student outcomes; teaching in a master's degree program that is an integral part of the doctoral program; and developing, evaluating, and maintaining the program.*

Based on this information, Dr. Kashdan's disaffiliation with our clinical program will include: 1) removal from the clinical handbook and website; 2) no participation in clinical meetings or program decision making; 3) no participation in <u>clinical program related</u> student training, which includes teaching courses or seminars to clinical students, participating in clinical program brown bags, doing research with clinical students, publishing/writing grants with clinical students, serving on clinical student committees (e.g., clinical comps, second year projects, dissertation), or mentoring clinical students; and 4) no participation in other clinical program development activities such as serving on clinical committees that support the program. Notably, this does not preclude Dr. Kashdan from employing clinical students on his grants accepted through the university or writing papers <u>unrelated to clinical program requirements</u> with clinical students if they independently choose to do so.

If at some point in the future, Dr. Kashdan has accumulated ample evidence to show that he has fully remediated his behavior and can abide by requirements of our **APA Ethical Principles of Psychologists Code of Conduct** and our **APA Standards of Accreditation for Programs in Health Service Psychology**, he may submit a request to the current Director of Clinical Training to be considered for reaffiliation with the clinical program. However, as the current study body has been exposed to the unsupportive learning environment resulting from Dr. Kashdan's violations, which affects their perceptions of safety and supportiveness, we ask that his re-affiliation occur <u>no earlier than when our last currently enrolled student leaves for internship (approximately 4-5 years)</u>.

To be clear, our request would not impinge on Dr. Kashdan's ability to teach or conduct research in the department at large or within the context of any of the other four programs in the department. <u>Our request is solely limited to the clinical psychology doctoral program</u>.

Importantly, Dr. Esposito-Smythers, Director of Clinical Training, did meet with Dr. Kashdan on 7-24-19, in the presence of Dr. Renshaw, Department Chair, to ask him to voluntarily disaffiliate from the clinical psychology program and provided the reasons behind this request. After taking a few days to think through his decision, Dr. Kashdan prepared a long response which ended with, "I realize that program accreditation may be affected by my decision" and "I must refuse the request to disaffiliate."

In summary, the Title IX office has formally substantiated that Kashdan has engaged in conduct that violates our **APA Ethical Principles of Psychologists Code of Conduct** (**3.02, 3.03, 3.04**) and **APA Standards of Accreditation for Programs in Health Service Psychology** (**Institutional and Program Context section A.1.c.; Student sections B.1., B.2., C.1, C.2; and Faculty section 1.e**) which places our program accreditation at risk. Moreover, based on the **Communication Practices** section of our **Standards of Accreditation for Programs in Health Service Psychology,** and **section 1.05 Reporting Ethical Violation** of our **APA Ethical Principles of Psychologists Code of Conduct**, we must report these violations to the APA Office of Consultation and Accreditation if we cannot resolve this issue through our grievance. Thus, to preserve our training environment and accreditation, we are requesting that Dr.

**A422**

Kashdan no longer affiliate with the Clinical program and lose all of the associated privileges clearly delineated above. Dr. Kashdan may submit a request for re-affiliation, with evidence of demonstrated behavior change, but we ask that this occur no earlier than when the last current clinical student in our program has left for internship.

We sincerely thank you for your time and attention to this matter and are happy to provide any additional information or documentation that you may require.

Sincerely,

Drs. Christianne Esposito-Smythers, Jerome Short, Sarah Fischer, Tara Chaplin, Lauren Cattaneo, June Tangney, Leah Adams, and Robyn Mehlenbeck

# EXHIBIT 4



# FACULTY
# HANDBOOK

July 1, 2018

http://universitypolicy.gmu.edu/policies/non-discrimination-and-reasonable-accommodation-on-the-basis-of-disability/

1301 Responsible Use of Computing
http://universitypolicy.gmu.edu/policies/responsible-use-of-computing/

1406 Environmental Health and Safety
http://universitypolicy.gmu.edu/policies/environmental-health-and-safety/

4007 Misconduct in Research and Scholarship
http://universitypolicy.gmu.edu/policies/misconduct-in-research-and-scholarship/

4001 Conflict of Interest
http://universitypolicy.gmu.edu/policies/financial-conflicts-of-interest-in-university-contracts-with-businesses-under-virginia-law/

**2.10.2 Professional Ethics**

Although no set of rules or professional code can guarantee or take the place of a scholar's personal integrity, the University believes that the "Statement of Professional Ethics" and the "Statement on Plagiarism" promulgated by the American Association of University Professors at http://www.aaup.org/aaup serve as a reminder of the obligations assumed by all members of the professoriate. Faculty members must also adhere to the ethical standards of their respective professional associations and to university policies related to professional ethics (e.g., Research and Scholarship Misconduct, Responsible Use of Computing) while employed by the University. Please see University Policies at https://universitypolicy.gmu.edu/. In addition, unethical or unprofessional conduct may include, but is not limited to, repeated instances of workplace bullying, intimidation, harassment, verbal abuse, sabotage, and threatening behavior.

Generally accepted standards of professional ethics require faculty members who plan to resign or retire to give notice in writing to their local unit administrator no later than May 15. Only in personal emergencies or for other compelling reasons should faculty members leave the institution during the academic year, except when this coincides with the expiration of their contractual obligations.

Allegations of unethical or unprofessional conduct may be brought to the attention of the Provost, President, employee relations specialists in the Human Resources and Payroll office, or the appropriate University or local academic unit grievance committee (see Section 2.11.2.1 and Section 2.9.3). In all cases, all parties have a right to procedural due process.

**2.10.3 Faculty Work Assignments**

Faculty work assignments include some combination of teaching, research and scholarship, and/or service.

The faculty of each local academic unit prepares and maintains a plan for the equitable allocation of teaching, scholarly and service activities that will be components of the individual work

# A426

**2.11.2 Grievances**

**2.11.2.1 Policies Concerning Grievances**

This section does not apply to the resolution of (1) research and scholarship misconduct allegations, which are governed by University Policy 4007 –Misconduct in Research and Scholarship; (2) allegations of discrimination, which are investigated by the Office of Compliance, Diversity and Ethics; or (3) alleged violations of academic freedom related to reappointment, promotion or tenure, for which Section 2.8 applies.

The university and each college/school are required to have a standing committee charged to investigate internal grievances in a timely manner concerning (i) alleged violations of academic freedom; (ii) other conditions of employment, such as work assignments, salaries, facilities, and support services (except for grievances related to Discontinuation of Degree Programs (Section 2.9.2) and Termination for Cause (Section 2.9.3); and (iii) charges of unprofessional or unethical conduct brought by one faculty member against another.

College/school committees hear grievances from faculty whose primary affiliation is within the college/school. The University Grievance Committee hears grievances that involve faculty from more than one college/school as well as other grievances mandated in the committee charge. The University Grievance Committee hears all grievances against academic administrators at or above the level of Dean. See Section 2.11.2.2.

The University Grievance Committee and each college/school grievance committee will establish, publish, and disseminate their grievance procedures. Upon receipt of a grievance that includes an allegation of violation of federal or state law, or discrimination in violation of federal or state law or University policy, the grievance hearing shall be held in abeyance until the Office of Compliance, Diversity and Ethics has investigated the allegation and has submitted a report to the committee.

In addition to hearing specific cases, the committees may initiate, as they deem necessary, discussions with appropriate administrators about any matters that fall within the committees' purview. In the course of such discussions, however, they may not commit the faculties of their units to changes in grievance policy unless specifically authorized to do so.

At their discretion, academic departments may also establish grievance committees. Their procedures should be similar to those of the collegiate committees.

**2.11.2.2 Grievance Procedures**

1. Grievance procedures for all Grievance Committees must adhere to the following basic elements.

   a. The faculty member initiates a grievance by filing a written statement of the grievance, along with supporting documentation, with the Chair of the relevant grievance committee. No grievance may be heard on behalf of a third party or group.

**A427**

b. Before the grievance itself is considered, the committee must conclude that the petitioner's case appears to have merit.

c. The faculty member may withdraw the grievance at any time without the grievance committee's approval. In such case, the grievance committee will not make a decision or recommendation.

d. No member of the committee with a conflict of interest in the grievance case may participate in the proceedings.

e. Committees are particularly charged to be alert to instances of inequitable treatment and retaliation against colleagues who have filed grievances.

2. Within a college/school, grievances against fellow faculty members and academic administrators below the level of Dean are heard by the local grievance committee.

a. If the grievance is against a fellow faculty member, the committee is charged to investigate the facts of the case and determine an appropriate resolution. The grievance committee's decision is final.

b. If the grievance is against an academic administrator below the level of Dean, the committee is charged to investigate the facts of the case and to recommend a resolution, which is then forwarded to the Dean, whose decision is final.

c. In cases of alleged violations of academic freedom, the faculty of the college/school acts on its grievance committee's recommendation by formal vote, the outcome of which is final.

3. Grievances against academic administrators at or above the level of Dean are heard by the University Grievance Committee.

a. If the grievance is against a Dean, the committee's recommendation is forwarded to the Provost, whose decision is final.

b. If the grievance is against the Provost, the committee's recommendation is forwarded to the President, whose decision is final.

c. If the grievance is against the President, the committee's recommendation is forwarded to the Rector of the Board of Visitors, whose decision is final.

**2.12 Department Chairs**

Department chairs serve in a dual capacity: as representatives of their faculty colleagues to the administration and as spokespersons of the administration to their faculty colleagues.

Normally, chairs serve in twelve-month instructional faculty appointments and are subject to all university policies pertaining to twelve-month appointees, including annual leave policies. Their specific responsibilities, including teaching assignments, are negotiated with the administration

A428

# EXHIBIT 5



**College of Humanities and Social Sciences**
4400 University Drive, MS 3A3, Fairfax, Virginia 22030
Phone: 703-993-8720   Fax: 703-993-8714

July 28, 2014                    *6603285 92*

Dr. Todd Kashdan
Department of Psychology
MSN 3F5

Dear Dr. Kashdan:

It is my pleasure to offer you the position of Professor.  I believe you will find George Mason University an exciting and rewarding environment in which to work, and a place where the contributions of faculty are valued.

This offer is subject to the terms and conditions of the document entitled "Faculty Elected Without Term, Terms and Conditions of Employment", attached hereto as "Attachment A", which is incorporated herein by reference.

The terms of this offer are as follows:

- Title:               Professor

- Effective Date:      August 25, 2014

- Appointment:         Full time nine (9) month Faculty Election Without Term, 1.0 FTE.  The phrase "Election Without Term" is referred to as "Tenure" in the Faculty Handbook.

- Salary:              $125,000.00

- Assignment:          You are assigned to the Department of Psychology and will report to Reeshad Dalal.  This position has a 2:2 teaching load based on research productivity.

- Other Terms:         The department will provide you with one course release during AY 2014/15.

                       You will be provided with research funds of up to $10,000 by CHSS that must be used by the end of FY17 (FY17 ends June 30, 2017).  Any funds remaining after FY17 will revert to CHSS.

If these terms and conditions are acceptable to you, please sign and date in the space provided below, initial at the bottom right of each page, and return the original to my office. This offer will remain open until August 15, 2014; if you do not sign and return this offer of employment before such date, this offer will be null and void.

Initials

I look forward to your acceptance of this offer and to a rewarding professional association in the future. Should you need additional information or assistance, please contact Reeshad Dalal at 703-993-9487.

Sincerely,

Deborah A. Boehm-Davis, Dean
College of Humanities and Social Sciences

S. David Wu
Provost and Executive Vice President

Ángel Cabrera
President

I accept the appointment described under the terms and conditions set forth in this letter, including all terms and conditions in the Attachment referenced in this letter. I further acknowledge that I will be governed by the administrative policies and regulations of the University, currently in force and as amended in the future. I also acknowledge that said rules do not create any vested employment rights and that the University reserves the right to reassign me during my term of employment.

Todd Kashdan

Date 8/14/14

cc: Human Resources and Payroll
    Office of the Provost
    College of Humanities and Social Sciences

Initials TK

ATTACHMENT A

**Faculty Elected Without Term, Terms and Conditions of Employment**

1. <u>Eligibility for Employment</u>.  Your employment is contingent upon providing the University, **prior** to your first day of employment, official documentation of degrees earned. An original transcript from the institution awarding the highest degree mailed to the Office of the Provost will ordinarily satisfy this requirement.  Please forward to - Office of the Provost, Attention:  Personnel Project Manager, 4400 University Drive MSN 3A2, Fairfax, VA  22030 or to provppm@gmu.edu.  You are responsible for providing a certified third-party translation and evaluation of your academic transcripts, if required by the University.  Your employment is contingent upon satisfying all Federal employment eligibility requirements, including any necessary work authorizations; and is contingent upon compliance with all applicable federal rules and regulations, including but not limited to those federal rules and regulations regarding sponsored research.  Your employment is contingent upon making no false or misleading representations in your application for employment.  Your employment is contingent upon a successful background investigation; if the results of such investigation are not satisfactory to the University, this contract is voidable by the University.  Questions regarding employment-based immigration should be directed to the Office of International Programs and Services.

2. <u>Approval of Appointment</u>.  This appointment is subject to approval by the appropriate University administrative officers. The appointment is also subject to the policies and bylaws of the Board of Visitors and approval by the Board of Visitors.

3. <u>Faculty Handbook</u>.  Your appointment is subject to all terms and conditions of the Faculty Handbook (the "Handbook") and any future modifications to it.  The Handbook, as modified, is hereby incorporated by reference, except as otherwise specifically provided by your offer letter. In the event of a conflict between the Handbook and your offer letter, the terms of your offer letter will take precedence.

4. <u>General Conditions of Employment</u>.  George Mason University is an agency of the Commonwealth of Virginia, organized pursuant to statute.  As is the case for all University employees, your employment is subject to the Acts of the General Assembly of Virginia, Executive Orders of the Governor, regulations adopted by the Board of Visitors of the University, all applicable regulations, and all policies of the University.  As a condition of your employment, you are subject to all applicable practices, policies and procedures of the University, including but not limited to policies regarding conflicts of interests, nondiscrimination, outside professional activities, leave, and intellectual property.  It is your responsibility to be aware of these policies and procedures, as well as all others which may apply to you.  University policies and procedures are subject to change without notice.  You agree to make best efforts to successfully perform your duties under this contract.

5. <u>Benefits</u>.  You may be eligible to receive certain benefits provided to Commonwealth of Virginia and University employees.  You are responsible for making all decisions and for taking all actions relating to such benefits, within established timeframes and deadlines.  Questions regarding benefits should be directed to the Department of Human Resources and Payroll.

6. <u>Taxation and Direct Deposit</u>.  All amounts paid by the University to you may be subject to taxation both for reporting and withholding.  Any amounts subject to withholding will have taxes withheld in accordance with federal and state law.  If you accept this offer and it is your first appointment to George Mason University, you must complete tax forms in order to receive payment.  Electronic direct deposit is mandatory for all employees.

7. <u>Assignment</u>.  The University reserves the right to change your assignment, as well as your physical location, at any time during your employment, and you may be reassigned duties as determined by the University.

Initials _____

**A432**

8. <u>Outside Activities</u>.  You may not engage in any outside activities which interfere with the proper performance of your duties.  You are also subject to all University policies regarding outside activities, including policies regarding conflicts of interest.

9. <u>Resignation</u>.  If you resign prior to completion of the Term of this contract, you agree to provide notice to the University as provided in the Handbook.

10. <u>General Terms</u>.  This contract may be modified only by a written agreement signed by both you and by an authorized employee of the University.  The waiver by either party of a breach of any provision of this contract will not operate or be construed as a waiver by that party of any prior or subsequent breaches.  All agreements and covenants contained herein are severable, and if an appropriate court declares any such agreement or covenant to be invalid, this contract will be interpreted and applied as if such invalid agreements or covenants were not contained herein. This contract shall be construed in accordance with the laws of the Commonwealth of Virginia. Venue for determination of the legal rights and obligations of the parties to this contract shall be an appropriate court in the Commonwealth of Virginia.  This contract contains the entire agreement for employment by and between you and the University for the position stated in this contract.  Oral modifications, additions, or supplementation to this contract shall have no effect and shall not bind the parties.  This contract supersedes all prior contracts of employment entered into between you and the University.  Paragraph headings are mere catchwords and shall not be used in interpretation of the terms of this contract.

11. <u>Availability</u>.  All instructional faculty must be available two weeks before classes begin and two weeks after classes end.

Initials

**From:** Ann L Ardis <aardis@gmu.edu>
**Sent:** Monday, September 16, 2019 16:49
**To:** Catherine Gallagher <cgallag4@gmu.edu>; Jenna M McGwin <jmcgwin@gmu.edu>
**Cc:** Ann L Ardis <aardis@gmu.edu>
**Subject:** RE: CONFIDENTIAL: CHSS GRIEVANCE COMMITTEE RECOMMENDATION

Dear Catherine,

I concur with the CHSS Grievance Committee's recommendation (b) regarding the August 1 grievance filed by Professor Esposito-Smythers on behalf of all of the petitioners in the Clinical Psychology Program.

As for recommendation (c), my understanding is that all applicable appeals within the university have been exhausted at this time and that, as per the Provost's July 30, 2019 letter to the Faculty Senate Executive Committee, Mason will not be conducting a re-evaluation of CDE's substantive findings of this case.

Thank you again for your committee's thoughtful deliberations on this case.

Sincerely,

Ann Ardis

*******
**Ann Ardis**
Dean, College of Humanities and Social Sciences
George Mason University

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. Action No. 1:19-cv-01249-LO-MSN |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
GEORGE MASON UNIVERSITY'S MOTION TO DISMISS PLAINTIFF'S TITLE IX
CLAIM PURSUANT TO FEDERAL RULE 12(b)(6)**

---

**NESENOFF & MILTENBERG, LLP**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

**and**

**FARMER LEGAL, PLLC**
**5030 Sadler Place, #205**
**Glen Allen, VA 23060**
**(804)325-1441**

**A435**

## **INTRODUCTION**

Plaintiff respectfully submits this memorandum of law in opposition to Defendant George Mason University's ("GMU" or the "University") Motion to Dismiss Plaintiff's Title IX claim (Count I). The Court should deny GMU's motion in its entirety.

GMU's attack on Plaintiff's erroneous outcome claim is, in part, grounded in a misstatement of the standards applicable to sexual harassment claims under Title IX, as well as GMU's own policies. While GMU claims that Plaintiff was responsible for sexual harassment because his statements and/or conduct caused discomfort or interference, the objective evidence in possession of GMU's Title IX Coordinator and/or submitted in support of Plaintiff's appeal demonstrated that there was no interference with the complainants' education. More importantly, the Title IX complainants were in no way denied access to or limited in their ability to participate in educational opportunities. Indeed, two of the complainants had already graduated from a graduate program prior to making allegations which dated back nearly five years.

GMU further argues that Plaintiff's erroneous outcome claim must be dismissed because Plaintiff acknowledged certain of the facts alleged. The relevant case law does not so hold. At all times, Plaintiff denied that he engaged in any misconduct constituting a policy violation. Plaintiff also denied a number of the allegations at issue.

GMU next imposes a heightened pleading standard on Plaintiff that does not exist, arguing that because he cannot allege a due process claim (which is, in any event, incorrect), he cannot allege facts which cast articulable doubt on the outcome of his Title IX proceedings. Again, the relevant case law does not so hold. Moreover, Plaintiff has alleged a number of flaws in the Title IX process which support his erroneous outcome claim.

**A436**

GMU further argues that Plaintiff has failed to plausibly allege gender bias. Yet Plaintiff has alleged that: the decisionmakers responsible for deciding the outcome of the Title IX investigation and appeal made statements, and engaged in conduct, which were indicative of gender bias; those same decisionmakers made public statements which were indicative of gender bias; and those decisionmakers made public statements, or were involved in events, related to pressure that GMU was under from the government, media scrutiny and its own students to better protect female students from sexual misconduct.

Finally, GMU argues that Plaintiff's selective enforcement claim should be dismissed for failure to allege a female comparator. Plaintiff has alleged his claim on information and belief, as permitted under *Twombly*, because the data necessary to allege and prove this claim is exclusively within GMU's possession or control—a fact which is undisputed—rendering GMU's argument remarkably disingenuous.

## BACKGROUND

Plaintiff, a full tenured professor at GMU, conducts research on human sexuality and cultural norms. Compl. ¶ 28. Plaintiff has worked at GMU for well over a decade, receiving consistently stellar course evaluations and peer evaluations. *Id.* ¶¶ 28, 31. In Fall 2018, a few months after Plaintiff fired one of his graduate students (Complainant 4) from his lab due to poor performance, Complainants 1-4, who were all friends, brought Title IX complaints against Plaintiff. Compl. ¶ 140. Prior to this time, Plaintiff had been subject to no disciplinary actions and had an unblemished record. *Id.* ¶ 28.

In Fall 2018, Complainants 1 and 2 had already graduated from GMU's graduate program. *Id.* ¶ 142. GMU's Title IX policy did not provide for the investigation of *post hoc* complaints lodged by alumnae. *Id.* Their allegations, some of which were identical, concerned two examples

2

**A437**

that Plaintiff used in two classes he taught—one in Spring 2013 and one in Spring 2014. *Id.* ¶¶ 247-299. Both students praised Plaintiff as an instructor, including with respect to the two courses. Both specifically requested that Plaintiff teach Course B—a course that he had not previously taught and only did so at his students' request. *Id.* ¶ 256. Complainant 1 later asked Plaintiff to serve on her dissertation committee even though there were other, more qualified faculty who could do so. *Id.* ¶ 259, Ex. 28. Complainants 1 and 2 made other allegations against Plaintiff (also dating back to 2013-2014) which were contradicted by evidence. *Id.* ¶¶ 247-299.

Complainant 3, who was Complainant 4's roommate, took one class with Plaintiff for one semester in Fall 2014. *Id.* ¶¶ 140, 323. She worked on one additional group project with Plaintiff which involved no one-on-one meetings, and Plaintiff provided her with two references. *Id.* ¶ 323. Complainant 3 never worked in Plaintiff's lab, nor did the two plan to conduct research together. *Id.* Though Complainant 3 blamed Plaintiff for leaving her research program, her mentor informed program faculty that Complainant 3 had lost interest in pursuing a research career. *Id.* ¶¶ 322-323.

Complainant 3's allegations also dated back a number of years and, for the most part, concerned statements Plaintiff allegedly made to third persons about Complainant 3. *Id.* ¶ 303. Complainant 3 alleged that Plaintiff noted her attractiveness during a conversation they had, hugged her on two occasions, two years apart (and in public), and made offensive comments to her boyfriend. *Id.* Complainant 3 also alleged that as a graduate student, she should not have been invited to attend Plaintiff's peer-reviewed conference presentation on issues concerning human sexuality. *Id.* These allegations were either uncorroborated or contradicted by evidence. *Id.* ¶¶ 304-323. Despite her allegations of harm, Complainant 3 sent Plaintiff unsolicited emails (when she wasn't a student) praising him and his work, asked him for letters of reference and asked to be part of one of Plaintiff's research projects. *Id.* ¶ 312, Ex. 29.

3

**A438**

Complainant 4 had a friendly and professional relationship with Plaintiff until such time as he fired her from her lab. *Id.* ¶ 324-332. Under Plaintiff's mentorship, Complainant 4 co-authored a number of published articles and conference presentations, received funding for research projects, and obtained an internship, and job with a six-figure salary, in the private sector. *Id.* ¶ 365. Complainant 4 frequently initiated and engaged in conversations of an explicitly sexual nature with Plaintiff and her colleagues, used derogatory language, and, while at a professional conference, organized a trip to a famous Atlanta lounge which had a strip club component. *Id.* ¶¶ 324-332, 345-352; Ex. 27. Complainant 4's allegations against Plaintiff concerned group conversations of a sexual nature that Complainant 4 actively engaged in with Plaintiff and other graduate students who were studying human sexuality. *Id.* ¶¶ 333-365. These conversations covered only a small portion of the hundreds of hours of conversations Plaintiff had with Complainant 4 over the course of two years. *Id.* ¶ 326. Some of the activities about which Complainant 4 complained—which she organized—she later described in emails as the best times of her life. Ex. 27. Complainant 4 routinely praised the lab culture. *Id.* Complainant 4's allegations were contradicted by evidence. *Id.* ¶¶ 333-365. Complainant 4's credibility and motives in filing her complaint were called into question by her co-mentor and Student 1 (*Id.* ¶¶ 157, 340).

Defendant Jennifer Hammat ("Dr. Hammat"), the Title IX Coordinator, commenced an investigation of Complainant 1-4's allegations, deemed sexual harassment, including those that were time barred under GMU's policies, implausible on their face, or both. *Id.* ¶¶ 136-144. When notifying Plaintiff about the investigation, she provided Plaintiff with five (5) different copies of GMU's sexual misconduct policies and four (4) different copies of the grievance procedures. Exs. 4-7. Dr. Hammat withheld from Plaintiff all of the evidence gathered in the case. *Id.* ¶ 155. Plaintiff responded to the allegations, and provided evidence to the best of his ability. *Id.* While Plaintiff

4

acknowledged certain of the facts alleged, he denied engaging in sexual harassment with respect to Complainants 1-4. *Id.* ¶¶ 247-365. Plaintiff filed a complaint against Complainant 4 for bad faith reporting, which GMU ignored. *Id.* ¶¶ 366-369; Ex. 13. Certain of Dr. Hammat's findings that Plaintiff violated GMU's sexual misconduct policies were based on allegations of which Plaintiff was not apprised during the Title IX investigation. *Id.* ¶¶ 282, 297, 322-323, 359-362, 364-365; Exs. 8-11. Plaintiff was not apprised of the policies and procedures Dr. Hammat relied on to find Plaintiff responsible. Exs. 8-11. Dr. Hammat added the charge of gender-based harassment to her determination and, further, referred to uncorroborated statements as factual findings supporting her determination. *Id.* Dr. Hammat's notices and determination letters contained statements that were indicative of gender bias. *Id.* ¶¶ 282, 321, 377, 485.e; Exs. 4-11. Dr. Hammat has also made public statements which are indicative of gender bias. *Id.* ¶¶ 112, 150-152.

Defendant Julian Williams ("Mr. Williams") denied Plaintiff's appeal despite the wealth of contradictory evidence and flawed procedures employed by Dr. Hammat. *Id.* ¶¶ 370-384. Certain statements made in Mr. Williams' determination letter were indicative of gender bias. *Id.*; Ex. 15. Mr. Williams also made public statements that are indicative of gender bias. *Id.* ¶ 166; Ex. 19. Mr. Williams publicly acknowledged the pressure that GMU was under after the Office for Civil Rights ("OCR") commenced an investigation of the university, including the potential loss of financial aid funding. *Id.* ¶¶ 108-109; Ex. 21.

Defendant Keith Renshaw ("Dr. Renshaw") imposed the Title IX sanctions, including restrictions on his teaching, mentorship and supervision of graduate students until August 2021 at the earliest, or until such time as Renshaw and the Dean determine, in their discretion, that Plaintiff exhibited "sufficient behavioral change" to resume these aspects of his professorship. *Id.* ¶ 393;

**A440**

Ex. 16. In response to a grievance filed by a group of Plaintiff's colleagues who had learned of the Title IX findings and sanctions, Dr. Renshaw disaffiliated Plaintiff from his program for a period of at least 5-6 years. *Id.* ¶¶ 441, 452, 455-457; Exs. 30-31.

Dr. Renshaw acknowledged to Plaintiff that the evidence at issue in the Title IX proceedings contradicted that Complainants 1-4 were harmed by the alleged conduct and implied that Plaintiff's disaffiliation from the program was motivated by Complainants 1-4 objecting to the sanctions already imposed as too lenient. Dr. Renshaw also said that the #metoo movement may have caused Complainants 1-4 to look back and "reframe" Plaintiff's conduct as sexual harassment. *Id.* ¶¶ 443-445.

<u>**STANDARD OF REVIEW**</u>

A Rule 12(b)(6) motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *1 (W.D. Va. 2015). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "'state a claim to relief that is plausible on its face.'" *Kirch v. Kowalski*, 2018 WL 3596028, at *1 (E.D. Va. 2018) (O'Grady, J.). The *Twombly* plausibility standard does not preclude a plaintiff from alleging facts on "information and belief" where the facts are peculiarly within the possession and control of the defendant. *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. *Kirch*, 2018 WL 3596028, at *1.

**A441**

## ARGUMENT

### I.    GMU Misstates the Standards Applicable to Sexual Harassment Claims

GMU incorrectly asserts that there could not have been an erroneous outcome in Plaintiff's Title IX proceedings because Complainants 1-4 alleged that Plaintiff "made them feel uncomfortable and interfered with their educational experience." Moving Br. at 3. This is not the proper standard for evaluating whether a Title IX violation has occurred.

As set forth in the Office for Civil Rights' ("OCR") guidance concerning sexual harassment claims against university personnel, sexual harassment which creates a hostile environment must be "sufficiently serious to *deny or limit* a student's ability to participate in or benefit from the school's program." Ex. 1, OCR, *Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Students, or Third Parties* (the "2001 Guidance"), January 2001, at 5, 16. *See* Ex. 2, 2003 Dear Colleague Letter, at 2; Ex. 3, September 2017 Q&A on Campus Sexual Misconduct (the "2017 Guidance"), at 1. Conduct that is not severe will not create a hostile environment and "the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX." *Id.* at 22.[1] Indeed, OCR's 2003 Dear Colleague Letter directs universities not to interpret sexual harassment as "encompassing all offensive speech regarding sex…. Harassment… must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive." Ex. 2, at 2.

---

[1] *See also* Ex. 1, 2001 Guidance, at 3, concerning gender-based harassment. Dr. Hammat improperly added gender-based harassment as a charge in her determination letters. Compl. ¶¶ 278-284, 294-299, 313-323, 356-365. Exs. 4-11.

GMU asserts that Complainants 1-4 experienced discomfort and interference.[2] They were not denied access to, or limited from participating in, their educational programs, and no evidence that Plaintiff provided in his case, or objective evidence, supported such a finding:

- Complainant 1's allegations concerned statements that Plaintiff made during *one session* of Class A, taught in Spring 2013, and *one session* in Class B, taught in Spring 2014. She made these allegations *after she had already completed her graduate coursework* at GMU. Compl. ¶ 247. After Complainant 1 took Course A, *she asked Plaintiff* to teach Course B—which he never taught before—so that she could have him as an instructor for a second time. *Id.* ¶ 256. After taking Course B with Plaintiff, Complainant 1 sent him an unsolicited email stating "this semester has rocked." *Id.* ¶ 264; Ex. 28. Complainant 1 later asked Plaintiff to be on her dissertation committee even though there were a number of other, more qualified faculty members who could have done so. *Id.* ¶ 259. Under these circumstances it is implausible that Plaintiff engaged in sexual or gender-based harassment with respect to Complainant 1.

- Complainant 2 also completed her graduate program prior to making any allegations against Plaintiff. Like Complainant 1, with whom she was friends, Complainant 2 complained—nearly five years after the fact—about the same statements as Complainant 1, made by Plaintiff during Course A (Spring 2013) and Course B (Spring 2014). Compl. ¶ 285. Complainant 2 also *asked Plaintiff* to teach Course B. *Id.* ¶ 256. After she took Courses A and B with Plaintiff, Complainant 2 had limited engagement with Plaintiff other than asking him for a recommendation in July 2014, which Plaintiff readily provided. *Id.* ¶¶ 291, 297. Again, under these circumstances it is implausible that Plaintiff engaged in sexual or gender-based harassment with respect to Complainant 2.

- Complainant 3, Complainant 4's roommate, also waited several years to report her allegations. Compl. ¶ 303. Immediately *after* Plaintiff allegedly made derogatory comments to her and her boyfriend during a party at Plaintiff's home, Complainant 3 sent him an unsolicited email noting "[l]ovely house and adorable children. See you soon." *Id.* ¶ 309; Ex. 29. Complainant 3 was *not* Plaintiff's student at the time.[3] As Plaintiff learned from Dr. Hammat's determination letter (not during the investigation), Complainant 3 claimed she

---

[2] GMU's unsupported and conclusory footnote discussing the purported power imbalance between graduate students and faculty members should not be considered by the Court as it raises issues of fact which are improper at this stage of the proceedings. However, even if it were considered, such an imbalance was neither evident nor salient in Plaintiff's case. *See* Compl. ¶¶ 247-365. Per the 2001 Guidance, when determining whether sexual harassment has occurred, a school should take into account "the age and maturity of the students involved and the educational environment." Ex. 1, at vi. Where a student "actively participates in sexual banter and discussions and gives no indication that he or she objects then the evidence generally will not support a conclusion that the conduct was unwelcome." *Id.* at 8.

[3] Indeed, with the exception of certain allegations dating back to November 2014, Complainant 3 was not a student of Plaintiff's during the times in which the allegedly offensive conduct occurred. Compl. ¶¶ 308-312, 322-323.

deliberately removed herself from research opportunities with Plaintiff and turned down a grant opportunity for which Plaintiff had written her a letter of recommendation because "she could not spend another year in the program." *Id.* ¶ 322. On appeal, Plaintiff provided evidence demonstrating significant credibility issues with Complainant 3's attribution of harm to Plaintiff's alleged misconduct: i) she took one class with Plaintiff in Fall 2014 and worked on a literature review with a group of students for which there were no one-on-one meetings—she completed the literature review project (*i.e.* did not remove herself); ii) the two never planned to work on any research together; iii) Complainant 3 emailed Plaintiff *after* certain alleged incidents occurred and told him that she was "grateful" to be involved in the literature review and had a "great experience" (Ex. 29); iv) she never worked in Plaintiff's lab; v) Plaintiff provided Complainant 3 with letters of recommendation for a project *outside* his area of research which she intended to conduct with her mentor; and vi) Complainant 3's mentor told program faculty that Complainant 3 was not interested in pursuing a research career. *Id.* ¶ 323. Once again, it is implausible that Plaintiff engaged in sexual or gender-based harassment with respect to Complainant 3.

- Complainant 4 graduated from GMU's doctoral program in May 2019. Compl. ¶ 324. Complainant 4 routinely initiated, and engaged in, banter and conversations of a sexual nature with Plaintiff and her fellow graduate students, and used derogatory and demeaning language during these exchanges. *Id.* ¶ 325, 327. Complainant 4 praised the very experiences about which she complained—including a trip to a lounge which she herself organized—and routinely praised Plaintiff's lab and its culture. *Id.* ¶¶ 325-328, 342-343, 345-349; Ex. 27. Complainant 4 requested that Plaintiff meet each of her parents (which he did). *Id.* ¶ 329. When interviewing for jobs, Complainant 4 told Plaintiff "thank you so much. I wouldn't even be interviewing at these places if it weren't for you. And more yet to come." *Id.* ¶ 328; Ex. 27. Plaintiff presented evidence that raised significant credibility issues with Complainant 4's allegations of harm: i) she received co-authorship credit on five published articles and three conference presentations over the course of approximately two years; ii) she received funding from two consulting projects to conduct research; iii) she obtained an internship, which led to a post-graduate job offer, as a result of her work in Plaintiff's lab and his recommendations; and iv) she was terminated from Plaintiff's lab after she became interested in working in the private sector and failed to conduct the work required of her. Compl. ¶ 365. *See also Id.* ¶¶ 323.c., 330 (Complainant 4's fellow students complained that she was not pulling her weight). Complainant 4 excelled under Plaintiff's mentorship and elected to make a bad faith complaint against him only after she was terminated from Plaintiff's lab. Under these facts it is implausible that Plaintiff engaged in sexual or gender-based harassment with respect to Complainant 4.

9

**A444**

The evidence outlined above, standing alone, demonstrates that Dr. Hammat's findings that Plaintiff engaged in sexual or gender-based harassment were erroneous.

## II.   Plaintiff Has Plausibly Alleged an Erroneous Outcome Claim

The Court should deny that portion of GMU's motion seeking to dismiss Plaintiff's Title IX erroneous outcome claim because: a) GMU wrongly asserts that Plaintiff admitted to engaging in misconduct; b) Plaintiff has alleged sufficient facts to cast doubt on the accuracy of the outcome of the Title IX proceedings against him; and c) Plaintiff has plausibly alleged a causal connection between gender bias and the erroneous findings against him, including the denial of his appeal.

### A.   Plaintiff Did Not Admit to Engaging in Sexual or Gender-Based Harassment

GMU argues that Plaintiff's erroneous outcome claim[4] should be dismissed because Plaintiff elected to be forthcoming and truthful about *certain* statements and events—both during the Title IX investigation and in the Complaint. Moving Br. at 22. Contrary to GMU's assertions, Plaintiff's acknowledgment that *certain* facts were true is not remotely fatal to his erroneous outcome claim because he did not concede—and in fact repeatedly denied—that he engaged in sexual or gender-based harassment in violation of GMU's Title IX policies. Compl. ¶¶ 250-365. *See Doe 2 v. Fairfax County School Board*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019) (plaintiff's admission that he engaged in certain acts was not equivalent to admission that he engaged in sanctionable misconduct); *Doe v. Rector and Visitors of George Mason University*, 149 F. Supp. 3d 602, 621-622 (E.D. Va. 2016) ("*GMU*") (plaintiff did not confess with such clarity that it would be inescapable to conclude that any fact-finder would find him responsible for sexual misconduct

---

[4] GMU asserts, without a single citation, that Plaintiff's erroneous outcome claim is limited to Dr. Hammat's determination that he engaged in sexual harassment. Moving Br., at 7. This argument is meritless *See, e.g.*, *Doe v. Baum*, 903 F.3d at 575, 580 (6th Cir. 2018) (discussing appeal process); Ex. 12, *Grinnell*, SJ Order, at 17-18 (finding flaws and bias at both adjudication and appeal stage); *Norris v. CU Boulder*, 362 F. Supp. 3d at 1011-1012 (D. Colo. 2019) (examining entire process including appeal and subsequent review).

**A445**

regardless of the procedural protections in place). *See also Baum*, 903 F.3d at 584-585 (at motion to dismiss stage court could not conclude that plaintiff confessed to misconduct); *Norris*, 362 F. Supp. at 1011-1012 (plaintiff's acknowledgment as to some of the facts did not preclude erroneous outcome claim). Plaintiff also appealed Dr. Hammat's findings. Compl. ¶¶ 370-384. With respect to the factual "findings" that GMU outlines in its Moving Brief (at pages 21-22), Plaintiff responds to the University's oversimplification of his allegations as follows:

- Plaintiff acknowledged that he invited graduate students to his home in December 2016 to celebrate the end of the semester. Compl. ¶ 341. During that time, people gathered in the hot tub in their swimsuits.[5] Plaintiff discussed his trip to Germany with graduate students (including Complainant 4), who were conducting research about human sexuality. This topic was part of a larger conversation about many different topics. Complainant 4 actively participated in the conversation (which should have been corroborated by the other students who participated). Within days of attending the party, Complainant 4 emailed Plaintiff that she was "unbelievably proud and grateful to be part of this lab family. [H]aving you as a mentor has changed the course of my life…thank you for being you." *Id.* ¶¶ 341-343, 359; Ex. 27.

- Plaintiff and Complainant 4 conducted, and published, research about the science of pornography. This was a topic that Plaintiff and Complainant 4 typically discussed for this reason. Complainant 4 also specifically requested that Plaintiff secure her one of three graduate student invitations to a conference at which leading researchers would be discussing the science of pornography. Compl. ¶¶ 338-339. On one occasion, Plaintiff and a few graduate students, including Student 1 and Complainant 4, were discussing how pornography could be used as a methodological tool to capture people's true sexual interests. *Id.* ¶ 338. Plaintiff did not recall Student 1 having a negative reaction to this conversation. *Id.* ¶ 337. Student 1 **did not** file a complaint against Plaintiff. *Id.* Student 1 was interviewed during the Title IX investigation and **denied** that Plaintiff engaged in any misconduct and said that the allegation that Plaintiff repeatedly asked her about pornography **was untrue**. *Id.* ¶ 340.

---

[5] GMU makes much ado about the hot tub (Moving Br. at 22) but takes no issue with the fact that a female professor in Plaintiff's program invited students over to swim in her pool. Compl. ¶ 379, n. 71. GMU also does not address why statements made by the facilitator at a mandatory workshop that Plaintiff's graduate students attended, concerning the facilitator's personal, sexual preferences—such as BDSM—were acceptable but Plaintiff's statements constituted harassment. Compl. ¶ 380, n. 72. GMU also fails to address why it was not sexual or gender-based harassment for a female facilitator to hold an orientation seminar for *first-year undergraduate* students at which sex toys were discussed and squeeze toys modeled as eggplants and peaches (depicting human anatomy) were given out. *Id.*

11

- Complainant 4 lied when she alleged that, in March 2018, Plaintiff "took his students" to a strip club. Compl. ¶¶ 345, 377; Exs. 7, 11. Complainant 4, an Atlanta native, ***took it upon herself*** to organize a trip to the Clermont Lounge while at a professional conference in Atlanta. The Clermont Lounge has been featured on CNN's "best places to eat and drink in Atlanta." *Id.* ¶ 347. It is a kitschy lounge visited by celebrities and has a strip club component. While at the lounge, Complainant 4 bought a lap dance for another graduate student—who refused—and then she directed the lap dance to Plaintiff. Complainant 4 also received a lap dance. Plaintiff took a photo of Complainant 4 getting a lap dance and the two joked about using it for blackmail. There was no evidence that this was more than Plaintiff and Complainant 4 joking around. In a group chat the next day, Complainant 4 said "thanks for dinner and everything last night…everything I could have hoped for in a first titty bar." She further referred to "seedy Atlanta bars (and their bathrooms)" as "bonus" "unforgettable memories" in a self-evaluation. *Id.* ¶¶ 347-349; Ex. 27. Plaintiff acknowledged that once he realized that Complainant 4 took the group to Clermont Lounge because of its strip club component that he should have bowed out and returned to his hotel. However, Plaintiff denied engaging in any discriminatory behavior towards Complainant 4 or that his error in judgment amounted to sexual or gender-based harassment. *Id.* ¶ 350.[6]

- Complainant 4 embellished her allegations concerning a discussion that Plaintiff had with some of his graduate students at a conference in January 2017, incorrectly stating that Plaintiff solicited information about their sexual encounters at the conference. Compl. ¶ 360. Complainant 4 routinely volunteered personal information about her sex life to Plaintiff and her fellow graduate students. *Id.* ¶ 361. Plaintiff acknowledged that he and his graduate students had a mutual, voluntary conversation about their sexual activities during the conference, which was a small part of the conversations had during the conference. *Id.* Plaintiff denied that having this conversation in any way constituted sexual or gender-based harassment. *Id.*

- Plaintiff acknowledged that while attending a conference in August 2018, Plaintiff engaged in several hours of conversation with his graduate students and that an experience he had in Hanoi Vietnam did come up as one topic of conversation. Compl. ¶ 353. Plaintiff denied that this discussion constituted sexual or gender-based harassment.

- Plaintiff *did not* concede that he generally spoke about sexuality with all of his graduate students. Plaintiff stated that "as part of months of work with Complainant 4 on presentations related to a research study of pleasurable and intimate sexual intercourse, Plaintiff, and Complainant 4, and students in his lab talked about sexuality. Plaintiff talked about sexuality with students

---

[6] Dr. Hammat's determination letter also mentioned that "at least one student had so much to drink that they threw up in the bathroom," suggesting, without basis, that Plaintiff was somehow responsible for monitoring the alcohol consumption of adults who were not only of legal drinking age but well into their twenties. There were no allegations made regarding the use of alcohol and this was entirely irrelevant to any accusations of sexual harassment. Ex. 11.

working with him on sexuality-related scientific research, including Complainant 4. Plaintiff and Complainant 4 had hundreds of hours of conversations, *only a small portion* of which concerned sexuality-related topics." Compl. ¶ 326 (emphasis added).

- Plaintiff filed a university complaint against Complainant 4 for "providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct." Compl. ¶ 369; Ex. 13. Plaintiff's colleague, Complainant 4's co-mentor, was interviewed during the Title IX investigation and raised concerns about Complainant 4's credibility and the veracity of her allegation that she was sexually harassed. *Id.* ¶ 157.

- Complainants 1 and 2 complained about an example Plaintiff used in a single class on sexual disorders that Plaintiff taught in Spring 2013 (Course A). Compl. ¶¶ 247-250, 252-253, 288. Plaintiff cited an example of performing oral sex on a woman at a party during a discussion about exhibitionism, one of the topics being taught. *Id.* ¶ 254. A peer evaluation of the same class, written by a professor in attendance, noted "[g]iven the sensitive nature of the materials and some strong opinions in the class [Plaintiff] worked very well to keep an atmosphere of mutual respect and fact based discussion throughout the class." *Id.* ¶ 257; Ex. 32.

- With respect to Complainant 2, missing from Dr. Hammat's purported findings of fact was the context in which Plaintiff shared the number of his sexual partners with the graduate students in Course A. Compl. ¶ 292. This occurred because *Complainant 2* asked him this question on the last day of class. *Id.* Plaintiff responded only with a number. *Id.* It is implausible that an individual who solicits information on a topic related to sex can then be sexually harassed by the receipt of that information.

- Complainants 1 and 2 complained about an example Plaintiff used during Course B (in Spring 2014), in which they first accused Plaintiff of telling a story about a female travel companion, who was "not his wife" "skinny-dipping" in front of him. Compl. ¶¶ 249, 287.c. Plaintiff denied that he told a story about "skinny-dipping" and there was no corroborating evidence so, instead, Dr. Hammat found him responsible for violating GMU's Title IX policies because he told an "erotic" story.[7] Compl. ¶ 296. Plaintiff acknowledged as part of one class he taught for Course B he gave an example of his travel to the Middle East, during which his female tour guide took him to a beach where she could swim in a bathing suit, which was forbidden in her country, and to a location where people kept mistresses and young people threw burner phones into cars in order to arrange dates (because dating was forbidden). *Id.* ¶¶ 262-263. All of

---

[7] This finding only appeared in Complainant 2's Letter of Determination though Complainant 1 made the same allegation. *Compare* Exs. 4, 5 *with* Exs. 8, 9. Compl. ¶¶ 281, 296.

this related to the emergence of counter cultures. *Id.* Plaintiff received excellent student reviews for Course B. Plaintiff denied that this example amounted to sexual or gender-based harassment, as erroneously determined by Dr. Hammat. *Id.* ¶ 265.

- With respect to Complainant 3, Plaintiff did not recall making any derogatory comments to her boyfriend about Complainant 3 while at a conference in November 2014 (four years before Complainant 3 made her complaint against Plaintiff). Compl. ¶ 306.

The cases GMU relies upon in arguing for dismissal of Plaintiff's erroneous outcome claim are inapposite. In *Armstrong v. James Madison U.*, 2017 WL 2390234 at *8 (W.D. Va. 2017), the plaintiff—an alumnus who was stripped of gym privileges—admitted to making unsolicited sexual advances to two undergraduate students working at the university's gym. In *Marshall v. Ohio University*, 2015 WL 7254213, at **5-6 (S.D Ohio 2015), the plaintiff admitted that he sent harassing text messages to the Title IX complainant *and* that he violated the university's sexual misconduct policy. *Id.*

GMU ignored that Plaintiff denied a number of the allegations and findings with respect to Complainant 1 (Compl. ¶¶ 269-277, 366-369, 376), Complainant 2 (*Id.* ¶¶ 290, 297, 366-369, 376), Complainant 3 (*Id.* ¶¶ 304, 306-312, 315-323, 367, 376, 379) and Complainant 4 (*Id.* ¶¶ 354, 355, 359, 362, 364-369, 375-380, Ex. 13).[8]

GMU incorrectly asserts that "the question for an erroneous outcome claim is whether [GMU] erroneously concluded that the conduct occurred." Moving. Br. at 23.[9] The question at

---

[8] For all of these reasons, GMU's request to dismiss Plaintiff's Title IX claim *with prejudice*, on the ground that he admitted to engaging in sexual misconduct, should be denied.

[9] GMU also concludes that "it is plain on the face of the Complaint" that Plaintiff's discussions with his graduate students, and examples used in class, "have no pedagogical or research value." Moving Br. at 22-23. This is an issue of fact which cannot be decided at the motion to dismiss stage. The class reviews, peer evaluation, the complainants' unsolicited praise of Plaintiff and statement of Student 1 that she was not sexually harassed readily contradict GMU's assertion. *See supra* Points I and II.A. GMU dismisses Mr. Williams' archaic assumption that a group of adults sitting in a hot tub in swimsuits is inappropriate as unrelated to gender bias. Moving Br. at 15. This is yet another question of fact that cannot be resolved now. *See, e.g.* Ex. 12, Grinnell, SJ Order, at 22-28. GMU further misstates the standards applicable to Plaintiff's appeal as a measure of whether he exercised "good judgment" as opposed to whether there

14

issue is whether GMU erroneously found that Plaintiff engaged in sexual or gender-based harassment in violation of Title IX and whether Plaintiff alleged (i) sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). *See, e.g. Norris*, 362 F. Supp. 3d at 1011-1012.

### B.   Plaintiff Has Alleged Sufficient Facts to Cast Some Articulable Doubt on the Accuracy of the Outcome of the Title IX Proceedings

Pleading sufficient facts to cast some articulable doubt on the accuracy of the outcome of a Title IX disciplinary proceeding is "not a significant barrier to cross" and can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Marymount U.*, 297 F. Supp. 3d at 584; *Norris*, 362 F. Supp. 3d at 1011. Allegations that a plaintiff was not provided a right of cross-examination when credibility was at stake is also sufficient. *Baum*, 903 F.3d at 585-586. As are "particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witnesses." *Norris*, 362 F. Supp. 3d at 1011.

The Complaint more than adequately pleads this element of an erroneous outcome claim. In fact, Plaintiff pled twenty-six (26) flaws in GMU's Title IX process which deprived him of an adequate, reliable and impartial process—certain of which also deprived him of his right to due process.[10] *See* Ex. 1, 2001 Guidance at 20; Ex. 3, 2017 Guidance at 5; Ex. 14, August 2015 Dear

---

were significant procedural flaws, or new evidence, which called Dr. Hammat's findings into question. Moving Br. at 15; Compl. ¶¶ 224, 234, 245.

[10] GMU incorrectly presumes that in order to adequately plead a Title IX claim against a state university a plaintiff must also adequately plead a due process claim. *See* Moving Br. at 23-28. This misstates the law as requiring an unreasonably high bar for Title IX claims which does not exist. For example, in *Norris*, 362 F. Supp. 3d at 1011-1012, the Court found that the plaintiff adequately pleaded the first element of a Title IX erroneous outcome claim by setting forth a "litany of grievances which he argues denied him of a fair and impartial process." The court separately analyzed the plaintiff's due process claim. *See also Doe v. Miami U.*, 882 F.3d 579, 592-593 (6th Cir. 2018) (facts supporting

Colleague Letter, at 2-3. *See also* Compl. ¶¶ 40, 194, 204, 484. A non-exhaustive list of the most

glaring flaws in the process are:

    a.  **Biased Process**: Dr. Hammat had a conflict of interest because she served as both Title IX Coordinator and decided Plaintiff's case, in violation of OCR Guidance. Compl. ¶¶ 84, 197, 207, 473. Dr. Hammat also relied on statements and evidence compiled by Megan Simmons, the Title IX investigator that Dr. Hammat removed from Plaintiff's case for possible bias. *Id.* ¶¶ 146-148. Dr. Hammat further devised the very policies which she was required to apply in Title IX cases. *Id.* ¶¶ 192, 202. Dr. Hammat also exhibited bias (including gender bias) in statements made to Plaintiff, in emails she authored concerning the investigation and findings, and in her decision-making process. *Id.* ¶¶ 149-164, 202, 251-256, 260-265, 275, 278-284, 288-299, 304, 313-323, 331-332, 336, 339-340, 357-365, 483; Exs. 4-11.

      Mr. Williams had a conflict of interest because, as the head of CDE, he is responsible for enforcing GMU's administrative policies and is also the direct supervisor of the Title IX office. Compl. ¶ 483.z. GMU faculty noted this bias in their submission to Provost Wu regarding the lack of due process in faculty proceedings. Compl. ¶ 390; Ex. 26. Mr. Williams also demonstrated bias in his decision making. *Id.* ¶¶ 370-384; Ex. 15.

      GMU acknowledges (albeit tentatively) that Plaintiff alleged that: Dr. Hammat and Mr. Williams may have had a bias "against perpetrators of sexual misconduct or in favor of victims of sexual misconduct" (Moving Br. at 9); Dr. Hammat was biased "about the maturity of first-year graduate students." (*Id.* at 12); and certain of Plaintiff's allegations could be indicative of Dr. Hammat having a bias against faculty members (*Id.* at 14).[11]

      Plaintiff also alleged that the statements he made, and evidence he submitted, contradicted the allegations of Complainants 1-4 and Dr. Hammat's findings (Compl. ¶¶ 250, 255-277, 288, 296-298, 307, 308-312, 321, 323, 324-332, 343, 345-349, 354-355, 359, 362, 365, 367-368, 372, 375-380), that certain allegations were uncorroborated yet included in Dr. Hammat's findings (*Id.* ¶¶ 275, 296, 315), and that he later learned that a number of witnesses gave statements to Dr. Hammat which undermined Complainant 4's credibility and, in the case of Student 1, disproved certain of her allegations. (*Id.* ¶¶ 157, 340, 425). *See Doe v. Columbia U.*, 831 F. 3d 46, 57 (2d Cir. 2016) ("where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" bias may be inferred).

---

erroneous outcome claim differed from facts supporting due process claim). While GMU has utilized a portion of its brief to address Plaintiff's due process claim—even though it is not a named defendant with respect to said claim— Plaintiff separately addresses his due process claims in his opposition to the Individual Defendants' motion to dismiss and to the extent relevant, incorporates it herein.

[11] GMU's arguments concerning whether Plaintiff has adequately alleged gender bias are addressed *infra* Point II.C.

b. **Evidence of Improper Motive:** The complainants, all friends—two of whom had already graduated from GMU's graduate program—lodged years old allegations against Plaintiff only after Complainant 4 was fired from Plaintiff's lab for poor performance. Compl. ¶ 140. Complainant 4's co-mentor was interviewed during the Title IX investigation and raised questions about Complainant 4's credibility and motives. *Id.* ¶¶ 157, 366-367. Neither Dr. Hammat nor Mr. Williams questioned the complainants' motives. *Id.* ¶ 332. Plaintiff filed a university complaint against Complainant 4 which GMU ignored. *Id.* ¶¶ 366-369; Ex. 13.

c. **Failure to Adhere to Grievance Procedures-*Time-Barred Complaints***

The allegations lodged by Complainants 1 and 2—concerning events that occurred in 2013 and 2014—were timed out under the policies provided to Plaintiff by Dr. Hammat. Compl. ¶ 214; Exs. 4-5, Policy 2006-14, at p. 2 ("a complaint should be filed within 180 days of the most recent incident"). Given that these students had already graduated from GMU, it is further inconceivable that any allegations concerned incidents that had occurred in the six months prior to the time at which their complaint was made. It is undisputed that there was no policy in place which allowed GMU to conduct *post hoc* investigations once a complainant graduated. Accordingly, Complainants 1 and 2 should not have been included in the Title IX investigation. With respect to Complainant 3, the 2015 Grievance Procedure required that a written complaint be filed within 180 days except "where the complainant can show he or she needed additional time due to circumstances beyond his or her control." Compl. ¶ 220; Ex. 6, Grievance Procedure, at p. 2. A number of Complainant 3's allegations dated back to 2014 and 2015 and were clearly time barred. *Id.* ¶¶ 143, 214, 220, 303; Ex. 6.

GMU tries to explain away the impropriety of Dr. Hammat's decision to investigate these time-barred allegations by parsing the plain language of Policy 2006-14 to conclude that it could reasonably be understood as setting forth a timeframe that GMU could readily disregard, rendering the policy language meaningless. Moving Br. at 26. That GMU meant the 180-day timeframe to be a limitation on the bringing of sexual harassment complaints is belied by later iterations of GMU's grievance procedures, which add express language that expands the timeframe under specific circumstances. *Compare* Policy 2006-14, Ex. 4, *with* 2015 Grievance Procedure, Compl. ¶ 220, Ex. 6, at p. 2 ("Filing Process" notes "the University will consider requests to extend this period where the complainant can show he or she needed additional time due to circumstances beyond his or her control").[12]

---

[12] GMU also asserts that Dr. Hammat had the authority to direct Dr. Renshaw to prohibit Plaintiff from taking on graduate student research assistants (one-year ahead of time) because the 2016 Grievance Procedure (provided to Plaintiff in the cases of Complainants 3 and 4) and the 2017 Grievance Procedure (provided to Plaintiff in the case of Complainant 4) permitted the "appropriate supervisor" to take "interim emergency action until the conclusion of the investigation." Moving Br. at 26, Exs. 6-7, Grievance Procedures, at p. 3. This argument rings hollow because no

d. **Lack of Adequate Notice:** The emails that Dr. Hammat sent to Plaintiff with respect to each complainant noted only that potential violations of varying sexual misconduct policies had been alleged. Despite GMU's assertions to the contrary Dr. Hammat did not specify the "charges" or the specific policy provisions applicable in the case of each complainant. Appended to each email were varying policies and grievance procedures. Compl. ¶¶ 138, 249, 287, 301, 302, 333. Exs. 4-7. Dr. Hammat emailed Plaintiff a total of five (5) different sexual misconduct policies and four (4) different grievance procedures. Exs. 4-7. The determination letters added charges of gender-based harassment and did not specify the policy provisions or grievance procedures Dr. Hammat applied in finding Plaintiff responsible for violating GMU's "Policy 1202." *Id.* ¶¶ 278-279, 294, 313, 356; Exs. 8-11. Dr. Hammat also made factual findings based on allegations and information of which Plaintiff was not notified—*and to which Plaintiff could not respond*—during the Title IX investigation. *Id.* ¶¶ 282, 297, 316-318, 320, 322, 359, 360-364; Exs. 8-11. Despite GMU's arguments to the contrary, the Complaint specifies the allegations that Plaintiff could not address during the Title IX investigation. Moving Br. at 24; *Id.* ¶¶ 282, 297, 316-319, 320-323, 360-361, 362, 364-365. These allegations stand in stark contrast to *Doe v. Loh*, 2018 WL 1535495, at *6 & n. 4 (D. Md. 2018), where the *hearing board* that evaluated the allegations against the plaintiff heard all of the plaintiff's arguments and defenses when he "presented testimony, answered questions, and submitted affidavits at his hearing," after he reviewed the evidence.

e. **Failure to Adhere to Sexual Misconduct Policies-*Withholding of Evidence***
Plaintiff was denied access to all of the evidence gathered during the Title IX investigation. Compl. ¶ 155. Both the 2016-2017 and the 2017-2018 Sexual Misconduct Policies (which Dr. Hammat provided to Plaintiff with respect to Complainant 4) expressly provide for "thorough and impartial investigations that afford all parties … an opportunity … to *view the information that will be used in determining whether a policy violation has occurred*." Compl. ¶¶ 194, 204, Ex. 7, appended Sexual Misconduct Policies, at Pt. III (emphasis added). *See Doe v. Salisbury U.*, 123 F. Supp. 3d 748 (D. Md. 2015) (withholding of evidence from plaintiff was one of "numerous procedural defects" which supported first element of erroneous outcome claim); *Norris*, 362 F. Supp. 3d at 1011 (denying plaintiff access to investigative file supported first element). Even under the standards set forth in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) and *Linton v. Frederick County Board of County Commissioners*, 964 F. 2d 1436, 1440 (4th Cir. 1992), Plaintiff did not receive an adequate explanation of the evidence against him because he was not fully apprised of the evidence that would be used in assessing whether he violated

---

emergency was present—for instance, only one of the four complainants (Complainant 3) requested a no contact order (even though she had not been in recent contact with Plaintiff)—and the graduate students to be hired were not yet working with Plaintiff. Exs. 4-7. As alleged in the Complaint, Dr. Hammat issued the directive, which was not authorized by the Grievance Procedures.

# A453

GMU's Sexual Misconduct policies and could not fully respond. *See supra* point d.

f. **No Right of Cross-Examination:** GMU does not dispute that its Title IX process provided no method by which Plaintiff could confront his accusers. Compl. ¶ 156. Rather, relying on *Loh,* GMU asserts that Plaintiff had no right of confrontation at all. Moving Br. at 27. In *Loh,* the Fourth Circuit found that the plaintiff was not entitled to "trial-like"[13] rights of confrontation. but the plaintiff was permitted to review the Title IX complainant's statements and focus the hearing committee on inconsistencies in those statements. 2018 WL 1535495, at *7. The plaintiff also reviewed the Title IX investigation report and challenged the complainant's allegations through evidence and testimony at his hearing. *Id.* n. 4. *See Marymount U.*, 297 F. Supp. 3d at 583 (at motion to dismiss stage, lack of cross-examination was one procedural flaw which raised a concern that plaintiff was denied a full and fair hearing).

g. **Lack of Hearing**: It cannot be disputed that Plaintiff did not have a full and fair hearing. Dr. Hammat, who, as discussed *supra*, exhibited bias against Plaintiff, was solely responsible for deciding whether Plaintiff violated GMU's sexual misconduct policies. Compl. ¶¶ 6, 158. That Plaintiff was interviewed three times for purposes of the Title IX investigation, and that he submitted evidence to the best of his ability, given the various policies and procedures he was given and the fact that he could not review the evidence against him, does not equate to a fair or adequate hearing process. *See* Defs. Moving Br. at 18; *supra* point e. *Loh* is inapposite because the plaintiff was able to review the evidence against him prior to appearing before a review committee, question the Title IX investigator in front of the committee, present witnesses and submit additional evidence in the form of affidavits. 2018 WL 1535495, at ** 3 & n. 4.

GMU at once argues that only Dr. Hammat's findings should be considered when evaluating Plaintiff's Title IX claim and then, in an effort to discredit Plaintiff's erroneous outcome claim, points to Plaintiff's appeal as another purported opportunity for Plaintiff to be heard. *Cf.* Moving Br. at 7 *with* Moving Br. at 25. Regardless, Plaintiff's appeal did not provide him with sufficient opportunity to be heard because: i) Mr. Williams, the sole arbiter of Plaintiff's appeal, was biased; and ii) Plaintiff did not have access to the evidence against him prior to submitting his appeal (*e.g.* he learned after he was sanctioned that

---

[13] Ironically, while GMU argues that Plaintiff was not entitled to "trial like" procedures, the University likens itself to a court of law—this Court in particular—with respect to its handling of Title IX complaints. Moving Br. at 26-27 ("In other words, Mason does exactly what this Court does when evaluating a motion to dismiss.") GMU references its quasi-judicial role in an effort to negate the bias inherent in GMU's Grievance Procedures, which require the University to assume "the complete veracity of the allegations" in a Title IX complaint in order to determine whether the allegations contained in the complaint "constitute a violation of university policy." Compl. ¶ 239. Whether this procedure actually causes bias in the process or if it is true that the administrators engaging in this analysis are properly trained not to carry this assumption through to the investigation, or adjudication, phase of any Title IX proceedings cannot be determined on a motion to dismiss.

Student 1 disproved certain of Complainant 4's allegations). *See supra* points a., e.; Compl. ¶ 340.

GMU also poses the meritless argument that Plaintiff's submission to the Faculty Grievance Committee gave him yet another opportunity to be heard regarding the Title IX findings. Yet there is no allegation that the Committee had, nor does GMU assert that the Committee had, any power to reverse Dr. Hammat's findings or the decision on appeal. *See* Moving Br. at 25. *See* Compl. ¶¶ 400-411. Moreover, the Committee declined to review Plaintiff's grievances against Mr. Williams and GMU and, thus, Plaintiff had no opportunity to be heard with respect to the Title IX process or the issues raised in his appeal. Ex. 17. Grievance Letter.

h. **Failure to Apply the Preponderance of the Evidence Standard:** Dr. Hammat failed to apply the preponderance of the evidence standard. Compl. ¶¶ 280, 295, 314-315, 357, 483.t.u. This was evidenced by a number of her purported factual "findings" which (i) were directly contradicted by the evidence that Plaintiff was able to provide, or (ii) which she conceded were uncorroborated in her Letters of Determination. Compl. ¶¶ 157, 247-369. Under the 2016 and 2017 Grievance Procedures the preponderance of the evidence standard "requires that the evidence supporting *each finding* be more convincing than the evidence offered in opposition to it." Compl. ¶ 232, Exs. 6-7, 2016 and 2017 Grievance Procedures, at p. 3. *See also* Compl. ¶¶ 195, 205.

Overall, Plaintiff has alleged sufficient facts to cast some articulable doubt on the outcome of his Title IX proceedings, such that the Complaint should not be dismissed on the ground that he failed to satisfy this element of his Title IX erroneous outcome claim. *See Marymount U.*, 297 F. Supp. 3d at 583 (viewing alleged procedural flaws together, rather than in isolation, to hold that plaintiff satisfied first element of erroneous outcome claim).

C. **Plaintiff Has Plausibly Alleged Gender Bias**

Defendants move to dismiss Plaintiff's Title IX claim on the ground that Plaintiff failed to plausibly allege gender bias. Moving Br. at 8-18 . Gender bias may be demonstrated through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf*, 35 F. 3d 709, 715 (2d Cir. 1994). Gender bias may also be inferred where a decisionmaker possesses "outdated and

20

discriminatory views of gender and sexuality." *Marymount U.*, 297 F. Supp. 3d at 586 (allegations that one adjudicator possessed discriminatory views about male sexual behavior was, alone, sufficient to plead gender bias). *See* Ex. 12, *Grinnell*, SJ Order, at 24-27 (adjudicator's written decisions evidenced a gender-biased perspective as to how women behave during sexual encounters). Gender bias can also be inferred from the manner in which university officials treat a male Title IX respondent as compared to the female complainant(s), including allegations that exculpatory evidence was overlooked in favor of finding the male responsible for Title IX violations. *Marymount U.*, 297 F. Supp. 3d at 586-587. *See Norris*, 362 F. Supp. 3d at 1012-1013.

With respect to Dr. Hammat, Plaintiff alleged:

a. No students corroborated the allegation that Plaintiff discussed "skinny-dipping" while teaching Course B. Compl. ¶¶ 249, 287, 296. Dr. Hammat included this teaching discussion in her findings of responsibility for Complainant 2 anyway, deeming Plaintiff's example to be "erotic" even though it concerned Plaintiff merely taking a swim in the ocean with a woman. *Id.* ¶ 296. *See* Exs. 5, 9. Regarding Complainant 2's allegations, Dr. Hammat also included reference to the fact that the woman involved was "not his wife," the inclusion of which suggested that Dr. Hammat was seeking to punish Plaintiff for not complying with traditional notions of marriage and monogamy as a husband. *Id.* ¶¶ 287, 485.f; Ex. 5. GMU attempts to explain this away as a "detail in the alleged story."[14] Moving Br. at 12. However, Plaintiff's allegations are afforded a presumption of truth and GMU's unsupported statements concerning the drafting, and origin, of the allegation, cannot be considered at this stage of the proceedings.

b. Dr. Hammat found Plaintiff responsible for sexual harassment based on his recommendation that students go to a spa to relax. Compl. ¶¶ 249, 274, 281, 287, 296, 485.f; Exs. 8-9. In her email to Plaintiff concerning Complainant 2's allegations, Dr. Hammat referenced that the recommended spa was known for human trafficking and public nudity (potentially to sexualize the allegations) even though there was no allegation that Plaintiff knew the spa to be other than a legitimate business. *Id.* ¶ 290.

---

[14] GMU further misses the mark in its assertion that a failure to include the statements or findings complained of would have caused Plaintiff to claim that he was not given adequate notice. Moving Br. at 11. What Dr. Hammat included as a basis for investigation, the manner in which the allegations and findings were phrased, and what was ultimately included in Dr. Hammat's Letters of Determination, tell the reader about who Dr. Hammat was as a decisionmaker, including whether she held any biases, particularly with respect to gender roles. *See, e.g.* Ex. 12, *Grinnell*, SJ Order, at 22-28 (adjudicator's written opinions raised questions of fact concerning gender bias); Exs. 8-11.

c. Dr. Hammat deemed the characteristic of "being emotional" a "stereotypical female trait." Ex. 8. This shows that Dr. Hammat possessed outdated and discriminatory views about gender, including a belief that women are particularly emotional. Dr. Hammat found Plaintiff responsible for sexual harassment based on the allegation that Plaintiff called students "emotional, irrational or weak." Compl. ¶¶ 249, 275-276, 281; Ex. 8. The only evidence uncovered during the investigation was that Plaintiff called one student's *arguments* emotional. Ex. 8, Compl. ¶¶ 275-276.

d. Dr. Hammat found that Plaintiff disclosed the number of sexual partners he had to his class but ignored that Plaintiff provided the number only after Complainant 2 asked him. Compl. ¶¶ 291, 296; Ex. 9.

e. In an email notice to Plaintiff, Dr. Hammat falsely described Complainant 3 as having been an undergraduate student of Plaintiff's and suggested that it was improper for a male professor to invite Complainant 3, a female graduate student, to a professional conference presentation which addressed peer-reviewed research on human sexuality. Compl. ¶¶ 304-305, 485.f; Ex. 6. GMU argues that this was merely indicative of Dr. Hammat's bias concerning the maturity level of first-year graduate students (Moving Br. at 12). However, the gender of Plaintiff (male) and Complainant 3 (female) cannot be divorced from this allegation, made in support of a sexual harassment charge. Whether Dr. Hammat included this allegation in her investigation because of her gender-biased view that a male professor should not invite a female graduate student to an "explicit" research presentation is a question of fact that cannot be resolved on a motion to dismiss.[15]

f. Dr. Hammat's outdated and discriminatory views of gender carried through to the Letter of Determination concerning Complainant 3, in which she referenced Complainant 3's belief that she was being "groomed" by Plaintiff, even though such claim was outrageous and there was no evidence to support it. Compl. ¶ 321; Ex. 10. Once again, gender cannot be divorced from such an analysis and whether Dr. Hammat was, in fact, motivated by gender bias is a question of fact that cannot be resolved on a motion to dismiss.

g. Dr. Hammat's determination letter for Complainant 3 included findings of fact that she admitted were uncorroborated. Compl. ¶ 315; Ex. 10.

h. Dr. Hammat found Plaintiff responsible for sexual harassment with respect to asking Student 1 about pornography, during a conversation about his research with Complainant 4, even though Student 1 did not file a complaint against him and she told Dr. Hammat that Plaintiff did nothing wrong. Compl. ¶¶ 337-340; Ex. 11.

---

[15] Indeed, GMU asserts that it was Dr. Hammat's job to first weed out allegations which did not rise to the level of sexual harassment in order to protect "accused parties from having to defend against facially meritless accusations." Moving Br. at 27. Her failure to weed out this allegation is indicative of gender bias.

i. Dr. Hammat gave the Complainants an opportunity to respond to Plaintiff's side of the story but did not afford Plaintiff the same opportunity. Compl. ¶ 485.e.

j. Dr. Hammat ignored Complainant 4's potential motive to lie even though her co-mentor told Dr. Hammat that Complainant 4's allegations were not credible and Plaintiff provided evidence that contradicted her allegations of harassment. Compl. ¶¶ 5, 157, 336-355.

Plaintiff also alleged that Dr. Hammat made public statements that are indicative of bias against men. More specifically, an article about Dr. Hammat, published in a women's advocacy group newsletter,[16] states "another experience that *informs Hammat's work* is that she is a survivor of sexual assault that happened on a college campus." Ex. 18, at p. 8. (emphasis added). In the article, Dr. Hammat referred to victims of sexual assault as follows: "Let's say that someone notices that the roommate is not eating, not sleeping. *She's* crying at night." *Id.* at 9 (emphasis added). Dr. Hammat made it a point, while being interviewed in her position as a Student Affairs administrator, to point out the hypervigilance with which she chose to protect female college students in her sorority—"we wouldn't leave a party until we had gone into every room, kicked down doors, got all our girls out." *Id.* She also pointed out that she made clear to male fraternity students at the time that they needed to be "angry and protective of every female that walks into this house because you never know." *Id.*

These statements undeniably reflect gendered assumptions about males as sexual predators, females being in need of protection and the aggressive manner in which males need to be handled in order to prevent them from raping females (*e.g.* kicking down doors). Given that GMU placed Dr. Hammat in the role of decisionmaker, these facts certainly raise questions about

---

[16] GMU quibbles about whether IDVSA engages in women's advocacy, (Moving Br. at 10) and whether the interview was given for a journal or a newsletter. The very contents of the periodical for which Dr. Hammat was interviewed make several references to advocacy concerning women's issues. (Ex. 18, at 3-5, 15). Thus, Plaintiff made no attempt to mischaracterize the publication at issue. What is significant, and what GMU attempts to distract from, are the statements attributed to Dr. Hammat.

**A458**

the manner in which she viewed, and handled, cases against men accused of sexual misconduct. GMU's argument that these statements should be discredited because they were made in 2013 is meritless. Moving Br. at 10, n. 4. The statements, and the purpose for which they were made, concern Dr. Hammat's longstanding beliefs and assumptions about sexual misconduct and her role as a Title IX administrator. Whether or not she possesses the same beliefs, or whether those beliefs influenced her decision making in Plaintiff's case, are questions of fact that cannot be resolved on a motion to dismiss.

GMU disputes that Dr. Hammat's participation in an advocacy event has any bearing on gender bias. Moving Br. at 1. As GMU's Title IX Coordinator Dr. Hammat was required to be impartial when deciding cases. Her participation in a "DC Area Feminist Event" about how equity advocates can support Title IX Coordinators raises questions about Dr. Hammat's impartiality. Compl. ¶ 152. GMU's assertion that Plaintiff has "no idea what she said" at said event only reinforces the need for discovery on the issue of gender bias. Moving Br. at 11.

With respect to Mr. Williams, Plaintiff alleged that his response to Plaintiff's appeal: (i) failed to address the majority of Plaintiff's arguments and new evidence; (ii) blamed Plaintiff for creating a "hypersexual" environment despite the evidence submitted by Plaintiff that showed that Complainant 4 initiated, and fully participated in, a number of conversations concerning sex; (iii) found that students felt obligated to participate in conversations of a sexual nature to gain "favor" when Complainants 1-3 had absolutely no reason to do so because they did not work in Plaintiff's lab (Compl. ¶¶ 256, 259, 291, 297, 323); and (iv) ignored the evidence that clearly demonstrated that none of the Complainants were denied access to or limited in their ability to participate in their educational programs. Compl. ¶¶ 370-377. *See supra* Point I.

**A459**

Williams also mischaracterized the evidence when denying Plaintiff's appeal: i) stating that there was more than one occasion in which students visited Plaintiff's "home hot tub;" and ii) ignoring Student 1's statement that Plaintiff engaged in no wrongdoing to find that he "asked probing questions about pornography." Compl. ¶¶ 379-381, 485g-i. Mr. Williams also found that Plaintiff exhibited a "lack of professional boundaries." Ex. 15. However, a lack of professionalism is not the equivalent of sexual or gender-based harassment.

Plaintiff further alleged that Mr. Williams' response insinuated that female graduate students in their mid-twenties are in need of parenting by professors and that they should not be held accountable for, or are incapable of, initiating or voluntarily participating in, discussions of a sexual nature with professors and fellow graduate students absent the coercion of a male, authority figure. Compl. ¶¶ 380-381, 485.h.

While the Title IX officer at Vassar College, Mr. Williams made public statements to the effect that campus administrators have a "moral obligation" to protect and care for female students. Compl. ¶ 166; Ex. 19. These statements were not, as GMU asserts, gender neutral. Moving Br. at 12. When asked about Title IX, Mr. Williams, said:

> If you don't have an environment that is investigating and responding to issues of sexual assault and sexual harassment, **female students** on your campus may not feel safe, and they may not feel like they belong. So at Vassar we want to meet not only our legal obligation under Title IX but, more importantly, our moral obligations to protect and care for our students and our community. Ex. 19. (emphasis added.)

Mr. Williams' statement that "just because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean we don't believe you, doesn't mean we think you are lying," is also significant because it suggests that Mr. Williams, who earlier referenced having a moral obligation to female students, always believes they are telling the truth. Ex. 19; Compl. ¶ 166.

**A460**

GMU's argument that Dr. Hammat and Mr. Williams were committed to the "laudable goal of preventing sexual misconduct" ignores that they each could be committed to such a goal and still be influenced by their own outdated and discriminatory views of gender. *See* Moving Br. at 10, 15.[17] *GMU*, 132 F. Supp. 3d at 732-733, is readily distinguishable from the present case. In *GMU*, the plaintiff alleged only that the Title IX complainant was treated more favorably and gender bias "was the only explanation for the outcome of the proceeding." *See also Haley v. Virginia Commonwealth U.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (same). In support of his equal protection claim the *GMU* plaintiff alleged gender bias was the "only possible explanation" for the adjudicator's decision against the weight of the evidence. *Id.* at 734. Unlike Plaintiff, here, the plaintiff in *Fairfax County School Board*, 384 F. Supp. 3d at 608, failed to allege that any decisionmaker involved in his Title IX proceedings exhibited anti-male bias. As fully detailed *supra* Point II.B, a decision against the weight of the evidence is indicative of bias. As detailed in the preceding paragraphs, Plaintiff has also specifically alleged that the decisionmakers involved in his Title IX proceedings exhibited gender bias.

Evidence that a university has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of sexual assault provides a "backdrop" for gender bias. *Doe v. Baum*, 903 F.3d 575, 586-587 (6th Cir. 2018) (external pressure combined with credibility determinations in favor of females raised plausible inference of gender bias). *See also Norris*, 362 F. Supp. 3d at 1015-1016

---

[17] To the extent that GMU attempts to disclaim the relevance of Dr. Hammat's statements because they concern sexual assault as opposed to sexual harassment, this is a distinction without a difference. GMU's policies and OCR guidance make no distinction between the procedures to be followed in either case. The OCR has included sexual assault within the definition of sexual harassment for purposes of Title IX. Ex. 1, 2001 Guidance at p. 21. GMU ineffectively argues that the public perception of Dr. Hammat as an "ideologue" with a "preconceived worldview" who broadly redefined rape and sexual assault is irrelevant to the issue of gender bias. Ex. 20. Within the context of Plaintiff's other allegations concerning Dr. Hammat, it tends to show that she could not only believe that males are typically sexually aggressive and women in need of protection but that she would also find men responsible for violations that did not, in fact, constitute sexual misconduct (which Plaintiff has alleged here). Moving Br. at 11; Compl. ¶¶ 150-151.

(media pressure, campus involvement in sexual assault awareness campaign, OCR investigation, and statements of administrators, taken in concert with allegations concerning Plaintiff's Title IX process rendered claim of gender bias plausible on its face); *Marymount U.,* 297 F. Supp. 3d at 586 (university official's statement that implicitly acknowledged that sexual assault policies were influenced by political pressure to convict males supported allegation of gender bias); *Washington & Lee U.*, 2015 WL 4647996 at *10 (allegations of biased decisionmaker coupled with charge that university under government pressure to convict male students plausibly alleged gender bias). Here, GMU concedes this point. Moving Br. at 15.

As alleged in the Complaint, "in the years leading up to, and during, the time period in which the allegations against Plaintiff were investigated, and an outcome decided, GMU was under pressure from the federal government, the State of Virginia, constant negative publicity, and campus activism to aggressively protect female students from the sexual misconduct at the expense of the rights of the accused." Compl. ¶¶ 101, 102-135. This pressure came in the form of: i) an OCR investigation at GMU, coupled with the criticism that GMU was exposing female Title IX complainants to a hostile environment; ii) Joe Biden's visit to campus and speech urging men to take responsibility in changing the culture of sexual violence against women on college campuses; iii) a published list, "Sexual Harassment in the Academy," which garnered national media attention and listed GMU professors; iv) a second OCR investigation; v) nationwide negative publicity concerning sexual harassment allegations against a GMU professor;[18] vi) campus outcry over the hiring of United States Supreme Court Justice Brett Kavanaugh.[19] *Id.*

---

[18] The complainant and respondent in this case were both male, so it does not provide an apt comparison to Plaintiff's case. GMU concedes that this case placed pressure on GMU to address sexual misconduct by professors. Moving Br. at 18. At the very least, this case garnered significant, negative publicity for GMU.

[19] GMU argues that the outcry against Justice Kavanaugh is irrelevant because of its timing. However, the Kavanaugh announcement, and subsequent campus activism, occurred prior to Mr. Williams denial of Plaintiff's appeal and Dr. Renshaw's imposition of sanctions. Dr. Renshaw was also a member of the Faculty Senate, which called for an investigation of Kavanaugh prior to Dr. Renshaw's determination in Plaintiff's case. Compl. ¶¶ 128-132, 373, 393.

Plaintiff also alleged that Mr. Williams: i) responded to the announcement of the first OCR investigation by stating that GMU had to comply with Title IX because otherwise it could lose federal financial aid funding (Compl. ¶ 109; Ex. 21); and ii) demanded a written retraction from the student newspaper for publishing an article which criticized GMU's handling of a female student's Title IX complaint, noting "we would never want a message conveyed to our community that suggests a student would not be listened to or receive a timely response" (Compl. ¶¶ 119-120; Exs. 22-23).

Plaintiff alleged that Dr. Hammat: i) met with GMU's Women and Gender Studies Department after the announcement of the OCR investigation to address their list of demands for Title IX proceedings (Compl. ¶ 110; Ex. 24); and ii) told an "Inside Higher Education" reporter that Education Secretary DeVos's remarks concerning the 2011 Dear Colleague Letter—which focused on due process protections for the accused—could be construed as devaluing sexual assault survivors and wanting to roll back their protections (Compl. ¶¶ 66-71, 112; Ex. 25).

GMU's assertion that Plaintiff's allegations show that the University was facing pressure to protect both the victims and the accused is meritless. *See* Moving Br. at 18-19. What the Complaint shows is that GMU: does not follow AAUP's recommendations for Title IX proceedings against faculty (Compl. ¶¶ 87-97); has made no changes to its process with respect to the proposed Title IX regulations (Compl. ¶¶ 79-86); and was criticized for failing to provide due process in Title IX proceedings against faculty (Compl. ¶¶ 385-392).

### III.    <u>Plaintiff Has Plausibly Alleged A Selective Enforcement Claim</u>

GMU asserts that Plaintiff's selective enforcement claim should be dismissed because he fails to specifically identify a female comparator who was treated more favorably by GMU and, instead, alleges his claim on information and belief. Moving Br. at 28-30. It is well established that

a claim may be pled on information and belief and still satisfy *Iqbal/Twombly*, when the information which could support the claim is in the exclusive possession of the defendant. *Ridenour*, 147 F. Supp. 3d at 456. Indeed, a number of courts have declined to dismiss Title IX claims, including for selective enforcement, where the information necessary to support the claim was in the exclusive possession of the university. *See Trustees of the U. of Penn.*, 270 F. Supp. 799, 824 (E.D. Pa. 2017); *Doe v. Brown U.*, 166 F. Supp. 3d 177 (D.R.I. 2016); *Salisbury U.*, 123 F. Supp. 3d at 768.

Here, Plaintiff has alleged that, upon information and belief: (i) GMU has engaged in a pattern of unfair investigations and unduly severe sanctions being imposed on males accused of sexual or gender-based harassment; (ii) female professors accused of sexual or gender-based harassment have not been formally investigated by Title IX administrators; and (iii) to the extent that GMU has pursued the investigation of reports of sexual and gender-based harassment against female professors, and found them responsible, GMU imposed far less severe sanctions than against male professors found responsible for similar violations. Compl. ¶¶ 486-490. GMU does not dispute that the statistical evidence necessary to prove this claim is within its exclusive possession or control.[20]

---

[20] To the extent that the Court finds that Plaintiff's allegations are insufficient to state a selective enforcement claim and allows Plaintiff's erroneous outcome claim to proceed, Plaintiff respectfully requests that the Court dismiss the selective enforcement claim without prejudice so that Plaintiff may seek leave to amend his Complaint in the event that statistical evidence obtained from GMU during discovery provides the substantiation, but is now in the exclusive possession of GMU.

**A464**

### <u>CONCLUSION</u>

For the above stated reasons, GMU's motion to dismiss Plaintiff's Title IX claim, with prejudice, should be denied, along with such other and further relief as this court deems just and proper.

Dated: January 22, 2020

<div align="center">

Respectfully Submitted,

NESENOFF & MILTENBERG, LLP

</div>

By:    /s/ *Andrew T. Miltenberg*
       Andrew T. Miltenberg (admitted *pro hac vice*)
Kara L. Gorycki (admitted *pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

      -and-

FARMER LEGAL, PLLC

By:    /s/ *Joshua T. Farmer*
       Joshua T. Farmer
Virginia State Bar Number 87508
5030 Sadler Place, #205
Glen Allen, VA 23060
(804)325-1441
josh@farmerlegalhelp.com

<div align="center">

30

</div>

**A465**

Case 1:19-cv-01249-LO-MSN   Document 38   Filed 01/22/20   Page 32 of 32 PageID# 749

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on the 22nd day of January, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all parties of record.  I also served a copy of the foregoing on counsel for Defendants at the following address:

> Eli S. Schlam
> Assistant Attorney General
> Virginia Bar Number 92987
> George Mason University
> 4400 University Drive,
> MS 2A3
> Fairfax, VA 22030
> Phone: (703) 993-2619
> Fax: (703) 993-2340
> eschlam@gmu.edu

**EXHIBIT 1**

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## TITLE IX



**January 2001**

**U.S. Department of Education
Office for Civil Rights**

**A468**

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the Federal Register "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance.  It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  Gebser v. Lago Vista Independent School District (Gebser), 524 U.S. 274 (1998), and Davis v. Monroe County Board of Education (Davis), 526 U.S. 629 (1999). The Court held in Gebser that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages.  See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639.  The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages.  See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding.  The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092).  A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance.  In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance.  In these areas, no changes in the guidance were necessary.  A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.


## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being.  Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn.  As with the 1997 guidance, the revised guidance applies to students at every level of education.  School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

**A470**

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well- publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

iii

# A471

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2]  Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

**Harassment by Teachers and Other School Personnel**

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees.  These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students.  The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students.  In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing.  We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services."  However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment.  We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping.  Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways.  The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program.  Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists.  We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created.  We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages.  We disagree.  First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -– that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program. In determining whether harassment is actionable, both <u>Davis</u> and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing <u>Oncale</u>)), and the <u>Davis</u> Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action. A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students. Other commenters, by contrast, commended OCR for recognizing that <u>Gebser</u> and <u>Davis</u> did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point. While <u>Gebser</u> and <u>Davis</u> made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the <u>Davis</u> Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

### Effective Response

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools. We disagree. Effectiveness has always been the measure of an adequate response under Title IX. This does not mean a school must overreact out of fear of being judged inadequate. Effectiveness is measured based on a reasonableness standard. Schools do not have to know beforehand that their response will be effective. However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.

## The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX. The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

vi

**A474**

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent). Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record. Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser. This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim. It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation. In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4] The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. The Department is in the process of developing a consistent approach and specific factors for implementing this provision. OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

---

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d). A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients). The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

**A475**

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record.  The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges.  The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion.  They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process.  They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations.  We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

## REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS[1] BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

### Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

## I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2]  The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3]  This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding.  It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

## II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6]  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct.  For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7]  Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment.  However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment.  For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

## III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities.  The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions.  The "education program or activity" of a school includes all of the school's operations.[8]  This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

**A479**

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]   A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]   The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

4

### V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered.  The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex.  If it does, the second issue is the nature of the school's responsibility to address that conduct.  As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

#### A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as quid pro quo harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34]  Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct.  Harassment of this type is generally referred to as hostile environment harassment.[36]  This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment.  Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

#### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex.  OCR considers the conduct from both a subjective[38] and objective[39] perspective.  In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40]  Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- The degree to which the conduct affected one or more students' education.  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program.  For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- The type, frequency, and duration of the conduct.  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical.  For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46]  Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

**A482**

and relationship between the alleged harasser and the subject or subjects of the harassment. For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- Underline: The number of individuals involved. Sexual harassment may be committed by an individual or a group. In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group. Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context. For certain types of conduct, there may be "safety in numbers." For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students. On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- The age and sex of the alleged harasser and the subject or subjects of the harassment. For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- The size of the school, location of the incidents, and context in which they occurred. Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus. Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50] Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct in a public place may be more humiliating. Each incident must be judged individually.

- Other incidents at the school. A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- Incidents of gender-based, but nonsexual harassment. Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists. Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

## 2. Welcomeness

The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome. Conduct is unwelcome if

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]   Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]   For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.  In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.  The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]   Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.  On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection. Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.  For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.  Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.  If elementary students are involved, welcomeness will not be an issue:  OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.  In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]  In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]   The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.  For example, a student's age could affect his or her ability to do so. Similarly, certain types of disabilities could affect a student's ability to do so.

**A484**

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

### B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

**A485**

### 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60]  Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence.  A school also may be responsible for remedying the effects of the harassment on the student who was harassed.  The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students.  Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62]  The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has "notice" of the harassment.  (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.)  Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors.  If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.  In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

10

**A486**

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63]  Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth-grade student in a school hallway.  Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways.  Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class.  In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment.  An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus.  As a result, the student stops using the campus shuttle and walks the very long distances between her classes.  In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

**A487**

of aid, benefits, or services to students.  However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program.  Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

    If the school takes these steps, it has avoided violating Title IX.  If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program.  The school, therefore, has engaged in its own discrimination.  It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively.  (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

### 2. Harassment by Other Students or Third Parties

    If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67]  As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations.  On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68]  In this case, the school is responsible for taking effective corrective action to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

    Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program.  As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

    The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70]  For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes.  However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back.  (This issue is discussed more fully in the section on "Recipient's Response.")

    If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

**A488**

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

13

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79] (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.") These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations. By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied. If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84] (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR. This is true in cases

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence). This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85] Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

## VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86] As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment. The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works. If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Requests by the student who

**A491**

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation. Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate. In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified. In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[88] Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[89] A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90] In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student. Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed. If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created. For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment. If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record. Other measures may include, if appropriate, directing a harasser to apologize to the harassed student. If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93] For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

16

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances. As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95] At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

### B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment. In all cases, a school should discuss confidentiality standards and concerns with the complainant initially. The school should inform the student that a confidentiality request may limit the school's ability to respond. The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs. If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees. Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

17

**A493**

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student.  Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused.  The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment.  There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant.  Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual.  In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action.  In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school.  Those steps can be very effective in preventing further harassment.

### C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student.  If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response.  These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter.  If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

**A494**

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome. If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation. If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place. Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations. However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it. Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment. Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98] Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100] Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints. However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment. Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

19

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

**A496**

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]  The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]  Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]  While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.  Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]  Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]  OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).  In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.  Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.  Police investigations or reports may be useful in terms of fact gathering.  However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]  Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.  The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.  In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

21

**A497**

## X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution.  The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions.  The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment.  Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions.  Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.  In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements.  Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

## XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112]  Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]).  In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech.  OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117]  In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights.  For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard.  The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119]  As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

Example 1:  In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

22

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women.  Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class.  What must the school do in response?

  Answer:  Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals.  Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

  Example 2:  A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus.  The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety.  What must a school do in response?

  Answer:  Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment.  The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

**A499**

---

# Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX.  20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E.  If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance.  28 CFR 42.604.  Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964.  For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General.  This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

(professor's spanking of university student may constitute sexual conduct under Title IX); Doe v. Petaluma, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim);  Denver School Dist. #2, OCR Case No. 08-92-1007 (same to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); Nashoba Regional High School, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also Shoreline School Dist., OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); Dartmouth Public Schools, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); San Francisco State University, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); Analy Union High School Dist., OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987).  See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance.  (See section on "Harassment by Teachers and Other Employees.")  See Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees.  (See section on "Harassment by Teachers and Other Employees.")  For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10] Cf. John Does 1 v. Covington County Sch. Bd., 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that sex discrimination consisting of same-sex sexual harassment can violate Title VII's prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997 guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds, 171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65, 1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other students, including both boys and girls, sufficient to raise a claim under Title IX);  John Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by a male teacher.)  It can also occur in certain situations if the harassment is directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334, 1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment, but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex, court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee.)  In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g, pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both.  Thus, in Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband.  In both cases, according to the court, the remarks were based on sex in that they were made with an intent to demean each member of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct. 733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

26

# A502

---

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19] See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

may be actionable even if the harassment is not sexual in nature); <u>Hicks</u>, 833 F.2d at 1415; <u>Eden Prairie Schools, Dist. #272</u>, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] <u>Davis</u>, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); <u>Franklin</u>, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation. 34 CFR 106.31; See <u>Sexual Harassment Guidance</u>, 62 FR 12034 (1997). When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment. S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987). The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, <u>id.</u> at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students. Congress also intended that if discrimination occurred, recipients needed to implement effective remedies. S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements. 34 CFR 106.31(a)(b). Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions. For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

# A504

---

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment.  62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw).

[37] 34 CFR 106.31(b).  See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment.  The Court stated–– "... if the victim does not subjectively perceive the environment to be abusive, the

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  510 U.S. at 21-22.

[39] See Davis, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); Elgamil v. Syracuse University, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing Harris); Booher v. Board of Regents, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same).  See Oncale, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing Harris, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment.  This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., Ellison, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See Davis, 526 U.S. at 651, citing both Oncale, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., Davis, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); Doe v. Petaluma, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); Modesto City Schools, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); Weaverville Elementary School, OCR Case No. 09-91-1116 (students left school due to the harassment).  Compare with College of Alameda, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] Doe v. Petaluma, 830 F.Supp. at 1566.

[43] See Waltman v. Int'l Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); Monteiro v. Tempe Union High School, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing Waltman; see also Hall, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., Elgmil 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Andrews, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986).

[45] 34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf. Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf. Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf. Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding of racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment.  Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

---

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b). Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination. Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.

The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action.  Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642.  The concept of a "responsible employee" under our guidance is broader. That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations.  34 CFR 106.8(a).

[76] 34 CFR 106.31.  See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been sexually harassed by that coach.  See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises ....  The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII); but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

**A510**

---

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3. <u>Gebser</u>, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3.").

[85] 20 U.S.C. 1682. In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students. It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] <u>Gebser</u>, 524 U.S. at 288; <u>Bundy v. Jackson</u>, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); <u>accord</u>, <u>Jones v. Flagship Int'l</u>, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See <u>Doe ex rel. Doe v. Dallas Indep. Sch. Dist.</u>, 220 F.3d 380 (5th Cir. 2000) (citing <u>Waltman</u>); <u>Waltman</u>, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); <u>Dornhecker v. Malibu Grand Prix Corp.</u>, 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See <u>Intlekofer v. Turnage</u>, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment — to inform the school community that harassment will not be tolerated. Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e). The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent. Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b). This requirement has been part of the Title IX regulations since their inception in 1975. Thus, schools have been required to have these procedures in place since that time. At the elementary and secondary level, this responsibility generally lies

# A512

Case 1:19-cv-01249-LO-MSN   Document 38-1   Filed 01/22/20   Page 47 of 49 PageID# 796

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] Fenton Community High School Dist. #100, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally Meritor, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  See note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] Id.

[106] See Meritor, 477 U.S. at 72-73.

[107] University of California, Santa Cruz, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  See University of Maine at Machias, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in Cape Cod Community College, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

# A513

Case 1:19-cv-01249-LO-MSN   Document 38-1   Filed 01/22/20   Page 48 of 49 PageID# 797

---

[109] Indeed, in University of Maine at Machias, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated.  While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way.  However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] Academy School Dist. No 20, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); Mills Public School Dist., OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] Cf. EEOC v. Board of Governors of State Colleges and Universities, 957 F.2d 424 (7th Cir. 1992), cert. denied, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors.  The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).  However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); Portland School Dist. 1J, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See Florida Agricultural and Mechanical University, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); Cf. Cohen v. San Bernardino Valley College, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); George Mason University, OCR Case No. 03-94-2086 (law professor's use of a

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones).

**A515**

**EXHIBIT 2**

# A516

## U.S. Department of Education

---

🖨 Print                                                                              ✖ Close Window

---

# First Amendment: Dear Colleague

**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**
**400 MARYLAND AVE., S.W.**
**WASHINGTON, D.C. 20202-1100**

**THE ASSISTANT SECRETARY**

July 28, 2003

Dear Colleague:

I am writing to confirm the position of the Office for Civil Rights (OCR) of the U.S. Department of Education regarding a subject which is of central importance to our government, our heritage of freedom, and our way of life: the First Amendment of the U.S. Constitution.

OCR has received inquiries regarding whether OCR's regulations are intended to restrict speech activities that are protected under the First Amendment. I want to assure you in the clearest possible terms that OCR's regulations are not intended to restrict the exercise of any expressive activities protected under the U.S. Constitution. OCR has consistently maintained that the statutes that it enforces are intended to protect students from invidious discrimination, not to regulate the content of speech. Harassment of students, which can include verbal or physical conduct, can be a form of discrimination prohibited by the statutes enforced by OCR. Thus, for example, in addressing harassment allegations, OCR has recognized that the offensiveness of a particular expression, standing alone, is not a legally sufficient basis to establish a hostile environment under the statutes enforced by OCR. In order to establish a hostile environment, harassment must be sufficiently serious (i.e., severe, persistent or pervasive) as to limit or deny a student's ability to participate in or benefit from an educational program. OCR has consistently maintained that schools in regulating the conduct of students and faculty to prevent or redress discrimination must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech. OCR's regulations and policies do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment.

As you know, OCR enforces several statutes that prohibit discrimination on the basis of sex, race or other prohibited classifications in federally funded educational programs and activities. These prohibitions include racial, disability and sexual harassment of students. Let me emphasize that OCR is committed to the full, fair and effective enforcement of these statutes consistent with the requirements of the First Amendment. Only by eliminating these forms of discrimination can we fully ensure that every student receives an equal opportunity to achieve academic excellence.

# A517

Some colleges and universities have interpreted OCR's prohibition of "harassment" as encompassing all offensive speech regarding sex, disability, race or other classifications. Harassment, however, to be prohibited by the statutes within OCR's jurisdiction, must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive. Under OCR's standard, the conduct must also be considered sufficiently serious to deny or limit a student's ability to participate in or benefit from the educational program. Thus, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances, including the alleged victim's age.

There has been some confusion arising from the fact that OCR's regulations are enforced against private institutions that receive federal-funds. Because the First Amendment normally does not bind private institutions, some have erroneously assumed that OCR's regulations apply to private federal-funds recipients without the constitutional limitations imposed on public institutions. OCR's regulations should not be interpreted in ways that would lead to the suppression of protected speech on public or private campuses. Any private post-secondary institution that chooses to limit free speech in ways that are more restrictive than at public educational institutions does so on its own accord and not based on requirements imposed by OCR.

In summary, OCR interprets its regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles. No OCR regulation should be interpreted to impinge upon rights protected under the First Amendment to the U.S. Constitution or to require recipients to enact or enforce codes that punish the exercise of such rights. There is no conflict between the civil rights laws that this Office enforces and the civil liberties guaranteed by the First Amendment. With these principles in mind, we can, consistent with the requirements of the First Amendment, ensure a safe and nondiscriminatory environment for students that is conducive to learning and protects both the constitutional and civil rights of all students.

Sincerely,


Gerald A. Reynolds
Assistant Secretary
Office for Civil Rights
Department of Education

Top

---

 Print                                                        ✖ Close Window

---

Last Modified: 09/25/2018

**EXHIBIT 3**



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

September 2017

<u>Q&A on Campus Sexual Misconduct</u>

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

**SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT**

<u>Question 1</u>:

What is the nature of a school's responsibility to address sexual misconduct?

<u>Answer</u>:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf  [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.
[2] 2001 Guidance at (VII).
[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

1

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

### THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

### INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

# A521

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

## GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).

[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").

[12] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).

[13] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k)(3)(i)(A).

<u>Answer</u>:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

**INFORMAL RESOLUTIONS OF COMPLAINTS**

<u>Question 7</u>:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

<u>Answer</u>:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); *see also* 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

**A523**

## DECISION-MAKING AS TO RESPONSIBILITY

Question 8:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

Answer:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.

[22] 34 C.F.R. § 668.46(k)(2)(iii).

[23] 34 C.F.R. § 668.46(k)(2)(iv).

5

# A524

**DECISION-MAKING AS TO DISCIPLINARY SANCTIONS**

<u>Question 9</u>:

What procedures should a school follow to impose a disciplinary sanction against a student found responsible for a sexual misconduct violation?

<u>Answer</u>:

The decision-maker as to any disciplinary sanction imposed after a finding of responsibility may be the same or different from the decision-maker who made the finding of responsibility. Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.[24] In its annual security report, a postsecondary institution must list all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking.[25]

**NOTICE OF OUTCOME AND APPEALS**

<u>Question 10</u>:

What information should be provided to the parties to notify them of the outcome?

<u>Answer</u>:

OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final.[26] This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[27] For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.[28] In an elementary or secondary school, the notice should be provided to the parents of students under the age of 18 and directly to students who are 18 years of age or older.[29]

---

[24] 34 C.F.R. § 106.8(b); 2001 Guidance at (VII)(A).

[25] 34 C.F.R. § 668.46(k)(1)(iii).

[26] 34 C.F.R. § 668.46(k)(2)(v). The Clery Act applies to proceedings arising from allegations of dating violence, domestic violence, sexual assault, and stalking.

[27] 34 C.F.R. § 668.46(k)(3)(iv).

[28] A sanction that directly relates to the reporting party would include, for example, an order that the responding party stay away from the reporting party. *See* 2001 Guidance at vii n.3. This limitation allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act. *See* 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13).

[29] 20 U.S.C. § 1232g(d).

6

# A525

Case 1:19-cv-01249-LO-MSN   Document 38-3   Filed 01/22/20   Page 8 of 8 PageID# 809

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

## EXISTING RESOLUTION AGREEMENTS

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

***Note:*** The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").

**EXHIBIT 4**

**CONFIDENTIAL**

---------- Forwarded message ----------
From: **Jennifer R Hammat** <jhammat@gmu.edu>
Date: Tue, Dec 4, 2018 at 11:52 AM
Subject: Notice of Investigation
███████████████████████████████

Cc: Keith D Renshaw <krenshaw@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>



December 4, 2018

███████████████

George Mason University

Fairfax, VA 22030

Dear ████████,

The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE).  The complaint, filed by ████████, alleges potential violations of George Mason University's Sexual Harassment Policy 2006-2014. Specifically, the allegations state that you shared the below information during your instruction of ████████ the spring semester of 2013 in and during the instruction of ████████ in the spring semester of 2014 in:

    o  During class, you provided a detailed description with the students of a sexual encounter wherein you performed oral sex upon a woman at a party where others were "packed around" and able to see you perform oral sex;

**CONFIDENTIAL**

o  During class, you discussed a then recent event that occurred while traveling to the middle east and you described having an erotic and adventurous experience in the middle of the desert while you watched a woman with notability and a connection to power "skinny dipping" while you relaxed and watched her. You told the students how erotic the experience was without actually having sex with the woman;

o  During class, also emphasized to the students in the class (a cohort) that they "needed to get naked together to really get to know each other." To that end, you repeatedly mentioned Spa World (a spa where people are often naked in the common areas) and encouraged the cohort to go together to really get to know each other.

o  During class, you asked the students who they thought would end up "sleeping with who" in the cohort. You also indicated, "Grad students typically end up being incestuous with each other."

o  During class, you bragged about presenting your new findings at a conference in a presentation entitled, "Can you fuck the pain away?"

o  During class, if a student expressed that they were offended, uncomfortable, or frustrated by the topic of discussion, you would you dismiss those concerns as being "emotional," "irrational," or "weak."

o  During class, you stated, on ███████████ "if you want to argue that men and women are equal, it is up to you to provide empirical evidence that men and women *are* equal."

o  Graduate students in the program often warned new students to "not get on ██████ bad side, because if ████ liked you, you would get ample opportunities for publications, collaborations, and very reasonable feedback as a committee member. If ████ did not like you, interactions were very uncomfortable."

o  Through favoritism, you made it clear to your students that opportunities and teaching was dependent on liking them and having sexually stimulating conversations with them.

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter.  The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange

**A529**

**CONFIDENTIAL**

a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:

- University Policy 1202: Sexual Harassment Policy 2006-14

- Equal Opportunity/Affirmative Action Grievance Procedures 2006-14

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu.  Your cooperation in this process is appreciated.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

**A530**

**CONFIDENTIAL**

George Mason University

CC:     Dr. Keith Renshaw, Department Chair

        Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

titlenine.gmu.edu

# A531

Subject: **Equal Opportunity/Affirmative Action Grievance Procedure**
**(This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment)**

## I.     Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, and visitors.

## II.    Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of the Office of Equity and Diversity Services (OEDS). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. The OEDS may amend this process as necessary. Any student, faculty member, staff employee, or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, religion, sex, national origin, sexual orientation, ancestry, age, marital status, physical or mental disability, or veteran status should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the University reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

**Retaliation**

The OEDS also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the charging party prevails in the original charge. No agent of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations and will be investigated by the OEDS. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

### III. Filing Process

Complainants will be asked to complete a form describing the alleged discrimination and/or harassment. Assistance will be arranged, if needed.

A complaint should be filed within 180 days of the most recent incident.

The complainant will meet with a representative from the Office of Equity and Diversity Services to discuss options (informal, formal) for proceeding.

**Options:**

*Informal*.  Discuss allegations and concerns with respondent (the accused) and attempt to resolve the situation.  The respondent is reminded that George Mason University expects all to adhere to our equal opportunity policies.  Respondent is put on notice that behavior has been questioned, and informal resolution sought, if possible. If attempts to resolve the situation are not successful, the complainant may pursue a formal complaint.  The Office reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

*Formal*.  A full investigation is conducted by the Office complete with written findings. If a violation is found, the Office will recommend corrective actions.  The determination of the Office of Equity and Diversity Services is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a complainant may file their complaint with the appropriate external agencies.  A complete list of agencies, along with contact information, is available from the Office of Equity and Diversity Services, Mason Hall D105, MS 2C2, Fairfax, VA  22030.  Phone (703) 993-8730. TTY: (703) 993-8787

**Time Line for Investigation Process**

The Office of Equity and Diversity Services will complete its investigations as expeditiously as possible.  Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including lack of cooperation from the complainant, the respondent, or witnesses.  The Office of Equity and Diversity Services will maintain contact with the Complainant and Respondent throughout the course of the investigation to keep them up to date on the process.

### IV. Confidentiality

The OEDS takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the respondent, the complainant, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

**A533**

**V.    Right to Advisor**

The complainant and the respondent each has the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to the Office of Equity and Diversity Services at least 72 hours prior to the meeting. If either the complainant or the respondent's advisor is a person degreed or qualified in law, the Office of Equity and Diversity Services must be notified.

**VI.   Responsibilities and Jurisdiction of the Office of Equity and Diversity Services**

Consistent with federal and state laws and university policies related to nondiscrimination, the OEDS only investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex (including sexual harassment), national origin, age, disability, veteran status, or sexual orientation. The OEDS investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

**Transfer of Function**

If a complaint, whether informal or formal, is directed against the Office of Equity and Diversity Services, the functions assigned to the Office by these procedures will transfer to the Office of the President or to the president's designee. If a complaint, whether informal or formal, is directed against the President, the functions assigned to the Office by these procedures will transfer to the Board of Visitors

**A534**

**GEORGE MASON UNIVERSITY**

**University Policy Number 1202**

**Subject:** Sexual Harassment Policy

**Responsible Parties:** Office of Equity and Diversity Services

**Procedures:** Equal Opportunity/Affirmative Action Grievance Procedures

**Related University Policies:** Policy 1201: Non-Discrimination Policy

---

**I.    SCOPE**

This policy applies to all George Mason University faculty, staff, students, university contractors, and visitors.

**II.    POLICY STATEMENT**

It is the policy of University to provide an academic and work environment free from sexual harassment. Sexual harassment is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated.  Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures.[*]

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

  1. Sexual assault
  2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

---

[*] Note: Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

Any student, faculty member, or staff employee, who believes he or she is the victim of sexual harassment, should report the incident promptly in the manner most comfortable to him or her. The Equal Opportunity/Affirmative Action Grievance Procedures, University Policy 1204 list the various ways to file a complaint.

Retaliation against an individual who has raised claims of illegal discrimination or has cooperated with an investigation of such claims is prohibited.

Note that supervisors and managers who become aware of sexual harassment or other potentially discriminatory behavior must contact the Office of Equity and Diversity Services.

## III.   RESPONSIBLE PARTIES

The Office for Equity and Diversity Services is responsible for administering and monitoring George Mason University's sexual harassment policy.

## IV.   COMPLIANCE

Inquiries about or complaints alleging violation of the University's sexual harassment policy should be directed to the Office of Equity and Diversity Services. Mason Hall D105, MS 2C2, Fairfax, VA  22030. Phone (703) 993-8730. TTY: (703) 993-8787.

## V.   EFFECTIVE DATE AND APPROVAL

The policies herein are effective April 3, 2006. This Administrative Policy shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

Approved: _____   _____
                    Senior Vice President                    Provost

Date approved: _____

**EXHIBIT 5**

**A537**

**CONFIDENTIAL**

From: **Jennifer R Hammat** <jhammat@gmu.edu>
Date: Tue, Dec 4, 2018 at 11:51 AM
Subject: Notice of Investigation

▇▇▇▇▇▇▇▇

Cc: Keith D Renshaw <krenshaw@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>



December 4, 2018

▇▇▇▇▇▇▇▇

George Mason University

Fairfax, VA 22030

Dear ▇▇▇▇▇,

The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE). The complaint, filed by ▇▇▇▇▇▇, alleges potential violations of George Mason University's Sexual Harassment Policy 2006-14. Specifically, the allegations state that you shared the below information during your instruction of ▇▇▇▇▇▇▇ the spring semester of 2013 in and during the instruction of ▇▇▇▇▇▇ in the spring semester of 2014 in:

> o During class you provided a detailed description with the students of a sexual encounter wherein you performed oral sex upon a woman at a party;

> o During class you shared with the students the number of sexual partners you had;

▇▇▇▇▇

# A538

**CONFIDENTIAL**

      o During class you discussed "skinny dipping" with a woman who was not your wife with the students in the class;

      o During class you recounted your visits to a Spa World, a Korean Spa in Centreville, VA, allegedly known for human trafficking and public nudity, and encouraged the students of the class to go together.

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter.  The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:

- University Policy 1202: Sexual Harassment Policy 2006-14

- Equal Opportunity/Affirmative Action Grievance Procedures 2006-14

**A539**

**CONFIDENTIAL**

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu.  Your cooperation in this process is appreciated.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

George Mason University

CC:     Dr. Keith Renshaw, Department Chair

          Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

titlenine.gmu.edu

**A540**

Subject: **Equal Opportunity/Affirmative Action Grievance Procedure**
**(This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment)**

## I.   Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, and visitors.

## II.   Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of the Office of Equity and Diversity Services (OEDS).  The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. The OEDS may amend this process as necessary. Any student, faculty member, staff employee, or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, religion, sex, national origin, sexual orientation, ancestry, age, marital status, physical or mental disability, or veteran status should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the University reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

**Retaliation**

The OEDS also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process.  Retaliation is prohibited whether or not the charging party prevails in the original charge. No agent of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations and will be investigated by the OEDS.  Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

**A541**

### III.   Filing Process

Complainants will be asked to complete a form describing the alleged discrimination and/or harassment. Assistance will be arranged, if needed.

A complaint should be filed within 180 days of the most recent incident.

The complainant will meet with a representative from the Office of Equity and Diversity Services to discuss options (informal, formal) for proceeding.

**Options:**

*Informal*.  Discuss allegations and concerns with respondent (the accused) and attempt to resolve the situation.  The respondent is reminded that George Mason University expects all to adhere to our equal opportunity policies.  Respondent is put on notice that behavior has been questioned, and informal resolution sought, if possible. If attempts to resolve the situation are not successful, the complainant may pursue a formal complaint.  The Office reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

*Formal*.  A full investigation is conducted by the Office complete with written findings. If a violation is found, the Office will recommend corrective actions.  The determination of the Office of Equity and Diversity Services is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a complainant may file their complaint with the appropriate external agencies.  A complete list of agencies, along with contact information, is available from the Office of Equity and Diversity Services, Mason Hall D105, MS 2C2, Fairfax, VA  22030.  Phone (703) 993-8730. TTY: (703) 993-8787

**Time Line for Investigation Process**

The Office of Equity and Diversity Services will complete its investigations as expeditiously as possible.  Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including lack of cooperation from the complainant, the respondent, or witnesses.  The Office of Equity and Diversity Services will maintain contact with the Complainant and Respondent throughout the course of the investigation to keep them up to date on the process.

### IV.   Confidentiality

The OEDS takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the respondent, the complainant, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

**A542**

### V.    Right to Advisor

The complainant and the respondent each has the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to the Office of Equity and Diversity Services at least 72 hours prior to the meeting. If either the complainant or the respondent's advisor is a person degreed or qualified in law, the Office of Equity and Diversity Services must be notified.

### VI.   Responsibilities and Jurisdiction of the Office of Equity and Diversity Services

Consistent with federal and state laws and university policies related to nondiscrimination, the OEDS only investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex (including sexual harassment), national origin, age, disability, veteran status, or sexual orientation. The OEDS investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

**Transfer of Function**

If a complaint, whether informal or formal, is directed against the Office of Equity and Diversity Services, the functions assigned to the Office by these procedures will transfer to the Office of the President or to the president's designee. If a complaint, whether informal or formal, is directed against the President, the functions assigned to the Office by these procedures will transfer to the Board of Visitors

**A543**

**GEORGE MASON UNIVERSITY**

**University Policy Number 1202**

**Subject:** Sexual Harassment Policy

**Responsible Parties:** Office of Equity and Diversity Services

**Procedures:** Equal Opportunity/Affirmative Action Grievance Procedures

**Related University Policies:** Policy 1201: Non-Discrimination Policy

I.    **SCOPE**

This policy applies to all George Mason University faculty, staff, students, university contractors, and visitors.

II.    **POLICY STATEMENT**

It is the policy of University to provide an academic and work environment free from sexual harassment. Sexual harassment is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated.  Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures.[*]

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1.  Sexual assault

2.  Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

---

[*] Note: Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

Any student, faculty member, or staff employee, who believes he or she is the victim of sexual harassment, should report the incident promptly in the manner most comfortable to him or her. The Equal Opportunity/Affirmative Action Grievance Procedures, University Policy 1204 list the various ways to file a complaint.

Retaliation against an individual who has raised claims of illegal discrimination or has cooperated with an investigation of such claims is prohibited.

Note that supervisors and managers who become aware of sexual harassment or other potentially discriminatory behavior must contact the Office of Equity and Diversity Services.

## III.    RESPONSIBLE PARTIES

The Office for Equity and Diversity Services is responsible for administering and monitoring George Mason University's sexual harassment policy.

## IV.    COMPLIANCE

Inquiries about or complaints alleging violation of the University's sexual harassment policy should be directed to the Office of Equity and Diversity Services. Mason Hall D105, MS 2C2, Fairfax, VA  22030. Phone (703) 993-8730. TTY: (703) 993-8787.

## V.    EFFECTIVE DATE AND APPROVAL

The policies herein are effective April 3, 2006. This Administrative Policy shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

Approved: _____    _____
                    Senior Vice President                              Provost

Date approved: _____

**A545**

**EXHIBIT 6**

**A546**

**CONFIDENTIAL**

From: **Megan R Simmons** <msimmo@gmu.edu>
Date: Fri, Jan 11, 2019 at 3:34 PM
Subject: FW: Notice of Investigation
████████████████████████

Per your request.


Respectfully,

Megan Simmons

**From:** Jennifer R Hammat
**Sent:** Tuesday, December 04, 2018 11:53 AM
**To:** ████████████████████
**Cc:** Keith D Renshaw <krenshaw@gmu.edu>; Shernita Rochelle Parker <srochell@gmu.edu>
**Subject:** Notice of Investigation
**Importance:** High



_____

December 4, 2018


████████████

George Mason University

Fairfax, VA 22030

████████

# A547

**CONFIDENTIAL**

Dear Ms. ███████,


The intent of this letter is to acknowledge your complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE).  The respondent, ████████, has been notified of this complaint and potential violations of George Mason University's Sexual Harassment Policy (2014-15 and 2015-16). Specifically, the allegations state that:


- Over the November 21-23, 2014 weekend, while attending the annual Association for Behavioral and Cognitive Therapy conference, ██████ opened a conference discussion, attended by ██████, with a graphic description of his time working at a pornography store, images of naked women within in the slides, and several explicit reference to sexual acts. ████████ invited Williams to attend this talk, knowing she was a first year graduate student and had been an undergraduate student in his classes previously.

- At the same conference listed above, after the talk, ████████ pulled graduate student ██████ aside and said, "Yo, are you plowing that chick?" (Referencing ██████) and indicated he was in a committed relationship with ██████. ██████ then looked at Williams again and then "high fived" ██████.

- At the next lab Happy Hour, ██████ approached ██████ and told her you knew about her relationship with ██████, then hugged her, and congratulated her on the relationship. He also told her he "knew how to keep secrets" and then you ordered her a drink and put it on his tab.

- Around mid-February 2015, while hosting a lab party for graduate students at his home, ██████ commented on ██████ penis size (██████ boyfriend at the time) in reference to him dating ██████. He further commented on ██████ lack of sexual experience and made a comparative statement about ██████ appearance ("██████ must have a big dick to be dating you. Like, just look at you.")

- During the spring of 2016, while attending the ████████ ████████, in Chicago, Illinois, ██████ hugged ██████ at a restaurant and told her he had overheard her conversation with her companion. He told ██████ she "didn't have to worry because he knew how to keep secrets. I won't tell ████ what I overheard."

- In the spring of 2016, ██████ and ██████ broke up. ██████ said ██████ stopped her in the hallway of the ██████ building, hugged her, and said, "I'm not mad and I still think highly of you." He indicated that he wanted to work with her in the future and commented that she was intelligent, attractive and creative and expressed that he hoped they could work together on projects, despite the breakup.


Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter.  The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the

**A548**

**CONFIDENTIAL**

investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will contact you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigator with any materials you think should be considered from an evidentiary lens; if you have any witnesses you would like to be interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by me will solely be on a need to know basis.

Based on the information in this allegation, you are to have no further contact with ▇▇▇▇ ▇▇▇▇▇. This includes any contact in person, by phone, text, email, instant messenger, written notes, social media (such as Facebook, Twitter, Snapchat, Google Hangout), or any other method of communication. No one (you, your friends, your family, or your colleagues) is to contact the ▇▇▇▇▇, her friends, her family, or her colleagues on your behalf. This "No Contact" order will remain in effect until the conclusion of the investigation. It may also be extended beyond the investigative timeframe.

Additionally, please be advised that George Mason University's non-discrimination policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:

- University Policy 1202: Sexual Harassment and Misconduct Policy 2014-15

- University Policy 1202: Sexual Harassment and Misconduct Policy 2015-16

- Equal Opportunity/Affirmative Action Grievance Procedures 2013 version

- Equal Opportunity/Affirmative Action Grievance Procedures January 2015 version

**A549**

**CONFIDENTIAL**

Equal Opportunity/Affirmative Action Grievance Procedures February 2016 version

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Naomi Martinez-Jones in Disability Services at nmarti20@gmu.edu. Your cooperation in this process is appreciated.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

George Mason University

CC:    Dr. Keith Renshaw, Department Chair

Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

**CONFIDENTIAL**

titlenine.gmu.edu

**A551**





GEORGE **MASON** UNIVERSITY | Compliance, Diversity, and Ethics

# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. CDE may amend this process as necessary. Any student, faculty member, staff employee, or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, color, religion, retaliation, sex (including sexual harassment), national origin, sexual orientation, age, physical or mental disability, veteran status, marital status, pregnancy status, or genetic information (GINA) should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the University reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the charging party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.





## III. Filing Process

<u>Complaints</u>

Complaints must be filed with CDE. Complainants will be asked to complete an intake form describing the alleged discrimination and/or harassment. Assistance will be arranged, if needed.

A complaint should be filed within 180 calendar days of the most recent incident. The University will consider requests to extend this period where the complainant can show he or she needed additional time due to circumstances beyond his or her control.

The complainant will meet with a representative from Compliance, Diversity and Ethics to discuss options (informal, formal) for proceeding. The Title IX and Age Discrimination in Employment Act (ADEA) Coordinator is the Associate Director/Chief Investigator in Compliance, Diversity and Ethics, located in Research Hall, Room 344, 703-993-8730, CDE@gmu.edu.  The complainant is not required to follow the informal procedure before filing a formal complaint. The respondent (the individual accused of discrimination) will be notified of the complaint within 10 working days after it is filed.

<u>Options</u>

**Informal**. Discuss allegations and concerns with respondent (the accused) and attempt to resolve the situation. The respondent is reminded that George Mason University expects all to adhere to our equal opportunity policies. Respondent is put on notice that behavior has been questioned, and informal resolution sought, if possible. If attempts to resolve the situation are not successful, the complainant may pursue a formal complaint. The Office reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

**Formal**. A full investigation is conducted by CDE complete with written findings. If a violation is found, the Office will recommend corrective actions. These may include a directive to stop any ongoing discrimination, harassment, or retaliation; disciplinary or other corrective action against the respondent or others; relief for the complainant to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.** A finding may be appealed in writing to the Vice President of Compliance, Diversity by either party within 10 working days of receipt of CDE's determination. A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding. The appellant should be as specific as possible in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination Compliance, Diversity and Ethics is final.



**MASON GEORGE UNIVERSITY | Compliance, Diversity, and Ethics**



At any time, prior to filing a charge, or while a complaint proceeding is in progress, a complainant may file their complaint with the appropriate external agencies. A complete list of agencies, along with contact information, is available from Compliance, Diversity and Ethics, Research Hall, Room 344, MS 2C2, Fairfax, VA 22030;  Phone (703) 993-8730;  Fax (703) 993-8899.

Time Line for Investigation Process

Compliance, Diversity and Ethics will complete its investigations as expeditiously as possible. The investigation shall normally be completed within 45 working days from the filing of a formal complaint, including notification of the parties of the outcome of the investigation. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. Compliance, Diversity and Ethics will maintain contact with the Complainant and Respondent throughout the course of the investigation to keep them up to date on the process.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the respondent, the complainant, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The complainant and the respondent each have the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to Compliance, Diversity and Ethics at least 72 hours prior to the meeting. If either the complainant or the respondent's advisor is a person degreed or qualified in law, Compliance, Diversity and Ethics must be notified.

## VI. Responsibilities and Jurisdiction of the Office of Equity and Diversity Services

Consistent with federal and state laws and university policies related to nondiscrimination, the CDE only investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex, national origin, sexual orientation, age, marital status,  pregnancy status,  genetic information, physical or mental disability, or veteran status.  CDE investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

Updated 1/26/2015

 **Compliance, Diversity & Ethics**

*Updated February 2016*

# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, vendors and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. CDE may amend this process as necessary. Any student, faculty member, staff employee, contractor or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, color, religion, retaliation, sex (including sexual harassment), national origin, sexual orientation, age, physical or mental disability, veteran status, marital status, pregnancy status, or genetic information (GINA) should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the university reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the Reporting Party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal

1

# A555

Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

## III. Filing Process

<u>Complaints</u>

If a member of the George Mason University community believes that he or she has been the victim of discrimination or discriminatory harassment or has information about discrimination/harassment in the university community, he or she may promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to CDE, located on the Fairfax Campus, Aquia Building, Suite 373. They may also email the office at cde@gmu.edu, or call the office at (703) 993-8730. This report initiates a complaint. Alternatively, a member of the university community may report the situation to his or her immediate supervisor, department head, or Dean, who will immediately notify CDE of the report. This report will also initiate a complaint. Supervisors must immediately report any complaints they receive or incidents of alleged harassment or discrimination they witness to the Office of Compliance, Diversity and Ethics.

A complaint should be filed within 180 calendar days of the most recent incident. The university will consider requests to extend this period where the Reporting Party can show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior. Matters which are determined not to require further investigation or follow-up by CDE may be referred to a representative from the Office of Human Resources or the applicable supervisor.  All complaints of discrimination and harassment will be treated in the strictest confidence possible under the particular circumstances.

The Reporting Party will meet with a representative from Compliance, Diversity and Ethics to discuss options (informal, formal) for proceeding. The Reporting Party is not required to follow the informal procedure before filing a formal complaint. The Responding Party (the individual accused of discrimination) will be notified of the complaint within five (5) working days after it is filed.

<u>Options</u>

**Informal**. Discuss allegations and concerns with Responding Party (the accused) and attempt to resolve the situation. The Responding Party is reminded that George Mason University expects all to adhere to our equal opportunity policies. Responding Party is put on notice that behavior has been questioned, and informal resolution is sought, if possible. If attempts to resolve the situation are not successful, the Reporting Party may pursue a formal complaint. CDE reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

**Formal**. A full investigation is conducted by CDE complete with interviews of the Reporting Party, the Responding Party, and any material witnesses identified, as well as a review of any

2

# A556

relevant documentation.  The Reporting Party and the Responding Party will be kept apprised of the progress of the investigation and will be given the opportunity to provide any additional relevant information to the investigator, including the names of additional witnesses to contact and/or additional documents to review before the investigation is closed. At any time before the conclusion of the investigation, the appropriate supervisor to which the Responding Party is assigned may take interim emergency action until the conclusion of the investigation.

At the conclusion of its investigation CDE will issue a final written determination.  The final written determination will state whether, based on CDE's investigation, there was a violation of this policy. The final written determination will be provided to the Reporting Party, the Responding Party, and the appropriate supervisor.  A copy of the written determination will also be provided to Human Resources and other pertinent university officials as necessary to ensure proper resolution and follow-up regarding the matter.  CDE's involvement in the matter concludes when the final written determination is issued.

The investigator's findings of fact will be made using the "preponderance of the evidence" standard.  Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct occurred.  This "preponderance of the evidence" standard requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it.

If the investigation finds that discrimination or harassment occurred, the university will determine appropriate corrective action, up to and including dismissal.  The university may also take corrective action if no discrimination or harassment is found, but Responding Party is found to have engaged in inappropriate workplace behavior.

The Responding Party's appropriate supervisor, Human Resources, or any other pertinent university official shall promptly notify CDE of any corrective action imposed, if any.

Sanctions imposed on those individuals who have been found to be in violation of the university's Equal Opportunity Policy or its Discriminatory Harassment Policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

Corrective actions may include a directive to stop any ongoing discrimination, harassment, or retaliation; disciplinary or other corrective action against the Responding Party or others; relief for the Reporting Party to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.** A finding may be appealed in writing to the Vice President of Compliance, Diversity and Ethics in CDE by either party within 10 working days of receipt of CDE's determination. A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding. The appellant should be as specific as possible in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination of the VP/CDE is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a Reporting Party may file their complaint with the appropriate external agencies, such as the Department

3

**A557**

of Education Office of Civil Rights (OCR) or the Equal Employment Opportunity Commission (EEOC), within applicable time limits. In addition, any person who is dissatisfied with GMU's internal procedures utilized for handling complaints, or who is dissatisfied with the result of the investigation or the sanctions imposed, may seek redress through the EEOC, to the extent allowed by law. The Reporting Party should be aware that filing a complaint with CDE or other university resources does not extend or postpone the deadline for filing with external agencies. In the event that a complaint is filed with an external agency or court, the university reserves the right to determine, at its discretion, whether the university's internal complaint resolution procedure should be discontinued or continued separately.

<u>Time Line for Investigation Process</u>

CDE will complete its investigations as expeditiously as possible. The investigation shall normally be completed within 45 working days from the filing of a formal complaint, including notification of the parties of the outcome of the investigation. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. CDE will maintain contact with the Reporting Party and Responding Party throughout the course of the investigation to keep them up to date on the process.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the Responding Party, the Reporting Party, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The Reporting Party and the Responding Party each have the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to CDE at least 72 hours prior to the meeting. If either the Reporting Party or the Responding Party's advisor is a person degreed or qualified in law, CDE must be notified.

## VI. Responsibilities and Jurisdiction of Compliance, Diversity and Ethics

Consistent with federal and state laws and university policies related to nondiscrimination, CDE investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex, national origin, sexual orientation, age, marital status, pregnancy status, genetic information, physical or mental disability, or veteran status. CDE investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.



# MEMORANDUM
### COMPLIANCE, DIVERSITY, AND ETHICS
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730; Fax: 703-993-8899

| | |
|---|---|
| To: | Tom Moncure, University Counsel |
| | J.J. Wagner Davis, Senior Vice President for Administration and Finance |
| | S. David Wu, Provost and Executive Vice President |
| From: | Elizabeth I. Woodley, University Policy Manager |
| Date: | July 30, 2014 |
| Subject: | University Policy 1202: Sexual Harassment and Misconduct |

---

Enclosed please find a revision of University Policy 1202, Sexual Harassment and Misconduct. This revision was initiated by Compliance, Diversity, and Ethics to ensure that the policy complies with Title IX and the Campus SaVE Act. The policy now describes Sexual Misconduct more fully as a form of Sexual Harassment under Title IX, defines the SaVE Act's four categories of Sexual Misconduct (domestic violence, dating violence, sexual assault, and stalking), and sets out the process of investigation in cases of Sexual Misconduct. The policy also provides a list of resources for incidents of Sexual Misconduct. The revision was completed with assistance from Rory Muhammad, Herbertia Gilmore, Brent Ericson, Hortense Rascoe, Andre Clanton, Mary Ann Sprouse, Juliet Blank, and David Drummey, among others.

After your review, please include your signature of approval on the final page of the policy, if appropriate. Please also initial where indicated below and forward to the next office for administrative review.

If you have any questions or concerns, please do not hesitate to contact me at 3-5115 or ewoodley@gmu.edu.

Thank you.

- Legal Department Review
- Approval and Signature of Senior Vice President
- Approval and Signature of Provost
- Return to University Policy Manager – Elizabeth Woodley, MSN 2C2



University Policy #1202
*Sexual Harassment and Misconduct*

---

**Categorized: General Policies**

**Responsible Office:**
Compliance, Diversity, and Ethics

**Policy Procedures:**
Equal Opportunity/Affirmative Action Grievance Procedures
Code of Student Conduct Procedures

**Related Law & Policy:**
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
University Policy 1201: Non-Discrimination Policy
Code of Student Conduct
Student Rights and Responsibilities (from University Catalog)

---

I.     **SCOPE**

This policy applies to all George Mason University *(Mason)* faculty, staff, students, university contractors, and visitors.

II.    **POLICY STATEMENT**

It is the policy of the University to provide an academic and work environment free from sexual harassment. Sexual harassment, a form of gender discrimination, is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated. Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures. Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1. Sexual assault

2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

1

**A560**

III.    ADDRESSING AND PREVENTING SEXUAL MISCONDUCT

Sexual misconduct, which is a form of gender discrimination and incorporates a range of behaviors, is contrary to the standards and mission of the university. The University recognizes a need to establish a *comprehensive* policy that addresses campus sexual misconduct, which includes but is not limited to, sexual assaults, domestic violence, dating violence, stalking and sexual exploitation. In this context, Mason reaffirms its commitment to maintain a campus environment emphasizing the dignity and worth of all members of the university community; to foster a community that promotes prompt reporting of all types of sexual misconduct; and, to resolve sexual misconduct complaints in a fair, impartial and timely manner.

The University will respond promptly and decisively to all reports of sexual misconduct. Members of the university community accused of sexual misconduct will be subject to disciplinary action when the alleged incident has occurred on campus, off campus or materially affects the learning environment or operations of the university.

A. **Sexual Misconduct Reporting Options**

All reports of sexual misconduct, sexual harassment and gender discrimination made to any University employee must be reported to the University's Title IX Coordinator, Rory Muhammad, in Compliance Diversity and Ethics (CDE). In addition, any person who believes he or she has been subject to sexual misconduct, sexual harassment or gender discrimination may contact the Title IX Coordinator directly. The telephone number for CDE is (703) 993-8730 and email is rmuhamma@gmu.edu. The Title IX Coordinator, in consultation with Human Resources and University Life, will ensure complaints are addressed by appropriate University entities and will assist complainants in receiving any medical, mental health, or other services that may be warranted. The Title IX Coordinator will also facilitate any interim administrative action necessary to protect the complainant in the institutional setting while the disciplinary or investigative process is taking place. Such action may be taken when, in the professional judgment of University officials, a threat of imminent harm to persons or property exists. Interim administrative action is not a sanction. Actions may include, but are not limited to, interim suspension, alternate housing or academic accommodations, alternate transportation on campus, no contact directives, workspace relocation, or temporary change of reporting structure.

Complaints against students are handled by the Office of Student Conduct and are governed by the Code of Student Conduct (See at http://studentconduct.gmu.edu/university-policies/code-of-student-conduct/). Complaints against faculty and staff are handled by Compliance Diversity and Ethics and are governed by Equal    Opportunity/Affirmative    Action    Grievance    Procedures    at http://integrity.gmu.edu/compliance/grievanceprocedures.cfm. The Title IX Coordinator will decide which grievance procedure to apply in cases where the respondent is a student and employee. In addition to filing internal complaints, the University encourages individuals to report incidents of sexual misconduct to the University Police at (703) 993-4111 or local law enforcement at 911.

Anonymous reports can be used to initiate the student conduct process and employee conduct investigations. Under federal law the University is required to investigate all incidents of sexual harassment and gender discrimination, including sexual assaults, about which the University knows or has reason to know to protect the health and safety of the University community. The University will undertake an investigation even in those cases in which the complainant chooses not to cooperate. In those cases, the University may be limited in the scope of its investigation due to the availability of information. Third party or anonymous reports alleging sexual misconduct will be accepted by the University through Compliance Diversity and Ethics.

Any information provided anonymously or formally will be used in compliance with *The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act* for data collection.

B. **Confidentiality and Reporting**

The University will protect the identity of persons who report having been victims of sexual assault, domestic violence, dating violence, stalking or sexual exploitation to the fullest extent possible or required by law. However, when accessing university resources, individuals should be aware of the University's

confidentiality and mandatory reporting obligation in order to make informed choices. Some on-campus resources offer confidentiality, sharing options and advice without having an obligation to tell anyone unless the complainant wants them to. This is limited to counselors in Counseling & Psychological Services (CAPS) and staff members in Student Health Services (SHS) and Wellness, Alcohol and Violence Education Services (WAVES). In addition, complainants may speak on- or off-campus with members of the clergy and chaplains who will keep reports made to them confidential.

Complainants are encouraged to speak to officials of the University to make reports of incidents (e.g., Deans, Directors, Vice Presidents, Department Chairs, Faculty, University Police, Human Resources staff, Resident Director and Advisors, etc.). The University considers these people to be *"responsible employees."* Notice to them is official notice to the University. Complainants have the right and can expect to have incidents of sexual misconduct taken seriously by the University when reported, and to have those incidents investigated and properly resolved through appropriate administrative procedures. Only people who need to know will be told and information will be shared only as necessary with investigators, hearing boards members, administrators, witnesses and the respondent.

**C.  Sanctions**

University sanctions, up to and including separation from the university, may be imposed upon those determined to have violated this policy. For students, some form of sexual misconduct, such as, sexual assault, domestic violence, dating violence, stalking and sexual exploitation are violations of the Code of Student Conduct, subjecting the respondent to disciplinary sanctions up to and including expulsion and suspension from the university. Employees who violate this policy will be subject to discipline, up to and including termination of employment. Sexual assault, domestic violence, and stalking are criminal acts which also may subject the respondent to criminal and civil penalties under federal and Virginia state law.

**D.  Campus Emergency, Medical, Counseling, Advocacy Support Resources**

**University Title IX Coordinators**
**Rory Muhammad**, Associate Director/Chief Investigator & Title IX Coordinator
**Herbertia Gilmore**, Equal Opportunity Specialist & Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Mason Hall, D201
Phone: (703) 993-8730
E-mail: rmuhamma@gmu.edu and hwillia9@gmu.edu
Website: http://integrity.gmu.edu/compliance/titleIX.cfm

**Wellness, Alcohol and Violence Education and Services (WAVES)** — Provides students with *confidential* help and support to develop and maintain healthy lifestyles. Topics include: relationships, stress management, sexual assault, drugs/alcohol.
Mary Ann Sprouse, Director
Phone: (703) 993-3687
E-mail: msprouse@gmu.edu
WAVES Office Phone: (703) 993-9999
WAVES 24 Hour Sexual and Intimate Partner Violence Crisis Line: (703) 380-1434

**Counseling and Psychological Services (CAPS)** — Provides *confidential* counseling services to students in crisis and non-emergency situations. Crisis Intervention Assistance is provided to members of the University community who are experiencing crises which affect their ability to function in the community.
  • For consultation or emergency assistance during office hours call 703-993-2380.
  • For assistance during non-office hours, call University Police at 703-993-4357.
  • For life threatening emergencies call 911.
Barbara Meehan, Director
Phone: (703) 993-2380
E-mail: bmeehan@gmu.edu

**Student Health Services (SHS)** — Provides *confidential* health care to enrolled students in emergency and non-emergency circumstances on the Fairfax, Arlington and Prince William campuses.  If there is a medical emergency and Student Health Services (SHS) is closed, please contact the free after-hours nurse ((703) 993-2831), a hospital emergency room, an urgent care facility, or call 911.

# A562

| Fairfax Campus | Arlington Campus | Prince William Campus |
|---|---|---|
| SUB 1, Suite 2300 | Founders Hall, B | 102 Occoquan Bldg, Room 229 |
| 703-993-2831 | 703-993-4863 | 703-993-8374 |
| Fax: 703-993-4365 | Fax: 703-993-9425 | Fax: 703-993-1948 |

Wagida Abdalla, MD and Carol Filak, PhD, RN, Directors
Email: wabdalla@gmu.edu and cfilak@gmu.edu

**University Police**
Police Phone Numbers/Information
Emergency: 911
Non-Emergency: (703) 993-2810
Reporting a Crime (Crime Solvers Anonymous Tip Hot-Line): (703) 993-4111
Mason Police Website: http://police.gmu.edu/
Eric Heath, Chief of Police
Phone: (703) 993-3840
E-mail: eheath2@gmu.edu

**University Life (UL)** — The Offices of University Life oversee the academic and non-academic adjudication process and help students and faculty resolve grievances by mapping out resources and explaining policies. In addition to fostering campus and community engagement through a myriad of student clubs and organizations, University Life offices promote health and wellness, learning services, diversity education, and career readiness. University Life seeks to enhance the university experience by helping students, staff, and faculty find their place in the George Mason University community.
Pam Patterson, Assistant Vice President and Dean of Students
Phone: (703) 993-2884
Email: ppater2@gmu.edu

**Lesbian, Gay, Bisexual, Transgender, Queer and Questioning Resource Office (LGBTQ)** — Provides students of all genders and sexual orientations a safe, supportive, confidential space for advocacy, guidance and mentorship, community building, educational programming, resources, and coordination of the Safe Zone Program.
Ric Chollar, Director
Phone: (703) 993-2702
Email: rchollar@gmu.edu
Website: http://lgbtq.gmu.edu/

**Student Support and Case Management (OSSCM)** — Provides comprehensive service to students of concern. Working in cooperation with the Dean of Students Office, OSSCM serves as the primary resource for managing referrals and student issues related to crisis intervention. The office will make referrals to the Campus Assessment & Intervention Team, as necessary. Individuals concerned about a Mason student are encouraged to share their concerns if they:
- Observe behavior which could reasonably lead one to be concerned for the student's safety, or for the safety of those around him/her;
- Feel threatened by the student, whether by action or direct verbal threat;
- Observe new behavior, different from a previously established pattern of behavior that causes concern to the observer.

Margaret Olszewska, Director
Office Phone: (703) 993-5376
E-mail: molszews@gmu.edu
Website: http://osscm.gmu.edu/

**Office of Student Conduct (OSC)** — Provides primarily responsible for resolving allegations of misconduct in a timely and consistent manner. Cases related to Title IX are heard, and decided, on an individual basis taking each situation's circumstances into account. Additional information regarding the hearing process can be found at Resolution of Alleged Sexual Misconduct (http://studentconduct.gmu.edu/our-process/resolution-of-alleged-sexual-assault/).
Brent Ericson, Assistant Dean and Director
Phone: (703) 993-6209
E-mail: bericson@gmu.edu

4

**A563**

**Intercollegiate Athletics (ICA)** — ICA is available to assist individuals and to address the challenges of our student-athletes at George Mason University.
Nena Rogers, Associate Athletic Director, Student Services, Intercollegiate Athletics
Phone: (703) 993-3594
Email: nrogers1@gmu.edu

**Human Resources and Payroll's Employee Relations Team (HR&P)** — Provides assistance to university employees and their supervisors to help identify and resolve work related problems or proactively avoid potential problems, including but not limited to, sexual misconduct issues in the workplace. Resources for faculty and staff can be found here.
Pat Donini, Director
Phone: (703) 993-3878
E-mail: pdonini@gmu.edu

**Office of Housing and Residential Life (OHRL)** — Provides a student-centered community that supports the academic mission of the university. They promote student success, encourage engagement with the university community, and promote appreciation for diversity among our residents. Professional and student staff are available around the clock to assist students and ensure safety.
Michelle Coleman, Associate Director of Community Development, Housing & Residence Life
Phone: (703) 993-2720
E-mail: mcolem11@gmu.edu

**E. External Emergency, Medical, Counseling, Advocacy Support Resources**

**Office for Women and Domestic and Sexual Violence Services (OFWDSVS)** — Provides comprehensive state-accredited programs for women, men, teens and children who have been affected by domestic and sexual violence and stalking. OFWDSVS promotes safety, responsibility, awareness and equality by offering a 24-hour hotline, free counseling, group sessions, and referrals.
Fairfax County Government Center, 12000 Government Center Pkwy, Suite 339, Fairfax, VA 22035
Phone: (703) 324-5730 and TTY: (703) 324-5706
24 hour Hotline/Helpline: 703-360-7273 and TTY (703) 435-1235

**Domestic Violence Action Center (DVAC)** — Provides services to individuals experiencing domestic violence or stalking and their families who reside in Fairfax County or were assaulted and/or stalked in the county. Referrals for offender services are also available through the intake telephone number only *(no offender walk-ins).*
Fairfax County Historic Courthouse, 4000 Chain Bridge Road, Suite 2702, Fairfax, VA 22035
Information and Intake Phone: 703-246-4573
Walk-In Intake Hours: 10 a.m. to 3 p.m., Monday through Friday

**Rape, Abuse and Incest National Network (RAINN)** — Among its programs, RAINN operates the National Sexual Assault Hotline at (800)656-HOPE. This nationwide partnership of more than 1,100 local rape treatment hotlines provides victims of sexual violence with free, confidential services around the clock.
Phone: (800) 656-HOPE
Website: www.rainn.org

IV.  **DEFINITIONS**

A.  *Sexual Misconduct* is a range of behaviors, including but not limited to, sexual harassment, sexual assault, domestic violence, dating violence, stalking and sexual exploitation.  It includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that (a) is sufficiently severe, persistent, or pervasive to limit a student or employee's ability to participate in or benefit from an education program, or (b) explicitly or implicitly affects an individual's employment or academic environment, unreasonably interferes with an individual's academic or work performance, or creates an intimidating, hostile, or offensive academic or work environment.

B.  *Consent* is clear, knowing and voluntary. Consent is active, not passive. Silence, in and of itself, cannot be interpreted as consent. Consent can be given by words or actions, as long as those words or actions create mutually understandable clear permission regarding willingness to engage in (and the condition of) sexual activity. Consent to any one form of sexual activity cannot automatically imply consent to other forms of

5

sexual activity. Previous relationships or prior consent cannot imply consent to future sexual acts. Consent can be withdrawn at any time.

If any of the following are present, consent cannot be given:
1. *Force* is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and coercion that overcome resistance or produce consent.
2. *Coercion* is unreasonable pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another.
3. *Incapacitation* is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction). Sexual activity with someone who you should know to be – or based on the circumstances should reasonably have known to be – mentally or physically incapacitated (by alcohol or other drug use, unconsciousness or blackout), constitutes a violation of university policy. University policy covers a person whose incapacity results from mental disability, sleep, involuntary physical restraints, or from taking drugs or other substances.

C. *Sexual Assault* is any unwanted, non-consensual sexual contact against any individual by another. Sexual assault can occur either forcibly (against a person's will) or when a person cannot give consent (under the age of consent, intoxicated, developmentally disabled, mentally/physically unable to consent, etc.). Sexual assault can include non-consensual touching or fondling of a sexual nature, which can include touching of breasts, buttocks and/or genitalia.

D. *Domestic Violence* includes violence committed by a current or former spouse or intimate partner of the complainant, by a person with whom the complainant shares a child in common, by a person who is cohabitating with or has cohabitated with the complainant as a spouse or intimate partner, by a person similarly situated to a spouse of the complainant under the domestic or family violence laws of the Commonwealth of Virginia, or by any other person against an adult or youth complainant who is protected from that person's acts under the domestic or family violence laws of the Commonwealth of Virginia.

E. *Dating Violence* is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant. The existence of such relationship shall be determined based on a consideration of three factors: (1.) The length of the relationship; (2.) The type of relationship; and (3.) The frequency of interaction between the persons involved in the relationship.

F. *Stalking* includes any behavior directed at another person, on more than one occasion, that the stalker intends, knows, or reasonably should know, places the other person in reasonable fear of his or her safety or the safety of others or causes them to suffer substantial emotional distress. Examples of stalking behaviors include, but are not limited to, the following: non-consensual communication, including face-to-face, telephone calls, voice messages, email, texts, written letters; unwanted gifts; threatening or obscene gestures; pursuing or following; surveillance or other observation; trespassing; vandalism; and non-consensual touching.

G. *Sexual Exploitation* occurs when a person takes non-consensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute one of other sexual misconduct offenses. Examples of sexual exploitation include, but are not limited to, invasion of sexual privacy; prostituting another person; non-consensual recording or broadcast of sexual activity; going beyond the boundaries of consent (such as letting someone hide in the closet to watch another have consensual sex); engaging in voyeurism; knowingly transmitting an STD or HIV to another person; exposing one's genitals in non-consensual circumstances – inducing another to expose their genitals; and sexually-based stalking, bullying and cyber-bullying.

## V.    PROTECTION AGAINST RETALIATION

Any member of the Mason community has the right to raise concerns about or complain of, sexual harassment or misconduct without fear of reprisal. Retaliation against any person related to any portion of this policy may result in disciplinary action up to and including termination or expulsion by Mason. Retaliation against any person who is the alleged victim of sexual harassment or misconduct is prohibited as well.

**A565**

## VI.   TRAINING, EDUCATION AND PREVENTION PROGRAMS

The University's Wellness, Alcohol, Violence and Education Services (WAVES) and Compliance, Diversity and Ethics (CDE), are responsible for developing and implementing a comprehensive, institution-wide education and prevention campaign for students and employees related to prevention of sexual assaults, domestic violence, dating violence, stalking and sexual exploitation as well as training on this policy. These programs will inform the university community about the risks and myths that contribute to incidents of sexual misconduct and strategies for bystander intervention.

## VII.   COMPLIANCE

Inquiries about or complaints alleging violation of the University's Sexual Harassment and Misconduct Policy should be directed to the Title IX Coordinator in Compliance Diversity and Ethics (Mason Hall D201, Mailstop 2C2, Fairfax, VA 22030 Phone (703) 993-8730).

## VIII.   RESPONSIBLE PARTIES

Compliance, Diversity, and Ethics is responsible for administering and monitoring George Mason University's equal opportunity/affirmative action policies and procedures.

## IX.   DATES:

### A.   Effective Date and Approval

This policy will become effective upon the date of approval by the Provost and Senior Vice President for Administration and Finance.

### B.   Timetable for Review

The policy, and any related procedures, shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

## X.   SIGNATURES

Approved:

_____
Senior Vice President for Administration and Finance

8/8/2014
Date

Approved:

_____
Provost and Executive Vice President

8/5/14
Date

**A566**



# University Policy #1202
## *Sexual Harassment and Misconduct*

**Categorized: General Policies**

**Responsible Office:**
Compliance, Diversity, and Ethics

**Policy Procedures:**
Equal Opportunity/Affirmative Action Grievance Procedures
Code of Student Conduct Procedures

**Related Law & Policy:**
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
University Policy 1201: Non-Discrimination Policy
Code of Student Conduct
Student Rights and Responsibilities (from University Catalog)

## I.    SCOPE

This policy applies to all George Mason University *(Mason)* faculty, staff, students, university contractors, and visitors.

## II.    POLICY STATEMENT

It is the policy of the University to provide an academic and work environment free from sexual harassment. Sexual harassment, a form of gender discrimination, is contrary to the standards and mission of the University. Sexual harassment is illegal and will not be tolerated. Each member of the University community has a responsibility to maintain an academic and work environment free from sexual harassment. The University will take whatever action necessary to prevent, stop, correct, or discipline harassing behavior. Same-sex sexual harassment violates this policy and is subject to discipline under the same procedures. Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission.

Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other forms of expressive communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or unreasonably creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:

1. Sexual assault

2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment, i.e., grades, employment, promotion, letters of recommendation or other privileges

3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression

III.    ADDRESSING AND PREVENTING SEXUAL MISCONDUCT

Sexual misconduct, which is a form of gender discrimination and incorporates a range of behaviors, is contrary to the standards and mission of the university. The University recognizes a need to establish a *comprehensive* policy that addresses campus sexual misconduct, which includes but is not limited to, sexual assault, domestic violence, dating violence, stalking and sexual exploitation. In this context, Mason reaffirms its commitment to maintain a campus environment emphasizing the dignity and worth of all members of the university community; to foster a community that promotes prompt reporting of all types of sexual misconduct; and, to resolve sexual misconduct complaints in a fair, impartial and timely manner.

The University will respond promptly and decisively to all reports of sexual misconduct. Members of the university community accused of sexual misconduct will be subject to disciplinary action when the alleged incident has occurred on campus, off campus or materially affects the learning environment or operations of the university.

IV.    REPORTING SEXUAL MISCONDUCT

The University strongly encourages prompt reporting of sexual misconduct. A report may be made by
- A person who believes they experienced sexual misconduct (a "Complainant"); or
- A person who has information that sexual misconduct may have been committed by a university student, employee or participant in a university program (a "Reporter").

If the Reporter or Complainant chooses not to participate in the University's review of the report, the University may pursue the report without that person's participation.

All reports to any University employee must be reported to the University's Interim Title IX Coordinator, Herbertia Gilmore, in Compliance Diversity and Ethics (CDE). Reports made to any other non-confidential University employee, including, but limited to, the University's Deputy Title IX Coordinators for Athletes (Nena Rogers) and Mason Korea (Kent Zimmerman) will be referred to the Title IX Coordinator for further review.

The Title IX Coordinator, in consultation with Human Resources and University Life, will ensure complaints are addressed by appropriate University entities and will assist complainants in receiving any medical, mental health, or other services that may be warranted. The Title IX Coordinator will also facilitate any interim administrative action necessary to protect the complainant in the institutional setting while the disciplinary or investigative process is taking place. Such action may be taken when, in the professional judgment of University officials, a threat of imminent harm to persons or property exists. Interim administrative action is not a sanction. Actions may include, but are not limited to, interim suspension, alternate housing or academic accommodations, alternate transportation on campus, no contact directives, workspace relocation, or temporary change of reporting structure.

Complaints against students are governed by the Code of Student Conduct (See at http://studentconduct.gmu.edu/university-policies/code-of-student-conduct/). The Office of Student Conduct handles those complaints except for students studying at the Mason Korea campus. Complaints against faculty, staff, and students studying at the Mason Korea campus are handled by Compliance Diversity and Ethics. The Equal Opportunity/Affirmative Action Grievance Procedures are available at http://integrity.gmu.edu/compliance/grievanceprocedures.cfm. The Title IX Coordinator will decide which grievance procedure to apply in cases where the respondent is a student and employee. In addition to filing internal complaints, the University encourages individuals to report incidents of sexual misconduct to the University Police at (703) 993-4111 or local law enforcement at 911.

Anonymous reports can be used to initiate the student conduct process and employee conduct investigations. Under federal law the University is required to investigate all incidents of sexual harassment and gender discrimination, including sexual assaults, about which the University knows or has reason to know to protect the health and safety of the University community. The University will undertake an investigation even in those cases in which the complainant chooses not to cooperate. In those cases, the University may be limited in the scope of its investigation due to the availability of information. Third party or anonymous reports alleging sexual misconduct will be accepted by the University through Compliance Diversity and Ethics.

All crimes and other emergencies should be immediately reported to the George Mason University Department of Police & Public Safety (Mason Police) or local police and fire authorities by dialing 9-1-1. For the Mason

# A568

Korea Campus, crimes and other emergencies should be immediately reported to local police and fire authorities by dialing 1-1-2 or 1-1-9. After receiving information concerning a crime or an emergency, the University will ensure an effective investigation and appropriate follow-up actions, which may include issuing timely warning notifications to alert the campus community about crimes that pose a serious or continuing threat to safety, or issuing emergency notification and evacuation procedures to alert the campus community about significant emergencies or dangerous situations. Reporting all incidents to Mason Police also allows for accurate reporting of crime statistics in public disclosures such as the Annual Security and Fire Safety Report and the daily Crime and Fire Log in compliance with *The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act*. See University Policy #1404 for more information (http://universitypolicy.gmu.edu/policies/reporting-of-crimes-accidents-fires-and-other-emergencies/)."

## A. Confidentiality and Reporting

The University will protect the identity of persons who report having been victims of sexual assault, domestic violence, dating violence, stalking or sexual exploitation to the fullest extent possible or required by law. However, when accessing university resources, individuals should be aware of the University's confidentiality and mandatory reporting obligation in order to make informed choices. Some on-campus resources offer confidentiality, sharing options and advice without having an obligation to tell anyone unless the complainant wants them to. This is limited to staff in Counseling and Psychological Services, Office of the Ombudsman, Student Health Services and Wellness, Alcohol and Violence Education Services.

Complainants and Reporters are encouraged to speak to officials of the University to make reports of incidents (e.g., Deans, Directors, Vice Presidents, Department Chairs, Faculty, University Police, Human Resources staff, Resident Director and Advisors, etc.). The University considers these people to be *"responsible employees."* Notice to them is official notice to the University. Complainants have the right and can expect to have incidents of sexual misconduct taken seriously by the University when reported, and to have those incidents investigated and properly resolved through appropriate administrative procedures. Only people who need to know will be told and information will be shared only as necessary with investigators, hearing board members, administrators, witnesses and the respondent.

If the Complainant requests confidentiality or asks that the report of sexual misconduct not be pursued, the University will, generally before taking any further investigative steps, forward that information, along with all available information about the report, to a review panel. The review panel will consist of the Title IX Coordinator and staff members. These panel members will represent the interests of the University, law enforcement, survivors of sexual misconduct, persons accused of sexual misconduct, and/or other offices as deemed necessary and appropriate under the circumstances.

## B. Sanctions

University sanctions, up to and including separation from the university, may be imposed upon those determined to have violated this policy. For students, some forms of sexual misconduct, such as, sexual assault, domestic violence, dating violence, stalking and sexual exploitation are violations of the Code of Student Conduct, subjecting the respondent to disciplinary sanctions up to and including expulsion and suspension from the university. Employees who violate this policy will be subject to discipline, up to and including termination of employment. Sexual assault, domestic violence, and stalking are criminal acts which also may subject the respondent to criminal and civil penalties under federal and Virginia state law.

## C. Campus Emergency, Medical, Counseling, Advocacy Support Resources

**University Title IX Coordinators**
**Herbertia Gilmore**, Interim Title IX Coordinator
Compliance, Diversity and Ethics
373 Aquia Building (*From July 2015 until October 2015, our office will be temporarily located in Research Hall, 3rd Floor, Room 344.*)
Phone: (703) 993-8730
E-mail: hwillia9@gmu.edu
Website: http://integrity.gmu.edu/compliance/titleIX.cfm

**Deputy Title IX Coordinator for Athletics** – Nena Rogers nrogers1@gmu.edu

**A569**

**Deputy Title IX Coordinator for Mason Korea –** Kent Zimmerman

**Wellness, Alcohol and Violence Education and Services** — Provides students with *confidential* help and support to develop and maintain healthy lifestyles. Topics include: relationships, stress management, sexual assault, drugs/alcohol.
Mary Ann Sprouse, Director
Phone: (703) 993-3687
E-mail: msprouse@gmu.edu
WAVES Office Phone: (703) 993-9999
WAVES 24 Hour Sexual and Intimate Partner Violence Crisis Line: (703) 380-1434

**Counseling and Psychological Services** —Provides free, *confidential* counseling services to students in crisis and non-emergency situations.
- o   For consultation or urgent assistance during business hours, call CAPS at 703-993-2380.
- o   For assistance after hours, call George Mason University Police at 703-993-2810.
- o   For life threatening emergencies, dial 911.
Barbara Meehan, Ph.D., Executive Director
Phone: (703) 993-2380

**Student Health Services** — Provides *confidential* health care to enrolled students in emergency and non-emergency circumstances on the Fairfax, Arlington and Prince William campuses. If there is a medical emergency and Student Health Services is closed, please contact the free after-hours nurse ((703) 993-2831), a hospital emergency room, an urgent care facility, or call 911.

| Fairfax Campus | Arlington Campus | Prince William Campus |
|---|---|---|
| SUB 1, Suite 2300 | Founders Hall, B | 102 Occoquan Bldg, Room 229 |
| 703-993-2831 | 703-993-4863 | 703-993-8374 |
| Fax: 703-993-4365 | Fax: 703-993-9425 | Fax: 703-993-1948 |

Wagida Abdalla, MD and Carol Filak, PhD, RN, Directors
Email: wabdalla@gmu.edu and cfilak@gmu.edu

**Office of the Ombudsman** — Provides *confidential* services for students to discuss any concerns and complaints, and serves as a safe space to facilitate conflict resolution. The Office of the Ombudsman does not accept notice on behalf of the University.
J. Fernando Caetano, University Ombudsman
Phone: (703) 993-3306
E-mail: jcaetano@gmu.edu
Website: http://ombudsman.gmu.edu

**University Police**
Police Phone Numbers/Information
Emergency: 911
Non-Emergency: (703) 993-2810
Reporting a Crime (Crime Solvers Anonymous Tip Hot-Line): (703) 993-4111
Mason Police Website: http://police.gmu.edu/
Thomas Longo, Interim Chief of Police
E-mail: tlongo@gmu.edu

**University Life** — The Offices of University Life oversee the academic and non-academic adjudication process and help students and faculty resolve grievances by mapping out resources and explaining policies. In addition to fostering campus and community engagement through a myriad of student clubs and organizations, University Life offices promote health and wellness, learning services, diversity education, and career readiness. University Life seeks to enhance the university experience by helping students, staff, and faculty find their place in the George Mason University community.
Pam Patterson, Assistant Vice President and Dean of Students
Phone: (703) 993-2884
Email: ppater2@gmu.edu

**Lesbian, Gay, Bisexual, Transgender, Queer and Questioning Resource Office** — Provides students of all genders and sexual orientations a safe, supportive, confidential space for advocacy, guidance and mentorship, community building, educational programming, resources, and coordination of the Safe Zone Program.

# A570

Ric Chollar, Director
Phone: (703) 993-2702
Email: rchollar@gmu.edu
Website: http://lgbtq.gmu.edu/

**Office of Student Support** — Provides comprehensive service to students of concern. Student Support serves as the primary resource for managing referrals and student issues related to crisis intervention. The office will make on and off campus referrals as necessary. Individuals concerned about a Mason student are encouraged to share their concerns if they:

- Observe behavior which could reasonably lead one to be concerned for the student's safety, or for the safety of those around him/her;
- Feel threatened by the student, whether by action or direct verbal threat;
- Observe new behavior, different from a previously established pattern of behavior that causes concern to the observer.

Margaret Olszewska, Director
Office Phone: (703) 993-5376
E-mail: molszews@gmu.edu
Website: http://osscm.gmu.edu/

**Office of Student Conduct** — Provides primarily responsible for resolving allegations of misconduct in a timely and consistent manner. Cases related to Title IX are heard, and decided, on an individual basis taking each situation's circumstances into account. Additional information regarding the hearing process can be found at Resolution of Alleged Sexual Misconduct (http://studentconduct.gmu.edu/our-process/resolution-of-alleged-sexual-assault/).
Brent Ericson, Assistant Dean and Director
Phone: (703) 993-6209
E-mail: bericson@gmu.edu

**Intercollegiate Athletics** — ICA is available to assist individuals and to address the challenges of our student-athletes at George Mason University.
Nena Rogers, Associate Athletic Director, Student Services, Intercollegiate Athletics
Phone: (703) 993-3594
Email: nrogers1@gmu.edu

**Human Resources and Payroll's Employee Relations Team** — Provides assistance to university employees and their supervisors to help identify and resolve work related problems or proactively avoid potential problems, including but not limited to, sexual misconduct issues in the workplace. Resources for faculty and staff can be found here.
Pat Donini, Director
Phone: (703) 993-3878
E-mail: pdonini@gmu.edu

**Office of Housing and Residential Life** — Provides a student-centered community that supports the academic mission of the university. They promote student success, encourage engagement with the university community, and promote appreciation for diversity among our residents. Professional and student staff are available around the clock to assist students and ensure safety.
Michelle Coleman, Associate Director of Community Development, Housing & Residence Life
Phone: (703) 993-2720
E-mail: mcolem11@gmu.edu

## E. External Emergency, Medical, Counseling, Advocacy Support Resources

**Office for Women and Domestic and Sexual Violence Services** — Provides comprehensive state-accredited programs for women, men, teens and children who have been affected by domestic and sexual violence and stalking. OFWDSVS promotes safety, responsibility, awareness and equality by offering a 24-hour hotline, free counseling, group sessions, and referrals.
Fairfax County Government Center, 12000 Government Center Pkwy, Suite 339, Fairfax, VA 22035
Phone: (703) 324-5730 and TTY: (703) 324-5706
24 hour Hotline/Helpline: 703-360-7273 and TTY (703) 435-1235

**Domestic Violence Action Center** — Provides services to individuals experiencing domestic violence or stalking and their families who reside in Fairfax County or were assaulted and/or stalked in the county. Referrals for offender services are also available through the intake telephone number only *(no offender walk-ins)*.
Fairfax County Historic Courthouse, 4000 Chain Bridge Road, Suite 2702, Fairfax, VA 22035
Information and Intake Phone: 703-246-4573
Walk-In Intake Hours: 10 a.m. to 3 p.m., Monday through Friday

**Rape, Abuse and Incest National Network** — Among its programs, the network operates the National Sexual Assault Hotline at (800)656-HOPE. This nationwide partnership of more than 1,100 local rape treatment hotlines provides victims of sexual violence with free, confidential services around the clock.
Phone: (800) 656-HOPE
Website: www.rainn.org

## V.    DEFINITIONS

A. *Sexual Misconduct* covers a range of behaviors, including but not limited to, sexual harassment, sexual assault, domestic violence, dating violence, stalking and sexual exploitation, that can create a hostile academic and/or work environment. It includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that (a) is sufficiently severe, persistent, or pervasive to limit a student or employee's ability to participate in or benefit from an education program, or (b) explicitly or implicitly affects an individual's employment or academic environment, unreasonably interferes with an individual's academic or work performance, or creates an intimidating, hostile, or offensive academic or work environment.

B. *Consent* is clear, knowing and voluntary permission. Consent is active, not passive. Silence, in and of itself, cannot be interpreted as consent. Consent can be given by words or actions, as long as those words or actions create mutually understandable clear permission regarding willingness to engage in (and the condition of) sexual activity. Consent to any one form of sexual activity cannot automatically imply consent to other forms of sexual activity. Previous relationships or prior consent cannot imply consent to future sexual acts. Consent can be withdrawn at any time.

   If any of the following are present, consent cannot be given:
   1. *Force* is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and coercion that overcome resistance or produce consent.
   2. *Coercion* is unreasonable pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another.
   3. *Incapacitation* is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction). Sexual activity with someone who you should know to be – or based on the circumstances should reasonably have known to be – mentally or physically incapacitated (by alcohol or other drug use, unconsciousness or blackout), constitutes a violation of University policy. University policy covers a person whose incapacity results from mental disability, sleep, involuntary physical restraints, or from taking drugs or other substances.

C. *Sexual Assault* is any unwanted, non-consensual sexual contact against any individual by another. Sexual assault can occur either forcibly (against a person's will) or when a person cannot give consent (under the age of consent, incapacitated, developmentally disabled, mentally/physically unable to consent, etc.). Sexual assault can include non-consensual touching or fondling of a sexual nature, which can include touching of breasts, buttocks and/or genitalia.

D. *Domestic Violence* includes violence committed by a current or former spouse or intimate partner of the complainant, by a person with whom the complainant shares a child in common, by a person who is cohabiting with or has cohabited with the complainant as a spouse or intimate partner, by a person similarly situated to a spouse of the complainant under the domestic or family violence laws of the Commonwealth of Virginia, or by any other person against an adult or youth complainant who is protected from that person's acts under the domestic or family violence laws of the Commonwealth of Virginia.

E. *Dating Violence* is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant. The existence of such relationship shall be determined based on a

# A572

consideration of three factors: (1.) The length of the relationship; (2.) The type of relationship; and (3.) The frequency of interaction between the persons involved in the relationship.

F. *Stalking* includes any behavior directed at another person, on more than one occasion, that the stalker intends, knows, or reasonably should know, places the other person in reasonable fear of his or her safety or the safety of others or causes them to suffer substantial emotional distress. Examples of stalking behaviors include, but are not limited to, the following: non-consensual communication, including face-to-face, telephone calls, voice messages, email, texts, written letters; unwanted gifts; threatening or obscene gestures; pursuing or following; surveillance or other observation; trespassing; vandalism; and non-consensual touching.

G. *Sexual Exploitation* occurs when a person takes non-consensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute one of other sexual misconduct offenses. Examples of sexual exploitation include, but are not limited to, invasion of sexual privacy; prostituting another person; non-consensual recording or broadcast of sexual activity; going beyond the boundaries of consent (such as letting someone hide in the closet to watch another have consensual sex); engaging in voyeurism; knowingly transmitting an STD or HIV to another person; exposing one's genitals in non-consensual circumstances – inducing another to expose their genitals; and sexually-based stalking, bullying and cyber-bullying.

H. *Retaliation* is an adverse action taken against an individual because he or she has or is believed to have: (1.) reported or opposed conduct which reasonably and in good faith believes is discrimination, harassment or retaliation; (2.) participated in a discrimination, harassment or retaliation investigation or hearing; or (3.) assisted someone in reporting or opposing discrimination, harassment or retaliation.

## VI.    PROTECTION AGAINST RETALIATION

Any member of the Mason community has the right to raise concerns about or complain of sexual harassment or misconduct without fear of reprisal. Retaliation against any person related to any portion of this policy may result in disciplinary action up to and including termination or expulsion by Mason. Retaliation against any person who is the alleged victim of sexual harassment or misconduct is prohibited as well.

## VII.    TRAINING, EDUCATION AND PREVENTION PROGRAMS

The University's Wellness, Alcohol, Violence and Education Services and Compliance, Diversity and Ethics are responsible for developing and implementing a comprehensive, institution-wide education and prevention campaign for students and employees related to prevention of sexual assaults, domestic violence, dating violence, stalking and sexual exploitation as well as training on this policy. These programs will inform the university community about the risks and myths that contribute to incidents of sexual misconduct and strategies for bystander intervention.

## VIII.    COMPLIANCE

Inquiries about or complaints alleging violation of the University's Sexual Harassment and Misconduct Policy should be directed to the Title IX Coordinator in Compliance Diversity and Ethics (Aquia Building, Room 373, Mailstop 2C2, Fairfax, VA 22030 Phone (703) 993-8730).

## IX.    RESPONSIBLE PARTIES

Compliance, Diversity, and Ethics is responsible for administering and monitoring George Mason University's equal opportunity/affirmative action policies and procedures.

## X.    DATES:

A. **Effective Date and Approval**

This policy will become effective upon the date of approval by the Provost and Executive Vice President and Senior Vice President for Administration and Finance.

B. **Timetable for Review**

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                                          7

The policy, and any related procedures, shall be reviewed and revised, if necessary, annually to become effective at the beginning of the University's fiscal year, unless otherwise noted.

XI.    SIGNATURES

Approved:

_____
Senior Vice President for Administration and Finance

_____
Provost and Executive Vice President

Date approved: April 20, 2006

Revision Approved: August 15, 2014

**EXHIBIT 7**

**CONFIDENTIAL**

From: **Megan R Simmons** <msimmo@gmu.edu>
Date: Fri, Jan 11, 2019 at 3:27 PM
Subject: FW: Notice of Investigation

███████████████████████

Per your request.

Respectfully,

Megan Simmons

**From:** Jennifer R Hammat <jhammat@gmu.edu>
**Date:** Tuesday, December 4, 2018 at 11:51 AM

███████████████████████

**Cc:** Keith D Renshaw <krenshaw@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>
**Subject:** Notice of Investigation



_____

December 4, 2018

█████████████████

George Mason University

Fairfax, VA 22030

████████

# A576

**CONFIDENTIAL**

Dear Dr. █████,


The intent of this letter is to notify you of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics (CDE).  The complaint, filed by ██████████, alleges potential violations of George Mason University's Sexual Harassment and Misconduct Policy (2016-17) and the Sexual and Gender-Based Harassment and Other Interpersonal Violence Policy (2017-18). Specifically, the allegations state that you shared the below information during your instruction of ███████ the spring semester of 2013 in and during the instruction of █████████ in the spring semester of 2014 in:

- o On December 9, 2016, you invited the graduate students from your lab to your house, for drinks and hot tubbing at your home. You shared stories about your sexual experiences at a large brothel house in Germany.
- o On January 20, 2017, while attending the annual ██████████ ██████████ conference, in San Antonio, Texas, you and your graduate students went to dinner and then to the bar, Howl at the Moon, for drinks. You left the bar with another woman attending the conference and then provided explicit sexual details about that encounter the next day at the conference with your graduate students;
- o During the first week of class in the fall of 2017, you gathered the graduate students from the lab for a gathering at Oh George! Tables & Taphouse with ██████ and several other students. You discussed an erotic massage you experienced in Thailand;
- o During the spring of 2018, you asked student ███████ what kind of pornography she liked/watched while at Oh George! Tables & Taphouse and asked her repeatedly to provide an answer when she tried to avoid the conversation;
- o While attending a conference for the ██████████████████████ in March of 2018, after going to dinner with your graduate students, you took your graduate students to a strip club called the Clermont Lounge. A fellow student bought a lap dance for ███████, which you took a photo of and made reference to future blackmail against her;
- o On August 6, 2018, at the Double Tree Hotel in Santa Ana, California, while attending an academic conference with graduate students (██████ and others), you shared the details of a sexual experience you had in Hanoi, Thailand with a 24-your old woman while you were presenting a professional workshop.  You also told your students your wife had "given you a free pass" to have sex with whomever you wanted while in Hanoi;
- o While in the campus laboratory setting, you engaged students in frequent conversations about sex and the pursuit of women as sexual vessels;
- o Through favoritism, you made it clear to your students that opportunities for research, supervision, and consulting was dependent on how you viewed them and if they were willing to engage in sexual conversations with them.
- o You created a toxic, verbally abusive environment, using profanity and demeaning language with your graduate students tasked with lab management. These occurred in person, over email, and through the Slack messaging system;

**A577**

**CONFIDENTIAL**

Consistent with the university's responsibility to ensure an environment free from harassment or discrimination, CDE will begin a formal investigation into this matter.  The investigation will cover this allegation(s) and any other issue(s) that are made known during the course of the investigation. CDE intends to resolve this matter in the most equitable and timely fashion for all those involved.

Ms. Megan Simmons, Title IX Investigator, and an EO Specialist, will investigate this case. Ms. Heather Madnick (administrative support for CDE) will email you in the coming days to arrange a time for you to be interviewed as part of the investigative process. At that time, you may also provide the investigators with any materials you would like considered from an evidentiary lens; if you have any witnesses you would like interviewed regarding this matter, please have their names and contact information available as well. To preserve the integrity of the investigative process, you are strongly encouraged to keep this matter as confidential as possible, for the protection of your own privacy interests as well as the interests of those involved. This is not intended to restrict your ability to discuss the investigation with potential witnesses or otherwise prohibit you from defending your interests. Any information divulged by the office will solely be on a need to know basis.

Additionally, please be advised that George Mason University's sexual and gender-based harassment and other interpersonal violence policy strictly prohibits any form of retaliation, and if this provision is not adhered to, an additional investigation may ensue separate and distinct from this investigation. Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Attached to this communication, you will find:

- University Policy 1202: Sexual Harassment and Misconduct Policy 2016-17
- University Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence 2017-18
- Equal Opportunity/Affirmative Action Grievance Procedures February 2016 version
- Equal Opportunity/Affirmative Action Grievance Procedures December 2017 version

Should you have any questions concerning this matter, please feel free to contact the CDE office at 703-993-8730 or cde@gmu.edu. If you need ADA accommodations for the Title IX process, please contact Ruth Townsend in Compliance, Diversity and Ethics, at rtownse2@gmu.edu.  Your cooperation in this process is appreciated.

**CONFIDENTIAL**

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

George Mason University

CC:     Dr. Keith Renshaw, Department Chair

        Shernita Rochelle Parker, Human Resources

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

titlenine.gmu.edu

**A579**

 **Compliance, Diversity & Ethics**

*Updated February 2016*

# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, vendors and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of complaints. CDE may amend this process as necessary. Any student, faculty member, staff employee, contractor or visitor who feels he or she is the victim of harassment or other form of discrimination on the basis of race, color, religion, retaliation, sex (including sexual harassment), national origin, sexual orientation, age, physical or mental disability, veteran status, marital status, pregnancy status, or genetic information (GINA) should follow the grievance procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the university reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the Reporting Party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal

1

Opportunity complaint resolution process. Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE. Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

### III. Filing Process

<u>Complaints</u>

If a member of the George Mason University community believes that he or she has been the victim of discrimination or discriminatory harassment or has information about discrimination/harassment in the university community, he or she may promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to CDE, located on the Fairfax Campus, Aquia Building, Suite 373. They may also email the office at cde@gmu.edu, or call the office at (703) 993-8730. This report initiates a complaint. Alternatively, a member of the university community may report the situation to his or her immediate supervisor, department head, or Dean, who will immediately notify CDE of the report. This report will also initiate a complaint. Supervisors must immediately report any complaints they receive or incidents of alleged harassment or discrimination they witness to the Office of Compliance, Diversity and Ethics.

A complaint should be filed within 180 calendar days of the most recent incident. The university will consider requests to extend this period where the Reporting Party can show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior. Matters which are determined not to require further investigation or follow-up by CDE may be referred to a representative from the Office of Human Resources or the applicable supervisor.  All complaints of discrimination and harassment will be treated in the strictest confidence possible under the particular circumstances.

The Reporting Party will meet with a representative from Compliance, Diversity and Ethics to discuss options (informal, formal) for proceeding. The Reporting Party is not required to follow the informal procedure before filing a formal complaint. The Responding Party (the individual accused of discrimination) will be notified of the complaint within five (5) working days after it is filed.

<u>Options</u>

**Informal**. Discuss allegations and concerns with Responding Party (the accused) and attempt to resolve the situation. The Responding Party is reminded that George Mason University expects all to adhere to our equal opportunity policies. Responding Party is put on notice that behavior has been questioned, and informal resolution is sought, if possible. If attempts to resolve the situation are not successful, the Reporting Party may pursue a formal complaint. CDE reserves the right to investigate any allegation brought forward if it finds sufficient information to indicate a serious or continuing violation of the equal opportunity policy.

**Formal**. A full investigation is conducted by CDE complete with interviews of the Reporting Party, the Responding Party, and any material witnesses identified, as well as a review of any

2

relevant documentation.  The Reporting Party and the Responding Party will be kept apprised of the progress of the investigation and will be given the opportunity to provide any additional relevant information to the investigator, including the names of additional witnesses to contact and/or additional documents to review before the investigation is closed. At any time before the conclusion of the investigation, the appropriate supervisor to which the Responding Party is assigned may take interim emergency action until the conclusion of the investigation.

At the conclusion of its investigation CDE will issue a final written determination.  The final written determination will state whether, based on CDE's investigation, there was a violation of this policy.  The final written determination will be provided to the Reporting Party, the Responding Party, and the appropriate supervisor.  A copy of the written determination will also be provided to Human Resources and other pertinent university officials as necessary to ensure proper resolution and follow-up regarding the matter.  CDE's involvement in the matter concludes when the final written determination is issued.

The investigator's findings of fact will be made using the "preponderance of the evidence" standard.  Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct occurred.  This "preponderance of the evidence" standard requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it.

If the investigation finds that discrimination or harassment occurred, the university will determine appropriate corrective action, up to and including dismissal.  The university may also take corrective action if no discrimination or harassment is found, but Responding Party is found to have engaged in inappropriate workplace behavior.

The Responding Party's appropriate supervisor, Human Resources, or any other pertinent university official shall promptly notify CDE of any corrective action imposed, if any.

Sanctions imposed on those individuals who have been found to be in violation of the university's Equal Opportunity Policy or its Discriminatory Harassment Policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

Corrective actions may include a directive to stop any ongoing discrimination, harassment, or retaliation; disciplinary or other corrective action against the Responding Party or others; relief for the Reporting Party to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.** A finding may be appealed in writing to the Vice President of Compliance, Diversity and Ethics in CDE by either party within 10 working days of receipt of CDE's determination. A party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding. The appellant should be as specific as possible in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination of the VP/CDE is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a Reporting Party may file their complaint with the appropriate external agencies, such as the Department

of Education Office of Civil Rights (OCR) or the Equal Employment Opportunity Commission (EEOC), within applicable time limits. In addition, any person who is dissatisfied with GMU's internal procedures utilized for handling complaints, or who is dissatisfied with the result of the investigation or the sanctions imposed, may seek redress through the EEOC, to the extent allowed by law. The Reporting Party should be aware that filing a complaint with CDE or other university resources does not extend or postpone the deadline for filing with external agencies. In the event that a complaint is filed with an external agency or court, the university reserves the right to determine, at its discretion, whether the university's internal complaint resolution procedure should be discontinued or continued separately.

<u>Time Line for Investigation Process</u>

CDE will complete its investigations as expeditiously as possible. The investigation shall normally be completed within 45 working days from the filing of a formal complaint, including notification of the parties of the outcome of the investigation. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. CDE will maintain contact with the Reporting Party and Responding Party throughout the course of the investigation to keep them up to date on the process.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the Responding Party, the Reporting Party, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The Reporting Party and the Responding Party each have the right to bring an advisor to the investigative meeting. If either party chooses to exercise this option, he or she shall submit the name of the advisor in writing to CDE at least 72 hours prior to the meeting. If either the Reporting Party or the Responding Party's advisor is a person degreed or qualified in law, CDE must be notified.

## VI. Responsibilities and Jurisdiction of Compliance, Diversity and Ethics

Consistent with federal and state laws and university policies related to nondiscrimination, CDE investigates complaints of unlawful discrimination and/or harassment on the basis of race, color, religion, sex, national origin, sexual orientation, age, marital status, pregnancy status, genetic information, physical or mental disability, or veteran status. CDE investigates such complaints of discrimination and/or harassment at George Mason University and renders a determination following such investigations.

4



# Compliance, Diversity and Ethics

December 2017

# Equal Opportunity/Affirmative Action Grievance Procedure

This procedure replaces all previous procedures for investigation of complaints of discrimination and sexual harassment.

## I. Scope

This procedure applies to all George Mason University faculty, staff, students, university contractors, vendors and visitors.

## II. Policy Statement

The Equal Opportunity/Affirmative Action Grievance Procedure is the responsibility of Compliance, Diversity and Ethics (CDE). The procedure assists the university in carrying out its responsibilities in administering and enforcing applicable federal and state laws and university policies related to nondiscrimination and investigation of such complaints. CDE may amend this procedure as necessary. Any student, faculty, staff, contractor, vendor or visitor who feels she or he is the victim of discrimination on the basis of race, color, religion, national origin, sex, physical or mental disability, status as a protected veteran, sexual orientation, gender identity, age (40 or older), marital status, pregnancy status, or genetic information, should follow the complaint procedures outlined below. Consistent with George Mason University's duty to provide a work and academic environment free from unlawful harassment or discrimination, the university reserves the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims.

## Retaliation

CDE also investigates and resolves allegations of retaliation against individuals who have raised claims of discrimination based on the above factors or who have cooperated in an investigative process in some manner. Retaliation is a negative action taken against an individual as a result of a complaint being filed or after an individual has cooperated with an investigative process. Retaliation is prohibited whether or not the Reporting Party prevails in the original charge. No agent, employee or student of the university may harass, coerce, intimidate, or discriminate against an individual who has filed an Equal Opportunity complaint or participated in the Equal Opportunity

**A584**

complaint investigative process.  Charges of retaliation will be treated as separate and distinct from the original charges and allegations, and will be investigated by CDE.  Those in a supervisory position must monitor the academic or work environment to ensure that it is free from retaliation.

## III. Filing Procedure

<u>Complaints</u>

If a member of the George Mason University community believes that she or he has been the victim of discrimination or discriminatory harassment or has information about discrimination/harassment in the university community, she or he may promptly report, without fear of reprisal, the facts of the incident and the name(s) of the individual(s) involved to CDE, located on the Fairfax Campus, Aquia Building, Suite 373.  They may also email the office at cde@gmu.edu, or call the office at (703) 993-8730.  Alternatively, a member of the university community may report the situation to her or his immediate supervisor, department head, or Dean, who will immediately notify CDE of the report.  Supervisors must immediately report any complaints they receive or incidents of alleged discrimination they witness to the CDE Office.

A complaint should be filed within one hundred eighty (180) calendar days of the most recent incident.  The university will consider requests to extend this period where the Reporting Party can show she or he needed additional time due to circumstances beyond her or his control, or a pattern of ongoing discriminatory behavior.  All complaints of discrimination will be treated in the strictest confidence possible under the particular circumstances.

The Reporting Party will meet with a member from CDE to discuss their concerns.  Assuming the complete veracity of the allegation(s), CDE will make a threshold determination as to whether the allegation(s) contained in the complaint constitute a violation of university policy.  This threshold determination will be made within three (3) business days of the initial meeting with a CDE member.  Where appropriate, CDE may conduct a preliminary inquiry to determine whether an investigation is required.  If the threshold determination indicates that the allegation(s) in the complaint do not constitute a violation of university policy, either with or without a preliminary investigation, the Reporting Party will be notified that no further action will be taken with regard to the complaint.  If the threshold determination indicates that an investigation is required, CDE will determine the appropriate investigation process, and an investigator from CDE assigned to the complaint will notify the Reporting party and Responding party (the individual accused of discrimination) that said investigation is under way.

<u>Types of Investigations</u>

**Informal.**  Discuss allegations and concerns with Responding Party (the accused) and attempt to resolve the situation.  The Responding Party is reminded that George Mason University expects all to adhere to our Equal Opportunity policies.  Responding Party is put on notice that behavior has been questioned, and informal resolution is sought, if possible.  CDE reserves the right to pursue a Formal investigation in to any allegations brought forth during the Informal Procedure should those allegations be indicative of a serious or continuing violation of the Equal Opportunity policies.

**Formal**.  An investigation is conducted by CDE complete with interviews of the Reporting Party, the Responding Party, and any material witnesses identified, as well as a review of any relevant documentation.  The Reporting Party and the Responding Party will be given the opportunity to provide any additional relevant information to the investigator, including the names of additional witnesses to contact and/or additional documents to review before the investigation is closed.  At any time before the conclusion of the investigation, the appropriate supervisor to which the Responding Party is assigned may take interim emergency action until the conclusion of the investigation.

At the conclusion of its investigation CDE may issue a final written determination.  The final written determination will state whether, based on CDE's investigation, there was a violation of this policy.  The final determination will be shared with the Reporting Party, the Responding Party, and the appropriate supervisor.  A copy of the written determination may be provided to Human Resources and other pertinent university officials as necessary to ensure proper resolution and follow-up regarding the matter.  CDE's involvement in the matter concludes when a final determination is made.

The investigator's findings of fact will be made using the "preponderance of the evidence" standard.  Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct occurred.  This "preponderance of the evidence" standard requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it.

If the investigation finds that discrimination occurred, the university will determine appropriate corrective action, up to and including dismissal.  The university may also take corrective action if no discrimination and/or unlawful harassment is found, but Responding Party is found to have engaged in inappropriate workplace behavior.

The Responding Party's appropriate supervisor, Human Resources, or any other pertinent university official shall promptly notify CDE of any corrective action imposed, if any.

Sanctions imposed on those individuals who have been found to be in violation of George Mason University's Equal Opportunity policy or its Discriminatory Harassment policy shall be commensurate with the severity and/or frequency of the conduct, and shall be adequate and sufficient to prevent such conduct in the future.

Corrective actions may include a directive to stop any ongoing discrimination, unlawful harassment, or retaliation; disciplinary or other corrective action against the Responding Party or others; relief for the Reporting Party to remedy the effects of the discrimination, harassment or retaliation; and any other action considered necessary to ensure that this or similar conduct will not happen again.

**Appeal.**  A finding may be appealed in writing to the Vice President of CDE by either Party within ten (10) business days of receipt of CDE's determination.  A Party may appeal a decision based on discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of finding.  The appellant should be as specific as possible

**A586**

in setting out basis for appeal; general dissatisfaction with the decision will not be sufficient. The determination of the VP/CDE is final.

At any time, prior to filing a charge, or while a complaint proceeding is in progress, a Reporting Party may file their complaint with the appropriate external agencies, such as the Department of Education Office of Civil Rights (OCR) or the Equal Employment Opportunity Commission (EEOC), within applicable time limits. In addition, any person who is dissatisfied with George Mason University's internal procedures utilized for handling complaints, or who is dissatisfied with the result of the investigation or the sanctions imposed, may seek redress through the EEOC, to the extent allowed by law. The Reporting Party should be aware that filing a complaint with CDE or other university resources does not extend or postpone the deadline for filing with external agencies. In the event that a complaint is filed with an external agency or court, the university reserves the right to determine, at its discretion, whether the university's internal complaint resolution procedure should be discontinued or continued separately.

<u>Time Line for Investigations</u>

CDE will complete its investigations as expeditiously as possible. The investigation shall normally be completed within forty five (45) business days (excluding holidays and university closings) from the determination that an investigation will ensue, including notification to the parties of the investigation outcome. In extraordinary circumstances, CDE reserves the right to extend this time to a reasonable period. All parties will be notified if such an extension is necessary. Many factors can interfere with an investigative fact-finder's commitment to complete a determination promptly, including unavailability of witnesses or the complexity of the issues involved. CDE may notify respective parties upon nearing conclusion of an investigation.

## IV. Confidentiality

CDE takes any allegation of discrimination, harassment, and/or retaliation seriously and is committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals. Note that all those involved (the Responding Party, the Reporting Party, and the witnesses) have privacy interests. Therefore, outside the scope of the investigation, all parties are highly cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved.

## V. Right to Advisor

The Reporting Party and the Responding Party each have the right to bring an advisor to the investigative meeting. If either Party chooses to exercise this option, CDE asks that you submit the name and relationship of the advisor (e.g., legal counsel), in writing, at least 72 business hours prior to the meeting.

**VI. Responsibilities and Jurisdiction of Compliance, Diversity and Ethics Office**

Consistent with federal and state laws and university policies related to nondiscrimination, CDE investigates complaints of unlawful harassment and/or discrimination on the basis of race, color, religion, national origin, sex, physical or mental disability, status as a protected veteran, sexual orientation, gender identity, age (40 or older), marital status, pregnancy status, or genetic information.  CDE investigates such complaints of discrimination at George Mason University and renders a determination following such investigations.

**A588**

 **MEMORANDUM**
COMPLIANCE, DIVERSITY, AND ETHICS
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730; Fax: 703-993-8899

To:     Tom Moncure, University Counsel
        J.J. Wagner Davis, Senior Vice President for Administration and
            Finance
        S. David Wu, Provost and Executive Vice President

From:   Elizabeth I. Woodley, University Policy Manager

Date:   August 24, 2016

Subject:   University Policy 1202: Sexual Harassment and Misconduct

---

Enclosed please find a revision of University Policy 1202, Sexual Harassment and
Misconduct. The revision was completed with input from Jennifer Hammat, Herbertia
Gilmore, Juliet Blank-Godlove, Brent Ericson, and David Drummey, among others.

After your review, please include your signature of approval on the final page of the policy,
if appropriate. Please also initial where indicated below and forward to the next office for
administrative review.

If you have any questions or concerns, please do not hesitate to contact me at 3-5115 or
ewoodley@gmu.edu.

Thank you.

- Legal Department Review
- Approval and Signature of Senior Vice President
- Approval and Signature of Provost
- Return to University Policy Manager – Elizabeth Woodley, MSN 2C2



# DRAFT Policy 1202: Sexual Harassment and Misconduct

**Responsible Office:**

> Compliance, Diversity, and Ethics

**Procedures:**

- Appendix A: Investigating Reports of Prohibited Conduct Committed by Students
- Appendix B: Adjudicating Reports of Prohibited Conduct Committed by Students
- Appendix C: Equal Opportunity/Affirmative Action Grievance Procedures
- Appendix D: Training, Prevention, and Awareness Programs
- Appendix E: Resource Guide for Students & Employees

**Related Law & Policy:**

- Policy 1201: Non-Discrimination Policy
- Policy 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct
- Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
- Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
- 20 U.S.C. § 1092(f): Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1998
- Virginia Code §23-9.2:15. Reporting of acts of sexual violence
- Violence Against Women Act's Amendments to Clery Act Regulations
- Code of Student Conduct
- Student Rights and Responsibilities (from University Catalog)

## I.     Scope

This policy applies to Students who are registered or enrolled for credit or non-credit-bearing coursework ("Students"); University employees, consisting of all full-time and part-time faculty, University Staff, wage (including temps), professional research staff, and post-doctoral fellows ("Employees"); and contractors, vendors, visitors, guests or other third parties ("Third Parties").

1

This policy pertains to acts of Prohibited Conduct committed by or against Students, Employees and Third Parties when:

>   (1) the conduct occurs on campus or other property owned or controlled by the University;
>
>   (2) the conduct occurs in the context of a University employment or education program or activity, including, but not limited to, University-sponsored study abroad, research, on-line, or internship programs; or
>
>   (3) the conduct occurs outside the context of a University employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for Students, Employees or Third Parties while on University campus or other property owned or controlled by the University or in any University employment or education program or activity.

## II.    Policy Statement

George Mason University, consisting of its 12 schools and colleges located throughout six campuses, Fairfax, Arlington, Science and Technology, Mason in Loudon, Smithsonian-Mason School of Conservation, and Mason Korea (collectively, the "University") is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities. To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ("Title IX"); Title VII of the Civil Rights Act of 1964 ("Title VII"); and/or the Virginia Human Rights Act. Such behavior also requires the University to fulfill certain obligations under the Violence Against Women Reauthorization Act of 2013 ("VAWA") and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act").

The University prohibits Sexual Assault, Sexual Exploitation, Intimate Partner Violence, Stalking, Sexual or Gender-Based Harassment, Complicity in the commission of any act prohibited by this policy, and Retaliation against a person for the good faith reporting of any of these forms of conduct or participation in any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). These forms of Prohibited Conduct are unlawful, undermine the character and purpose of the University, and will not be tolerated.

The University adopts this policy with the intention of:
*   Eliminating, preventing, and addressing the effects of Prohibited Conduct;
*   Creating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct;
*   Providing a prompt, fair, and impartial process for all parties; and
*   Identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed.

Employees or Students who violate this policy may face disciplinary action up to and including termination or expulsion. The University will take prompt and equitable action to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The University conducts

2

ongoing prevention, awareness, and training programs for Employees and Students to facilitate the goals of this policy. It is the responsibility of every member of the University community to foster an environment free of Prohibited Conduct. All members of the University community are encouraged to take reasonable and prudent actions to prevent or stop an act of Prohibited Conduct. The University will support and assist community members who take such actions.

## III.    Applicable Procedures under this Policy

The specific procedures for reporting, investigating, and resolving Prohibited Conduct are based upon the nature of the Respondent's relationship to the University (Student, Employee, or Third Party). Each set of procedures referenced below is guided by the same principles of fairness and respect for Complainants and Respondents. "Complainant" means the Student, Employee or Third Party who presents as the victim of any Prohibited Conduct under this policy, regardless of whether that person makes a report or seeks action under this policy. "Respondent" means the Student, Employee or Third Party who has been accused of violating this policy.

A Student or Employee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. Third Parties who commit Prohibited Conduct may have their relationships with the University terminated and/or their privileges of being on University premises withdrawn.

The procedures referenced below provide for prompt and equitable response to reports of Prohibited Conduct. The procedures designate specific timeframes for major stages of the process and provide for thorough and impartial investigations that afford all parties notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred. The University applies the Preponderance of the Evidence standard when determining whether this policy has been violated. "Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

A. WHERE THE RESPONDENT IS A STUDENT
The procedures for responding to reports of Prohibited Conduct committed by Students are detailed in Appendix A: Investigating and Resolving Reports of Prohibited Conduct Committed by Students.

B. WHERE THE RESPONDENT IS AN EMPLOYEE
The procedures for responding to reports of Prohibited Conduct committed by Employees are detailed in Appendix B: Equal Opportunity/Affirmative Action Grievance Procedures.

C. WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE
- The Student-Respondent procedures (Appendix A) will apply if the Respondent is a full-time Student but not a full-time Employee;
- The Employee-Respondent procedures (Appendix B) will apply if the Respondent is a full-time Employee but not a full-time Student; or
- If there is a question as to the predominant role of the Respondent, the University's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates in the context of the Prohibited Conduct).

3

**A592**

Further, where a Respondent is both a Student and an Employee, the Respondent may be subject to any of the sanctions applicable to Students or Employees.

### D. WHERE THE RESPONDENT IS A THIRD PARTY

The University's ability to take appropriate corrective action against a Third Party will be determined by the nature of the relationship of the Third Party to the University. The Title IX Coordinator will determine the appropriate manner of resolution consistent with the University's commitment to a prompt and equitable process consistent with federal law, federal guidance, and this policy.

## IV.    Title IX Coordinator

Under Title IX:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

The Title IX Coordinator is charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures. The University has also designated Deputy Title IX Coordinators who may assist the Title IX Coordinator in the discharge of these responsibilities. The Title IX Coordinator and Deputy Title IX Coordinators receive appropriate training to discharge their responsibilities.

Concerns about the University's application of Title IX, VAWA, Title VII, the Clery Act, or the Virginia Human Rights Act may be addressed to the Title IX Coordinator; the United States Department of Education, Clery Act Compliance Division (at clery@ed.gov); the United States Department of Education, Office for Civil Rights (at OCR@ed.gov or (800) 421-3481); and/or the Equal Employment Opportunity Commission (at info@eeoc.gov or (800) 669-4000).

The Title IX Coordinator and Deputy Title IX Coordinators can be contacted by telephone, email, or in person during regular office hours:

**Jennifer Hammat**
University Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: jhammat@gmu.edu

**Herbertia Gilmore**

**A593**

Equal Opportunity Specialist/Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: hwillia9@gmu.edu

**Elizabeth Woodley**
University Policy Manager / Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: ewoodley@gmu.edu

**Nena Rogers**
Senior Associate Athletic Director, Student Services / Deputy Title IX Coordinator
Intercollegiate Athletics
Phone: (703) 993- 3594
Email: nrogers1@gmu.edu

**Kent Zimmerman**
Professor of Information Technology / Deputy Title IX Coordinator
Mason Korea
Email: dzimmer2@gmu.edu

### V.    Resources and Reporting Options

The University offers a wide range of resources for all Students and Employees to provide
support and guidance in response to any incident of Prohibited Conduct. For comprehensive
information on accessing University and community resources, including emergency and
ongoing assistance; health, mental health, and victim-advocacy services; options for reporting
Prohibited Conduct to the University and/or law enforcement; and available support with
academics, housing, and employment, review the Resource Guide for Students or the Resource
Guide for Employees.

A. REMEDIAL AND PROTECTIVE MEASURES

The University offers a wide range of resources for Students and Employees, whether as
Complainants or Respondents, to provide support and guidance throughout the initiation,
investigation, and resolution of a report of Prohibited Conduct. The University will offer
reasonable and appropriate measures to protect a Complainant and facilitate the Complainant's
continued access to University employment or education programs and activities. These
measures may be both remedial (designed to address a Complainant's safety and well-being and
continued access to educational opportunities) or protective (involving action against a

5

Respondent). Remedial and protective measures, which may be temporary or permanent, may include no-contact directives, residence modifications, academic modifications and support, work schedule modifications, interim disciplinary suspension, suspension from employment, and pre-disciplinary leave (with or without pay).

Remedial measures are available regardless of whether a Complainant pursues a complaint or investigation under this policy. The University will maintain the privacy of any remedial and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures. The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a Complainant or Respondent to address any concerns about the provision of interim measures.

The University will provide reasonable remedial and protective measures to Third Parties as appropriate and available, taking into account the role of the Third Party and the nature of any contractual relationship with the University.

B. PRIVACY AND CONFIDENTIALITY

**Employee Responsibility to Report Disclosures or Information about Prohibited Conduct:** Every Employee is either a "Confidential Employee" or a "Responsible Employee."

**A "Confidential Employee"** is (1) any Employee who is a licensed medical, clinical or mental-health professional (e.g., physicians, nurses, physicians' assistants, psychologists, psychiatrists, professional counselors and social workers, and those performing services under their supervision), when acting in that professional role in the provision of services to a patient who is a Student ("health care providers"); and (2) any Employee providing administrative, operational and/or related support for such health care providers in their performance of such services. A Confidential Employee will not disclose information about Prohibited Conduct to the University's Title IX Coordinator without the Student's permission (subject to the exceptions set forth in the Confidentiality section of this policy).

**A "Responsible Employee"** is any University Employee who is not a Confidential Employee. A Responsible Employee is required to report to the University's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of Prohibited Conduct that involves any Student as a Complainant, Respondent, and/or witness, including dates, times, locations, and names of parties and witnesses. Responsible Employees include Resident Assistants, Graduate Teaching Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees. Responsible Employees are not required to report information disclosed (1) at public awareness events (e.g., "Take Back the Night," candlelight vigils, protests, "survivor speak-outs" or other public forums in which students may disclose incidents of Prohibited Conduct; collectively, "Public Awareness Events"), or (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"). The University may provide information about Students'

Title IX rights and about available University and community resources and support at Public Awareness Events, however, and Institutional Review Boards may, in appropriate cases, require researchers to provide such information to all Student subjects of IRB Research.

**Responsibility to Report Prohibited Conduct Where Either the Complainant or the Respondent Is an Employee:** Under this policy, supervisors, management and human resources professionals are required to report to the University's Title IX Coordinator all relevant details about an incident of Prohibited Conduct where either the Complainant or the Respondent is an Employee. Reporting is required when such supervisors, management and human resource professionals know (by reason of a direct or indirect disclosure) or should have known of such Prohibited Conduct. For academic faculty, supervisors include department chairs, deans, and other unit administrators.

**Reporting of Any Prohibited Conduct on Certain University Property:** Consistent with the requirements of Va. Code § 23-9.2:15 (the "Virginia Reporting Statute"), Responsible Employees are also required to report to the Title IX Coordinator all information obtained, from any source, about alleged Prohibited Conduct that occurs anywhere on University campus (including residence halls); on any contiguous (off-campus) property owned or controlled by the University; on any property controlled by a Student organization (including fraternity houses) or frequently used by Students, wherever located; and public property (including streets, sidewalks and parking facilities) that is within or immediately adjacent to, and accessible from, campus.

**Reporting to Law Enforcement:** Under the Virginia Reporting Statute, the University is required to report information about certain allegations of Prohibited Conduct to the law enforcement agencies and the prosecuting authorities who would be responsible, respectively, for investigating and prosecuting such allegations.

**Clery Act Reporting:** Pursuant to the Clery Act, the University includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education in a manner that does not include any personally identifying information about individuals involved in an incident. The Clery Act also requires the University to issue timely warnings to the University community about certain crimes that have been reported and may continue to pose a serious or continuing threat to the campus community. Consistent with the Clery Act, the University withholds the names and other personally identifying information of Complainants when issuing timely warnings to the University community. See University Policy Number 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct for more information about Clery Act Reporting.

C. UNDERLINE CONFIDENTIAL RESOURCES

Consistent with the definition of Confidential Employees and licensed community professionals, there are a number of resources off campus where Students and Employees can obtain confidential, trauma-informed counseling and support. Please review the Resource Guide for

Employees or the Resource Guide for Students for a list of available on- and off-campus confidential resources.

D. <u>REPORTING</u>

There are multiple channels for reporting Prohibited Conduct. A Complainant may choose to report to the University, to law enforcement, to both, or to neither. These reporting options are not exclusive. Complainants may simultaneously pursue criminal and disciplinary action. The University will support Complainants in understanding, assessing and pursuing these options.

**1. Law Enforcement**

Complainants have the right to notify or decline to notify law enforcement. In keeping with its commitment to taking all appropriate steps to eliminate, prevent, and remedy all Prohibited Conduct, the University urges Complainants to report Prohibited Conduct immediately to local law enforcement by contacting:

- 911 (for emergencies in Virginia)
- 119 (for emergencies at Mason Korea)
- University Police ((703) 993-2810) (for non-emergencies)
- Fairfax County Police ((703) 691-2131) (for non-emergencies)
- Fairfax City Police ((703) 385-7924) (for non-emergencies)
- Manassas Police ((703) 257-8000) (for non-emergencies)
- Arlington County Police ((703) 558-2222) (for non-emergencies)

Police have unique legal authority, including the power to seek and execute search warrants, collect forensic evidence, make arrests, and assist in seeking Emergency Protective Orders. Although a police report may be made at any time, Complainants should be aware that a one-year statute of limitations may apply to certain misdemeanors in Virginia. The University will assist Complainants in notifying law enforcement if they choose to do so.

**2. The University**

The University also urges anyone who becomes aware of an incident of Prohibited Conduct to report the incident immediately to the University through the following reporting options:

- **Title IX Coordinator** — Title IX protects any person from sex-based discrimination, including sexual assault. Call 703-993-8730, email cde@gmu.edu, or complete the intake form online at https://diversity.gmu.edu/intake-form.
- **Office of Student Conduct** — Responsible for resolving allegations of misconduct under the Code of Student Conduct, including sexual misconduct. Call 703-993-6209. http://studentconduct.gmu.edu/.

- **Office of Housing and Residential Life** — Professional and student staff are available 24 hours a day to assist students and ensure safety. For 24-hour, nonemergency line, call 703-993-2720. https://housing.gmu.edu/.
- **Employee Relations** — Provides assistance to university employees and their supervisors to help identify and resolve work-related problems and proactively avoid potential problems. Call 703-993-3878.
- **Student Support and Advocacy Center** — Provides comprehensive services for students in an effort to foster the safety and well-being of the Mason community. Call 703-993-3686. http://waves.gmu.edu. Call 703-380-1434 for the 24-hour sexual and intimate partner violence helpline.

There is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University. If the Respondent is no longer a Student or an Employee, the University will provide reasonably appropriate remedial measures, assist the Complainant in identifying external reporting options, and take reasonable steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.

The University will not pursue disciplinary action against Complainants or witnesses for disclosure of illegal personal consumption of drugs or alcohol where such disclosures are made in connection with a good faith report or investigation of Prohibited Conduct. Complainants may simultaneously pursue criminal and University complaints.

## VI.    Prohibited Conduct Under this Policy

Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the Complainant or Respondent. Prohibited Conduct includes the following specifically defined forms of behavior: Sexual Assault, Sexual Exploitation, Intimate Partner Violence, Stalking, Sexual or Gender-Based Harassment, Complicity, and Retaliation.

A. SEXUAL ASSAULT

Sexual Assault consists of (1) Sexual Contact and/or (2) Sexual Intercourse that occurs without (3) Affirmative Consent.

**1. Sexual Contact** is:

- Any intentional sexual touching
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

9

Sexual Contact includes (a) intentional touching of the breasts, buttocks, groin or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

**2. Sexual Intercourse is:**

- Any penetration
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

Sexual Intercourse includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue, or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

**3. Affirmative Consent is:**

- Informed (knowing)
- Voluntary (freely given)
- Active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity

Affirmative Consent cannot be obtained by Force. Force includes (a) the use of physical violence, (b) threats, (c) intimidation, and/or (d) coercion.

a) Physical violence means that a person is exerting control over another person through the use of physical force. Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

b) Threats are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

c) Intimidation is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

d) Coercion is the use of an unreasonable amount of pressure to gain sexual access. Coercion is more than an effort to persuade, entice, or attract another person to have sex. When a person makes clear a decision not to participate in a particular form of Sexual Contact or Sexual Intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can be coercive. In evaluating whether coercion was used, the University will

consider: (i) the frequency of the application of the pressure, (ii) the intensity of the pressure, (iii) the degree of isolation of the person being pressured, and (iv) the duration of the pressure.

Affirmative Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated. Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity.

A person who is incapacitated is unable, temporarily or permanently, to give Affirmative Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

The University offers the following guidance on Affirmative Consent and assessing incapacitation:

A person who wants to engage in a specific sexual activity is responsible for obtaining Affirmative Consent for that activity. Lack of protest does not constitute Affirmative Consent. Lack of resistance does not constitute Affirmative Consent. Silence and/or passivity also do not constitute Affirmative Consent. Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

Affirmative Consent to one form of sexual activity does not, by itself, constitute Affirmative Consent to another form of sexual activity. For example, one should not presume that Affirmative Consent to oral-genital contact constitutes Affirmative Consent to vaginal or anal penetration. Affirmative Consent to sexual activity on a prior occasion does not, by itself, constitute Affirmative Consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Affirmative Consent.

Affirmative Consent may be withdrawn at any time. An individual who seeks to withdraw Affirmative Consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once Affirmative Consent is withdrawn, the sexual activity must cease immediately.

In evaluating Affirmative Consent in cases of alleged incapacitation, the University asks two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated? and if not, (2) Should a sober, reasonable person in the same situation have

known that the other party was incapacitated? If the answer to either of these questions is "YES," Affirmative Consent was absent and the conduct is likely a violation of this policy.

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or using drugs. The impact of alcohol and other drugs varies from person to person.

One is not expected to be a medical expert in assessing incapacitation. One must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs include slurred or incomprehensible speech, unsteady gait, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?" "Do you know how you got here?" "Do you know what is happening?" "Do you know whom you are with?"

One should be cautious before engaging in Sexual Contact or Sexual Intercourse when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether Affirmative Consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to forego all sexual activity.

Being impaired by alcohol or other drugs is no defense to any violation of this policy.

B. SEXUAL EXPLOITATION

Sexual Exploitation is purposely or knowingly doing any of the following:

• Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give Affirmative Consent to sexual activity;
• Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images) without consent of all parties;
• Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy);
• Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
• Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
• Prostituting another person; or
• Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

C. INTIMATE PARTNER VIOLENCE

**A601**

Intimate Partner Violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship.[1] Intimate Partner Violence may include any form of Prohibited Conduct under this policy, including Sexual Assault, Stalking, and Physical Assault (as defined below).

Physical Assault is threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person. Physical Assault will be addressed under this policy if it involves Sexual or Gender-Based Harassment, Intimate Partner Violence, or is part of a course of conduct under the Stalking definition.

## D. STALKING[2]

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

Course of conduct means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Substantial emotional distress means significant mental suffering or anguish.

Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

## E. SEXUAL OR GENDER-BASED HARASSMENT

**Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions outlined in (1) and/or (2), below, are present.

**Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (1) and/or (2), below, are present.

---

[1] Intimate Partner Violence includes "dating violence" and "domestic violence," as defined by VAWA. Consistent with VAWA, the University will evaluate the existence of an intimate relationship based upon the Complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.
[2] This definition is consistent with VAWA.

**A602**

(1) Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or

(2) Such conduct creates a hostile environment. A "hostile environment" exists when the conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education or employment programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective. In evaluating whether a hostile environment exists, the University will consider the totality of known circumstances, including, but not limited to:

• The frequency, nature and severity of the conduct;
• Whether the conduct was physically threatening;
• The effect of the conduct on the Complainant's mental or emotional state;
• Whether the conduct was directed at more than one person;
• Whether the conduct arose in the context of other discriminatory conduct;
• Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities; and
• Whether the conduct implicates concerns related to academic freedom or protected speech.

A hostile environment can be created by persistent or pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of Sexual Assault, for example, may be sufficiently severe to constitute a hostile environment. In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment.

## F. RETALIATION

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

## G. COMPLICITY

Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of Prohibited Conduct by another person.

**A603**

### VII.    Violations of Law

Behavior that violates this policy may also constitute a crime under the laws of the jurisdiction in which the incident occurred. For example, the Commonwealth of Virginia criminalizes and punishes some forms of Sexual Assault, Intimate Partner Violence, Sexual Exploitation, Stalking, and Physical Assault. The criminal statutes that may apply in cases of Physical Assault and Intimate Partner Violence are found in various sections of Chapter 4, Articles 1 (Homicide) and 4 (Assaults and Bodily Woundings), of Title 18.2 of the Code of Virginia. The criminal statutes relating to Sexual Assault are found in Sections 18.2-61 to 18.2-67.10 of the Code of Virginia. Section 18.2-60.3 of the Code of Virginia defines and identifies the penalty for criminal stalking. Finally, Sections 18.2-386.1 and 18.2-386.2 of the Code of Virginia provide for criminal penalties in some cases of Sexual Exploitation. This compilation of criminal statutes is not exhaustive, but is offered to notify the University community that, some forms of Prohibited Conduct may also constitute crimes under Virginia law, which may subject a person to criminal prosecution and punishment in addition to any sanctions under this policy.

### VIII.    Prevention and Awareness Programs

The University is committed to the prevention of Prohibited Conduct through regular and ongoing education and awareness programs. Incoming Students and new Employees receive primary prevention and awareness programming as part of their orientation, and returning Students and current Employees receive ongoing training and related education. For a description of the University's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, see Appendix C.

### IX.    Training

The University provides training to Students and Employees to ensure they understand this policy and the topics and issues related to maintaining an education and employment environment free from harassment and discrimination. For a description of the University's training related to this policy, see Appendix C.

### X.    Obligation to Provide Truthful Information

All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under the University's Student Code of Conduct and disciplinary action under the appropriate Employee disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

XI.   Forms

  ○  **CSA Crime Statistics Reporting Form:** http://police.gmu.edu/clery-act-reporting/csa-form/

  ○  **Compliance, Diversity, and Ethics Intake Form:** https://diversity.gmu.edu/intake-form

XII.   **Dates:**

   A.   **Effective Date:**

   This policy will become effective upon the date of approval by the Senior Vice President for Administration and Finance and the Provost and Executive Vice President.

   B.   **Date of Most Recent Review:**

   N/A.

XIII.   **Timetable for Review**

The University will review and update this policy, as appropriate, by October 31 of each year. The University will evaluate, among other things, any changes in legal requirements, existing University resources, and the resolution of cases from the preceding year (including, but not limited to, timeframes for completion and sanctions and remedies imposed). The Title IX Coordinator shall certify to the State Council of Higher Education for Virginia that this policy has been reviewed and updated, as appropriate, in accordance with Virginia law.

XIV.   **Signatures**

Approved:

_____          10/10/2016
Senior Vice President for                 Date
Administration and Finance

Approved:

_____          10/10/16
Provost and Executive Vice President      Date

16



## MEMORANDUM

COMPLIANCE, DIVERSITY, AND ETHICS
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730; Fax: 703-993-8899

| | |
|---|---|
| To: | Brian Walther, University Counsel<br>J.J. Wagner Davis, Senior Vice President for Administration and Finance<br>S. David Wu, Provost and Executive Vice President |
| From: | Elizabeth I. Woodley, University Policy Manager |
| Date: | August 21, 2017 |
| Subject: | University Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence |

Enclosed please find a revision of University Policy 1202, Sexual and Gender-Based Harassment and Other Interpersonal Violence. This revision was initiated by the Title IX Coordinator to broaden the policy's application beyond only intimate partner violence to violence between cohabitants and family members. The revision also clarifies the definition of sexual and gender-based harassment. The revision was completed with input from Jennifer Hammat, Brent Ericson, and Brian Walther, among others.

After your review, please include your signature of approval on the final page of the policy, if appropriate. Please also initial where indicated below and forward to the next office for administrative review.

If you have any questions or concerns, please do not hesitate to contact me at 3-5115 or ewoodley@gmu.edu.

Thank you.

- Legal Department Review
- Approval and Signature of Senior Vice President
- Approval and Signature of Provost
- Return to University Policy Manager – Elizabeth Woodley, MSN 2C2



University Policy #1202
*Sexual and Gender-Based Harassment and*
*Other Interpersonal Violence*

---

**Categorized: General Policies**

**Responsible Office:**
    Compliance, Diversity, and Ethics

**Policy Procedures:**
    Appendix A: Investigating and Resolving Reports of Prohibited Conduct Committed by
        Students
    Appendix B: Equal Opportunity/Affirmative Action Grievance Procedures
    Appendix C: Student Conduct Sexual Misconduct Resolutions 2016-2017
    Appendix D: Resources and Reporting Guide for Students & Employees
    Appendix E: Training, Prevention and Awareness Programs

**Related Law & Policy:**
    Policy 1201: Non-Discrimination Policy
    Policy 1204: Consensual Relationships
    Policy 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct
    Code of Student Conduct
    Student Rights and Responsibilities (from University Catalog)
    Virginia Code § 23.1-806. Reporting of acts of sexual violence
    Virginia Code § 23.1-900. Academic transcripts; suspension, permanent dismissal, or
    withdrawal
        from institution.
    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
    Title IX of the Education Amendments of 1972, 20 U.S.C. §1681
    Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1998,
        20 U.S.C. § 1092(f)
    Violence Against Women Reauthorization Act of 2013 amendments to the Clery Act, Pub. L.
        113–4

---

## I.   SCOPE

This policy applies to Students who are registered or enrolled for credit or non-credit-bearing coursework ("Students"); University employees, consisting of all full-time and part-time faculty, University Staff, wage (including temps), professional research staff, and post-doctoral fellows ("Employees"); and contractors, vendors, visitors, guests or other third parties ("Third Parties").

This policy pertains to acts of Prohibited Conduct committed by or against Students, Employees and Third Parties when:

(1) the conduct occurs on campus or other property owned or controlled by the University;

(2) the conduct occurs in the context of a University employment or education program or activity, including, but not limited to, University-sponsored study abroad, research, on-line, or internship programs; or

(3) the conduct occurs outside the context of a University employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for Students, Employees or Third Parties while on University campus or other property owned or controlled by the University or in any University employment or education program or activity.

## II.    POLICY STATEMENT

George Mason University, consisting of its 10 schools and colleges located throughout four campuses, Fairfax, Arlington, Science and Technology, and George Mason University Korea, as well as instructional sites elsewhere, (collectively, the "University") is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities. To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ("Title IX"); Title VII of the Civil Rights Act of 1964 ("Title VII"); and/or the Virginia Human Rights Act. Such behavior also requires the University to fulfill certain obligations under the Violence Against Women Reauthorization Act of 2013 ("VAWA") and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act").

The University prohibits Sexual Assault, Sexual Exploitation, Interpersonal Violence, Stalking, Sexual or Gender-Based Harassment, and Complicity in the commission of any act prohibited by this policy, and Retaliation against a person for the good faith reporting of any of these forms of conduct or participation in any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). These forms of Prohibited Conduct are unlawful, undermine the character and purpose of the University, and will not be tolerated.

The University adopts this policy with the intention of:

- Eliminating, preventing, and addressing the effects of Prohibited Conduct;
- Creating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct;
- Providing a prompt, fair, and impartial process for all parties; and
- Identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed.

Employees or Students who violate this policy may face disciplinary action up to and including termination or expulsion. The University will take prompt and equitable action to eliminate Prohibited Conduct, prevent its  recurrence, and remedy its effects. The University conducts ongoing prevention, awareness, and training programs for Employees and Students to facilitate the goals of this policy. It is the responsibility of every member of the University community to foster an environment free of Prohibited Conduct. All members of the University community are encouraged to take reasonable and prudent actions to prevent or stop an act of Prohibited Conduct. The University will support and assist community members who take such actions.

## III.    APPLICABLE PROCEDURES UNDER THIS POLICY

The specific procedures for reporting, investigating, and resolving Prohibited Conduct are based upon the nature of the Respondent's relationship to the University (Student, Employee, or Third Party). Each set of procedures referenced below is guided by the same principles of fairness and respect for Complainants and Respondents. "Complainant" means the Student, Employee or Third Party who

# A608

presents as the victim of any Prohibited Conduct under this policy, regardless of whether that person makes a report or seeks action under this policy. "Respondent" means the Student, Employee or Third Party who has been accused of violating this policy.

A Student or Employee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. Third Parties who commit Prohibited Conduct may have their relationships with the University terminated and/or their privileges of being on University premises withdrawn.

The procedures referenced below provide for prompt and equitable response to reports of Prohibited Conduct. The procedures designate specific timeframes for major stages of the process and provide for thorough and impartial investigations that afford all parties notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred. The University applies the Preponderance of the Evidence standard when determining whether this policy has been violated. "Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

## A. WHERE THE RESPONDENT IS A STUDENT

The procedures for responding to reports of Prohibited Conduct committed by Students are detailed in Appendix A: Investigating and Resolving Reports of Prohibited Conduct Committed by Students.

## B. WHERE THE RESPONDENT IS AN EMPLOYEE

The procedures for responding to reports of Prohibited Conduct committed by Employees are detailed in Appendix B: Investigating and Resolving Reports of Prohibited Conduct Committed by Employees.

## C. WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE

- The Student-Respondent procedures (Appendix A) will apply if the Respondent is a full-time Student but not a full-time Employee;
- The Employee-Respondent procedures (Appendix B) will apply if the Respondent is a full-time Employee but not a full-time Student; or
- If there is a question as to the predominant role of the Respondent, the University's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates in the context of the Prohibited Conduct). Further, where a Respondent is both a Student and an Employee, the Respondent may be subject to any of the sanctions applicable to Students or Employees.

## D. WHERE THE RESPONDENT IS A THIRD PARTY

The University's ability to take appropriate corrective action against a Third Party will be determined by the nature of the relationship of the Third Party to the University. The Title IX Coordinator will determine the appropriate manner of resolution consistent with the University's commitment to a prompt and equitable process consistent with federal law, federal guidance, and this policy.

## IV.    TITLE IX COORDINATOR

Under Title IX:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

# A609

The Title IX Coordinator is charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures. The University has also designated Deputy Title IX Coordinators who may assist the Title IX Coordinator in the discharge of these responsibilities. The Title IX Coordinator and Deputy Title IX Coordinators receive appropriate training to discharge their responsibilities.

Concerns about the University's application of Title IX, VAWA, Title VII, the Clery Act, or the Virginia Human Rights Act may be addressed to the Title IX Coordinator; the United States Department of Education, Clery Act Compliance Division (at clery@ed.gov); the United States Department of Education, Office for Civil Rights (at OCR@ed.gov or (800) 421-3481); and/or the Equal Employment Opportunity Commission (at info@eeoc.gov or (800) 669-4000).

The Title IX Coordinator and Deputy Title IX Coordinators can be contacted by telephone, email, or in person during regular office hours:

**Jennifer Hammat**

University Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: jhammat@gmu.edu

**Elizabeth Woodley**

University Ethics Officer and Policy Manager / Deputy Title IX Coordinator
Compliance, Diversity and Ethics
Phone: (703) 993-8730
Email: ewoodley@gmu.edu

**Nena Rogers**

Senior Associate Athletic Director, Student Services / Deputy Title IX Coordinator
Intercollegiate Athletics
Phone: (703) 993-3594
Email: nrogers1@gmu.edu

**Kent Zimmerman**

Professor of Information Technology / Deputy Title IX Coordinator
Mason Korea
Email: dzimmer2@gmu.edu

## V.    RESOURCES AND REPORTING OPTIONS

The University offers a wide range of resources for all Students and Employees to provide support and guidance in response to any incident of Prohibited Conduct. For comprehensive information on accessing University and community resources, including emergency and ongoing assistance; health, mental health, and victim-advocacy services; options for reporting Prohibited Conduct to the University and/or law enforcement; and available support with academics, housing, and employment, review the Resources and Reporting Guide for Students & Employees (Appendix D).

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    4 of 15

## A. REMEDIAL AND PROTECTIVE MEASURES

The University offers a wide range of resources for Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the initiation, investigation, and resolution of a report of Prohibited Conduct. The University will offer reasonable and appropriate measures to protect a Complainant and facilitate the Complainant's continued access to University employment or education programs and activities. These measures may be both remedial (designed to address a Complainant's safety and well-being and continued access to educational opportunities) or protective (involving action against a Respondent). Remedial and protective measures, which may be temporary or permanent, may include no-contact directives, residence modifications, academic modifications and support, work schedule modifications, interim disciplinary suspension, suspension from employment, and pre-disciplinary leave (with or without pay).

Remedial measures are available regardless of whether a Complainant pursues a complaint or investigation under this policy. The University will maintain the privacy of any remedial and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures. The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a Complainant or Respondent to address any concerns about the provision of interim measures. For a full list of interim measures, please review Appendix D: Resources and Reporting Guide for Students and Employees.

The University will provide reasonable remedial and protective measures to Third Parties as appropriate and available, taking into account the role of the Third Party and the nature of any contractual relationship with the University.

## B. PRIVACY AND CONFIDENTIALITY

For any report under this Policy, every effort will be made to respect and safeguard the privacy interests of all individuals involved in a manner consistent with the need for a careful assessment of the allegation and any necessary steps to eliminate the conduct, prevent its recurrence, and address its effects. Privacy and confidentiality have distinct meanings under this Policy.

### 1. Privacy

Information related to a report under this Policy will only be shared with those University employees who need to know in order to assist in the active review, investigation, or resolution of the report. If the decision is made to pursue disciplinary action against a Respondent, information related to the report will be shared with the Respondent. Information regarding a report will not be shared with either the Complainant or Respondent's parents or guardians unless: the party is a minor (and sharing is permissible under the Family Education Rights and Privacy Act (FERPA); the party has signed a waiver that is compliant with FERPA; or there is an articulable threat to the health or safety of the party or other individuals.

### 2. Confidentiality

Information shared with *Confidential Resources* (specially designated campus or community professionals) will only be disclosed with the individual's express written permission, unless there is a continuing threat of serious harm to the patient/client or to others or there is a legal obligation to reveal such information (e.g., where there is suspected abuse or neglect of a minor).

### 3. Records

The Compliance, Diversity, and Ethics office will maintain records of all reports under this Policy and their outcomes.

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    5 of 15

### 4. Release of Information

If a report of *Prohibited Conduct* discloses a serious and immediate threat to the campus community, GMU Department of Police and Public Safety will issue a timely notification to protect the health or safety of the community as required by the Clery Act. The notification will not include identifying information about a Reporting Party.

Pursuant to the Clery Act and the 2013 Amendments to the Violence Against Women Act, anonymous statistical information regarding reported criminal incidents must be shared with GMU Department of Police and Public Safety for inclusion in the Daily Crime Log. This information will also be included in the University's Annual Security Report (http://police.gmu.edu/annual-security-report/). The University may also share aggregate and not personally identifiable data about reports, outcomes, and sanctions.

No information, including the identity of the parties, will be released from such proceedings except as required or permitted by law or University policy.

**Employee Responsibility to Report Disclosures or Information about Prohibited Conduct:**
Every Employee is either a "Confidential Employee" or a "Responsible Employee."

A **"Confidential Employee"** is (1) any Employee who is a licensed medical, clinical or mental-health professional (e.g., physicians, nurses, physicians' assistants, psychologists, psychiatrists, professional counselors and social workers, and those performing services under their supervision), when acting in that professional role in the provision of services to a patient who is a Student ("health care providers"); and (2) any Employee providing administrative, operational and/or related support for such health care providers in their performance of such services. A Confidential Employee will not disclose information about Prohibited Conduct to the University's Title IX Coordinator without the Student's permission (subject to the exceptions set forth in the Confidentiality section of this policy).

A **"Responsible Employee"** is any University Employee who is not a Confidential Employee. A Responsible Employee is required to report to the University's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of Prohibited Conduct that involves any Student as a Complainant, Respondent, and/or witness, including dates, times, locations, and names of parties and witnesses. Responsible Employees include Resident Assistants, Graduate Teaching Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees. Responsible Employees are not required to report information disclosed (1) at public awareness events (e.g., "Take Back the Night," candlelight vigils, protests, "survivor speak-outs" or other public forums in which students may disclose incidents of Prohibited Conduct; collectively, "Public Awareness Events"), or (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"). The University may provide information about Students' Title IX rights and about available University and community resources and support at Public Awareness Events, however, and Institutional Review Boards may, in appropriate cases, require researchers to provide such information to all Student subjects of IRB Research.

**Responsibility to Report Prohibited Conduct Where Either the Complainant or the Respondent Is an Employee:** Under this policy, supervisors, management and human resources professionals are required to report to the University's Title IX Coordinator all relevant details about an incident of Prohibited Conduct where either the Complainant or the Respondent is an Employee. Reporting is required when such supervisors, management and human resource professionals know (by reason of a direct or indirect disclosure) or should have known of such Prohibited Conduct. For academic faculty, supervisors include department chairs, deans, and other unit administrators.

**Reporting of Any Prohibited Conduct on Certain University Property:** Consistent with the requirements of Va. Code § 23-9.2:15 (the "Virginia Reporting Statute"), Responsible Employees are also required to report to the Title IX Coordinator all information obtained, from any source, about alleged Prohibited Conduct that occurs anywhere on University campus (including residence halls); on

any contiguous (off-campus) property owned or controlled by the University; on any property controlled by a Student organization (including fraternity houses) or frequently used by Students, wherever located; and public property (including streets, sidewalks and parking facilities) that is within or immediately adjacent to, and accessible from, campus.

**Reporting to Law Enforcement:** Under the Virginia Reporting Statute, the University is required to report information about certain allegations of Prohibited Conduct to the law enforcement agencies and the prosecuting authorities who would be responsible, respectively, for investigating and prosecuting such allegations.

**Clery Act Reporting:** Pursuant to the Clery Act, the University includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education in a manner that does not include any personally identifying information about individuals involved in an incident. The Clery Act also requires the University to issue timely warnings to the University community about certain crimes that have been reported and may continue to pose a serious or continuing threat to the campus community. Consistent with the Clery Act, the University withholds the names and other personally identifying information of Complainants when issuing timely warnings to the University community. See University Policy Number 1412: Reporting of Clery Act Crimes and/or Prohibited Sexual Conduct for more information about Clery Act Reporting.

## C. CONFIDENTIAL RESOURCES

Consistent with the definition of Confidential Employees and licensed community professionals, there are a number of resources off campus where Students and Employees can obtain confidential, trauma-informed counseling and support. Please review Appendix D: Resources and Reporting Guide for Students & Employees for a list of available on- and off-campus confidential resources.

## D. REPORTING

There are multiple channels for reporting Prohibited Conduct. A Complainant may choose to report to the University Title IX Coordinator, to law enforcement, to both, or to neither. These reporting options are not exclusive. Complainants may simultaneously pursue criminal and disciplinary action. The University will support Complainants in understanding, assessing and pursuing these options. For a full list of reporting options, please review Appendix D: Resources and Reporting Guide for Students and Employees.

### 1. Law Enforcement

Complainants have the right to notify or decline to notify law enforcement. In keeping with its commitment to taking all appropriate steps to eliminate, prevent, and remedy all Prohibited Conduct, the University urges Complainants to report Prohibited Conduct immediately to local law enforcement by contacting:

- 911 (for emergencies in Virginia)
- 119 (for emergencies at Mason Korea)
- University Police ((703) 993-2810) (for non-emergencies)
- Fairfax County Police ((703) 691-2131) (for non-emergencies)
- Fairfax City Police ((703) 385-7924) (for non-emergencies)
- Manassas Police ((703) 257-8000) (for non-emergencies)
- Arlington County Police ((703) 558-2222) (for non-emergencies)

Police have unique legal authority, including the power to seek and execute search warrants, collect forensic evidence, make arrests, and assist in seeking Emergency Protective Orders. Although a police report may be made at any time, Complainants should be aware that a one-year statute of limitations

# A613

may apply to certain misdemeanors in Virginia. The University will assist Complainants in notifying law enforcement if they choose to do so.

### 2. The University

The University also urges anyone who becomes aware of an incident of Prohibited Conduct to report the incident immediately to the University through the following reporting options:

- **Title IX Coordinator** — Title IX protects any person from sex-based discrimination, including sexual assault. Call 703-993-8730, email cde@gmu.edu, or complete the intake form online at https://diversity.gmu.edu/intake-form.

- **Student Support and Advocacy Center** — Provides comprehensive services for students in an effort to foster the safety and well-being of the Mason community. Call 703-993-3686. http://ssac.gmu.edu. Call 703- 380-1434 for the 24-hour sexual and intimate partner violence helpline. (CONFIDENTIAL)

- **Office of Housing and Residence Life** — Professional and student staff are available 24 hours a day to assist students and ensure safety. For 24-hour, non-emergency line, Call 703-993-2720. https://housing.gmu.edu/.

- **Employee Relations** — Provides assistance to university employees and their supervisors to help identify and resolve work-related problems and proactively avoid potential problems. Call 703-993-3878. http://hr.gmu.edu/emp_relations/.

There is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University. If the Respondent is no longer a Student or an Employee, the University will provide reasonably appropriate remedial measures, assist the Complainant in identifying external reporting options, and take reasonable steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.

The University will not pursue disciplinary action against Complainants or witnesses for disclosure of illegal personal consumption of drugs or alcohol where such disclosures are made in connection with a good faith report or investigation of Prohibited Conduct. Complainants may simultaneously pursue criminal and University complaints.

## VI.    PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the Complainant or Respondent. Prohibited Conduct includes the following specifically defined forms of behavior: Sexual Assault, Sexual Exploitation, Interpersonal Violence, Stalking, Sexual or Gender-Based Harassment, Complicity, and Retaliation.

### A. SEXUAL ASSAULT

Sexual Assault consists of (1) Sexual Contact and/or (2) Sexual Intercourse that occurs without (3) Affirmative Consent.

### 1. **Sexual Contact** is:

- Any intentional sexual touching
- However slight
- With any object or body part (as described below)

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                              8 of 15

- Performed by a person upon another person

Sexual Contact includes (a) intentional touching of the breasts, buttocks, groin or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

## 2. Sexual Intercourse is:

- Any penetration
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

Sexual Intercourse includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue, or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

## 3. Affirmative Consent is:

- Informed (knowing)
- Voluntary (freely given)
- Active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity

Affirmative Consent cannot be obtained by Force. Force includes (a) the use of physical violence, (b) threats, (c) intimidation, and/or (d) coercion.

a) Physical violence means that a person is exerting control over another person through the use of physical force.
Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

b) Threats are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

c) Intimidation is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

d) Coercion is the use of an unreasonable amount of pressure to gain sexual access. Coercion is more than an effort to persuade, entice, or attract another person to have sex. When a person makes clear a decision not to participate in a particular form of Sexual Contact or Sexual Intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can be coercive. In evaluating whether coercion was used, the   University will consider: (i) the frequency of the application of the pressure, (ii) the intensity of the pressure, (iii) the degree of isolation of the person being pressured, and (iv) the duration of the pressure.

Affirmative Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated. Incapacitation   means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity.

A person who is incapacitated is unable, temporarily or permanently, to give Affirmative Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual

activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

The University offers the following guidance on Affirmative Consent and assessing incapacitation:

A person who wants to engage in a specific sexual activity is responsible for obtaining Affirmative Consent for that activity. Lack of protest does not constitute Affirmative Consent. Lack of resistance does not constitute Affirmative Consent. Silence and/or passivity also do not constitute Affirmative Consent. Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

Affirmative Consent to one form of sexual activity does not, by itself, constitute Affirmative Consent to another form of sexual activity. For example, one should not presume that Affirmative Consent to oral-genital contact constitutes Affirmative Consent to vaginal or anal penetration. Affirmative Consent to sexual activity on a prior occasion does not, by itself, constitute Affirmative Consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Affirmative Consent.

Affirmative Consent may be withdrawn at any time. An individual who seeks to withdraw Affirmative Consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once Affirmative Consent is withdrawn, the sexual activity must cease immediately.

In evaluating Affirmative Consent in cases of alleged incapacitation, the University asks two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated? And if not, (2) Should a sober, reasonable person in the same situation have known that the other party was incapacitated? If the answer to either of these questions is "YES," Affirmative Consent was absent and the conduct is likely a violation of this policy.

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or using drugs. The impact of alcohol and other drugs varies from person to person.

One is not expected to be a medical expert in assessing incapacitation. One must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs include slurred or incomprehensible speech, unsteady gait, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?" "Do you know how you got here?" "Do you know what is happening?" "Do you know whom you are with?"

One should be cautious before engaging in Sexual Contact or Sexual Intercourse when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether Affirmative Consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to forego all sexual activity.

Being impaired by alcohol or other drugs is no defense to any violation of this policy.

## B. SEXUAL EXPLOITATION

Sexual Exploitation is a form of Sexual or Gender-Based Harassment that involves purposely or knowingly doing one or more of the following without Affirmative Consent :

    1. taking sexual advantage of another person;

    2. taking advantage of another's sexuality; or

    3. exceeding the boundaries of consensual Sexual Contact without the knowledge of the other individual.

Sexual Exploitation may be committed for any purpose, including sexual arousal or gratification, financial gain, or other personal benefit.

Examples include, but are not limited to:

- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give Affirmative Consent to sexual activity;
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images) without consent of all parties;
- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy);
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Threatening to disclose an individual's Sexual Orientation, Gender Identity, or Gender Expression;
- Prostituting another person;
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge; or
- Knowingly failing to use contraception, or deliberately removing or compromising contraception (Stealthing) without the other party's knowledge

### C. INTERPERSONAL VIOLENCE

Interpersonal Violence (commonly referred to as intimate partner violence, dating violence, domestic violence, and relationship violence), can encompass a broad range of abusive behavior committed by a person who is or has been:

- In a romantic or intimate relationship with the Complainant (of the same or different sex);
- The Complainant's spouse or partner (of the same or different sex);
- The Complainant's family member; or
- The Complainant's cohabitant or household member within the past 12 months, including a roommate.

Whether there was such a relationship will be gauged by its length, type, and frequency of interaction. Reports of Interpersonal Violence that do not involve one of the specified relationships or do not involve an individual's Protected Status (Protected Statuses are listed in University Policy 1201, Non-Discrimination) will be resolved under the Code of Student Conduct or, for employees, applicable policies.

Interpersonal Violence includes physical violence, emotional abuse, sexual assault, economic control and neglect that a reasonable person in similar circumstances and with similar identities would find intimating, frightening, terrorizing, or threatening. Such behaviors may include threats of violence to one's self, one's family member, or one's pet.

<u>D. STALKING</u>

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person in similarly circumstances and with similar identities to fear bodily injury or to experience substantial emotional distress.

Course of conduct means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Substantial emotional distress means significant mental suffering or anguish, or creating a hostile, intimidating, or abusive environment for a reasonable person in similar circumstances with similar identities. Stalking may involve individuals who are known to one another, who have a current or previous relationship, or who are strangers.

Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

<u>E. SEXUAL OR GENDER-BASED HARASSMENT</u>

Sexual or Gender-Based Harassment includes:

1. Unwelcome sexual advances, requests for sexual favors and other verbal, physical, or electronic conduct of a sexual nature that creates a hostile, intimidating, or abusive environment;
2. Verbal, physical, or electronic conduct based on Sex, Gender, Sexual Orientation, or sex-stereotyping that creates a hostile, intimidating, or abusive environment, even if those acts do not involve conduct of a sexual nature, or
3. Harassment for exhibiting what is perceived as a stereotypical characteristic for one's Sex or for failing to conform to stereotypical notions of masculinity and femininity, regardless of the actual or perceived Sex, Gender, Sexual Orientation, Gender Identity, or Gender Expression of the individuals involved.

a) **Harassment** is a type of Discrimination that occurs when verbal, physical, electronic, or other conduct based on an individual's Protected Status (Protected Statuses are listed in University Policy 1201, Non-Discrimination) interferes with that individual's (a) educational environment (e.g., admission, academic standing, grades, assignment); (b) work environment (e.g., hiring, advancement, assignment); (c) participation in a University program or activity (e.g., campus housing); or (d) receipt of legitimately-requested services (e.g., disability or religious accommodations), thereby creating Hostile Environment Harassment or Quid Pro Quo Harassment, as defined below.

### i. Hostile Environment Harassment

Unwelcome conduct based on Protected Status that is so severe, persistent, or pervasive that it alters the conditions of education, employment, or participation in a University program or activity, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive. An isolated incident, unless sufficiently severe, does not amount to Hostile Environment Harassment.

### ii. Quid Pro Quo Harassment

Unwelcome conduct based on Protected Status where submission to or rejection of such conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education, employment, or participation in a University program or activity.

http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/                    12 of 15

**b) Additional Guidance about Discrimination and Harassment**

Consistent with the definitions provided above, conduct that constitutes Discrimination and Harassment:

- May be blatant and involve an overt action, threat, or reprisal; or may be subtle and indirect, with a coercive aspect that is unstated but implied.
- May or may not include intent to harm.
- May not always be directed at a specific target.
- May be committed by anyone, regardless of Protected Status, position, or authority. While there may be a power differential between the Complainant and the Respondent – perhaps due to differences in age or educational, employment, or social status – Discrimination and Harassment can occur in any context.
- May be committed by a stranger, an acquaintance, or someone with whom the Complainant has a current or previous relationship, including a romantic or sexual relationship.
- May be committed by or against an individual or by or against an organization or group.
- May occur in the classroom, in the workplace, in residential settings, or in any other setting.
- May be a pattern of behavior or, if sufficiently severe, a one-time event.
- May be committed in the presence of others, when the Complainant and Respondent are alone, or through remote communications, including email, text messages, or social media.
- May take the form of threats, assault, property damage, economic abuse, and violence or threats of violence.
- May include harassing or retaliatory behavior directed to a sexual or romantic partner, family member, friend, or pet of the Complainant.

## F. RETALIATION

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

## G. COMPLICITY

Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of Prohibited Conduct by another person.

## VII.    VIOLATIONS OF LAW

Behavior that violates this policy may also constitute a crime under the laws of the jurisdiction in which the incident occurred. For example, the Commonwealth of Virginia criminalizes and punishes some forms of Sexual Assault, Interpersonal Violence, Sexual Exploitation, Stalking, and Physical Assault. The criminal statutes that may apply in cases of Physical Assault and Intimate Partner Violence are found in various sections of Chapter 4, Articles 1 (Homicide) and 4 (Assaults and Bodily Woundings), of Title 18.2 of the Code of Virginia. The criminal statutes   relating to Sexual Assault are found in Sections 18.2-61 to 18.2-67.10 of the Code of Virginia. Section 18.2-60.3 of the Code of Virginia defines and identifies the penalty for criminal stalking. Finally, Sections 18.2-386.1 and 18.2-386.2 of the Code of Virginia provide for criminal penalties in some cases of Sexual Exploitation. This compilation of criminal statutes is not exhaustive, but is offered to notify the University community that, some forms of Prohibited Conduct may also constitute crimes under Virginia law, which may

subject a person to criminal prosecution and punishment in addition to any sanctions under this policy.

## VIII. PREVENTION AND AWARENESS PROGRAMS

The University is committed to the prevention of Prohibited Conduct through regular and ongoing education and awareness programs. Incoming Students and new Employees receive primary prevention and awareness programming as part of their orientation, and returning Students and current Employees receive ongoing training and related education. For a description of the University's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, see Appendix E: Training, Prevention, and Awareness Programs.

## IX. COMPLIANCE

The University provides training to Students and Employees to ensure they understand this policy and the topics and issues related to maintaining an education and employment environment free from harassment and discrimination. For a description of the University's training related to this policy, see Appendix E: Training, Prevention, and Awareness Programs.

## X. OBLIGATION TO PROVIDE TRUTHFUL INFORMATION

All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under the University's Student Code of Conduct and disciplinary action under the appropriate Employee disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

## XI. FORMS

**CSA Crime Statistics Reporting Form**
**Compliance, Diversity, and Ethics Intake Form**

## XII. DATES:

### A. Effective Date

This policy will become effective upon the date of approval by the Provost and Executive Vice President and Senior Vice President for Administration and Finance.

### B. Date of Most Recent Review

8/25/2016.

## XIII. TIMETABLE FOR REVIEW

The University will review and update this policy, as appropriate, by October 31 of each year. The University will evaluate, among other things, any changes in legal requirements, existing University resources, and the resolution of cases from the preceding year (including, but not limited to,

timeframes for completion and sanctions and remedies imposed). The Title IX Coordinator shall certify to the State Council of Higher Education for Virginia that this policy has been reviewed and updated, as appropriate, in accordance with Virginia law.

XIV.   SIGNATURES

**Approved:**

_____
Senior Vice President for Administration and Finance

_____
Provost and Executive Vice President

Date approved: April 20, 2006

Revision Approved: August 15, 2014

Revised: March 25, 2015

Revision Approved: September 11, 2015

Revised: June 22, 2016

Revision Approved: August 25, 2016

Revised: February 14, 2017

**EXHIBIT 8**

---------- Forwarded message ---------
From: **Jennifer R Hammat** <jhammat@gmu.edu>
Date: Fri, Feb 22, 2019 at 3:37 PM
Subject: LETTER OF DETERMINATION
██████████████████████████

Cc: Julian Williams <jwilli89@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>, Keith D Renshaw
<krenshaw@gmu.edu>, Ann L Ardis <aardis@gmu.edu>, Heather M Madnick <hmadnick@gmu.edu>

**Compliance Diversity and Ethics**
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu



LETTER OF DETERMINATION

Confidential

February 22, 2019

████████████

George Mason University

Fairfax, VA 22030

Dear ████████████,

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by ███████████, whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also considered the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence.***

████████ alleged that during the spring 2013 ██████████████ : ██████████ class, on April 2, 2013, that you provided a detailed personal description to students of performing oral sex on a woman at a party. During the investigation, you confirmed sharing this story in class. Student witnesses confirmed and corroborated this information.

████████ also alleged that during this same course, you cautioned them about sharing the stories told in class outside of the course. During the investigation, you indicated you could not recall warning your class about not share the stories you told in class. Student witnesses confirmed and corroborated that you made it clear it would be better if they did not share your stories outside of class.

████████ alleged that you encouraged students in your class to get to know each other outside of class and stated that going to Spa World would be a great way to do so. During the investigation, you said you shared many resources with students during class. You indicated that graduate school was stressful and that Spa World was a place where you can get a massage and there were bathing pools as well. You said you suggested it was a place where they could meet and relax. One student witness stated, "I remember him mentioning Spa World multiple times. I don't remember if it was in one of these classes but I wouldn't be surprised." You also acknowledged that you "jested" about graduate students often dating each other and you provided the personal example, that your first mentor married his post doc as an example that some of them would probably end up dating. Student witnesses confirmed and corroborated that you told them not to let "other" faculty members know if they were dating each other.

████████ alleged that in class you often called students emotional, irrational, or weak. During the investigation, you said you absolutely did not tell students they were being emotional, irrational, or weak. Student witnesses confirmed you did tell at least one student their arguments were emotional.

████████ indicated that the interactions with you included regular and gratuitous stories detailing sexual encounters, disparaging comments and actions regarding stereotypical female traits (e.g., being emotional).

Investigation found that these repeated instances of sexual conversations with students you supervise and teach indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the classroom.

2

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to ███████, to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions.  Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

CC:    Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology

        Dr. Ann L. Ardis, Dean, College of Humanities and Social Sciences

        Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life

        Julian Williams, Vice President for Compliance, Diversity and Ethics

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

titlenine.gmu.edu

--



**A626**

**EXHIBIT 9**

---------- Forwarded message ---------
From: **Jennifer R Hammat** <jhammat@gmu.edu>
Date: Fri, Feb 22, 2019 at 3:37 PM
Subject: LETTER OF DETERMINATION
█████████████████████████████
Cc: Julian Williams <jwilli89@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>, Keith D Renshaw
<krenshaw@gmu.edu>, Ann L Ardis <aardis@gmu.edu>, Heather M Madnick <hmadnick@gmu.edu>

**Compliance Diversity and Ethics**
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu



LETTER OF DETERMINATION

Confidential

February 22, 2019

████████████

George Mason University

Fairfax, VA 22030

Dear ████████████

1

████████

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by ███████, whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also considered the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-Based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence.***

████████ alleged that during the spring 2013 ███████████████████████, on April 2, 2013, that you provided a detailed personal description to students of performing oral sex on a woman at a party. You indicated this was a concrete personal example that would help them remember the material. This story was also confirmed and corroborated by student witnesses from that class.

████████ also alleged that the ████████████ you shared a conversation with the class regarding the number of sexual partners you have had during a class discussion. Multiple witnesses corroborated this conversation occurred.

████████ also alleged that you told a story in class about an intimate encounter on a then recent trip. During the investigation, you disputed the factual accuracy of the allegation that you shared a conversation about skinny-dipping with a woman on a business trip. You stated this allegation was a false recall of a story your told students for pedagogical reasons. You indicated you did not "skinny dip" with the woman, but rather went swimming in the ocean with her on a trip to Kuwait and she served as your escort. Student witnesses from the class remembered this story and described it as "erotic," "serene," and "a moment of awe," but did not recall the "skinny-dipping" element of the story.

████████ alleged that your encouraged students in your class to get to know each other outside of class and stated that going to Spa World would be a great way to do so. During the investigation, you confirmed that you shared many resources with students during class. You indicated that graduate school was stressful and that Spa World was a place where you can get a massage and there were bathing pools as well. You said you suggested it was a place where they could meet and relax. One student witness indicated, "I remember him mentioning Spa World multiple times. I don't remember if it was in one of these classes but I wouldn't be surprised."

████████ indicated that she felt your stories and personal examples from your own sex life made her uncomfortable and made it a difficult environment in which to learn. She also feared being labeled as a "narc" and did not feel she had the power to stand up to your unprofessional and inappropriate sexual comments. ████████ indicated that the behavior you exhibit for your graduate students encouraged them to be inappropriate and verbally harassing of other students. She states, ████████ behavior is an issue of the ████████████ Program and it contributed to a toxic environment where learning is more difficult. While ███ is not responsible for anyone's behavior but his own, the fact that he is

unaware of what transpires in his lab, or if aware does not take meaningful steps to intervene, is grossly negligent as an educator."

Investigation found that these repeated instances of sexual conversations with students you supervise and teach indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the classroom.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to ▮▮▮▮▮▮ to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions. Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

CC:    Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology

Dr. Ann L. Ardis, Dean, College of Humanities and Social Sciences

Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life

Julian Williams, Vice President for Compliance, Diversity and Ethics

3

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

titlenine.gmu.edu

--



4

**EXHIBIT 10**

---------- Forwarded message ---------
From: **Jennifer R Hammat** <jhammat@gmu.edu>
Date: Fri, Feb 22, 2019 at 3:37 PM
Subject: LETTER OF DETERMINATION
████████████████

Cc: Julian Williams <jwilli89@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>, Keith D Renshaw
<krenshaw@gmu.edu>, Ann L Ardis <aardis@gmu.edu>, Heather M Madnick <hmadnick@gmu.edu>



**Compliance Diversity and Ethics**
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730 Fax: 703-993-8899 Web: http://diversity.gmu.edu

LETTER OF DETERMINATION

Confidential

February 22, 2019

████████████

George Mason University

Fairfax, VA 22030

Dear ████████,

1

████████

# A633

The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by ▮▮▮▮▮▮▮▮▮, whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also considered the factual information you provided to the investigator(s).

**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence.***

▮▮▮▮▮▮ alleged that while attending the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (November 21-23, 2014), after learning she was dating another graduate student, you approached him and asked him about it. He reported you asked him if he was "pumping" or "plowing" that "chick" and gave him a high-five when he said "yes." During the investigation, you indicated that you used different language and that you did not "high-five" him.  Although details differ, student witness confirmed and corroborated a conversation of this nature.

▮▮▮▮▮▮ alleged that after the conference you hugged her at the bar and offered to buy her a beer on your tab. During the investigation, you indicated you did not recall this ever happening. Due to lack of corroborating witnesses, the investigator was unable to determine whether this occurred.

▮▮▮▮▮▮ alleged that at a party in your home in February of 2015, as she and ▮▮▮▮▮▮▮▮ were leaving, while looking at ▮▮▮▮▮▮, you said to your wife, "Dave must have a big dick to be dating you. Like, just look at you." ▮▮▮▮▮▮ said this was the first of many comments you made about her appearance.

During the investigation, you said you did not recall being involved in that conversation. ▮▮▮▮▮▮ said there was lots of alcohol consumed that evening, and that his memory from that evening is not very good and that recollection of the night is much better. He said he was mostly upset when you got drunk and hinted that that they were not "really happy" because you said that about their relationship in front of several people from the lab.

▮▮▮▮▮▮ alleged that while attending the Association of Behavioral and Cognitive Therapies conference in Chicago, Illinois, after enjoying a dinner with her colleague and venting about her relationship she realized you were sitting behind her. When she introduced you to her colleague, she said you hugged her and whispered that you heard what she said about ▮▮▮▮▮▮ but that, her secret was safe with you and that you knew how to keep secrets. ▮▮▮▮▮▮ said this was the first time you made it seem like secrets between the two of you were a good thing. She said that made her very uncomfortable. During the investigation, you said you were facing ▮▮▮▮▮▮ and she saw you the whole time. A non-student witness provided photo evidence of you sitting behind ▮▮▮▮▮▮.

▮▮▮▮▮▮ also alleged that after the break up, she ran into you in the hallway in ▮▮▮▮▮▮. She said you approached her, hugged her tightly and for too long, and told her you were not mad at her and still thought highly of her. She said you made a comment about how she was intelligent, attractive, creative, driven, and skilled and you expressed hope that the two of you could work together on projects. During the investigation, you said you had no recollection of that interaction.

2

A non-student witness confirmed that ███████ told her about this interaction in real time, corroborating this interaction.

███████ said when you included her attractiveness in the "reasons" provided for wanting to work with her, she felt like that was a grooming behavior. She recalls deliberately removing herself from future research opportunities with you based on these concerning behaviors. She stressed it was hard to describe in detail the number of times when she felt offended, objectified, invalidated, and demeaned as a result of chronic sexual harassment from you. ███████ stated, "The impact ███ had on my productivity and my curriculum are disturbing. I turned down a grant opportunity, that same grant for which he wrote a letter of recommendation, because I could not spend another year in this program. The abusive tactics ███ used only exacerbated the helplessness I felt across all of the situations described here, and numerous others."

Investigation found that these repeated instances of sexual conversations and physical interactions with students ████ supervises and teaches indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the program.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to ███████, to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions.  Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator


CC:     Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology

        Dr. Ann L. Ardis, Dean, College of Humanities and Social Sciences

        Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life

         Julian Williams, Vice President for Compliance, Diversity and Ethics



**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

[titlenine.gmu.edu](titlenine.gmu.edu)



**EXHIBIT 11**

On Fri, Feb 22, 2019 at 3:49 PM ███████████████████ wrote:

---------- Forwarded message ---------
From: **Jennifer R Hammat** <jhammat@gmu.edu>
Date: Fri, Feb 22, 2019 at 3:37 PM
Subject: LETTER OF DETERMINATION
████████████████████
Cc: Julian Williams <jwilli89@gmu.edu>, Shernita Rochelle Parker <srochell@gmu.edu>, Keith D Renshaw
<krenshaw@gmu.edu>, Ann L Ardis <aardis@gmu.edu>, Heather M Madnick <hmadnick@gmu.edu>

Compliance Diversity and Ethics
4400 University Drive, MS 2C2, Fairfax, Virginia 22030
Phone: 703-993-8730  Fax: 703-993-8899  Web: http://diversity.gmu.edu



LETTER OF DETERMINATION

Confidential

February 22, 2019

███████████████

George Mason University

Fairfax, VA 22030

# A638

Dear ████████,


The purpose of this correspondence is to notify you that Compliance, Diversity, and Ethics (CDE) has concluded its formal investigation into the complaint filed against you by ████████, whereby it is alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*. CDE conducted interviews and reviewed documentation to evaluate the specifics of the complaint. The investigation also took into account the factual information you provided to the investigator(s).


**After evaluating the information gathered, CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-based Harassment and Other Interpersonal Violence.***


████████ alleged that while attending a party at your home on December 9, 2018, you invited the students into your hot tub. She stated you shared an elaborate, sexual story about your sexual experience at a large brothel house while traveling in Germany. The conversation was described as lasting a least one hour in length, and described as going into very intimate details about sexual acts performed, how long the sex lasted, how you selected the women with whom you were engage in the sex acts, and what criteria you used to select the sex partners.


████████ said she felt "stuck" and unable to leave the conversation discreetly. She said she felt extremely uncomfortable with the conversation, given the setting. During the investigation, you confirmed that you invited your graduate students (from the lab) to your home for an end-of-the-semester gathering for drinks and food. You also confirmed that you and your graduate students ended up in the hot tub, discussing life, wellness, research, and a recent sexual experience you personally had in Germany.  This was corroborated by several student witnesses.


████████ alleged that while attending the ████████████████████ conference, ████████, in San Antonio, Texas, you and several graduate students met up with other attendees from the conference and took them back to your respective hotel rooms. She said the next morning, you and the other students discussed in detail what happened the night before. You asked for explicit details about their sexual encounters. You confirmed that you met someone at the conference and that you and your graduate students discussed the prior evening's sexual activity the next morning at breakfast. Several student witnesses and one non-student witness corroborated this event.


████████ alleged that on another occasion you shared intimate details about a "happy ending" erotic massage you told a story about at a gathering at Oh! George in the fall of 2017. Investigation confirms a conversation with students about an erotic massage you received in Sri Lanka in 2017.

████████ alleged that during a different gathering at Oh! George, in the fall of 2017, you repeatedly asked a graduate student what type of porn she liked to watch. During the investigation, you stated you did ask a graduate student what kind of pornography she liked to watch.

████████ alleged that while attending the ████████████████████████, you and a group of graduate students went to the Claremont Lounge, a strip club in Atlanta, Georgia. Investigation confirmed at least one student received a lap dance, and you took a photo of that, and you received a lap dance. Witnesses told investigators that at least one student had so much to drink that they threw up in the bathroom. During the investigation, you agreed that you attended the strip club with the students and received a lap dance.

During the investigation you confirmed that while attending the ████████, academic conference in Santa Ana, California, you discussed with students an intimate sexual encounter you had with a woman (for over 10 hours) while you were out of the country presenting a professional workshop in Hanoi, Thailand. Student witnesses corroborated this conversation.

During the investigation, you said you discuss a number of things with your graduate students. You said you discussed research trends, wellness, disfunction, and sex. Several student witnesses confirmed this fact, one offering, "███ likes to talk about sex. A lot."

████████ said having time away from the lab and the opportunity to work in a professional environment that would never tolerate the conversation or circumstances she experienced while working for ███. Only now does she feel able to articulate how inappropriate the power imbalance of ████ mentorship was. She conveyed that the way ███ viewed her (including her sexual behaviors) had an effect on his decisions for how he handled graduate assistantships, authorship on papers, and consulting opportunities.

Investigation found that these repeated instances of explicit sexual conversations with students you supervise and teach indicate a lack of appropriate professional behavior and combine to create a hostile environment for students in the classroom, the laboratory and at professional conferences.

CDE has communicated to those involved in this process that it is a violation of George Mason University's Sexual or Gender-Based Harassment or Other Interpersonal Violence policy to retaliate against students, faculty, or staff members for filing a complaint alleging a violation or participating in an investigation. Retaliation is a separate violation, distinct from the initial underlying allegation. Those who violate this policy by retaliating may be subject to discipline, regardless of whether or not there has been a finding for cause in the initial complaint. In the event you witness or experience retaliation, please report it immediately to CDE. In addition, those involved have privacy interests. Therefore, outside the scope of this investigation, all parties are cautioned to reflect upon the appropriateness before publicizing or divulging the nature of the proceedings or the identity of those involved.

If you wish to appeal this decision you may do so in writing to Julian R. Williams, Vice President of CDE, within ten (10) business days from receipt of this determination letter. According to university policy, you may appeal this decision

based on either discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding. CDE requests that you be as specific as possible in setting out a basis for appeal. General dissatisfaction with CDE's decision will not be sufficient grounds to overturn a decision. Please note that the determination of your appeal is final. Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

CDE is closing its file on this matter. Our findings have been communicated to ██████████, to your supervisor, Dr. Keith Renshaw, and to Employee Relations. They will be in contact with you to communicate any disciplinary sanctions.  Should you have any questions or concerns regarding our investigation, please feel free to contact us at (703) 993-8730.

Sincerely,

Dr. Jennifer R. Hammat

University Title IX Coordinator

CC:    Dr. Keith Renshaw, Associate Professor and Chair, Department of Psychology

Dr. Ann L. Ardis, Dean, College of Humanities and Social Sciences

Shernita Rochelle Parker, Interim Vice President, HR/Payroll and Faculty/Staff Life

Julian Williams, Vice President for Compliance, Diversity and Ethics

**Jennifer R. Hammat, Ed.D.**

University Title IX Coordinator

Compliance, Diversity, and Ethics

George Mason University

4400 University Drive, MS 2C2
Fairfax, VA 22030

703-993-8730

4

titlenine.gmu.edu



--

**EXHIBIT 12**

**A643**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| JOHN DOE,<br><br>     Plaintiff,<br><br>v.<br><br>GRINNELL COLLEGE, SARAH MOSCHENROSS, ANGELA VOOS, and BAILEY ASBERRY,<br><br>     Defendants. | **No. 4:17-cv-00079-RGE-SBJ**<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

John Doe was a student at Grinnell College when, during his sophomore year, a fellow student reported Doe had engaged in nonconsensual sexual contact with her. Several months later, another student reported Doe had nonconsensual sexual intercourse with her. Grinnell eventually investigated both reports, found Doe responsible for sexual misconduct, and dismissed Doe from Grinnell.

Doe claims Grinnell and Grinnell employees discriminated against him on the basis of sex during the disciplinary proceeding that led to his dismissal. He also claims various aspects of the proceedings violated Grinnell's policies and promises made to him by Grinnell employees. Doe has sued Defendants Grinnell College, Grinnell's former Dean of Students Sarah Moschenross, Grinnell's former Title IX Coordinator Angela Voos, and Grinnell's former Title IX Deputy for Case Management Bailey Asberry, alleging violations of Title IX of the Education Amendments of 1972, breach of contract, promissory estoppel, and negligent misrepresentation. Defendants move for summary judgment on all of Doe's claims.

The Court holds Doe has demonstrated a genuine dispute of material fact as to whether

gender bias was a motivating factor that caused an inaccuracy in his sexual misconduct disciplinary proceeding. The Court also concludes there is a dispute of material fact regarding whether Grinnell substantially performed its contract with Doe. The Court thus denies Defendants' motion for summary judgment on Doe's Title IX and breach of contract claims. As for Doe's promissory estoppel and negligent misrepresentation claims, the Court concludes there are no material facts in dispute and these claims fail as a matter of law. The Court thus grants Defendants' motion for summary judgment on Doe's estoppel and negligent misrepresentation claims.

## II.    BACKGROUND

### A.    Factual Background

In presenting the facts relevant to the Defendants' motion for summary judgment, the Court first outlines the social climate at Grinnell at the time Doe was accused of sexual misconduct. Next, the Court sets forth Grinnell's sexual misconduct policy. The Court then recounts the sexual misconduct complaints brought against Doe and the subsequent disciplinary process that resulted in his dismissal. The following facts are either uncontested or, if contested, viewed in the light most favorable to Doe. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587−88 (1986).

### 1.    Campus climate

Doe enrolled at Grinnell College in the fall of 2014. Pl.'s Br. Supp. Resp. Defs.' Mot. Summ. J. 3, ECF No. 129-1. In late 2014 and early 2015, a Grinnell student group called Dissenting Voices advocated for reform of Grinnell's process for handling complaints filed under Title IX, which prohibits discrimination on the basis of sex at educational institutions. Defs.' Unsealed Resp. Pl.'s Statement Add'l Facts Resp. Defs.' Mot. Summ. J. ¶¶ 16, 19, 23–33, 36, 38, 40–41, ECF No. 136; Pl.'s Unsealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 161–69, ECF No. 129-5; *see also* 20 U.S.C. § 1681(a). The focus of Dissenting Voices's

2

**A645**

criticism was the treatment by Grinnell of alleged victims of sexual assault. Among other forms of activism, Dissenting Voices wrote opinion pieces in Grinnell's student newspaper calling upon Grinnell's administrators to make Grinnell a place "where sexual assault is taken seriously" and to more proportionally punish "students who commit violent sexual assaults." *See, e.g.*, Pl.'s Unsealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 170–79, ECF Nos. 129-5 &129-6; *see also* ECF No. 136 ¶ 31–33, 36, 38–41.

In March 2015, *The Huffington Post* published an article criticizing Grinnell's handling of Title IX complaints. ECF No. 136 ¶ 49; ECF No. 129-5 at P-APP 127–36. Shortly before *The Huffington Post* piece was published, Grinnell President Raynard Kington contacted the Office for Civil Rights at the U.S. Department of Education and asked for assistance in reforming Grinnell's Title IX process. ECF No. 136 ¶ 48; ECF No. 129-6 at P-APP 182–83. That same month, Kington cancelled an interview with *U.S. News and World Report*, citing reservations about speaking publicly at that time. ECF No. 136 ¶ 55; Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 609, ECF No. 131-3. The Office of Civil Rights denied Kington's request for assistance. Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 485, Voos Dep. 75:25–76:4, ECF No. 131-2. Several months later, the Office of Civil Rights opened an investigation of Grinnell based on complaints from Grinnell students. ECF No. 136 ¶ 66; ECF 129-6 at P-APP 189–95. The case against Grinnell was eventually resolved and the students withdrew their complaints. Defs.' Sealed Resp. Pl.'s Statement Add'l Facts Resp. Defs.' Mot. Summ. J. ¶¶ 73–74, ECF No. 140-1; Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 1685–86, ECF No. 131-19.

### 2. Grinnell's Sexual Misconduct Policy

Three different versions of Grinnell's Sexual Misconduct Policy applied at different times while Doe was a student at Grinnell. Pl.'s Resp. Defs.' Statement Undisputed Facts Supp.

3

# A646

Defs.' Mot. Summ. J. ¶¶ 65–67, ECF No. 129. One version of the policy was in place in 2014, another version was in place in 2015, and a third version was in place in 2016. *Id.*; *see* Pl.'s Unsealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 49–120, ECF Nos. 129-4 to 129-5 (the 2014 policy); Pl.'s Unsealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 236–85, ECF Nos. 129-6 to 129-7 (the 2016 policy). [1] Events relevant to Doe's claims occurred during times when each of these versions of the sexual misconduct policy applied.

Grinnell generally made changes to the sexual misconduct policy during the summer, between academic years. *See* Voos Dep. 21:2–5, ECF No. 131-2 at P-APP 477.2. However, in February 2015—at the time Dissenting Voices was advocating for reform—Grinnell updated its policy during the academic year. ECF No. 136 ¶¶ 34–35; *see also* ECF No. 129-5 at P-APP 141–44; ECF No. 129-7 at P-APP 347–49. Notably, Grinnell shifted from the use of "hearing boards" in adjudicating complaints to using an "external adjudicator." *Compare* ECF No. 129-4 at P-APP 95–98, *with* ECF No. 129-7 at P-APP 278–82. From 2014 to 2016, however, the definitions of sexual assault, nonconsensual sexual contact, nonconsensual sexual intercourse, consent, and coercion remained identical or substantively the same. ECF No. 129 ¶ 67; *compare* ECF No. 129-4 at P-APP 61, 63–64, *with* ECF No. 129-7 at P-APP 249, 251–52. The 2016 sexual misconduct policy governed Doe's disciplinary proceeding and thus is most relevant here. The Court will refer to the 2016 sexual misconduct policy as "the Policy" throughout.

The Policy defines sexual assault as "having or attempting to have sexual intercourse or sexual contact with another individual without consent." ECF No. 129-7 at P-APP 249.

---

[1] The parties do not submit a copy of the policy in place in 2015 in their appendices. However, Doe provides a document summarizing the differences between the 2014 and 2015 policies. *See* ECF No. 129-7 at P-APP 347–49.

Nonconsensual sexual contact is defined as "[h]aving or attempting to have sexual contact with another individual without consent." *Id.* Similarly, nonconsensual sexual intercourse is defined as "[h]aving or attempting to have sexual intercourse with another individual without consent." *Id.* The Policy includes the following definition of consent:

> Consent to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. Consent to engage in sexual activity must exist from the beginning to end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually understandable words and/or clear, unambiguous actions that indicate a willingness to engage freely in sexual activity. Consent is active, not passive. . . . Consent to one form of sexual contact does not constitute consent to engage in all forms of sexual contact. Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. . . . Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent. . . . Consent may be withdrawn by either party at any time. Withdrawal of consent must also be outwardly demonstrated by mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity. Once withdrawal of consent has been expressed, sexual activity must cease. . . . Consent is not affirmative if it results from the use of threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise his/her/hir [ ] own free will to choose whether or not to have sexual contact.

*Id.* at P-APP 251–52. It also includes the following definition of coercion:

> Coercion is direct or implied threat of force, violence, danger, hardship, or retribution sufficient to persuade a reasonable person of ordinary susceptibility to perform an act which otherwise would not have been performed or acquiesce in an act to which one would not have submitted. Coercion can include unreasonable and sustained pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another. A person's words or conduct cannot amount to coercion unless they wrongfully impair the other's freedom of will and ability to choose whether or not to engage in sexual activity. When someone makes it clear that he/she/zi does not want to engage in sexual activity, that he/she/zi wants to stop, or that he/she/zi does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

*Id.* at P-APP 253.

5

The Policy outlines how complainants can report sexual misconduct. *Id.* at P-APP 260–61. There is no time limit for reporting sexual misconduct. *Id.* at P-APP 263. The Policy provides two ways to resolve complaints: informal resolution and formal resolution. *Id.* at P-APP 272–85. Informal resolution culminates in non-disciplinary action for the respondent, such as training or an educational program. *Id.* at P-APP 272–74. Under the Policy, an informal resolution can serve as a "final resolution" of a complaint when there is an agreement between Grinnell, the complainant, and the respondent. *Id.* at P-APP 273. Title IX Coordinator Voos stated in her deposition the informal resolution agreement must be in writing; but the Policy does not include such a requirement. Defs.' Sealed App. Supp. Defs.' Mot. Summ. J. at DEF APP 70, Voos Dep. 11:17–20, ECF No. 99; Defs.' Unsealed App. Supp. Defs.' Mot. Summ. J. at DEF APP 295, Voos Decl. ¶¶ 2–3, ECF No. 94-2. Formal resolution involves an investigation and adjudication. ECF No. 129-7 at P-APP 274–83. Formal resolution may result in disciplinary sanctions—described by the Policy as "educational outcomes"—against a respondent, including dismissal. *Id.* at P-APP 281–82. Grinnell's Title IX Office considers certain factors in deciding if a complaint should be handled formally or informally. These factors include the interest and preference of the complainant; the seriousness, persistence, or pervasiveness of the alleged conduct; and whether there have been multiple reports of misconduct against the respondent. *Id.* at P-APP 268–69.

Grinnell will pursue a formal resolution when the complainant requests one, when an investigation is warranted based on the Title IX Office's assessment, or when informal resolution is not successful. *Id.* at P-APP 274. The first step of a formal resolution is a fact-finding investigation. The Title IX Coordinator engages either a Grinnell employee or an external investigator to interview the parties and review the relevant documents. *Id.* at P-APP 275–76. The investigator is charged with fact-finding but is not charged with weighing the evidence or

6

# A649

determining whether the respondent is responsible for violating the Policy. *Id.* at P-APP 275, 277. The investigator writes an investigation report outlining the findings and incorporates comments from both parties into the report. *Id.* at P-APP 277.

The investigation report is then reviewed by an adjudicator. *Id.* at P-APP 278. Grinnell may engage an external adjudicator—"an outside individual or firm" that "posses[es] the requisite training and experience needed to competently and fairly adjudicate the matter, and [who] will be free from actual bias or conflict of interest"—to review the investigation report and adjudicate the case. *Id.* at P-APP 279. An external adjudicator is typically a retired judge "trained in the intricacies of Title IX." *Id.* The adjudicator holds three separate, private, non-adversarial meetings with the investigation team, the complainant, and the respondent. *Id.* at P-APP 280–81. The adjudicator first meets with a representative of the investigation team and asks any questions necessary to gain a greater understanding of the case. *Id.* at P-APP 280. The adjudicator then meets with the complainant and the complainant's support person. *Id.* The complainant may present an account of the events and the adjudicator may ask questions. *Id.* The complainant may also bring an impact statement to the meeting and may recommend appropriate sanctions for the respondent. *Id.* The adjudicator then meets with the respondent and the respondent's support person. *Id.* At the meeting, the adjudicator asks the respondent if the respondent pleads "responsible" or "not responsible" and asks the respondent to respond to the charges in a narrative form. *Id.* The adjudicator may ask the respondent questions. *Id.* The respondent may also bring a mitigation statement and may suggest an appropriate sanction. *Id.* at P-APP at 280–81.[2]

After the adjudication meetings, the adjudicator deliberates privately, reviews all

---

[2] Defendants contend the Policy permits the respondent or complainant to submit questions for the external adjudicator to ask during the individual meetings. *See* ECF No. 136 ¶¶ 241–242. The Policy does not provide for such a process. *See* ECF No. 129-7 at P-APP 280–81.

information presented by the parties, and issues a written decision determining whether the respondent is responsible for the alleged sexual misconduct based on a preponderance of the evidence. *Id.* at P-APP 281. If the respondent is found responsible, the adjudicator recommends appropriate educational outcomes to the Dean of Students. *Id.* at P-APP at 281–82. The Dean of Students has the authority to impose an educational outcome and "may broaden or lessen any range of recommended education outcomes in the case of serious mitigating circumstances, contextual or historical aggravating circumstances, or egregiously offensive behavior." *Id.*

The Policy also provides for an appeal process. *Id.* at P-APP 283–84. A party may appeal the determination of the respondent's responsibility and the imposition of the educational outcome on only two grounds: the discovery of new evidence or procedural error. *Id.* at P-APP 283. The party's appeal must consist of a "plain, concise, and complete written statement expounding on the grounds for the appeal." *Id.* at P-APP 284. The Title IX Coordinator first decides whether to accept or deny the appeal. *Id.* If the appeal is accepted, a designated appeals officer evaluates the appeal. *Id.* The appeals officer must be an "impartial decision-maker." *Id.* If the designated appeals officer "was consulted about the conduct at issue in the complaint/grievance," the Title IX Coordinator must designate a different senior official as the appeals officer. *Id.* If a party believes the appeals officer has actual bias or a conflict of interest, the party may raise that challenge in writing within two days after the Title IX Coordinator accepts the appeal. *Id.* The appeals officer does not conduct a de novo review of the evidence considered or the conclusions reached in the determination of responsibility. *Id.* Instead, the appeals officer considers the appeal based solely on the two permissible grounds for appeal—new evidence or procedural error. *Id.* The appeals officer "can affirm the original findings, alter the findings, and/or alter the educational outcomes." *Id.* Appeal decisions are final. *Id.*

**A651**

### 3.   Doe's sexual misconduct disciplinary process

In November 2015, a Grinnell employee informed the Title IX Office that a student reported Grinnell sophomore John Doe had engaged in nonconsensual sexual contact with her about one year prior. ECF No. 129 ¶ 71; *see* ECF No. 131-19 at P-APP 1751. The student, Complainant #1,[3] met with Asberry,[4] Grinnell's Title IX Deputy Coordinator, and told her she did not want to pursue a formal resolution against Doe—she was only concerned Doe might attend her study abroad program. *See* ECF No. 131-2 at P-APP 535–36 (Asberry's notes documenting her meeting with Complainant #1). Voos determined it would be appropriate to resolve the complaint informally and to have an educational meeting with Doe to discuss the meaning of consent. ECF No. 129 ¶ 74; Voos Dep. 123:10–13, ECF No. 99 at DEF APP 87. Voos and Asberry met with Doe later that week. ECF No. 129 ¶ 76; *see* ECF No. 131-2 at P-APP 537. During the meeting, Voos and Asberry discussed with Doe the meaning of affirmative consent. ECF No. 129 ¶ 79; *see* Doe Dep. 131:11–15, ECF No. 99 at DEF APP 64. After the meeting, Doe understood Grinnell would not be moving forward with a formal resolution of Complainant #1's complaint at that time. ECF No. 129 ¶ 80; Doe Dep. 150:16–22, ECF No. 99 at DEF APP 67.

In February 2016, a different Grinnell employee notified Asberry that a student, Complainant #2,[5] had expressed concern about studying abroad with Doe. ECF No. 129 ¶ 86; *see* ECF No. 131-19 at P-APP 1756. Asberry met with Complainant #2 to discuss her concerns. ECF No. 129 ¶ 87; Asberry Dep. 111:11–19, ECF No. 131-3 at P-APP 521; *see* ECF No. 131-3 at P-APP 548. Complainant #2 told Asberry Doe had engaged in sexual intercourse with her

---

[3] The parties use the pseudonym Jane Doe for this student. The Court will refer to her as Complainant #1 to avoid confusion with Plaintiff's pseudonym.

[4] Defendant Bailey Asberry was known as Bailey Thompson at this time and at the times relevant to Doe's complaint. Asberry Dep. 6:10–16, ECF No. 131-2 at P-APP 508.

[5] The parties refer to this student as Jane Roe. The Court will refer to her as Complainant #2 for consistency.

**A652**

without asking for her consent in the summer of 2015. ECF No. 129 ¶ 88; ECF No. 131-2 at P-APP 546.

In March 2016, after Asberry's meeting with Complainant #2, Voos and Asberry consulted legal counsel and decided to open a formal investigation against Doe. ECF No. 129 ¶ 90; Asberry Dep., 119:21–120:4, 121:17–24, ECF No. 99 at DEF APP 109, 110; Voos Dep. 142:12–143:9, ECF No. 99 at DEF APP 91. Grinnell retained the law firm Husch Blackwell to begin the formal investigation in accordance with the Policy. *See* ECF No. 131-2 at P-APP 546. The investigators interviewed Complainant #1 in March 2016. Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 701, 752–70, ECF Nos. 131-5 to 131-6. During her interview, Complainant #1 told the investigators Doe engaged in nonconsensual sexual contact with her on two days in 2014. ECF No. 131-5 at P-APP 754–56. Grinnell then sent a Notice of Investigation to Doe on April 13, 2016, informing him Grinnell was moving forward with a formal resolution of Complainant #1's and Complainant #2's complaints. Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 673, ECF No. 131-4. Dean of Students Moschenross, Voos, and Asberry met with Doe the next day to explain the formal resolution process. *See* ECF No. 131-3 at P-APP 561–64.

Complainant #2 initially told Asberry she did not want to speak with the investigators, but after Voos told her Grinnell was moving forward with a formal resolution, Complainant #2 agreed to meet with them. *Id.* at P-APP 553. Investigators interviewed Complainant #2 in April 2016. Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 801–29, ECF No. 131-6 to 131-7. The same day, the investigators interviewed Complainant #1 a second time. ECF Nos. 131-5 to 131-6 at P-APP 772–799.

The investigators also interviewed Doe in April 2016. ECF No. 131-7 at P-APP 831–58. During his interview, Doe told investigators he remembered little about the first encounter

10

with Complainant #1 and denied the second encounter with Complainant #1 occurred. *Id.* at P-APP 833–34, 838. In regard to the encounter with Complainant #2, Doe denied the sexual intercourse was nonconsensual. ECF No. 131-5 at P-APP 722.

In May 2016, the investigators conducted follow-up interviews with Doe and Complainant #2. Pl.'s Sealed App. Supp. Resp. Defs' Mot. Summ. J. at P-APP 907–33, ECF No. 131-9. The investigators also interviewed four student witnesses and reviewed text messages and emails submitted by the parties and witnesses. *See* ECF No. 131-5 at P-APP 701; Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 860–905, ECF Nos. 131-7 to 131-9.

The investigators produced a 51-page final investigation report summarizing the facts gathered about Complainant #1's and Complainant #2's complaints. ECF No. 131-5 at P-APP 700–50. The investigators appended to the report transcripts of interviews with the parties and witnesses, as well as other documents related to the investigation. Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 751–1020, ECF Nos. 131-5 to 131-10. The investigators also included comments submitted by the parties responding to a preliminary version of the report. ECF No. 131-10 at P-APP 1021–25.

Grinnell submitted the final investigation report to the designated external adjudicator, former Chief Justice of the Iowa Supreme Court Marsha Ternus ("the Adjudicator"). ECF No. 129 ¶¶ 42, 105. The Adjudicator did not meet with the investigation team. *See* Norton Dep. 46:3–6, ECF No. 131-5 at P-APP 696. The Adjudicator reviewed the investigation report and conducted adjudication meetings with Complainant #1 and Doe. Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 1073, Ternus Dep. 57:13–23, ECF No. 131-11. Complainant #2 declined to have an adjudication meeting with the Adjudicator. ECF No. 129 ¶ 106.

11

## A654

The Adjudicator issued separate findings for each complaint against Doe. ECF No. 129 ¶ 110; *see* ECF No. 131-11 at P-APP 1102–07; Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 1108–15, ECF No. 131-12. The Adjudicator found Doe responsible for nonconsensual sexual contact with Complainant #1. ECF No. 129 ¶ 111; ECF No. 131-11 at P-APP 1106–07. The Adjudicator also found Doe responsible for nonconsensual sexual intercourse with Complainant #2. ECF No. 129 ¶ 116; ECF No. 131-12 at P-APP 1113–15.

In a separate decision, the Adjudicator recommended Doe's educational outcome: dismissal from Grinnell. ECF No. 129 ¶¶ 121–122; ECF No. 131-12 at P-APP 1116–18. The Adjudicator found dismissal was appropriate considering Doe's "responsibility for engaging in nonconsensual sexual intercourse with [Complainant #2] and based upon a predatory pattern of behavior that these two complaints demonstrate." ECF No. 131-12 at P-APP 1117. The Adjudicator provided a caveat with the recommended sanction: that it "be consistent with the sanctions imposed in similar cases." *Id.* at P-APP 1117–18. Moschenross accepted the Adjudicator's recommendation and finalized the decision to dismiss Doe. ECF No. 129 ¶ 128; *see* ECF No. 131-4 at P-APP 685–87.

Doe appealed Grinnell's determination of his responsibility and his dismissal, asserting, among other claims of error, the Adjudicator failed to apply the preponderance of the evidence standard and that it was procedurally improper to consolidate the complaints of Complainant #1 and Complainant #2 into one investigation. *See* ECF No. 131-19 at P-APP 1701–03. As dictated by the Policy, Andrea Conner, the Assistant Vice President for Student Affairs, served as the appeals officer. *See* ECF No. 129-7 at P-APP 284. During Conner's review, Conner asked the Adjudicator to provide comments on the findings. ECF No. 131-3 at P-APP 592. The Adjudicator responded with several pages of written comments supporting the conclusions in the determinations of responsibility. *Id.* at P-APP 588–91. The Policy does not permit the

12

review of an appeal by anyone other than the appeals officer. Doe was not made aware of these communications or given the opportunity to respond to the Adjudicator's comments. ECF No. 136 ¶ 333. Conner ultimately denied Doe's appeal, finding no evidence of a procedural error in the disciplinary process. ECF No. 131-3 at P-APP 598–602.

Additional facts are provided below as necessary.

**B.    Procedural Background**

Doe filed suit in March 2017 against Grinnell College, Raynard Kington, Sarah Moschenross, Angela Voos, Andrea Conner, Bailey Asberry, Marsha Ternus, and Husch Blackwell, LLP. ECF No. 1. Doe alleged five counts: violation of the due process clause of the Fourteenth Amendment of the United States Constitution against Grinnell (Count I); violation of Title IX of the Education Amendments of 1972 against all Defendants (Count II); breach of contract against Grinnell (Count III); estoppel and reliance against Grinnell (Count IV); and negligent misrepresentation against Grinnell, Moschenross, Voos, and Asberry (Count V). *Id.* ¶¶ 84–155.

In June 2017, Doe voluntarily dismissed Ternus and Husch Blackwell. Stipulation Dismissal, ECF Nos. 31 & 32. In September 2017, the Court dismissed Doe's constitutional claim, Count I, on Defendants' partial motion to dismiss, finding Doe did not plead sufficient facts to show Grinnell should be deemed a governmental actor. Order Granting Defs.' Partial Mot. Dismiss 4–5, ECF No. 46. The Court also dismissed Doe's Title IX claim, Count II, against the remaining individual Defendants after Doe conceded individuals cannot be liable under Title IX. *Id.* at 2. Kington and Conner were thus dismissed from the case. *Id.* at 6.

Defendants now move for summary judgment on Doe's remaining claims: Doe's Title IX claim under an erroneous outcome theory against Grinnell (Count II), his state law breach of contract and estoppel claims against Grinnell (Counts III and IV), and his state law negligent

**A656**

misrepresentation claim against Grinnell, Moschenross, Voos, and Asberry (Count V). ECF No. 94; *see also* Defs.' Br. Supp. Defs.' Mot. Summ. J., ECF No. 100. Doe resists. ECF No. 129; *see also* ECF No. 129-1. Defendants have replied. ECF No. 141. This matter came before the Court for hearing on February 7, 2019. Mot. Summ. J. Hr'g Mins., ECF No. 147; Mot. Summ. J. Hr'g Tr., ECF No. 149. Attorneys Kara Gorycki and David Goldman represented Doe. ECF No. 147. Attorneys Frances Haas and Frank Harty represented Defendants. *Id.*

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court must grant a party's motion for summary judgment if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Partial summary judgment is also permissible. *See* Fed. R. Civ. P. 56(a) (allowing summary judgment for "the part of each claim or defense"). A genuine issue of material fact exists where a factual issue capable of sustaining a claim under the governing law "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Where there is a genuine dispute, the "facts must be viewed in the light most favorable to the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

To defeat a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (omission in original) (quoting a prior version of Fed. R. Civ. P. 56(e)). In analyzing whether a party is entitled to summary judgment, a court "may consider only the portion of the submitted materials that is admissible or useable at

14

**A657**

trial." *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008) (quoting *Walker v. Wayne Cty.*, 850 F.2d 433, 434 (8th Cir. 1988)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and the moving party is entitled to summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (quoting *Ricci*, 557 U.S. at 586).

## IV.    DISCUSSION

The Court first considers Doe's Title IX claim (Count II) against Grinnell. The Court concludes Doe has demonstrated a genuine dispute of material fact regarding whether gender bias was a motivating factor in Doe's dismissal. A reasonable jury could therefore find Grinnell discriminated against Doe on the basis of sex in violation of Title IX. The Court thus denies Defendants' motion for summary judgment on Count II. The Court next considers Doe's breach of contract claim (Count III) against Grinnell. Because determining this claim also implicates factual issues that must be resolved by a jury, the Court denies Defendants' motion for summary judgment on Count III. The Court then addresses Doe's estoppel claim against Grinnell and negligent misrepresentation claim against Grinnell, Moschenross, Voos, and Asberry (Counts IV and V). The Court concludes Doe has not set forth material facts demonstrating a genuine dispute as to these claims and Defendants are entitled to judgment as a matter of law. The Court therefore grants Defendants' motion for summary judgment on Counts IV and V. Accordingly, Moschenross, Voos, and Asberry are dismissed.

### A.    Title IX Erroneous Outcome Claim (Count II)

District courts in this Circuit have followed the Second Circuit's decision in *Yusuf v. Vassar College* as a framework to resolve Title IX sex discrimination claims. 35 F.3d 709 (2d Cir. 1994). "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf*, 35 F.3d at 715; *accord Rossley v. Drake Univ.*,

15

342 F. Supp. 3d 904, 924 (S.D. Iowa 2018); *Doe v. St. John's Univ.*, No. 17–2413 (PAM/LIB), 2017 WL 4863066, at *2 (D. Minn. Oct. 26. 2017); *Stenzel v. Peterson*, No. 17-580 (JRT/LIB), 2017 WL 4081897, at *4 (D. Minn. Sept. 13, 2017). Among other types of sex discrimination that can be brought under Title IX, a student can challenge an educational institution's disciplinary proceedings under an erroneous outcome theory by alleging "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf,* 35 F.3d at 715.

To succeed on a Title IX claim under an erroneous outcome theory, a plaintiff must demonstrate: 1) articulable doubt as to the accuracy of the outcome of the disciplinary proceeding, and 2) gender bias was a motivating factor behind the erroneous finding. *Doe v. Miami Univ.,* 882 F.3d 579, 592 (6th Cir. 2018). To demonstrate an articulable doubt as to the accuracy of the outcome of a disciplinary proceeding, a plaintiff "must demonstrate evidentiary weaknesses behind the finding of the offense such as a motive to lie, particular strengths of the defense, or procedural flaws affecting the record." *Doe v. Univ. of Arkansas-Fayetteville*, No. 5:18-cv-05182, 2019 WL 1493701, at *12 (W.D. Ark. Apr. 3, 2019); *see also Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018) (noting a plaintiff can show an articulable doubt as to the outcome of the disciplinary proceeding by "challenging the overall sufficiency and reliability of the evidence").

In addition to demonstrating an articulable doubt in the outcome of the proceeding, the plaintiff must show "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf,* 35 F.3d at 715; *accord Rossley*, 342 F. Supp. 3d at 924. Such circumstances may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf,* 35 F.3d at 715. However, "[a]s a general rule, Title IX is not

16

**A659**

an invitation for courts to second-guess disciplinary decisions of colleges or universities." *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017). Title IX should be construed to give educational institutions the "flexibility they require to initiate a reasonable disciplinary response." *Id.* at 990 (internal quotations marks omitted) (quoting *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999)).

Thus, to avoid summary judgment, Doe must show a that a reasonable jury could conclude: 1) there is articulable doubt regarding the accuracy of Doe's disciplinary proceeding; and 2) gender bias was a motivating factor that caused the inaccuracy. Doe has successfully demonstrated a genuine dispute of material fact on both prongs of his erroneous outcome claim.

### 1.    Accuracy of the outcome

As to the first prong, the Court concludes Doe proffers sufficient facts that cast doubt on the accuracy of the outcome of his disciplinary process. Broadly, Doe argues Grinnell "did not handle [Doe's] discipline consistent with its Policy." ECF No. 129-1 at 13. Specifically, Doe alleges he was denied an impartial review during the appeal of Grinnell's determinations of his responsibility for sexual misconduct. Doe has proffered sufficient evidence for a reasonable jury to find Grinnell's review of Doe's appeal was not impartial. Because the determinations of responsibility were the basis of Grinnell's decision to dismiss Doe, evidence that the review of the determinations was not impartial is of heightened significance.

The parties do not dispute that Conner, the appeals officer, consulted with the Adjudicator before resolving Doe's appeal. *See* ECF No. 136 ¶¶ 331, 335. Conner emailed the Adjudicator—who had written the determinations of responsibility that were the subject of Doe's appeal—a copy of Doe's appeal with the message: "I would like to afford you the opportunity to respond with any comments, if you'd like." ECF No. 131-3 at P-APP 592. The Adjudicator responded to Conner's request with an email addressing each of Doe's appeal

17

**A660**

arguments and providing additional support to the findings. *Id.* at P-APP 588–91. Conner claims her review of Doe's appeal remained independent despite her consultation with the Adjudicator. Conner Dep. 122:2–15, ECF No. 131-3 at P-APP 578. However, the Policy does not provide for the adjudicator's involvement in the appeal process. *See* ECF No. 136 ¶ 329. Rather, the Policy requires the appeals officer to be an "impartial decision-maker" without any actual bias or conflict of interest. ECF No. 129-7 at P-APP 284.

The Court finds Doe has proffered sufficient facts from which a reasonable jury could doubt the accuracy of the outcome of Doe's disciplinary proceeding. *Cf. Univ. of Arkansas-Fayetteville*, 2019 WL 1493701, at *12 (determining plaintiff failed to sufficiently allege hearing panel's finding that he lacked credibility raised an articulable doubt on the accuracy of the hearing). Evidence regarding Conner's consultation with the Adjudicator is sufficient to generate a dispute of material fact regarding the accuracy of the outcome of Doe's disciplinary proceeding. A reasonable jury could conclude that, even though the Policy does not explicitly prohibit consultation between the appeals officer and an adjudicator, such consultation detracts from the appeals officer's independence. A reasonable jury could further conclude that Doe did not receive a fair and impartial review of his appeal and this lack of an impartial review casts doubt on the accuracy of the outcome of the disciplinary proceeding. Because the evidence regarding Doe's appeal is sufficient to demonstrate a genuine dispute of material fact as to the first prong of his erroneous outcome claim, the Court does not need to address Doe's other alleged procedural inaccuracies.

### 2.    Gender bias as a motivating factor

As for the second prong of his erroneous outcome claim, Doe alleges a reasonable jury could find gender bias was a motivating factor behind the inaccuracy in his disciplinary proceeding from four types of conduct: 1) gender-biased Title IX trainings attended by

18

decisionmakers; 2) the political climate on campus generated by campus activists; 3) the reasoning behind the determinations of responsibility in Doe's sexual misconduct case; and 4) the statistics of the outcomes of other sexual misconduct cases at Grinnell indicating Grinnell's preferential treatment of female respondents. ECF No. 129-1 at 29–39. Doe fails to show a genuine dispute of material fact as to the effect of gender bias based on Grinnell's Title IX training materials, the political climate on Grinnell's campus, or the statistics of the outcomes of other sexual misconduct cases at Grinnell. Doe does, however, demonstrate a genuine dispute of material fact regarding the reasoning behind the determinations of Doe's responsibility for sexual misconduct, particularly in light of the determination of responsibility in another sexual misconduct case at Grinnell written by the same Adjudicator. Considering this evidence, a reasonable jury could find gender bias was a motivating factor that caused an inaccuracy in Doe's disciplinary outcome. Because Doe demonstrated a genuine dispute of material fact corresponding to both prongs of his erroneous outcome claim, the Court denies Defendants' motion for summary judgment on Doe's Title IX claim.

a.    Title IX training

Doe first alleges decisionmakers Moschenross, Voos, and Asberry attended a Title IX training that "portrayed males as sexual predators and females as sexual assault victims." ECF No. 129-1 at 29–30. Doe also alleges the Adjudicator attended a separate training presentation that used material with gender-biased language. *Id.* at 30–31. The presentations in both trainings included hypothetical scenarios featuring female victims and male perpetrators. *See, e.g.*, ECF No. 129-7 at P-APP 320; Pl.'s Unsealed App. Supp. Resp. Defs.' Mot. Summ. J. P-APP at 396–99, ECF No. 129-8. However, the adjudicator training presentation also included statistics showing both men and women can be victims of sexual violence. ECF No. 129-7 at P-APP 322. The Title IX training presentation included a statement indicating Title IX

19

covers both men and women. ECF No. 129-8 at P-APP 362. The Title IX training presentation also contained definitions of sexual misconduct offenses with gender-neutral language. *Id.* at P-APP 365–70. Given the presentations' statements indicating men can also be victims of sexual assault, no reasonable jury could find the inclusion of female names in hypothetical scenarios in training materials reveals gender bias. *See Doe v. Colgate Univ.*, 760 F. App'x 22, 31 (2d Cir. 2019) (unpublished) (concluding Title IX training presentations that used female pronouns for victims were insufficient evidence of gender bias); *Doe v. Univ. of Denver*, No. 16–cv–00152–PAB–KMT, 2018 WL 1304530, at *10 (D. Colo. Mar. 13, 2018) (concluding defendant's training presentations were gender-neutral and thus did not give rise to gender bias).

Grinnell's training materials are distinguishable from those at issue in *Doe v. Washington & Lee*, No. 6:14–CV–00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015). There, a university decisionmaker cited an article during a presentation "posit[ing] sexual assault occurs whenever a woman has consensual sex with a man and regrets it." *Washington & Lee*, 2015 WL 4647996, at *10. The United States District Court for the Western District of Virginia found the training materials citing that article supported a plausible allegation that the decisionmaker held gender-biased views. *Id.* Here, the use of female pronouns and names in the examples in the training presentations may reflect the reality that more complainants are female than male—but it does not reveal gender bias. *See Colgate Univ.*, 760 F. App'x at 31 ("There is no indication [the Title IX Coordinator's] use of such pronouns reflects anything more than the statistical reality that most respondents are men and most complainants are women."). Grinnell's training materials contain inclusive and gender-neutral information. No reasonable jury could find the training materials demonstrated gender bias.

20

b.    Campus climate

Doe also alleges events at Grinnell in the years prior to his disciplinary process provide evidence of "tremendous pressure to protect female sexual assault victims and issue harsher sanctions against male respondents." ECF No. 129-1 at 38. Doe argues the advocacy by the student group Dissenting Voices, the criticism in the *Huffington Post*, the Office of Civil Rights investigation, and the revision of the sexual misconduct policy all demonstrate Grinnell was motivated by gender bias during Doe's disciplinary process. *Id.* at 34–37. Doe does not provide evidence, however, that the decisionmakers in his case considered the opinions of Dissenting Voices, the criticism in the press, or the investigation by the Office of Civil Rights in coming to their conclusions in his disciplinary proceeding. Moreover, Doe fails to provide evidence that any of these external circumstances—if they had been considered—would have resulted in gender bias affecting Doe's disciplinary proceeding. For example, Grinnell made changes to its policy in the wake of the activism of Dissenting Voices—but all of the changes it made were gender neutral. *See* ECF No. 129-7 at P-APP 347–49 (letter from Grinnell's President noting changes to the Policy included establishing an external adjudicator model, increasing the length of time to retain recordings, and requiring more training for campus safety staff members).

The Court concludes no reasonable jury could find the evidence of Grinnell's reform of the sexual misconduct disciplinary process—which reflected a national trend—shows gender bias affected the outcome of Doe's disciplinary proceeding. Other courts have reached similar conclusions. In *Colgate*, for example, the Second Circuit held student activism events on campus similar to those held by Dissenting Voices and interaction with the Office of Civil Rights were insufficient to show gender bias. 760 F. App'x at 30. In *Doe v. Trustees of Boston College*, the First Circuit held the "outside pressure" from the Office of Civil Rights did not itself "reflect[ ] or espouse[ ] gender bias" and thus could not influence the decisionmakers. 892 F.3d 67, 91, 92

**A664**

(1st Cir. 2018). In *Doe v. University of Colorado, Boulder ex rel. Board of Regents of University of Colorado*, the United States District Court for the District of Colorado found "pressure from the federal government to investigate sexual assault allegations more aggressively—either general pressure exerted by [an Office of Civil Rights publication] or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men." 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017). As in those cases, there is no evidence Grinnell's campus climate resulted in gender bias in Doe's disciplinary proceeding.

<p style="text-align:center">c.    Determinations of responsibility in Doe's case</p>

Doe next asserts the analysis in the determinations of responsibility concluding he violated the Policy, which Grinnell relied upon to dismiss him, "reflect . . . outdated and discriminatory views of male and female roles in heterosexual relationships which impacted [the] credibility determinations." ECF No. 129-1 at 32. Doe alleges the determinations of responsibility were influenced by the "belief that females are incapable of asserting themselves in sexual situations with male counterparts." *Id.* In response, Defendants argue no reasonable jury could conclude the determinations contain evidence of intentional sex bias, in part because the determinations "do not mention sex or make any assumptions about responsibility or the facts." ECF No. 141 at 10. Instead, Defendants argue, Doe's characterization of the determinations is an attempt "to second-guess [the Adjudicator]'s sincere belief that [Doe] sexually assaulted two students." *Id.*

One court has concluded, at the motion to dismiss stage, that gender bias can be inferred when decisionmakers employ "outdated and discriminatory views of gender and sexuality." *Marymount Univ.*, 297 F. Supp. 3d. at 585–86 (concluding a hearing panel member's statement insinuating men are aroused during nonconsensual contact plausibly supported a minimal inference of sex bias). Doe points to specific portions of the determinations of responsibility he

**A665**

claims are evidence of the influence of gender bias. For example, Doe claims the determination in Complainant #1's case arbitrarily found Complainant #1's side of the story more credible and made unwarranted assumptions about Complainant #1 being naïve and sexually inexperienced. *See* ECF No. 129-1 at 32–33. As for the determination in Complainant #2's case, Doe argues, among other inaccuracies, the determination of responsibility wrongfully found Complainant #2 was coerced into having sex with Doe without analyzing evidence in the record showing her choice to have sex was voluntary. *See id.* at 33–34. Doe also argues the determination in Complainant #2's case reveals evidence of gender bias because it concludes Doe must have coerced Complainant #2 into consenting to sex, in part, because Complainant #2 reported she was not on birth control during the encounter. *Id.* at 34.

For the reasons discussed below, a jury could—but need not—find gender bias caused an inaccuracy in Doe's disciplinary outcome. The Court concludes Doe has presented sufficient evidence from which a reasonable jury could deduce the determinations of responsibility relied upon by Grinnell to dismiss Doe were based on a biased perspective regarding the behavior of women during sexual encounters. *See Marymount Univ.*, 297 F. Supp. 3d. at 585–86. The Court now addresses portions of the determination of responsibility in Complainant #2's case.[6] The Court concludes the facts Doe proffers related to the analysis and reasoning contained in the determination of responsibility in Complainant #2's case are sufficient to generate a genuine dispute of material fact as to gender bias in Doe's disciplinary proceeding.

First, Doe has produced evidence that the determination of responsibility in Complainant #2's case did not note some of Complainant #2's statements to the investigators that

---

[6] The Court finds the facts relevant to Complainant #2's case demonstrate a genuine dispute of material fact so that the jury could find for Doe on his erroneous outcome claim. Therefore, the Court does not need to analyze the arguments Doe asserts as to the gender bias regarding Complainant #1's complaint or other aspects of the disciplinary proceeding.

23

weigh against the determination's conclusion that Complainant #2 was coerced into consenting to sex with Doe.[7] The determination states: "[A] preponderance of the evidence shows that [Doe]'s sustained pressure on [Complainant #2] coerced her to acquiesce to sexual intercourse that she did not want and to which she would not otherwise have submitted." ECF No. 131-12 at P-APP 1114. But the determination does not analyze, consider, grapple with, or even note the following statements made by Complainant #2 to investigators:

- "And I just remember thinking like well maybe—maybe if I just like do it, if I just like kiss him—or I don't know—like—he'll leave me alone and I'll just go to sleep. And I should have just stopped and left . . . but I turned back towards him and was like I—I responded—I like kissed him." ECF No. 131-6 at P-APP 820.

- "I guess I just felt like fine, it's just sex, but I just didn't really want to do it." *Id.*

- "I remember like to a certain extent like being like well I'll just get this over with." ECF No. 131-7 at P-APP 823.

- "Yeah, I just kinda figured if [I] get it over with—then he would just leave me alone." ECF No. 131-9 at P-APP 915.

The determination only notes Complainant #2 said she was "passive," that she "just wanted it to be done," and she tried to "zone out." ECF No. 131-12 at P-APP 1114.

The Policy states "[c]oercion can include unreasonable and sustained pressure for sexual activity . . . . A person's words or conduct cannot amount to coercion unless they wrongfully impair the other's freedom of will and ability to choose whether or not to engage in sexual activity." ECF No. 129-7 at P-APP 253. The determination of responsibility concluded Doe coerced Complainant #2 into acting against her free will. *See* ECF No. 131-12 at P-APP 1113 ("[Doe] applied 'unreasonable and sustained pressure' that 'wrongfully impair[ed] [Complainant

---

[7] The Court does not suggest a jury consider Complainant #2's statements for their truth. But evidence of Complainant #2's statements may be admissible at trial in order for the jury to consider why the statements were not incorporated into the determination of responsibility.

#2's] freedom of will and ability to choose whether or not to engage in sexual activity." (second alteration in original)). But the determination failed to engage with the evidence in the record indicating Complainant #2 *chose* to engage in sexual activity—even if she was motivated only by a desire to "get [it] over with." *See* ECF No. 131-7 at P-APP 823. Instead, the determination described Complainant #2's actions as a way to "passively allow[ ]" Doe to have sex with her. ECF No. 131-12 at P-APP 1114. The determination's omission of some parts of the investigation record provides evidence sufficient to demonstrate a dispute of material fact as to gender bias.

A reasonable jury could draw different conclusions from the omissions in the determination of responsibility. One reasonable conclusion is that the determination was influenced by the gendered assumption that a woman would not consent to sex she felt was meaningless, and thus Complainant #2's statements that did not conform to this assumption were omitted. Another reasonable conclusion is that the evidence in the investigation report showed Doe coerced Complainant #2 into having sex and the inclusion of all of Complainant #2's statements in the determination would have been unnecessary. Because a jury could reach these opposite conclusions, Doe has produced evidence exposing a genuine issue of material fact. A jury need not find the lack of analysis of some of Complainant #2's statements proves that gender bias affected Doe's disciplinary proceeding—but a reasonable jury could.

Second, Doe has provided evidence the determination relied on Complainant #2's lack of birth control to support its finding of coercion. This evidence also results in a genuine dispute of material fact from which a reasonable jury could deduce gender bias caused an inaccuracy in Doe's disciplinary proceeding. The determination of responsibility states: "[Complainant #2's] supply of birth control pills had run out while she was in Grinnell, and this fact supports her assertion that she did not want to have sexual intercourse with [Doe]." ECF No. 131-12 at P-APP 1114.

25

**A668**

Considering this statement, a reasonable jury could conclude the determination of responsibility was influenced by the assumption that a woman without birth control would not consent to sex. Complainant #2 did in fact send a text message to her friend the day after the incident with Doe telling her friend she was upset about what happened in part because her birth control prescription had run out. ECF No. 131-10 at P-APP 947. However, Complainant #2 did not tell investigators that she did not consent to having sex with Doe *because* she was not on birth control. Rather, she told the investigators she had run out of her birth control prescription when explaining why she asked Doe to wear a condom—not as a reason she did not consent to sex with Doe. ECF No. 131-7 at P-APP 828 ("[S]o the reason that I freaked out when he didn't want to wear a condom is um because my birth control wasn't—like I didn't have my birth control with me.").

A reasonable jury could conclude the determination of responsibility included the information about Complainant #2 not being on birth control because the detail corroborated Complainant #2's account of the incident. A reasonable jury could also conclude the discussion of this evidence demonstrates gender bias. This latter conclusion is reasonable in light of the determination's exclusion of other evidence incongruous with common stereotypes about the typical behavior of women in sexual encounters. For example, this statement by Complainant #2, which does not conform with the common stereotype of women being more passive than men during sexual encounters, is not addressed in the determination of responsibility: "I said that he could be like more rough but like not like—just meaning like . . . like he didn't have to like take me slowly." ECF No. 131-6 at P-APP 817. Considering the exclusion of both this statement and the others previously discussed, a reasonable jury could—but need not—find the determination's reliance on Complainant #2's lack of birth control as evidence of gender bias.

Finally, Doe further demonstrates a dispute of material fact regarding the impact of gender bias on his disciplinary proceeding by providing evidence of a 2015 sexual misconduct case at

26

Grinnell adjudicated by the Adjudicator. The analysis in the determination of responsibility in the 2015 case, which found a female respondent responsible for sexual misconduct, supports Doe's assertion that there is a dispute regarding the impact of gender bias on Doe's disciplinary proceeding. The 2015 determination of responsibility, like the determination in Doe's case, considers evidence of two conflicting accounts of a sexual encounter. *See* Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 1660–67, ECF No. 131-18. The 2015 determination of responsibility notes the female respondent believed she had consent for sexual conduct with the complainant, also female, who reported she was trying to sleep when the respondent digitally penetrated her vagina. *Id.* at P-APP 1662, 1663. That determination ultimately concluded the sexual intercourse was nonconsensual and recommended a sanction for the respondent. *Id.* at P-APP 1665, 1666. But the determination of responsibility also stated: "While the conduct at issue here was indeed serious, this adjudicator believes [the respondent] mistakenly thought she was engaging in conduct that would be welcomed by [the complainant]." *Id.* at P-APP 1666. In contrast, Doe's actions are not described as mildly—even though Doe reported he believed Complainant #2 had consented to the conduct. *Compare* ECF No. 131-12 at P-APP 1113 ("A preponderance of the evidence shows that [Doe] continued to kiss [Complainant #2], to touch her, and to try to turn her toward him, notwithstanding her stated desire to sleep and her prior verbal indication that she did not want to engage in any more sexual activity."), *with* Pl.'s Sealed App. Supp. Resp. Defs.' Mot. Summ. J. at P-APP 1185, Recorded Adjudication Meeting 38:11–39:38, ECF No. 131-13 (recording of Doe explaining to the Adjudicator during his adjudication meeting he understood that Complainant #2 had consented to the conduct).

The difference between the analysis in the 2015 determination of responsibility and the analysis in Doe's determination may not be indicative of gender bias. But the differences in the

**A670**

analyses of the facts of the two cases do support a genuine dispute of material fact. It would be reasonable—although not necessary—for a jury to draw the inference that the language in the 2015 determination differed because the respondent was female.

> d.    Other sexual misconduct cases at Grinnell

The Court rejects Doe's argument that a pattern in the outcomes of the sexual misconduct cases at Grinnell generates a dispute of material fact. *See* ECF No. 129-1 at 31–32. Most of the sexual misconduct cases Doe cites involve circumstances distinct from those in Doe's case and thus are not apt comparators to reveal gender bias. Further, Doe does not allege his Title IX claim under a selective enforcement theory, and thus does not specifically allege similarly situated females were treated more favorably. *Cf. Rossley*, 342 F. Supp. 3d at 931–34.

Thus, although the outcomes of other sexual misconduct cases at Grinnell are insufficient to give rise to a dispute of material fact regarding the impact of gender bias on Doe's disciplinary outcome, the analysis in the determination of responsibility in the 2015 case discussed above—when viewed in the light most favorable to Doe's argument—constitutes such a dispute.

> e.    Conclusion

The Court recognizes the dearth of case law finding genuine disputes of material fact regarding gender bias reflected in an educational institution's disciplinary process. Many courts have found in favor of defendants on erroneous outcome claims, finding the plaintiffs failed to proffer specific evidence demonstrating genuinely disputed material facts regarding gender bias in the defendants' decision-making processes. *See Ayala v. Butler Univ.*, No. 1:16-cv-01266-TWP-DLP, 2018 WL 5117292, at *8 (S.D. Ind. Oct. 19, 2018) (holding evidence of questions by hearing panel members about consent "did not directly show any gender bias nor did they imply any gender bias"); *Rossley*, 342 F. Supp. 3d at 926–28; *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 133–34 (D.D.C. 2018) (holding

28

"a *plausible* inference [of gender bias] is not sufficient to show likelihood of success on the merits as required for a preliminary injunction" (emphasis added)); *Univ. of Denver*, 2018 WL 1304530, at *11–12 (reasoning a decisionmaker's determination that the female complainant was more credible than the male respondent, among other deficiencies in the disciplinary proceeding, did not reveal gender bias); *Colgate Univ.*, 760 F. App'x at 31–32 (reasoning a decisionmaker's assessment of complainant's memory did not evince gender bias). These cases, however, are distinguishable. For example, in *Rossley*, this Court found the plaintiff provided only conclusory statements—and no actual evidence—to support his argument that the defendant university viewed the evidence in his sexual misconduct disciplinary proceeding through a gender-biased lens. 342 F. Supp. 3d at 926. Here, in contrast, Doe has generated a dispute of material fact by pointing to specific omissions in the determination of responsibility in Complainant #2's case that could lead a jury to conclude the determination was motivated by gender bias.

Thus, the Court finds Doe has provided evidence to show a dispute of material fact so that a reasonable jury could find for Doe on his erroneous outcome claim. Specifically, Doe has provided evidence sufficient to cast doubt on the accuracy of the outcome of his disciplinary proceeding and, further, has provided evidence suggesting that gender bias could be a motivating factor that caused the inaccuracy. Defendants' motion for summary judgment is denied as to Doe's Title IX claim.

In denying Defendants' motion for summary judgment, the Court reaches no conclusion as to the propriety of Grinnell's decision to dismiss Doe. Universities have flexibility in developing and executing their disciplinary policies. *See Univ. of St. Thomas*, 240 F. Supp. 3d at 989–90. But universities must also comply with Title IX. Here, Doe has offered sufficient evidence to show Grinnell may have failed to comply with its Title IX obligations. Whether Grinnell violated Title IX by discriminating against Doe on the basis of sex must be decided by a jury. At this

29

stage in the proceedings, the Court may not weigh that evidence against other evidence in the record—so long as there is evidence that could support a finding in Doe's favor, summary judgment is appropriate.

### B.    Breach of Contract Claim (Count III)

The Court next turns to Doe's breach of contract claim. As an initial matter, the Court must address Defendants' argument that Doe alleges new breach of contract claims in his resistance to Defendants' motion for summary judgment. *See* ECF No. 141 at 21–22. In his complaint, Doe alleges the following in his breach of contract claim, Count III:

138.    Defendant Grinnell breached express and/or implied contracts with John Doe.

139.    Defendant Grinnell's Policy provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the College to show that a violation has occurred before any sanctions are imposed. Defendant Grinnell breached its contract with John Doe when it failed to conduct a fair and impartial process, including not holding a hearing. At no time was John Doe afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser, and cross-examine and challenge any witnesses against him, all before an impartial and objective fact-finder. Thus, Defendants violated the contract with John Doe when they failed to afford him a proper hearing on the accusations against him.

140.    The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students, Defendant Grinnell utilizes this standard of review, as recognized in its Policy. Defendant Grinnell violated this provision when it improperly placed the burden of proof on John Doe to prove that the accusations against him were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching the outcome. Defendant Grinnell therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

141.    Based on the aforementioned facts and circumstances, Defendant Grinnell breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. Defendant Grinnell failed its duty of good faith and fair dealing when it meted out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct.

ECF No. 1 ¶¶ 138–141. In his resistance to Defendants' motion for summary judgment, Doe argues Grinnell breached its contract by deviating from specific aspects of the Policy. ECF No. 129-1 at 39–40. Doe lists seventeen areas of the Policy he contends Grinnell violated. *Id.* Doe claims these deviations demonstrate "Defendants acted in bad faith . . . by ignoring the express terms of the Policy, [and] by reading in terms that did not exist." *Id.* at 40–41. He argues Grinnell's failure "to carry out their roles and responsibilities under the Policy in a diligent, fair and impartial manner . . . . resulted in a severe, unwarranted and disproportionate sanction in Plaintiff's case." *Id.* at 42. Defendants ask the Court not to consider the specific deviations from the Policy alleged by Doe in his resistance, arguing his allegations are untimely because he did not initially plead them in his complaint. ECF No. 141 at 21–22.

Rule 8(a) of the Federal Rules of Civil Procedure requires that complaints contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Although the pleading requirements under Rule 8(a) are relatively permissive, the essential function of notice pleading is to 'give the defendant fair notice of what the . . . claim is and the grounds up which it rests.'" *WireCo Worldgroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992 (8th Cir. 2018) (omission in original) (emphasis omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However, "[t]he federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1219 (3d 2002 ed. & Supp. 2019); *accord Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 714 (8th Cir. 1979).

The Court determines Defendants had sufficient notice of the grounds for Doe's breach of

contract claim. In his complaint, Doe alleged Defendants breached their contract by "met[ing] out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct." ECF No. 1 ¶ 141. From the outset, Defendants were on notice of Doe's allegation that his disciplinary proceeding was unfair. Doe's broad description of his claim in his complaint did not prejudice Defendants or prevent them from adequately preparing their defense.

*WireCo Worldgroup* provides a helpful counterpoint. In that case, the Eighth Circuit affirmed the district court's decision not to consider new grounds for the plaintiff's breach of contract claim that the plaintiff raised for the first time in its resistance to the defendant's motion for summary judgment. 897 F.3d at 992–93. There, however, the Eighth Circuit noted the complaint "was specific as to the nature, bases, and grounds of [the defendant]'s alleged breaches." *Id.* at 993. The Eighth Circuit reasoned allowing a plaintiff to allege additional grounds for a breach of contract claim in its resistance to defendant's summary judgment motion would force the defendant to "intuit additional theories of liability that were not apparent from [the plaintiff's] complaint." *Id.* Here, by contrast, Doe pleaded from the beginning that Grinnell conducted an unfair and flawed disciplinary proceeding. The more specific arguments regarding the flaws in Doe's disciplinary proceeding argued in Doe's resistance should not have been unexpected to Defendants. Doe's characterization of his claims in his resistance, although more specific, are not based on new facts unfamiliar to Defendants. *Cf. J. Lloyd Int'l, Inc. v. Testor Corp.*, No. 08-CV-134-LRR, 2010 WL 605657, at *6 (N.D. Iowa Feb. 17, 2010) (declining to consider claims at the summary judgment stage not initially pleaded because they were based "on entirely different facts and theories"); *Sun Media Sys., Inc. v. KDSM, LLC*, 564 F. Supp. 2d 946, 995–96 (S.D. Iowa 2008) (same). Thus, the Court will consider the Policy deviations listed in Doe's resistance to Defendants' motion for summary judgment when resolving Doe's breach of

contract claim.

Under Iowa law, to prevail on a breach of contract claim, a plaintiff must prove: 1) the existence of a contract; 2) the terms and conditions of the contract; 3) that the plaintiff has performed all the terms and conditions required under the contract; 4) the defendant's breach of the contract in some particular way; and 5) that the plaintiff has suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). Iowa law recognizes an implied covenant of good faith and fair dealing in all contracts. *See Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014); *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Am. Tower, L.P. v. Local TV Iowa, LLC*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011) (quoting 13 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 38.15 (4th ed. 2000) (hereinafter "Williston on Contracts")).

The parties do not dispute the Policy served as a contract between Grinnell and Doe containing terms and conditions relevant to the present dispute. *See* ECF No. 100 at 26; ECF No. 129-1 at 39–42. Nor do the parties dispute the Policy contained an implied covenant of good faith and fair dealing. There is a factual dispute, however, over whether Grinnell breached the contract and, if so, whether Grinnell's breach caused Doe to suffer damages. The Court concludes that dispute is both genuine and material to Doe's claim.

In general, the terms of a contract "will be strictly construed if the words are clear and unambiguous." *SDG Macerich Props., L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 586 (Iowa 2002); *see also Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (finding the terms of a financial aid agreement between a student and university were unambiguous and did not contain

33

an implicit right for the student to play basketball). Under the doctrine of substantial performance, however, a party can fulfill its obligations under a contract with a performance that, "despite deviations from the contract requirements, provides the important and essential benefits of the contract to the promisee." *SDG Macerich Props.,* 648 N.W.2d at 586 (quoting an earlier edition of 17B C.J.S. *Contracts* § 801 (2019)); *see also Union Pac. R.R. Co. v. Cedar Rapids & Iowa City Ry. Co.*, 477 F. Supp. 2d 980, 991 (N.D. Iowa 2007) ("The Iowa Supreme Court has recognized that there may be situations in which substantial performance of a contract term will suffice."). Generally applied in disputes overs construction contracts, "[t]he doctrine . . . excuses contractual deviations or deficiencies which do not severely impair the purpose underlying a contractual provision." *SDG Macerich Props.*, 648 N.W.2d at 586. "In the area of contracts, '[s]ubstantial performance is performance without a material breach, and a material breach results in performance that is not substantial.'" *Flynn Builders, L.C. v. Lande*, 814 N.W.2d 542, 546 (Iowa 2012) (alteration in original) (quoting II E. Allan Farnsworth, *Farnsworth on Contracts* § 8.16 (3d ed. 2004)).

The Eighth Circuit has recognized the doctrine of substantial performance as applicable to non-construction breach of contract claims under Illinois state law, even though Illinois courts, like Iowa courts, typically apply the doctrine to construction disputes. *See In re Interstate Bakeries Corp. v. Interstate Brands Corp.*, 751 F.3d 955, 963 (8th Cir. 2014) ("[W]e are not convinced that Illinois law limits consideration of the doctrine of substantial performance to construction cases."). The Court thus considers the doctrine of substantial performance in analyzing Doe's breach of contract claim.

Doe alleges specific ways Grinnell deviated from its contract with Doe. *See* ECF No. 129-1 at 39–40. Doe provides evidence that the following deviations—among others—occurred during his disciplinary proceeding: Moschenross did not participate in the decision to pursue informal

34

resolution of Complainant #1's complaint, *see* Moschenross Dep. 54:18–55:11, 60:3–6, ECF No. 131-4 at P-APP 628, 630; *see generally* ECF No. 129-7 at P-APP 272; Moschenross did not participate in the decision to pursue formal resolution of the complaints against Doe, *see* Moschenross Dep. 65:17–25, ECF No. 131-4 at P-APP 632; *see generally* ECF No. 129-7 at P-APP 267; Moschenross did not participate in the decision to consolidate Complainant #1's and Complainant #2's complaints into one investigation, *see* Moschenross Dep. 69:4–22, ECF No. 131-4 at P-APP 633; *see generally* ECF No. 129-7 at P-APP 276; the Notice of Investigation Doe received did not accurately indicate the conduct for which he was being investigated, *see* ECF No. 131-19 at P-APP 1725; ECF No. 131-5 at P-APP 708; *see generally* ECF No. 129-7 at P-APP 274; Doe was told he could only have one support person during his interview with the investigators while Complainant #2 was allowed to have two support people present during her interview, *see* Voos Dep. 111:15–18, ECF No. 131-2 at P-APP 487; ECF No. 131-3 at P-APP 564; ECF No. 131-6 at P-APP 801–03; *see generally* ECF No. 129-7 at P-APP 272; the Adjudicator did not meet with investigators to discuss Doe's case, *see* Norton Dep. 46:3–6, ECF No. 131-5 at P-APP 696; *see generally* ECF No. 129-7 at P-APP 280; Complainant #1's adjudication meeting occurred before the final investigation report was issued, *see* ECF No. 131-11 at P-APP 1102 (noting the Adjudicator met with Complainant #1 on June 3, 2016); ECF No. 131-4 at P-APP 681 (investigation report dated June 6, 2016); *see generally* ECF No. 129-7 at P-APP 278–80; and Complainant #1 was allowed to submit comments on the preliminary investigation report several days late, after the final investigation report had already been issued and after she met with the Adjudicator, *see* ECF No. 131-4 at P-APP 679; *see generally* ECF No. 129-7 at P-APP 277.

Defendants argue Doe's claim fails because Grinnell nonetheless substantially performed the contract. Defendants do not deny, however, Grinnell deviated from the Policy during Doe's disciplinary proceeding. Defendants do not dispute, for example, that Complainant #1 had more than one support person at her meeting with investigators, that Grinnell gave Complainant #1 flexibility in scheduling her adjudication meeting and submitting her impact statement, that Moschenross was not involved in the disciplinary process at certain points, and that the Adjudicator did not meet with investigators. *See* ECF No. 141 at 23. Instead, Grinnell argues "[n]one of the alleged errors frustrated the purpose of his disciplinary process—to investigate and adjudicate the claims of misconduct—or [Doe]'s protections under that Policy." *Id.* Further, Defendants argue, the Policy allows for flexibility and does not require stringent compliance with its terms. At the hearing on this motion, Defense counsel pointed out, as an example of the Policy's flexibility, that the timeframe for scheduling adjudication meetings can be extended for good cause. Mot. Summ. J. Hr'g Tr. 60:21–61:2, ECF No. 149 at 60–61; *see* ECF No. 129-7 at P-APP 278.

The Court concludes there is a factual dispute over whether Defendants' deviations from the Policy amounted to a breach of contract that caused Doe to suffer damages. Defendants claim the deviations identified by Doe are immaterial and Grinnell still substantially performed the contract; Doe claims the deviations denied him essential benefits of the contract. "There is no ready formula for determining what amounts to substantial performance in any particular case. Precise boundaries cannot be drawn, since the question turns on the facts of each case." 15 Williston on Contracts § 44:54. "Whether there has been substantial performance of a contract is ordinarily a question of fact for the jury to resolve." 17B C.J.S. *Contracts* § 1035 (2019). Resolving all factual disputes in favor of Doe, the nonmoving party, the Court cannot grant Defendants' motion for summary judgment. A reasonable jury could find Grinnell's deviations

36

**A679**

from the contract did not prevent Grinnell from fulfilling the essence of its contractual duties and did not affect Grinnell's ultimate decision to dismiss Doe. Alternatively, a reasonable jury could also determine Grinnell's deviations, considered in the aggregate, made the disciplinary proceedings unfair to Doe and thus amounted to a material breach of the contract that caused him harm. Because the facts in the record could reasonably sustain either determination, Doe's breach of contract claim should be decided by a jury.

Because there are underlying factual disputes that cannot be resolved by the Court on summary judgment, the Court denies Defendants' motion for summary judgment on Doe's breach of contract claim.

### C.    Promissory Estoppel Claim (Count IV)

Under Iowa law, "[t]he theory of promissory estoppel allows individuals to be held liable for their promises despite an absence of the consideration typically found in a contract." *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 48 (Iowa 1999). In order to establish a claim for promissory estoppel, a plaintiff must show:

> (1) [A] clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Schoff*, 604 N.W.2d at 49. A defendant may not be held liable, however, for a representation—that is, "a statement . . . made to convey a particular view or impression of something with the intention of influencing opinion or action." *Id.* at 51 (omission in original) (quoting *Webster's Third New International Dictionary* 1926 (1993)). And, because promissory estoppel is a form of equitable relief and applies only where a contract otherwise does not exist, a plaintiff may only assert a claim of promissory estoppel if the promise at issue is not already encompassed by a written and formal contract. *See, e.g.*, *PFS Distrib. Co. v. Raduechel*,

37

574 F.3d 580, 599 (8th Cir. 2009). Finally, Iowa law requires a plaintiff asserting promissory

estoppel claims to demonstrate "strict proof of all elements." *Nat'l Bank of Waterloo v. Moeller*,

434 N.W.2d 887, 889 (Iowa 1989).

Doe contends he "relied to his detriment on [the] express and implied promises and

representations made by Defendant Grinnell." ECF No. 1 ¶ 147. Doe asserts Grinnell made the

following promises—which he alleges are beyond the express provisions of the Policy—that he

relied upon to his detriment: 1) Doe received a Notice of Investigation that stated he was being

investigated for only one incident of nonconsensual sexual conduct with Complainant #1 and the

investigation report ultimately contained references to two incidents; 2) Doe was given a resource

card with information about counseling services but it only included resources for those who had

experienced sexual assault, not those accused; 3) Doe was told he could only bring one support

person to his meeting and Complainant #1 brought two; 4) Doe was provided with deadlines with

which he complied and Complainant #1 did not comply; and 5) Doe was told by the Adjudicator

during his adjudication meeting that she was not testing his memory but then cited

Complainant #1's memory as a sign of credibility. *See* ECF No. 129-1 at 42–43.

The undisputed facts show Doe's estoppel claim fails as a matter of law. Doe does not

provide examples of clear and definite promises upon which Defendants knew Doe would rely.

The statements Doe calls promises are representations, which under Iowa law, cannot sustain a

promissory estoppel claim. *Schoff*, 604 N.W.2d at 51; *see also Newkirk v. GKN Armstrong

Wheels, Inc.*, 168 F. Supp. 3d 1174, 1190 (N.D. Iowa 2016) ("A claim for promissory estoppel

cannot lie on a mere representation.").

For example, when Doe was told there was only one incident of sexual misconduct with

Complainant #1 alleged against him in the Notice of Investigation, that statement conveyed a

representation of a specific fact, but not a promise to Doe. The same logic applies to Defendants'

38

# A681

statements about the resources available to Doe, the rules about the support persons and the deadlines, and the Adjudicator's instructions to Doe during his adjudication meeting—all these were representations made to Doe about the disciplinary process, not clear and definite promises to invoke Doe's reliance. In other words, the conduct Doe alleges is irrelevant to an estoppel claim. *See Anderson*, 477 U.S. at 248. ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

Concluding Doe cannot prove the first element of a promissory estoppel claim, the Court need not consider the other elements. Doe's promissory estoppel claim fails as a matter of law. The Court grants summary judgment to Defendants on Doe's promissory estoppel claim.

### D.    Negligent Misrepresentation Claim (Count V)

Doe alleges Grinnell, Moschenross, Voos, and Asberry are liable for the tort of negligent misrepresentation under Iowa law. ECF No. 1 ¶¶ 150–155. Doe asserts the information Defendants provided him regarding the status of Complainant #1's case against him during his November 2015 meeting with the Title IX Office was false. ECF No. 129-1 at 43–44.

"[W]hen the negligent misrepresentation only interferes with intangible economic interests, courts have developed more restrictive rules of recovery." *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012) (quoting *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 690 (Iowa 2010)). When intangible economic interests are at stake, as they are here for Doe, a defendant is liable for the tort of negligent misrepresentation if:

> (1) [T]he defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that

39

the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff.

*AT&T Corp. v. Aventure Commc'n Tech., LLC*, 207 F. Supp. 3d 962, 1021 (S.D. Iowa 2016) (alteration in original) (quoting *Boliver v. Kester*, No. 15–1973, 2016 WL 4384369, at *3 (Iowa Ct. App. Aug. 17, 2016)). Liability for negligent misrepresentation is not confined to traditional commercial transactions. *See Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 126 (Iowa 2001). An individual who acts as an advisor, such as a school guidance counselor, can be liable for supplying false information. *Id.* However, an individual will not be liable simply for providing "personal opinions or statements of future intent" to a plaintiff. *Id.* at 127. The information provided must actually be false. *Id.*

Doe asserts Voos told him "she intended to reach a mutual agreeable resolution with the parties" and "[Complainant #1] was not pursuing conduct at th[e] time [of the November 2015 meeting]." ECF No. 129-1 at 43 (citing ECF No. 131-2 at P-APP 537–40; ECF No. 131-19 at P-APP 1717). Doe contends these statements were false. *Id.* at 44. He argues these statements made him believe the allegations by Complainant #1 would be informally resolved, and Grinnell "would take no further action in regard to [Complainant #1's] report." ECF No. 1 ¶ 151; *see also* Mot. Summ. J. Hr'g Tr. 53:20–55:6, ECF No. 149 at 53–55. Defendants argue, even if Doe had the impression Complainant #1's allegations would be permanently resolved with an informal resolution, Voos did not tell Doe so—Voos only expressed her prospective hope that a resolution would be reached at the disciplinary meeting. ECF No. 100 at 29–30; Mot. Summ. J. Hr'g Tr. 28:6–19, ECF No. 149 at 28.

The Court concludes the undisputed facts demonstrate Defendants did not provide Doe with false information as required to sustain a negligent misrepresentation claim under Iowa law. Voos's statement regarding her desire to reach a mutually agreeable resolution is a statement of

**A683**

future intent. Statements of future intent do not qualify as false information for purposes of a negligent misrepresentation claim. *Sain*, 626 N.W.2d at 127. As for Voos's statement regarding Complainant #1's decision not to pursue further discipline, there is no genuine dispute regarding the truth of that statement. Voos told Doe during the meeting that Complainant #1 did not wish to pursue a formal resolution "at this time." ECF No. 131-2 at P-APP 537. There is no evidence Voos said anything to Doe about Grinnell's future plans regarding his discipline or that the informal resolution would be final. Defendants' later decision to consolidate Complainant #1's complaint with Complainant #2's complaint and to pursue formal resolution does not render Voos's statement about Complainant #1's decision false.

Because the undisputed facts show Defendants did not provide Doe with false information, the Court does not need to consider the remaining elements of negligent misrepresentation. There is no triable question of fact regarding Doe's negligent misrepresentation claim. His claim fails as a matter of law. The Court grants summary judgment to Defendants on Doe's negligent misrepresentation claim. Defendants Moschenross, Voos, and Asberry are dismissed as parties to this case.

## V. CONCLUSION

The Court grants in part and denies in part the Motion for Summary Judgment filed by Defendants Grinnell College, Sarah Moschenross, Angela Voos, and Bailey Asberry. The Court concludes there are disputes of material fact regarding the accuracy of the outcome of Doe's disciplinary proceeding and whether that inaccuracy was caused by gender bias. The Court denies Defendants' motion for summary judgment on Doe's Title IX claim, Count II. The facts as to whether Grinnell substantially performed its contractual duties or breached its contract so that Doe suffered damage are genuinely disputed. Because the material facts regarding Doe's breach of contract claim are in dispute, the Court denies Defendants' motion for summary judgment as to

Doe's breach of contract claim, Count III.

The material facts of Doe's estoppel claim and his negligent misrepresentation claim are not disputed. The undisputed facts demonstrate Grinnell did not make clear and definite promises to Doe that he relied upon to his detriment. The undisputed facts also show Defendants did not provide Doe with false information. Thus, the Court grants Defendants' motion for summary judgment on Doe's estoppel and negligent misrepresentation claims, Counts IV and V.

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 94, is **GRANTED IN PART AND DENIED IN PART**.

Based on the Court's ruling, the Clerk is directed to terminate the following parties as defendants: Sarah Moschenross, Angela Voos, and Bailey Asberry. No counts remain naming them as defendants.

**IT IS SO ORDERED.**

Dated this 9th day of July, 2019.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE

**EXHIBIT 13**

**COMPLAINT**

**POSSIBLE ACT OF MISCONDUCT UNDER STUDENT CONDUCT CODE AND VIOLATION OF SECTION X OF POLICY 1202**

Name of Student Referred: ████████████

Referred By/Complaining Individual: ████████████

Date of the Alleged Violation: November 2018

Violation Discovered: February 22, 2019

Description of the Alleged Misconduct:

The basis for my complaint is that ████████ violated the Code of Student Conduct by committing acts of dishonesty when she knowingly furnished false information, and fabricated a false narrative of harm, when filing a sexual harassment complaint against me with the Office of Compliance, Diversity and Ethics ("CDE") in Fall 2018. ████████ also violated Section X of Policy 1202 by "providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct."

████████ allegations go as far back as 2016, yet, to my knowledge, she provided no viable explanation for the nearly two-year delay in reporting. I believe that ████████ also solicited reports from three other graduate students—two of whom had already graduated—in order to fabricate a pattern of conduct that did not exist.

████████ further engaged in misconduct when embellishing these allegations, and changing her account, prior to CDE's issuance of a Letter of Determination erroneously finding me responsible for sexual harassment. I learned of the new allegations on February 22, 2019 and was only able to address them as part of my appeal of the finding, which I submitted to CDE on March 28, 2019. The totality of the allegations against me, which are unsupported by any behavioral evidence, are also the subject of my appeal.

████████ had a potential motive for filing a misleading or false report against me—in September 2018, I relieved her of her duties in my lab. Her curriculum vitae primarily lists research that she conducted in my lab. Consequently, her current and future employers, or others, could reach out to me as a reference. ████████ concerns about what I might say about her declining performance in the lab—including her removal—could be behind her report. To my knowledge, this was not explored by CDE.

I make this complaint in good faith, and it is supported by the evidence I submitted to CDE during the course of its Title IX investigation and in support of my appeal.

**A687**

CONFIDENTIAL

I.    **Background**

Since the Fall of 2017, ██████████ has been, and is currently, a graduate student in the ██████████████████████. She was initially accepted into the ████████ ████████ program in the Fall of 2015. For approximately two years, she worked in my laboratory. The bulk of ████████████ research in my lab concerned emotion and human sexuality. In particular, she was a co-author on a long-term project to study physically pleasurable sexual activity, including orgasms:

Prior to this publication, ████████████ also served as co-author on a publication concerning the influence of physical touch, intimate and non-intimate, on human emotions:

████████ was also co-author on a conference talk on these topics:

As a researcher who studies sexuality, and as part of months of work with ████████ on presentations and a publication related to ████████████████, we talked about sexuality. I talked about sexuality with students working with me on sexuality-related scientific research. We talked about recent articles, podcasts and books concerning sexuality, including recent science on pornography that I shared with students, detailed ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████. One of my students (it might have been ██████████) recommended an episode of ████████████. We each listened to it on our own and discussed the details, relating it back to our research program. This is what we do, collect, analyze, and discuss data. You must talk about the things you study and use real-world context to dissect and deconstruct, to aid in research questions and thinking about the topic. ████ ████████ and I had hundreds of hours of conversation, and a small portion of this was on sexuality related topics.

████████ touted the research we conducted on sexuality ████████████ ████████████. She regularly praised the lab and its culture. She told me that she was "unbelievably proud and grateful to be part of this lab family." In a self-evaluation in April 2018,

2

**CONFIDENTIAL**

████████ wrote that the lab provided her with the opportunity to "understand and be understood," skills that "will serve me in my career to change people's lives," "Friends with whom I can discuss anything" and "unforgettable memories." When interviewing for jobs in Spring 2018, ████████ texted me "thank you so much. I wouldn't even be interviewing at these places if it weren't for you and the badass experiences we get as grad students through you. And more yet to come." These types of communications were the norm. At no point in time did ████████ express discomfort with any conversations that we had, or that were the topic of the lab group's conversations.

In May 2016, ████████ also wrote a letter to a fellow graduate student recounting her experiences after one year in my lab. The letter was laden with expletives—including addressing her female colleague as "Dude/chief/yo bitch"—and intimate associations that ████████ subjectively attributed to working in the lab. ████████ regularly communicated with the lab group in this manner. ████████ talked about sex from the time of her graduate interview—where she volunteered her sexual orientation—onward.[1]

In the Spring of 2017, ████████ expressed a growing disinterest in ████████ and decided to switch into the ████████ program at George Mason University. She wanted ████████ to serve as a potential mentor. ████████ spoke with me, as ████████ primary mentor, and ████████, as her secondary mentor, in the ████████ to determine why she wanted to leave and if there were any issues. Both ████████ and myself told ████████ that ████████ was an average student with some issues in writing and completing projects, but said that this might be a result of ████████ disinterest in ████ work. ████████, with some reluctance, accepted ████ as her advisee in the program. ████████ continued to work in my lab until September 2018, though ████████ served as her advisor.

In September 2018, after some discussion with ████████ about her lack of commitment to my lab's ongoing research, I dismissed her from the lab. While part of the lab, ████████ had problems getting her work done and often attempted to take more credit for authorship than her colleagues believed she deserved. Prior to her dismissal from my lab, ████████ also worked for many months as a co-author of a paper I recently submitted for publication, ████████. ████████ was informed that she was being removed as an author due to her lack of work and commitment, which she acknowledged.

As part of my lab, ████████ was given credit as a co-author on five published articles and three conference presentations. She never earned first authorship because she never completed any project that she led. During the time that she worked in my lab, ████████ also received funding from 2 consulting projects to conduct research, with ████████. ████████ work on the ████████ project was criticized by a graduate student who

---

[1] These communications have been submitted to CDE as part of my appeal. I am happy to provide a copy of this evidence to the Office of Student Conduct upon request. I did not provide them, here, because I did not want to violate any University rules concerning confidentiality in Title IX proceedings.

# A689

**CONFIDENTIAL**

worked on it with her and thought that ▮▮▮▮▮ should not be lead author because she did not do enough of the work.

▮▮▮▮▮ obtained an internship in California for Summer 2018 because of her work in my lab. I wrote her primary reference for that job. Over the Summer of 2018, ▮▮▮▮▮ told me that she had been offered a job with the same company after graduation. She was enthusiastic and expressed her gratitude for the opportunities I had given her and for assisting her in getting the job through my letter of reference.

In Fall 2018, I was shocked to learn that ▮▮▮▮▮ had made a complaint against me because at all times we had a positive, professional relationship. As set forth above, ▮▮▮▮▮ expressed her gratitude and enthusiasm for working in the lab. ▮▮▮▮▮ asked me to meet her father when he planned a campus visit in 2018, which I did. The three of us had lunch at the campus cafeteria. Later in the year, in April of 2018, ▮▮▮▮▮ asked me to meet her mother when she planned a campus visit, which I did. We attended a conference in August 2018 in ▮▮▮▮▮ California with two other graduate students. At this conference, she asked me to help her to negotiate her job salary and benefits with the company, which I did. That was our last face-to-face interaction. Yet, afterwards she continued to communicate with me in a positive manner, with no indication that she was upset or uncomfortable in any way.

**II.**    **▮▮▮▮▮    False and/or Misleading Allegations**

The following table outlines ▮▮▮▮▮ allegations and the reasons why they provide no basis for a sexual harassment claim against me.

| ▮▮▮▮▮ **ALLEGATIONS PER CDE'S NOTICE OF INVESTIGATION** | **COMMENTS** |
|---|---|
| "*On December 9, 2016, you invited the graduate students from your lab to your house, for drinks and hot tubbing at your home. You shared stories about your sexual experiences at a large brothel house in Germany.*" | ▮▮▮▮▮ clarified to CDE that the students were not invited over for hot tubbing. They were invited to come over and spend time at his house with him and his ▮▮▮▮▮ to celebrate the end of the semester. He provided dinner at his house. As he mentioned during an interview with ▮▮▮▮▮, for part of the time, ▮▮▮▮▮ were in the hot tub with them – no different than being in a pool. <br><br> ▮▮ ▮▮▮▮▮ acknowledged that this conversation occurred as part of a lengthy conversation with his lab students on a number of different topics. ▮▮▮ ▮▮▮▮▮ actively participated in the conversation. <br><br> Within days of attending the party, ▮▮▮▮▮ sent ▮▮▮▮▮ an unsolicited email stating that she was "unbelievably proud and grateful to be part of this lab family. [H]aving you as a mentor has change the course of my entire life…thank |

4

**A690**

**CONFIDENTIAL**

| | |
|---|---|
| | you for being you. with love, ▮▮▮▮." This contradicts ▮▮▮▮ ▮▮▮▮ allegation, made nearly two years later, that her participation in this social gathering harmed her in any way or that she was uncomfortable with the conversation. |
| *"On January 20, 2017, while attending the annual* ▮▮▮ ▮ ▮▮▮ *conference, in San Antonio, Texas, you and your graduate students went to dinner and then to the bar, Howl at the Moon, for drinks. You left the bar with another woman attending the conference and then provided explicit sexual details about that encounter the next day at the conference with your graduate students."* | CDE's Letter of Determination states that ▮▮▮ engaged in a mutual and voluntary conversation with his graduate students about sexual encounters that occurred on the trip. ▮▮▮ actively participated in this discussion and can allege no harm as a result. Her text messages show evidence of how she often initiates discussion about her romantic encounters. |
| *"During the first week of class in the fall of 2017, you gathered the graduate students from the lab for a gathering at Oh George! Tables & Taphouse with* ▮▮▮ *and several other students. You discussed an erotic massage you experienced in Thailand."* | CDE's Letter of Determination embellishes ▮▮▮ ▮▮▮ allegation and changes the location from Thailand to Sri Lanka.<br><br>This event did not occur. |
| *"During the spring of 2018, you asked student* ▮▮▮ ▮▮▮ *what kind of pornography she liked/watched while at Oh George! Tables & Taphouse and asked her repeatedly to provide an answer when she tried to avoid the conversation."* | The Letter of Determination changed the date of this alleged occurrence to Fall of 2017.<br><br>The Letter of Determination omits the context in which this conversation occurred. A group of graduate students and ▮▮▮▮▮ were discussing his attempts to obtain data from Pornhub for research, and discussing recent books that were published and read on the science of pornography, including *A Billion Wicked Thoughts: What the World's Largest Experiment Reveals About Human Desire* by Ogi Ogas and Sai Gaddam and *Everybody Lies: Big Data, New Data, and What the Internet Can Tell Us About Who We Really Are* by Seth Stephens-Davidowitz.<br><br>This conversation also concerned research that ▮▮▮ ▮▮▮ and ▮▮▮▮ had been conducting on deriving pleasure and meaning from sex. There is no corroborating evidence that ▮▮ ▮▮▮ repeatedly asked ▮▮▮▮. Nor did ▮▮▮▮ file a complaint. |

**CONFIDENTIAL**

| | |
|---|---|
| "*While attending a conference for the* ████ ████████████████████, *after going to dinner with your graduate students, you took your graduate students to a strip club called the Clermont Lounge. A fellow student bought a lap dance for* ██████ *which you took a photo of and made reference to future blackmail against her.*" | **The Letter of Determination excludes the following**: *you took your graduate students to a strip club called the Clermont Lounge.*<br><br>This is because ████████ ████ arranged the trip, which she had described beforehand as a "seedy bar." ████████ purchased a lap dance for ██. In a group chat the day after the trip, ████████████ stated "Thanks for dinner and everything last night…everything I could have hoped for in a first titty bar." A fellow graduate student thanked her for organizing the trip. ██ ████████ acknowledged taking a photo of ██. ████████ lap dance and joking around with her about it.<br><br>In an April 2018 email to ████████, ██ cited this trip as an unforgettable memory. In his appeal, ████████ acknowledged that, in hindsight, he should have bowed out when realizing ██████ took the group to a strip club. ████████ has arranged other trips for her fellow graduate students which involve sex-related activities, including to a sex shop in Japan. ██ ████████ was not present on this trip. |
| "*On* ██████ ████████, *California, while attending an academic conference with graduate students (*██████ *and others), you shared the details of a sexual experience you had in Hanoi, Thailand with a 24-year old woman while you were presenting a professional workshop. You also told your students your wife had "given you a free pass" to have sex with whomever you wanted while in Hanoi.*" | ████████ acknowledged that this conversation took place in the midst of several hours of conversation that he had with ██████ and two other male graduate students during the conference. The conversation was not directed at ██████. After the conference, ██████ continued to text message and group chat with ████████. She made no reference to the conversation or that she was uncomfortable. ██████ had requested one of three invitations to the conference because she was interested in attending a presentation by the leading researcher on pornography and human sexuality, ████████. |
| "*While in the campus laboratory setting, you engaged students in frequent conversations about sex and the pursuit of women as sexual vessels.*" | **The Letter of Determination excluded this allegation.** |
| "*Through favoritism, you made it clear to your students that opportunities for research, supervision, and consulting was dependent on how you viewed* | **The Letter of Determination excluded this allegation.** |

**CONFIDENTIAL**

| | |
|---|---|
| *them and if they were willing to engage in sexual conversations with them.*" | |
| "*You created a toxic, verbally abusive environment, using profanity and demeaning language with your graduate students tasked with lab management. These occurred in person, over email, and through the Slack messaging system.*" | **The Letter of Determination excluded this allegation.** |
| ████████████ **NEW ALLEGATIONS PER CDE'S LETTER OF DETERMINATION** | **Comments** |
| "████████ *said having time away from the lab and the opportunity to work in a professional environment that would never tolerate the conversation or circumstances she experienced while working for* ████. *Only now does she feel able to articulate how inappropriate the power imbalance of* ████ *mentorship was. She conveyed that the way* ████ *viewed her (including her sexual behaviors) had an effect on his decisions for how he handled graduate assistantships, authorship on papers, and consulting opportunities.*" | This statement was proven false by the evidence ████████ submitted to CDE. Evidence shows that over the course of the approximately two years that ████ worked in ████████ lab, she was given credit as a co-author on five published articles and three conference presentations. She never earned first authorship because she never completed any project that she led. During the time that she worked in the lab, ████ also received funding from two consulting projects to conduct research, with ██████. As her interests waned from ████ and moved towards working in the private sector, her lab contributions suffered and she encountered disagreement from her colleagues with respect to co-authorship and participation. Eventually, ████████ had to dismiss her from the lab because she had been focusing all of her attention on her new job and her work for the lab was suffering. |

I urge the Office for Student Conduct, in conjunction with CDE, to investigate ████ ████ reporting of false and/or misleading allegations to CDE which are simply not supported by the evidence as well as her motives for doing so.

7

**EXHIBIT 14**



### Notice of Language Assistance
### Dear Colleague Letter on Title IX Coordinators

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知：** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339)，或電郵：Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

**A695**



**UNITED STATES DEPARTMENT OF EDUCATION**

**OFFICE FOR CIVIL RIGHTS**

**THE ASSISTANT SECRETARY**

April 24, 2015

Dear Colleague:

I write to remind you that all school districts, colleges, and universities receiving Federal financial assistance must designate at least one employee to coordinate their efforts to comply with and carry out their responsibilities under Title IX of the Education Amendments of 1972 (Title IX), which prohibits sex discrimination in education programs and activities.[1]  These designated employees are generally referred to as Title IX coordinators.

Your Title IX coordinator plays an essential role in helping you ensure that every person affected by the operations of your educational institution—including students, their parents or guardians, employees, and applicants for admission and employment—is aware of the legal rights Title IX affords and that your institution and its officials comply with their legal obligations under Title IX.  To be effective, a Title IX coordinator must have the full support of your institution.  It is therefore critical that all institutions provide their Title IX coordinators with the appropriate authority and support necessary for them to carry out their duties and use their expertise to help their institutions comply with Title IX.

The U.S. Department of Education's Office for Civil Rights (OCR) enforces Title IX for institutions that receive funds from the Department (recipients).[2]  In our enforcement work, OCR has found that some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the appropriate level of authority to oversee the recipient's compliance with Title IX.  By contrast, OCR has found that an effective Title IX coordinator often helps a recipient provide equal educational opportunities to all students.

OCR has previously issued guidance documents that include discussions of the responsibilities of a Title IX coordinator, and those documents remain in full force.  This letter incorporates that existing OCR guidance on Title IX coordinators and provides additional clarification and recommendations

---

[1] 34 C.F.R. § 106.8(a).  Although Title IX applies to any recipient that offers education programs or activities, this letter focuses on Title IX coordinators designated by local educational agencies, schools, colleges, and universities.

[2] 20 U.S.C. §§ 1681–1688.  The Department of Justice shares enforcement authority over Title IX with OCR.

# A696

as appropriate.  This letter outlines the factors a recipient should consider when designating a Title IX coordinator, then describes the Title IX coordinator's responsibilities and authority.  Next, this letter reminds recipients of the importance of supporting Title IX coordinators by ensuring that the coordinators are visible in their school communities and have the appropriate training.

Also attached is a letter directed to Title IX coordinators that provides more information about their responsibilities and a Title IX resource guide.  The resource guide includes an overview of the scope of Title IX, a discussion about Title IX's administrative requirements, as well as a discussion of other key Title IX issues and references to Federal resources.  The discussion of each Title IX issue includes recommended best practices for the Title IX coordinator to help your institution meet its obligations under Title IX.  The resource guide also explains your institution's obligation to report information to the Department that could be relevant to Title IX.  The enclosed letter to Title IX coordinators and the resource guide may be useful for you to understand your institution's obligations under Title IX.

## Designation of a Title IX Coordinator

Educational institutions that receive Federal financial assistance are prohibited under Title IX from subjecting any person to discrimination on the basis of sex.  Title IX authorizes the Department of Education to issue regulations to effectuate Title IX.[3]  Under those regulations, a recipient must designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX and the Department's implementing regulations.[4]  This position may not be left vacant; a recipient must have at least one person designated and actually serving as the Title IX coordinator at all times.

In deciding to which senior school official the Title IX coordinator should report and what other functions (if any) that person should perform, recipients are urged to consider the following:[5]

### A. Independence

The Title IX coordinator's role should be independent to avoid any potential conflicts of interest and the Title IX coordinator should report directly to the recipient's senior leadership, such as the district superintendent or the college or university president.  Granting the Title IX coordinator this

---

[3] The Department's Title IX regulations, 34 C.F.R. Part 106, are available at http://www.ed.gov/policy/rights/reg/ocr/edlite-34cfr106.html.

[4] 34 C.F.R. § 106.8(a).

[5] Many of the principles in this document also apply generally to employees required to be designated to coordinate compliance with other civil rights laws enforced by OCR against educational institutions, such as Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 34 C.F.R. § 104.7(a), and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12134; 28 C.F.R. § 35.107(a).

independence also ensures that senior school officials are fully informed of any Title IX issues that arise and that the Title IX coordinator has the appropriate authority, both formal and informal, to effectively coordinate the recipient's compliance with Title IX.  Title IX does not categorically exclude particular employees from serving as Title IX coordinators.  However, when designating a Title IX coordinator, a recipient should be careful to avoid designating an employee whose other job responsibilities may create a conflict of interest.  For example, designating a disciplinary board member, general counsel, dean of students, superintendent, principal, or athletics director as the Title IX coordinator may pose a conflict of interest.

### B. Full-Time Title IX Coordinator

Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest and in many cases ensure sufficient time is available to perform all the role's responsibilities.  If a recipient designates one employee to coordinate the recipient's compliance with Title IX and other related laws, it is critical that the employee has the qualifications, training, authority, and time to address all complaints throughout the institution, including those raising Title IX issues.

### C. Multiple Coordinators

Although not required by Title IX, it may be a good practice for some recipients, particularly larger school districts, colleges, and universities, to designate multiple Title IX coordinators.  For example, some recipients have found that designating a Title IX coordinator for each building, school, or campus provides students and staff with more familiarity with the Title IX coordinator.  This familiarity may result in more effective training of the school community on their rights and obligations under Title IX and improved reporting of incidents under Title IX.  A recipient that designates multiple coordinators should designate one lead Title IX coordinator who has ultimate oversight responsibility.  A recipient should encourage all of its Title IX coordinators to work together to ensure consistent enforcement of its policies and Title IX.

### Responsibilities and Authority of a Title IX Coordinator

The Title IX coordinator's primary responsibility is to coordinate the recipient's compliance with Title IX, including the recipient's grievance procedures for resolving Title IX complaints.  Therefore, the Title IX coordinator must have the authority necessary to fulfill this coordination responsibility.  The recipient must inform the Title IX coordinator of all reports and complaints raising Title IX issues, even if the complaint was initially filed with another individual or office or the investigation will be conducted by another individual or office.  The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination.  This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate.  Such coordination can help the recipient avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents

**A698**

Page 4—Dear Colleague Letter: Title IX Coordinators

from recurring or becoming systemic problems that affect the wider school community.  Title IX does not specify who should determine the outcome of Title IX complaints or the actions the school will take in response to such complaints.  The Title IX coordinator could play this role, provided there are no conflicts of interest, but does not have to.

The Title IX coordinator must have knowledge of the recipient's policies and procedures on sex discrimination and should be involved in the drafting and revision of such policies and procedures to help ensure that they comply with the requirements of Title IX.  The Title IX coordinator should also coordinate the collection and analysis of information from an annual climate survey if, as OCR recommends, the school conducts such a survey.  In addition, a recipient should provide Title IX coordinators with access to information regarding enrollment in particular subject areas, participation in athletics, administration of school discipline, and incidents of sex-based harassment.  Granting Title IX coordinators the appropriate authority will allow them to identify and proactively address issues related to possible sex discrimination as they arise.

Title IX makes it unlawful to retaliate against individuals—including Title IX coordinators—not just when they file a complaint alleging a violation of Title IX, but also when they participate in a Title IX investigation, hearing, or proceeding, or advocate for others' Title IX rights.[6]  Title IX's broad anti-retaliation provision protects Title IX coordinators from discrimination, intimidation, threats, and coercion for the purpose of interfering with the performance of their job responsibilities.  A recipient, therefore, must not interfere with the Title IX coordinator's participation in complaint investigations and monitoring of the recipient's efforts to comply with and carry out its responsibilities under Title IX.  Rather, a recipient should encourage its Title IX coordinator to help it comply with Title IX and promote gender equity in education.

<u>**Support for Title IX Coordinators**</u>

Title IX coordinators must have the full support of their institutions to be able to effectively coordinate the recipient's compliance with Title IX.  Such support includes making the role of the Title IX coordinator visible in the school community and ensuring that the Title IX coordinator is sufficiently knowledgeable about Title IX and the recipient's policies and procedures.  Because educational institutions vary in size and educational level, there are a variety of ways in which recipients can ensure that their Title IX coordinators have community-wide visibility and comprehensive knowledge and training.

---

[6] 34 C.F.R. § 106.71 (incorporating by reference 34 C.F.R. § 100.7(e)).

Page 5—Dear Colleague Letter: Title IX Coordinators

### A. Visibility of Title IX Coordinators

Under the Department's Title IX regulations, a recipient has specific obligations to make the role of its Title IX coordinator visible to the school community.  A recipient must post a notice of nondiscrimination stating that it does not discriminate on the basis of sex and that questions regarding Title IX may be referred to the recipient's Title IX coordinator or to OCR.  The notice must be included in any bulletins, announcements, publications, catalogs, application forms, or recruitment materials distributed to the school community, including all applicants for admission and employment, students and parents or guardians of elementary and secondary school students, employees, sources of referral of applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient.[7]

In addition, the recipient must always notify students and employees of the name, office address, telephone number, and email address of the Title IX coordinator, including in its notice of nondiscrimination.[8]  Because it may be unduly burdensome for a recipient to republish printed materials that include the Title IX coordinator's name and individual information each time a person leaves the Title IX coordinator position, a recipient may identify its coordinator only through a position title in printed materials and may provide an email address established for the position of the Title IX coordinator, such as TitleIXCoordinator@school.edu, so long as the email is immediately redirected to the employee serving as the Title IX coordinator.  However, the recipient's website must reflect complete and current information about the Title IX coordinator.

Recipients with more than one Title IX coordinator must notify students and employees of the lead Title IX coordinator's contact information in its notice of nondiscrimination, and should make available the contact information for its other Title IX coordinators as well.  In doing so, recipients should include any additional information that would help students and employees identify which Title IX coordinator to contact, such as each Title IX coordinator's specific geographic region (*e.g.*, a particular elementary school or part of a college campus) or Title IX area of specialization (*e.g.*, gender equity in academic programs or athletics, harassment, or complaints from employees).

The Title IX coordinator's contact information must be widely distributed and should be easily found on the recipient's website and in various publications.[9]  By publicizing the functions and responsibilities of the Title IX coordinator, the recipient demonstrates to the school community its commitment to complying with Title IX and its support of the Title IX coordinator's efforts.

---

[7] 34 C.F.R. § 106.9.

[8] 34 C.F.R. § 106.8(a).

[9] 34 C.F.R. § 106.9.

Page 6—Dear Colleague Letter: Title IX Coordinators

Supporting the Title IX coordinator in the establishment and maintenance of a strong and visible role in the community helps to ensure that members of the school community know and trust that they can reach out to the Title IX coordinator for assistance.  OCR encourages recipients to create a page on the recipient's website that includes the name and contact information of its Title IX coordinator(s), relevant Title IX policies and grievance procedures, and other resources related to Title IX compliance and gender equity.  A link to this page should be prominently displayed on the recipient's homepage.

To supplement the recipient's notification obligations, the Department collects and publishes information from educational institutions about the employees they designate as Title IX coordinators.  OCR's Civil Rights Data Collection (CRDC) collects information from the nation's public school districts and elementary and secondary schools, including whether they have civil rights coordinators for discrimination on the basis of sex, race, and disability, and the coordinators' contact information.[10]  The Department's Office of Postsecondary Education collects information about Title IX coordinators from postsecondary institutions in reports required under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act and the Higher Education Opportunity Act.[11]

### B.  Training of Title IX Coordinators

Recipients must ensure that their Title IX coordinators are appropriately trained and possess comprehensive knowledge in all areas over which they have responsibility in order to effectively carry out those responsibilities, including the recipients' policies and procedures on sex discrimination and all complaints raising Title IX issues throughout the institution.  The resource guide accompanying this letter outlines some of the key issues covered by Title IX and provides references to Federal resources related to those issues.  In addition, the coordinators should be knowledgeable about other applicable Federal and State laws, regulations, and policies that overlap with Title IX.[12]  In most cases, the recipient will need to provide an employee with training to act as its Title IX coordinator.  The training should explain the different facets of Title IX, including regulatory provisions, applicable OCR guidance, and the recipient's Title IX policies and grievance procedures.  Because these laws, regulations, and OCR guidance may be updated, and

---

[10] OCR began collecting this information through the CRDC for the 2013-2014 school year.  More information about the CRDC is available at http://www.ed.gov/ocr/data.html.

[11] The Department will begin collecting this information in 2015.  More information about the Clery Act data collection is available at http://www.ed.gov/admins/lead/safety/campus.html.

[12] *See, e.g.*, the Family Educational Rights and Privacy Act, 20 U.S.C. §1232g, and its implementing regulations, 34 C.F.R. Part 99; and the Clery Act, 20 U.S.C. § 1092(f), and its implementing regulations, 34 C.F.R. Part 668.  These documents only address an institution's compliance with Title IX and do not address its obligations under other Federal laws, such as the Clery Act.

Page 7—Dear Colleague Letter: Title IX Coordinators

recipient policies and procedures may be revised, the best way to ensure Title IX coordinators have the most current knowledge of Federal and State laws, regulations, and policies relating to Title IX and gender equity is for a recipient to provide regular training to the Title IX coordinator, as well as to all employees whose responsibilities may relate to the recipient's obligations under Title IX. OCR's regional offices can provide technical assistance, and opportunities for training may be available through Equity Assistance Centers, State educational agencies, private organizations, advocacy groups, and community colleges. A Title IX coordinator may also find it helpful to seek mentorship from a more experienced Title IX coordinator and to collaborate with other Title IX coordinators in the region (or who serve similar institutions) to share information, knowledge, and expertise.

In rare circumstances, an employee's prior training and experience may sufficiently prepare that employee to act as the recipient's Title IX coordinator. For example, the combination of effective prior training and experience investigating complaints of sex discrimination, together with training on current Title IX regulations, OCR guidance, and the recipient institution's policies and grievance procedures may be sufficient preparation for that employee to effectively carry out the responsibilities of the Title IX coordinator.

<u>**Conclusion**</u>

Title IX coordinators are invaluable resources to recipients and students at all educational levels. OCR is committed to helping recipients and Title IX coordinators understand and comply with their legal obligations under Title IX. If you need technical assistance, please contact the OCR regional office serving your State or territory by visiting http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm or call OCR's Customer Service Team at 1-800-421-3481; TDD 1-800-877-8339.

Thank you for supporting your Title IX coordinators to help ensure that all students have equal access to educational opportunities, regardless of sex. I look forward to continuing to work with recipients nationwide to help ensure that each and every recipient has at least one knowledgeable Title IX coordinator with the authority and support needed to prevent and address sex discrimination in our nation's schools.

Sincerely,

/s/

Catherine E. Lhamon
Assistant Secretary for Civil Rights

**EXHIBIT 21**

Case 1:19-cv-01249-LO-MSN   Document 38-21   Filed 01/22/20   Page 2 of 5 PageID# 1035

 FOURTH ESTATE



NEWS   /   CULTURE   /   OPINION   /   SPORTS   /   THE VOICE OF GMU KOREA   /   ETC.   /   FIND YOUR COPY   /

# Sexual assault investigation

OCTOBER 24, 2016   /   0 COMMENTS   /   905 VIEWS

Facebook   7      Twitter      Linkedin      Email

BY SARMAT CHOWDHURY, STAFF WRITER

Students received an email Sept. 16 alerting the community to the launch of an investigation surrounding a sexual assault case filed by a female student on campus.

The investigation, led by the U.S. Department of Education's Office for Civil Rights, started with a complaint that "alleges that the university failed to respond promptly and equitably to her [the female student's] report of sexual assault, and as a result, she was subjected to a sexually hostile environment," the Office of Compliance, Diversity and Ethics' Vice President Julian R. Williams said. The complaint was lodged to the Office of Compliance, Diversity and Ethics, according to Williams in an email to the Mason community.

Williams said he and others take such matters seriously, which he explained was the intent behind the initial email that was sent out to students.

"Some schools do it differently. What we try to do here at Mason is to be as transparent as we can around these issues. Because it is all public information, so what we would rather not do is [keep it quiet and] have somebody in the community find out about a situation like this where we have received a complaint from the Office for Civil Rights," Williams said.

Williams added that he and the university would rather not have the first time students hear about an issue like this come from an email that somebody forwarded to them.

"We'd rather let the community know that 'hey, this is what's out there,' this is what we are doing in response as well as this is how we are going to move forward around these issues as well. So, it's trying to be as transparent as possible and be as forthright as possible," Williams said.

Since 2011, there have been a total of 336 "investigation of colleges for possibly mishandling reports of sexual violence" according to the Chronicle of Higher Education. As of October 2016, only 55 cases have been resolved. Regarding Mason and its particular case, Williams said he was willing to explain the procedures for the filing of an investigation.

"It's a back and forth process. We would have to provide certain information to the Office of Civil Rights. They want to know a lot of information, but specifically how have we [Mason] responded to complaints of sexual harassment, sexual assault, dating violence and stalking for the last three academic years," Williams said. "They also want to see our training materials, who is in some of these roles to respond to these issues."

He added that the next step in this case is piecing all the information together, reaching out to the investigator about the case, getting some clarification and then compiling that information to send and submit to the Office for Civil Rights.

Though this is an ongoing investigation, Williams was confident in stating that Mason would not be going to the court due to the nature of the complaint.

"Usually, these sorts of complaints, they are handled within the Office for Civil Rights resolution processes," Williams said.

Williams added that what happens with a situation like this case is that Mason has to comply with Title IX, because the school receives federal funding in the form of financial aid. Title IX refers to Title IX of the Education

## SEARCH

Search

## SPONSOR

## TWITTER FEED

 **@IVEstate**
Student-run news outlet for daily updates and in-depth coverage of George Mason University. •Ads are not endorsements• Find us online at https://t.co/XcwS8mEYmU

RT @IVEstate_Sports: Check out @NatalieHeavren's recap of @MasonWBB's win over American U yesterd...
Sat 23rd Nov 19 16:23

RT @IVEstate_Sports: .@MasonMBB lost their first game of the season against No.6 Maryland. Here...
Sat 23rd Nov 19 16:23

Our Panda Express fundraiser is TODAY! Stop by and show our flyer to the cashier until 8:00 tonig...
Fri 22nd Nov 19 13:29

RT @IVEstate_Sports: Don't forget to follow @NatalieHeavren for live coverage of the Mason-Mary...
Fri 22nd Nov 19 13:29

This week in #Opinion: Yes, The Equal Rights Amendment Matters https://t.co/hBaaC4n7fs
Fri 22nd Nov 19 13:00

Recent   Popular   Comments

 Javon Greene's career-high not enough to edge Maso...
JANUARY 18, 2020

 Virginia Supreme Court Rules Against Transparent G...
DECEMBER 15, 2019

 Mason Men's Basketball Improves to 10-1 With...
DECEMBER 8, 2019

Amendments of 1972, which is designed to protect individuals from discrimination in educational activities or programs that receive Federal financial assistance.

"Their job [the Department of Education and the Office for Civil Rights] is when they receive and accept a complaint, they would come in and investigate to make sure/double check just in case. So their enforcement power isn't listed. They wouldn't be able to sue the university. The biggest sort of power that they would wield would be one of the egregious cases where they could limit a university's ability to accept financial aid funding," Williams said.

As Williams pointed out, the government has never had to limit a university's ability to accept financial aid funding for investigations. He also mentioned the proactive moves that Mason has made prior to the Title IX complaint, with the hire of a full-time Title IX committee.

While the investigation continues, Mason will have resources both on and off-campus for students who either wish to report a case of sexual assault or utilize the counselors and various other outlets that are available to victims of sexual violence.

📁 | campus | | News |

🏷 | lawsuit | | mishandled case | | sexual assault |

About jennifershaskan
View all posts by jennifershaskan →

‹ Read Previous                                    Read Next ›
Bomb scare at Mason                        George Mason and Slavery



**New Title IX Coordinator, Who This?**
AUGUST 26, 2019



**Mason's Student Senate Signs New Resolution**
APRIL 1, 2019



**Mason Searching for New Title Ix Coordinator**
MARCH 25, 2019



**Mason improves to 9-1 in a lackluster performance …**
DECEMBER 5, 2019



**Women's Basketball Falls to 4-5 in Wednesday Matin…**
DECEMBER 4, 2019

## FOURTH ESTATE WEEKLY

Shelf by Issuu
11.18.19 - Fourth Estate



## FOLLOW IVE ON SOCIAL MEDIA



**Sponsored**

**Prevent Gutter Clogging With This Trick. See Why Gutter Cleaning Companies Hide This From Homeowners**

LeafFilter Partner

**Meet The Skincare Made For Women Over 40 In Mind. Real Naturals Repair and Prevent Creams**

Color The World Lipsticks

**You Will Be Surprised How Affordable LeafFilter™ Is!**

LeafFilter Partner

**These Venus® Dresses Are Perfect For Every Body Type**

Venus

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD Bio Complete 3 Supplements

**3 Dangerous Foods People Feed Their Dogs (Without Realizing It)**

Dr. Marty ProPower Plus Supplement



Sponsored

**Giada De Laurentiis Is Way More Than Just A Chef**

MyDailyMagazine

**Prevent Gutter Clogging With This Trick. See Why Gutter Cleaning Companies Hide This From Homeowners**

LeafFilter Partner

**Meet The Skincare Made For Women Over 40 In Mind. Real Naturals Repair and Prevent Creams**

Color The World Lipsticks

**These Venus® Dresses Are Perfect For Every Body Type**

Venus

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD Bio Complete 3 Supplements

**3 Dangerous Foods People Feed Their Dogs (Without Realizing It)**

Dr. Marty ProPower Plus Supplement

RECENT COMMENTS

Alexander Kenny

Great story! Should be distributed on a leaflet a...

FEBRUARY 9, 2018

 Amanda

I'll happily watch the curling competitions and c...

FEBRUARY 8, 2018

Scarlett Simpson

Really great article! It definitely brings a pers...

FEBRUARY 7, 2018

Johnny Walker

I never thought about it but I bet biathlon reall...

FEBRUARY 5, 2018

WHERE TO GET PRINT COPIES

Fourth Estate Pr... ☆



Map data ©2020    Terms    2,000 ft





3269
Likes

3933
Followers

SUBSCRIBE
RSS Feeds

© Fourth Estate Designed by FairPixels.com

**EXHIBIT 22**



NEWS / CULTURE / OPINION / SPORTS / THE VOICE OF GMU KOREA / ETC. / FIND YOUR COPY /



## A Title IX report alleged harassment by Student Body President

APRIL 29, 2018    0 COMMENTS    1716 VIEWS

Facebook   685    Twitter    Linkedin    Email

By Lauren Sullivan, Staff Writer; Fareeha Rehman, Co-editor-in-chief; Michael Eberhart, News Editor

*Editor's note: headline has been updated to more accurately reflect new information brought to Fourth Estate after the original article was published. Further updates have been added throughout the body of the article. The full corrections request can be viewed* here.

*We would also like to clarify that a report does not equate to an investigation. As mentioned more than once in the article, there is no formal Title IX investigation against David Kanos. According to Julian Williams, VP of CDE, "there have not been any active or closed investigations involving Mr. Kanos by the Title IX office." The CDE office did not provide explicit definitions of a report and an investigation.*

*\*Brenda is a pseudonym used to protect the student's identity.*

When Brenda\* heard that David Kanos was running for Mason student body president, she was instantly alarmed.

Before they both came to Mason for their freshman year, Kanos had repeatedly messaged Brenda via Facebook in May 2014, sending suggestive and inappropriate questions asking about her virginity and making unwanted sexual advances. Brenda stopped responding and blocked him on Facebook.

"I responded to his inappropriate messages as a naive freshman and didn't realize the magnitude of [the messages] until my mom intervened," she wrote in a message to Fourth Estate.

Later that month, Kanos also contacted Brenda's mother on Facebook, describing her as "really pretty," and asking about her father and their divorce.

"It is not appropriate to ask a mother about her personal life, and it is not appropriate to message Brenda about sexual things like you have done," Brenda's mother wrote in a response to Kanos on May 30, 2014 before also

---

### SEARCH

Search

### SPONSOR

### TWITTER FEED

**@IVEstate**
Student-run news outlet for daily updates and in-depth coverage of George Mason University. ·Ads are not endorsements· Find us online at https://t.co/XcwS8mEYmU

RT @IVEstate_Sports: Check out @NatalieHeavren's recap of @MasonWBB's win over American U yesterd...
Sat 23rd Nov 19 16:23

RT @IVEstate_Sports: .@MasonMBB lost their first game of the season against No.6 Maryland. Here...
Sat 23rd Nov 19 16:23

Our Panda Express fundraiser is TODAY! Stop by and show our flyer to the cashier until 8:00 tonig...
Fri 22nd Nov 19 13:29

RT @IVEstate_Sports: Don't forget to follow @NatalieHeavren for live coverage of the Mason-Mary...
Fri 22nd Nov 19 13:29

This week in #Opinion: Yes, The Equal Rights Amendment Matters https://t.co/hBaaC4n7fs
Fri 22nd Nov 19 13:00

Recent   Popular   Comments


Javon Greene's career-high not enough to edge Maso...
JANUARY 18, 2020


Virginia Supreme Court Rules Against Transparent G...
DECEMBER 15, 2019


Mason Men's Basketball Improves to 10-1 With...
DECEMBER 8, 2019

blocking him on Facebook.

Facebook posts obtained by Fourth Estate from February 2015 show multiple other women sent comments to Brenda about receiving inappropriate and suggestive messages from Kanos through text messages and social media until they also blocked him.

"He would use my name to message them as an icebreaker and he would say disgusting stuff," said Brenda, speaking in an interview with Fourth Estate.

Kanos declined multiple requests for interview or comment for this story.

## INCIDENT IN ROOSEVELT HALL

In August 2014, Brenda moved onto an all-girls floor in the Roosevelt residence hall.

"It was very uncommon for guys to be on our floor," said Brenda.

But according to Brenda, Kanos, who lived on the floor above, confronted her one night early in the spring 2015 semester as she was returning from the communal bathroom wearing only a towel.

"He proceeded to corner me in the hallway and tried to force conversation upon me," said Brenda, "and eventually after 2-3 minutes of this I said 'I need to go back to my room and change.'"

She was finally able to get to her room, but the incident was not over when she reached the door.

"He tried to push the door open and force his way in," said Brenda. "I kept saying, 'I need to change' and he would say 'oh, I know' and was still trying to get in. But I eventually was able to close the door on him."

According to Brenda, the harassment did not end after that incident. Speaking to Fourth Estate, she described other instances of leaving her dorm room door unlocked to quickly go to the bathroom, only to return and find Kanos in her room, uninvited — even laying on her bed.

Based on the Facebook messages from the previous year and other contact with Kanos in 2015, Brenda decided to tell her resident advisor about him the day after the hallway incident.

## REPORTING TO THE RA

According to Mason's Title IX Policy 1202: Sexual Harassment and Misconduct, "A Responsible Employee is required to report to the University's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of Prohibited Conduct that involves any Student as a Complainant, Respondent, and/or witness, including dates, times, locations, and names of parties and witnesses."

As defined by Policy 1202, "Responsible Employees include Resident Assistants, Graduate Teaching Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees."

But according to Brenda, there was no follow-up to her from the Title IX office based on her verbal report to her RA. Fourth Estate reached out to the RA for comment but did not receive a response.

"The university cannot discuss individual Title IX complaints that involve students, as they are considered educational records," wrote Julian Williams, Mason's vice president of Compliance, Diversity and Ethics (CDE), in an email to Fourth Estate. CDE oversees the Title IX office at Mason. Student's records are protected by federal law according to the Family Educational Rights and Privacy Act of 1974 (FERPA).

After reporting to her RA and not receiving any follow up from the Title IX office, Brenda decided to avoid Kanos and leave the incidents behind her.

Update: Housing and Residence Life confirmed that no incident report was submitted for the Complainant and the Respondent in the fall of 2015, according to Williams.

## THE CAMPAIGN

When Brenda found out Kanos was running for student body president in March 2017, she decided to share her experiences with the public.

"My main concern going forward was that I would have to be friendly with him in a work capacity, and I didn't think I could do that," said Brenda, who was then an intern in a University office in a position that worked closely with student body president.

However, the situation was complicated by her friendship with Kelley Dugan, Kanos' running mate for vice president.

"I was in a really tough situation because I didn't want to ruin her own personal success," said Brenda.



**Mason improves to 9-1 in a lackluster performance …**
DECEMBER 5, 2019



**Women's Basketball Falls to 4-5 in Wednesday Matin…**
DECEMBER 4, 2019

## FOURTH ESTATE WEEKLY

Shelf by Issuu

## FOLLOW IVE ON SOCIAL MEDIA

In texts obtained by Fourth Estate, Dugan texted Brenda about running on the same ticket as Kanos shortly before the student government candidates were to be announced.

"Idk if you know him but I heard there may be beef???" read Dugan's message to Brenda. "Not sure lol but he said he would really like to talk to you if necessary!"

Brenda replied, "To be honest that kind of changes everything... he treated me inappropriately my freshman year, messaged my mom and trapped me in the hallway in my towel."

Further texts from Brenda to Dugan relayed the content of Kanos' messages to Brenda and her mom from 2015, that Brenda went to her RA about Kanos and about his "sexual advancements" to her friends.

"Omg I'm sorry!!" Dugan wrote in her reply to Brenda. "That's not cool. He didn't tell me what happened and I'm not excusing him but all he said was how he acted immature freshman year and he's grown up a lot. That's all he told me so I'm sorry about that."

Brenda decided to remain silent after Dugan asked her for a "favor" in March 2017.

"I know you don't like him, but do you mind not saying anything to anyone?" Dugan wrote to Brenda in text messages obtained by Fourth Estate, hours after Brenda explained her concerns with Kanos. "I've gotten really passionate about this and while we're on the same ticket, I have a lot of potential power if I win and plan on doing things that have nothing to do with him. There's a lot I would love to bring to Mason. I would just really love that kind of quiet support from you as a friend."

Dugan did not respond to multiple requests for an interview or comment about this story.

Speaking to Fourth Estate, Brenda added that she does not blame Dugan "at all, for any of this."

But Brenda was still scared of having to interact with Kanos in student government. She decided to make her experiences with him public.

"[At first] I was going to write an anonymous article with everything in it," said Brenda, but she instead decided to meet with student government advisor Phil McDaniel on March 30, 2017 to express her concerns about Kanos' behavior.

As a university employee, McDaniel is a "responsible reporter" according to Mason's Title IX policy. This means he is "required to report to the university's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of prohibited conduct that involves any student as a complainant, respondent, and/or witness, including dates, times, locations, and names of parties and witnesses," according to the Title IX website.

McDaniel did not respond to Fourth Estate's request for comment on this story. But according to emails later sent to Brenda by the Title IX office, student government advisors reported her complaints about Kanos on March 30.

### UNHEARD GRIEVANCE

Next, Brenda filed a grievance on April 6, 2017 with the Student Government Elections and Disputes Committee (EDC) against Kanos' eligibility to be president.

"Over the past two weeks, several other female students have reached out to me, relaying to me similar stories of unwarranted sexual advances by this candidate," Brenda wrote to the EDC in the 2017 grievance. "Although these students are not comfortable coming forward personally and sharing what has occurred between them and David, I personally feel like it is my responsibility to alert those with positions of influence about his misconduct."

The grievance detailed the incident in Roosevelt Hall during her freshman year, as well as screenshots of "sexual and predatory" messages sent by Kanos to Brenda and her mother through Facebook.

"There has been an ongoing Title IX investigation open on this candidate for sexual harassment based upon his treatment of myself, to which I have personally felt threatened by this candidate," Brenda wrote. "Having to see this candidate is triggering for me, and to me, gives the impression that sexual misconduct is excusable."

Mason's student government election code states that candidates are responsible for all violations of university policies — including Title IX. Section 1.7 of the election code states: "Should university policies be violated, the candidate, and not the Commission or Student Government, is responsible for all transgressions."

The rule does not specify time frame limit for reporting any violations that may have taken place.

Brenda's grievance claimed that Kanos had broken five different election codes, including 3.2.2.1 (No threats shall be made against other campaigns, candidates, students, faculty, staff, or administrator) and 3.2.2.2 (The medium in which incompliant threats can be made includes, but is not limited to, verbal, written, online, in-person, or in the form of email, text message, or other method of communication).

The EDC's Election Code states that when a grievance is filed, the committee must hold a hearing and post a copy of the grievance as well as meeting minutes from the hearing. But Brenda received a response by email the next day,

April 7, 2017.

"The commission only hears election grievances for incidents that take place during the current Student Government Election cycle," the EDC's email read. "Because of the nature of the grievance the EDC has forwarded your email to Jennifer Hammat, George Mason University's Title IX Coordinator, to review."

In an email to Fourth Estate, the EDC wrote, "The rules that bound the EDC are straightforward and outline that all grievances filed must have an incident that occurs within the timeframe of the election."

A response from Fourth Estate requesting a copy or citation of this rule has not been answered at the time of this article.

"It is my interpretation that Student Government's governing documents do not outline a timeline in which grievance hearings must be adhered to, but does lay out how a grievance shall be dealt with," said Caiti Lively, speaker of the 2017-2018 student senate. "It is the EDC's responsibility to deal with all grievances brought forward."

According to Brenda, she reached out to McDaniel again for more information on why her grievance would not be heard but was again told that "there was nothing they could do because it all happened before he ran for president."

Kanos was elected Mason's student body president on April 11, 2017.

## MEETING WITH TITLE IX

According to Mason's Title IX Policy 1202, "once an institution has notice of an act of Prohibited Conduct, it is required to (1) take immediate and appropriate steps to investigate or otherwise determine what occurred; and (2) take prompt and effective action to end any misconduct that occurred; remedy its effects; and prevent its recurrence."

Emails obtained by Fourth Estate show that Brenda's complaint towards Kanos was reported to Mason's Title IX Coordinator Jennifer Hammat by student government advisors on March 30, 2017.

According to the EDC's email on April 7, Hammat had also been sent a copy of the election grievance filed by Brenda which included screenshots of messages from Kanos.

On April 19, 2017 Brenda emailed Hammat, "I just wanted to check in if there is any progress with the Title 9 [sic] investigation with David Kanos. Any information would be greatly appreciated."

On April 20, 2017, nine days after Kanos was elected to his position, Hammat made her first contact with Brenda via email, introducing herself and explaining that she received a report from student government advisors about the incident. The email provided a range of options available to Brenda as a victim.

Emails provided to Fourth Estate show that Brenda exchanged emails during the summer to schedule a meeting about her report with Katusia Lundi, Equal Opportunity and Diversity Specialist in the CDE office with certifications in "Title IX Training" and "The Four Corners of Title IX Regulatory Compliance." Lundi has been in her position with CDE since September 2016.

After several attempts, Brenda met with Lundi to discuss her encounters with Kanos on June 27, 2017.

"She made me reenact the hallway incident and show her the pictures [of Kanos' messages]," said Brenda. "She said she would give me any information as updates were given."

Update: "During the intake meeting with CDE investigator Kat Lundi, Ms. Lundi explained to the Complainant, verbally, that the Facebook messages from before her freshman year were outside the scope of our jurisdiction (we cannot investigate those who were not yet students) and that the towel incident, as described to Ms. Lundi at the time, would not rise to the level to warrant an investigation." said Williams.  The CDE did not provide this information in writing to Brenda, but "has since changed its practice and will now follow up in email communication to all Complainant's about their in-take meeting, and next steps, if applicable,"  said Williams.

Update: According to Williams, Brenda said "she was going to "retrieve" and locate additional evidence" and that Lundi "was told by the Complainant, that she would hear back from her within a week or so. Ms. Lundi reached out to the Complainant multiple times in the late spring of 2017 and did not hear back from the Complainant."

Shortly before classes began for the fall 2017 semester, Brenda sent another email asking for the status of her report.

"Now that the school year is starting, is there anyway to get an update on the investigation into David Kanos?" Brenda wrote to Lundi on August 24, 2017.

They arranged one last meeting in the CDE office at 2 p.m. on August 31, 2017. During the meeting with Lundi, Brenda said she was told to "wait for emails with updates," but never heard back.

Brenda claims she still has not heard anything about her investigation more than one year after her original report to the EDC.

# A712

"There were months when I would send emails saying 'What's an update? Can I get an update?'" she said. "They said they would keep me updated, but they really didn't."

Update: Brenda "met with Kat Lundi on August 31, 2017, and again indicated she had no new materials or information to share with Lundi. The Complainant indicated she would send those materials to Hammat. Lundi explained that there was not an open investigation and that Hammat would be available to receive the materials she referenced. This was the last contact we had with the Complainant." said Williams.

Update: Brenda responds, "They were so vague and confusing in the meetings and never explicitly told me anything. They just told me they were meeting with David and they'd keep me updated, which they never did." She adds, "In our meetings they'd just say that they were working on it and would keep me updated. I don't ever remember them telling me I didn't have enough information. They told me in the beginning I didn't have enough for the election commission because it was before he ran, but for my own personal case, I don't remember that at all."

Based on Brenda's statements to Fourth Estate and the grievance, Brenda believed that her reports were a "formal investigation" against Kanos. But according to Hammat, there have been zero formal Title IX investigations involving student government members between 2016-2018.

In the first email Hammat sent to Brenda about her options, a distinction between formal and informal investigations was not specified in the body of the email.

## HOW TITLE IX REPORTING WORKS

"The university reviews every Title IX report received," wrote CDE Vice President Williams in an email to Fourth Estate.

"If a report includes facts that warrant an investigation, the university opens a formal investigation and acts promptly," continued Williams. "There are also times when a Title IX report is made, but a formal investigation cannot be opened. The reasons for this can be a lack of necessary factual information or the incident in question doesn't arise to the level of being a violation of Mason policy, amongst others."

According to Hammat, the office uses a "preponderance of the evidence standard" when conducting a formal investigation, "which means more likely than not, or 50.1 percent." Evidence can include screenshots, witnesses or physical evidence.

"When people come in to tell me their experience, one of the first things I will say is 'so what are you looking for?'" said Hammat, speaking in an interview with Fourth Estate.

Hammat explained that most students are seeking no-contact orders – a campus conduct process designed to prevent two students from contacting each other, or an email to faculty to explain a student's absences or missed assignments due to a Title IX issue or simply wanting Title IX staff to have an informal conversation with the perpetrator.

"Less than 10 percent report with the intent of an investigation," she explained.

But Mason's Title IX office only has two employees — Hammat and Title IX investigator Megan Simmons — assigned to handle investigations for all of the university's 35,000 students and three campuses. Both staff members also handle other aspects related to Title IX compliance in addition to student complaints and training.

"If we're working 14 cases at once, that could elongate all of those processes," said Hammat. "I'd love to tell you that I have ten hours a week to write nothing but investigation reports, but I am lucky if I even get a few hours a week to write those reports."

In an email to Fourth Estate, Williams wrote, "while there are no direct plans to expand the office at the moment, the university is always examining ways to add the resources necessary to respond to, prevent, and eradicate sexual violence on campus."

## THE "INVESTIGATION"

According to Brenda, the Title IX office did not give her a timeline of when her "investigation" would be finished, and she was only told it would be "a really slow process."

While it seems Brenda never opened a formal investigation that she believed she did, there have been multiple formal Title IX investigations at Mason that took longer than 60 days to complete.

Mason's Title IX Policy 1202 states: "Typically, the period from commencement of an investigation through resolution (finding and sanction, if any) will not exceed sixty (60) calendar days."

According to Hammat, four Title IX cases took longer than 60 days to complete during 2016-2017. Hammat attributed these to student initiated delays including scheduling, reconsideration, availability, time to review materials and time to provide evidence and witnesses.

In 2017-2018, the number of cases going beyond the 60-day policy increased to ten. Hammat also attributed these to student-initiated delays and administrative process delays including campus closures for weather, holiday breaks and administrators being out of office.

"If an investigation is going to be over 60 days, we provide a status update as to why," Hammat said.

On September 12, 2016, the United States Department of Education Office for Civil Rights (OCR) sent a letter to Mason President Ángel Cabrera stating the OCR had received a complaint from a student claiming "the University failed to promptly and equitably respond to her report of sexual assault and, as a result, she was subject to a sexually hostile environment."

The letter explained that OCR determined it has jurisdiction to open the complaint for investigation, however it "in no way implies OCR has made a determination on the merits of the complaint."

"The university is taking this very seriously," wrote CDE Vice President Williams, in a statement released the following day. "We will cooperate fully with the investigation, which will review the handling of sexual misconduct and harassment complaints involving students, faculty and staff."

According to the U.S. Dept. of Education website, the OCR investigation is still pending as of March 30, 2018.

### AFTERMATH

Since her last contact with the Title IX office, Brenda has shifted her focus back to school and work. But she still wonders why the office has never updated her about the report, and why the EDC refused to hold a hearing or publish her grievance as required.

"Students who wish to run for Student Government must be in good standing with the university," CDE Vice President Williams wrote to Fourth Estate. "That includes no Title IX charges or discipline. While I can't speak directly to this, it is my understanding that David Kanos was in good standing with the university when he ran for office, and he remains in good standing now as Student Government President."

During the 2017-2018 school year, Student Government focused on taking a stand against sexual assault and harassment. An amendment to suspend any student government member under investigation by the university was introduced in April 2018, but was not voted on by the 38th Student Senate. Instead, the amendment has been tabled until the fall 2018 semester.

Kanos completed his term as student body president on April 26, 2018.

*Photo by Allie Thompson*

📁   campus   Need To Know   News   Student Government

---

About Fareeha Rehman
Fareeha Rehman served as Co-Editor-in-Chief for the Fourth Estate from fall 2017 to spring 2018. Prior to that, she was the Online Editor and began her time at IVE as a staff writer for news in 2016. She graduated in May 2018 with a B.A. in Communication (Journalism concentration). Follow her Twitter @RehmanFareeha

View all posts by Fareeha Rehman →

---

‹ Read Previous                                                    Read Next ›
Cradling a freshman phenom                        Transparent GMU lawsuit update



Virginia Supreme Court Rules Against Transparent GMU
DECEMBER 15, 2019



Mason Weekly Crime Log
NOVEMBER 18, 2019



Last Week in Politics
NOVEMBER 18, 2019

Sponsored

**The Reason Chris Brown Is Banned From UK Is Unnerving**

Miss Penny Stocks

**Prevent Gutter Clogging With This Trick. See Why Gutter Cleaning Companies Hide This From Homeowners**

LeafFilter Partner

**Meet The Skincare Made For Women Over 40 In Mind. Real Naturals Repair and Prevent Creams**

Color The World Lipsticks

**You Will Be Surprised How Affordable LeafFilter™ Is!**

LeafFilter Partner

**These Venus® Dresses Are Perfect For Every Body Type**

Venus

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD Bio Complete 3 Supplements

**Comments**    **Community**                        🔴 **Login** ▼

♡ **Recommend**        🐦 Tweet    f Share              Sort by Best ▼

Start the discussion…

LOG IN WITH                    OR SIGN UP WITH DISQUS ⑦

Name

Be the first to comment.

✉ Subscribe    ⊕ Add Disqus to your siteAdd DisqusAdd

Sponsored

**You Won't Believe Why Chris Brown Just Got Banned From The U.K.**

Miss Penny Stocks

**Check Out Erin Andrews's Annual Salary**

FetchSport

**The Average Football Fan Only Gets 7 Right! Can You Beat That?**

QuizGriz

**20+ Surprising Foods That Instantly Cause Cancer!**

HealthNormal

**Simple Trick Melts Abdominal Fat At Night (Try It Now)**

Diet Reviews

**The Worst Dog Breeds To Adopt According To Veterinarians**

Science101

RECENT COMMENTS

Alexander Kenny

Great story! Should be distributed on a leaflet a...

FEBRUARY 9, 2018

 Amanda

I'll happily watch the curling competitions and c...

FEBRUARY 8, 2018

 Scarlett Simpson

Really great article! It definitely brings a pers...

FEBRUARY 7, 2018

 Johnny Walker

I never thought about it but I bet biathlon reall...

FEBRUARY 5, 2018

WHERE TO GET PRINT COPIES

 Fourth Estate Pr... ☆



Map data ©2020   Terms   2,000 ft

 

3269
Likes

3933
Followers



SUBSCRIBE
RSS Feeds

© Fourth Estate Designed by FairPixels.com

**A716**

**EXHIBIT 23**

ABOUT    ADVERTISING    CONTACT    GET INVOLVED    OPINION SECTION SUBMISSIONS



# FOURTH ESTATE

NEWS /   CULTURE /   OPINION /   SPORTS /   THE VOICE OF GMU KOREA /   ETC. /   FIND YOUR COPY /

## Corrections request: Title IX article published on 4/30

MAY 16, 2018   /   1 COMMENT   /   934 VIEWS

Facebook    Twitter    LinkedIn    Email

Corrections request from Vice President of University Life Rose Pascarell and Vice President of Compliance, Diversity and Ethics Julian Williams in response to this article originally titled "How a Title IX report in Student Government dragged on for over a year."

Article has been updated in response to requests below as of May 16, 2018.

Thu 5/10, 9:24 AM

———

Dear Fourth Estate,

I wanted to follow up to address the reply VP Pascarell received.

The issues prompting the request for a correction are not alleviated by your reply. Although the headline did not explicitly use the word "investigation" and instead used "report" it conflates the two terms. Any casual reader will interpret "report" as an "investigation." The headline is not only incorrect, it is misleading because it implies that the University did not follow up on this matter. That is not the case.

The headline of the story "How a Title IX report in Student Government dragged on for over a year" is indeed misleading. To readers, "report, case and investigation" could seem the same. It may be semantics, but the words matter. Student Government "responded" and made a referral to the Title IX office as soon as the EDC started hearing about alleged incidents from during and before both parties freshman year at Mason were outside the scope of the election.

The Complainant received the resources email from Hammat on April 20, 2017, day after she emailed CDE. She met with the investigator in CDE during our inquiry process – the time when we review the materials we have received and determine if it meets the threshold to proceed with a formal or informal investigation.

During the intake meeting with CDE investigator Kat Lundi, Ms. Lundi explained to the Complainant, verbally, that the Facebook messages from before her freshman year were outside the scope of our jurisdiction (we cannot investigate those who were not yet students) and that the towel incident, as described to Ms. Lundi at the time, would not rise to the level to warrant an investigation.

She was told that CDE would reach out to Housing and Residence Life to see if an incident report had been submitted for the alleged incident. Housing and Residence Life confirmed that no incident report was submitted for the Complainant and the Respondent in the fall of 2015. The Complainant told the investigator that there was additional "evidence" and that she would reach out to others and gather additional information she had knowledge of to share with CDE to see if that additional information would change the status of "did not rise to the level to warrant an investigation" to something that would warrant an investigation.

Ms. Lundi was not contacted for comment by the article's writer, but her notes reflect what she shared verbally with the complainant. The Complainant left the initial meeting in CDE with the knowledge that the information shared during the initial meeting did not warrant a formal investigation. As such, we did not provide that same information to her in writing.*(CDE has since changed its practice and will now follow up in email communication to all Complainant's about their in-take meeting, and next steps, if applicable).

## SEARCH

Search

## SPONSOR

## TWITTER FEED

 @IVEstate
Student-run news outlet for daily updates and in-depth coverage of George Mason University. -Ads are not endorsements- Find us online at https://t.co/XcwS8mEYmU

RT @IVEstate_Sports: Check out @NatalieHeavren's recap of @MasonWBB's win over American U yesterd…
Sat 23rd Nov 19 16:23

RT @IVEstate_Sports: .@MasonMBB lost their first game of the season against No.6 Maryland. Here…
Sat 23rd Nov 19 16:23

Our Panda Express fundraiser is TODAY! Stop by and show our flyer to the cashier until 8:00 tonig…
Fri 22nd Nov 19 13:29

RT @IVEstate_Sports: Don't forget to follow @NatalieHeavren for live coverage of the Mason-Mary…
Fri 22nd Nov 19 13:29

This week in #Opinion: Yes, The Equal Rights Amendment Matters https://t.co/hBaaC4n7fs
Fri 22nd Nov 19 13:00

Recent   Popular   Comments

 Javon Greene's career-high not enough to edge Maso…
JANUARY 18, 2020

Virginia Supreme Court Rules Against Transparent G…
DECEMBER 15, 2019

 Mason Men's Basketball Improves to 10-1 With…
DECEMBER 8, 2019

Case 1:19-cv-01022-LO-MSN   Document 38-23   Filed 01/22/20   Page 3 of 6 PageID# 1050

Additionally, since she was going to "retrieve" and locate additional evidence, Ms. Lundi was told by the Complainant, that she would hear back from her within a week or so. Ms. Lundi reached out to the Complainant multiple times in the late spring of 2017 and did not hear back from the Complainant.

When the Complainant emailed Hammat on June 1, 2017 and asked if there "was anyway to get any updates or information on my case." Hammat forwarded the email to Ms. Lundi and asked her to schedule another meeting with the Complainant to see if any additional information/evidence had been located, and to re-emphasize that the information presented to the EDC and to CDE did not rise to the level to warrant an investigation.

Kat Lundi met with the Complainant on June 27, 2017, and it was reiterated that without any new information, there was still not sufficient evidence to warrant an investigation. The Complainant emailed CDE on August 24, 2017, asking for an update. The Complainant was contacted the same day and a meeting was set for the following week.

She met with Kat Lundi on August 31, 2017, and again indicated she had no new materials or information to share with Lundi. The Complainant indicated she would send those materials to Hammat. Lundi explained that there was not an open investigation and that Hammat would be available to receive the materials she referenced. This was the last contact we had with the Complainant.

The article as written is replete with inaccuracies and reflects a lack of understanding of the Title IX reporting process. It sends a message to the campus community that is factually incorrect.   We humbly request correction.

Julian R. Williams
Vice President of Compliance, Diversity and Ethics
George Mason University
MS 2C2
Fairfax, VA 22030
Phone: 703/993-8730
Fax: 703/993-8899
https://diversity.gmu.edu/

Thu 5/3, 4:54 PM
Dear Rose and Julian,

Thank you for contacting Fourth Estate about this story. We believe the readers will benefit from your response and we appreciate you reaching out to do so.

We take corrections requests very seriously, and are willing to transparently make corrections if determined to be necessary. We would like to clarify some of our reporting in regards to the corrections requested.

The headline of the story, "How a Title IX report in Student Government dragged on for over a year," is referring to the report made to Title IX on March 30, 2017 by "student government advisors," according to the email Jennifer Hammat sent Brenda. If we go by the date Brenda herself made contact with Title IX, April 19, 2017, we are still past one year at the date of publication. Brenda alleges that she was never updated on the status of her report and has still not been updated. She claims that after her last meeting with a CDE employee, she was told she would be updated via email. If someone is able to provide us with information that can prove Brenda was contacted and informed on the final status of her report, without violating FERPA, we will be able to make a correction that she was in fact told by a Title IX representative that Title IX stopped looking into her report on a certain date.

The word "investigation" or "case" is not used, because we verified it was a report and not an investigation.

The story is clear that there have been no formal Title IX investigations for Kanos or other student government members. Please refer to the following excerpts:

Based on Brenda's statements to Fourth Estate and the grievance, Brenda believed that her reports were a "formal investigation" against Kanos. But according to Hammat, **there have been zero formal Title IX investigations involving student government members between 2016-2018**.

While it seems Brenda **never opened a formal investigation** that she believed she did, there have been multiple formal Title IX investigations at Mason that took longer than 60 days to complete.

"Students who wish to run for Student Government must be in good standing with the university," CDE Vice President Williams wrote to Fourth Estate. "That includes **no Title IX charges** or discipline. While I can't speak directly to this, it is my understanding that **David Kanos was in good standing with the university when he ran for office, and he remains in good standing now as Student Government President**."


**Mason improves to 9-1 in a lackluster performance …**
DECEMBER 5, 2019


**Women's Basketball Falls to 4-5 in Wednesday Matin…**
DECEMBER 4, 2019

## FOURTH ESTATE WEEKLY

Shelf by Issuu

## FOLLOW IVE ON SOCIAL MEDIA

All of these excerpts were based on correspondence between Fourth Estate and university staff. For these reasons, we are not able to make the corrections requested without further information. If you believe these or other passages are factually inaccurate, please let us know specifically so that we may issue an appropriate correction.

To clarify further: you wrote that "there is **no specific ongoing Title IX investigation** involving former Student Body President David Kanos." Have there been previous Title IX investigations or reports involving Kanos that are now closed? If so, we appreciate the opportunity to update the original article to correct the record.

Other students have come forward with their own experiences, whether it is with the Title IX office or Kanos. We will further investigate for updates and follow-ups if necessary, and we would welcome a response from the university. We are not printing again until fall 2018, but we can publish a letter from the university online addressing the original article. We can also print your original email, with an editor's note about the corrections requested, if you would like that to be the letter from the university. If anyone who did not originally respond to comment for the article would like to now come forward with more information, we would be happy to continue reporting and updating.

Thank you for your cooperation with the comments we have received thus far.

Respectfully,

Fareeha Rehman, Co-Editor-in-Chief

Michael Eberhart, News Editor

---

Thu 5/3, 7:53 AM

Dear Editor,

We are writing to request a correction to the April 29, 2018 article "How a Title IX report in Student Government dragged on for over a year." The story contains several incorrect statements of fact and inconsistencies, starting with the headline.

The Title IX Office has no cases that have lasted for a year, or "dragged on for over a year." A headline like this leaves the reader with the impression that the university was not responsive to Title IX complaints. That is false. We hope you will correct the record. Furthermore, there is no specific ongoing Title IX investigation involving former Student Body President David Kanos. While federal law restricts what we are able to share, it is important that our campus community knows that our goal has always been and continues to be that victims/survivors report their experience. That reporting can happen through an initial meeting with someone in the Title IX office or through a number of campus offices that serve as resources to all students. In addition, both Counseling and Psychological Services (CAPS) and staff in the Student Support and Advocacy Center are confidential reporting sites. Students who wish to report but not make a formal complaint can do so in these offices to receive resource information and support. Our goal is also to provide appropriate due process and support resources to students who are accused.

Mason has been and remains strongly committed to eradicating sexual violence in all forms. As a result of the Sexual Assault and Interpersonal Violence Task Force that President Cabrera commissioned in 2015, 18 recommendations have been implemented on campus, and several more recommendations are currently being created and/or finalized. One of those implemented recommendations was the creation of additional Title IX staff and resources.

We would never want a message conveyed to our community that suggests a student would not be listened to or receive a timely response. Please feel free to contact Juliet Blank-Godlove, Dean of Students and co-chair of the Sexual Assault and Interpersonal Violence Implementation Committee, if you or someone you know has a concern about a current Title IX process. Our goal will always be to make continuous improvements to best serve students, create an environment and climate of safety, provide a victim-centered process, as well as and one that ensures due process. We hope to hear from you.

Regards,

Rose Pascarell, Vice President for University Life
Julian Williams, Vice President for Compliance, Diversity and Ethics

📁  | Editor's Blog |  | Uncategorized |

---

**About Fareeha Rehman**
Fareeha Rehman served as Co-Editor-in-Chief for the Fourth Estate from fall 2017 to spring 2018. Prior to that, she was the Online Editor and began her time at IVE as a staff writer for news in 2016. She graduated in May 2018 with a B.A. in Communication (Journalism concentration). Follow her Twitter @RehmanFareeha
View all posts by Fareeha Rehman →

❮ Read Previous                          Read Next ❯

Video Surfaces Of Mason Students Singing N-word

Credit Where Credit is Due





Faces of Mason
NOVEMBER 18, 2019

Washington, D.C. Can Do Something Right
NOVEMBER 4, 2019

Last Week in News
OCTOBER 28, 2019

Sponsored

**You Won't Believe Why Chris Brown Just Got Banned From The U.K.**
Miss Penny Stocks

**Check Out Erin Andrews's Annual Salary**
FetchSport

**The Average Football Fan Only Gets 7 Right! Can You Beat That?**
QuizGriz

**20+ Surprising Foods That Instantly Cause Cancer!**
HealthNormal

**Simple Trick Melts Abdominal Fat At Night (Try It Now)**
Diet Reviews

**The Worst Dog Breeds To Adopt According To Veterinarians**
Science101

Comments    Community                    ● Login ▼

♡ Recommend      ▾ Tweet    f Share        Sort by Best ▼

Join the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ⑦

Name

**ABDQUDUS DAMILARE** · 2 years ago
https://proudlyloaded.com
∧ | ∨ · Reply · Share ›

✉ Subscribe    ⊕ Add Disqus to your siteAdd DisqusAdd

Sponsored

**Prevent Gutter Clogging With This Trick. See Why Gutter Cleaning Companies Hide This From Homeowners**

LeafFilter Partner

**Meet The Skincare Made For Women Over 40 In Mind. Real Naturals Repair and Prevent Creams**

Color The World Lipsticks

**You Will Be Surprised How Affordable LeafFilter™ Is!**

LeafFilter Partner

**These Venus® Dresses Are Perfect For Every Body Type**

Venus

**Check out these 7 easy steps for moving clients to cloud accounting.**

Xero Online Accounting

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD Bio Complete 3 Supplements

RECENT COMMENTS

Alexander Kenny

Great story! Should be distributed on a leaflet a...

FEBRUARY 9, 2018

Amanda

I'll happily watch the curling competitions and c...

FEBRUARY 8, 2018

Scarlett Simpson

Really great article! It definitely brings a pers...

FEBRUARY 7, 2018

Johnny Walker

I never thought about it but I bet biathlon reall...

FEBRUARY 5, 2018

WHERE TO GET PRINT COPIES

Fourth Estate Pr... ☆



Map data ©2020    Terms    2,000 ft

 

3269          3933
Likes        Followers

SUBSCRIBE
RSS Feeds

© Fourth Estate Designed by FairPixels.com

**EXHIBIT 24**

ABOUT   ADVERTISING   CONTACT   GET INVOLVED   OPINION SECTION SUBMISSIONS



NEWS   /   CULTURE   /   OPINION   /   SPORTS   /   THE VOICE OF GMU KOREA   /   ETC.   /   FIND YOUR COPY   /

## Students release sexual assault demands

DECEMBER 5, 2016   /   0 COMMENTS   /   907 VIEWS

Facebook     10     Twitter     LinkedIn     Email

BY GRACE ZIPPERER, STAFF WRITER

During Patriots in Action Week, which ran from Nov. 28 to Dec. 2, student government helped spread the word about the Women and Gender Studies department's sexual assault prevention demands for the Mason administration. This event was part of an ongoing effort to involve more students in the pledge to end sexual assault on campus.

Patriots in Action Week is a student government project that looks to prevent sexual assault and educate the community on gender violence, according to student government's website.

Pablo Ramírez Uribe, the secretary for Diversity and Multicultural Affairs for Student Government, was heavily involved in organizing the events of the week and has been the primary student government contact in overseeing the demands.

"The events [last] week all had the purpose of helping students understand, in an institutional sense, what they can be involved in and what they can expect from the university administration and student government," Uribe said.

Ramírez Uribe said that during the "Vigil and What's Next" show, the last event of Patriots in Action held Friday evening, the demands were discussed in more detail.

"The Vigil centered on highlighting the events of the week, having a moment of remembrance for sexual assault survivors and pledging to continue the fight against sexual assault. After Patriots in Action we need to continue to provide tools to end sexual violence on campus," Ramírez Uribe said.

Ramírez Uribe added that student government has a critical role to play in continuing to check on the demands.

"They are an accumulation of work-in-the-making for a long time," Ramírez Uribe said.

The demands were first presented to the university Oct. 4 during a nationwide event called Take Back the Night where Ramírez Uribe was co-master of ceremony. According to the Take Back the Night Foundation's website, the event focuses on ending all kinds of sexual violence.

Ramírez Uribe said that the event was the perfect place to release the demands.

"The name of the event refers to the night as a space where fear of being alone and the fear of rape is especially uncomfortable for women and victims of sexual assault," Ramírez Uribe said. "The night can apply to any space metaphorically where comfort is taken away because of lack of closure, justice and societal understanding towards victims of sexual violence."

However, there has been a gap in communication with university administration since the official release of the demands. Ramírez Uribe confirmed that while the administration had heard about the demands, they were not directly given to them.

"It ended up working out that during Patriots in Action, I was able to meet with Rose Pascarell [the University Life Vice President] to discuss the demands and establish direct communication. We talked about how all of the demands are already in the works and being addressed in one upcoming policy or another," Ramírez Uribe said.

Mary Ann Vega, one of the creators of the demands and co-MC of Take Back the Night, also met with the new Title IX coordinator, Jennifer Hammat, during Patriots in Action to discuss the demands.

### SEARCH

Search

### SPONSOR

### TWITTER FEED


@IVEstate
Student-run news outlet for daily updates and in-depth coverage of George Mason University. ·Ads are not endorsements· Find us online at https://t.co/XcwS8mEYmU
RT @IVEstate_Sports: Check out @NatalieHeavren's recap of @MasonWBB's win over American U yesterd…
Sat 23rd Nov 19 16:23

RT @IVEstate_Sports: .@MasonMBB lost their first game of the season against No.6 Maryland. Here…
Sat 23rd Nov 19 16:23

Our Panda Express fundraiser is TODAY! Stop by and show our flyer to the cashier until 8:00 tonig…
Fri 22nd Nov 19 13:29

RT @IVEstate_Sports: Don't forget to follow @NatalieHeavren for live coverage of the Mason-Mary…
Fri 22nd Nov 19 13:29

This week in #Opinion: Yes, The Equal Rights Amendment Matters https://t.co/hBaaC4n7fs
Fri 22nd Nov 19 13:00

Recent     Popular     Comments


Javon Greene's career-high not enough to edge Maso…
JANUARY 18, 2020


Virginia Supreme Court Rules Against Transparent G…
DECEMBER 15, 2019

Mason Men's Basketball Improves to 10-1 With…
DECEMBER 8, 2019

According to Mason's Compliance, Diversity and Ethics website, Mason is in compliance with Title IX of the Education Amendments of 1972 which states "Sexual assault and sexual harassment are forms of sex discrimination [and are] prohibited [at the university]."

Hammat's job as the Title IX coordinator is to assist any student, staff or faculty member who is concerned about "sex discrimination or sexual misconduct" as well as assist in policy implementation.

"All of the items on the list are being addressed in one form or another by the Sexual Assault and Interpersonal Violence implementation team and out of the Title IX shop here in Compliance, Diversity and Ethics, in collaboration with other campus partners," Hammat said.

One of the demands that requested a campus survey has already been implemented. A Task Force on Sexual Assault and Interpersonal Violence was created by President Cabrera in 2014 and is made up of Mason faculty, staff, students and community members. In their Final Report published Feb. 28, 2015, the force's eighth recommendation stated the university should initiate a campus climate survey on sexual assault.

The "Mason Speaks: Sexual Violence Survey" was sent Oct. 23 through the official university email server. The White House Task Force to Protect Students from Sexual Assault and the Department of Education's Office for Civil Rights have identified these surveys as the best practice to generate data on sexual violence on campuses, according to the United States Department of Justice's website.

"By seeing the results of this confidential survey," Ramírez Uribe said, "sexual assault on campus becomes more tangible in our minds. Sexual assault is so prevalent, but we [as a society] are so resistant to get to the bottom of it."

Ramírez Uribe said he is confident there will be opportunities for student government to continue to work closely with Pascarell and others in continuing the goals of the demands.

Sara Alhariri, an attendee of Take Back the Night who has experienced sexual assault, said she one hundred percent agrees with the demands because she believes it is crucial to have a supportive environment in the university's administration.

"[The way Mason] can help get rid of the victim stigma in society," Alhariri said, is "by allowing victims to become something more beautiful: survivors."

Here is the List of Demands:

We demand that sexual assault prevention experts/experts on sexual violence should not only be consulted during the policy making process, but their opinion should be a vital part of the decision making process.

We demand the release of regular updates on what progress is being made on the recommendations released by the Sexual Assault and Interpersonal Violence Task Force.

We demand the implementation of sexual assault prevention programming that students can participate in annually during their academic career.

We demand a reporting system that takes into account the fear victims of sexual assault experience when reporting to police/the university.

We demand that the waiver used by the Mason Police Department be removed as it makes it harder for advocates to work with students while they are in crisis and the use of the waiver can suggest that advocates do not have confidential relationship with the student.

We demand for all departments that interact with victims during the reporting process to be trained in trauma informed responses to sexual assault disclosures.

We demand that the hearing process be designed alongside experts in sexual violence prevention or scholars who focus on sexual violence.

We demand the hearing process be equitable, realistic in its needs, and trauma informed.

We demand policies in place to provide financial support for students who have been sexually assaulted and need to drop out of school.

We demand trigger warnings on all timely warnings sent out about sexual violence.

We demand a staff member for Counseling and Psychological Services that has experience in providing support to victims of sexual violence and intimate partner violence.

We demand an updated statement on the availability of resources and options for victims of sexual assault and interpersonal violence for use by faculty.

We demand sustained funding support and emphasis on sexual assault service provision since Wellness, Alcohol and Violence Education and Services has been absorbed by Student Support Services.


Mason improves to 9-1 in a lackluster performance ...
DECEMBER 5, 2019


Women's Basketball Falls to 4-5 in Wednesday Matin...
DECEMBER 4, 2019

## FOURTH ESTATE WEEKLY

Shelf by Issuu

## FOLLOW IVE ON SOCIAL MEDIA

Case 1:19-cv-01249-LO-MSN   Document 38-24   Filed 01/22/20   Page 4 of 6 PageID# 1057

The list of demands and where to sign if you so choose can also be found at the following link:

https://docs.google.com/forms/d/e/1FAIpQLSfkIhuf3vsOLqOlYQxuPbiGhPhfFCEMwxGz7AOtgolmRNyKFA/viewform

📁  campus

🏷  patriots in action week   prevention   sexual assault   women and gender studies

About jennifershaskan
View all posts by jennifershaskan →

‹ Read Previous                                    Read Next ›
Coursicle Comes to Mason                          Sexual offender on campus again

Mason Hosts Fifth Annual Chapter        Consent Carnival Continues In Second
Next: Ending Sexual Violence Program    Year
NOVEMBER 11, 2019                       SEPTEMBER 16, 2019



New Title IX Coordinator, Who This?
AUGUST 26, 2019

Sponsored

**Prevent Gutter Clogging With This Trick. See Why Gutter Cleaning Companies Hide This From Homeowners**

LeafFilter Partner

**Meet The Skincare Made For Women Over 40 In Mind. Real Naturals Repair and Prevent Creams**

Color The World Lipsticks

**You Will Be Surprised How Affordable LeafFilter™ Is!**

LeafFilter Partner

**These Venus® Dresses Are Perfect For Every Body Type**

Venus

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD Bio Complete 3 Supplements

**3 Dangerous Foods People Feed Their Dogs (Without Realizing It)**

Dr. Marty ProPower Plus Supplement



**Comments**   **Community**                                   🔴 **Login** ⌄

♡ **Recommend**        🐦 Tweet    f Share            Sort by Best ⌄

Start the discussion…

LOG IN WITH              OR SIGN UP WITH DISQUS ⓘ

                         Name

Be the first to comment.

✉ Subscribe    ⊕ Add Disqus to your siteAdd DisqusAdd

Sponsored

**Prevent Gutter Clogging With This Trick. See Why Gutter Cleaning Companies Hide This From Homeowners**
LeafFilter Partner

**Meet The Skincare Made For Women Over 40 In Mind. Real Naturals Repair and Prevent Creams**
Color The World Lipsticks

**You Will Be Surprised How Affordable LeafFilter™ Is!**
LeafFilter Partner

**These Venus® Dresses Are Perfect For Every Body Type**
Venus

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**
Gundry MD Bio Complete 3 Supplements

**3 Dangerous Foods People Feed Their Dogs (Without Realizing It)**
Dr. Marty ProPower Plus Supplement

RECENT COMMENTS

Alexander Kenny

Great story! Should be distributed on a leaflet a...

FEBRUARY 9, 2018

Amanda

I'll happily watch the curling competitions and c...

FEBRUARY 8, 2018

Scarlett Simpson

Really great article! It definitely brings a pers...

FEBRUARY 7, 2018

Johnny Walker

I never thought about it but I bet biathlon reall...

FEBRUARY 5, 2018

WHERE TO GET PRINT COPIES

Fourth Estate Pr...    ☆



Map data ©2020   Terms   2,000 ft

f

**3269**
Likes

𝕩

**3933**
Followers



SUBSCRIBE
RSS Feeds

© Fourth Estate Designed by FairPixels.com

**EXHIBIT 25**



#News (/news)

# Pledges of Continued Vigilance

After Education Secretary Betsy DeVos announces plan to change rules around campus sexual assault investigations, many college-based professionals reassure students that their commitment to punishing sexual assault remains unchanged.

By Jeremy Bauer-Wolf // September 8, 2017

7 COMMENTS (/NEWS/2017/09/08/CAMPUS-ADMINISTRATORS-REASSURE-STUDENTS-PROTECTIONS-AFTER-TITLE-IX-ANNOUNCEMENT#DISQUS_THREAD)

Following Education Secretary Betsy DeVos's announcement (https://www.insidehighered.com/news/2017/09/08/devos-says-federal-title-ix-guidelines-have-%E2%80%98failed%E2%80%99-will-seek-public-input-new) that she will replace Obama administration guidance on how colleges should adjudicate campus rape cases, administrators across the country have begun assuring students and sexual assault victims that their rights will be protected, while awaiting the federal department's new orders.

DeVos pledged Thursday to end "rule by letter," a reference to a Dear Colleague letter the Obama administration issued in 2011 clarifying how institutions should handle sexual misconduct cases under Title IX of the Education Amendments of 1972, the federal law barring gender discrimination.

The Education Department will accept comment before releasing new regulations, a more concrete decree than the 2011 guidance, DeVos said. In the interim, it will give more information to colleges and universities on addressing sexual assault procedures, which will likely come this month.

Advocates for sexual assault survivors have vocally blasted DeVos's intentions. One, for instance, declared the secretary was making campuses "safer for rapists." With many people uncertain of exactly how DeVos wants to alter policy, campus officials said after Thursday's announcement they were trying to tell students that they're still committed to helping those who have been assaulted, and to investigating allegations.

**U.S. to Replace Sexual Assault Rules**

Education Secretary Betsy DeVos says the Obama-era rules "failed." Her agency will issue short-term information and solicit



seek-public-input-new)

Hammat.

Some sexual assault survivors do not understand DeVos's remarks, and may interpret them as her devaluing them, or wanting roll back their protections, Hammat said.

Hammat anticipates a campuswide email to be sent today reiterating how and where students can report sexual assault and reminding students about the services of George Mason's counseling center.

The university will also need to inform students, faculty and staff that the trainings they underwent on Title IX still remain valid, Hammat said.

Hammat said she believes some students will react quickly to a sense that DeVos is making it more difficult to file complaints.

She said some students may react quickly to a sense that DeVos's department is making it more difficult to file complaints.

"I think you might have some of those secondary types of issues, where there's panic," Hammat said. "Where you'll have people saying, 'Do I need to do it now or forever lose my opportunity, if they're taking this away? Was what happened to me not real; did it not count?'"

In a blistering statement, University of California System President Janet Napolitano said that President Trump's administration aimed to "undo six years' worth of federal enforcement designed to strengthen sexual violence protections on college campuses."

Napolitano noted that both state and federal law are preserved. California has enacted one of the United States' most stringent laws regulating how institutions of higher education investigate rape cases, requiring that institutions receiving state money use a lower standard of evidence -- "preponderance of evidence, used in most civil litigation involving discrimination, which requires a 50.1 percent chance that the accused is responsible -- to judge sexual assault accusations. This was also a directive in Obama's 2011 guidance, but it was cemented into law in California, which could possibly set up a legal clash (https://www.insidehighered.com/news/2017/09/06/state-campus-rape-laws-could-be-problematic-under-new-administration) if DeVos's Education Department mandated a higher burden of proof, such as "clear and convincing," which many experts say requires something more like 75 percent surety the accused is responsible.

"Even in the midst of unwelcome change and uncertainty, the university's commitment to a learning environment free of sexual violence and sexual harassment will not waver," Napolitano said.

The day before DeVos's speech, Michelle Johnston, president of the University of Rio Grande and Rio Grande Community College, in Ohio, said she "put on alert" her governing board and staff members about the possibilities.

Johnston was one of the college presidents invited to a "listening session" with DeVos to hear feedback on Title IX enforcement. At the July meeting, Johnston was encouraged by how intently DeVos appeared to absorb their feedback, and she said in an interview Thursday that the comment period for the coming regulations was "critical."

of Art and Design, in Florida, intends to gather her staff immediately and discuss the new ways they would need to interact with students.

She's particularly worried about a couple of potential shifts that she said would turn a college conduct inquiry into a courtroom -- the standard of evidence piece, which DeVos criticized on Thursday, and mandating that students be allowed a lawyer during the hearing, as some believe DeVos would like to require. Federal rules allow an adviser to be present with a student.

Parker likened it to a lawyer being present if an elementary school-age children was called to the principal's office. And institutions would need to spend massive amounts of money hiring employees trained to the same legal background as a lawyer, she said.

"It's more important than ever for people involved in this work to do things, not because they're legally required to do it, and not do things that are illegal, but what I'm saying is -- to do things that on a very basic human level are the right thing. Go for it," she said.

But Brett Sokolow, president of the National Center for Higher Education Risk Management, called NCHERM, which advises universities, said that despite the hullabaloo, he doesn't anticipate a major shift in university practices without new regulations. A small percentage of institutions historically disregarded Title IX, but most will uphold the infrastructure required both by the law and the 2011 guidance.

Administrators he spoke with were "irate" in the wake of DeVos's comments Thursday, and Sokolow said most don't have a willingness to change, though the "writing has been on the wall" about the administration valuing due process protections, a point he said DeVos hammered in her speech.

"Due process has been legal requirement on colleges forever -- 50 years, 60 years. The fact that we're just getting around to this in sexual misconduct is absurd," he said. "I think the ability to be transparent is going to become more and more critical. Students need to be fully informed."

*Read more by*   *Jeremy Bauer-Wolf*

jump to comments (#comment-target)



(/print/news/2017/09/08/campus-administrators-reassure-students-protections-after-title-ix-announcement)

**Be the first to know.**
(https://www.insidehighered.com/content/sign-



Work/School Email · Yes, please!

☐ I have read and agree to the terms of Inside Higher Ed's Privacy Policy.*

## *Inside Higher Ed Careers*

| Faculty Jobs(#tab-facultyjobs) | Administrative(#tab-administrativejobs) Jobs | Executive Administration (#tab-executiveadministrationjobs) Jobs | Jobs Outside Higher Education (#tab-jobsoutsidehighereducation) |

### Browse Faculty Jobs

Arts & Humanities (https://careers.insidehighered.com/jobs/arts-and-humanities/)

Education (https://careers.insidehighered.com/jobs/education/)

Engineering & Mathematics (https://careers.insidehighered.com/jobs/engineering-and-mathematics/)

Health & Medical (https://careers.insidehighered.com/jobs/health-and-medical/)

Professional Fields (https://careers.insidehighered.com/jobs/professional-fields/)

Science & Technology (https://careers.insidehighered.com/jobs/science-and-technology/)

Social Sciences (https://careers.insidehighered.com/jobs/social-sciences/)

Technical & Vocational Fields (https://careers.insidehighered.com/jobs/technical-and-vocational-fields/)

Hide comments



Become An Insider    Login



Become An Insider    Login

 

# Today's News from Inside Higher Ed



(/news/2020/01/17/calbright-college-give-it-time-or-doomed-start)
**Crunch Time for Calbright** (/news/2020/01/17/calbright-college-give-it-time-or-doomed-start)



(/news/2020/01/17/universities-ignore-growing-concern-over-sci-hub-cyber-risk)
**Is Sci-Hub Safe?** (/news/2020/01/17/universities-ignore-growing-concern-over-sci-hub-cyber-risk)



(/news/2020/01/17/proposed-rule-focuses-faith-based-colleges-religious-liberty-and-free-speech)
**Protecting Faith-Based Colleges** (/news/2020/01/17/proposed-rule-focuses-faith-based-colleges-religious-liberty-and-free-speech)

# Inside Higher Ed's Quick Takes

**House Rebukes DeVos on Borrower Defense** (/quicktakes/2020/01/17/house-rebukes-devos-borrower-defense)

**Warren Scrutinizes Fake University Sting** (/quicktakes/2020/01/17/warren-scrutinizes-fake-university-sting)

**Dixie State Settles With Terminated Professor** (/quicktakes/2020/01/17/dixie-state-settles-terminated-professor)

**Clemson English Lecturers Make $20K Less Than Peers** (/quicktakes/2020/01/17/clemson-english-lecturers-make-20k-less-peers)

**Ex-Professor Paid Mortgage With Cancer Research Grants** (/quicktakes/2020/01/17/ex-professor-paid-mortgage-cancer-research-grants)

**Google Releases New IT Certificate** (/quicktakes/2020/01/17/google-releases-new-it-certificate)

**POPULAR RIGHT NOW**



Become An Insider    Login

=ffective-diversity-statement-essay)

Advice for students so they don't sound silly in emails (essay) (http://www.insidehighered.com/views/2015/04/16/advice-students-so-they-dont-sound-silly-emails-essay)

National Science Board report finds U.S. dominance in science is slipping (http://www.insidehighered.com/news/2020/01/16/national-science-board-report-finds-us-dominance-science-slipping)

New study links student motivations for going to college to their success (http://www.insidehighered.com/news/2013/04/25/new-study-links-student-motivations-going-college-their-success)

7 Apps for Cataloguing Your Home Library | GradHacker (http://www.insidehighered.com/blogs/gradhacker/7-apps-cataloguing-your-home-library)

Note-Taking in Graduate School | GradHacker (http://www.insidehighered.com/blogs/gradhacker/note-taking-graduate-school)

Essay on writing academic book reviews (http://www.insidehighered.com/advice/2015/03/27/essay-writing-academic-book-reviews)

Cynics, Skeptics, and Pollyannas | Higher Ed Gamma (http://www.insidehighered.com/blogs/higher-ed-gamma/cynics-skeptics-and-pollyannas)

BACK TO TOP

## News & Views

Admissions

Digital Learning

Fund-Raising

Diversity

## Careers

Find a Job

College Pages

Career Advice

Job Alerts

## Events



Become An Insider    Login

## Reports & Data

Special Reports

Surveys

Booklets

AAUP Compensation Data

Quick Takes | Views | Blog U | Audio | Topics | Events & People | Sponsored Content

keyword

News & Opinion ▼

search

Free Newsletters | Contact Us | About Us | Hire Faculty & Staff | Advertise | Work For Us | Testimonials | Rights and Permissions | Privacy | Share our content

Copyright © 2020 • Inside Higher Ed • 1150 Connecticut Avenue NW Suite 400 • Washington, DC 20036 • Ph: 1-202-659-9208 •
Fax: 1-202-659-9381
Do Not Sell My Personal Information



**EXHIBIT 26**



Faculty Senate

4400 University Drive, MS 5E5, Fairfax, Virginia 22030
Phone: 703-993-2990; Email: facsen@gmu.edu

May 15, 2019

President Cabrera, Provost Wu, & Senior VP Kissal
George Mason University
4400 University Dr.
Fairfax, VA 22030

Dear President Cabrera, Provost Wu, and Senior VP Kissal:

We are writing to express our grave concerns regarding the handling of cases of allegations made against faculty members and to request immediate actions. Our concerns are based on our review of cases of complaints about alleged faculty misconduct that were submitted to Compliance, Diversity, and Ethics (CDE) via the Title IX Office and to Human Resources (HR) via Employee Relations. To engage the full leadership of the University while protecting the confidentiality of the faculty members, we are sending this letter outlining our broader concerns without accompanying documentation. We will follow up with you and the Dean involved in each case with a more detailed letter that includes specific examples from each case we have reviewed.

After reviewing extensive documentation provided by multiple faculty members, we noted several ways in which faculty members have not been afforded procedural due process in the handling of these allegations. These violations of due process are inconsistent with Section 2.10.2 of the Faculty Handbook (which asserts that all parties involved in such allegations have a right to procedural due process), as well as principles advanced by several institutions, such as the American Association of University Professors (https://www.aaup.org/issues/appointments-promotions-discipline/faculty-misconduct-and-discipline-2005) and the Foundation for Individual Rights in Education (https://www.thefire.org/research/fire-guides/fires-guide-to-due-process-and-campus-justice/fires-guide-to-due-process-and-fair-procedure-on-campus-full-text/). Moreover, they are reflective of a general lack of clearly specified processes and procedures for handling such allegations, such as those that exist in Faculty Handbook Sections 2.6.2, 2.9.3, 2.10.9, and 2.11.2, as well as those that exist in the context of other University policies (e.g., https://diversity.gmu.edu/about/grievance-procedures).

We are not writing to address the specific merits of any of the cases we reviewed. Rather, we are seeking to engage the full senior leadership of the University in working with us to redress the violations of due process and faculty rights that have occurred and are occurring. Below, we list ways in which due process appears to have been violated in the cases we reviewed (based on documentation provided to us by the faculty members), after which we make specific requests. In our follow-up letters, we will provide specific examples and documentation that support these observations.

1. **Lack of appropriate notification of allegations brought to HR.** In cases involving allegations to HR, faculty members were not informed of the existence of allegations before a meeting – rather, they came to the meeting completely unprepared to have allegations verbally levied against them. We note that, in the case of allegations made to Title IX, faculty members have received general notification that allegations had been made when receiving a meeting request.

2. **Inadequate opportunity to respond to allegations.** First, in several cases, faculty members received no written description of allegations upon notification or even prior to being interviewed about the allegations. This is more variable in Title IX cases, with some faculty receiving formal, written descriptions and others receiving only an informal email summary of allegations, after requesting such a summary (and after having been interviewed). In HR cases, faculty members either never received a formal written summary of allegations or received a written summary only after a formal letter substantiating the allegations was inserted in their personnel file. Moreover, in at least one HR case, the faculty member was never formally interviewed with an opportunity to fully respond to the allegations.

3. **Presumption of guilt/Biased investigations.** In at least one HR case, a faculty member was removed from all contact with staff and students *during an investigation* (and without following procedures specified in Faculty Handbook Section 2.10.9). In multiple HR cases, the faculty members provided evidence from other parties that contradicted the allegations, but we saw no indication that such exculpatory evidence was addressed in the ultimate findings.

4. **Attempts to coerce confessions.** In HR cases, faculty members reported multiple instances during which supervisors or representatives of HR tried to "force" them to admit to the allegations, including statements that things would be "easier" if they did confess.

5. **Lack of timely communication.** In HR cases, email records indicate that faculty members frequently received no response to their requests for updates, or that such updates came only after inordinately long periods of time.

6. **Lack of clarity in presenting evidence that supports decisions.** The standard for making a decision in Title IX cases is stated as the "preponderance of evidence," but evidence provided in letters of determination is minimal. There is no established standard for making a decision in HR cases, nor is there clear evidence provided in supporting decisions.

7. **Inadequate appeal process.** In line with the fact that there are no clear published policies or procedures to guide investigation of allegations made to HR, there was no clear indication of an opportunity to appeal the findings of the HR investigations. In the case of appeals of Title IX findings, the individual who reviews the appeal is the VP of CDE, who is the direct supervisor of the Title IX office. This would seem to present a lack of independent objectivity in reviewing appeals.

8. **Lack of consistency in processes and sanctions.** The handling of potential removal from duties during an investigation is inconsistent across cases. Moreover, the severity of sanctions varies greatly across cases as well, with little relation to variation in the severity of allegations.

In sum, we find that the processes for handling allegations against faculty members are flawed. Each of the instances above represent violations of faculty rights. Given the opacity with which such investigations are conducted, and the serious ramifications for faculty members' reputations, productivity, and job security, faculty are often hesitant to and fearful of objecting to such violations. Thus, we assume that these represent only some of the cases in which violations have occurred, as others have likely gone unreported to us. We further note that, even when a complaint was filed through Title IX, which has more established policies and procedures, there were defects in the process that seriously affected faculty rights.

We are requesting a meeting of the Provost, Senior Vice President, and any other personnel deemed relevant (e.g., VP of Human Resources, VP of Compliance, Diversity and Ethics) with the Faculty Senate Executive Committee, to be scheduled as soon as possible, to discuss our findings, as well as the following proposed remedies:

1. Representatives from HR, CDE, and other relevant administrative offices work with representatives of the Faculty Senate to establish a clear set of guidelines and procedures for handling allegations against faculty members that will protect the rights of both complainants *and* respondents. This work should utilize external consultants as needed, and draw on best practices at other universities and in other relevant offices. The guidelines and procedures should address all of the problems described above and any other identified issues, including but not limited to:
   a. The authorization under which Human Resources is charged with conducting an investigation of faculty behavior should be clearly described in writing.
   b. The completed set of guidelines and procedures under which the investigations are to be conducted should be published in writing.
   c. Respondents in cases should be notified in writing that they may have an advisor present during all meetings.
   d. A set of guidelines and procedures for appealing a determination should be published in writing. Appeals should be reviewed by an independent set of individuals who have not yet been involved in the case.

2. Representatives from HR, CDE, and other relevant administrative offices work with representatives of the Faculty Senate to establish a clear set of guidelines and procedures for issuing sanctions other than dismissal (which is already addressed in the Faculty Handbook). This work should utilize external consultants as needed, and draw on best practices at other universities and in other relevant offices.

3. For all investigations of alleged faculty misconduct that are ongoing or that have been concluded within the last two years, the administration work with faculty representatives (designated by the Faculty Senate) to evaluate whether findings of investigations were impacted by any of the issues enumerated above, and if so, reopen those investigations if desired by the respondent for that case. This work should utilize external consultants as needed.

4. Upon completion of guidelines and procedures for issuing sanctions and renewals (see #2), for all cases in which sanctions of faculty members are currently in place, the administration work with faculty representatives (designated by the Faculty Senate) to evaluate whether those sanctions are consistent with the newly established guidelines and procedures. If not, that group should work to realign the sanctions with the newly established guidelines.

5. If the volume of work for #3 and #4 above is large enough to warrant it, faculty representatives involved in the work should be compensated for their time through either course releases or stipends that are commensurate with the workload.

We understand that allegations like these are highly complex, and that the University has a duty to protect all of its constituents – students, staff, and faculty. However, the lack of process for addressing

3

complaints like these is violating that duty in regard to protecting the faculty who have allegations made against them.

As a final note, the Faculty Senate Chair and Executive Committee are charged with acting on behalf of the Faculty Senate in the summer as needed. Our review does not preclude future or concurrent review by the Grievance Committee. Also, Shannon Davis is both a member of the Executive Committee and the incoming Faculty Senate Chair, with her term beginning on May 18, 2019. However, she is currently serving in an interim capacity as the Senior Associate Dean of CHSS. To avoid any possibility of an apparent conflict of interest, Dr. Davis will not participate in this review until her term as Interim Senior Associate Dean ends on August 1. Until that time, Keith Renshaw, outgoing Faculty Senate Chair, will continue to operate in that role for matters directly related to personnel issues, such as this one. The Executive Committee will update the Faculty Senate on progress at our first meeting of the Fall 2019 semester.

We look forward to your quick response and to working with you to redress these problems.

Sincerely,

Keith D. Renshaw                           Suzanne Slayden
Chair, Faculty Senate                      Chair, Academic Policies


Tim Leslie                                 Girum Urgessa
Chair, Budget & Resources                  Chair, Faculty Matters


Melissa Broeckelman-Post                   Lisa Billingham
Chair, Nominations                         Chair, Organization & Operations


CC: Shernita Rochelle Parker, Interim VP of Human Resources and Payroll
    Julian Williams, VP of Compliance, Diversity, and Ethics
    Peggy Agouris, Dean, College of Science
    Ann Ardis, Dean, College of Humanities and Social Sciences
    Kevin Avruch, Dean, School for Conflict Analysis and Resolution
    Kenneth Ball, Dean, Volgenau School of Engineering
    Zofia Burr, Dean, Honors College
    Henry Butler, Dean, Antonin Scalia Law School
    Rick Davis, Dean, College of Visual and Performing Arts
    Mark Ginsberg, Dean, College of Education and Human Development
    Germaine Louis, Dean, College of Health and Human Services
    Maury Peiperl, Dean, School of Business
    Mark Rozell, Dean, Schar School of Policy and Government



**Office of the Provost**

4400 University Drive, MS 3A2, Fairfax, Virginia 22030
Phone: 703-993-8770, Fax: 703-993-8887

May 21, 2019

Dear Faculty Senate Executive Committee:

In response to recent communications from the faculty senate highlighting the concern regarding the handling of misconduct allegations associated with faculty, we are recommending the following actions to take place over the next few months.

Setting aside individual cases that have and are being handled by HR and the Office of Compliance, Diversity and Ethics, our actions will focus on the overall processes, policies and procedures Mason has in place and to determine how to enhance and improve those procedures for handling employment matters.

To this end, we will request the University Auditor to complete a formal internal audit to determine if (i) GMU policies and procedures related to the handling of faculty misconduct allegations are in alignment with Commonwealth law, our bylaws, faculty and employee handbooks, and other requirements; (ii) the auditor will also compare Mason's policies and procedures with policies and procedures at other similar universities.

In addition and in parallel to the audit, we will convene a multi-constituent committee to determine how we can enhance and improve our procedures.   The guiding principles for this will be:

1.  To establish the current process for handling allegations of faculty misconduct
2.  Identify where there are gaps with compliance with state and federal regulations and /or recommend incorporating best practices
3.  Identify process and procedure improvements for a future state that will align with state, federal and regulations and best practices
4.  Identify policy, procedure changes that will require update and ensure guidelines are written in a clear manner
5.  Develop mandatory training and education related to the new procedures and policy
6.  Establish a framework for a communication plan to all faculty and staff

We are recommending the following representatives to the committee:

1.  Human Resources: Danielle Reich, Director of Employee Relations
2.  University Audit: Edward Dittmeier, University Auditor
3.  Office of the Provost: Renate Guilford, Associate Provost for Academic Administration
4.  University Counsel: Brian Walther, University Counsel
5.  Compliance, Diversity, and Ethics: Elizabeth Woodley, University Policy Manager
6.  Faculty Senate: Keith Renshaw
7.  Faculty Handbook Revisions Committee: Girum Urgessa

The committee will engage over the summer and will be responsible for updating and transitioning the new Chief of Human Resources on the status of the work as well as regular updates to both of us throughout this process.

Sincerely,

S. David Wu
Provost and Executive Vice President

Carol D. Kissal
Senior Vice President for
    Administration & Finance

**EXHIBIT 27**

Case 1:19-cv-01249-LO-MSN    Document 38-27    Filed 01/22/20    Page 2 of 9 PageID# 1079



Wed, Mar 14, 7:46 AM

Nice, when will you be on campus until?

Be there 9-1015ish

Gah, too tight. On Monday I can do between 1:30 and 3? Or before 10:30

If you want call I have a 16 min drive

Wed, Mar 14, 8:32 PM

Appropriately ruminating. Thank you for never letting me settle into complacency. It may not be immediately demonstrable but I'll be making changes to grow as a leader and researcher. Thank you.



Verizon ◻◻◻◻ 11:52 PM  89% ▢

⟨ 2

still interviewing with ▮▮▮▮
next week

Your life. Amazing

I'm dying. To think this was just
a convo after a talk. So fucking
cool to work ▮▮▮▮▮▮▮ to
improve employee well being,
▮▮▮▮▮▮▮▮▮▮▮They
offered ▮▮▮▮▮max of 40
hrs a week.

Wed, Mar 28, 9:59 PM

Also just thank you so much. I
wouldn't even be interviewing
at these places if weren't for
you and the badass
experiences we get as grad
students through you. And
more yet to come 🐎 so
relieved I'm hired for summer



**A750**

Case 1:19-cv-01249-LO-MSN    Document 38-3    Filed 01/22/20    Page 5 of 9 PageID# 1082
CONFIDENTIAL

ıl Verizon 🛜    4:33 PM    100% 🔋

‹ 4

You guys are missing out on getting pissed at this one person for asking too many questions. Surprisingly that person is not me...

Mar 3, 2018, 12:08 PM

She's firey

Yeah she was like a crabby old woman haha.

So sorry I missed it. But it was the best conversation I've had outside of you guys. Well with it. I'm off. Have fun and I'll see you at home base

Dope! Who?

iMessage

         



Verizon  4:33 PM  100%

4

Dope! Who?

Safe travels. Thanks for dinner
and everything last night. 🤍
everything I could've hoped for
in first titty bar

How you feeling today? Now
you know you can be a flatlined
and still be loved.

Appreciate the love. I made it
to an 8am talk. Was back in
bed by 9.

Alright we will see you back in
NOVA. Thanks for taking us out
last night. Always a good time.



# A753

CONFIDENTIAL

# ▶ Gmail

---

## Self-reflection

---

To: ████████████████████████                    Mon, Apr 30, 2018 at 10:08 PM

I'd prefer this to not be sent out on slack but happy to talk about in person

- **I am at my best at work doing this... (fill in the blank -- do not worry about bragging)**

- working hard and staying calm on a tight timeline
- learning new stats/conceptualizing what/how analyses will answer our research question(s)
- writing specific sections of manuscripts ████████████████████████████
- editing full or incomplete drafts for missing conceptual pieces
- individualizing tasks (e.g., using RAs for specific purpose, ████ and I splitting up tasks based on our dominant skill sets)
- manically writing blog pieces/thinking outside the box about psych topics (e.g., ████ papers)

- **I am at my worst at work doing this... (fill in the blank)**

- conceptualization of an entire paper
- overall writing without being clear on section goals
- deep reading of the literature
- outlines
- saying no
- when we don't have an agreement on deadline or division of labor

- **I can consistently deliver this at work...**

- if I say I'm going to do something and attach a timeline to it
- myriad of statistics and data management
- editing/feedback on drafts
- generating ideas and brainstorming with collaborators for interpretation of results, how to incorporate theory, how to integrate ideas, flow of manuscript, etc.

- **What do I need in the lab to be successful?**

- I think I've had the extreme fortune of being exposed to several manuscripts on different topics, stats, collaborators, and just different styles of papers. Now I need my own ass to get into gear for ████ and the guidance to do/lead this without ████ or ████ but moreso on my own and/or with ████
- I need more of a map or path or stepping stones for getting from a plan to executing it. I think I get overwhelmed with the entirety of things
- deadlines (with consequences) and accountability
- It's an easy excuse to say time but I am excited to finally decrease to 2 classes in the fall and to have my ████████████ paper well under way (which has taken about 80% of my time this spring semester)
-

- **Bonus: What do you hope to get (or have gotten) from the lab?**

- To understand and be understood
- Friends with whom I can discuss anything
- Ever-lasting brain trust
- Autonomous skills (stats, problem-solving, conceptual thinking) that will serve me in my career to change people's lives for the better
- Continue to have unforgettable memories like zip lining across terror corn field mazes, San Antonio steaks, incalculable Auld Shebeen/Oh George drinks, ████ watching drag shows at a pride parade in Albuquerque (plus hot air balloons), literally everything we did in Japan, when we unsuccessfully went for dim sim in Chicago, seedy Atlanta bars (and their bathrooms), having the trust that I can change programs, spend some much needed dedication to ████ but still have a strong partnership and pick back up on doing good work with ████ the lab.

CONFIDENTIAL

This was fun and enlightening. Fuck these program evals, let's do this more often.



**EXHIBIT 28**



CONFIDENTIAL

Mon, May 5, 2014, 11:32 AM

I concur. This semester has rocked. Our awesomeness has now ruined you for all following cohorts. Conversely, the rest of our classes will now be terrible in comparison.

On Mon, May 5, 2014 at 11:28 AM, [REDACTED] wrote:

Thanks! We really appreciate your feedback, and I think I speak for all of us when I say that we are SO glad that you were the one teaching this class. It was a blast.

In terms of moving forward with the publication, we're going to invoke the 48-hour rule to marinate on our next steps. Hopefully this could turn into something awesome.

Much love,

CONFIDENTIAL



**Case Conceptualization**

Tue, May 6, 2014 at 2:10 PM

To:

Once again- This class really has been great. Thanks for taking it over for us!

I've attached my case conceptualization for you, thus officially ending my participation in ███████████ It is okay to mourn.

Thanks for everything

📄 **Case Conceptualization_████.docx**
23K



CONFIDENTIAL

Internship Reference Letter

Thu, Sep 15, 2016, 7:41 AM

Thank you again for your willingness to write me a letter of reference for my internship application. APPIC should have sent out an email to you this morning with the necessary details. If not, please let me know and I can generate a new one.

To assist with writing the letter, I have attached the currently approved APPIC form as well as my current CV. Additionally, I have detailed below our primary interactions over the years:
- Member of my dissertation committee
- Instructor for
- Collaborated on 3 papers to date:

courses

Additionally, I've included a list of the internships that I plan to apply for below. I am looking for a research focused internship with at least some veteran rotations,

Gmail

Compose

Inbox                2,995
Starred
Snoozed
Sent
Drafts              17
Trash
Categories
[Mailbox]





CONFIDENTIAL

Second year project

I am currently working on my 2yp proposal inspired in part by the lit review I wrote for your class.

I was wondering if you'd possibly be interested and willing to be my second committee member.

but based on your familiarity with

Mon, Jul 15, 2013, 1:00 PM

Thanks,

of course.

you rocked the casbah in class and I loved your ideas.

I'm in.

Mon, Jul 15, 2013, 1:08 PM

**EXHIBIT 29**

A764

**CONFIDENTIAL**

The invasion    GMU protection ×

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓    🔗 Mon, Feb 16, 2015, 1:34 PM    ☆    ↩    ⋮

You're research has even invaded the yuppie/hippie-filled aisles of Whole Foods! Spread the word.
Thanks again for having us to your house on Friday! Lovely house and adorable children.
See you soon,
▓▓▓▓▓▓▓
•••

Here is an unprompted email she sent after being invited to do paid work on a consulting project I was hired for ▓▓▓▓▓▓▓▓▓▓▓▓▓. Notably, she asked for additional money in reference to ▓▓▓▓▓ ▓▓▓▓▓▓ lack of commitment to the two chapters she was assigned. She was the only student who had difficulty.

4

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓    Mon, Dec 28, 2015, 10:30 AM    ☆    ↩    ⋮
▓▓▓▓▓▓

I wanted to thank you again for inviting me to be involved on this project. It was a great experience, especially learning to write for a different audience. I really appreciated your feedback along the way and am grateful that I got to be involved with such a good group of people!
I wanted to check in on the financial side of the project. Originally, I was supposed to get paid $2000 for my work on the project, which seemed fair as I was going to co-lead (as opposed to lead) one chapter and not assist on any others. However, over the course of the project, I ended up taking much more of a leading role on the ▓▓▓▓▓▓▓▓▓▓▓▓. I did the vast majority of the research and writing for the chapter, and while I did not assist on another project, I believe that did just as much work and input just as much time as other leaders for their respective chapters.
▓▓▓▓▓ was great and spent a lot of time adding in her sections and providing some helpful comments/edits and support along the way. I really enjoyed working with her, as I think we made a good team. I do think, however, that she was very busy leading her own chapter and ended up taking more of the assistant role for the ▓▓▓▓▓▓▓▓ chapter, which is understandable.
Overall, I would like to ask for $3000 for my work on this project. Again, I am thrilled that I got the opportunity to be involved and work with this group, and for that I will continue to be grateful. I'm happy to talk about it more via phone ▓▓▓▓▓▓▓ or email if you'd like.
Sincerely,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Email is not a secure form of communication as information and confidentiality cannot be guaranteed. Information provided in an email is not intended to be

▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓

**A766**

CONFIDENTIAL

Gmail

Mon, Dec 28, 2015 at 10:29 AM

To:

Hi ████,

I wanted to thank you again for inviting me to be involved on this project. It was a great experience, especially learning to write for a different audience. I really appreciated your feedback along the way and am grateful that I got to be involved with such a good group of people!

I wanted to check in on the financial side of the project. Originally, I was supposed to get paid $2000 for my work on the project, which seemed fair as I was going to co-lead (as opposed to lead) one chapter and not assist on any others. However, over the course of the project, I ended up taking much more of a leading role on the █████████████████ I did the vast majority of the research and writing for the chapter, and while I did not assist on another project, I believe that did just as much work and input just as much time as other leaders for their respective chapters.

████████ was great and spent a lot of time adding in her sections and providing some helpful comments/edits and support along the way. I really enjoyed working with her, as I think we made a good team. I do think, however, that she was very busy leading her own chapter and ended up taking more of the assistant role for the ████████████████, which is understandable.

Overall, I would like to ask for $3000 for my work on this project. Again, I am thrilled that I got the opportunity to be involved and work with this group, and for that I will continue to be grateful. I'm happy to talk about it more via phone █████████ or email if you'd like.

Sincerely,
--

Email is not a secure form of communication as information and confidentiality cannot be guaranteed. Information provided in an email is not intended to be a professional service. In the case of a crisis or emergency situation, call 911.
[Quoted text hidden]

CONFIDENTIAL

Verizon LTE 6:59 PM 89%

Letters of reference instructions - December 8 deadline

[redacted] Nov 28, 2016
Hi there, Attached are the instruction...

[redacted] Nov 28, 2016
Hi there, Attached are the instruction...

[redacted] Nov 29, 2016
bam. that shit is in.

[redacted] Nov 29, 2016
to me

You are truly a rock star. Thank you so much for taking care of this!! I really appreciate it.
Let me know if you want to meet soon to discuss that paper idea from when we met - [redacted] I'm excited about the prospect of that paper!
Hope your break was relaxing and had some family time!

•••

Reply | Forward

[redacted]



**EXHIBIT 30**

**A770**

CONFIDENTIAL



September 10, 2019

Dear Professors Kashdan, Renshaw and Esposito-Smythers:

The CHSS Grievance Committee has reviewed materials related to the August 1st grievance filed by Professor Esposito-Smythers.[1]

The petitioners assert that Dr. Kashdan's continued affiliation with the Clinical Psychology Program risks the loss of its American Psychological Association (APA) accreditation, which potentially harms its faculty and students.

The primary question for this Committee is whether violation(s) of University Policy 1202 by a faculty member affiliated with the Clinical Psychology Program must be resolved in a manner to a) protect the program's affiliation and b) satisfy faculty members' responsibility per the *Faculty Handbook*, Section 2.10.2: "Faculty members must also adhere to the ethical standards of their respective professional associations and to university policies related to professional ethics."

The Committee interprets Mason's policies and the *Faculty Handbook* (section 2.10.2) as requiring that faculty with direct knowledge of violation(s) of University Policy 1202 would violate the *Faculty Handbook's* statement on "ethical standards" by failing to report this violation to the accreditation body. This presents a potential harm to the petitioners; either a known violation goes unreported (thereby creating new ethics violations), or the violation is reported and the APA potentially withdrawals the Clinical Psychology Program's accreditation.

The Committee concludes that the responsibility to protect faculty members (and students) who are affected by an individual's actions rest with the institution's designated authority [Dr. Renshaw, in his capacity as Dr. Kashdan's direct supervisor]. The designated authority should act to avert additional ethical violations or potential loss of accreditation if violations of University Policy 1202 have been determined.

---

[1] Representative for the petitioners: Associate Program Director (Dr. Jerome Short), and other core clinical faculty (Drs. Sarah Fischer, Tara Chaplin, Lauren Cattaneo, June Tangney, Leah Adams, and Robyn Mehlenbeck).

**A771**

Thus, the Committee recommends the following:

a. If determination(s) of violation(s) of University Policy 1202 by a faculty member affiliated with the Clinical Psychology PhD program occurred, then that faculty member [Dr. Kasdhan] should act in accordance with the *Faculty Handbook* Section 2.10.2 and disaffiliate from the Clinical Psychology Program to prevent harm to the program and to prevent violations of Section 2.10.2 for himself and other faculty.

b. If determination(s) of violation(s) of University Policy 1202 by a faculty member affiliated with the Clinical Psychology PhD program occurred, and that faculty member does not voluntarily disaffiliate, the onus to take corrective actions lie with the supervisor [Dr. Renshaw] per *Compliance, Diversity and Ethics Grievance Procedure, Corrective Actions and Sanctions*. Corrective actions should require, if they do not already, the disaffiliation of that faculty member from the Clinical Psychology Program.

c. Then disaffiliation should occur after all appeals applicable to violation(s) of University Policy 1202 have been exhausted within the University (including direct appeals of determinations made by Compliance, Diversity, and Ethics (CDE) and any review of CDE investigative procedures by the Provost's Office).

The Committee has considered the additional corrective actions proposed by the petitioners. Per University personnel policy and CDE procedures regarding *Corrective Actions and Sanctions*, the Committee concludes that any corrective measures beyond requiring disaffiliation should be developed by the direct supervisor(s) and should consider any existing corrective measures that may have been imposed and any relevant public guidelines that are specific to the Clinical Psychology Program's operation at George Mason University.

The Committee recognizes that this issue is extremely difficult for all parties involved. Please contact me should you have any questions or concerns.

On behalf of the Committee,

*CAGallagher*

Catherine Gallagher, PhD
Chair of the Faculty Grievance Committee, College of Humanities and Social Sciences
George Mason University
4400 University Drive MSN 4F4 Enterprise 303,
Fairfax, Virginia 22030
cgallag4@gmu.edu

A772

**EXHIBIT 31**

 Department of Psychology

4400 University Drive, MS 3F5, Fairfax, Virginia 22030-4444
Phone: 703-993-1384; Fax: 703-993-1359

September 17, 2019

Dear ██████████:

On August 1, 2019, multiple faculty members in the ████████████ program filed a grievance with the College of Humanities and Social Sciences (CHSS) Grievance Committee against me in my role as Department Chair, for failing to take what they saw as necessary steps to protect the accreditation of that program. Specifically, they suggested that, in four separate cases, you were found to have violated University Policy 1202, which is the university's policy prohibiting sexual or gender-based harassment. They then described ways in which they believed that having a core faculty member of the program with substantiated claims of sexual harassment would put the program in violation of the ████████ ███████████████████████████████████████████ They concluded by requesting that, if you did not voluntarily "disaffiliate" from the ███████ program, I compel your disaffiliation from the program.

I note that, throughout my communication with the Grievance Committee, I did not confirm whether there was any investigation of your behavior or any subsequent findings or sanctions. However, I did respond to the substance of the grievance, in terms of the consequences if any faculty member in the ████ program was found to have violated the University policy on sexual and gender-based harassment. On September 10, 2019, the Grievance Committee concluded their review of this complaint, and issued the following recommendations:

  a. If determination(s) of violation(s) of University Policy 1202 by a faculty member affiliated with the ████████████████ program occurred, then that faculty member ████████████ should act in accordance with the Faculty Handbook Section 2.10.2 and disaffiliate from the ████ ██████████ Program to prevent harm to the program and to prevent violations of Section 2.10.2 for himself and other faculty.

  b. If determination(s) of violation(s) of University Policy 1202 by a faculty member affiliated with the ████████████████ program occurred, and that faculty member does not voluntarily disaffiliate, the onus to take corrective actions lie with the supervisor [Dr. Renshaw] per Compliance, Diversity and Ethics Grievance Procedure, Corrective Actions and Sanctions. Corrective actions should require, if they do not already, the disaffiliation of that faculty member from the ████████████ Program.

  c. Then disaffiliation should occur after all appeals applicable to violation(s) of University Policy 1202 have been exhausted within the University (including direct appeals of determinations made by Compliance, Diversity, and Ethics (CDE) and any review of CDE investigative procedures by the Provost's Office).

The Faculty Handbook Section 2.11.2.2 (subsection 2b) indicates that, when a grievance is filed against an academic administrator below the level of the a Dean, the college-level grievance committee makes a recommendation to the Dean, whose decision on the matter is considered final. On September 16, 2019,

CHSS Dean Ann Ardis indicated that she concurred with recommendation 'b'. Moreover, with regard to recommendation 'c', she indicated that her "understanding is that all applicable appeals within the university have been exhausted at this time and that, as per the Provost's July 30, 2019 letter to the Faculty Senate Executive Committee, Mason will not be conducting a re-evaluation of CDE's substantive findings of this case." I sought and received additional confirmation of Dean Ardis' understanding of the status of the Provost's Office's review of investigative procedures in an email from Senior Vice President Carol Kissal on September 16, 2019.

Therefore, I am issuing this letter to inform you that, as of today, you may no longer serve as a core faculty member of the ███████████ program. In line with the description provided by ███████ ██████ in the grievance filed on August 1, 2019, the following actions will accompany this change:

1. Your name and information will be removed from listings of core faculty members ████ program materials (e.g., brochure, handbook) and on the website

2. You should no longer attend ██████ program faculty meetings or participate in ██████ program decision making

3. You should not participate in ██████ program related student training, which includes:
   a. Teaching courses or seminars targeted toward ██████ students
   b. Participating in ██████ program brown bags
   c. Conducting program-related research (i.e., research related to ██████ program requirements) with doctoral students in the ████████ program
   d. Serving on ██████ student committees (e.g., comps, second year projects, dissertation)
   e. Serving as a research ███████ mentor for doctoral students in the ████████████ program

4. You should not participate in other work related to the ██████ program (e.g., serving on committees related to the program's functioning).

To facilitate these actions, I will send a letter to ███████████████████, instructing her that you are no longer to be considered a core faculty member in the █████████████ program. In that letter, I will request that she remove your information from program materials. I will also ask her to identify all program-related student committees and faculty committees on which you are currently a member, so that we can identify replacements. In addition, based on the preferences you expressed during our meeting on September 16, 2019, I will contact the three doctoral students in the █████████████ program whom you are currently mentoring ████████████████████ to set up meetings with each of them individually. I will conduct these meetings with ███████████████████. Together, we will inform the students that you can no longer act as their primary research mentor, and work with them to identify new advisors in line with their research interests. We will make it clear that this decision was not made by you, but we will not disclose the specific nature of the reasons for this change. I will seek to conduct these meetings as soon as possible, and I will ask ████████████████ to refrain from discussing this situation with any faculty until we have met with each of these students. Throughout this process, we will do our utmost to provide the students with the support they need.

Finally, I will work with our department staff to remove your affiliation from the ██████ program on the ████████████ department's website. I ask that you please make all necessary adjustments to any materials that you maintain (e.g., websites, email signatures) to remove references to an affiliation with the █████████████ program.

Please note that these changes do *not* prohibit doctoral students in the ████████████ program from working with you on non-related program research, nor do they prohibit such students from electing to work for you as Graduate Research Assistants, if you have independent funding for them. The same constraints that were described in the May 31, 2019 letter of censure do continue to apply to your interactions with students in any capacity for the time period specified in that letter.

Barring any unforeseen events, this change in affiliation status will be in place *at least until* all students who are currently enrolled in the program as of the 2019-2020 academic year are no longer enrolled in the ████████ program (through graduation or withdrawal). At that time, if you desire to reaffiliate with the ████ program, you can follow any prescribed procedures that may be in place in the department at that time. If no such procedures exist, you may make a direct request to the Director of the ████████████ Program and Department Chair. You may be asked to provide evidence of behavior change in support of your request.

I know that this process has been grueling, and that this decision is a painful one for you. I also understand that it will take extensive work to attempt to rebuild some sense of collegiality, to the extent possible, among you and the other faculty. I am committed to helping to facilitate this work however I can. As one possibility, I am prepared to advocate for facilitated, one-on-one meetings between you and other faculty to help talk through some of these issues. I understand that you may not wish to take such a step now, and that you may not wish to do so with all faculty. Thus, I will rely on your input as to whether, when, and how to initiate such attempts. I am also wholly open to discussing other possibilities with you. I truly hope that we can work to find a productive way forward from these difficult circumstances.

Sincerely,

Keith Renshaw, PhD
Professor & Chair

CC: Ann Ardis, PhD, Dean, College of Humanities and Social Sciences

**EXHIBIT 32**

A777

# CONFIDENTIAL

### Department of Psychology - George Mason University
### Peer Evaluation of Teaching Form

Instructor being evaluated     ____Todd Kashdan_____

Peer observer                  ____James Thompson_____

Course # and name        PSY 822 Psychopathology I
    **Undergrad**        **Graduate**

Type of course        Ind. Study/Supervision     Seminar          Lecture

Date of observation        4/2/2013____          Semester   _Spring_____

Number of students in course _____       Number attending today ____7

**Narrative**

I observed Dr. Kashdan's PSYC 822 Psychopathology graduate seminar on 4/2/2013. This class covers concepts and research on current theories of psychopathology. Dr. Kashdan emailed me the syllabus and reading a week or so in advance – this was a clear and organized syllabus.

Students had arrived on time for the class and appeared to be prepared for the class to begin. Dr. Kashdan was able to begin on time, and started with some discussion about assignments and other class business. The topic of the seminar was Sexual Issues and Disorders. The class had been assigned readings for that week and had been asked to send opinion papers to the group ahead of the class. It was clear from the start of the discussion that this had been a lively process. Some members of the class had even shared other papers that were contrary to those posted as the weeks reading, clearly demonstrating an engagement with the topic. Dr. Kashdan begun the discussion of the materials by praising the group on their strong, positive engagement with the reading materials, and their ability to relate the materials to clinical experience.

Dr. Kashdan had a good rapport with the group, and asked some questions to get the group to think outside their prior-held beliefs. There was considerable discussion about a paper that reported evidence of differences in sexual plasticity between men and women. A few students in the class had very strong reactions to this paper, and quite strong beliefs about the topic. Dr. Kashdan worked to broaden the discussion and encouraged all of the students to think about what is the empirical evidence to support their opinions. Given the sensitive nature of the materials and some strong opinions in the class, Dr. Kashdan worked very well to keep an atmosphere of mutual respect and fact-based discussion throughout the class.

TK00340

A778

CONFIDENTIAL

**Overall, the discussion was very lively and interesting. Dr. Kashdan's teaching style was positive and encouraging, and allowed the students to voice a range of thoughts and opinions in a highly supportive environment.**

TK00341

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**


JOHN DOE,                                          )
                                                   )
                    Plaintiff,                     )     Civ. Action No. 1:19-cv-01249-LO-MSN
                                                   )
          v.                                       )
                                                   )
GEORGE MASON UNIVERSITY, *et al.*                  )
                                                   )
                    Defendants.                    )


---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S DUE PROCESS AND FIRST**
**AMENDMENT CLAIMS PURSUANT TO FEDERAL RULE 12(b)(6)**

---


**NESENOFF & MILTENBERG, LLP**

**363 Seventh Avenue, Fifth Floor**

**New York, New York 10001**

**(212) 736-4500**

          **-and-**

**FARMER LEGAL, PLLC**

**5030 Sadler Place, #205**

**Glen Allen, VA 23060**

**(804) 325-1441**

**A780**

## <u>INTRODUCTION</u>

Plaintiff respectfully submits this memorandum of law in opposition to the Individual Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's due process (Counts II and III) and First Amendment (Count IV) claims (ECF Nos. 29-30). The motion should be denied.

Defendants assert that Plaintiff had no right to due process because he was not terminated. On this ground, they further argue that Plaintiff cannot allege deprivation of a constitutionally-protected property interest. Plaintiff need not have been terminated to plausibly allege the deprivation of a property interest in his tenured position as a full professor.

Defendants further argue that Plaintiff cannot allege that he was deprived of a constitutionally-protected liberty interest in his name and reputation because (i) he was not terminated and (ii) the charges were not made public. On the contrary, Plaintiff plausibly alleged that he suffered a significant demotion and was relegated to a "perilous detour" in, if not a "dead end" to, his career. Plaintiff also plausibly alleged publication, based on Defendants Williams and Renshaw disseminating information about the Title IX findings and sanctions to the Title IX complainants, faculty and students at George Mason University ("GMU").

Defendants concede that Plaintiff was entitled to notice and opportunity to be heard, and then argue that he received all the process he was due. Defendants ignore controlling case law to surmise that the due process rights articulated in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), do not apply to Plaintiff because he was not terminated. Plaintiff plausibly alleged that Defendants violated his right to due process because he could not review even a scintilla of evidence in the Title IX proceedings against him, he was not provided with notice of all of the allegations upon which the Title IX findings were based, and the administrator involved at

**A781**

each stage of the process was biased. Defendants violated Plaintiff's clearly established rights and are not entitled to qualified immunity.

Defendants argue that Plaintiff's First Amendment claim should be dismissed because the statements at issue in the Title IX investigation (i) did not involve matters of public concern and, even if they did, (ii) they were made in Plaintiff's role as a public employee. As detailed below, both of these arguments fail under controlling free speech case law, both inside and outside the classroom of a university professor. This controlling case law further demonstrates that Defendants have no right to assert a qualified immunity defense with respect to Plaintiff' First Amendment claim.

## BACKGROUND

In Fall 2018, four (4) sexual harassment complaints were made against Plaintiff by graduate students in Plaintiff's Department, including: Complainant 4, whom Plaintiff had recently fired from his lab for poor performance; Complainants 1 and 2, who had already graduated from GMU; and Complainant 3, with whom Plaintiff had minimal contact over the course of her academic career. Compl. ¶¶ 3, 140, 142, 323, 369. Complainants 1-3 were all friends with Complainant 4 and Complainant 3 was also her roommate. *Id.* ¶ 5, 140.

With the exception of Complainant 3's allegations that Plaintiff gave her a hug on two occasions, two years apart (one of which was not substantiated), the allegations concerned no physical contact or romantic or sexual overtures. *Id.* ¶ 249, 287, 303, 335. Rather, they concerned an example that Plaintiff used in teaching Course A, in *Spring 2013*, and an example that Plaintiff used in Course B, in *Spring 2014*, as well as conversations Plaintiff had with his lab group—which conducted research on issues concerning human sexuality, including sexual pleasure and pornography—during social activities and at professional conferences. *Id.* No contemporaneous

complaints were made with respect to these statements. *Id.* There was, further, no evidence that the purportedly offensive statements denied the complainants access to, or interfered with, their educational opportunities in any way. *Id.* ¶¶ 247, 256, 259, 264, 285, 291, 297, 303, 309, 322-329, 342-343, 345-349, 365.

Defendant Jennifer Hammat ("Dr. Hammat"), GMU's Title IX Coordinator, commenced an investigation into the allegations even though GMU policy did not permit *post hoc* investigations on behalf of alumni and the majority of allegations were time-barred, dating back as early as 2013. *Id.* ¶¶ 142-143. Despite the lack of any evidence to support the allegation that Plaintiff engaged in any form of harassment with respect to any complainant, Dr. Hammat erroneously found Plaintiff responsible for violating GMU's Sexual Misconduct Policy with respect to all four complainants. *Id.* ¶¶ 247-359. Plaintiff, who worked at GMU for over 15 years and is a tenured, full professor, had no disciplinary record and stellar student and peer evaluations prior to the Title IX investigation. *Id.* ¶¶ 28, 31.

Dr. Hammat notified Plaintiff about the Title IX investigation by sending him four emails which stated only that potential violations of varying sexual misconduct policies had been alleged. Dr. Hammat did not specify the "charges" or the specific policy provisions applicable in the case of each complainant. Appended to each email were varying policies and grievance procedures. *Id.* ¶¶ 138, 249, 287, 301, 302, 333. Dr. Hammat emailed Plaintiff a total of five (5) different sexual misconduct policies and four (4) different grievance procedures. Exs. C-F. It is undisputed that Plaintiff had no opportunity to review any of the evidence supporting the charges against him. *Id.* ¶ 155. Dr. Hammat included findings in her determination letters which were based on allegations and information of which Plaintiff was never notified during the Title IX investigation. Exs. K-N. Dr. Hammat was also biased. *Id.* ¶ 66-78, 84, 112-127, 149-164, 197, 202, 207, 251-256, 260-265,

275, 278-284, 288-289, 304, 313-323, 331-332, 336, 339-340, 357-365. Defendant Julian Williams

("Mr. Williams"), Dr. Hammat's direct supervisor, who and denied Plaintiff's appeal was also

biased. *Id.* ¶¶ 108-109, 116-120, 166, 259, 290, 302, 319, 323, 332, 336-341, 352, 359, 370-381,

401-403, 435, 483.z, 485 (h)-(i), 520-521; Ex. T.

      After Plaintiff's appeal was denied, GMU faculty, including Plaintiff's supervisor,

Defendant Keith Renshaw ("Dr. Renshaw") sent a memorandum to Defendant S. David Wu

("Provost Wu") outlining their grave concerns with the lack of due process in faculty disciplinary

proceedings, including the failure to provide supporting evidence to faculty accused of

misconduct, Mr. Williams' partiality as Dr. Hammat's supervisor, and the lack of proportionality

between the severity of sanctions and the severity of allegations. *Id.* ¶¶ 385-392; Ex. O.

      Dr. Renshaw was responsible for sanctioning Plaintiff. *Id.* ¶¶ 393-399. Plaintiff faced

termination as a potential sanction. *Id.* ¶¶ 187(b), 190(b), 196, 206. The subsequent final Title IX

sanctions imposed by Dr. Renshaw substantially impaired Plaintiff's ability to carry out his normal

and required duties as a tenured professor because they imposed restrictions of an indefinite

duration which could only be lifted at Dr. Renshaw's discretion, including banning Plaintiff from

working with graduate students until at least Fall 2021. *Id.* ¶¶ 393-399; Ex. B. Plaintiff was also

deprived of salary increases as a result of the sanctions. *Id.* ¶ 399. It is undisputed that Plaintiff had

no notice regarding the sanctioning process or any opportunity to meet with Dr. Renshaw prior to

his imposition of the sanctions. *Id.* ¶ 406.

      As a result of Dr. Renshaw and Mr. Williams sharing information concerning Plaintiff's

Title IX findings and sanctions, Professor 1 attempted to force Plaintiff to disaffiliate from his

program. *Id.* ¶ 413-422. When Plaintiff refused, Professor 1 and a number of other professors filed

an unauthorized grievance against Plaintiff with the Faculty Grievance Committee. Per GMU's

attorney, the Committee did not speak for the University. *Id.* ¶¶ 418-422, 442. The Committee "recommended" that Plaintiff either voluntarily disaffiliate from his program or that Dr. Renshaw disaffiliate Plaintiff from his program—a program which Plaintiff helped create and worked in for the entirety of his career. *Id.* ¶ 423; Ex. A. The only graduate students interested in working on Plaintiff's research are in his program. *Id.* ¶ 426. Regardless, Dr. Renshaw elected to disaffiliate Plaintiff from his program for at least **5-6 years** and with no clear path for reinstatement. *Id.* 455-457. Ex. G. He also forced three students who remained interested in working with Plaintiff— two of whom had defended Plaintiff in the Title IX investigation—to find new mentors. *Id.* ¶ 456. Like Dr. Hammat and Mr. Williams, Dr. Renshaw was biased. *Id.* ¶¶ 131, 427-429, 432-426, 444-445.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *1 (W.D. Va. 2015). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "'state a claim to relief that is plausible on its face.'" *Kirch v. Kowalski*, 2018 WL 3596028, at *1 (E.D. Va. 2018) (O'Grady, J.). Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.* at *1.

## ARGUMENT

**I.**     **Plaintiff Plausibly Alleged A Procedural Due Process Claim**[1]

---

[1] Plaintiff hereby withdraws his federal and state due process claims (Counts II and III) against Defendants Wu and Ardis, in their individual capacities, for money damages. Plaintiff believes that Defendants Wu and Ardis are indispensable parties in their official capacities because they have the authority to effectuate the injunctive relief sought in Counts II and III of the Complaint. *See Doe v. Rectors and Visitors of George Mason University ("GMU"),* 149 F. Supp. 3d 602, 624 & n. 22 (E.D. Va. 2016).

Defendants seek dismissal of Plaintiff's federal and state law[2] due process claims (Counts II and III) on the grounds that: a) he has not adequately alleged a deprivation of a property interest; b) he has not adequately alleged a deprivation of a liberty interest; and c) he received all of the due process protections to which he was entitled. For the reasons set forth below, these arguments are meritless and the Court should deny that portion of Defendants' motion seeking to dismiss Counts II and III of the Complaint.[3]

### A.      Plaintiff Plausibly Alleged Deprivation of a Protected Property Interest

Defendants do not dispute that Plaintiff has a property interest in his tenured position as a full professor at GMU. Moving Br. at 7. Rather, they dispute that Plaintiff has been deprived of that property interest because he was not terminated from his employment. *Id.* Defendants point to no bright line rule in this Circuit that *requires* that a public employee be terminated in order to plausibly allege a deprivation of his or her property interest in continuing employment. On the contrary, the "scope of a property interest in a fact-intensive inquiry that turns on the terms of the contract (or law) creating the property interest." *Garner v. Steger*, 69 F. Supp. 3d 581, 590-591 (W.D. Va. 2014) (holding that professor whose "monetary benefits and prestige"—not salary— were reduced by loss of laboratory subsidy and ability to control funding for additional researchers plausibly alleged deprivation of property interest). *See Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 604, 614 (E.D. Va. 2015) (20- and 40-hour suspensions constituted deprivation of property

---

[2] For the reasons stated in Points I.A., I.C. and I.D, Plaintiff's state law due process claim (Count III) should not be dismissed. Plaintiff is not asserting a state law claim with respect to his liberty interest. *See* Defs. Moving Br. at 19.

[3] Defendants assert that Plaintiff's claims for money damages against Defendants "in their official capacities" should be dismissed on Eleventh Amendment grounds. Moving Br. at 6. The Complaint clearly alleges claims for injunctive relief against the Defendants in their official capacities and claims for money damages against the Defendants in their individual capacities. Compl. ¶¶ 528-529, 534-535, 556-557. The Eleventh Amendment does not bar claims for money damages against Defendants acting in their individual or personal capacities. *See Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F. 3d 292, 306 & n. 13 (4th Cir. 2006).

# A786

interest); *Wilkinson v. School Bd. of Cnty. of Henrico*, 566 F. Supp. 766, 769 (E.D. Va. 1983) (plaintiff had property interest in not having employment interrupted by suspension).

Defendants also attack the propriety of Plaintiff's due process claim, raising the specter of Rule 11, because he alleged that the severe sanctions imposed on him were "tantamount to dismissal." Defs. Moving Br. at 10 & n. 8. Yet the facts set forth in the Complaint, including the impact of the sanctions, strongly support this claim. *See, e.g. Ridpath v. Board of Governors Marshall University*, 447 F. 3d 292, 310 (4th Cir. 2006) (reassignment of employee was neither voluntary nor innocuous transfer—despite salary increase—rendering it "tantamount to outright discharge"). Defendants ineffectively attempt to minimize the impact of the alleged sanctions by mischaracterizing them as a mere probationary period in which Plaintiff's job requirements barely changed. In fact, the sanctions imposed on Plaintiff have hobbled his career and his ability to carry out his required duties as a full professor at GMU.

Plaintiff alleged that, as result of the biased and flawed Title IX proceedings, Dr. Hammat's erroneous findings and Mr. Williams' denial of his Title IX appeal, Dr. Renshaw first issued sanctions which substantially impacted his ability to fulfill his role as a full professor and cost him at least two forms of salary increase. Compl. ¶¶ 393-399. Then, as a result of the Faculty Grievance Committee's recommendation,[4] which neither he nor Dr. Renshaw were obliged to follow, Dr. Renshaw disaffiliated Plaintiff from his program, rendering Plaintiff unable to effectively fulfill his role as professor. Compl. ¶¶ 412-459.

Contrary to Defendants' assertions, the sanctions imposed on Plaintiff are not temporary in nature and, even if they were, would not preclude his due process claim. Dr. Renshaw's first

---

[4] Defendants criticize Plaintiff for failing to include the members of the Faculty Grievance Committee as defendants. First, GMU never disclosed the identities of the Committee members to Plaintiff, other than the Chair. He received no information about their decision-making process. There was, further, no basis to do so because Committee did not have the authority to disaffiliate Plaintiff from his program, only to issue a decision that was akin to an advisory opinion. *See* Compl. ¶ 441 (noting that Committee "does not speak or act for the University").

**A787**

sanction letter, (Ex. B), imposed restrictions on Plaintiff's continuing employment at GMU that were, in fact, of an ***indefinite duration***:

1) Plaintiff was ineligible to recruit new graduate students to work under his mentorship and supervision. While the sanction letter states that this restriction is in place for over two years (until August 15, 2021), it also says that Plaintiff's return to working with graduate students is subject to Dr. Renshaw's, and the Dean's, discretion as to whether Plaintiff has exhibited "sufficient behavioral change." Compl. ¶ 393. The reason why Plaintiff has alleged that this indefinite restriction was tantamount to dismissal is because, in effect, Plaintiff could be prevented from ever conducting research with graduate students, who comprised the necessary human capital needed to conduct his research, ***ever again***. *Id.* ¶ 395. Plaintiff further alleged that the restrictions will have a long lasting, chilling effect on his work. *Id.* ¶ 396.

2) The monitoring and reporting requirements imposed by Dr. Renshaw are vague enough that it would be easy for Dr. Renshaw to argue that Plaintiff violated the conditions of the sanction, preventing him from resuming his supervision and mentorship of graduate students ***at any point in time***—even if Dr. Renshaw and the Dean allow him to resume working with graduate students in 2021. *Id.* ¶ 397.

3) Per the sanction letter, if Plaintiff is allowed to resume supervising graduate students in his lab, Dr. Renshaw and the Dean "will make the determination if any continuing restrictions are necessary." *Id.* ¶ 398. Thus, by the plain language of Dr. Renshaw's letter, Plaintiff is not merely on probation for ***two years***—the potential timeframe in which he will be restricted from his core responsibility of working with graduate students is ***indefinite***.

Ex. B. Plaintiff further alleged that he was deprived of compensation as a result of Dr. Renshaw's sanction because he is ineligible for salary increases to which he would have been entitled, as well as any merit-based pay raises, for an indefinite period of time. Compl. ¶ 399.[5]

After the Title IX sanctions were imposed, and faculty began spreading rumors about Plaintiff around the Department. Professor 1 attempted to force Plaintiff to disaffiliate from the program within which he had worked for his entire career. Professor 1 offered the sham excuse that the program could lose its accreditation if Plaintiff remained part of it—which Plaintiff learned from the accrediting association was untrue. Compl. ¶¶ 413-416. Professor 1 had no

_____

[5] Subsequent to the filing of the Complaint, Plaintiff also lost Department funding for his research.

authority to impose additional sanctions on Plaintiff or to amend the sanctions already imposed by Dr. Renshaw. *Id.* ¶ 417. When Plaintiff refused to voluntarily disaffiliate from the program, Professor 1, along with 7 other professors, filed a grievance with the Faculty Grievance Committee, pursuant to which the Committee took it upon itself to review the sanctions imposed on Plaintiff under GMU's Grievance Procedures for *Title IX* investigations. The Title IX Grievance Procedures provided for no such level of review. *Id.* ¶¶ 418-422; Exs. C-F (appended policies and procedures). The Grievance Committee recommended that Plaintiff either voluntarily disaffiliate from the program or that Dr. Renshaw disaffiliate Plaintiff. Ex. A. Because the Committee is an internal faculty body "that does not speak for the University," Dr. Renshaw was not obligated to follow this recommendation. *Id.* ¶ 442.

When Plaintiff elected not to acquiesce to the Committee's recommendation and disaffiliate from his program, Dr. Renshaw elected not only to disaffiliate Plaintiff, but to do so for *5-6 years*. Compl. ¶¶ 455-457. Ex. G. Plaintiff was banned from teaching any courses or seminars in the program, participating in program-related brown bag lunches, conducting program-related research with doctoral students, serving on committees and serving as a mentor. *Id.* ¶ 455. Though three of Plaintiff's graduate students in the program (male and female)—who decried the allegations that Plaintiff created a hostile environment—wanted to continue working with Plaintiff, Dr. Renshaw forced them to separate from his mentorship. Compl. ¶ 456.[6] Whether or not Plaintiff can ever re-affiliate with the program is an open question, left to the discretion of whomever heads the Department and the program in or around 2026, whether there are any procedures in place at

---

[6] Defendants falsely assert that "Plaintiff was allowed to continue to work with existing graduate students under his mentorship, if those students chose to continue working with him." Defs. Moving Br. at n.7. *Compare* Ex. B *with* Ex. G.

that point to do so and Plaintiff "may be asked to provide evidence of behavioral change in support of [his] request." Ex. G.

Disaffiliation was a form of banishment from a program that Plaintiff heavily contributed to and helped establish. Compl. ¶ 423. Moreover, the only students who have shown interest in Plaintiff's research at GMU are students in the very program from which he was disaffiliated. *Id.* ¶ 426. As alleged in the Complaint, "the new severe sanctions imposed on Plaintiff were the final blow to Plaintiff's research and professorship" and "rendered his position untenable." *Id.* ¶ 457. Clearly, Defendants were asserting pressure on Plaintiff in order to force his resignation by stripping him of every meaningful aspect of his professorship. Plaintiff has not caved to this pressure.

Contrary to Defendants' assertion, the sanctions outlined above are a far cry from a mere "change in assignment," "reassignment of duties" or change in "physical location," as referenced in Plaintiff's appointment letter. *See* Defs. Ex. 5. Moreover, the *University* did not undertake the implementation of additional sanctions on Plaintiff—per University counsel the decision of the Faculty Grievance Committee to disaffiliate Plaintiff was not the University's decision. Compl. ¶ 442. Pursuant to his appointment letter, Plaintiff is required to make his "best efforts to successfully perform his duties." Defs. Ex. 5, Attachment A, page 3. The sanctions imposed by Dr. Renshaw have made it essentially impossible to comply with this provision.

Defendants do not address that the Faculty Handbook, and the very provisions upon which the Faculty Grievance Committee relied in recommending Plaintiff's disaffiliation, provides that "*[i]n all cases, the parties have a right to procedural due process*." Defs. Ex. H, Section 2.10.2 (emphasis added).

**A790**

Defendants also fail to address that GMU's Sexual Misconduct Policies, which are incorporated by reference into the Faculty Handbook and were relied upon by Dr. Renshaw and the Faculty Grievance Committee, require due process for all individuals involved in the process. *See, e.g.* Ex. C-D, Policy 2006-14, Section IV; Ex. E-F, 2016-2017 Sexual Misconduct Policy, Section III (mandating thorough and impartial investigation, notice, opportunity to present witnesses and evidence and view evidence).

Defendants also attempt to minimize the impact of Dr. Renshaw's sanctions on Plaintiff's tenure, spanning over the next 6 years with no finality, by offering for the Court's review a few lines concerning faculty work assignments while conveniently omitting the Faculty Handbook provisions concerning faculty evaluations. Defs. Moving Br. at 9; Defs. Ex. 4. Defendants also set forth the type of work that faculty assignments include, but ignore that these assignments must be "equitably allocated" and ensure "fairness and equity throughout the University." Ex. H, 2.10.3 at 47-48.

With respect to evaluating tenured faculty, the Faculty Handbook sets forth criteria for annual evaluations, which are the "primary basis for determining salary increases." Ex. H, 2.6.1, at 28. The evaluations examine whether professors are effective teachers, including with respect to "the training and supervision of teaching assistants, mentoring graduate students, clinical and field supervision of students and student advising." *Id.* Section 2.4.1. Dr. Renshaw's sanctions bar Plaintiff from engaging in any of these activities for an unlimited period of time.

Tenured faculty are also evaluated for scholarly achievement, or original publications and peer-reviewed contributions which, as set forth *supra*, will be impacted in Plaintiff's case by his lack of graduate student staff (even though students wanted to continue working in his lab). *Id.* Section 2.4.2. A third component of faculty evaluations is University and professional service. *Id.*

11

Section 2.4.3. This requires participation in faculty meetings, governance and operational activities outside the classroom. *Id.* Plaintiff has been banned from participating in meetings, and sitting on committees, in his program. His lack of ability to participate will surely negatively impact his evaluations going forward. Tenured faculty who receive two "unsatisfactory" reviews in a four-year period may be terminated. *Id.* Section 2.6.2. Given these provisions, Defendants cannot reasonably argue that the sanctions imposed on Plaintiff are a mere probationary process with minimal impact on his tenure.

Defendants concede that the Court may not consider evidence outside the scope of the Complaint and then include this purported evidence in their brief anyway. Such tactics should not be countenanced by this Court. Defs. Moving Br. at n. 8.[7] Missing from Defendants' purported evidence are facts concerning the invaluable role that graduate students play in assisting faculty with their research, including by providing the human capital necessary to timely complete the projects funded by research grants. Indeed, graduate students comprise the majority of staff that Plaintiff worked with in his lab over the course of his career at GMU. Compl. ¶¶ 28, 394-396, 426. A professor's inability to utilize graduate students to conduct research can hobble a given project and result in a loss of funding. By way of example, the removal of graduate students from Plaintiff's lab is the equivalent of removing all middle management executives from a company, and leaving the Chief Executive Officer to work with the least skilled and experienced employees to try and keep the company functioning. Such a position is untenable.

Defendants' assertion that Plaintiff's submission and publication of articles in 2019 evidences a lack of harm is also misleading. Defs. Moving Br. at n. 8. For example, Complainant 4

---

[7] Plaintiff responds to Defendants' assertions in kind even though they are improper, outside the scope of the pleading, and raise questions of fact that cannot be resolved at this stage. Should the Court elect to consider evidence outside the scope of the pleadings, Plaintiff requests the opportunity to submit responsive evidence and/or testimony to the Court concerning these issues.

is listed as co-author of one of the articles, indicating that it was researched, and written, before Complainant 4 was fired from Plaintiff's lab in September 2018. Compl. ¶ 331. Certain of the co-authors of other articles listed were in Complainant 4's lab group and graduated from GMU in May 2019. Moreover, it is silly for Defendants to assert that articles *published* or *submitted for publication* in 2019 involve research conducted by Plaintiff in the few months after Dr. Renshaw imposed sanctions on Plaintiff (on May 31, 2019 and then again on September 17, 2019). Compl. ¶¶ 449.[8]

While Defendants point to a research grant that Plaintiff was recently awarded as evidence of how well they believe he is doing, they provide no context, such as whether Plaintiff has historically relied on research grants or if his Department cut off his research funding because he can no longer work with graduate students. Surely Plaintiff would need additional monies to close any gaps resulting from Dr. Renshaw's sanctions. Defendants' assertion that a job posting for post-doctoral students is the equivalent of having adequate staff to support Plaintiff's research is also baseless, particularly since Defendants do not assert that Plaintiff has been able to hire any replacement staff. The same can be said for the assertion that having more laboratory space signifies more than just that.

The cases relied upon by Defendants to argue that Plaintiff has not been deprived of a protected property interest are readily distinguishable from the facts at hand. In *Huang v. Board of Governors of the University of North Carolina*, 902 F.2d 1134 (4th Cir. 1990), addressing the district court's prior summary judgment ruling, the appellant was merely transferred to another department where his "expertise …would be effectively employed," and he remained employed at the same, or greater, compensation. *Id.* at *1142. The appellant also received a full, nine-day

---

[8] Plaintiff's participation in conferences is also neutral evidence—it could be that the conferences were scheduled well in advance of his disaffiliation from Dr. Renshaw's imposition of either round of sanctions.

hearing prior to any determination being made with respect to his employment. *Id.* at **1137, 1142. Here, Plaintiff alleged that he is ineligible for any salary increases, as well as merit-based pay raises, for an indefinite period of time and, as detailed *supra*, he is no longer "effectively employed" because of both the immediate and long-term effects of Dr. Renshaw's sanctions. Dr. Renshaw simply disaffiliated Plaintiff from his program. Unlike *Huang*, there was no effort to place Plaintiff in another program within his Department and, therefore, no reassignment. *See* Ex. G. It is unheard of that a professor would be completely isolated by not being affiliated with any program within a Department.

In *Royster v. Board of Trustees of Anderson County School District*, 774 F.2d 618 (4th Cir. 1985), the Fourth Circuit reversed a directed verdict in the plaintiff's favor because the plaintiff received all of the compensation and benefits that were due for the term of his employment contract. *Id.* at 621. Here, Plaintiff is a GMU employee "elected without term," or with tenure, that has been deprived of salary increases. Unlike the plaintiff in *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990), Plaintiff has not alleged that he is entitled to perform a particular job or even work in a particular program of his Department. As detailed *supra*, the sanctions imposed on him have deprived him of the ability to perform the critical duties required of him in order to maintain his tenure, including working within the program that he was affiliated with for the entirety of his career. *See, e.g. Garner*, 69 F. Supp. 3d at 590-591. *See also Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 900-01 (8th Cir. 1994) ("An employee can have a protected property interest in a benefit, such as a particular assignment or duty station, if he legitimately expects to continue in that assignment or duty station."). Plaintiff's case is also readily distinguishable from *Cominelli v. The Rector and Visitors of the University of Virginia*, 589 F. Supp. 2d 706, 713-714

(W.D. Va. 2008), in which the plaintiff asserted that he had a property interest in an *at-will* position as director of his department.

  **B.**  <u>Plaintiff Plausibly Alleged Deprivation of a Protected Liberty Interest</u>

  Defendants do not dispute that Plaintiff has sufficiently alleged that the charges against him placed a stigma on his reputation and were false. Defs. Moving Br. at 12. Rather, Defendants assert that Plaintiff "has not, and cannot plead" that (1) the charges were made in conjunction with his termination or demotion and (2) that they were made public. *Id.* As set forth below, Defendants' arguments are meritless and the Court should deny defendant's motion to dismiss Plaintiff's due process claims.

  **1.**  **Plaintiff Plausibly Alleged That the Sanctions Imposed**
     <u>Constitute A Significant Demotion</u>

  A procedural due process claim grounded in the deprivation of a liberty interest is sufficiently alleged for purposes of a motion to dismiss where the plaintiff alleges "a significant demotion [which] may include the reassignment of an employee to a position outside his field of choice." *Ridpath*, 447 F.3d at 310. In evaluating the "gravity of a change in assignment, a court may consider surrounding circumstances; for example, a reassignment involving threats to the employer's career has a greater likelihood of being significant." *Miller v. Hamm*, 2011 WL 9185, at \*9 (D. Md. Jan. 3, 2011) (citations omitted) (plaintiff sufficiently pleaded significant demotion where reassignment excluded him from flying helicopters for law enforcement and assigned him to foot patrol). *See Hall v. City of Newport News*, 469 Fed. Appx. 259, 262 (W.D. Va. 2012) (significant demotion pleaded where plaintiff, though still an employee, was stripped of his law enforcement duties, and reinstated position "excluded him from his calling"). In *Ridpath*, the Fourth Circuit found that this element was satisfied by the Plaintiff's allegations that, among other things, he was banished from the department in which he worked, and relegated to a position that

constituted a "perilous detour" or "dead end" to his career. *Id.* As fully detailed *supra* Point II.A, Plaintiff alleged that, while he is still employed, the sanctions that Dr. Renshaw imposed banished him from the program that he worked in for the entirety of his career, and which supported his research, for at least six years. Plaintiff further alleged that the prohibition on working with graduate students (including those who elected to continue working with him) has prevented him from fulfilling his duties as a professor. Being banished from his program is no different from the public employees in *Ridpath*, *Miller* and *Hall* who remained employed, but were relegated to jobs that were not reflective of their chosen careers. Per the allegations of the Complaint, Plaintiff's ability to continue on his chosen career path has been crippled by Dr. Renshaw's sanctions.[9]

### 2.  Plaintiff Sufficiently Pleaded Publication

Where, as here, a plaintiff alleges that stigmatizing statements were made to faculty, students, and staff, then "there is at least a question as to whether such disclosure constitutes 'public' disclosure." *Garner*, 69 F. Supp. 3d at 581. *See Cannon v. Village of Bald Head Island,* 891 F.3d 489, 503 (4th Cir. 2018) (under *Sciolino* standard publication occurred when employer sent email to employees stating that employees were terminated for sexual harassment). Plaintiff alleged that: a) he was approached by students asking whether the University punished him for engaging in sexual misconduct and whether he had been prohibited from taking on new students for the upcoming year—whether these students learned about the restriction from Complainants 1-4 or GMU faculty, there was no basis in any University policy (or under the applicable OCR 2017 Guidance) for informing Complainants 1-4, or faculty, about this restriction (or any

---

[9] *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 617 (E.D. Va. 2015), is distinguishable from the present facts because the *Willis* plaintiffs alleged nothing more than a conclusory assertion that they lost pay opportunities "and many other benefits of employment" without any explanation or other supporting allegations. In *Echtenkamp v. Loudon Cty.*, 263 F. Supp. 2d 1043 (E.D. Va. 2003), the restrictions imposed on the plaintiff concerned only 5% of her job responsibilities. *Id.* at 1051. In *Cominelli*, the plaintiff alleged that he was removed from administrative positions but that he remained, and was able to carry on his duties as, a member of the faculty. 589 F. Supp. 2d 715.

**A796**

subsequent sanctions) (Compl. ¶¶ 382-384; Ex. I; Exs. C-F (appended policies and procedures));

b) Student 1 told Plaintiff that faculty in the Department were telling their students about the Title

IX proceedings and sanctions against Plaintiff (*Id.* ¶ 412); c) Professor 1 was informed about the

Title IX proceedings and sanctions, which caused her to file a sham grievance against Plaintiff (*Id.*

¶¶ 413-426); d) CDE, helmed by Mr. Williams, provided Professor 1 with copies of the Title IX

findings against Plaintiff (and potentially more documentation, as yet undetermined) without

Plaintiff's knowledge (*Id.* ¶ 427); e) Professor 1 disseminated Plaintiff's Title IX documents to at

least nine other professors (*Id.* ¶¶ 427, 432-436); f) Dr. Renshaw led a meeting with the full faculty

of Plaintiff's Department with a focused discussion of the details of Plaintiff's case (*Id.* ¶ 510);[10]

and g) the Title IX sanction letter was permanently placed in Plaintiff's personnel file (*Id.* ¶ 394).[11]

*See also* Compl. ¶¶ 503-511.[12] Defendants' general disclosure of Plaintiff's Title IX findings and

sanctions to University faculty and students is sufficient to preclude dismissal at this stage of the

proceedings.

　　　　　While Defendants argue that only "internal" disclosures were alleged, it cannot reasonably

be argued that disclosure to an entire Department, and students, was not a public disclosure. *See*

Defs. Moving Br. at 13. The cases cited by Defendants in support of this argument are inapposite.

In *Scott v. Va. Port Auth'y*, 2018 WL 3232825 at *17 (E.D. Va. Feb. 7, 2018), the plaintiff alleged

---

[10] After the Complaint was filed, the faculty who filed the grievance against Plaintiff held a "town hall" meeting about Plaintiff with the graduate students in the program. Plaintiff was not notified that would occur. He found out about the meeting from graduate students that approached him about it. Professor 1, still not satisfied, also took it upon herself to meet with the heads of other programs in Plaintiff's Department to tell them that he had been disaffiliated from her program. Plaintiff was not notified that this would occur.

[11] Defendants' bald assertion that "several allegations are false," (Defs. Moving Br. at 13), need not be considered by the Court as this is an issue that will be ferreted out in discovery.

[12] Since the Complaint was filed, Plaintiff has learned about additional disclosures of which he was not informed and which indicate that the persons informed about Plaintiff's Title IX proceedings at GMU publicly disclosed the information beyond the walls of the University, including to government organizations through which Plaintiff has received grant funding. Should the Court find that dismissal of Plaintiff's stigma-plus claim is warranted based on a lack of publication, Plaintiff requests that it be dismissed without prejudice so that Plaintiff may have the opportunity to replead this element of his claim.

**A797**

not only that the information in question was disclosed to his co-workers, but placed in his personnel file, which would likely be requested by prospective employers. Here, Plaintiff has alleged a number of disclosures, including to members of the public (*e.g.* students at GMU) and that the Title IX sanctions letter will permanently reside in his personnel file. In *Adler v. VCU*, 259 F. Supp. 3d 359, 409 (E.D. Va. 2017), the court found that the plaintiff's allegation that an audit report circulated to decisionmakers in an internal investigatory process did not meet the publication requirement. *Id.* at 403-404. Here, Plaintiff has not alleged publication via the transmission of the Title IX findings or related documentation amongst or between the decisionmakers involved in that process. Unlike *Willis*, 90 F. Supp. 3d at 617, and *Echtenkamp*, 263 F. Supp. 2d at 1056, the alleged disclosures in Plaintiff's case were not limited to "internal memoranda, private conversations, or meetings not attended by the general public." *Id.* Plaintiff alleged the general dissemination of information about his Title IX case to GMU students and faculty, not simply those who needed to know for administrative purposes.

Defendants' argument that Plaintiff has not alleged publication because GMU may not disclose information concerning his disciplinary record, absent his consent, is not dispositive. *See* Moving Br. at 13. As this court found in *GMU*, 149 F. Supp. 3d 602 (E.D. Va. 2016), the potential availability of Title IX disciplinary records to future employers, with the plaintiff's authorization, sufficiently alleged publication because the plaintiff (i) would have to forgo employment opportunities with institutions or organizations which require disclosure of disciplinary records or (ii) authorize the dissemination of defamatory records which would likely foreclose the plaintiff's ability to pursue such opportunities. *Id.* at 614 & n. 9. *See Sciolino v. Newport News*, 480 F. 3d 642, 649 (4th Cir. 2007) ("If prospective employers are likely to see the stigmatizing allegations, an employee must choose between finding future employment and protecting his reputation by not

**A798**

applying for jobs and thus not risking the release of stigmatizing information."). In *GMU*, the Court also held that dissemination of the Title IX findings to the Title IX complainant Jane Roe, "a member of the general public," constituted publication. *Id.* at 614. Here, the Title IX sanctions were disclosed to Complainants 1-4, who were upset that Dr. Renshaw was too lenient. Compl. ¶¶ 445, 453.

Defendants' reliance on *Sciolino* is also misplaced. In *Sciolino*, the Fourth Circuit rejected the argument Defendants assert here, finding that the Government Data Collection and Dissemination Practices Act did not, in practice, completely protect the plaintiff's personnel file from dissemination. *Id.* at n. 3. Likewise, DRHM Policy 6.05, which Defendants are "required to follow," (Defs. Moving Br. at 13), permits the disclosure of Plaintiff's disciplinary records *without his consent* and at GMU's discretion in a number of circumstances. Ex. J (referencing disclosure without consent to supervisors, higher level managers, private service providers, and in response to subpoenas, court "requests" and court orders). The policy notes that "this list is not all inclusive." *Id.* Defendants have provided no insight into their actual practices, including in a case where Plaintiff may apply for employment at another public institution. *See Sciolino*, 480 F. 3d at n. 3 (employer, in practice, engaged in some dissemination of personnel file, including prospective employers, in some cases).

**C.    <u>Plaintiff Plausibly Alleged That Defendants Deprived Him of Due Process</u>**

Contrary to Defendants' assertions, Plaintiff's claim that he was deprived of due process is not based on a "fundamental misunderstanding of what the due process clause requires." Moving Br. at 17. Rather, it is Defendants' misunderstanding of what process was due Plaintiff—under the Due Process clause and as codified in GMU's own policies—that has left them in the position of having to defend against this claim. GMU cannot dispute that, subsequent to Plaintiff's Title IX

**A799**

case, its very own faculty raised grave concerns about the lack of due process in disciplinary proceedings concerning faculty, triggering an audit by Provost Wu. Compl. ¶¶ 385-392.

Defendants and GMU question the applicability of *Loudermill* to cases other than those in which a public employee is *terminated*. Yet the Fourth Circuit, and at least one court in this District, have applied *Loudermill* in precisely such circumstances. *See Hibbits v. Buchanan County School Bd.*, 433 Fed. Appx. 203, 205 (4th Cir. 2011) (in case of probation, "[t]he only process guaranteed by the Constitution is notice and a hearing before termination of the protected property right");[13] *Willis*, 90 F. Supp. 3d at 613 (citing *Loudermill* and stating that "[i]f adequate process was not provided, the deprivation is illegal" in case concerning 20- and 40-hour suspensions). In accordance with *Loudermill*, a tenured public employee is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence against him, and an opportunity to present his side of the story." 470 U.S. at 544 (citing *Arnett v. Kennedy*, 416 U.S. 134, 170-171 (1974)). In *Loudermill*, the United State Supreme Court, discussing *Arnett*, and addressing pre-termination proceedings, noted "six Justices found constitutional minima satisfied where the employee *had access to the material upon which the charge was based* and could respond orally and in writing and present rebuttal affidavits." *Id.* at 542 (emphasis added). As set forth below, Plaintiff had no such rights here. *See* Compl. ¶ 517.

Apart from the process that was due Plaintiff under *Loudermill*, it is axiomatic that plaintiff was also entitle to a fair and impartial process. *Willis*, 90 F. Supp. 3d at 614 ("[a]n impartial decision maker is an essential element of due process"). While there is typically a presumption of honesty and integrity on the part of administrative decisionmakers, such presumption can be

---

[13] *Hibbits*, a summary judgment decision, is distinguishable from the present case because the plaintiffs in *Hibbits* were reassigned, with a salary reduction, in accordance with the express language of a State statute. The statute also provided for notice and "an informal meeting." 433 Fed. Appx. at 205.

rebutted where a plaintiff can show "bias stemming from an extrajudicial source." *Id.* Here Plaintiff alleged numerous sources of bias in his Title IX process, from the investigation through the sanctioning process, as well as in Dr. Renshaw's decision to disaffiliate Plaintiff from his program.

### 1. <u>Dr. Hammat Deprived Plaintiff of Due Process</u>

GMU codified the fundamental principles of due process in its sexual misconduct policies. The 2016-2017 and 2017-2018 Sexual Misconduct Policies that Dr. Hammat provided to Plaintiff with respect to Complainant 4 expressly provides for "thorough and impartial investigations that afford *all parties* notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred." Compl. ¶¶ 194, 204; Ex. F, at III. With respect to the Title IX investigation, and erroneous findings against Plaintiff, Dr. Hammat violated Plaintiff's right to due process:[14]

a. **<u>Bias:</u>** GMU conceded in its Moving Brief (albeit tentatively) that Plaintiff alleged that: Dr. Hammat may have had a bias "against perpetrators of sexual misconduct or in favor of victims of sexual misconduct" (GMU Moving Br. at 9); Dr. Hammat was biased "about the maturity of first-year graduate students." (*Id.* at 12); and certain of Plaintiff's allegations could be indicative of Dr. Hammat having a bias against faculty members (*Id.* at 14).

Dr. Hammat had a conflict of interest because she served as both Title IX Coordinator *and* decided Plaintiff's case (which violated Office for Civil Rights' ("OCR") Guidance). Compl. ¶¶ 84, 197, 207, 473. In her role as Title IX Coordinator, Dr. Hammat was not only responsible for determining the outcome of Title IX complaints, she was also charged with monitoring the University's compliance with Title IX. *Id.* ¶¶ 197, 207.

At around the time in which Dr. Hammat investigated the allegations against Plaintiff, GMU was under OCR investigation and facing criticism in the press for its purported mishandling of Title IX complaints. *Id.* ¶¶ 116, 113-127. Dr. Hammat publicly questioned Betsy DeVos' changes to Title IX enforcement, which were

---

[14] Plaintiff hereby incorporates by reference his opposition to GMU's motion to dismiss his Title IX claim (ECF No. 38) ("Title IX Opp.").

**A801**

intended to provide more due process protections for the accused. Compl. ¶¶ 66-78, 112.

Dr. Hammat also exhibited bias in statements made to Plaintiff, in emails she authored concerning the investigation and findings, and in her decision-making process. *Id.* ¶¶ 149-164, 202, 251-256, 260-265, 275, 278-284, 288-299, 304, 313-323, 331-332, 336, 339-340, 357-365, 483. *See also* Title IX Opp., Pts. II.B, C.

Plaintiff also alleged that the statements he made, and evidence he submitted, contradicted the allegations of Complainants 1-4, as well as Dr. Hammat's findings (Compl. ¶¶ 157, 250, 255-277, 288, 296-298, 307, 308-312, 321, 323, 324-332, 340, 343, 345-349, 354-355, 359, 362, 365, 367-368, 372, 375-380).

b.   **<u>Lack of Adequate Notice</u>:** Dr. Hammat's "notices" to Plaintiff stated only that potential violations of varying sexual misconduct policies had been alleged. Dr. Hammat did not specify the "charges" or the specific policy provisions applicable in the case of each complainant. Appended to each email were varying policies and grievance procedures. Compl. ¶¶ 138, 249, 287, 301, 302, 333. Exs. C-F. Dr. Hammat emailed Plaintiff a total of five (5) different sexual misconduct policies and four (4) different grievance procedures. Exs. C-F. The determination letters added charges of gender-based harassment and did not specify the policy provisions, or grievance procedures, Dr. Hammat applied in finding Plaintiff responsible. *Id.* ¶¶ 278-279, 294, 313, 356. Exs. K-N. Dr. Hammat also made factual findings based on allegations and information of which Plaintiff was not notified—*and to which Plaintiff could not respond*—during the Title IX investigation. Compl. ¶¶ 282, 297, 316-318, 320, 322, 359, 360-364. *Id.* ¶¶ 282, 297, 316-319, 320-323, 360-361, 362, 364-365. *Compare* C-F *with* K-N.

These allegations stand in stark contrast to *Doe v. Loh*, 2018 WL 1535495, at *6 & n. 4 (D. Md. Mar. 29, 2018), where the *hearing board* that evaluated the allegations against the plaintiff heard all of the plaintiff's arguments and defenses when he "presented testimony, answered questions, and submitted affidavits at his hearing," *after* he reviewed the evidence. In *Linton v. Frederick County Bd.*, 964 F.2d 1436, 1440-1441 (4th Cir. 1992), the court held that allegations of a general nature, or that serve as a "catch-all" do not provide sufficient notice. *See* Exs. C-F, K-N. Neither case addressed Dr. Hammat's failure to include allegations in her emails to Plaintiff that later appeared in her determination letters. *See GMU*, 149 F. Supp. 3d at 616-617 (failure to give notice of specific charges and events that later appeared in determination letter was constitutionally inadequate).

c.   **<u>Withholding of Evidence</u>:** Plaintiff was denied access to any and all evidence gathered during the Title IX investigation. Compl. ¶ 155. *See also* Title IX Opp. at Point II.B. Both the 2016-2017 and the 2017-2018 Sexual Misconduct Policies expressly provided "all parties … an opportunity … to *view the information that will be used in determining whether a policy violation has occurred*." Compl. ¶¶

194, 204, Ex. F. (emphasis added). *See Doe v. Salisbury U.*, 123 F. Supp. 3d 748 (D. Md. 2015) (withholding evidence from plaintiff was one of "numerous procedural defects"); *Norris*, 362 F. Supp. 3d at 1011 (denying plaintiff access to investigative file). Under *Loudermill*, 470 U.S. at 538, and *Linton*, 964 F. 2d at 1440, Plaintiff did not receive an adequate explanation of the evidence against him because he was not apprised of *any* evidence that would be used in assessing whether he violated GMU's sexual misconduct policies and, accordingly, could not fully respond to the complainants' allegations. *See, e.g.* Compl. ¶¶ 157, 158, 340, 425; Ex. O (GMU faculty criticized "lack of clarity in presenting evidence that supports decisions"). Complainants 1-4 were permitted to review, and respond to, Plaintiff's evidence and statements. Compl. ¶ 485.e. *See id.* ¶ 390(6).

d. **Lack of Hearing**: Plaintiff did not have a fair or adequate Title IX hearing. On the contrary, Dr. Hammat's bias precluded it. *See supra* point a; Title IX Opp., Pts. II.B., C. That Plaintiff was interviewed three times and that he submitted evidence to the best of his ability, does not equate to a fair or adequate hearing process. *See* Defs. Moving Br. at 18; *supra* point c. *Loh* is inapposite in this regard because the plaintiff was able to review the evidence against him prior to personally appearing before a review committee, questioning the Title IX investigator, presenting witnesses and submitting additional evidence. 2018 WL 1535495, at ** 3 & n. 4. *See Arnett*, 416 U.S. at 170-171. Plaintiff was also deprived of a fair and adequate hearing because he had no right of cross-examination. GMU does not dispute that its Title IX process provided no method through which Plaintiff could confront his accusers. Compl. ¶ 156. *See Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018); *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 583 (E.D. Va. 2018). *See* Title IX Opp., Pt. II.B.f.

Despite Defendants' assertion to the contrary (Moving Br. at 18), the Court may consider Dr. Hammat's deviations from GMU policies and procedures as part of its analysis as to whether, as alleged, the disciplinary process in Plaintiff's case fell short of due process. *GMU*, 149 F. Supp. 3d at 620-621. Apart from the due process violations outlined above, Dr. Hammat also elected to investigate time-barred complaints and failed to apply the preponderance of the evidence standard when making her determinations. *See* Title IX Opp., Pt.II.B.c, h.

### 2. **Mr. Williams Violated Plaintiff's Right to Due Process**

Mr. Williams violated Plaintiff's right to due process because he failed to conduct a fair and impartial review of Plaintiff's appeal. *See, e.g. GMU*, 149 F. Supp. 3d 620 (appellate officer's

bias denied plaintiff a meaningful opportunity to be heard). Plaintiff's right was further impeded because he did not have access to any of the evidence including the statements of Student 1, his colleague, and potentially two other students who provided exculpatory information. Compl. ¶¶ 157-158, 340, 425.

GMU conceded (albeit tentatively) that Plaintiff alleged that Mr. Williams may have had a bias "against perpetrators of sexual misconduct or in favor of victims of sexual misconduct" (Moving Br. at 9). Mr. Williams also had a conflict of interest because, as the head of CDE, he is responsible for enforcing GMU's administrative policies and the direct supervisor of the Title IX office. Compl. ¶ 483.z. GMU's faculty noted this bias in their submission to Provost Wu decrying the lack of due process in faculty proceedings. *Id.* ¶ 390; Ex. O. Mr. Williams also made public statements concerning the OCR's investigation of GMU, including that the University could lose federal funding, and he vehemently opposed the student newspaper's criticism of GMU's failure to timely and adequately address a sexual harassment complaint made by a female student. *Id.* ¶¶ 108-109, 116-120; Exs. P-R. Mr. Williams also made statements to the effect that universities have a moral obligation to protect female students from sexual misconduct, and that he believes that accusers always tell the truth. *Id.* ¶ 166; Ex. S. *See also* Title IX Opp. at Point II.C. Mr. Williams also exhibited bias in his decision-making process. *Id.* ¶¶ 259, 302, 319, 323, 332, 336-341, 352, 359, 370-381, 401-403, 435, 485(h)-(i), 520-521; Ex. T.

### 3. **Dr. Renshaw Deprived Plaintiff of Due Process**

Dr. Renshaw improperly restricted Plaintiff from hiring graduate students to work in his lab in Fall 2019 *before* any findings and *before* Plaintiff's appeal. Compl. ¶¶ 159, 405. Dr. Renshaw also directed Plaintiff to reject the students he had already interviewed. *Id.* ¶ 405. It cannot be disputed that this restriction was imposed without notice and that Plaintiff had no right

**A804**

to object to, or appeal, this restriction. It further became public knowledge even though there was no reason why the University would need to disseminate such information to persons other than Plaintiff. *Id.* ¶¶ 383-384.

Dr. Renshaw was responsible for devising the sanctions imposed on Plaintiff. *Id.* ¶¶ 393-399. Plaintiff faced termination as a potential sanction. *Id.* ¶¶ 187(b), 190(b), 196, 206. It cannot be disputed that Plaintiff was provided no information about the sanctioning process, or any opportunity to meet with Dr. Renshaw, prior to the sanctioning. *Id.* ¶ 406.

With respect to the Program Grievance filed by Professor 1 and eight other professors, the Faculty Grievance Committee had no authority to review the grievance because the Faculty Handbook did not authorize grievances "on behalf of a third party or group." Compl. ¶ 419; Ex, H, Section 2.11.2.1.a. Moreover, there was no provision in the Title IX Grievance Procedures that permitted third parties, such as Professor 1, to seek review of Dr. Renshaw's Title IX sanctions for their appropriateness. Compl. ¶¶ 420-422. *See* C-F. Regardless, the Committee took it upon itself, without any authority, to recommend that the extreme sanction of disaffiliation be imposed. *Id.* ¶ 439. Given that the Committee only issued a recommendation to Dr. Renshaw, which stated that "[c]orrective actions *should* require, if they do not already, the disaffiliation of" Plaintiff, (Ex. A, 9/10/19 Letter, at 2), and given that the University's counsel stated that the Faculty Grievance Committee did not speak or act for the University, Dr. Renshaw was not required to disaffiliate Plaintiff. Compl. ¶ 441.[15] Moreover, Dr. Renshaw again imposed extreme measures that were not recommended by the Committee but instead were crafted by Professor 1, disaffiliating Plaintiff from his program for a period of at least 5-6 years and barring Plaintiff from working with the

---

[15] Defendants incorrectly assert that Plaintiff violated the Faculty Handbook by declining the "recommendation" that he "should" disaffiliate from the program. Defs. Moving Br. at 16. Ironically, GMU argues in its moving brief that the word "should" is not mandatory. GMU Moving Brief, at 26. Plaintiff understood the Committee's decision to be what it stated, a recommendation. Compl. ¶¶ 415-417, 424-425; Ex. A.

**A805**

three graduate students who wanted to continue working with him. *Id.* ¶ 457. Plaintiff had no right

to appeal this second round of sanctions, which went beyond what was even contemplated by the

Committee.

Dr. Renshaw was also biased: i) prior to issuing the Title IX sanctions, he was a member of

the Faculty Senate, which called for an investigation into Justice Kavanaugh, who had been hired

to teach a course at GMU (Compl. ¶ 131); ii) he was a member of the very program from which

Plaintiff was disaffiliated, and participated in meetings at which faculty attacked Plaintiff's

character (prior to the Program Grievance being decided) (*Id.* ¶¶ 429, 432-436); iii) he incredibly

denied that program faculty learned about Plaintiff's Title IX findings from Professor 1 (*Id.*¶ 427);

iv) he expected *Plaintiff* to quell the hostile environment created by the faculty against Plaintiff

(*Id.* ¶ 428); v) he told Plaintiff that Complainants 1-4 were upset that the Title IX sanctions were

too light (*Id.* ¶ 445); and vi) he acknowledged to Plaintiff that the #metoo movement may have

impacted Plaintiff's case.

**D.      Defendants Are Not Entitled to Qualified Immunity**

"A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but … when

asserted at this early stage of the proceedings, the defense faces a formidable hurdle and is usually

not successful." *Owens v. Baltimore City State's Attorney's Office*, 767 F. 3d 379, 396 (4th Cir.

2014). *See also McVey v. Stacy*, 157 F.3d 271, 278-279 (4th Cir. 1998) Plaintiff has satisfied the

first prong of the two-part test for determining whether Defendants have qualified immunity: he

alleged that Defendants deprived him of his constitutionally protected property and liberty

interests by violating his right to due process. *Ridpath*, 447 F. 3d at 306. At issue is whether

Plaintiff's rights were clearly established. *Cannon*, 891 F.3d at 497 (a constitutional right is clearly

established when its contours are sufficiently clear that a reasonable official would understand

**A806**

what he is doing violates that right). Defendants concede that "[c]learly established law is that, at most, Plaintiff was entitled to notice and a hearing." Defs. Moving Br. at 25. As detailed *supra* Point C, Plaintiff did not receive adequate notice or an opportunity to be heard. ¶¶ 522-523.

Plaintiff had a clearly established right to the due process rights set forth in *Loudermill. See Hibbits*, 433 Fed. Appx. at 205 (citing *Loudermill*); *Willis*, 90 F. Supp. 3d at 613 (same). Plaintiff had a clearly established right not to be deprived of his property and liberty interests without due process of law, including notice, a right to view the evidence supporting the charges against him and to be heard, even though he was not terminated. *See Willis*, 90 F. Supp. 3d at 614 (20- and 40-hour suspensions constituted deprivation of property interest); *Wilkinson*, 566 F. Supp. at 769 (plaintiff had property interest in not having employment interrupted by suspension). *See also Ridpath*, 447 F.3d at 310 (liberty interest due to reassignment constituting significant demotion); *Hall*, 469 Fed. Appx. at 262 (same). Plaintiff also had a clearly established right not to have the stigmatizing Title IX findings and/or sanctions disseminated to faculty and students without adequate due process. *Cannon*, 891 F.3d at 503. Plaintiff also had a clearly established right to an impartial process. *Willis*, 90 F. Supp. 3d at 614 (citing *Bowens v. N.C. Dep't of Human Resources*, 710 F.2d 1015, 1020 (4th Cir. 1983)). As set forth *infra* Point C, the process employed in disciplining Plaintiff was rife with bias at every stage. Compl. ¶ 520, 522-523. Dr. Hammat, Mr. Williams and Dr. Renshaw knew, or reasonably would have known, about Plaintiff's clearly established rights. Compl. ¶¶ 518-522, 527.

## II.    Plaintiff Plausibly Alleged A First Amendment Claim

Defendants argue that Plaintiff's First Amendment claims should be dismissed because Plaintiff's statements concerning human sexuality (i) did not involve matters of public concern and

(ii) were made in his role as a public employee. Defs. Moving Br. at 20-22.[16] Of note is the fact that Defendants predominantly rely on summary judgment opinions in asserting their arguments because these issues are not typically decided at the motion to dismiss stage. *See, e.g.*, *Boring v. Buncombe County Bd. of Education*, 136 F. 3d 364, 374 (4th Cir. 1998) (dissenting op. Hamilton, J. and Murnaghan, J.). Defendants further resort to general assertions, without context, that Plaintiff's statements were not related to matters of public concern, pointing to only a few of the statements at issue in the Complaint. Moving Br. at 20-21.

Plaintiff's statements related to matters of public concern. The United States Supreme Court found that: "'[s]ex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; *it is one of the vital problems of human interest and public concern*.'" *Urofsky v. Gilmore*, 216 F. 3d 401, 438 (4th Cir. 2000) (dissenting op., Murnaghan, J.) (citing *Roth v. United States*, 354 U.S. 476, 487 (1957)) (emphasis in original). The Fourth Circuit has also held that speech concerning "campus culture, sex, feminism, abortion, homosexuality, religion, and morality…plainly touch on issues of public, rather than private concern." *Adams*, 640 F.3d at 565. In order to determine whether speech involves matters of public concern, courts evaluate (typically at the summary judgment stage) the "content, form, and context of the speech at issue in light of the entire record." *Id.* at 565.

---

[16] Defendants do not—because they cannot—dispute that the allegations of the Complaint satisfy the third prong of the "*McVey* Test"—that Plaintiff's speech was a substantial factor in Plaintiff's adverse employment decision. *Adams v. Trustees of the University of North Carolina—Wilmington*, 640 F.3d 550, 560-561 (4th Cir. 2011). Because they have discounted all of Plaintiff's statements as not subject to First Amendment protection, Defendants do not address the second prong—whether Plaintiff's interest in speaking about matters of public concern outweighed the government's interest in providing effective and efficient services to the public. *Id.* Plaintiff submits that, if the Court finds that any or all of his statements related to matters of public concern, that Defendants cannot satisfy the second prong because, at the time that Plaintiff made the statements in question, there was no disruption or threat to GMU's educational mandate. *See, e.g.*, *Scallet v. Rosenblum*, 911 F. Sup. 999, 1017 (W.D. Va. 1996) *aff'd* 106 F.3d 391 (4th Cir. 1997). Unlike the plaintiff in *Scallet*, Plaintiff, here, had a clean disciplinary record prior to the Title IX investigation and his courses received stellar reviews from peers and students alike. In addition, Defendants cannot convert protected speech into unprotected speech based on factors that came into play only after the protected speech was made. *Adams*, 640 F. 3d at 561.

Defendants' assertion that Plaintiff's speech in the classroom is merely "curricular speech" that "fails *per se* to be a matter of public concern" is dead wrong. *See* Defs. Moving Br. at 21 & n. 15. "To suggest that the First Amendment, as a matter of law, is never implicated when a professor speaks in class, is fantastic" as "the First Amendment is routinely implicated in the classroom, both at the university level and below." *Scallet*, 911 F. Supp. at 1014. Indeed, at the level of higher education—and graduate school in particular—there is little justification for restricting professors' in-class speech, because the "interest in assuring that readers or listeners are not exposed to material that may be inappropriate for their level of maturity is not implicated in the graduate school context." *Id.* at 1011 (citation omitted).

Here, Plaintiff's in-class statements (made in 2013 and 2014 with no complaints at the time) related to human sexuality and sexual disorders, as well as the emergence of counterculture and cultural taboos that were, accordingly, related to matters of public concern.[17] Compl. ¶¶ 252-284, 287-289, 292, 296. Plaintiff's statements outside of the classroom (also made months to years prior with no contemporaneous complaints) also related to matters of public concern, again, to topics of human sexuality which Plaintiff's graduate students were researching. Compl. ¶¶ 304-305, 326, 335-344, 353, 359, 362, 363, 367, 375-377, 379-380 & n. 72, 548-550.[18]

Defendants' argument that the statements at issue were made "in his role as an employee" also fails. Defs. Moving Br. at 22. *See Adams*, 640 F.3d at 564 (statements made outside classroom were not in official capacity); *Scallet*, 911 F. Supp. at 1012-1014 (court did not find in-classroom

---

[17] That Plaintiff discussed events in which he was a participant does not, in the context in which the events were discussed, render those examples obscene. *See, e.g. Roth*, 354 U.S. at 488-490.

[18] *Kirby*, *Grutzmacher* and *Lee*, cited by Defendants in support of dismissal, are all summary judgment decisions. None of them involved university professors. *Urofsky*, also a summary judgment decision, concerned the right of university professors to access sexually explicit materials on computers leased by state universities. 216 F.3d 401 (4th Cir. 2000). *Boring*, though an opinion addressing the defendants' motion to dismiss, concerned a high school teacher's selection and production of a play as part of the school curriculum. 136 F.3d at 364. *German v. Fox*, 2007 WL 1228481, at * 1 (W.D. Va. Apr. 26, 2007), involved an employee who worked for a private organization—not a professor—and emails he sent with the organization's signature block.

statements were made in official capacity and, therefore, unprotected). In *Adams*, the Fourth Circuit rejected the argument that simply because a faculty member's speech concerned scholarship, research and service that he was required to undertake as part of his duties as professor, that such speech constituted statements made pursuant to his official duties. 640 F.3d at 564. The Fourth Circuit held that the professor's speech was not "tied to any more specific or direct employee duty than the general concept that professors will engage in writing, public appearances, and service within their respective fields." *Id.*[19]

For the above-stated reasons, that portion of Defendants' motion seeking to dismiss Plaintiff's First Amendment claim should be denied.

### CONCLUSION

For the above stated reasons, the Court should deny the Individual Defendants' motion to dismiss Counts II-IV of the Complaint in its entirety, along with such other and further relief that the Court deems just and proper.

Dated: January 22, 2020

<div align="center">

Respectfully Submitted,

**NESENOFF & MILTENBERG, LLP**

</div>

By:  _____/s/ *Andrew T. Miltenberg*_
Andrew T. Miltenberg (*pro hac vice*)
Kara L. Gorycki (*pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

---

[19] Under *Adams* and *Scallet*, Plaintiff had a clearly established right to First Amendment protection with respect to the statements later used as grounds for sanctioning him. Therefore, Defendants are not entitled to qualified immunity with respect to Plaintiff's First Amendment Claim. *See* Defs. Moving Br. at 24.

**FARMER LEGAL PLLC**

By:         */s/ Joshua T. Farmer*
Joshua T. Farmer, VSB #87508
5030 Sadler Place, #205
Glen Allen, VA 23060
(804) 325-1441
josh@farmerlegalhelp.com

*Attorneys for Plaintiff John Doe*

**A811**

Case 1:19-cv-01249-LO-MSN   Document 43   Filed 01/22/20   Page 33 of 33 PageID# 1162

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 22nd day of January, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such

filing to all parties of record. I also served a copy of the foregoing on counsel for Defendants at

the following address:

Eli S. Schlam
Assistant Attorney General
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

By:        /s/ *Joshua T. Farmer*
Joshua T. Farmer, VSB #87508
5030 Sadler Place, #205
Glen Allen, VA 23060
(804) 325-1441
josh@farmerlegalhelp.com

APPENDIX CONTINUED
IN FOLLOWING VOLUME