**20-1509**

IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

➤➤◄◄

TODD KASHDAN, f/k/a John Doe,

*Plaintiff-Appellant,*

*v.*

GEORGE MASON UNIVERSITY; RECTOR AND BOARD OF VISITORS OF GEORGE MASON UNIVERSITY; JENNIFER RENEE HAMMAT, in her official and individual capacity; JULIAN ROBERT WILLIAMS, in his official and individual capacity; KEITH DAVID RENSHAW, in his official and individual capacity; ANN LOUISE ARDIS, in her official and individual capacity; SZUYUNG DAVID DWU, in his official and individual capacity,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court*
*for the Eastern District of Virginia at Alexandria*

## APPENDIX
## VOLUME III OF III
## Pages A812 to A967

TOBY JAY HEYTENS
OFFICE OF THE ATTORNEY GENERAL
 OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
804-786-7420

      *and*

ELI SAMUEL SCHLAM
GEORGE MASON UNIVERSITY
Merten Hall, Room 5400
4400 University Drive
Fairfax, Virginia 22030
703-993-2619

*Attorneys for Defendants-Appellees*

NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500

*Attorneys for Plaintiff-Appellant*

## **Table of Contents**

**Page**

### **Volume I**

District Court Docket Entries ................................................................ A1

Complaint and Jury Demand, filed September 26, 2019 ....................... A8

Defendant The Rector and Visitors of George Mason University's
    Motion to Dismiss Count I, dated December 20, 2019 ................. A170

Memorandum of Points and Authorities in Support of Defendant
    The Rector and Visitors of George Mason University's Motion
    to Dismiss Count I, dated December 20, 2019 ............................. A173

        Exhibit 1 to Memorandum -
        Notice of Investigation, dated December 4, 2018 .................. A205

        Exhibit 1A to Memorandum -
        George Mason University Sexual Misconduct Policy
        for Academic Year 2006-2014 ................................................ A209

        Exhibit 1B to Memorandum -
        George Mason University Sexual Misconduct Investigation
        Procedures for Academic Year 2006-2014 ............................ A212

        Exhibit 2 to Memorandum -
        Notice of Investigation, dated December 4, 2018 .................. A216

        Exhibit 2A to Memorandum -
        George Mason University Sexual Misconduct Policy for
        Academic Year 2006-2014 ...................................................... A219

        Exhibit 2B to Memorandum -
        George Mason University Sexual Misconduct Investigation
        Procedures for Academic Year 2006-2014 ............................ A222

**Table of Contents**
**(Continued)**

**Page**

Exhibit 3 to Memorandum -
Notice of Investigation, dated December 4, 2018 ................... A226

Exhibit 3A to Memorandum -
George Mason University Sexual Misconduct Policy
for Academic Year 2014-2015 ................................. A230

Exhibit 3B to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2014-2015 ............................ A239

Exhibit 3C to Memorandum -
George Mason University Sexual Misconduct Policy
for Academic Year 2015-2016 ................................. A243

Exhibit 3D to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2015-2016 ............................ A252

Exhibit 4 to Memorandum -
Notice of Investigation, dated December 4, 2018 .................. A257

Exhibit 4A to Memorandum -
George Mason University Sexual Misconduct Policy for
Academic Year 2016-2017 ..................................... A261

Exhibit 4B to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2016-2017 ............................ A279

Exhibit 4C to Memorandum -
George Mason University Sexual Misconduct Policy for
Academic Year 2017-2018 ..................................... A284

Exhibit 4D to Memorandum -
George Mason University Sexual Misconduct Investigation
Procedures for Academic Year 2017-2018 ............................ A301

**Table of Contents**
**(Continued)**

**Page**

Exhibit 5 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A307

Exhibit 6 to Memorandum -
Letter of Determination, dated February 21, 2019 .................. A310

Exhibit 7 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A313

Exhibit 8 to Memorandum -
Letter of Determination, dated February 22, 2019 .................. A317

Exhibit 9 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019 ................................................. A321

Exhibit 10 to Memorandum -
IDVSA Voice, Season 2013 ...................................... A324

Exhibit 11 to Memorandum -
"Sexual assault remains under-reported on campus
despite growing awareness", *The Daily Texan*,
published on November 4, 2013 ............................. A348

Exhibit 12 to Memorandum -
Excerpts from "Myths, Realities, and Common Sense at
Texas", *Minding the Campus*, November 6, 2013 ................. A357

Exhibit 13 to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015 .......... A361

Exhibit 14 to Memorandum -
"Students Release Sexual Assault Demands",
*Fourth Estate*, December 5, 2016 ........................... A367

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit 15 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019 .................................................... A371

Defendants Jennifer Hammat, Julian Williams, Keith Renshaw,
  Ann Ardis and S. David Wu's Motion to Dismiss Counts II-IV,
  dated December 20, 2019 ............................................ A375

Memorandum of Points and Authorities in Support of Defendants
  Jennifer Hammat, Julian Williams, Keith Renshaw, Ann Ardis
  and S. David Wu's Motion to Dismiss Counts II-IV,
  dated December 20, 2019 ............................................ A379

**Volume II**

Exhibit 1 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019
(Reproduced Herein at pages A372 to A374)

Exhibit 2 to Memorandum -
Letter from CHSS Grievance Committee to
Appellant, dated June 19, 2019 ................................ A407

Exhibit 3 to Memorandum -
Email from CHSS Grievance Committee to Todd Kashdan,
dated August 8, 2019 .............................................. A413

Exhibit 4 to Memorandum -
Excerpts from George Mason University's Faculty
Handbook, dated July 1, 2018 ................................ A423

Exhibit 5 to Memorandum -
Offer Letter from Deborah A. Boehm-Davis,
dated August 14, 2014, with Attachment A ............................ A428

**Table of Contents**
**(Continued)**

Page

Exhibit 6 to Memorandum -
Email from Ann L. Ardis to Catherine Gallagher and
Jenna M. McGwin, dated September 16, 2019 ...................... A433

Plaintiff's Memorandum of Law in Opposition to Defendant
George Mason University's Motion to Dismiss Plaintiff's
Title IX Claim Pursuant to Federal Rule 12(b)(6),
dated January 22, 2020 .................................................. A434

Exhibit 1 to Memorandum -
Revised Sexual Harassment Guidance: Harassment of
Students By School Employees, Other Students, Or
Third Parties, dated January 2001 .......................................... A466

Exhibit 2 to Memorandum -
First Amendment: Dear Colleague, dated July 28, 2003 ........ A515

Exhibit 3 to Memorandum -
Q & A on Campus Sexual Misconduct,
dated September 2017 ............................................... A518

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018, with Attachments .......................... A526

Exhibit 5 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018, with Attachments .......................... A536

Exhibit 6 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments .................................................... A545

Exhibit 7 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments .................................................... A574

**Table of Contents**
**(Continued)**

**Page**

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ........................................................... A621

Exhibit 9 to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019 ........................................................... A626

Exhibit 10 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ........................................................... A631

Exhibit 11 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ........................................................... A636

Exhibit 12 to Memorandum -
Order Granting in Part and Denying in Part Defendants'
Motion for Summary Judgment in *Doe v. Grinnell College,
et al.*, so ordered July 9, 2019 ................................................. A642

Exhibit 13 to Memorandum -
Todd Kashdan's Complaint Against Complainant for
Possible Act of Misconduct Under Student Conduct
Code and Violation of Section X of Policy 1202 .................... A685

Exhibit 14 to Memorandum -
Dear Colleague Letter on Title IX Coordinators,
dated April 24, 2015 ................................................................ A693

Exhibit 15 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A322 to A323)

# Table of Contents
## (Continued)

**Page**

Exhibit 16 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated May 31, 2019
(Reproduced Herein at pages A372 to A374)

Exhibit 17 to Memorandum -
Letter from CHSS Grievance Committee,
dated June 19, 2019
(Reproduced Herein at pages A408 to A412)

Exhibit 18 to Memorandum -
IDVSA Voice, Season 2013
(Reproduced Herein at pages A325 to A347)

Exhibit 19 to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015
(Reproduced Herein at pages A362 to A366)

Exhibit 20 to Memorandum -
Excerpts from "Myths, Realities, and Common Sense at
Texas", Minding the Campus, November 6, 2013
(Reproduced Herein at pages A358 to A360)

Exhibit 21 to Memorandum -
"Sexual Assault Investigation", *Fourth Estate*,
October 24, 2016 ...................................................................... A702

Exhibit 22 to Memorandum -
"A Title IX Report Alleged Harassment by Student Body
President", *Fourth Estate*, April 29, 2018 ............................... A707

Exhibit 23 to Memorandum -
"Corrections Request: Title IX Article Published on 4/30",
*Fourth Estate*, May 16, 2018 ................................................. A716

# Table of Contents
## (Continued)

**Page**

Exhibit 24 to Memorandum -
"Students Release Sexual Assault Demands",
*Fourth Estate*, December 5, 2016 ............................................. A722

Exhibit 25 to Memorandum -
"Pledges of Continued Vigilance", *Inside Higher Ed*,
September 8, 2017 ..................................................................... A728

Exhibit 26 to Memorandum -
(i) Letter from Faculty Senate Executive Committee to
President Cabrera, *et al.*, dated May 15, 2019 ........................ A738
(ii) Letter from S. David Wu and Carol D. Kissal to
Faculty Senate Executive Committee, dated May 21, 2019 ... A744

Exhibit 27 to Memorandum -
Complainant 4 Text Messages and Email ............................... A746

Exhibit 28 to Memorandum -
Communications between Appellant and Complainant 1 ....... A755

Exhibit 29 to Memorandum -
Communications between Appellant and Complainant 3 ....... A763

Exhibit 30 to Memorandum -
Letter from CHSS Grievance Committee to Todd Kashdan,
dated September 10, 2019 ........................................................ A769

Exhibit 31 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019 ........................................................ A772

Exhibit 32 to Memorandum -
Peer Evaluation of Teaching Form, dated April 2, 2013 ........ A776

# **Table of Contents**
## **(Continued)**

**Page**

Plaintiff's Memorandum of Law in Opposition to the Individual
    Defendants' Motion to Dismiss Plaintiff's Due Process and
    First Amendment Claims Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020 .................................................................... A779

        Exhibit A to Memorandum -
        Letter from CHSS Grievance Committee to Todd Kashdan,
        dated September 10, 2019
        (Reproduced Herein at pages A770 to A771)

        Exhibit B to Memorandum -
        Letter from Dr. Keith Renshaw to Todd Kashdan,
        dated May 31, 2019
        (Reproduced Herein at pages A372 to A374)

        Exhibit C to Memorandum -
        Notice of Investigation (Complainant 1),
        dated December 4, 2018, with Attachments
        (Reproduced Herein at pages A527 to A535)

        Exhibit D to Memorandum -
        Notice of Investigation (Complainant 2),
        dated December 4, 2018, with Attachments
        (Reproduced Herein at pages A537 to A544)

        Exhibit E to Memorandum -
        Email from Megan R. Simmons, dated January 11, 2019,
        with Attachments
        (Reproduced Herein at pages A546 to A574)

        Exhibit F to Memorandum -
        Email from Megan R. Simmons, dated January 11, 2019,
        with Attachments
        (Reproduced Herein at pages A575 to A620)

**Table of Contents**
**(Continued)**

**Page**

Exhibit G to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019
(Reproduced Herein at pages A773 to A775)

**Volume III**

Exhibit H to Memorandum -
George Mason University's Faculty Handbook,
dated July 1, 2018 ....................................................  A812

Exhibit I to Memorandum -
Q & A on Campus Sexual Misconduct,
dated September 2017
(Reproduced Herein at pages A519 to A525)

Exhibit J to Memorandum -
Department of Human Resource Management Policies
and Procedures Manual-Policy Number: 6:05-Personnel
Records Disclosure, revised July 1, 2005 ..............................  A873

Exhibit K to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019
(Reproduced Herein at pages A622 to A625)

Exhibit L to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019
(Reproduced Herein at pages A627 to A630)

Exhibit M to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019
(Reproduced Herein at pages A632 to A635)

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019
(Reproduced Herein at pages A637 to A641)

Exhibit O to Memorandum -
(i) Letter from Faculty Senate Executive Committee to
President Cabrera, *et al*., dated May 15, 2019
(Reproduced Herein at pages A739 to A742)
(ii) Letter from S. David Wu and Carol D. Kissal to
Faculty Senate Executive Committee, dated May 21, 2019
(Reproduced Herein at pages A744 to A745)

Exhibit P to Memorandum -
"A Title IX Report Alleged Harassment by Student Body
President", *Fourth Estate*, April 29, 2018
(Reproduced Herein at pages A708 to A715)

Exhibit Q to Memorandum -
"Corrections Request: Title IX Article Published on 4/30",
*Fourth Estate*, May 16, 2018
(Reproduced Herein at pages A717 to A721)

Exhibit R to Memorandum -
"Sexual Assault Investigation", *Fourth Estate*,
dated October 24, 2016
(Reproduced Herein at pages A703 to A707)

Exhibit S to Memorandum -
"A Conversation with Julian Williams, Vassar's Title IX
Officer", Vassar College Website, dated April 1, 2015
(Reproduced Herein at pages A362 to A366)

**Table of Contents**
**(Continued)**

**Page**

Exhibit T to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A322 to A323)

Exhibit U to Memorandum -
Letter from CHSS Grievance Committee,
dated June 19, 2019
(Reproduced Herein at pages A408 to A412)

Reply Brief in Support of Defendant The Rector and Visitors of
    George Mason University's Motion to Dismiss Count I,
    dated February 5, 2020 ................................................................. A877

Reply Brief in Support of Defendants Jennifer Hammat,
    Julian Williams, Keith Renshaw, Ann Ardis and S. David Wu's
    Motion to Dismiss Counts II-IV, dated February 5, 2020 ............. A899

Memorandum Opinion and Order of the Honorable Liam O'Grady,
    so ordered on April 23, 2020, Appealed From .............................. A921

Notice of Appeal, dated April 29, 2020 ................................................. A965

**Volume IV**

**Documents Filed Under Seal**

Memorandum of Points and Authorities in Support of Defendant
    The Rector and Visitors of George Mason University's Motion
    to Dismiss Count I, dated December 20, 2019
    (Omitted Herein and Reproduced at page A173 to A204)

Exhibit 1 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018 ......................................................... A968

**Table of Contents**
**(Continued)**

**Page**

Exhibit 2 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018 ........................................................ A976

Exhibit 3 to Memorandum -
Notice of Investigation (Complainant 3),
dated December 4, 2018 ........................................................ A983

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 4),
dated December 4, 2018 ........................................................ A1009

Exhibit 5 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 ........................................................ A1054

Exhibit 6 to Memorandum -
Letter of Determination (Complainant 2),
dated February 21, 2019 ........................................................ A1056

Exhibit 7 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 ........................................................ A1058

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 ........................................................ A1061

Exhibit 9 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019 ........................................................ A1064

Plaintiff's Memorandum of Law in Opposition to Defendant
    George Mason University's Motion to Dismiss Plaintiff's
    Title IX Claim Pursuant to Federal Rule 12(b)(6),
    dated January 22, 2020
    (Omitted Herein and Reproduced at pages A434 to A465)

**Table of Contents**
**(Continued)**

**Page**

Exhibit 4 to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018
(Reproduced Herein at pages A968 to A975)

Exhibit 5 to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018
(Reproduced Herein at pages A976 to A982)

Exhibit 6 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ..................................................................    A1066

Exhibit 7 to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments ..................................................................    A1095

Exhibit 8 to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019 .........................................................    A1142

Exhibit 9 to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019 .........................................................    A1147

Exhibit 10 to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019 .........................................................    A1152

Exhibit 11 to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019 .........................................................    A1157

**Table of Contents**
**(Continued)**

**Page**

Exhibit 13 to Memorandum -
Todd Kashdan's Complaint Against Complainant 4 for
Possible Act of Misconduct Under Student Conduct
Code and Violation of Section X of Policy 1202 ................... A1163

Exhibit 15 to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
Reproduced Herein at pages A1064 to A1065)

Exhibit 27 to Memorandum -
Complainant 4 Text Messages and Email ............................. A1171

Exhibit 28 to Memorandum -
Communications between Todd Kashdan
and Complainant 1 ................................................. A1180

Exhibit 29 to Memorandum -
Communications between Todd Kashdan
and Complainant 3 ................................................. A1188

Exhibit 31 to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019 ...................................... A1194

Plaintiff's Memorandum of Law in Opposition to the Individual
Defendants' Motion to Dismiss Plaintiff's Due Process and
First Amendment Claims Pursuant to Federal Rule 12(b)(6),
dated January 22, 2020
(Omitted Herein and Reproduced at pages A779 to A811)

Exhibit C to Memorandum -
Notice of Investigation (Complainant 1),
dated December 4, 2018, with Attachments .......................... A1198

**Table of Contents**
**(Continued)**

Page

Exhibit D to Memorandum -
Notice of Investigation (Complainant 2),
dated December 4, 2018, with Attachments ........................    A1208

Exhibit E to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments
(Reproduced Herein at pages A1067 to A1094)

Exhibit F to Memorandum -
Email from Megan R. Simmons, dated January 11, 2019,
with Attachments
(Reproduced Herein at pages A1096 to A1141)

Exhibit G to Memorandum -
Letter from Dr. Keith Renshaw to Todd Kashdan,
dated September 17, 2019
(Reproduced Herein at pages A1195 to A1197)

Exhibit K to Memorandum -
Letter of Determination (Complainant 1),
dated February 22, 2019
(Reproduced Herein at pages A1143 to A1146)

Exhibit L to Memorandum -
Letter of Determination (Complainant 2),
dated February 22, 2019
(Reproduced Herein at pages A1148 to A1151)

Exhibit M to Memorandum -
Letter of Determination (Complainant 3),
dated February 22, 2019
(Reproduced Herein at pages A1153 to A1156)

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Memorandum -
Letter of Determination (Complainant 4),
dated February 22, 2019
(Reproduced Herein at pages A1158 to A1162)

Exhibit T to Memorandum -
Letter from Julian R. Williams to Todd Kashdan,
dated April 11, 2019
(Reproduced Herein at pages A1064 to A1065)

**EXHIBIT H**

THIS PAGE INTENTIONALLY LEFT BLANK



# FACULTY
# HANDBOOK

July 1, 2018

## Table of Contents

Table of Contents ............................................................................................................ 2
Preamble: The Mission of George Mason University ...................................................... 5
Preface to the Handbook ................................................................................................. 6
CHAPTER I.  UNIVERSITY ORGANIZATION ............................................................ 9
  1.1 The Rector and Board of Visitors ......................................................................... 9
  1.2 Administrative Organization ................................................................................. 9
    1.2.1 The President ................................................................................................... 9
    1.2.2 The Provost ..................................................................................................... 9
    1.2.3 Executive Council and President's Council .................................................. 10
    1.2.4 Academic Deans as Members of the Central Administration....................... 10
    1.2.5 Faculty Participation in the Selection of Certain Members of the Central
    Administration ...................................................................................................... 10
  1.3 Faculty Organization .......................................................................................... 11
    1.3.1 The General Faculty ...................................................................................... 11
    1.3.2 The Faculty Senate ........................................................................................ 11
    1.3.3 Colleges and Schools .................................................................................... 12
    1.3.4 Academic Institutes....................................................................................... 12
    1.3.5 Academic Departments ................................................................................. 13
    1.3.6 Definition of Local Academic Units (LAU) and Primary Affiliation ......... 13
    1.3.7 Colleges and Schools without Departments ................................................. 14
    1.3.8 The Graduate Council .................................................................................... 14
    1.3.9 Multidisciplinary or Interdisciplinary Programs.......................................... 14
    1.3.10 Centers ......................................................................................................... 15
    1.3.11 Research Institutes ....................................................................................... 15
CHAPTER II.  FACULTY PERSONNEL MATTERS ................................................... 16
  2.1 Faculty Appointments ........................................................................................ 16
    2.1.1 Tenured Appointment .................................................................................... 16
    2.1.2 Tenure-Track Appointment ........................................................................... 16
    2.1.3 Term Appointments ....................................................................................... 16
    2.1.4 Part-Time Appointment ................................................................................. 17
    2.1.5 Adjunct Appointment ..................................................................................... 17
    2.1.6 Postdoctoral Research Fellows ..................................................................... 17
    2.1.7 Affiliate Faculty ............................................................................................ 18
    2.1.8 Academic Year Appointments and Fiscal Year Appointments .................... 18
    2.1.9 Faculty with Governance Responsibilities.................................................... 18
  2.2 Faculty Ranks...................................................................................................... 19
    2.2.1 Instructor ....................................................................................................... 19
    2.2.2 Assistant Professor ........................................................................................ 19
    2.2.3 Associate Professor ....................................................................................... 19
    2.2.4 Professor ........................................................................................................ 19
    2.2.5 University Professor....................................................................................... 19
    2.2.6 Distinguished Service Professor ................................................................... 20

2.2.7 Emeritus Faculty ............................................................................................ 20
2.2.8 Administrators Holding Faculty Rank ........................................................... 20
2.3 Recruitment and Appointment of Faculty.............................................................. 21
2.3.1 Policies on Recruitment and Appointment of Faculty ................................... 21
2.3.1.1 Favoritism in Personnel Decisions ......................................................... 21
2.3.2 Procedures for Recruitment and Appointment of Tenured, Tenure-Track, and Term
Faculty.................................................................................................................... 22
2.3.2.1 Competitive Appointments ..................................................................... 22
2.3.2.2 Non-competitive Appointments............................................................... 22
2.3.2.3 Awarding of Tenure at the Time of Appointment .................................. 23
2.3.3 Criteria and Procedures for Appointment, Reappointment, and Promotion of Term
Faculty.................................................................................................................... 23
2.3.3.1 Reappointment ........................................................................................ 24
2.3.3.2 Promotion ................................................................................................ 25
2.4 Criteria for Evaluation of Tenured and Tenure-Track Faculty ............................. 25
2.4.1 Teaching ........................................................................................................ 26
2.4.2 Research and Scholarship .............................................................................. 27
2.4.3 University and Professional Service .............................................................. 27
2.5 Procedures for Evaluation of Tenured and Tenure-Track Faculty ........................ 27
2.5.1 Teaching ........................................................................................................ 27
2.5.2 Research and Scholarship .............................................................................. 28
2.5.3 University and Professional Service .............................................................. 28
2.6 Annual Evaluations of Faculty and Administrators .............................................. 28
2.6.1 Annual Review of Faculty ............................................................................. 28
2.6.2 Post Tenure Review Policies and Procedures ............................................... 29
2.6.3 Faculty Role in the Evaluation of Academic Administrators ........................ 32
2.7 Procedures for Renewal, Promotion, and Tenure ................................................. 32
2.7.1 General Procedures ........................................................................................ 32
2.7.2 Procedures for Renewal ................................................................................ 32
2.7.3 Procedures for Promotion and Tenure ........................................................... 33
2.7.4 Tenure-Track Contract Extension ................................................................. 37
2.8 Appeal of Negative Decisions in Renewal, Tenure and Promotion Cases. .......... 38
2.8.1 Grounds for Appeal. ...................................................................................... 38
2.8.2 University Promotion, Tenure and Renewal Appeal Committee ................... 39
2.8.2.1 Committee Charge ................................................................................... 39
2.8.2.2 Committee Composition .......................................................................... 39
2.8.3 Appeal Procedure ......................................................................................... 40
2.8.4 Final Consideration When Appeal Not Found to Have Merit ....................... 40
2.8.5 Remand Process ............................................................................................ 40
2.9 Policies and Procedures Relating to Termination ................................................. 41
2.9.1 Financial Exigency........................................................................................ 41
2.9.2 Discontinuation of Degree Programs ............................................................ 42
2.9.3 Termination of Appointment of Tenured, Tenure-Track, and Term Faculty Members
for Cause ................................................................................................................ 43
2.10 Faculty Duties and Responsibilities..................................................................... 46
2.10.1 University Policies ....................................................................................... 46

2.10.2 Professional Ethics...................................................................................... 47
2.10.3 Faculty Work Assignments......................................................................... 47
2.10.4 Faculty Absences from Class...................................................................... 48
2.10.5 Faculty Responsibility Under the Honor Code............................................ 48
2.10.6 Political Candidacy.................................................................................... 48
2.10.7 Outside Employment and/or Business Interests .......................................... 48
2.10.8 Full-Time Faculty Teaching at Other Institutions ...................................... 49
2.10.9 Temporary or Short-Term Relief of Faculty from Duties and Responsibilities ........ 49
2.10.10 The Family and Medical Leave Act............................................................ 50
2.11 Faculty Rights and Privileges ............................................................................... 50
2.11.1 Academic Freedom and Civil Liberties ...................................................... 50
2.11.2 Grievances................................................................................................ 51
2.11.2.1 Policies Concerning Grievances ......................................................... 51
2.11.2.2 Grievance Procedures ....................................................................... 51
2.12 Department Chairs ................................................................................................. 52
2.12.1 Duties and Responsibilities........................................................................ 53
2.12.2 Policies on Appointment and Renewal ....................................................... 53
2.12.3 Procedures for Appointment and Renewal ................................................. 54
2.12.3.1 Search Procedures............................................................................. 54
2.12.3.2 Renewal Procedures .......................................................................... 55
2.12.4 Removal.................................................................................................... 56
2.13 Directors of Academic Programs Spanning More Than a Single Academic Unit ........... 56
CHAPTER III.  FACULTY COMPENSATION AND BENEFITS ........................................ 57
3.1 Faculty Salaries ...................................................................................................... 57
3.2 Salary Increases ...................................................................................................... 57
3.3 Summer Salary ........................................................................................................ 57
3.4 Salary Matrix .......................................................................................................... 58
3.5 Faculty Benefits ...................................................................................................... 58
3.6 Faculty Development ............................................................................................... 58
3.6.1 Study Leave for Tenure-Track Faculty ....................................................... 58
3.6.2 Leave Programs for Tenured Instructional Faculty ...................................... 59
3.7 Retirement............................................................................................................... 59
3.8 Conversion Factors ................................................................................................. 60

**Preamble: The Mission of George Mason University**

# George Mason University

# Mission Statement

George Mason University is innovative and entrepreneurial in spirit and utilizes its multi-campus organization and location near our nation's capital to attract outstanding faculty, staff and students. George Mason will:

- Educate the new generation of leaders for the 21st century men and women capable of shaping a global community with vision, justice, and clarity.
- Encourage freedom of thought, speech, and inquiry in a tolerant, respectful academic setting that values diversity.
- Provide innovative and interdisciplinary undergraduate, graduate, and professional courses of study that enable students to exercise analytical and imaginative thinking and make well-founded ethical decisions.
- Nurture and support a highly qualified and entrepreneurial faculty that is excellent at teaching, active in pure and applied research, capable of providing a broad range of intellectual and cultural insights, and is responsive to the needs of students and their communities.
- Maintain an international reputation for superior education and public service that affirms its role as the intellectual and cultural nexus among Northern Virginia, the nation, and the world.

as amended by the Board of Visitors on February 4, 2009
approved by the State Council of Higher Education Virginia on May 12, 2009

**A818**

**Preface to the Handbook**

The *George Mason University Faculty Handbook* defines and describes the conditions of full-time instructional, research, and clinical faculty employment; the structures and processes through which the faculty participates in institutional decision-making and governance; and the academic policies of the University as established by its Board of Visitors. As an institution of higher education of the Commonwealth of Virginia, George Mason University is governed by the Code of Virginia. Nothing in this Handbook shall be interpreted as creating any right or benefit not duly authorized by law, or which is contrary to any law, policy, rule or regulation of the Commonwealth of Virginia.

The provisions of the *Faculty Handbook*, as amended from time to time, are incorporated by reference in all full-time instructional, research, and clinical faculty employment contracts. These provisions are binding on the University and on individual faculty members. The *Faculty Handbook* governs the employment relationship of individual faculty members, and sets forth the rights, privileges, and responsibilities of faculty members and of the University. Faculty and academic administrators are expected to read the *Faculty Handbook* and to be familiar with its contents.

Except as noted below, revisions to the *Handbook* may be proposed by any of the parties who have participated in its adoption: the Board of Visitors; the Faculty Senate, acting on behalf of the General Faculty; and the central administration.

Proposals to revise the Handbook originating from the Faculty Senate or University administrators will be considered by a joint committee of the faculty and the central administration consisting of three faculty elected by the Faculty Senate, at least one of whom must be a Faculty Senator, and two administrators appointed by the Provost. The chair of the Faculty Senate appoints one of the elected faculty members as the committee chair. Arrangements must assure an expeditious meeting in cases of urgency. It is not necessary to convene a committee for the following cases:

- Revisions proposed and approved by the Faculty Senate, and approved by the Provost;

- Revisions proposed by the central administration, and submitted to and approved by the Faculty Senate.

All revisions require the formal approval of the Board of Visitors. Each revision shall be incorporated, as of the effective date fixed by the Board, in all existing and future faculty employment contracts; however, no revision shall operate retroactively to change materially the substantive rights of any faculty member or the conditions of award of tenure for faculty members already granted tenure, or who have filed a written request with his or her Dean to be evaluated for the award of tenure. For example, the conditions of employment governed by the Handbook may be changed prospectively and criteria for tenure may be changed for faculty who have not been awarded tenure, but may not be changed for faculty already tenured. Where no effective date is fixed for a revision, it shall become effective on July 1st following its approval by the BOV.

# A819

When a policy or procedure described in this Handbook is subject to alternative interpretations, then the Provost and the Faculty Senate Executive Committee will be the designated body to resolve the disagreement.

As of the date of the adoption of this edition of the Handbook, all prior policies with respect to matters covered therein are superseded. With the exception of the bylaws governing the University's Board of Visitors, the provisions of this Handbook supersede all inconsistent bylaws, policies and procedures in effect at the time of its adoption by the Board of Visitors (including, if applicable, custom and usage) of any officer, person, body, or unit of the University, including but not limited to the President or other officer of the University and any college, school, department or other faculty organization.

The *Handbook* Committee acknowledges that some sections use language taken from policy statements of the American Association of University Professors. The use of AAUP language does not, however, represent any University endorsement of AAUP policies other than those explicitly contained in this *Handbook*.

The Faculty Senate and the Provost's Office assume joint responsibility for updating and maintaining the contents of the Faculty Handbook in both the print and web versions.

University policies are located on the university's website at http://universitypolicy.gmu.edu/. The Provost's Office web address is http://provost.gmu.edu/. Other important information is located on the websites of the Human Resources and Payroll Office (http://hr.gmu.edu/) and the Office of Compliance, Diversity and Ethics (http://integrity.gmu.edu/). Please refer to these websites for issues not addressed in the *Faculty Handbook*.

*Members of the Handbook Committee, 2009 Edition*

| | |
|---|---|
| Richard L. Coffinberger, Chair | David J. Harr |
| Kevin A. Avruch | Marilyn Sanders Mobley |
| Lorraine A. Brown | David W. Rossell |
| Martin E. Ford | Suzanne W. Slayden |

REVISION HISTORY

Adoption date: January 1, 2009. Approved by the Faculty Senate [October 15, 2008] and the Board of Visitors [December 3, 2008].

Revision effective date: July 1, 2011. Approved by the Faculty Senate [April 6, 2011] and the Board of Visitors [May 4, 2011], confirmed by a Memorandum of Record (July 15, 2011).

Revision effective date: July 1, 2012. Approved by the Faculty Senate [February 15, 2012] and the Board of Visitors [May 9, 2012].

Revision effective date: July 1, 2013. Approved by the Faculty Senate [February 13, 2013] and the Board of Visitors [ March 20, 2013 and May 8, 2013].

**A820**

Revision effective date: July 1, 2014. Approved by the Faculty Senate [March 5, 2014 and April 2, 2014] and the Board of Visitors [May 7, 2014].

Revision effective date: July 1, 2017. Approved by the Faculty Senate [February 1, 2017 and March 1, 2017] and the Board of Visitors [May 11, 2017].

Revision effective date: July 1, 2018. Approved by the Faculty Senate [April 4, 2018] and the Board of Visitors [May 3, 2018].

**A821**

**CHAPTER I.  UNIVERSITY ORGANIZATION**

**1.1 The Rector and Board of Visitors**

Responsibility for the governance of George Mason University is vested by the laws of the Commonwealth of Virginia in the Rector and Board of Visitors. Members of the Board of Visitors are appointed by the Governor of the Commonwealth to serve fixed terms of four years. The Rector is a member of the Board, elected by the Board to serve as its chair.

Without limiting the generality of its powers, the Board of Visitors exercises its authority principally in policy making and oversight. With the exception of meetings convened in executive session, meetings of the Board of Visitors and its committees are open to the public. The chair of the Faculty Senate sits as a non-voting representative to the full Board. The voting membership of the General Faculty (see Section 1.3.1) shall elect a non-voting representative to all standing committees of the Board, except the Audit Committee (see below). To accomplish this, the Faculty Senate shall conduct elections biennially. The candidates will come from the voting membership of the General Faculty. The Faculty Senate will notify the Rector of the outcome of the election. A separate faculty member may be selected by the Board to serve as a nonvoting, faculty liaison to the Audit Committee. No faculty member may serve concurrently on more than one committee. No faculty member can serve more than three consecutive 2-year terms, although subsequent reelection is permitted.

**1.2 Administrative Organization**

**1.2.1 The President**

The Board of Visitors appoints the President of the University, who serves at its pleasure. The President is the chief executive officer of the University and reports to the Rector and Board of Visitors. As chief executive officer, the President is charged with carrying out the policies of the Board and providing leadership to the University's faculty, staff, and students in achieving major objectives. Within guidelines established by the laws of the Commonwealth of Virginia and the Board of Visitors, the President is in charge of day-to-day administration and operation of the University.

**1.2.2 The Provost**

The Executive Vice President for Academic Affairs and Provost (hereafter abbreviated as Provost) is the chief academic officer of the University and is responsible for all educational matters. The Provost is appointed by the President and serves at the President's pleasure.

The Provost functions as the liaison to the Faculty Senate for the university administration and has a primary responsibility to keep the Faculty Senate informed about new initiatives as well as ongoing developments within the University. The Provost implements this function in a manner that promotes the highest levels of faculty participation in the shared governance of the University.

**A822**

### 1.2.3 Executive Council and President's Council

The Executive Council is the President's advisory group. Members of the Executive Council have overall responsibility for monitoring university projects and for sharing information about major developments.

The President's Council includes senior members of the university administration and the chair of the Faculty Senate. Its function is to keep members informed about initiatives and activities, and to participate in discussions of basic policy.

More information about organizational structure of the central administration is available on the Mason website at https://www2.gmu.edu/about-mason/university-leadership.

### 1.2.4 Academic Deans as Members of the Central Administration

Collegiate or school Deans function in a dual capacity: they are the principal representatives of the organizational units and faculties within their charge, but they are also members of the central administration. As members of the central administration, they are appointed by the President, serve at the President's pleasure, and report to the Provost.

### 1.2.5 Faculty Participation in the Selection of Certain Members of the Central Administration

The faculty plays a vital role in the appointment and reappointment of senior academic administrators and other leadership positions related to the academic mission of the university.

The Board of Visitors provides for participation on presidential search committees by faculty who are elected by the General Faculty. The search and selection process must include opportunities for the General Faculty to meet with candidates who are finalists for the presidency. The Board of Visitors also provides for participation in the process of presidential reappointments or contract extensions by faculty who are elected by the General Faculty. This process includes an opportunity for the General Faculty to meet with the President to discuss his or her achievements and future plans for the university.

The President provides for faculty participation on search and reappointment committees for the Provost by faculty who are elected by the General Faculty. The search and selection process must include opportunities for the General Faculty to meet with the Provost or with candidates who are finalists for the Provost position.

The Provost provides for participation on search and reappointment committees for college/school Deans by faculty who are elected from and by the faculty of the college/school in which the appointment will occur. The search and selection process must include opportunities for the college/school faculty to meet with the Dean or with candidates who are finalists for the position.

The Faculty Senate will assist in conducting elections by the General Faculty.

### 1.3 Faculty Organization

The faculty conducts its work and participates in institutional governance at the University level, the college/school level, and the level of the local academic unit (defined in Section 1.3.6). The faculty is organized accordingly, to provide for the exercise of its responsibilities at all three levels, as described in Sections 1.3.1 through 1.3.6 below. In accordance with the best traditions of American universities, the faculty plays a primary role in two types of determinations: the University's academic offerings and faculty personnel actions. The faculty also plays a vital role in academic organization and institutional change.

### 1.3.1 The General Faculty

The General Faculty consists of all faculty who have full-time instructional, research, or clinical appointments. The General Faculty participates in governance at the university level.

Meetings of the General Faculty are scheduled by the President of the University, who serves as presiding officer. If at least 10% of the voting membership petitions for a called meeting of the General Faculty, the President is obliged to schedule it within thirty days, or within ten days if the purpose of the call is to consider modification of the authority the General Faculty has granted the Faculty Senate; or reversal of specific decisions of the Senate; or amending the Senate charter. All members of the General Faculty have voting rights on matters that pertain to the General Faculty. All members of the University community may attend meetings of the General Faculty and participate in the debate of matters that come before it.

Without relinquishing the generality of its powers, The General Faculty delegates by Charter to the Faculty Senate the responsibility for shared academic governance at the university level. Only those faculty who have instructional appointments – tenured, tenure-track, term, or adjunct – may be elected to the Faculty Senate.

### 1.3.2 The Faculty Senate

Under powers delegated to it by the General Faculty, the Faculty Senate is the principal faculty advisory body to the President. It has particular responsibility for the formulation of university-wide academic policies and is the principal voice of the faculty in matters affecting the faculty generally. It advises the President and other members of the central administration concerning matters that affect the welfare of the University as a whole.

The principal function of the Faculty Senate is to represent the faculty on all academic and governance issues not internal to any single college/school, including, but not limited to, curricular matters, matters concerning terms and conditions of faculty employment, and matters of academic organization and institutional change. In these matters, the Provost and Senate will consult during the process of planning and implementing changes. To ensure timely consultation about these and other matters, the Provost meets regularly with the Senate's executive committee. Meetings with the President and/or other members of the central administration occur as needed.

The Senate meets at least monthly during the fall and spring semesters. Meetings of the Senate are open to all members of the university community, who may speak to any item of business on the agenda. Only members of the Senate, however, may introduce motions and vote. The Faculty Senate deliberates in a respectful and open manner, consistent with existing principles of university discourse.

### 1.3.3 Colleges and Schools

The colleges and schools of the University are communities of teaching, learning, research and scholarship, and service established by the faculty and administration and approved by the Board of Visitors. They house faculties and programs representing shared educational interests, and may or may not be sub-divided into departments. Colleges may also be subdivided into schools.

As an organizational unit the college/school meets four functional criteria: (i) it has a tenured and tenure-track faculty directly and specifically appointed to it or to its departments by the Board of Visitors; (ii) its faculty establishes degree requirements; authorizes the conferral of degrees; proposes, reviews and approves courses and programs; actively participates in decisions concerning the creation, reorganization and dissolution of units within the college/school; and plays a key role in faculty personnel actions such as appointments, promotion, and granting tenure; (iii) it has an instructional budget that includes FTE funds for the payment of its faculty's salaries as well as funds for goods and services in support of its academic programs and other activities; and (iv) its chief administrative officer is a Dean who reports directly to the Provost.

The faculties of colleges/schools, together with their Deans, determine the processes and procedures of governance they will employ, consistent, with the provisions of the Faculty Handbook. All colleges/schools, and if so sub-divided, each of their departments, must act in accordance with the best traditions of the academic profession and within the following guidelines, which prescribe that they

   a. operate in an open and democratic manner;
   b. define their own voting membership;
   c. adopt bylaws or standing rules that are published and made available to all members and that undergo periodic review and that include procedures and define eligibility for faculty participation in the activities specified in this Handbook;
   d. meet often enough to ensure good communication and the timely conduct of business;
   e. hold meetings that follow an agenda distributed in advance;
   f. record the proceedings of the meetings in minutes that are distributed to and approved by the faculty.

### 1.3.4 Academic Institutes

An academic institute is an organizational unit of the University that fosters interdisciplinary activities that transcend the disciplines based in any single college/school. In addition to research and scholarship and service activities, institutes offer interdisciplinary academic programs that do not duplicate those of other academic units. Academic institutes are also analogous to schools or colleges in that they have a nucleus of full-time faculty appointed directly and specifically to primary affiliation in them.

In addition, academic institutes may have (i) faculty who are assigned to work in them (full- or part-time) but who are affiliated primarily with other local academic units; and (ii) part-time faculty whose work in the University is solely in the institute. Of sufficient size to ensure a sense of community and responsible faculty governance, the faculty of an institute establishes degree requirements; authorizes the conferral of degrees; proposes, reviews, and approves courses and programs; and plays a primary role in faculty personnel actions.

Administratively, the director of an institute is regarded as the equivalent of a Dean, and is therefore expected to possess appropriate academic credentials or their equivalent. Institute directors report directly to the Provost.

An institute has an instructional budget that includes FTE funds for the payment of its faculty's salaries as well as funds for goods and services in support of its academic programs and other activities.

The faculties of academic institutes define their own voting membership. Together with their directors, they determine the processes and procedures of governance they will employ, but all institutes must follow the guidelines applicable to schools and colleges set forth in Section 1.3.3.

For a description of non-academic "Research Institutes," see Section 1.3.11.

### 1.3.5 Academic Departments

In such colleges/schools as may be subdivided administratively to reflect disciplinary differences and intellectual traditions, the academic department is the local unit of faculty organization. Departments are established to carry out programs of instruction, research and scholarship, and public service in particular fields of knowledge. Accordingly, they are organized on the basis of disciplines or fields of study.

Departmental faculties determine their own voting membership. Together with their chairs, they determine the processes and procedures of governance they will employ, but all departments must follow the guidelines applicable to colleges/schools set forth in Section 1.3.3.

### 1.3.6 Definition of Local Academic Units (LAU) and Primary Affiliation

The term "local academic unit" refers to an academic department or to a college/school without departments. In this *Handbook* the chief administrative officers of local academic units are generically called "local unit administrators."

Although a faculty member's tenure resides in the University as a whole (see Section 2.1.1), in recognition of disciplinary qualifications and for purposes of governance, tenure-track and tenured faculty are appointed directly and specifically to one or more local academic units. Term faculty are also appointed directly and specifically to one or more local academic units. The status established by such an appointment to a local academic unit is called "primary affiliation." Primary affiliation in one local academic unit does not preclude the possibility of additional part-time or full-time assignments to other local academic units. An appointment to primary affiliation requires the concurrence of the faculty of the local academic unit to which the

appointment is to be made and may not be transferred from one local academic unit to another except with the concurrence of the faculty of the unit to which a transfer is proposed.

The local level of governance is the most important in the University for the faculty's direct exercise of professional and peer judgment. Faculties of local academic units actively participate in decision-making about academic matters, matters of faculty status, and organizational and institutional change. They have primary responsibility for such academic matters as unit reorganization, the design of programs, development and alteration of the curriculum, standards for admission to programs, and requirements in the major. They play a primary role in such matters of faculty status as the recruitment and initial appointment of new faculty; the reappointment, promotion, tenure, and post-tenure review of members; and in the case of departments, the selection of the department chair.

### 1.3.7 Colleges and Schools without Departments

Colleges and schools without departments provide simultaneously for faculty governance at the collegiate level (as described in Section 1.3.3) and at the local level. In carrying out their function as local academic units, such colleges/schools will operate analogously to departments (as described in Sections 1.3.4 and 1.3.5).

### 1.3.8 The Graduate Council

The Graduate Council, established by the General Faculty, oversees the conduct of graduate education. It establishes the general norms within which local academic units offer graduate degree programs; reviews and acts upon new graduate degree proposals; authorizes the conferral of graduate degrees; participates in the periodic evaluation of graduate programs and the periodic review of academic policy and admissions policies and procedures; and performs other functions as requested by the office of the Provost.

The Graduate Council establishes the specific means of conducting its own business. Like colleges/schools and departments, however, it must act within the guidelines set forth in Section 1.3.3.

### 1.3.9 Multidisciplinary or Interdisciplinary Programs

Most academic programs are offered by local academic units and are therefore administered and governed by the faculties of such units.

Some multidisciplinary or interdisciplinary programs are offered by faculties drawn from more than a single local academic unit. These faculty members do not hold primary affiliation in those programs but rather, in one or more local academic units (see Section 1.3.6). For purposes of personnel decisions regarding appointment, promotion and tenure, these faculty members are evaluated primarily by their peers in the local units of which they are a part, but with the requirement that recommendations from the multidisciplinary or interdisciplinary program faculty with which they are associated will be given due consideration.

# A827

Academic programs which are not internal to a single local academic unit are administered by a program director. This director is regarded as the equivalent of a department chair and is therefore expected to possess equivalent academic credentials. Such program directors normally report to a Dean. If the program transcends the boundaries of a single college/school, the program director reports to the Provost.

Program faculty define their own voting membership. Together with their directors, they determine the procedures of governance they will employ, but all program faculties must act within the guidelines set forth in Section 1.3.3.

### 1.3.10 Centers

A center is a unit of the University intended to advance the University's mission of research and/or public service. Normally housed within a department or college/school, a center does not develop or administer academic degree programs, nor does it possess instructional faculty appointed to primary affiliation with it. Centers may require the presence of research, clinical, and/or professional faculty whose affiliation with the center is subject to the availability of research funds. Faculty appointed to a center under externally funded grants or contracts may not receive tenure-track or tenured appointments through the center. A center is chartered for a specific period of time by the Provost on the recommendation of appropriate faculty and Dean(s). Renewal of a center's charter, when called for, is subject to favorable review of a center's performance and accomplishments

A center is administered by a director who serves at will and who is appointed by the local unit administrator of the unit within which the center is housed. Whenever possible, centers are expected to derive most of their operating budgets from a source or sources other than state appropriations.

### 1.3.11 Research Institutes

When the size and scope of a center's funding, personnel, and potential societal contributions grow to a level that is well beyond the parameters of a typical center, or when a new unit with this profile is initiated, that unit may be classified as a research institute.

Research institutes have the same defining features as centers with the following exceptions: (i) the overall volume and/or complexity of activity is substantially larger, as evidenced, for example, by the number of faculty affiliated with the unit, the range of projects undertaken, or the amount of funding invested in the unit; and (ii) the mission must include a broad social purpose focused directly on the betterment of the human condition.

The term "research institute" is reserved for special cases where there are clear and compelling reasons to provide a distinctive label for that unit. To ensure that this guideline is respected, the process for chartering a research institute must include opportunities for center directors, academic unit heads, and the Faculty Senate to review and comment on chartering proposals before a classification decision is made.

**A828**

## CHAPTER II.  FACULTY PERSONNEL MATTERS

### 2.1 Faculty Appointments

This section defines the various types of faculty appointment at George Mason University.

### 2.1.1 Tenured Appointment

Although the word "tenure" does not appear in the Code of Virginia, the University grants "election without term." As used in a faculty member's employment contract, the word "tenure" has the same meaning as "election without term". The University defines tenure as the right to continued employment unless separated from the University under conditions outlined in Section 2.9 of this document. For the University, tenure is a major safeguard of academic freedom, of the quality of education offered here, and of the continuity and stability of the institution. For the faculty member on whom tenure is conferred, it is a privilege granted by the University to those who have consistently demonstrated their value to the institution over an extended period of time. Faculty on instructional tenured appointments normally hold the rank of Associate Professor or Professor.

Tenure, once conferred, resides in the University, and is not affected by the reorganization of academic units. In the event of program discontinuation or financial exigency, the institution will make a good faith effort to protect and retain its tenured faculty members and to provide them with opportunities for professional development and training for other roles in the University.

### 2.1.2 Tenure-Track Appointment

This is an instructional faculty appointment for a fixed term which allows faculty the opportunity to meet the requirements for tenure. These appointments are issued for terms of up to three years. The University can, but is not required to, renew such appointments for additional terms up to a total of six years of service, not counting any extension of the tenure-track contract (see Section 2.7.4). Faculty on tenure-track appointments may hold the rank of Assistant Professor, Associate Professor, or Professor.

Faculty in their sixth year on the tenure-track at George Mason University stand for tenure at that time if they wish to retain their position beyond the seventh year. Earlier consideration for a tenured appointment is possible under certain conditions. For example, experienced faculty hired on tenure-track appointments from other institutions will not normally be expected to serve a six-year tenure-track period, although there is no requirement that they stand for tenure prior to their sixth year of tenure-track service at George Mason University. Exceptionally, faculty may apply for early consideration based on unusually strong performance.

### 2.1.3 Term Appointments

Full-time faculty on fixed-term, non-tenure-track appointments are known as Term Faculty. Term faculty whose assignments focus primarily on teaching are appointed as instructional faculty. Term faculty whose assignments focus primarily on research are appointed as research

faculty. Term faculty whose assignments focus primarily on clinical practice are appointed as clinical faculty.

Term faculty may be offered single-year or multi-year contracts up to a maximum of 5 years. Service in such positions cannot be applied to consideration for tenure, although a faculty member holding this kind of appointment can subsequently be considered for a tenure-track or tenured appointment. (See Sections 2.3.2 and 2.3.3.)

Term faculty appointments include appropriate academic rank as judged by the appointing local academic unit and subject to the approval of the Dean and Provost. Term faculty with a terminal degree are eligible for promotion in rank normally after six years of service.

Instructional term faculty may hold one of the following titles: Term Instructor, Term Assistant Professor, Term Associate Professor, or Term Professor. Research-oriented term faculty may hold one of the following titles: Research Instructor, Research Assistant Professor, Research Associate Professor, or Research Professor. Clinical-oriented term faculty may hold one of the following titles: Clinical Instructor, Clinical Assistant Professor, Clinical Associate Professor, or Clinical Professor.

Term faculty on single-year appointments whose permanent employment is with another organization hold title with the prefix of "Visiting."

### 2.1.4 Part-Time Appointment

Term faculty who are appointed to less than full-time positions are called part-time faculty. Their assignments may include research, service, clinical practice, administrative program development, or instructional responsibilities that go beyond the boundaries of specific courses. Part-time term faculty positions are governed by the same appointment, rank, and title requirements as full-time term faculty positions. The Dean is the final approval level for part-time faculty appointments, and the maximum length of a part-time term faculty position is one year. Exceptions require the approval of the Provost. Part-time faculty are not voting members of the General Faculty.

### 2.1.5 Adjunct Appointment

Adjunct Faculty are employees appointed to fulfill the teaching and advising responsibilities associated with a specific course (or a set of specified courses) in a specific semester.

Adjunct Faculty are not voting members of the General Faculty and are not covered by the provisions of this Handbook.

### 2.1.6 Postdoctoral Research Fellows

Postdoctoral Research Fellows are employees governed by the Postdoctoral Research Fellows Policy. Postdoctoral Research Fellows are not covered by the provisions of the Faculty Handbook.

# A830

### 2.1.7 Affiliate Faculty

The University recognizes two types of affiliate faculty, neither of which is governed by the Faculty Handbook.

Affiliate Faculty

Faculty with teaching, research, service, or administrative assignments who are not employed by the University may be designated with the honorific title of Affiliate Faculty. Recommendations for affiliate faculty appointments are initiated by a local academic unit and must be approved by the Provost. Affiliate faculty appointments are honorific only and carry no employee status.

University Affiliate

Faculty who are employed by the University may be designated with the honorific title of University Affiliate. University affiliate appointments are initiated and approved by a local academic unit. University affiliate status is considered secondary to the faculty's primary appointment as described in Section 1.3.6.

### 2.1.8 Academic Year Appointments and Fiscal Year Appointments

Academic Year Appointments (9 Months)

Academic year instructional appointments extend over the 9-month period from two weeks prior to the beginning of classes in the Fall semester until two weeks after the end of classes in the Spring semester (Governor's Consolidated Salary Authorization). The 9-month interval during which salary and benefits are paid is from August 25 through May 24. Assignments requiring significant work by faculty outside this time period should be compensated. Faculty on academic-year appointments who work less than the full 9- month period will be paid the appropriate percentage of their full 9-month salary.

Fiscal Year Appointments (12 months)

Faculty who are required to perform duties year-round are placed on 12-month or fiscal year appointments. Faculty on fiscal year appointments who work less than the full 12-month period will be paid the appropriate percentage of the full 12-month salary.

For faculty who convert from an academic year appointment to a fiscal year appointment, the conversion factor of 1.2222222222 will be used to establish the new base salary. For faculty who convert from a fiscal year appointment to an academic year appointment, the conversion factor of .81818181818 will be used to establish the new base salary.

### 2.1.9 Faculty with Governance Responsibilities

Faculty possess governance responsibilities in local academic units in which they hold primary affiliation and in the larger units of which their local academic units are a part. Local academic units and collegiate units may also choose to extend voting rights to other faculty who are

# A831

employed in those units. For purposes of participation in governance beyond the local and collegiate levels, the General Faculty is defined in Section 1.3.1.

## 2.2 Faculty Ranks

### 2.2.1 Instructor

An instructor holds the master's degree or equivalent academic and/or professional qualifications. Instructors do not receive tenure-track appointments; therefore, time spent in this rank is not counted as part of the period for consideration for tenure.

### 2.2.2 Assistant Professor

An assistant professor normally holds the terminal degree in the discipline or field and gives promise of excellence in teaching and/or research and scholarship.

### 2.2.3 Associate Professor

An associate professor must have met the University's established criteria for advancement in rank as specified in Section 2.3.3 Criteria and Procedures for Appointment, Reappointment, and Promotion of Term Faculty and Section 2.4 Criteria for Evaluation of Tenured and Tenure-Track Faculty. New appointees to the rank of associate professor must have demonstrated equivalent qualifications which give reasonable assurance that such criteria will be prospectively met. Additional information regarding evaluation of faculty can be found in Section 2.5 Procedures for Evaluation of Tenured and Tenure-Track Faculty.

### 2.2.4 Professor

A professor must have met the university's established criteria for advancement to the highest rank of the professoriate as specified in Section 2.3.3 Criteria and Procedures for Appointment, Reappointment, and Promotion of Term Faculty and Section 2.4 Criteria for Evaluation of Tenured and Tenure-Track Faculty. New appointees to the rank of professor must have demonstrated equivalent qualifications which give reasonable assurance that such criteria will be prospectively met. Additional information regarding evaluation of faculty can be found in Section 2.5 Procedures for Evaluation of Tenured and Tenure-Track Faculty.

### 2.2.5 University Professor

From time to time the University will encounter opportunities to recognize current members of the faculty or appoint to its faculty women and men of great national or international reputation. The rank of University Professor is reserved for such eminent individuals. University Professors are appointed by the President and the Board of Visitors with the advice and consent of a standing committee appointed by the Provost.

University Professor appointments are normally reserved for full professors. The criteria for such appointments include substantial research or scholarship or arts credentials, as appropriate to the discipline.

**A832**

### 2.2.6 Distinguished Service Professor

Distinguished Service Professors are recognized as individuals whose careers have had a major impact on their field or on the university community that goes well beyond ordinary levels of service. Normally, such individuals are recommended by a Dean and appointed by the Provost.

Such appointments are normally reserved for full professors. The criteria for granting the rank of distinguished service professor includes extraordinary level of impact, sustained contributions to the good of the university and the academic unit, and/or significant contributions to the field that extend beyond the boundaries of the university.

### 2.2.7 Emeritus Faculty

Upon retirement from George Mason University, full-time Associate and Full Professors with ten or more years of continuous academic service may be recommended to the Board of Visitors for election to the honorary rank of Emeritus/Emerita in recognition of outstanding dedication to the university. A letter reviewing the candidate's history of teaching, research and scholarship, and service at Mason is normally initiated by the individual's LAU. The letter is forwarded to the LAU Dean, the Provost and the President for accompanying recommendations.

### 2.2.8 Administrators Holding Faculty Rank

Each person appointed to an administrative/professional faculty position is assigned an academic rank. Initial appointment will normally be at the rank of Instructor. Individuals holding a terminal degree may be appointed at the rank of Assistant Professor. An academic unit and the Provost may together confer academic rank beyond Assistant Professor when appropriate. As exceptions, certain senior administrative positions will be assigned the rank of at least Associate Professor in keeping with the executive status of their position. Assignment of rank must be in accordance with *The Commonwealth of Virginia's Consolidated Salary Authorization for Faculty Positions in Institutions of Higher Education, 2001-2002*. (The assignment of rank to administrative/professional faculty does not confer, nor does time assigned to administrative/professional duties contribute to, tenure.)

Instructional faculty who are appointed to administrative/professional faculty positions, if tenured, retain their tenured status while so serving.

If on a term appointment, the faculty member has no automatic right to return to his or her previous instructional, research, or clinical faculty position.

**A833**

### 2.3 Recruitment and Appointment of Faculty

### 2.3.1 Policies on Recruitment and Appointment of Faculty

The Board of Visitors has full authority over faculty personnel matters, including faculty appointments. To carry out this function effectively, the Board selects a President, who appoints other academic administrators. Academic administrators share responsibility with the faculty for ensuring that appropriate standards are fostered; that equity and due process are the rule; that judgments in the selection, retention, and promotion of faculty are in the best long-term interests of the University; and that equal opportunity and fair employment practices are followed.

Initial review and evaluation of qualifications are carried out by eligible faculty in the local academic unit to which the candidate is to be appointed. Faculty recommendations for appointment are forwarded to the Dean of the academic unit in which the appointment is to be made. If concurring with the faculty recommendations, the Dean will forward them to the Provost.

### 2.3.1.1 Favoritism in Personnel Decisions

Favoritism, or the appearance of it, can undermine the trust that members of the university community place in personnel decisions as well as the public interest which the university serves. A personnel decision involving a family member or close personal relationship of a faculty member or administrator requires particular scrutiny and safeguards.

No faculty member or administrator who has reasonably questionable objectivity in the employment status of another employee may participate in the hiring, supervision, promotion, or evaluation of such employee. Every employee of the university has a continuing affirmative obligation to disclose to his or her supervisor(s) any relationship that may reasonably affect their objectivity in such matters.

If a faculty member or administrator might exercise or appear to exercise control over any personnel action associated with a person with whom he or she has a family or close personal relationship, the supervisor of the faculty member or administrator must designate a disinterested person to substitute for the individual who might have a personal interest. Additional safeguards may also be required if colleagues or subordinates of the individual with a personal interest are involved in those personnel actions. "Appearance of exercising control" includes but is not limited to assigning responsibility for personnel actions or supervision to a colleague or subordinate. If the personnel action involves a faculty member or administrator in a local academic unit, the faculty in that unit and all other interested parties must be fully apprised of the relationship and the safeguards that have been taken to ensure that the individual with a relationship is not involved in the personnel decision.

Relationships constituting a personal interest under the Conflict of Interest Act (S2.2-3100, *et seq.*), of the Code of Virginia will be handled by the Board of Visitors in accordance with the Act. Family or other relationships reasonably suggesting favoritism under this provision will be fully disclosed to the Board of Visitors incident to promotion, tenure, and hiring decisions. Prior

to consideration of a personnel action involving a family member or other relationship reasonably suggesting favoritism, the Provost, or his or her designee, will fully apprise the Board of Visitors of the relationship and the safeguards taken to ensure that the individual with a personal interest was not involved in the action. Only after the Board is satisfied that the present policy was implemented and that safeguards were adequate should the personnel action be approved.

### 2.3.2 Procedures for Recruitment and Appointment of Tenured, Tenure-Track, and Term Faculty

Requests for new faculty appointments to allocated positions normally originate with the local unit administrator, acting upon the recommendation of the unit's faculty. In particular, the administrator seeks the assistance of the faculty in defining the requirements of the position to be filled and the qualifications to be sought in the appointee. Authorization from the appropriate Dean and the Provost is necessary before a search is initiated to fill a vacancy or a new position. In unusual cases a waiver of the search process may be requested by the local unit administrator or Dean.

Before extending an offer of appointment, the local unit administrator must secure the concurrence of the unit's eligible faculty as specified in the following procedures, the relevant Dean, the Provost, and the Office of Compliance, Diversity and Ethics.

All full-time faculty receive letters of appointment specifying terms of employment and stating that such employment is governed by the administrative policies and regulations of the University (currently in force and as amended in the future). Acceptance in writing of these letters constitutes a contract between the University and each individual faculty member. Letters of initial appointment for faculty also indicate the expiration date of terms of appointment. All written offers of appointment must include the elements specified in the appropriate offer letter template located on the Mason website.

### 2.3.2.1 Competitive Appointments

In accordance with its bylaws or standing rules (Section 1.3.3), the local academic unit establishes a faculty committee to advise and assist the local unit administrator in carrying out a search. After receiving appropriate training from the Office of Compliance, Diversity, and Ethics, this committee reviews applicant credentials and makes recommendations regarding potential finalists for the position. All eligible faculty of the local academic unit will be provided with an opportunity to review the candidates' application materials, to meet with the candidates, and to attend job seminars or formal presentations by the candidates. The search committee then formulates a recommendation that includes the opinions of the eligible faculty. The local unit administrator transmits the faculty recommendation, together with her or his own, to the Dean or to the Provost, as applicable. The faculty shall be apprised in writing of the local academic unit administrator's recommendation at the time of its transmittal.

### 2.3.2.2 Non-competitive Appointments

Noncompetitive or direct appointments are appointments in which the search process is waived when appointing term, tenured, and tenure-track faculty. Competitive searches for tenured, tenure-track, and term faculty must be used except in very special circumstances. These circumstances are normally limited to situations in which (a) the candidate has already established a national/international reputation, the program has a unique opportunity to appoint the targeted candidate, and the area of specialization complements those of faculty already in the program; (b) the candidate is a spouse or partner of a candidate being appointed through formal search procedures and the university is attempting to accommodate her or him; or (c) an administrator is appointed and is considered for acceptance in a specific local academic unit. While an administrator is normally appointed using a competitive process at the administrative level, this policy applies because s/he is not part of a competitive process at the LAU level. Instructional term faculty may also be appointed without a search when classes must be staffed immediately due to unexpected circumstances. Waiver of a search in this situation is only valid for one year.

Eligible faculty in the LAU review the credentials of any individual who is a candidate for a noncompetitive appointment using the same procedures as those used to review candidates for competitive appointments. The appointment process moves forward only when a majority of the LAU faculty who are eligible to vote accept the candidate.

In the unusual case of an existing term faculty member seeking a noncompetitive appointment to a tenure-track position, the appointment process moves forward only when no fewer than two-thirds (2/3) of the LAU faculty who are eligible to vote accept the candidate.

### 2.3.2.3 Awarding of Tenure at the Time of Appointment

If a candidate is to be appointed without term, the appointment procedure is conducted as specified for competitive (Section 2.3.2.1) or non-competitive (Section 2.3.2.2) appointments. Following an affirmative decision to appoint, the eligible faculty consider whether to recommend tenure in a first-level review in conformance with Section 2.7.3 Procedures for Promotion and Tenure.

The recommendation is then sent to the second-level college/school promotion and tenure committee. Independent external letters from recognized experts in the candidate's field must be obtained in a manner consistent with other tenure reviews, and candidates are held to the same standards as other candidates in that LAU. Since such appointments may be made outside the normal annual promotion and tenure cycle, college/school promotion and tenure committees must establish and follow procedures for promptly reviewing candidates out of cycle.

### 2.3.3 Criteria and Procedures for Appointment, Reappointment, and Promotion of Term Faculty

Term faculty appointments will be explicitly designated as such, and offer letters must clearly state the type and length of appointment, as well as the focus of the appointment, whether instructional, research, or clinical. Some specific administrative or service functions may be attached to the instructional, research, or clinical focus.

Term faculty may be offered single-year or multi-year contracts up to a maximum of 5 years. Multi-year term faculty normally hold a terminal degree, as defined by standards in the discipline. Exceptions to either contract length or terminal degree requirements must be approved by the Provost. For initial appointments, the maximum contract length for term assistant professors is three years and for term associate and full professors it is five years. Such contracts automatically expire at the end of the contract period, and although a faculty member may be reappointed, there is no guarantee or right to reappointment from one contract to the next, whether single-year or multi-year.

If a multi-year appointment is offered to a faculty member whose position relies entirely or partially on non-state appropriated funding, then a multi-year contract may be established subject to the continuing availability of funding throughout the contract period. Both the university and the term faculty member retain the option to request a change from a multi-year contract to a single-year contract. This action must be endorsed by the respective Dean and approved by the Provost.

Term faculty cannot move to a tenure-track or tenured position, either as a direct appointment or as a result of a search, without prior approval of the Provost. [See Section 2.3.2.] Prior service on a fixed-term, externally-funded appointment is not applied to tenure consideration unless specified in the tenure-track letter of appointment.

Tenure-track faculty cannot move to a term position, either as a direct appointment or as a result of a search, without prior approval of the Provost. [See Section 2.3.2.] This procedure will only be considered in exceptional circumstances.

A maximum of 35% of all Instructional Term Faculty within the University may be on multi-year contracts and a maximum of 25% of all full-time Instructional Faculty within the University may be Term Faculty.

### 2.3.3.1 Reappointment

The terms "reappoint" or "reappointment" in this Handbook mean offering a term faculty member a contract for an additional term or terms, which may include the same or different duties and responsibilities. Term assistant professors may receive a one, two or three-year reappointment. Term associate and full professors may be reappointed to contracts of up to five years.

Term faculty on single-year contracts will be evaluated annually for reappointment. Term faculty on multi-year contracts will be evaluated for reappointment during the final year of their contract appointments. Term faculty are evaluated by the local unit administrator and/or a local academic unit faculty committee. Criteria for reappointment will emphasize strong performance in those areas designated in the initial and any subsequent contract letters. Based on that evaluation and programmatic needs, the Dean will recommend whether or not to reappoint.

Recommendations for instructional term faculty are due to the Provost usually by November 1st of the final year of the current contract. For research and clinical term faculty, this recommendation is usually due no later than 5 months prior to the last day of the contract term.

# A837

The Provost will make the final determination and notify instructional term faculty members, in writing, usually no later than 3 months prior to the last day of the term of their initial contracts, and usually no later than 5 months prior to the last day of the term of subsequent contracts. The Provost will make the final determination and notify research and clinical term faculty members, in writing, usually no later than 3 months prior to the last day of the term of their contracts.

## 2.3.3.2 Promotion

A term faculty member may be considered for promotion, normally after five years of service. Promotion may occur within the period of a multi-year contract.

Candidates for promotion to associate professor must demonstrate at least high competence in the focus area (instructional, research, or clinical) by the standards developed by the local academic unit and approved by the Provost. Candidates for promotion to full professor must demonstrate genuine excellence in the focus area (instructional, research, or clinical) by the standards developed by the local academic unit and approved by the Provost. The recommendation for promotion is due to the Provost by November 1st.

By the end of fall semester (no later than December 15th), the Provost will notify the faculty member, in writing, of a decision whether or not to recommend promotion.

Term faculty who are promoted will be announced to the Board of Visitors.

## 2.4 Criteria for Evaluation of Tenured and Tenure-Track Faculty

Recommendations on matters of faculty status (e.g., initial appointment, renewal, promotion, the conferral of tenure, and termination) are in large measure a faculty responsibility. The faculty's role in these personnel actions is based upon the essentiality of its judgment to sound educational policy, and upon the fact that scholars in a particular field have the chief competence for judging the work of their colleagues. An additional reason for the faculty's role in these matters is the general competence of experienced faculty personnel committees with a broader charge that encompasses the evaluation of teaching and service. Implicit in such competence is the acknowledgment that responsibility exists for both adverse and favorable judgments.

Recommendations in these matters originate through faculty action in accordance with established procedures; are reviewed by senior academic administrators; and presented to the Board of Visitors for final approval. The administration should overturn faculty personnel recommendations rarely, and only when it is clear that peer faculty have not applied appropriate standards, or when the University's long- term programmatic needs are an overriding consideration. Only in extraordinary circumstances and for clearly stated reasons should administrators substitute their own judgment of the value of scholarly accomplishments for judgments made by faculty.

Candidates for renewal, promotion and tenure will be evaluated in light of the missions of the University which are teaching; research and scholarship, both theoretical and applied; and service (as defined in Section 2.4.3). Peer review plays a central role in the evaluation of individual achievement in each of these areas. Although candidates are not expected to have

**A838**

equal levels of commitment or equal responsibilities in each of these areas, high competence is expected. Genuine excellence must be exhibited either in teaching or in research/scholarship. High competence must be exhibited in both areas. The primary consideration in the evaluation of the candidate's achievements will be the extent to which these continue to improve the academic quality of the University.

Levels of expectation will vary with the type of decision. While tenure-track appointments will, to some extent, recognize perceived potential rather than achievement, appointment without term or promotion in rank will be based on achievement rather than potential. Appointment without term should leave no doubt about the candidate's value to the University over an extended period.

As defined above, candidates need to exhibit levels of competence and excellence in teaching, research and scholarship, and service. In addition, candidates for tenure and promotion to the rank of associate professor must provide evidence that their contributions in their area(s) of genuine excellence have had some significant impact beyond the boundaries of this University. If the primary strength is teaching, there should be evidence that the candidate's contributions have influence beyond the immediate classroom; if in theoretical or applied research and scholarship, there should be evidence that the candidate's contributions have significant influence on colleagues at other institutions in this country, and where applicable, abroad.

Candidates seeking promotion to the rank of full professor must maintain high competence in teaching, research and scholarship, and service while also maintaining genuine excellence in teaching and/or research and scholarship. In addition, evidence of significant impact beyond the boundaries of the University must be much more substantial than in cases involving tenure or promotion to the rank of associate professor. Clear and convincing evidence must be provided of an established external reputation in the primary field, based on consequential achievements in teaching, research and scholarship, or professional activities directly related to teaching and research and scholarship.

In addition, evaluation for promotion or tenure should consider the candidate's adherence to professional ethics (see Section 2.10.2).

Only the criteria described in this handbook can be used in evaluations of faculty.

### 2.4.1 Teaching

Effective teaching is demonstrated by the clarity, appropriateness, and efficacy of course materials, methods and presentations, and by successful learning outcomes. Contributions to teaching include the development and implementation of new courses and programs; the development of instructional materials, including applications of new technologies; the training and supervision of teaching assistants; mentoring graduate students; clinical and field supervision of students; and student advising.

# A839

### 2.4.2 Research and Scholarship

Scholarly achievement is demonstrated by original publications and peer reviewed contributions to the advancement of the discipline/field of study or the integration of the discipline with other fields; by original research, artistic work, software and media, exhibitions, and performance; and by the application of discipline- or field-based knowledge to the practice of a profession.

### 2.4.3 University and Professional Service

Annual evaluations and decisions on reappointment, promotion and tenure will be influenced by the extent of the candidate's service to the University. All full-time faculty are expected to participate as part of their professional responsibilities in governance and operational activities outside the classroom. Required university service includes, but is not limited to, such activity as attendance at faculty meetings and participation in faculty personnel matters and curriculum development. University service beyond that which is required of all faculty members will be given positive weight in personnel decisions. Each local academic unit will make known in a timely manner its requirements concerning the minimum acceptable level of university service and its policies concerning positive weight to be given for intramural service in excess of that minimum requirement.

Professional service is demonstrated by contributions to recognized societies and associations that promote research and scholarship and by consultancies and cooperative projects that make the faculty member's discipline or field-based knowledge and skills available to individuals, groups or agencies outside the University. Local academic units will develop and disseminate in a timely manner (i) specific discipline- or field-based expectations regarding the types of professional service that will be considered appropriate as evidence in annual evaluations and for reappointment, promotion and tenure cases; and (ii) the criteria to be used in assessing the quality of this service.

### 2.5 Procedures for Evaluation of Tenured and Tenure-Track Faculty

### 2.5.1 Teaching

Local academic units regularly evaluate the teaching effectiveness of their faculty. In doing so, they are expected to incorporate data from both peers and students. Whatever additional methods may be used to gather information from students, the process should provide for their anonymous participation in course evaluations and should allow for comparisons among faculty teaching similar courses. Peer evaluation is expected to include, at a minimum, data on the development and implementation of new courses and programs, the appropriateness of course materials currently used, the level and quality of student advising, and learning outcomes. Additional forms of peer evaluation are expected. These may include, but are not limited to, peer observation of classroom teaching, evaluations by mentors, assessments of teaching performance by colleagues, and teaching portfolios.

The evaluation process requires both quantitative and qualitative data. The methods by which such data are gathered and incorporated into the final evaluation should be well-defined and made available to those who are being evaluated, as well as to those who are using the evaluations in personnel decisions. Specific guidelines for the procedures to be used in the

evaluation of teaching effectiveness will be those determined by the office of the Provost in consultation with the University Faculty Standing Committee on Effective Teaching.

### 2.5.2 Research and Scholarship

The systematic evaluation of a candidate's theoretical or applied research or scholarship begins in the local academic unit with a peer review of the candidate's work. In tenure and promotion cases the faculty will make independent judgments and will also seek and give consideration to external evaluations from qualified referees who are not associated with the University. Each local academic unit will develop its own specific guidelines with respect to the selection and use of external referees. These guidelines must be fair to all parties concerned and be publicized among the faculty in a timely manner. The local unit administrator has a specific responsibility to review annually the research and scholarly activities of tenure-track faculty and to discuss both the strengths and weaknesses with them on an individual basis.

### 2.5.3 University and Professional Service

The evaluation of university service is based on a peer review of the candidate's contribution to the life and governance of the local academic unit and the larger organizational units of which it is a part.

Procedures for the evaluation of external professional service are similar to those employed in the evaluation of research and scholarship.

### 2.6 Annual Evaluations of Faculty and Administrators

Universities have a long tradition of self-examination and improvement from within. That process includes the annual evaluation of faculty and administrators.

### 2.6.1 Annual Review of Faculty

All faculty are evaluated annually by the local unit administrator and/or a local academic unit faculty committee who report to the Dean or the Provost. The criteria for the annual faculty review are the same as those listed in Section 2.3.3.2 (Term Faculty) and Section 2.4 (Tenured and Tenure-Track Faculty) except that the evaluation is based upon the contributions of the preceding academic year and, where applicable, the summer. Faculty are evaluated on the quality of their overall performance and in the context of their goals and assignments. The results of and rationale for the evaluation must be given to the faculty member in writing; and faculty members must be afforded the opportunity to discuss the results of the evaluation.

Annual evaluations are the primary basis for determining salary increases (see Section 3.2). Local unit administrators may take into account performance evaluations over multiple years in making raise recommendations.

**A841**

**2.6.2 Post Tenure Review Policies and Procedures**

**Policy**
1. George Mason University will use the annual review of all faculty (see Section 2.6.1) as its primary procedure for implementing *Post Tenure Review* within the personnel policies of the Commonwealth of Virginia. The policies and procedures set forth in this document will apply to all tenured instructional faculty, regardless of the nature of the appointment.

   a. Annual reviews will serve as the vehicle for recognizing the positive contributions of faculty in fulfilling their professional obligations.
   b. When overall performance is recognized by the annual review as "unsatisfactory," the procedures below will be followed for each case.
   c. In accordance with the principles of peer judgment, the faculty of each local academic unit (LAU) will establish its criteria for "satisfactory" and "unsatisfactory" performance.

2. Faculty in honorific positions not evaluated annually by a specific LAU will be evaluated by the Office of the Provost. For faculty holding such appointments the standard of excellence includes contributions to institutional development, which will be addressed for all such appointees as part of their service. Annual evaluation reports for faculty in these categories will be submitted to the Provost. While faculty in these categories are not exempt from other sanctions, sanctions may include the loss of the honorific appointment.

3. Faculty members who receive an overall unsatisfactory rating by their LAU (as reported in the annual review to the Deans or the Provost by the LAU administrator) must develop a plan of action with the LAU administrator to remedy any stated deficiency. The plan will include a timetable.

4. Tenured faculty members who receive two overall "unsatisfactory" ratings in a four-year period will undergo a peer evaluation process to determine if continued employment with the university is appropriate (as described in the following section).

5. The Provost will review the recommendation from the peer evaluation process and take appropriate action.

**Procedure**
1. Tenured faculty who receive an overall unsatisfactory rating during any annual review but do not meet the criterion stated in paragraph 3 below will meet with the appropriate LAU administrator to establish a written plan of action. The plan will include a timetable.

2. At the meeting with the LAU administrator, the discussion will include at a minimum:

   a. a discussion of the basis for the evaluation(s) that culminated in an unsatisfactory rating, with particular attention to stated deficiencies or areas of weakness;
   b. an opportunity for the faculty member to respond to negative judgments;
   c. an exploration of the concerns of the university for remediation; and

**A842**

    d. the development of a plan of action in response to the judgment of "unsatisfactory" performance.

One copy of the plan of action will be retained by the faculty member and one copy will be placed in the faculty member's personnel file in the office of the LAU administrator. In addition, the Provost will be notified that the faculty member was given an unsatisfactory evaluation. The LAU administrator and the Office of the Provost will address relevant issues in subsequent annual evaluations during the rolling four-year period. Faculty members pursuing a plan of action for correcting unsatisfactory performance will be encouraged to avail themselves of university resources designed to assist all faculty in professional development.

3. Tenured faculty members who receive two overall "unsatisfactory" ratings in a four-year period will be required to undergo a peer evaluation procedure conducted by the college/school Promotion and Tenure Committee (i.e., the body authorized to conduct second-level review under the provisions of Section 2.7.3), serving as an Evaluation Committee. For faculty not assigned to a LAU, the Evaluation Committee will be the Promotion and Tenure Committee of the college/school most closely aligned with the faculty member's areas of expertise, as judged by the faculty member.

4. The evaluation will be conducted according to the following procedures:

    a. The Evaluation Committee will maintain the confidentiality of information reviewed in the proceedings, but will release such information to others with the consent of the faculty member, and to other University officials who have a legitimate business need to know such information (for example, to the Office of Compliance, Diversity, and Ethics for equity review.)

    b. The Provost will initiate the evaluation process with a written communication to the faculty member (the "Notice"). The Notice shall include:

      1. A statement explaining the current employment status of the faculty member and how that could change as a result of post-tenure review.

      2. The procedural rights, in detail, of the faculty member (as outlined below).

      3. A statement that to maintain employment the faculty member must submit a portfolio summarizing activities and accomplishments in teaching, research, and service, as appropriate, during the period spanning the two unsatisfactory evaluations. The statement should explicitly note that there is no limit on the amount or type of documentation the faculty member may submit, but that the submitted documentation must include copies of annual evaluation results during the period spanning the two unsatisfactory evaluations.

      4. A statement that if the faculty member fails to submit a portfolio within one calendar month of the date the Notice was transmitted, the Provost will make a recommendation for termination to the Board of Visitors without benefit of a committee report.

c. Submitted materials will be reviewed by the Evaluation Committee to determine if the faculty member under review has discharged the duties associated with his or her position conscientiously and with basic professional competence. The Evaluation Committee will not use the standards associated with the awarding of tenure and promotion to conduct this evaluation. Instead, the Evaluation Committee will focus on whether there is evidence of sustained overall unsatisfactory performance (including but not limited to incompetence and lack of appropriate expertise).

d. The Evaluation Committee may seek additional clarification from those who made or contributed to the unsatisfactory evaluations that led to the convening of the committee. Any response to such a request must be made in writing to the committee and shared with the faculty member under review.

e. After the committee has received any additional clarifying information, the faculty member under review must be given an opportunity to formally meet with the committee as part of the evaluation process if so requested. Such requests must be made in writing by the faculty member to the Chair of the Evaluation Committee. If the faculty member under review does elect to meet with the Evaluation Committee, a verbatim record of the entire meeting will be made. If the faculty member so requests, a copy will be provided without cost.

f. The faculty member under review must also be given an opportunity to have other individuals speak on his or her behalf to the committee if so requested. Such requests must be made in writing by the faculty member to the Chair of the Evaluation Committee. If a meeting is held in which others speak on behalf of the faculty member, a verbatim record of that meeting will be made. If the faculty member so requests, a copy will be provided without cost.

g. In the interest of avoiding unnecessary expense and to promote a prompt resolution, the Evaluation Committee may set reasonable time limits on speakers.

h. The recommendation of the Evaluation Committee must be based only on the complete record as presented to the committee following the above steps, and must be conveyed to the Provost in writing along with a recorded vote.

5. Recommendations to the Provost from the Evaluation Committee may include: (a) postponement of sanctions, with another peer review to be conducted within one calendar year; (b) a determination that no sanctions are necessary, with appropriate professional development recommendations; (c) a change in the faculty member's assignment that is better aligned with his or her strengths; (d) imposition of appropriate sanctions other than termination; or (e) termination of employment. Outcome (c) may be recommended in conjunction with outcome (a), (b), or (d). In the event of any outcome other than (e), the faculty member will meet with the appropriate LAU administrator to establish a written plan of action following the guidelines specified in paragraphs 1 and 2 of these procedures. Termination can only be considered by the Provost if a majority of those making a recommendation to the provost vote to recommend termination. If termination is recommended and the provost endorses this recommendation, the

faculty member undergoing review must be given at least six months written notice before termination can take effect.

6. The faculty member may appeal the decision to the President within 30 days of receipt of the written decision based on one or more of the following reasons:
    a. material procedural irregularity;
    b. violation of federal or state law or university policy;
    c. inadequate or faulty consideration of evidence.

In case of appeal, the President makes the final decision.

7. In the event the faculty member's employment is terminated in accordance with the procedures of this section, such termination shall be final and Section 2.9.3 shall not apply. However, nothing in this section shall act to prevent or prohibit termination of employment of a faculty member for cause in accordance with the procedure set forth in Section 2.9.3.

### 2.6.3 Faculty Role in the Evaluation of Academic Administrators

Senior academic administrators serve at the pleasure of the President. In reviewing their performance, the President should refer, when available, to the annual faculty evaluation of administrators, conducted under the joint auspices of the Faculty Senate and the University's Office of Institutional Planning and Research. The purposes of this annual evaluation are (i) to provide information regularly to the President and the Board of Visitors about the strengths and weaknesses of administrators as perceived by the faculty; (ii) to provide, over an extended period of time, a record of faculty opinion regarding the performance of administrators; and (iii) to provide individual administrators with an assessment of their performance.

Faculty are expected to participate in the evaluation of academic administrators.

### 2.7 Procedures for Renewal, Promotion, and Tenure

### 2.7.1 General Procedures

Renewal, promotion, and tenure recommendations are based upon an evaluation of performance over the faculty member's total period of service at George Mason University. Scholarly achievements prior to joining the George Mason University faculty weigh less heavily in these evaluations, but are also considered. These evaluations differ from the annual review in their emphasis on lasting contributions, consistency of performance, and versatility.

"Renew" or "renewal" in this Handbook means offering a tenure-track faculty member a contract for an additional term on the tenure track, which may include the same or different duties and responsibilities.

### 2.7.2 Procedures for Renewal

Faculty appointed to a tenure-track position receive an initial three-year term. (See Section 2.1.2) Tenure-track faculty will be evaluated for renewal during the third year of their initial

appointment using the following procedure:

1. Tenure-track faculty are evaluated by either the first-level or second-level promotion and tenure committee (see Section 2.7.3) according to the procedures in Section 2.4 and Section 2.5.

The Dean will submit a recommendation for renewal or non-renewal to the Provost by March 15th. Based on this evaluation, the Provost will act on the recommendation for renewal or non-renewal by April 15th. Faculty members will be advised of their renewals or non-renewals by May 1st of the third year of their initial appointments. Faculty members receive their renewal contracts no later than May 24th of the evaluation year.

2. If the decision is for renewal, then the faculty member's contract normally will be renewed for three years, and the next full evaluation will be for tenure consideration. Under exceptional circumstances, a faculty member may be renewed for only one year, in which case another evaluation will be conducted the following year. Renewal of a contract resulting from the evaluation in the fourth year of service will be for two years, and the next full evaluation will be for tenure consideration.

3. In the event of non-renewal, the faculty member will be offered a terminal, one-year term appointment following the decision for non-renewal contingent on the faculty member having submitted an appropriate and timely dossier for the purpose of seeking tenure-track contract renewal. If a faculty member chooses not to be evaluated, his or her contract will end on the last day of the term of her or his current contract.

4. If a faculty member is not renewed, the appeal procedure outlined in the Faculty Handbook Section 2.8 may be used.

### 2.7.3 Procedures for Promotion and Tenure

The process for promotion and tenure is initiated by the local academic unit with the faculty member's concurrence. Self-nomination is also permitted.

A decision on tenure may be made in any year that the candidate is appointed to the tenure-track unless a specific time is required by the appointment contract. A candidate must be considered no later than the final year of appointment to the tenure-track. An unsuccessful tenure decision prior to the final year on the tenure-track does not reduce the tenure-track period.

The Provost establishes the annual schedule for promotion and tenure review. Dossiers are to be prepared in accordance with the format provided by the Provost and the Dean. The candidate is responsible for assembling the contents of the dossier. The local unit administrator is responsible for inserting the external reference letters in the assembled dossier. Each formal internal evaluation letter is included in the dossier before sending it to the next level of review.

At any time in the promotion/tenure review process before a decision is made by the Provost, a faculty member may withdraw from candidacy by so stating in writing to the Dean and the Provost. After withdrawal from candidacy, there is no further review of the dossier. Candidates who withdraw from the review process in a mandatory decision year for tenure will be offered a

# A846

one-year terminal appointment for the next academic year with workload expectations determined by the unit's workload policy as it applies to tenure-track faculty.

If a faculty member is (or is to be) appointed to primary affiliation in more than one local academic unit, a recommendation for promotion and/or tenure may be initiated by any of the units. A separate evaluation leading to a recommendation and decision will be made by each unit. An action by one local academic unit does not obligate another local academic unit to act similarly. It is required, however, that in each evaluation process the promotion and tenure committee must solicit and consider evaluations from the other units. All evaluations become part of the candidate's dossier.

In all cases of promotion and/or tenure, there are two levels of faculty review. At both levels, evaluations are carried out only by tenured faculty in accordance with Sections 2.4 and 2.5. In addition to considering the candidate's dossier, faculty committees on promotion and tenure examine and include in the dossier, all relevant written evidence and testimony offered to them by members of the academic community and others with direct knowledge of the candidate's professional qualifications and achievements. Committees may provide in their bylaws or standing rules for faculty to attend meetings using an electronic connection. For all voting pertaining to promotion and tenure, provision must be made for anonymous submission by a written or secure electronic ballot.

A faculty member may not participate in a review of a candidate with whom he or she has, or has had, a family or close personal relationship or other conflict of interest (see Section 2.3.1.1).

The purpose of the first-level review is for the candidate to be evaluated by colleagues who are in the best position to have observed the candidate's performance in teaching and service and who are best able to professionally evaluate the candidate's research/scholarship and publication record. Accordingly, the first-level review is undertaken by faculty in the candidate's local academic unit, which must have published bylaws or standing rules that govern renewal, promotion, and tenure procedures (Section 1.3.3).

In departmentalized colleges/schools (see Section 1.3.5), the first level of review is departmental.

In non-departmentalized colleges/schools, which are subdivided into programs or other divisions, the first level of review is carried out by faculty appointed to program(s) or division(s) to which the candidate belongs. Tenured faculty from other substantively related areas may also serve on a candidate's first-level review committee if there is an insufficient number of qualified tenured faculty in the candidate's affiliated program(s)/division(s). Program or division faculties cannot exist solely to make personnel evaluations.

In non-departmentalized colleges/schools, which are not further subdivided, the first-level review is carried out by all eligible tenured faculty in the candidate's college/school. Tenured faculty from other substantively related areas may also serve on a candidate's first-level review committee if there is an insufficient number of eligible or qualified tenured faculty in the college/school.

The purpose of the second-level review is to evaluate all the candidates for promotion and/or tenure in the school/college and to make a recommendation to the Dean. The second level of

**A847**

review is carried out by a committee of tenured faculty. The committee members are elected by the college/school in accordance with its bylaws or standing rules (Section 1.3.3). The second-level review committee can include members from outside the college/school who are elected in the same manner as other members of the second-level review committee.

At no time shall a faculty member evaluate a candidate at both the first and second levels of review. Faculty eligible for the first level review cannot withhold their participation at the first level to participate in the second level review.

The School of Law is exempt from the provisions specified in the above paragraphs, but it is not exempt from the requirement for two-level peer review.

The procedure for considering promotion and tenure cases is as follows:

1a. Departmental review is initiated by the local first-level promotion and tenure committee, which may be a committee of the whole. The committee communicates the results of its review to the tenured members of the department who then vote. Normally, Associate Professors and Professors vote on promotion/tenure to Associate Professor, and Professors vote on promotion/tenure to the rank of Professor. Other voting combinations may be specified in the bylaws or standing rules. The department chair does not vote with the tenured faculty. The committee transmits the departmental recommendation and accompanying justification, including the division of the vote, to the department chair. The department chair transmits to the second-level review committee: (1) the candidate's dossier and related materials; (2) the recommendation of the departmental committee with appropriate justifications; and (3) his/her own recommendation and justification, if the chair is tenured. If the chair is not tenured, the chair submits a summary of the promotion/tenure proceedings. Notification of the recommendation of the local academic unit and copies of the accompanying justifications are sent promptly to the candidate and to the faculty who participated in the deliberations before the dossier is sent to the second-level committee.

The candidate is evaluated by the second-level review committee, which must have published procedures that govern its deliberations. The procedures must include a method for communication between the committee, the candidate, the department chair, and the first-level review committee. Normally, Associate Professors and Professors vote on promotion to Associate Professor, and Professors vote on promotion to the rank of Professor. Other voting combinations may be specified in the college/school bylaws or standing rules.

The committee forwards its recommendation along with all preceding reports and recommendations to the Dean. Notification of the recommendation of the second-level review committee is sent to the faculty who participated in the deliberations at the first level of review. Copies of the statement of justification are sent promptly to the candidate and the department chair.

If the second-level review committee's recommendation differs from that of the first-level review committee, the second-level review committee's recommendation and accompanying justification are sent to the first-level review committee.

**A848**

1b. The process is analogous in non-departmentalized units, except that the role assigned to department chairs is omitted.

2. All materials are reviewed by the Dean of the candidate's college/school. The dossier and the recommendation of the Dean are forwarded to the Provost. Notification of the recommendation is sent to the faculty bodies who participated in deliberations at the first and second levels of review and a copy of the accompanying justification is promptly sent to the candidate and the local unit administrator (the latter copy to be retained in the candidate's permanent file).

If the Dean's recommendation is different from that received from the second-level review committee, the reasons for that difference should be specified in the recommendation, which is sent to the candidate, to the faculty bodies participating in the decision-making process, and to the Provost.

3. The complete dossier is reviewed by the Provost. The Provost may consult with other academic administrators who have direct knowledge of one or more aspects of the candidate's professional performance. The Provost makes a recommendation as to whether promotion or tenure should be granted. Notification of the Provost's recommendation is sent to the faculty bodies who participated in deliberations at the first and second levels of review, and a copy of the accompanying justification is sent to the Dean, the candidate and the local unit administrator. The justification shall be retained in the candidate's personnel file.

If the Provost's recommendation is different from that received from the second-level review committee, the reasons for that difference should be specified in writing and sent to the candidate and to the faculty bodies participating in the decision-making process.

4. If the Provost recommends tenure or promotion be granted, the candidate's dossier, with all previously generated recommendations, is forwarded to the President. If the Provost recommends tenure or promotion not be granted, the recommendation is not forwarded to the President.

5. The President makes a recommendation as to whether tenure or promotion should be granted. If the President recommends tenure or promotion be granted, such recommendation is forwarded to the Board of Visitors. If the President recommends tenure or promotion not be granted, the recommendation is not forwarded to the Board of Visitors.

6. Tenure, and promotion to the rank of associate professor or professor, can only be conferred by the Board of Visitors. If the Board of Visitors decides to grant promotion or tenure, the candidate will be notified in writing by the Secretary of the Board of Visitors.

7. If either the Provost or the President recommends that tenure or promotion not be granted, the candidate will be notified of the decision on or before May 1. Upon receiving notice of the Provost's or President's decision, the candidate may:

    a.  accept the decision; or
    b.  appeal the decision according to the procedure described in Section 2.8.

**A849**

In the event tenure is not granted in a faculty member's final year on the tenure-track, the faculty member will be offered a one-year terminal appointment for the next academic year with workload expectations determined by the unit's workload policy as it applies to tenure-track faculty.

8. Tenure and promotion are never granted by default.

### 2.7.4 Tenure-Track Contract Extension

Extension of a tenure-track contract is granted when circumstances arise that may interfere substantially with a faculty member's ability to pursue his or her professional responsibilities (teaching, research/scholarship, service) while on the tenure track. At the time of tenure consideration, a faculty member who has received an extension or extensions will be considered using the same tenure criteria as those applied to other faculty in the college/school.

Length and frequency
Tenure-track contract extensions are granted in one-year increments. Two extensions are normally the maximum that will be granted for any combination of circumstances. The Provost may approve exceptions to this limit. However, in no case will a candidate receive more than three extensions. Tenure-track study leaves are independent of these extensions, but should generally not immediately follow a tenure-track contract extension.

Procedure for request and approval
The faculty member's request, in writing, to his or her local academic unit head must clearly state the circumstances that justify an extension of the tenure-track contract. The recommendation of the local academic unit head is forwarded to the Dean, if applicable, who forwards his or her recommendation to the Provost for final approval.

Medically-related extensions will correspond with the Department of Labor Family and Medical Leave Act (FMLA), University Policy 2215 (Family Medical Leave), University Policy 2230 (Parental Leave for Instructional 9-month Faculty), University Policy 2232 (Sick Leave Policy for Faculty under the Traditional Sick Leave Plan), and/or the Virginia Sickness and Disability Program (VSDP).

Circumstances
1. The birth, adoption, or foster placement of a child
   A faculty member who becomes a parent should request the tenure-track contract extension within one year of the child's arrival in the family and prior to August 25th of the academic year in which the tenure decision would have been made. Multiple births or multiple adoptions at the same time result in the same one-year extension as single births or adoptions.

2. Serious health condition

USCA4 Appeal: 20-1509    Doc: 25    Filed: 08/12/2020    Pg: 59 of 176

**A850**

A tenure-track contract extension may be requested based on a serious personal health condition or a serious health condition of a member of the faculty member's immediate family. A serious personal health condition or serious health condition within the immediate family will be defined according to the FMLA criteria for family and medical leave. Human Resources must receive written certification by the primary treating physician. The request for extension must be made within three months of Human Resources & Payroll's certification of family and medical leave.

3. Military Service

In accordance with the Uniformed Services Employment and Reemployment Rights Act (USERRA), a tenure-track faculty member who is also a member of the U.S. military and is called to active duty will be granted a tenure-track contract extension. The extension will last for the duration of the active duty assignment, rounded to the nearest year, but will not exceed the extension period provided by USERRA. For example, an active duty assignment lasting between 4 through 15 months will earn a one-year extension, 16 through 27 months will earn a two-year extension. The faculty member should make the request as early as possible before entering active duty and prior to August 25th of the academic year in which the tenure decision would have been made.

4. Other Extraordinary Circumstances

Tenure-track faculty members who engage in important public or University service may request a tenure-track contract extension. The request should be made prior to August 25th of the academic year in which the tenure decision would have been made. If there are circumstances beyond the faculty member's control that prevent him or her from fulfilling the professional responsibilities required for tenure consideration, the faculty member may request a tenure-track contract extension. The request should be made prior to August 25th of the academic year in which the tenure decision would have been made.

**2.8 Appeal of Negative Decisions in Renewal, Tenure and Promotion Cases.**

The decision of the President or of the Provost not to recommend renewal, tenure or promotion may be appealed to the University Promotion, Tenure and Renewal Appeal Committee (UPTRAC) as provided in this section. The intent of the appeal procedure is to provide a fair and competent review of the decision. The decision whether to appoint or reappoint a Term Faculty member may not be appealed.

**2.8.1 Grounds for Appeal**

An appeal must be based on one or more of the following reasons:

1. Substantial New Evidence;
2. material procedural irregularity;
3. violation of federal or state law or university policy related to nondiscrimination;

# A851

4. inadequate or faulty consideration of evidence; or
5. violation of academic freedom as defined in Section 2.11.1 and Section 2.11.2.1.

"Substantial New Evidence" means evidence that was not available at the time of the first-level review and that falls only within one or more of the following categories:

a. Scholarly work accepted for publication, or creative work exhibited, performed, or published, or other evidence of scholarly distinction.
b. Grants awarded.
c. Reviews of the candidate's scholarly or creative work that have been published.
d. Substantial evidence of significantly improved teaching.
e. Substantial evidence of significantly increased and influential professional service.

### 2.8.2 University Promotion, Tenure and Renewal Appeal Committee

### 2.8.2.1 Committee Charge

Upon written appeal, the UPTRAC reviews the decision of the Provost or President not to recommend tenure, promotion, or renewal. The committee must publish and follow standard procedures for its conduct that are consistent with provisions in this section. The committee members (including the member chosen by the appellant) do not act as advocates for either the appellant or the university. The committee does not review the merits of the tenure, promotion, or renewal case itself.

### 2.8.2.2 Committee Composition

The UPTRAC shall be composed of three tenured faculty members and two alternate tenured faculty members, elected by the Faculty Senate to staggered terms; and two tenured administrators and one alternate tenured administrator, selected by the Provost to staggered terms. Committee terms are for two years. No two committee members may be from the same local academic unit or administrative unit. A member can serve a maximum of two consecutive 2-year terms, although subsequent non-consecutive service is permitted. Elected alternate members' terms formally begin during the first year that they participate in an appeal. For the purpose of service on the UPTRAC, a local academic unit administrator is considered an administrator.

The appellant will choose a tenured administrator to serve as the sixth member of the committee for the duration of the appellant's appeal. The administrator must be someone who does not have a conflict of interest, who did not participate at an earlier stage of the appellant's promotion, tenure, or renewal process, and who does not come from the same administrative unit as one of the Provost's appointees.

If any member of the UPTRAC has a conflict of interest, participated at an earlier stage of the appellant's promotion, tenure, or renewal process, or is otherwise unable to serve, such member shall not participate in the appeal, and an alternate will serve instead. In the event there are not sufficient faculty alternates to serve, the Faculty Senate shall elect additional alternate members to serve for the appeal. If the need for faculty alternates arises after the last Faculty Senate

meeting of the academic year, the Faculty Senate Executive Committee will select the alternate(s). In the event there are not sufficient administrators to serve, the Provost shall select alternate members to serve for the appeal.

### 2.8.3 Appeal Procedure

To initiate an appeal, the appellant must file a written petition for appeal with the Chair of the Faculty Senate and the Provost's office no later than May 14 of the year in which tenure, promotion, or renewal was not recommended. The reasons for the appeal must be clearly stated, and the appeal must be limited to the grounds permitted in Section 2.8.1. All documentation and evidence in support of the appeal must accompany the petition. The burden of proof in the appeal rests with the appellant.

If the appellant alleges violation of federal or state law or University policy related to nondiscrimination, the appeal process shall be held in abeyance until the Office of Compliance, Diversity and Ethics has completed a formal investigation of the allegation and has issued a final written determination.

In accordance with its published procedures, the UPTRAC will consider all grounds of the appeal and the accompanying documentation and evidence. The UPTRAC may require submission of additional documentation and evidence.

At the conclusion of its deliberations, the UPTRAC will simultaneously forward to the Provost, the appellant's local academic unit, and the appellant a complete case file consisting of: the appeal petition with accompanying documentation and evidence; any additional documentation and evidence requested by the committee; a written report that includes its decision of whether the case has sufficient merit and the basis for its decision; the numerical result of the vote of the UPTRAC members; and any recommendation to the Provost, if applicable.

If the UPTRAC does not determine by majority vote that the appeal has sufficient merit, the case proceeds to final consideration as provided in Section 2.8.4. If the UPTRAC determines by majority vote that the appeal has sufficient merit, the case is remanded as provided in Section 2.8.5.

### 2.8.4 Final Consideration When Appeal Not Found to Have Merit

If the UPTRAC does not determine by majority vote that the appeal has sufficient merit, the Provost considers the case. The Provost forwards the case file to the President and makes a recommendation as to whether renewal, tenure or promotion should be granted.

If the President believes that tenure or promotion should be granted, the recommendation is forwarded to the Board of Visitors for final action. If the President decides that renewal should be granted, the decision is final. If the President decides renewal, tenure or promotion should not be granted, the decision is final and there is no further appeal.

### 2.8.5 Remand Process

# A853

If the UPTRAC determines by majority vote that the appeal has sufficient merit, then the UPTRAC remands the case to the lowest level at which the grounds for appeal was based or to the first-level review committee if the grounds for appeal is based on Substantial New Evidence (Section 2.8.1). At that level and each subsequent level specified in Section 2.7.3 (or in the case of renewal, Section 2.7.2), the case shall be evaluated by the designated bodies as they are constituted at the time of the remand, and by the individuals holding the relevant administrative positions at the time of the remand. At each level, a recommendation should normally be completed within fourteen calendar days and forwarded to the next level. The case file submitted by the UPTRAC must be explicitly addressed in the recommendation at each level. No case may be remanded more than once.

If the President believes that promotion or tenure should be granted, the recommendation is submitted to the Board of Visitors for final action. If the President decides that renewal should be granted, the decision is final. If the President decides renewal, promotion or tenure should not be granted, the decision is final and there is no further appeal.

At each level of review in the remand process, if a recommendation or decision is negative, a clear, written justification is sent concurrently to the appellant, to the local academic unit, and to the next level of review.

## 2.9 Policies and Procedures Relating to Termination

### 2.9.1 Financial Exigency

Financial exigency is understood to mean an urgent need to reorder the nature and magnitude of the institution's financial obligations in such a way as to restore or preserve the institution's financial stability. The existence of a state of financial exigency must be established by clear and convincing evidence. This can be demonstrated by various means; for example, by showing declining enrollments coupled with operating deficits of a magnitude or duration as to leave little doubt about the financial weakness of the institution. The crisis should be of sufficient gravity that it cannot be met by less drastic means than salary reductions or termination of faculty appointments.

The University strives to maintain a reasonable balance between positions devoted to its primary missions (instruction, research, and public service) and those devoted to its support programs (e.g., the library, student services, general administration). If threatened by the possibility of financial exigency, the institution will undertake retrenchment in such a way that this balance is preserved, and the faculty will participate with others in the decision-making process. This initial process of retrenchment will not include the termination or reduction of salaries of faculty on tenure-track or tenured appointments. Should it become necessary for the Board of Visitors to consider declaring a state of financial exigency, the Faculty Senate will participate in the determinations that lead to the Board's decision.

Formal declaration of financial exigency by the Board of Visitors initiates the next phase of retrenchment. Administrators responsible for developing specific budget reduction plans must consult with tenured and tenure-track faculty in developing these plans, which may include salary or personnel reduction programs.

Termination of appointment of tenured faculty should be a last resort. Should reductions in the size of the faculty become necessary, the affected units will make reductions on the following priority basis:

1. Termination of part-time faculty;
2. Termination of faculty on fixed-term appointments;
3. Termination of tenure-track faculty;
4. Termination of tenured faculty.

Unless financial, academic, or equity and diversity considerations are demonstrated to be overriding, then tenure, rank, and order of seniority in rank will be respected, in that order, in the termination of appointment of faculty on tenured and tenure-track appointments. Administrators responsible for developing specific budget reduction plans involving the termination of appointment of tenured and tenure-track faculty must consult with tenured and tenure-track faculty in developing these plans. Principles and criteria for identifying specific individuals whose appointments are to be terminated should be formulated by tenured and tenure-track faculty.

Any faculty member whose appointment is to be terminated due to financial exigency may request a hearing before the college/school grievance committee. The findings of the committee will be presented to the Board of Visitors for final action after review by the President.

In all cases of termination of appointment because of financial exigency, the position of the terminated faculty member will not be filled within a period of three years, unless the released faculty member has been offered reinstatement. Faculty members are responsible for keeping a current address on file with the University. Any offer of reinstatement will be sent by registered mail, and the faculty member must respond to it within one month of its receipt. Should termination of full-time untenured faculty members become necessary during the term of their appointment, the University will give them as much notice as possible and no less than thirty days. Tenured faculty members will be guaranteed employment for one additional academic year.

**2.9.2 Discontinuation of Degree Programs**

The recommendation to discontinue a degree program will be based upon educational considerations as determined jointly by the faculty and the administration. Such educational considerations must reflect long-range judgments that the educational mission of the institution as a whole will be enhanced by the discontinuation. Faculty adversely affected by the discontinuation of a degree program and holding multi-year term appointments will be given at least one academic year's notice of the decision to discontinue a program. Tenured and tenure-track faculty will be given opportunities to join the faculties of other programs, and, if appropriate, will be assisted by the institution through retraining and professional development opportunities. Procedures and safeguards will parallel those provided for termination of appointment in the face of financial exigency, where applicable (see Section 2.9.1).

## A855

### 2.9.3 Termination of Appointment of Tenured, Tenure-Track, and Term Faculty Members for Cause

Termination of appointment for cause is the involuntary termination of the employment of faculty members for reasons directly and substantially related to their professional conduct. Terminations will not be used to restrain faculty members in their exercise of their Constitutional rights. Tenure does not protect an individual from removal for cause.

Adequate cause may include, but is not restricted to: (i) violations of professional ethics; (ii) inability to perform assigned duties satisfactorily because of incarceration; (iii) exploitation of the power a faculty member may have over other members of the academic community (e.g., improper sexual advances, financial reward or punishment); (iv) failure to carry out professional obligations or assigned responsibilities; (v) falsification of information relating to professional qualifications; (vi) violation of institutional rules regarding outside employment; (vii) abusive or violent conduct toward members of the university community; (viii) retaliation for exercise of free speech and/or association.; and (ix) a finding of research or scholarship misconduct (University Policy 4007: Misconduct in Research and Scholarship).

The following procedures are designed to ensure due process in termination of appointment proceedings:

a. If the conduct of a faculty member comes into question, the President or the Provost will discuss the matter with the faculty member personally.

b. If the matter is not resolved in this conference, it will be referred by the President to the University Grievance Committee. This committee is charged to initiate an inquiry into the matter and to recommend whether or not the situation requires that formal proceedings for termination be instituted. This recommendation is confidential and advisory to the President of the University. The Grievance Committee must complete its work and report to the President within fourteen calendar days of receipt of the President's letter referring the matter to the committee.

c. The President must decide if formal termination proceedings are to begin. If so, the President will draw up the charge within fourteen calendar days from receipt of the committee's report. If the committee concurs in this decision it should join in the formulation of the statement.

d. The President will initiate the termination proceedings with a written communication to the faculty member (the "Notice"). The Notice shall include:

1. The charge that has been formulated.

2. The procedural rights, in detail, of the faculty member (as outlined below).

3. A statement that the faculty member may request a hearing within fourteen calendar days of receipt of the charge.

# A856

4. A statement that if the faculty member fails to respond, the President will make a recommendation for termination to the Board of Visitors without benefit of a committee hearing or report.

5. A statement that if the faculty member timely responds, waives the right to a hearing, but denies that adequacy of cause for termination exists, the University Grievance Committee which conducted the inquiry will make a recommendation to the Board of Visitors on adequacy of cause on the basis of available evidence.

e. Within (14) calendar days of the date the President transmits the Notice, the faculty member must respond to the President and must either: (i) acknowledge in writing the validity of the charges and agree that they constitute an adequate cause for termination; (ii) deny that adequacy of cause for termination exists, but waive the right to a hearing; or (iii) deny that adequacy of cause for termination exists, and request a hearing. If the faculty member denies that adequacy of cause for termination exists and requests a hearing, the President will notify the Faculty Senate and the Faculty Senate will nominate an ad hoc committee (the Hearing Committee) within seven (7) calendar days of receipt of the faculty member's response by the President. The Faculty Senate shall nominate nine full-time faculty members to serve on the Hearing Committee. These faculty members should be nominated on the basis of their objectivity and competence and of the regard in which they are held in the academic community; they will be determined to have no bias or untoward interest in the case and to be available at the anticipated time of hearing. Administrators, members of the University Grievance Committee, department chairs, and other faculty of the same local academic unit as the faculty member are ineligible to serve on this committee. The faculty member and the President will each have a maximum of two challenges from among the nominees without stated cause. The President will then name a five-member Hearing Committee from the remaining nominees. The Hearing Committee will elect its own chair. All materials and evidence the parties wish to have considered must be made available to the parties and to the committee.

f. The Hearing Committee shall conduct a hearing no sooner than 14 calendar days and no later than 28 calendar days following the establishment of the Hearing Committee. The Hearing Committee will observe the following procedures:

1. The faculty member may choose his or her academic and/or legal representatives to be present at the hearing. The administrative representative will enjoy the same rights.

2. At the request of either party or on the initiative of the Hearing Committee, representatives of one or more recognized educational associations may be present as observers.

3. The faculty member decides whether the hearing will be open or closed.

4. A verbatim record of the complete hearing will be made. If the faculty member so requests, a copy will be provided without cost.

# A857

5. The parties will make every reasonable effort to assure the availability of witnesses and documents under their control.

6. The hearing will be adjourned when necessary to enable either party to investigate newly disclosed evidence.

7. Both parties have the right to examine all documents and question all witnesses.

8. Witnesses may include, but are not limited to faculty members or administrators from any institution of higher education accredited by a regional accrediting association.

9. The faculty member, the administration, and the Hearing Committee are to avoid publicity about the case until the proceedings have been completed by the Board of Visitors. Only necessary announcements such as hearing time and place are permitted.

10. All the evidence should be duly recorded. It is not necessary to follow formal rules of court procedures.

11. In the interest of avoiding unnecessary expense and to promote prompt resolution of matters, the Hearing Committee may set reasonable time limits on the hearing, and appropriately limit testimony, witnesses, or introduction of other evidence.

g. The decision of the Hearing Committee must be based only on the complete record of the hearing considered as a whole. The burden of proof that adequate grounds exist for termination rests with the Administration. The Hearing Committee reports to the President, normally with one of the following recommendations:

1. cause has not been established and the faculty member should not be terminated.

2. cause has been established and the faculty member should be terminated.

3. cause has been established, but a lesser penalty than termination is appropriate.

h. If the President accepts the recommendation of the Hearing Committee that no cause has been established, then the process is concluded.

i. If the President accepts the recommendation of the Hearing Committee that cause has been established and the faculty member should be terminated, then the President's recommendation of this action to the Board of Visitors must include a record of the case.

j. If the President accepts the recommendation of the Hearing Committee that cause has been established but a lesser penalty than termination is appropriate, then such lesser penalties will be determined administratively.

k. Should the President reject the recommendation of the Hearing Committee that cause for termination or other disciplinary action has not been established, then the President must state his or her reasons for rejection in writing to the Hearing Committee and the faculty

member. In addition, all parties must be afforded an opportunity to respond to this statement before the President forwards a recommendation for termination to the Board of Visitors.

l. Should the President reject the decision of the Hearing Committee that cause has been established and therefore a recommendation for termination will not be forwarded, then the President must state his or her reasons for rejection in writing to the Hearing Committee and the faculty member.

m. If the faculty member wishes to appeal the President's decision, the Board of Visitors will evaluate the President's recommendation for termination, using the record of the hearing. It may at its discretion also afford an opportunity for the parties to present their arguments orally or in writing. If the Board of Visitors rejects the President's recommendation for termination, then the hearing process is concluded. The Board of Visitors renders the final decision.

n. Normally the faculty member will remain at his or her usual duties until the final decision is reached by the Board of Visitors. The faculty member may be suspended only if the President determines that continued work threatens immediate harm to self or others (see Section 2.10.9) or in situations where the faculty member has been found guilty by a court of a felony crime. Any such suspension is to be with pay. When termination charges are brought against a faculty member who fails to perform specified duties during the course of termination proceedings, the President can withhold a portion of the faculty member's salary prorated to the duties not performed.

## 2.10 Faculty Duties and Responsibilities

### 2.10.1 University Policies

Faculty are responsible for complying with a wide range of university policies (see University Policies: http://universitypolicy.gmu.edu/).

Of particular importance are:

1104 Use and Reproduction of Copyrighted Materials
http://universitypolicy.gmu.edu/policies/use-and-reproduction-of-copyrighted-materials/

1114 Data Stewardship
http://universitypolicy.gmu.edu/policies/data-stewardship/

1201 Non-Discrimination Policy
http://universitypolicy.gmu.edu/policies/non-discrimination-policy/

1202 Sexual and Gender-Based Harassment and Other Interpersonal Violence Policy
http://universitypolicy.gmu.edu/policies/sexual-harassment-policy/

1203 Non-Discrimination and Reasonable Accommodation on the Basis of Disability

**A859**

http://universitypolicy.gmu.edu/policies/non-discrimination-and-reasonable-accommodation-on-the-basis-of-disability/

1301 Responsible Use of Computing
http://universitypolicy.gmu.edu/policies/responsible-use-of-computing/

1406 Environmental Health and Safety
http://universitypolicy.gmu.edu/policies/environmental-health-and-safety/

4007 Misconduct in Research and Scholarship
http://universitypolicy.gmu.edu/policies/misconduct-in-research-and-scholarship/

4001 Conflict of Interest
http://universitypolicy.gmu.edu/policies/financial-conflicts-of-interest-in-university-contracts-with-businesses-under-virginia-law/

### 2.10.2 Professional Ethics

Although no set of rules or professional code can guarantee or take the place of a scholar's personal integrity, the University believes that the "Statement of Professional Ethics" and the "Statement on Plagiarism" promulgated by the American Association of University Professors at http://www.aaup.org/aaup serve as a reminder of the obligations assumed by all members of the professoriate. Faculty members must also adhere to the ethical standards of their respective professional associations and to university policies related to professional ethics (e.g., Research and Scholarship Misconduct, Responsible Use of Computing) while employed by the University. Please see University Policies at https://universitypolicy.gmu.edu/. In addition, unethical or unprofessional conduct may include, but is not limited to, repeated instances of workplace bullying, intimidation, harassment, verbal abuse, sabotage, and threatening behavior.

Generally accepted standards of professional ethics require faculty members who plan to resign or retire to give notice in writing to their local unit administrator no later than May 15. Only in personal emergencies or for other compelling reasons should faculty members leave the institution during the academic year, except when this coincides with the expiration of their contractual obligations.

Allegations of unethical or unprofessional conduct may be brought to the attention of the Provost, President, employee relations specialists in the Human Resources and Payroll office, or the appropriate University or local academic unit grievance committee (see Section 2.11.2.1 and Section 2.9.3). In all cases, all parties have a right to procedural due process.

### 2.10.3 Faculty Work Assignments

Faculty work assignments include some combination of teaching, research and scholarship, and/or service.

The faculty of each local academic unit prepares and maintains a plan for the equitable allocation of teaching, scholarly and service activities that will be components of the individual work

# A860

assignments of its faculty. For the purposes of meeting institutional needs while ensuring fairness and equity throughout the University, the plan of each local unit is prepared in consultation with the appropriate Dean and/or the Provost.

Faculty may use relevant grievance procedures to address disputes about work assignments. If the grievance is against the chair, the LAU's grievance committee is advisory to the Dean. If the grievance is against the Dean, the university grievance committee is advisory to the Provost or his/her designee. In all cases, the Provost's decision is final.

## 2.10.4 Faculty Absences from Class

Except for sudden illnesses and other emergencies, faculty members must arrange in advance for absences and notify their local unit administrator. Faculty members should arrange for qualified colleagues to assume their duties temporarily and/or leave appropriate assignments for their students. In emergencies they should make every effort to notify promptly class members and the local academic unit or program office as soon as practicable.

## 2.10.5 Faculty Responsibility Under the Honor Code

Since the founding of the University, the Honor Code has been and remains a part of the educational process at George Mason. Although the students are primarily responsible for preserving and enforcing the code, the faculty share common interests with the students in matters of academic integrity.

Faculty are expected to have a strong commitment to the Honor Code, and to support and to encourage students in their pursuit of its goals.

## 2.10.6 Political Candidacy

Faculty who run for elective office must inform the President in advance and must be aware of possible conflicts of interest and comply with applicable laws and university policies.

## 2.10.7 Outside Employment and/or Business Interests

The University encourages faculty members to keep abreast of developments in their disciplines and to gain practical experience in their fields. In many instances, consulting work affords excellent opportunities for faculty to improve themselves professionally and to bring added prestige to them and to the University. The University looks favorably on appropriate consulting work by faculty members insofar as it does not interfere with full, proper, and effective performance of faculty duties and responsibilities.

Outside employment and paid consulting cannot exceed the equivalent of one day per work week without written authorization from the collegiate Dean. Faculty may be required to document outside employment to insure compliance with these requirements. Although faculty members are state employees, they consult as private individuals, and the University is not responsible for their work outside the University. When consulting, faculty members should take care to preserve the distinction between projects undertaken through individual initiatives and projects

sponsored or officially sanctioned by the University. Outside business interests must not violate the Commonwealth's conflict of interest laws at (http://law.lis.virginia.gov/vacodepopularnames/state-and-local-government-conflict-of-interests-act) or the University's Conflict of Interest policy 4001.

Faculty members may use university facilities, equipment, supplies or computer time in their consulting only after obtaining the approval of the collegiate Dean. Faculty must also secure approval of the collegiate Dean before using university resources to support the activities of professional organizations.

### 2.10.8 Full-Time Faculty Teaching at Other Institutions

Full-time faculty are expected to teach their assigned course loads (as determined by their respective unit) unless they are granted release time for research, administrative and service functions or "buy down" their effort through sponsored program activities. This precludes teaching as "instructor of record" for another educational institution during the academic year (exceptions require the permission of the Provost). Full-time faculty who are teaching part-time at another institution may not at the same time teach overload courses.

This policy does not pertain to summer employment for nine-month faculty.

Requests for exceptions, generally for reasons of professional growth, must be submitted well in advance to the local academic unit head and the respective Dean. Approval, if granted, will normally apply only for one or two semesters. Approval would be made with the understanding that the outside teaching effort does not compromise the faculty member's professional responsibilities to George Mason University or create a conflict of interest.

### 2.10.9 Temporary or Short-Term Relief of Faculty from Duties and Responsibilities

Preserving the safety and well-being of students and faculty is a paramount concern. On occasion it might be determined that a faculty member is unable to carry out his or her duties or responsibilities, including classroom instruction. If at any time a faculty member's continued responsibilities, including classroom instruction, is judged by the Provost or a designated representative to constitute an immediate danger or serious threat of substantial damage to the faculty member, his or her colleagues, university staff, or students, the faculty member will be immediately relieved of his or her duties, including exclusion from the classroom, until such time as he or she can safely re-assume them. "Temporary relief of duties" for documented medical reasons is described in more detail in Section 2.10.10 The Family and Medical Leave Act. "Permanent termination of appointment for cause" is described in Section 2.9.3 Termination of Appointment of Tenure, Tenure-Track, and Term Faculty Members for Cause. Re-assumption of duties may entail a reassignment of primary duties and responsibilities within the local academic unit or university.

Unless waived by the faculty member, the grievance committee of the college/school will be convened within three days after any such relief of duties or classroom exclusion. To safeguard against abuse of this emergency authority, this committee will conduct a brief but careful, confidential, and thorough examination of the particulars of the case and report within three days

to the Provost or designated representative. Should the committee's findings not support the relief of duties or classroom exclusion, this committee will also report its findings to the chair of the Faculty Senate.

**2.10.10 The Family and Medical Leave Act**

Relief from faculty duties or responsibilities for medical reasons may be governed by the Family and Medical Leave Act (FMLA). Details can be found at the website: http://hr.gmu.edu/benefits/leave/fmla.php.

The FMLA describes the federal regulations regarding job-protected leave to eligible employees for certain family and medical reasons. In consideration of instructional faculty duties and responsibilities related to workloads and the university's academic calendar, whenever possible the university will attempt to adapt application of the FMLA to the academic calendar and the faculty member's needs. The federal regulations pertaining to the FMLA can be found at: http://www.dol.gov/dol/topic/benefits-leave/fmla.htm. Faculty members may also be eligible, depending on their medical condition, for either long-term or short-term disability benefits. For details see: http://hr.gmu.edu/benefits.

**2.11 Faculty Rights and Privileges**

**2.11.1 Academic Freedom and Civil Liberties**

One of the vital activities of a university is the critical examination of ideologies and institutions. It is essential that faculty members have the right to express their views and the University is committed to upholding the principles of academic freedom to protect the expression of faculty members without fear of censorship or retaliation. The University defines academic freedom as:

   1. the right to unrestricted exposition of subjects (including controversial questions) within one's field and professional obligations, both on and off the campus, in a professionally responsible manner; and

   2. the right to unrestricted scholarly research and publication within one's field and professional obligations, in a professionally responsible manner within the limits imposed by the resources of the institution.

The University is fully aware that faculty members must enjoy, in addition to academic freedom, the same civil liberties as other citizens. In the exercise of their civil liberties or academic freedom, faculty have an obligation to make clear that they are not representing the institution, its Board, or the Commonwealth of Virginia. All employees have an obligation to avoid any action which appears or purports to commit the institution to a position on any issue without appropriate approval.

Faculty personnel actions, including initial appointment, reappointment, annual performance evaluations, and promotion and tenure will not be affected by considerations such as the exercise of academic freedom and civil liberties.

# A863

**2.11.2 Grievances**

**2.11.2.1 Policies Concerning Grievances**

This section does not apply to the resolution of (1) research and scholarship misconduct allegations, which are governed by University Policy 4007 –Misconduct in Research and Scholarship; (2) allegations of discrimination, which are investigated by the Office of Compliance, Diversity and Ethics; or (3) alleged violations of academic freedom related to reappointment, promotion or tenure, for which Section 2.8 applies.

The university and each college/school are required to have a standing committee charged to investigate internal grievances in a timely manner concerning (i) alleged violations of academic freedom; (ii) other conditions of employment, such as work assignments, salaries, facilities, and support services (except for grievances related to Discontinuation of Degree Programs (Section 2.9.2) and Termination for Cause (Section 2.9.3); and (iii) charges of unprofessional or unethical conduct brought by one faculty member against another.

College/school committees hear grievances from faculty whose primary affiliation is within the college/school. The University Grievance Committee hears grievances that involve faculty from more than one college/school as well as other grievances mandated in the committee charge. The University Grievance Committee hears all grievances against academic administrators at or above the level of Dean. See Section 2.11.2.2.

The University Grievance Committee and each college/school grievance committee will establish, publish, and disseminate their grievance procedures. Upon receipt of a grievance that includes an allegation of violation of federal or state law, or discrimination in violation of federal or state law or University policy, the grievance hearing shall be held in abeyance until the Office of Compliance, Diversity and Ethics has investigated the allegation and has submitted a report to the committee.

In addition to hearing specific cases, the committees may initiate, as they deem necessary, discussions with appropriate administrators about any matters that fall within the committees' purview. In the course of such discussions, however, they may not commit the faculties of their units to changes in grievance policy unless specifically authorized to do so.

At their discretion, academic departments may also establish grievance committees. Their procedures should be similar to those of the collegiate committees.

**2.11.2.2 Grievance Procedures**

1. Grievance procedures for all Grievance Committees must adhere to the following basic elements.

    a. The faculty member initiates a grievance by filing a written statement of the grievance, along with supporting documentation, with the Chair of the relevant grievance committee. No grievance may be heard on behalf of a third party or group.

b. Before the grievance itself is considered, the committee must conclude that the petitioner's case appears to have merit.

c. The faculty member may withdraw the grievance at any time without the grievance committee's approval. In such case, the grievance committee will not make a decision or recommendation.

d. No member of the committee with a conflict of interest in the grievance case may participate in the proceedings.

e. Committees are particularly charged to be alert to instances of inequitable treatment and retaliation against colleagues who have filed grievances.

2. Within a college/school, grievances against fellow faculty members and academic administrators below the level of Dean are heard by the local grievance committee.

a. If the grievance is against a fellow faculty member, the committee is charged to investigate the facts of the case and determine an appropriate resolution. The grievance committee's decision is final.

b. If the grievance is against an academic administrator below the level of Dean, the committee is charged to investigate the facts of the case and to recommend a resolution, which is then forwarded to the Dean, whose decision is final.

c. In cases of alleged violations of academic freedom, the faculty of the college/school acts on its grievance committee's recommendation by formal vote, the outcome of which is final.

3. Grievances against academic administrators at or above the level of Dean are heard by the University Grievance Committee.

a. If the grievance is against a Dean, the committee's recommendation is forwarded to the Provost, whose decision is final.

b. If the grievance is against the Provost, the committee's recommendation is forwarded to the President, whose decision is final.

c. If the grievance is against the President, the committee's recommendation is forwarded to the Rector of the Board of Visitors, whose decision is final.

## 2.12 Department Chairs

Department chairs serve in a dual capacity: as representatives of their faculty colleagues to the administration and as spokespersons of the administration to their faculty colleagues.

Normally, chairs serve in twelve-month instructional faculty appointments and are subject to all university policies pertaining to twelve-month appointees, including annual leave policies. Their specific responsibilities, including teaching assignments, are negotiated with the administration

**A865**

at the time of appointment. The term of appointment for a department chair is four years; appointments are renewable. Chairs who serve two or more consecutive terms receive at the end of their last term a study leave equivalent to one-half year's pay for a full academic year's leave or full pay for a semester's leave. If they elect to take such a study leave, however, they may not succeed themselves in an additional term as chair.

During an unforeseen vacancy or during illness or temporary absences of an incumbent chair, the Dean or Provost may appoint an acting chair to serve until such time as the regularly appointed chair assumes or reassumes the position.

### 2.12.1 Duties and Responsibilities

The duties and responsibilities of department chairs are to:

1. Represent the unit to the university community and serve as a channel of communication on program, personnel, and budget matters;

2. Encourage and foster excellence in teaching, research and scholarship, professional and university service and provide leadership in the pursuit of the University's commitment to affirmative action and equal opportunity;

3. Coordinate, in consultation with the unit's faculty, the unit's academic programs, and plan and administer the unit's budget;

4. Make faculty work assignments;

5. Evaluate faculty for purposes of reappointment, promotion, tenure; and make annual reviews for the purpose of recommending salary increases;

6. Supervise staff and part-time faculty and provide an environment that, within the limitations of available resources, is supportive of faculty professional activities and goals;

7. Consult regarding fair employment practices with the Office of Compliance, Diversity and Ethics;

8. Consult with Human Resources and Payroll as appropriate on faculty and staff matters.

### 2.12.2 Policies on Appointment and Renewal

Department chairs are appointed by the Provost on the recommendation of the departmental faculty and the Dean in accordance with the following guidelines:

a. Since department chairs function in a dual administrative/faculty capacity, their selection requires substantive involvement of both the administration and the department faculty. Except under unusual circumstances, the final candidate must be acceptable to both.

b. Procedures for the selection of department chairs therefore foster joint faculty/administrative appraisals of candidates.

c. Similar criteria for reviewing incumbent chairs and searching for new chairs are applied, with the following clarifications:

> i. Incumbent chairs under review for renewal are kept fully apprised of the methods adopted by the review committee and are supplied a copy of the committee's report at the time of its submission to the Dean. Chairs have the same rights with regard to their personnel files as other faculty members.

> ii. An acting chair is considered as a possible candidate for a vacant position rather than as a candidate for renewal of his/her term.

> iii. Incumbent chairs who are not reappointed by the Provost because of negative recommendations and action at the department, college/school, or university level will receive a prompt account in writing as to the reasons for this non-renewal, if they request it.

### 2.12.3 Procedures for Appointment and Renewal

### 2.12.3.1 Search Procedures

Search procedures are initiated after the incumbent chair has declined to seek reappointment, or after the Provost has notified the incumbent chair that he/she will not be reappointed, or when the position is vacant. A search committee is constituted no later than December 10th. This committee consists of five faculty, all of whom must be tenured or tenure-track and will have held a full-time instructional appointment for at least one year: (i) a chair, appointed by the Dean, from among the faculty of the college/school but not of the department; (ii) two faculty, of whom one may be on tenure-track appointment, appointed by the Dean from among the faculty of the department; (iii) two faculty, of whom one may be on tenure-track appointment, elected by the faculty of the department from among its own ranks. The department elects its members of the committee after the appointments by the Dean have been made known. If the qualifications for faculty membership cannot be met, the Dean will appoint an appropriate faculty member. The search committee:

1. consults with the faculty of the department and other persons it deems appropriate about the qualities to be sought in a new chair;

2. seeks qualified candidates from inside or, if the Dean has given notice that external candidates can be considered, from outside the department;

3. requests dossiers, including references, from candidates outside the University, when appropriate;

4. consults regarding fair employment practices with the Office of Compliance, Diversity and Ethics;

5. evaluates qualifications and dossiers of candidates;

**A867**

6. supervises departmental discussion of candidates and balloting to determine the wishes of the department faculty; and

7. submits to the Dean reports including a general assessment of the several candidates, a summary of departmental discussions, the results of departmental balloting, and its own recommendations.

The Dean reports his/her recommendations and supporting arguments in writing to the Provost and the departmental faculty, including in that report the full report of the committee. If the committee and the departmental faculty are not in agreement or if the Dean does not endorse the majority recommendations of the committee and/or the department faculty, the Dean meets with the committee and/or the faculty to seek an identity of views before submitting the report to the Provost.

If the committee and/or the departmental faculty and the Dean have remained in disagreement or if the Provost does not endorse the joint recommendation of the committee and the Dean, the Provost meets with the committee and the Dean to seek an identity of view.

The Provost acts upon the recommendations received and apprises the Dean, search committee, and the faculty of his/her decision. Upon notification of the Provost's decision, the Dean extends a formal invitation to the person chosen.

If the vacancy is not filled nor an offer extended by May 1st, the Provost, after consultation with the Dean and the faculty of the department, appoints an acting chair and so notifies members of the department by July 1st.

### 2.12.3.2 Renewal Procedures

The Dean of the appropriate college/school writes to the incumbent chair before the last day of classes of the spring term of the academic year preceding the chair's final year of appointment. In this letter, the Dean states that the chair will be considered a candidate for reappointment unless the chair withdraws from consideration in writing before September 1st.

If the incumbent chair wishes to be a candidate for reappointment, the Dean constitutes by September 15th a committee to elicit and formulate the views of the faculty of the department. The committee is constituted according to the specifications governing the composition of the search committee described in Section 2.12.3.1.

The committee consults with the department faculty and other persons it deems appropriate concerning the past performance of the chair and the desirability of the chair's renewal. The committee ascertains the will of the department faculty and makes recommendations in writing to the Dean no later than October 15th. The report includes the division of departmental and committee balloting by numbers only.

The Dean makes a recommendation to the Provost by November 1st. The Provost decides whether or not to reappoint the incumbent chair by December 1st and promptly communicates

# A868

this decision and supporting reasons in writing to the Dean, the committee, the departmental faculty, and the chair.

### 2.12.4 Removal

The faculty of a department, under extraordinary circumstances, may petition the Dean to remove a chair who no longer enjoys the trust and confidence of the faculty. A petition of this type will be conveyed to the Dean only if supported by at least three-fourths of the tenure-track and tenured faculty of the department. Upon receipt of such a petition, the Dean, after having inquired into the circumstances which have resulted in the petition, will make a recommendation to the Provost whether or not the removal of the chair is in the best interests of the department and/or the University. The Provost will make the final determination.

The Provost, under extraordinary circumstances, and in consultation with the Dean and the faculty, may remove a chair who is failing to perform at an acceptable level, even when the chair is covered by a multi-year contract. The Provost will give the chair at least thirty days notice.

### 2.13 Directors of Academic Programs Spanning More Than a Single Academic Unit

Administratively, directors of programs that are not internal to a single local academic unit are regarded as the equivalent of department chairs. They have the same duties and responsibilities as department chairs except that, since faculty members are not appointed to primary affiliation in a program faculty, they do not make primary evaluations of faculty for purposes of reappointment, promotion, and tenure, and they do not make primary annual reviews for the purpose of recommending salary increases.

Policies on appointment and renewal of directors of academic programs are the same as those described for department chairs in Section 2.12.2 and Section 2.12.3. These procedures may be modified as appropriate to the size and complexity of the program to be directed. Program directors are subject to removal in accordance with the provisions set out for department chairs in Section 2.12.4.

**A869**

### CHAPTER III.  FACULTY COMPENSATION AND BENEFITS

#### 3.1 Faculty Salaries

State colleges and universities in the Commonwealth of Virginia do not have a common salary schedule. The General Assembly determines appropriations for state colleges and universities, which includes funding for faculty salaries.

The University attempts to be as competitive as possible in its recruitment and retention of faculty. The differences that are found among disciplines and departments with regard to salary ranges within a given academic rank partially reflect supply and demand in the marketplace.

Faculty salaries for the current academic year appear on the Faculty Senate website.

#### 3.2 Salary Increases

Subject to the availability of funding, salary increases are given annually. The annual salary increase is confirmed to the faculty member by a letter from the Provost.

Annual salary increases are based chiefly on performance. All faculty with a satisfactory performance rating will receive at least a minimum salary increment. Salary increases may also reflect efforts to achieve equity. In the case that funding from the state is designated as a cost-of-living adjustment, it is the responsibility of the University to ensure such funds are disbursed accordingly.

Faculty members who are dissatisfied with a salary increase normally seek recourse within their local academic unit. If dissatisfaction persists, grievance procedures outlined in Section 2.11.2 may be followed.

#### 3.3 Summer Salary

The University offers a summer program consisting of several sessions. Full-time faculty members assigned to teach a summer course shall be paid 3.33% per credit hour (10% per three-credit course) of their nine-month salary. If a course is valued at a higher or lower amount for workload purposes during the academic year, the summer payment will be assigned by the academic unit accordingly. Every full-time faculty member who wishes to teach in the summer shall be afforded an opportunity to teach one 3-credit course (or equivalent) at 10% of their annual nine-month salary, assuming he or she is qualified to teach the course and that the course meets minimal enrollment criteria and appropriate scheduling, curricular, and pedagogical needs. Furthermore, full-time faculty should not be excluded from teaching additional courses at 10% of their annual nine-month salary when no demonstrated financial constraints exist. Grievances over what constitutes financial constraints should be resolved at the local level, but if no agreement can be reached, then the Provost and the Faculty Senate's Executive Committee will be the designated body to resolve the disagreement. Summer teaching is optional, and in no case may it be required of a faculty member. Faculty may be paid no more than one third of their prior academic year salary for all summer work, regardless of funding sources.

Faculty members whose contracts end in the spring semester prior to the start of summer, or whose contracts begin in the fall semester after the summer semester, will be paid for summer teaching according to the salary matrix. Exceptions can only be granted by the Provost Office.

Faculty and LAU administrators on 12-month contracts who teach during the summer do not earn additional pay for teaching unless the teaching assignment is an overload assignment. Overload teaching is paid according to the salary matrix and must be approved by the Provost.

### 3.4 Salary Matrix

Most adjunct faculty and full-time faculty teaching overload courses are paid on the salary matrix. Faculty in highly competitive areas of instruction may be paid above matrix rates. These exceptions are considered on an individual basis and in light of the prevailing job market.

### 3.5 Faculty Benefits

As employees of the Commonwealth of Virginia, Mason faculty members are provided with health insurance, retirement plans, life insurance, and medical and child care flexible spending accounts. In addition, the University offers certain employee-funded benefits. All such benefits are described in more detail on the Human Resources and Payroll web site (http://hr.gmu.edu/), along with a Total Compensation Calculator.

### 3.6 Faculty Development

The quality of the institution depends on the vitality of its faculty. Faculty members have a responsibility to continue to grow as scholars and educators so that they remain contributing members of the intellectual community. The University recognizes its responsibility to foster faculty growth by providing a variety of opportunities for professional development. These may include, among other opportunities, departmental study leaves, competitive awards in the form of summer stipends and University study leaves, opportunities to consider new approaches to teaching and the assessment of teaching (e.g. portfolio development), and assisting faculty with the application of new technologies to instruction.

### 3.6.1 Study Leave for Tenure-Track Faculty

All tenure-track assistant and associate professors will be granted a one-semester study leave at some point during the first five years of their tenure-track appointment. The leave is at full pay and benefits. This leave is designed to assist a tenure-track faculty member in advancing his or her research, scholarly, or creative activities. The timing of this leave will be subject to approval by both the respective local academic unit head and the appropriate Dean. The Office of the Provost will provide one-course matrix replacement funding per granted leave request. This leave policy is not intended to conflict with an existing local academic unit practice; rather than reducing a local academic unit's flexibility, its intent is to enhance and supplement existing practices. During the semester either prior to or succeeding the faculty member's leave, the local academic unit may need to ask the recipient to teach one additional course in order to

**A871**

accommodate this leave. Full details and application procedures are available from the Provost Office's web site (http://provost.gmu.edu/ ).

### 3.6.2 Leave Programs for Tenured Instructional Faculty

There are two leave programs for tenured faculty. One is administered by the Provost's Office. The other is administered at the local academic unit level. The purpose of these leave programs is to support professional development initiatives designed to advance scholarly research, teaching, and/or creative activity, including the development of innovative teaching approaches and methods. Leaves are for one semester at full pay and full benefits or an academic year at half pay with full benefits (based on 50% of their base salary). Full details and application procedures for each of these programs are available on the Provost Office's web site (http://provost.gmu.edu/ ).

**Eligibility for the Provost Office Study Leave Program for Tenured Instructional Faculty:**

Faculty must be tenured, with six years of service at Mason, and have completed six years of such service since a previous study leave. This six-year period includes time spent on leave of absence, unless such leave includes time worked at another agency or institution, in which case an exception must be approved and granted by the Vice President for Research.

A faculty member who receives a study leave must agree to remain a full-time employee of the University for at least one academic year after the conclusion of the leave.

A faculty member who accepts a study leave must agree to serve as a reviewer of future applications at least once.

**Eligibility for LAU Professional Development Leaves:**

Faculty must be tenured, with six years of service at Mason, and have completed six years of service since a previous study leave. This six-year period includes time spent on leave of absence, unless such leave includes time worked at another agency or institution, in which case an exception must be approved and granted by the Vice President for Research.

A faculty member who receives a professional development leave must agree to remain a full-time employee of the University for at least one academic year after the conclusion of the leave.

Local academic units are responsible for establishing the procedures, criteria and deadlines for submission and review of leave proposals. Local academic units are also responsible for obtaining approval of leave proposals by their Dean and the Provost. The timing of a leave may be delayed if in the judgment of the LAU administrator, the faculty member's services are needed for a particular semester.

### 3.7 Retirement

**A872**

From time to time the University, and particular academic units, may develop programs to assist faculty with the transition to retirement. Faculty contemplating this transition should discuss their options with their Dean and with the Human Resources and Payroll department**.**

**3.8 Conversion Factors**

Instructional faculty who convert from an administrative or professional faculty contract are governed by the policies of the <u>Administrative Faculty Handbook</u>. Consult this source for information on related matters such as Section IV. Compensation Policies.

**A873**

**EXHIBIT J**

**A874**

| Department of Human Resource Management Policies and Procedures Manual |
|---|

### Policy Number: 6.05 - Personnel Records Disclosure
**Efft. Date: 9/16/93 Rev. Date: 7/01/05**

### PURPOSE

It is the Commonwealth's objective to ensure compliance with the Government Data Collection and Dissemination Practices Act and the Freedom of Information Acts. This policy establishes guidelines for access to and release of personal information on employees which is maintained by state agencies.

### EMPLOYEES TO WHOM POLICY APPLIES

This policy applies to positions covered under the Virginia Personnel Act to all classified employees. This policy also applies to positions expressly excluded from coverage of the Virginia Personnel Act. (See section II of Policy 2.20, Types of Employment.)

### DEFINITIONS

| | |
|---|---|
| **Official Records** | All written or printed books, papers, letters, documents, maps and tapes, photographs, films, sound recordings, reports or other material, regardless of physical form or characteristics, prepared, owned, or in the possession of a public body or any employee or officer of a public body in the transaction of public business. |
| **Personal Information** | All information that:<br><br>1. Describes, locates or indexes anything about an individual including his or her real or personal property holdings derived from tax returns, and his or her education, financial transactions, medical history, ancestry, religion, political ideology, criminal or employment records, or that affords a basis for inferring personal characteristics, such as finger and voice prints, photographs, or things done by or to such individual; and the record of his or her presence, registration, or membership in an organization or activity, or admission to an institution.<br>2. The term does not include routine information maintained for the purpose of internal office administration; nor does the term include real estate assessment information. |
| **Third Parties** | Individuals other than the subjects of the records, including other state agencies, who request information from the records maintained by agencies. |

### DISCLOSURE OF INFORMATION TO THIRD PARTIES

- Certain personal information must be disclosed to third parties upon request and may be disclosed without the knowledge and consent of the subject employee. This information includes:
  1. employee's position title;
  2. employee's job classification title;
  3. dates of employment; and
  4. annual salary, official salary or rate of pay, if such pay exceeds $10,000 per year.
- Other personal information may not be disclosed to third parties without the written consent of the subject employee. This information includes, but may not be limited to:
  1. performance evaluations;
  2. mental and medical records;
  3. credit or payroll deduction information;
  4. applications for employment;
  5. records of suspension or removal including disciplinary actions under the Standards of Conduct, Policy 1.60;
  6. records concerning grievances or complaints;
  7. scholastic records;
  8. records of arrests, convictions, or investigations;
  9. material relating to Workers' Compensation claims;
  10. material relating to Unemployment Compensation claims;
  11. retirement records;
  12. confidential letters of reference or recommendation;

- 13. results of pre-employment tests; and
- 14. personal information such as race, sex, age, home address, home telephone number, marital status, dependents' names, insurance coverage, or social security number.
- The following individuals/agencies may have access to employee records without the consent of the subject employee. This list is not all inclusive.
  1. The employee's supervisor and, with justification, higher level managers in the employee's supervisory chain.
  2. The employee's agency head or designee and agency human resource employees, as necessary.
  3. Specific private entities which provide services to state agencies through contractual agreements (such as health benefits, life insurance, Workers' Compensation, etc.) in order to provide such services.

## REQUESTS FOR INFORMATION - GENERAL

- All requests for information about employees by third parties should be directed to the agency's human resource officer. It is not necessary for these requests to be in writing.
  1. Requests for information which do not make specific reference to the Virginia Freedom of Information Act should be treated under the requirements of that Act.
  2. Requests under the Virginia Freedom Information Act must be answered by the custodian of the record within five workdays of their receipt. The response must:
     - provide the requested information; or
     - if the records are exempt from disclosure under the Virginia Personnel Act, explain why they cannot be provided (in this case, the specific Code section which exempts the records must be referenced); or
     - if portions of the records are exempt and others are not, provide the portions of the information which are not exempt and delete those portions which are, referencing the appropriate section of the Virginia Code which addresses the exemptions.
  3. Agencies are not required to provide information when the request is not reasonably specific. Agencies should ask for clarification of such requests.
  4. Agencies are not required to provide information that does not already exist or to convert a record from one format to another in order to comply with requests.
  5. Agencies are not required to interpret official records or to supply additional information which is not part of the records.
  6. Agencies are not required to entertain requests for future records or for continuing records.
  7. If agencies determine that it is impossible to provide the information requested pursuant to the Freedom of Information Act, they must notify the requestor within five workdays.
  8. If agencies find that they are unable to determine if the records are available within the five workday period, they must notify the requestor within this time. The agency then has seven additional days to provide a response as indicated in sections IV(A)(2) above.
  9. If the wrong agency is contacted for information, the agency must, within five workdays, advise the requesting party and, if known, inform the requesting party where to obtain the information. NOTE: Refer to the Virginia Freedom of Information Act for further information regarding the disclosure of records.
- Employment references should be provided by agency human resource officers.
  1. Agencies are under no obligation to provide employment references on current or past employees to prospective employers including other state agencies.
  2. If employment references are provided, the information given should be accurate, verifiable and should be limited to employment-related information.
- Before releasing employment references (information discussed in section III(B)), written authorization from the subject employee should be received. (See Attachment I.)
- Employee information needed to affect transfer, rehire, etc., may be released to other state agencies by telephone.

## REQUESTS FOR INFORMATION - COURT ORDERS

1. Agencies must comply with subpoenas ordering employee records to be turned over to the court.
2. Agencies may inform subject employees of such subpoenas, but are not required to do so.
3. When the court requests but does not order employees' files, copies of the requests and files should be forwarded immediately to the Attorney General's Office. That office will respond to the request.

## REVIEWING PERSONNEL FILES

- Employees have access to information retained in all personnel files of which they are the subject, in accordance with law. Two exceptions are provided below.
  1. When employees' physicians have requested in writing that employees' medical and/or mental health records remain confidential, their request shall be honored and employees will be denied access to those records.
  2. Under the provisions of the Freedom of Information Act (Va Code §2.2-3705.1), most state agencies must make employment references and letters of recommendation available to the individual who is the subject of these materials. Educational agencies and institutions are exempted by §2,2-3705.4 of that Act from the requirement to release these documents to the subject of the material.
- Individuals seeking access to their personnel files should arrange an appointment with their agency human resource officer.
  1. Employees are not required to obtain their supervisors' approval prior to reviewing their official personnel file. However, they must provide adequate notice to supervisors when they wish to obtain releases from work to

  review their files.
  2. Agency human resource officers may designate the location in which personnel files may be reviewed.
  3. Human resource officers must remove medical and/or mental health records and may remove confidential letters of reference from the files before they are reviewed. (See section VI(A) above.)
      - In educational institutions only, confidential letters of reference may be removed from the file before it is released for review.
      - Medical and/or mental health records may NOT be kept in the personnel file but must be retained separately.  The subject of these records has access to them UNLESS the physician has requested that the records not be shared with the subject.
  4. A representative of the human resource office normally should be present during the review of personnel files. However, supervisors are not required to be present while employees review their personnel files.
  5. Employees will not be charged for reasonable time away from work to review their files.
  6. Releases from work to review files will be granted based on agencies' needs.
- Employees may review supervisors' files of which they are the subject.
  1. Employees should make arrangements with their supervisors to review these files.
  2. The supervisor or a designee normally should be present during the review.

## COPYING RECORDS

Agencies may charge fees for providing information to requestors. These charges may not exceed the actual cost of providing the information. Charges may include the actual copying costs plus the costs for labor involved in locating and copying the information.

## AGENCY RESPONSIBILITIES

- Agencies should review information which is maintained to ensure it is accurate and have a process available by which inaccurate information can be corrected.
  1. Subject employees should be informed of their right to correct information in their files and the process by which it can be corrected.
  2. If information is changed or purged, subject employees should be notified.
- Agencies are encouraged to institute a written request policy for individuals seeking personal information.
- Agencies should record names of those third party entities who have had access to personal information in employees' files over the last three years.
- Agencies must take every reasonable precaution to ensure security of employees' personnel files.
- Agency heads and human resource officers are responsible for establishing written procedures for agency personnel to follow when responding to requests for work references. Such procedures should be communicated to all employees.
- Agency heads and human resource officers are responsible for notifying employees regarding appropriate handling of confidential information as well as disciplinary actions which may be taken for violations of confidentiality or this policy.
- Agency heads and human resource officers are responsible for the consistent application of this policy within their agency or facility.

## AUTHORITY AND INTERPRETATION

This policy is issued by the Department of Human Resource Management pursuant to the authority provided in Chapter 12, Title 2.2, of the Code of Virginia. This policy supersedes Policy 6.01, Personnel Records Maintenance, issued November 1, 1981; Policy 6.02, Release of Information for Employees Records, issued July 1, 1978; and Rules 13.1, Central Records, 13.2, Agency Records, and 13.3, Agency Reports, of the Rules for the Administration of the Virginia Personnel Act, effective July 1, 1977.

The Director of the Department of Human Resource Management is responsible for official interpretation of this policy, in accordance with section 2.2-1201 of the Code of Virginia. Questions regarding the application of this policy should be directed to the Department of Human Resource Management's Agency Human Resource Services. The Department of Human Resource Management reserves the right to revise or eliminate this policy.

**CONSENT TO RELEASE INFORMATION**

I, <u>Employee's Name</u>, hereby authorize <u>Agency's Name</u> to release information regarding <u>Subject of Request</u> to <u>Third Party</u>.

I agree to hold the agency harmless for the way in which the requesting entity uses the information.

_____    _____
                    Employee Signature                              Date

[Back to the Top](#)

**A877**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-cv-01249 |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT THE RECTOR AND VISITORS OF
<u>GEORGE MASON UNIVERSITY'S MOTION TO DISMISS COUNT I</u>**

**A878**

Plaintiff's attempts to argue that he has sufficiently alleged his Title IX claims only underscore that they must be dismissed.  Plaintiff has given the Court no reason to believe that (1) Mason is biased against men, (2) that its determination that Plaintiff repeatedly discussed sexual matters with his students creating a hostile environment was incorrect, or (3) that Mason treats male faculty members differently than female faculty members.  To the contrary Plaintiff's complaint alleges facts that show (1) both the decision makers in his case and Mason in general are not biased against men, (2) that the findings against Plaintiff are correct and Plaintiff received more than the due process to which he was entitled, and (3) that Plaintiff has no basis to allege selective enforcement.  Having both failed to plead his claim and having pled himself out of his claim, Count I must be dismissed with prejudice.

## I.    PLAINTIFF HAS NOT PLAUSIBLY ALLEGED THAT THE OUTCOME OF HIS TITLE IX CASE WAS MOTIVATED BY GENDER BIAS.

### A.    Plaintiff Fails To Identify Any Statements by University Officials That Evidence Gender Bias.

In *Doe v. Marymount Univ.*, on which Plaintiff repeatedly relies, this court held that "a Title IX plaintiff successfully alleges gender bias if he or she points to statistical evidence of gender bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias."  297 F. Supp. 3d 573, 585 (E.D. Va. 2018).  Plaintiff concedes that he has no allegations of statistical evidence of gender bias or of policies and procedures designed to reach gender-specific outcomes.  His entire case thus rests on whether he has properly alleged "statements by university officials evidencing gender bias."  *Id.*

Given his pleading burden, it is notable what Plaintiff did not argue in his opposition.  He does not contend that Dr. Hammat or Mr. Williams have ever actually expressed a bias against

**A879**

males or stated a preference for females.  Nor does he identify a single statement in which Dr. Hammat or Mr. Williams actually express an "outdated or discriminatory view of gender and sexuality."  *Id.*[1]

Instead, Plaintiff points to innocuous and neutral statements and then engages in inferential gymnastics to divine a meaning that is completely divorced from —and in some cases contrary to—the actual words used.  Each of the allegedly biased statements are before the Court, which can judge for itself based on the actual words used whether gender bias can reasonably be inferred from any of them.  A review of Dr. Hammat and Mr. Williams' actual words and the inferences Plaintiff is asking this Court to make demonstrates that Plaintiff's asserted inferences are not even conceivable, let alone plausible.  *See Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 732-33 (E.D. Va. 2015) ("*GMU*") (allegations from which an inference of gender bias is "conceivable or possible" are insufficient; the "factual allegation [must] make that inference cross the line from conceivable to *plausible*.").

*First*, Plaintiff cannot plead that Dr. Hammat is biased based on statements made by someone else.  *See* Opp. at 21-22, bullet points a, e, and f.  Each of these allegations concern statements that were made by a witness or one of the Complainants, not Dr. Hammat.  Plaintiff's contention is that it is somehow reasonable to infer that Dr. Hammat has a gender bias from Dr. Hammat putting Plaintiff on notice of the allegations against him and conveying in her letters of determination what other people said during the investigation.  One cannot infer anything about

---

[1] Contrary to Plaintiff's assertion, *see* Opp. at 10 n.4, Mason is not arguing that the erroneous outcome claim is limited to Dr. Hammat's determination.  Mason agrees that Mr. Williams appeal decision is relevant to Plaintiff's erroneous outcome claim.  The distinction Mason was drawing was between (1) the determination that Plaintiff violated Title IX and (2) the sanctions and disaffiliation that occurred afterwards, the latter of which is not relevant to the Title IX erroneous outcome claim.

**A880**

Dr. Hammat's beliefs from someone else's statements.  The only thing these allegations demonstrate is that Dr. Hammat is thorough in doing her job and ensured that Plaintiff had adequate notice of the allegations against him.

Moreover, the inferential leaps Plaintiff asks the Court to make are unsupportable.  There is nothing remotely related to gender, let alone anti-male gender bias, in (1) stating that a student referred to a story told by Plaintiff (which Plaintiff admits included a visit to an area where illegal mistresses lived and a road known as "love street," Compl. ¶ 262) as "erotic," (2) noting that one of the Complainants described the woman in that story as "not [Plaintiff's] wife," (3) relaying a student's belief that she was being "groomed," or (4) stating that one of the allegations was that Plaintiff invited one of the complainants to an "explicit" presentation.

*Second*, Plaintiff's assertion about an "insinuation" supposedly embedded in Mr. Williams' appeal decision is absurd.  Like Plaintiff's inexplicable allegation that Mr. Williams expressed "outrage" in his appeal decision about Plaintiff being in a hot tub with students, *see* Mot. at 14, Plaintiff's assertion finds no support in Mr. Williams' matter-of-fact appeal decision, *see* Mot. Ex. 9.   No reasonable person reading Mr. Williams appeal decision could interpret him as being outraged about Plaintiff being in a hot tub with graduate students or insinuating anything about the maturity of female graduate students.

*Third*, Plaintiff misrepresents (and in some cases changes) the statements.  Plaintiff continues to disingenuously claim that Mr. Williams said that campus administrators have a "'moral obligation' to protect and care for female students" despite then quoting what Mr. Williams actually said, which was that campus administrators have a "moral obligation to protect and care for our students and our community."  Opp. at 25.  Plaintiff also takes a statement out of context and uses selective quotations to assert that Dr. Hammat believes that "being emotional"

3

**A881**

is a "stereotypical female trait." Opp. at 22. But the actual statement is: "[Complainant 1] indicated that the interactions with [Plaintiff] included regular and gratuitous stories detailing sexual encounters, disparaging comments and actions regarding stereotypical female traits (e.g., being emotional)." *See* Mot. Ex. 5. Read in context, it is clear that what this statement means is that Complainant 1 asserted that ***Plaintiff*** made comments that were premised on stereotypes about females, e.g., calling their arguments emotional. Nothing in that statement plausibly suggests that Dr. Hammat believes that females are more emotional. Moreover, as discussed above, this is a description of what someone else said and, therefore, cannot be a basis to infer anything about Dr. Hammat's beliefs.

*Fourth,* Plaintiff incredibly tries to argue that the mere reference to a person's gender demonstrates bias. Opp. at 23. He asserts, without any explanation, that Dr. Hammat's use of the female pronoun to refer to potential victims of sexual assault is indicative of gender bias. *See Doe v. Univ. of Chi.*, No. 16 C 08298, 2017 U.S. Dist. LEXIS 153355, at *13 (N.D. Ill. Sept. 20, 2017) (rejecting argument that use of female pronouns to refer to victims of sexual assault indicated gender bias). Similarly, Plaintiff tries to argue that Mr. Williams stating that female students may feel unsafe if sexual assault or harassment are not investigated evidences a gender bias. There is no gender bias in recognizing that female students may feel unsafe if a college campus does not address sexual assault and harassment. If Plaintiff's argument were to be accepted, it would lead to the absurd result that any statement by a Title IX professional that recognizes that female students are potential victims of sexual assault could be used to demonstrate bias.

*Fifth*, Plaintiff's attempt to equate feminism with anti-male gender bias must be rejected. He asks the Court to find that it is reasonable to infer that the mere participation in an event

4

**A882**

sponsored by a feminist organization makes one incapable of being impartial.  Opp. at 24.  This unsupported assertion is itself based on a bias against feminists as being anti-male.  As the Sixth Circuit has held: "being a feminist . . . does not support a reasonable inference that an individual is biased against men."  *Doe v. Miami Univ.*, 882 F.3d 579, 593 n.6 (6th Cir. 2018).  Merely participating in an event sponsored by a feminist organization certainly provides no basis to make any inference about Dr. Hammat's beliefs.

*Finally*, Plaintiff asks the Court to infer a meaning that is directly contradicted by some of Dr. Hammat and Mr. Williams' statements.  Plaintiff argues that the Court can infer that Dr. Hammat harbors "gendered assumptions about males as sexual predators," Opp. at 23, based on a 2013 interview in which Dr. Hammat describes how her sorority protected its members and what she told fraternity members about preventing sexual assault.  But as explained in Mason's opening brief, Dr. Hammat's statements demonstrate the exact opposite.  Dr. Hammat explicitly states that she is not assuming that sexual assaults occurs in all fraternity houses.  *See* Mot. Ex. 10.  Similarly, her statement that fraternity members need to be vigilant and take action to prevent the possibility of sexual assault against females occurring in their fraternity houses, recognizes that most men will want to take actions to prevent sexual assault.  Dr. Hammat's statement is also correct.  Men should be angry about sexual assaults occurring against women and play a crucial role in preventing them.   There is no bias in conveying this important message to men.  *Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d 508, 519 (E.D. Va. 2019) ("Courts have widely held that vigilance in enforcing Title IX  . . . is not evidence of anti-male bias.").  Nor could one infer from her statements that Dr. Hammat believes woman are "in need of protection," Opp. at 23, since she describes how her fellow sorority sisters took actions on their own to protect themselves against sexual assault.

5

Plaintiff also tries to argue that the Court should infer that Mr. Williams always believes female students based on his statement that "[j]ust because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying." Opp. at 25. Nothing in this statement suggests that Mr. Williams always believes female complainants; it instead demonstrates that Mr. Williams understands, and wants complainants (of all genders) to understand, that a policy violation can only be found if there is sufficient information to corroborate the allegations. Moreover, as Mason explained in its opening brief, this statement cannot be a basis to infer gender bias, since both male and female students can be complainants in Title IX cases.

Simply put, the Court should not accept Plaintiff's conclusory assertions, false insinuations, and far-fetched inferences; none of which pass the straight-face test, let alone the *Twombly*-plausibility test.

### B. Plaintiff's Other Attempts to Demonstrate Gender Bias Fail As Well.

Plaintiff's failure to plead any statement by a university official that demonstrates gender bias, as required by *Yusuf v. Vassar Col.*, 35 F.3d 709, 715 (2d Cir. 1994) and *Marymount*, should be the end of Plaintiff's case. However, Plaintiff persists in arguing that he has alleged gender bias based on (1) his disagreement with how Dr. Hammat and Mr. Williams weighed and assessed the evidence in his case and (2) supposed "pressure" Mason faced. Neither support a plausible inference of gender bias. Indeed, as demonstrated in Mason's motion and left uncontested by Plaintiff, Plaintiff's own allegations disprove that Mason is biased against men.

To support the first argument, Plaintiff points to allegations which merely state his disagreement with determinations Dr. Hammat and Mr. Williams made. *See* Opp. at 21-23

**A884**

(paragraphs b, d, g, h, and j); *id.* at 24-25.  But Plaintiff does not provide any explanation for how those allegations, which contain no references to gender, possibly evidence gender bias. That Plaintiff disagrees with Dr. Hammat or Mr. Williams is not a basis to infer gender bias.

Moreover, even if Plaintiff were correct that Dr. Hamamt and Mr. Williams' decisions were "against the weight of the evidence," Opp. at 26, that would not be a basis to infer gender bias.  Plaintiff cannot plausibly allege that the reason Dr. Hammat or Mr. Williams made their determinations was gender bias, as opposed to any other reason.  This exact argument was rejected in *GMU*.[2]  As the court explained there, allegations "that gender bias is the 'only' explanation for the outcome of [the] proceedings are entirely conclusory and entitled to no weight under *Twombly*."  132 F. Supp. 3d at 732-33; s*ee id.* ("[T]here are a number of possible explanations for any disparate treatment, of which gender-motivated bias is only one."); *see Doe v. Loh*, PX-16-3314, 2018 U.S. Dist. LEXIS 53619, at *24 (D. Md. March 29, 2018) *aff'm* 767 Fed. Appx. 489 (4th Cir. 2019) (Plaintiff "must do more than state in conclusory fashion that the flawed outcome was the result of 'gender bias.'").

Additionally, were Plaintiff's argument accepted, it would collapse the two elements of an erroneous outcome claim into one.  If a plaintiff could satisfy the gender bias element by merely pleading that the decision was erroneous, the gender bias element would have no purpose.  But the requirement that a plaintiff actually plead evidence of a gender bias is essential to a Title IX claim.  *See Yusuf*, 35 F.3d at 715 ("[A]llegations of a procedurally or otherwise

---

[2] Plaintiff incorrectly asserts that this holding in *GMU* was addressing an equal protection clause claim.  *See* Opp. at 26.  While the court did hold that the plaintiff's allegations were insufficient to state an equal protection claim, the court also rejected the plaintiff's attempt to state an erroneous outcome claim based on this argument.  *See GMU*, 132 F. Supp. 3d at 732-33.

**A885**

flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegations of gender discrimination is not sufficient to survive a motion to dismiss.").

Equally unavailing is Plaintiff's argument that "[g]ender bias can be inferred from the manner in which university officials treat a male Title IX respondent as compared to the female complainant(s)."  Opp. at 21; *see also id.* at 23 (bullet point i) (asserting Dr. Hammat treated Plaintiff different than Complainants).[3]  Again, *GMU* addressed this very argument:  "even if one accepts that [the defendant] treated [the complainant] more favorably than he treated plaintiff, it does not necessarily—or even plausibly—follow that it was because plaintiff is a male.  As one district court noted recently in a similar case, a number of lawful, independent goals could have motivated any disparate treatment. . . . And, in the absence of any specific factual allegations pointing to such a bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable." 132 F. Supp. 3d at 733. Additionally, as the court in *GMU* explained, "Title IX does not impose liability for disparate impact."  *Id.* at 733.

Plaintiff also cannot satisfy the gender bias element based on his allegations of "pressure" Mason supposedly faced, a point that Plaintiff's brief all but concedes.  Plaintiff admits that these allegations at most provide a "'backdrop' for gender bias."  Opp. at 26.  Plaintiff also does not contest or attempt to distinguish the long line of cases cited in Mason's opening brief which have found no basis to infer gender bias based on allegations about the Dear Colleague letters, government investigations, or public pressure to address sexual assault on campus.  *See* Mot. at

---

[3] Plaintiff cites *Marymount* in support of this argument but there the court's finding that gender bias had been alleged was based solely on a statement by the adjudicator that indicated he believed men would always enjoy sexual contact regardless of whether it was consensual.  297 F. Supp. 3d at 587.  It, therefore, provides no support for Plaintiff's argument.

16-17.[4]  The opposition simply relists the allegations made in the Complaint without providing a

single argument for why these allegations demonstrate gender bias.  Plaintiff also has no

substantive response to Mason's argument that to the extent public pressure is relevant, his

allegations demonstrate that Mason faced equal if not greater public pressure to ensure a fair

process for those accused of sexual assault.  *Id.* at 18-19.  Finally, Plaintiff has no response to

Mason's argument that his own allegations about how Mason chose not to rescind its hiring of

Justice Kavanaugh (a male accused of sexual assault) despite public pressure disproves his

allegations of gender bias.  *Id.*  As Mason explained in its opening brief, and Plaintiff does not

contest, Plaintiff's own allegations have pled him out of an erroneous outcome claim by

demonstrating that Mason is not biased against males.  *Id.*

### C.  Plaintiff Has Not Plausibly Alleged that Gender Bias Was a Motivating Factor Behind the Finding in His Case.

Even assuming that Plaintiff had plausibly alleged that Dr. Hammat and Mr. Williams did

harbor a gender bias (he has not), that would still be insufficient to plead an erroneous outcome

claim.  To plausibly plead an erroneous claim, Plaintiff cannot merely plead the existence of

gender bias, he must "allege particular circumstances suggesting that gender bias was a

*motivating factor* behind the erroneous finding." *Yusuf*, 35 F. 3d at 715 (emphasis added).  There

must be a "causal connection" between the outcome and gender bias.  *Id.*  This is because Title

IX, which is the statutory basis of an erroneous outcome claim, only "bars the imposition of

university discipline where gender is a *motivating factor* in the decision to discipline."  *Id.*

(emphasis added).  This is particularly the case in the Fourth Circuit where that court has held, in

---

[4] Plaintiff incorrectly claims that Mason has "conceded" that such allegations can provide a "backdrop" for gender bias.  Opp. at 27.  To the contrary, Mason's opening brief cited a litany of cases holding that these allegations provide no evidence of a gender bias.

# A887

Case 1:19-cv-01249-LO-MSN   Document 45   Filed 02/05/20   Page 11 of 22 PageID# 1421

the analogous Title VII context, that a plaintiff must plead facts that support a "reasonable inference that the decisionmakers were *motivated by bias*."  *McCleary-Evans v. Md. DOT*, 780 F.3d 582, 585-86 (4th Cir. 2015) (emphasis removed and added).[5]  Merely alleging that a decision was made because the "decisionmakers were biased is simply too conclusory," because "only speculation can fill the gaps."  *Id.*

Here, Plaintiff has failed to fill the gap between his allegations of gender bias and the outcome of his case; instead he asks the court to speculate that the reason Mason found Plaintiff responsible for Title IX violations is gender bias.  For example, there is no basis to infer that Dr. Hammat or Mr. Williams' decision in Plaintiff's case was motivated by gender bias based on one-off statements made years before Plaintiff's Title IX investigation and that have nothing to do with Plaintiff's case, or even sexual harassment claims.  Indeed, the Complaint only alleges that the assertions about the statements by Dr. Hammat and Mr. Williams and the pressure on Mason *"suggest* that gender bias was a motivating factor" in the outcome of his case.  Compl. ¶¶ 484 & 485 (emphasis added).  Merely suggesting the possibility that gender bias was a motivating factor—as Plaintiff states is the most his allegations do—does not meet the requirements of *Twombly* to plausibly allege that gender bias was a motivating factor.  *See McCleary-Evans*, 780 F.3d at 586 (allegations must be more than just "*consistent* with discrimination," they must "support a *reasonable inference* that the decisionmakers were motivated by bias").

---

[5] Courts look to Title VII law to interpret Title IX.  *See Yusuf*, 35 F.3d at 714; *see also Marymount*, 297 F. Supp. 3d at 581 n.9 (looking to *McCleary-Evans* to determine the correct standard of review for Title IX case).

**A888**

Regardless of whether Plaintiff has properly alleged that Dr. Hammat or Mr. Williams have some gender bias (and again he has not), his claim cannot proceed without some allegation connecting the dots between the supposed gender bias and the outcome of his case.  That crucial "causal connection" is wholly lacking in Plaintiff's complaint.

## II.    PLAINTIFF HAS NOT PLAUSIBLY ALLEGED THAT THE OUTCOME OF HIS TITLE IX CASE WAS ERRONEOUS.

As in his complaint, Plaintiff's opposition again admits that most of the factual findings of Mason's Title IX investigation are correct.  He admits to repeatedly having conversations with graduate students about his own sexual experiences, their sexual experiences and pornographic preferences, and even visiting a strip club with graduate students where he "joked" about blackmailing a student with a photograph of her receiving a lap dance.  There is no question that Mason's conclusions that these events occurred are correct.

Having admitted to the conduct, Plaintiff's only argument is to ask this Court to second guess Mason's judgment that Plaintiff's admitted conduct constituted sexual harassment under Mason's sexual misconduct policies.  The Court should not do so.  *See Doe v. Wash. Univ.*, No. 19 CV 300, 2020 U.S. Dist. LEXIS 9525, at *48-51 (E.D. Mo. Jan. 21, 2020) (finding no allegation of articulable doubt about the outcome of a Title IX hearing based on university's credibility determination because such a judgement call was "fully within the purview of a university disciplinary hearing panel").  Plaintiff was found responsible for sexual harassment based on "repeated instances of sexual conversations and physical interactions with students [he] supervises and teaches which indicate a lack of appropriate professional boundaries and combine to create a hostile environment for students in the program."[6]  Mot. Ex. 5-8.  Having admitted in

---

[6] Plaintiff opens his opposition by arguing that Mason "misstates the standards applicable to sexual harassment claims."  Opp. at 7.  But Plaintiff's straw horse argument is responding to a

his complaint to "repeated instances of sexual conversations and physical interactions with students [he] supervises and teaches," Plaintiff cannot plausibly allege that Mason's determination was erroneous.[7]   As the OCR 2001 Guidance that Plaintiff is fond of citing states, "[i]n most cases, a hostile environment will exist if there is a pattern or practice of harassment." Opp. Ex. 1 at 6.

Nor has Plaintiff alleged a plausible basis to doubt the accuracy of the outcome based on "flaws in the process."  Opp. at 16.  As an initial matter, Plaintiff wrongly asserts that "[Mason] incorrectly presumes that in order to adequately plead a Title IX claim against a state university a plaintiff must plead a due process claim."  Opp. at 15 n.10.  Mason did not presume anything; it is Plaintiff's complaint that asserts that the process was flawed because he "was deprived of due process in all respects" and then lists the ways in which Plaintiff believes he was denied due process.  Compl. ¶ 483.  Mason was responding to Plaintiff's allegation that the process was flawed because he was denied due process; Plaintiff cannot change his allegations in his opposition.  Moreover, Plaintiff is wrong on the law.  In *Loh*, 2018 U.S. Dist. LEXIS 53619, at *25, the court relied on its findings that the plaintiff had received adequate due process to find that he had not "plausibly alleged a procedurally or otherwise flawed process."  Regardless,

---

statement in Mason's Factual Background section about what the Complainants alleged, not any argument that Mason made.   Regardless, Plaintiff is the one misstating the standard for sexual harassment under Mason's policy, which is all that Plaintiff has been found to have violated. Mason's sexual misconduct policy defines harassment as including conduct that interferes with another person's academic or work environment.  *See* Mot. Exs. 1A, 3A, 3C, 4A, 4C.

[7] Plaintiff's argument that he denied some of the findings is irrelevant because he was not found responsible for sexual harassment based on any single instance, but rather based on a pattern of behavior.

**A890**

Mason argued in its opening brief both that Plaintiff was not denied due process and that there were no procedural irregularities.  *See, e.g.*, Mot. at 23, 28.

Plaintiff cannot contest that he received notice which contained detailed descriptions of the allegations against him*, see* Mot. Ex. 1-4, that he had four opportunities to be heard (three interviews with Dr. Hammat and an appeal to Mr. Williams), and that he had the opportunity to present his side of the story both to Dr. Hammat and in his 38-page appeal to Mr. Williams, *see* Mot. at 24-25.  Mason's opening brief also discussed in detail why Plaintiff's list of 26 supposed flaws in the process were either demonstrably false (based on incorporated documents) or conclusory allegations.  Mot. at 25-28.  Plaintiff's opposition abandons all but eight of his allegations, and for those eight he merely repeats the conclusory or incorrect allegations without responding to Mason's arguments.  None demonstrate a procedurally flawed process, let alone plausibly allege a basis to doubt the outcome of Plaintiff's Title IX matter.

*First*, Plaintiff repeats his *ipse dixit* allegations that Dr. Hammat and Mr. Williams had a conflict of interest in deciding Plaintiff's case because they are also responsible for enforcing Mason's Title IX policy.  But Plaintiff does not explain why those two roles are in conflict with each other.  Nor could he because being responsible for enforcing the policy includes identifying and addressing violations of the policy.  Likewise, Plaintiff's conclusory allegations that Dr. Hammat and Mr. Williams "exhibited bias" in their decision making is entitled to no weight, and, as demonstrated above, Plaintiff has failed to allege any facts that demonstrate either were actually biased.  Nor has Mason admitted, tentatively or otherwise, that Dr. Hammat or Mr. Williams are biased.  *See, e.g.,* Mot. at 9-10 ("Plaintiff's allegations, however, do not even demonstrate that Dr. Hammat or Mr. Williams are biased against perpetrators of sexual misconduct.").  Also, as discussed above, Plaintiff cannot plausibly plead bias by alleging

13

**A891**

disagreement with how Dr. Hammat or Mr. Williams weighed the evidence or handled the investigation. *GMU*, 132 F. Supp. 3d at 733 ("[I]n the absence of any specific factual allegations pointing to such a bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable."); *see also Doe v. Univ. of Arkansas-Fayetteville*, No. 18-CV-05182, 2019 U.S. Dist. LEXIS 57889, at *40-41 (W.D. Ark. Apr. 3, 2019) ("credibility determination" by hearing panel not a basis to "allege articulable doubt on the accuracy of the hearing panel outcome"). To the contrary, "there is a presumption that government officials can and will decide particular controversies conscientiously and fairly." *Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986).[8]

    *Second*, Plaintiff's allegations about the Complainants' motives are (1) completely conclusory, *see, e.g.,* Compl. ¶ 378, (2) irrelevant given that Plaintiff corroborated most of their allegations against him, and (3) not a procedural defect.

    *Third*, Plaintiff continues to misread Mason's policies which do not prohibit investigating allegations that that are filed more than 180 days after the incident. *See* Mot. at 26. It is Plaintiff who is ignoring the plain language of the policy which is permissive and does not preclude Mason from investigating older allegations (or allegations filed by students after they have graduated). Additionally, Plaintiff cannot satisfy his pleading requirement by alleging a mere technical violation of Mason's policies. Rather, he must allege a procedural flaw that plausibly casts doubt on the outcome of the proceeding. *See Yusuf*, 35 F.3d at 715 (requiring "procedural

---

[8] Plaintiff's reliance on *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) is misplaced because the court in that case applied the *McDonnell Douglas* lower pleading standard, *i.e.*, that the "alleged facts need support only a minimal inference of bias," instead of the *Twombly* plausibility standard. As the court in *Marymount* found, this lower pleading standard is incompatible with *McCleary-Evans*, and the Fourth Circuit would require a Title IX complaint to meet the *Twombly* plausibility standard. *Marymount*, 297 F. Supp. at 581 n.9.

**A892**

flaw affecting the proof").  Whether or not Mason technically followed its policy regarding the time limit for complaints does not cast any doubt on Mason's conclusions.

*Fourth*, Plaintiff's assertion that the notices he received from Dr. Hammat "noted only that potential violations of varying sexual misconduct policies had been alleged," Opp. at 18, is demonstrably false.  The Court has before it the notices that Plaintiff received, Mot. Ex. 1-4, which clearly show that Plaintiff was told in detail what the allegations against him were and that he was being investigated for violating Mason's sexual misconduct policy.  *See Linton v. Frederick Cnty. Bd. of Cnty. Comm'rs.*, 964 F.2d 1436, 1439 (4th Cir. 1992) ("Notice is sufficient [ ] if it apprises the vulnerable party of the nature of the charges and general evidence against him.").  Additionally the notices provided Plaintiff with all of the applicable policies and procedures; if Plaintiff was truly confused about what policies and procedures applied he could have asked Dr. Hammat either by email or during any of his three interviews with her.  Similarly, Plaintiff's argument that the notices did not identify the specific policy provisions is disingenuous at best.  Given the allegations, there would have been no reason for Plaintiff to believe he was being investigated for any of the other conduct prohibited by Mason's policies such as sexual assault, domestic violence, or stalking.  And again, if Plaintiff was actually confused by this, he could have asked for clarification.

Moreover, that the Letters of Determination described the findings differently than how the notices described the allegations, is not a procedural flaw.  That is the very purpose of an investigation, to determine which of the allegations are correct and whether there is any additional relevant information.  Plaintiff certainly had notice of the "nature of the charges" against him, i.e., inappropriate sexual conversations with graduate students, and was able to respond to that charge.  *Id.*  And to the extent that Plaintiff was truly unable to respond to any

allegation during the investigation, he was aware of all of the findings before filing his appeal and had an opportunity to address them in his 36-page appeal.  Indeed, the Complaint admits that Plaintiff did respond to these supposedly "new" allegations in his appeal.  *See* Compl. ¶ 372 ("Plaintiff submitted new evidence on appeal that refuted the findings made in the Letters of Determination, a number of which were based on allegations of which Plaintiff had no notice as they appeared in the Letters of Determination for the first time."); *see also id.* ¶¶ 321, 323, & 365 (explaining response on appeal to supposed "new" findings).

The Complaint demonstrates that Plaintiff did have an opportunity to respond to each of the findings against him before a final decision was made or any sanctions were imposed, and it identifies no argument that Plaintiff was unable to make because of lack of notice.  As such, Plaintiff cannot claim a procedural defect based on lack of notice.  *Loh*, 2018 U.S. Dist. LEXIS 53619, at *20, (rejecting inadequate notice argument where "Complaint and the incorporated attachments show that [plaintiff] presented to [the hearing officer] all of the arguments and defenses of which he now claims to have been deprived").

*Fifth*, Plaintiff continues to assert a flawed process because he was not given access to "all of the evidence gathered during the Title IX investigation," but he does not dispute that "[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive explanation be afforded as to permit [plaintiff] to identify the conduct giving rise to the dismissal and thereby enable him to make a response."  *Linton*, 964 F.2d at 1440.  Again, Plaintiff was given a detailed description of the allegations against him in the notices.  That notice was sufficient for Plaintiff to compile "a list of witnesses," "over 150 pages" of documents, and prepare to respond to the allegations during his interviews.  Compl. ¶¶ 153-54; Mot. at 25 (citing allegations in complaint showing Plaintiff had opportunity to and did

16

**A894**

Case 1:19-cv-01249-LO-MSN  Document 45  Filed 02/05/20  Page 18 of 22 PageID# 1428

respond to allegations during meetings with Dr. Hammat). There was no requirement that Mason provide Plaintiff with all of the information from the investigation.

*Sixth*, Plaintiff reasserts that he was not given an opportunity to cross examine, but does not contest that he had no right to cross examine his accusers in an academic or employee discipline matter.[9] *See Butler v. Rector & Bd. of Visitors of the College of William & Mary*, 121 Fed. Appx. 515, 520 (4th Cir. 2005) (no right of cross examination in academic context). Plaintiff's argument, if accepted, would turn every employee discipline matter into a mini-trial.

*Seventh*, Plaintiff continues to argue that he was not provided with a hearing, despite his own Complaint admitting that (1) he had four opportunities to be heard before a final decision was made and (2) that he was able to share his side of the story and respond to the allegations. *See* Mot. at 25, *see also Loh*, 2018 U.S. Dist. LEXIS 53619, at *20. Plaintiff's arguments for why the four hearings he received were inadequate have already been addressed above.

*Finally,* Plaintiff argues that Dr. Hammat did not apply the preponderance of the evidence standard but his only basis for this conclusory assertion is that he disagrees with the way Dr. Hammat weighed the evidence. *See* Opp. at 20. That Plaintiff would have weighed the evidence differently is not a basis to plausibly allege that Dr. Hammat did not apply the preponderance of the evidence standard. Moreover, even if Plaintiff were correct, it would not matter because he had the opportunity to and did appeal Dr. Hammat's decision to Mr. Williams. Plaintiff does not allege that Mr. Williams, the final arbiter of whether Plaintiff would be held responsible, failed to apply the preponderance of the evidence standard.

---

[9] Plaintiff's reliance on *Marymount* to support this argument is again misplaced. The Court in *Marymount* merely noted that one of the plaintiff's alleged procedural flaws was that he was not allowed the opportunity to cross examine. The court did not state one way or another whether it agreed that the lack of cross examination specifically was a procedural flaw.

**A895**

\*   \*   \*

In order to state an erroneous outcome claim, Plaintiff must have alleged some fact that makes it plausible that the outcome of his Title IX matter was erroneous.  While some courts have set the bar to pleading this element low, those courts have not been true to the requirements of *Twombly* that a plaintiff must plausibly plead each element of his claim.  Moreover, allowing erroneous outcome claims to proceed based on the mere possibility that the outcome was incorrect, undercuts the ability of universities to address sexual misconduct on campuses.  Pleading disagreement with the outcome, identifying evidence that could have been weighed differently, or identifying procedural issues that did not impact a plaintiff's ability to respond to the allegations against him, might suggest a *possibility* that the outcome was erroneous, but they do not make it *plausible*.  This is especially the case here, where Plaintiff has admitted to most of the conduct and has admitted that he received numerous opportunities to and did respond to the allegations against him.  *See Yusuf*, 35 F.3d at 715. ("If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail.").  Holding Plaintiff to the requirements of *Twombly*, he has not plausibly alleged that the outcome of his case was erroneous.

## III.    THE SELECTIVE ENFORCEMENT CLAIM MUST BE DISMISSED.

Plaintiff does not contest that in order to plead a selective enforcement claim he must plead a valid female comparator.  Nor does he contest that he has failed to do so.  Instead he argues that his claim should be allowed to proceed based on "information and belief" allegations that merely state the elements of a selective enforcement claim.  But "a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Carter v. Va. Dep't of Game & Inland Fisheries*, No. 16cv661, 2018 U.S. Dist.

**A896**

LEXIS 126328, at *19-20 (E.D. Va. July 27, 2018) (information and belief allegations that are "unsupportable conclusory talismanic statements" are insufficient to state a claim).

The problem with Plaintiff's allegations are not that they are on "information and belief," it is the generic and conclusory nature of the allegations.  "If Plaintiff has 'information' supporting [his] allegation[s], he must provide enough to nudge his Complaint over the plausibility threshold; asserting mere 'belief' is exactly what the Supreme Court rejected in *Twombly* and *Iqbal*."  *Turner v. Va. Dep't of Med. Assist. Servs.*, 230 F. Supp. 3d 498, 510 (W.D. Va. 2017).  For Plaintiff to have made his information and belief allegations in good faith, he must actually be aware, albeit based on second-hand information, of some female faculty member who was treated differently than him.  Otherwise, Plaintiff is not pleading on information and belief, he is merely speculating (and not complying with Rule 8 or Rule 11).  *See Carter*, 2018 U.S. Dist. LEXIS 126328, at *19-20 (rejecting claim based solely on information and belief allegations where plaintiff did not identify "sources of second-hand information giving rise to any probable inference to support" the allegations); *Verfuerth v. Orion Energy Sys.*, 65 F. Supp. 3d 640, 647 (E.D. Wisc. 2014) (explaining that phrase '"information and belief' comes straight out of Rule 11" and rejecting claim pled on information and belief because plaintiff had not explained "why such a claim might be likely to have evidentiary support at some time").  Information and belief allegations are "not a license to undertake a fishing expedition."  *Id.* at 647.

In order to state a selective enforcement claim, Plaintiff must plead—on "information and belief" or otherwise—some specific valid female comparator.  If Plaintiff truly has some "information" to support his generic allegations, that should not be difficult.

**A897**

### CONCLUSION

For the reasons stated herein and in Mason's opening brief, Plaintiff's Title IX claims

against Mason (Count I) should be dismissed with prejudice.

February 5, 2020                          RESPECTFULLY SUBMITTED

_____/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

*Attorney for The Rector & Visitors of George Mason University*

**A898**

CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2020, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to counsel of record in this case.

_____/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

**A899**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-cv-01249 |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS JENNIFER HAMMAT, JULIAN WILLIAMS, KEITH RENSHAW, ANN ARDIS, AND S. DAVID WU'S**
**MOTION TO DISMISS COUNTS II-IV**

**A900**

Plaintiff's remaining claims against the Individual Defendants must be dismissed. Plaintiff does not dispute that he remains a tenured full professor at Mason. He, therefore, cannot assert that he has been deprived of the sole property interest he has alleged, his tenured position. Plaintiff has no property interest in mentoring graduate students or being part of a program within his department. Similarly, Plaintiff cannot allege a deprivation of a liberty interest because he has not been terminated or demoted nor have the charges against Plaintiff been published to potential employers. Plaintiff's due process claim also fails because (1) an employee who has not been terminated is not entitled to notice and a hearing and (2) to the extent that minimum due process was required, Plaintiff received it both in his Title IX matter and in the faculty grievance matter.[1] Finally, Plaintiff's First Amendment claim fails because his sharing of personal sexual experiences in his role as a university faculty member is not protected speech.

## I.     PLAINTIFF'S DUE PROCESS CLAIMS MUST BE DISMISSED.

### A.  Plaintiff Was Not Deprived of a Constitutionally Protected Property Interest.

Plaintiff does not dispute that the only "property interest" he has alleged is his "tenured position as a full professor." Compl. ¶ 502. Nor does he dispute that he continues to be a tenured full professor at Mason and receive the full salary due under his employment contract. He, therefore, has not been deprived of the sole property interest alleged in his complaint.

---

[1] Plaintiff's brief concedes that he has not stated a due process claim against Provost Wu or Dean Ardis. *See* Opp. at 5 n.1. Despite conceding that he has not alleged any due process violations by these defendants, Plaintiff seeks to maintain his claims against them in their official capacity. Having failed to allege that either of these individuals violated his due process rights in their personal or official capacity, the claims against them must be dismissed. Additionally, Plaintiff's contention that these individuals may be necessary to effectuate any injunctive relief is incorrect. If the Court were to order injunctive relief in favor of Plaintiff, Mason would comply regardless of whether Dean Ardis or Provost Wu remain defendants in their official capacity.

Plaintiff incorrectly claims that there is no "bright line rule in this Circuit that *requires* that a public employee be terminated in order to plausibly allege a deprivation of his or her property interest in continuing employment." Opp. at 6. The Fourth Circuit drew that bright line in *Huang v. Bd. of Govs. of Univ. of N.C.*, 902 F.2d 1134, 1141 (4th Cir. 1990) where the court held that it was "beyond dispute" that a professor who "remained a tenured professor in the University at the same or effectively greater salary" had not be "deprived of [his property] right" in his tenured position.

Plaintiff's attempts to dispute this bright line rule based on district court cases are all unavailing. In each of the cases cited by Plaintiff, the court identified a property right *other than tenured employment* that the plaintiff was denied. In *Garner v. Steger*, 69 F. Supp. 3d 581 (W.D. Va. 2014) the plaintiff was both demoted from "executive director" to a "position that reports to the executive director" and lost "a $500,000 annual laboratory subsidy" that was provided for in his contract. *Id.* at 585, 591. Based on specific provisions in Virginia Tech's faculty handbook, the court held that it was "at least plausible that Garner had a property interest in his position as Executive Director." *Id.* at 591. The property interest in *Garner* was not in remaining a tenured professor; it was in remaining the Executive Director, a role from which Garner was undeniably terminated. In *Willis v. City of Va. Beach*, 90 F. Supp. 3d 597 (E.D. Va. 2015) and *Wilkinson v. School Bd. Of Cnty. of Henrico*, 566 F. Supp. 766 (E.D. Va. 1983) the court found that state statutes created a property right in not being suspended for the specific types of employees at issue (police officer and teacher), which the plaintiffs were deprived of when they were suspended. *See* 90 F. Supp. 3d at 613; 566 F. Supp. at 769.[2] These cases, along with *Huang*, all

---

[2] *Ridpath v. Board of Gov. Marshall Univ.*, 447 F. 3d 292 (4th Cir. 2006), is completely inapposite because the plaintiff there only alleged a liberty interest.

2

**A902**

stand for the common sense principal that whatever property right a plaintiff has, in order to state

a due process claim he must have lost it.  Again, Plaintiff concedes that he has not been deprived

of the sole property right alleged, his tenured full professor position.  As in *Huang*, this

forecloses Plaintiff's due process claim based on a property interest.[3]

Plaintiff also does not dispute that he has no property interest in the only things he has

lost temporarily:[4]  membership in a program within Mason's Psychology Department, the ability

to mentor graduate students who are part of that program, the ability to teach graduate courses,

and (allegedly)[5] eligibility for salary increases.  Plaintiff may have a desire to retain these

privileges, but he has not identified anything in his contract, the Faculty Handbook, or anything

else that gives him a property right to be part of a particular program, mentor graduate students,

---

[3] Even if Plaintiff were correct that something less than termination could give rise to a property interest, the cases he cites would still not support his claim because unlike the plaintiffs in those cases he has not been transferred to a new department, been demoted, lost a title, or been suspended.  Similarly, the out of circuit decision in *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F. 3d 895 (8th Cir. 1994), also does not help Plaintiff.  There, the plaintiff was transferred to a new school.  Moreover, in *Huang*, the faculty member was transferred to a new school and the Fourth Circuit still held that there was no deprivation of a due process right.  Therefore, in this circuit a transfer is not sufficient to invoke the due process clause.

[4] Plaintiff spends much of his opposition speculating that the probationary period *might* be extended beyond four semesters.  But Plaintiff's speculation about what might happen in the future cannot be credited on a motion to dismiss.  The only *fact* regarding the duration of his probation that Plaintiff can plead is that it is scheduled to end after the Summer 2021 semester.  Plaintiff also speculates that he may receive poor evaluations in the future because of his inability to mentor graduate students.  These assertions regarding evaluations do not appear in the Complaint and are therefore not properly before the Court.  Even if they were alleged in the Complaint, they would be conclusory allegations based on Plaintiff's speculation about possible future events and would be entitled to no weight.

[5] In addition to being irrelevant, *see infra*, Plaintiff's assertion that he did not receive a raise and is not eligible to receive a raise is false.  Plaintiff received a 3% raise in the summer of 2019.  While the Court must credit Plaintiff's allegations, he is once again making assertions that cannot be reconciled with Rule 11.  Additionally, Plaintiff's claims about whether he will receive future salary increases is speculative and need not be credited by the Court.

**A903**

teach graduate courses, or receive salary increases.  "To have a property interest . . ., a person

clearly must have more than an abstract need or desire for it.  He must have more than a

unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd.*

*of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Moreover, as explained in the Individual

Defendant's opening brief, Plaintiff's contract explicitly demonstrates that Plaintiff does not

have a property interest in being part of any particular program or department or any particular

job duty.  *See* Mot. Ex. 5 ("The University reserves the right to change your assignment, as well

as your physical location, at any time during your employment, and you may be reassigned

duties as determined by the University.").

Plaintiff's only argument appears to be that the sanctions, specifically losing the ability to

work with graduate students in conducting research, will somehow prevent him from fulfilling

his role as a faculty member.  *See* Opp. at 12 ("professor's inability to utilize graduate students to

conduct research can hobble a given project and result in a loss of funding"); *id*. at 14 (asserting

that he is "no longer effectively employed" because of sanctions).  This argument fails for a

number of reasons.  *First*, the underlying premise of this argument is wrong; Plaintiff still has the

ability to work with graduate students in conducting his research.  Under the sanctions imposed

in the Title IX matter, Plaintiff was able to continue to mentor and supervise students he was

currently working with if they chose to continue to work with him.  Mot. Ex. 1.  Additionally

those sanctions did not prohibit Plaintiff from having other graduate students work in his lab, just

that he could not serve as their mentor or supervisor.  When Plaintiff was disaffiliated from his

program, he could still work with graduate students.  Dr. Renshaw's letter to Plaintiff regarding

his disaffiliation from the program clearly states:  "Please note these changes do *not* prohibit

doctoral students in the [  ] program from working with you on non-related program research,

**A904**

nor do they prohibit such students from electing to work for you as Graduate Research Assistants, if you have independent funding for them." Opp. Ex. G at 4. Additionally, Plaintiff does not, and could not, allege that he is barred from conducting research with graduate students from other programs or departments.[6] *Second*, nothing prevents Plaintiff from conducting research with undergraduates, post-doctoral students, or fellow faculty members. While it might be more difficult for Plaintiff to conduct research without the "middle management" Plaintiff asserts is provided by graduate students, that Plaintiff (the "CEO") may have to work harder to complete his research does not create a due process claim. *Third*, as demonstrated in the Individual Defendants' opening brief, conducting research with graduate students is just one small part of Plaintiff's job responsibilities as a faculty member. Mot. at 9-10. Therefore, Plaintiff's conclusory assertion that he is no longer "effectively employed" and his hyperbolic assertion that he has been "stripp[ed] of every meaningful aspect of his professorship" is demonstrably false on the face of the Complaint.

　　*Finally*, even if the Court were to accept Plaintiff's argument that the sanctions have "effectively prevented Plaintiff from fulfilling his duties as a full professor," Compl. ¶ 394, his claim would still fail under *Royster v. Board of Trustees*, 774 F.2d 618 (4th Cir, 1985). In *Royster*, the Fourth Circuit held that a public employee who retained his job and salary but was relieved of all of his duties was not deprived of a property interest. *Royster* forecloses Plaintiff's argument because a public employee has no property interest in "actively engag[ing] in and execut[ing] the duties of his office." *Id.* at 621. The Fourth Circuit reaffirmed this holding in

---

[6] Plaintiff's allegation that "the only students who have shown interest in Plaintiff's research at GMU are in the program" is irrelevant. That Plaintiff might have to identify students from other departments interested in his research does not create a due process right.

5

**A905**

*Hibbits v. Buchanan Cnty. Sch. Bd.*, 433 Fed. Appx. 203, 206 (4th Cir. 2011), a case relied on by Plaintiff, where it reiterated that "the Fourteenth Amendment's due process right to property does not guarantee a right to a particular job, or the right to perform particular services."

Plaintiff attempts to distinguish *Royster* by asserting that he is a tenured employee, but this is irrelevant. The plaintiff in *Royster* also had a contractual right to his employment; the question was whether a property right in employment included the right to perform the duties of the job. Likewise, Plaintiff's allegation that he "has been deprived of salary increases," Opp. at 14, is irrelevant. *Royster* held that the due process right of employment was "satisfied by payment of the full compensation due under the contract." *Id.*; *see also Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990). Plaintiff does not allege that he has been deprived of the full compensation due to him under his contract, and he identifies nothing that gives him a property right to salary increases. To the contrary, Plaintiff alleges that he is not eligible for "merit-based pay raises," Compl. ¶ 399, which by definition are discretionary and not something to which Plaintiff is entitled.

The Fourth Circuit's holdings in *Huang* and *Royster* foreclose Plaintiff's claim that he has been deprived of a property interest because of restrictions Mason has put on his ability to work with graduate students. To allow Plaintiff's claim to proceed would create a due process claim every time an employer places a restriction or limitation on an employee. As the *Royster* Court recognized that would "make it impossible for a public employer, dissatisfied with an employee's performance, but without specific contractual cause to discharge him, to relieve the employee from his duties although willing to compensate the employee in full." 774 F.2d at 721. It would also be directly contrary to the Supreme Court's long standing instruction that "[t]he

6

federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop v. Wood*, 426 U.S. 341, 349 (1976).

Before the sanctions and disaffiliation from the program, Plaintiff was a tenured full professor. After the sanctions and disaffiliation, Plaintiff remains a tenured full professor. He has not been deprived of any constitutionally protected property right.

### B.  Plaintiff Has Not Been Deprived of a Liberty Interest.

Plaintiff's arguments that he has been deprived of a liberty interest fail as well. Plaintiff does not dispute that "for a liberty interest to have been implicated, some damage to [plaintiff's] employment status must have resulted from publication of the reasons for his demotion." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990). Here, Plaintiff has not been terminated or demoted and therefore cannot state a liberty interest claim. Plaintiff tries to argue that he has been "demoted," yet he still has the same job, with the same title and tenure, in the same department, and will earn the same salary. Plaintiff's situation is nothing like that of the plaintiffs in *Ridpath*, *Miller*, or *Hall*. In *Ridpath*, the court found that the plaintiff's transfer from head of compliance for the athletic department to a position in student judicial affairs was a demotion because it was both a "dramatic change of status" and he was "completely excluded from his chosen field of intercollegiate athletic administration." 447 F.3d at 311. Similarly in *Miller v. Hamm*, No. CCB-10-243, 2011 U.S. Dist. LEXIS 141 (D. Md. Jan. 3, 2011), the plaintiff, a police helicopter pilot, was transferred from the aviation division to the lower paid harbor foot patrol, which "excluded him from his chosen career—flying helicopters for law enforcement." *Id.* at *8, *36. In *Hall v. City of Newport News*, 469 Fed. Appx. 259 (4th Cir. 2012), the plaintiff was stripped of his police position (including "the police power to make stops, issue summons and warrants, and make arrests") and was put in a civilian position in the

records bureau, thus "exclude[ing] him from his trade or calling as a police officer." *Id.* 262-63. In each of those cases, the court found there was a demotion because the plaintiff was reassigned to a position outside his field of choice.

Plaintiff, on the other hand, has not been reassigned at all, let alone to a position outside his field of choice: he remains a tenured full professor of Psychology able to teach and perform research in his chosen field.[7] Indeed, in *Garner*, a case Plaintiff cites repeatedly, the court found that the plaintiff could not plausibly state a liberty interest claim because he "remain[ed] employed in the same field." 69 F. Supp. 3d at 595. The court also rejected the argument, identical to the one that Plaintiff makes here, that the loss of funding and certain aspects of his responsibilities meant that he had been "demoted" or that he was "excluded . . . from his trade or calling as a professor [and] scientific researcher." *Id.*; *see also Echtenkamp v. Loudon Cnty. Pub. Schs.*, 263 F. Supp. 2d 1043, 1057 (E.D. Va. 2003) (no liberty interest claim where plaintiff was put on a probationary period during which restrictions were placed on her and she was subject to increased supervision). Plaintiff's own case demonstrates that he has no liberty interest claim.

Even if Plaintiff had pled a demotion, his liberty interest claim would still fail because he has not alleged publication to potential employers or the general public. *See Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007) (requiring that potential employers are likely

---

[7] Plaintiff only argues that his disassociation from the program constitutes a demotion. *See* Opp. at 16. He does not argue that the sanctions Dr. Renshaw imposed on him at the conclusion of the Title IX case constitute a demotion (nor could he). As such, if the Court were to find that Plaintiff has plausibly pled a deprivation of a liberty interest based on the disaffiliation, the due process analysis would be limited to whether Plaintiff received due process during the faculty grievance process that resulted in his disaffiliation. Plaintiff has not alleged that Dr. Hammat or Mr. Williams had any role in that process, and therefore Plaintiff's due process claims against them would need to be dismissed.

to learn of charges against plaintiff).  Again the cases that Plaintiff cites do not help his case.  In *Garner*, the plaintiff alleged that the reason for his transfer became known by "the leaders of other institutions of higher learning," i.e., plaintiff's "prospective employers."  69 F. Supp. 3d at 593.  Plaintiff, here, has not alleged publication to any other institution of higher education or any other potential employer.  Regardless, the court in *Garner* explicitly stated that it was ***assuming but not deciding*** that publication occurred.  *Id.* ("[T]he court will assume without deciding that he has sufficiently pled the first, second, and fourth elements of the stigma plus test").  Therefore *Garner* provides no support for Plaintiff's claim.  Plaintiff's citation to *Cannon v. Village of Bald Head Island*¸ 891 F.3d 489, 503 (4th Cir. 2018), conveniently fails to mention that the employer there not only emailed all employees but also ***sent the discharge letters to the media***.  Plaintiff has not alleged any disclosure to the general public or to any potential employers; instead he has only pled that disclosures were made internal to Mason.  *See* Compl. ¶¶ 503-10.  As explained in the Individual Defendant's opening brief, "statements and comments made only in internal memoranda, during private conversations, and at meetings not attended by the general public" are insufficient to demonstrate public disclosure.  *See Willis*, 90 F. Supp. 3d at 617; *Echtenkamp*, 263 F. Supp. 2d at 1056 (same).

Not only has Plaintiff not pled that there has been a publication, he has failed to allege, as required by *Sciolino*, that the "stigmatizing charges [ ] are likely to be inspected by prospective employers."  480 F.3d at 649.  He has not pled that Mason has a practice of releasing personnel information to all employers or that Mason would release it to an employer to which he intends to apply.  *See id.*  Without such allegations, Plaintiff cannot state a liberty interest claim.  Nor could Plaintiff make such allegations consistent with Rule 11 because of DHRM Policy 6.05 which prohibits the disclosure of personnel information to third parties.  It does not help

9

Plaintiff's claim that the policy allows supervisors, high level managers, and companies providing services to the state (e.g. "health benefits, life insurance, Worker's Compensation") to view personnel records without the employees consent and that the records could be turned over in response to subpoenas or court orders, because none of those exceptions permit disclosure to potential employers of Plaintiff. Nor is it Defendants' responsibility to provide "insight into their actual practices," for disclosing personnel information; it is Plaintiff's burden to plead that Mason has a practice of disclosing personnel information to his prospective employers.[8] Plaintiff's complaint does not plead publication.

Finally, Plaintiff cannot state a liberty interest claim based on allegations that the sanctions imposed or his disaffiliation from the program (as opposed to the disclosure of the findings against him) were disclosed, *see, e.g.,* Compl. ¶ 506, Opp. at 17 n.10. First, a liberty interest is only implicated when the "charges" against a public employee are made public. *Sciolino*, 480 F.3d at 646; *see also Johnson*, 903 F.2d at 999 (requiring "publication of the *reasons* for his demotion") (emphasis added). Disclosure of the sanctions imposed on Plaintiff or that he has been disaffiliated from the program does not reveal the charges against him. Second, for a statement to implicate a liberty interest it must be false. *Sciolino*, 480 F.3d at 646. Plaintiff does not, and cannot, allege that it is false that he has been sanctioned or that he has

---

[8] Plaintiff's reliance on *Sciolino* to support his argument ignores that the applicable policy there permitted the employer to "reveal[ ] the employee's 'reason for leaving' the department" and the employer admitted that it did disclose personnel information to requesting employers in certain circumstances. *Id.* at 647 n.3. Plaintiff has made no such allegations here. Plaintiff's reliance on *Doe v. Rector & Visitors of George Mason University*, 149 F. Supp. 3d 602 (E.D. Va. 2016) ("*GMU*") is also misplaced. That case involved a student who was expelled for sexual misconduct. The court found sufficient publication because the student's transcript, which would "routinely" be requested by potential employers, bore "a notation that he was the subject of a non-academic expulsion." *Id.* at 614. Plaintiff has not identified a similar notation in his personnel record that will be routinely requested by prospective employers nor has he alleged that Mason would provide that notation to the employers.

10

**A910**

been disaffiliated from the program.  In *Miller*, a case cited by Plaintiff, the court found that the

plaintiff could not assert a liberty interest based on the statement that he had resigned while

under investigation, because it was not false.  2011 U.S. Dist. LEXIS 141, at *37-38 (rejecting

argument that liberty interest can be based on "innuendo, where the underlying statement is

true").  As such, Plaintiff cannot state a liberty claim based on disclosures that only state what

sanctions Plaintiff received or that he has been disaffiliated.[9]

### C.  Plaintiff Received Sufficient Due Process.

Even if Plaintiff pled a property or liberty interest, his due process claim would still fail.

As discussed in the Individual Defendant's opening brief, because Plaintiff was not terminated,

he was not entitled to the due process of a notice and hearing required by *Cleveland Bd. of Educ.*

*v. Loudermill*, 470 U.S. 532, 546 (1985).  The Supreme Court has been explicit that it has not

"decide[d] whether the protections of the Due Process Clause extend to discipline of tenured

public employees short of termination."  *Gilbert v. Homar*, 520 U.S. 924, 929 (1997).  In

*Echtenkamp*, 263 F. Supp. 2d at 1056, the court recognized that "the minimum process [plaintiff]

must be provided to satisfy the Due Process Clause is notice and a hearing before she is

terminated" and that because the plaintiff there had not been terminated, she could not "allege

that she had been denied such process."  Nor does *Hibbits* suggest otherwise as Plaintiff

contends; to the contrary, it supports the Individual Defendant's position.  The language Plaintiff

---

[9] For these reasons, Plaintiff's allegation that Mason disclosed the "sanctions imposed" on Plaintiff to the Complainants cannot be a basis for a liberty interest claim.  Compl. ¶ 506. Additionally, Mason is required to make this disclosure by the federal Title IX regulations.  It would put Mason (and every other university) in an impossible Catch-22 if this mandated disclosure could be used against the university to plead a due process claim.  Moreover, such disclosure is not to employers.  Therefore, it could not constitute publication under *Sciolino*. Respectfully, the language in *GMU* suggesting the disclosure to a Title IX complainant could constitute publication is wrong.

quotes confirms that "[t]he only process guaranteed by the Constitution is notice and a hearing before termination or deprivation of the protected property right." 433 Fed. Appx. at 205. As discussed above, Plaintiff has not pled any protected property right other than his employment. Additionally, in *Hibbits*, the Fourth Circuit **affirmed** the district court's decision that the employees who had been placed on probation, but not terminated, could not state a due process claim.[10] Therefore, even under the case cited by Plaintiff, he was not entitled to the minimum constitutional due process of a notice and hearing.

Assuming, *arguendo*, that Plaintiff was entitled to notice and a hearing, Plaintiff's own allegations demonstrate that he received that due process. As an initial matter, Plaintiff's brief conflates two distinct processes that must be separated for the due process inquiry. One process is the Title IX investigation and sanction ("Title IX process"), which involved Dr. Hammat, Mr. Williams, and Dr. Renshaw and resulted in only the sanctions listed in Dr. Renshaw's May 31, 2019 letter. *See* Mot. Ex. 1. The second process was the faculty grievance process ("Grievance Process") which involved a decision by the faculty grievance committee against Plaintiff and Dr. Renshaw and resulted in Plaintiff's disaffiliation from the program. To the extent that the Court reaches the question of whether Plaintiff received adequate due process, it is important to analyze these processes separately because (1) Plaintiff's due process claims are against

---

[10] Plaintiff's citation to *Willis* is misplaced for several reasons. First, the court did not say that notice and hearing are required in all circumstances, rather it said that if a plaintiff pleads a deprivation of a constitutionally protected right "then the court must determine what process is due and whether it was provided." 90 F. Supp. 3d at 613. Second, as discussed above, *Willis* involved a state statute that created a property right for police officers in not being suspended, which they were denied. That statute also "set[] forth the procedures which must be followed prior to . . . suspending" a police officer, which included notice and a hearing. *Id.* No such statute is implicated here, and, therefore, to the extent *Willis* can be read to require notice and a hearing in a non-termination situation, it is inapposite.

**A912**

individual defendants, and Dr. Hammat and Mr. Williams played no role in the Grievance Process and (2) each process resulted in different sanctions and the Court only needs to analyze each process if it concludes that the sanction resulting from that process deprived Plaintiff of a protected interest.

    1.   Plaintiff Received Due Process During the Grievance Process.

Plaintiff's allegations demonstrate that he received notice and a hearing during the Grievance Process.  The notice Plaintiff received from the grievance committee contained the full grievance filed against him and notified him that he had fifteen days to submit a written response.  *See* Mot. Ex. 3.  Additionally, Plaintiff has not identified anything that Dr. Renshaw, the only remaining defendant involved in the Grievance Process, did that deprived him of due process.  Nor could he because Dr. Renshaw was a ***respondent*** in the Grievance Process along with Plaintiff.   The only thing Plaintiff argues Dr. Renshaw did was follow the recommendation of the Grievance Committee and the instruction of his Dean.  *See* Opp. at 25.  Finally, none of Plaintiff's attempts to argue that Dr. Renshaw was biased, *id.* at 26, make sense, let alone demonstrate bias.  Plaintiff has not alleged that Dr. Renshaw (or any of the other Individual Defendants) deprived him of due process during the Grievance Process.[11]

    2.   Plaintiff Received Due Process During the Title IX Process.

Plaintiff's arguments about the Title IX process, *see* Opp. at 21-24, are a repeat of the same conclusory allegations about supposed bias on the part of Dr. Hammat and Mr. Williams

---

[11] Additionally, the Grievance Process occurred because nine members of the program determined that Plaintiff's continued membership in the program threatened its accreditation.  A committee made up of Plaintiff's faculty colleagues agreed with that concern and found that Plaintiff should disassociate or be disassociated.  The Dean of Plaintiff's college concurred.  This determination is the type of internal academic decision "made by faculty of public educational institutions" that courts are not well "suited to evaluate."  *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).

13

**A913**

and demonstrably incorrect allegations about the process that Plaintiff received.  All of these arguments are addressed in Mason's Motion to Dismiss Count I and Mason's reply brief.  In short: (1) none of Plaintiff's allegations about Dr. Hammat or Mr. Williams plausibly allege that they are biased against Plaintiff or that they have a conflict of interest; (2) Plaintiff's allegations and the documents incorporated (e.g., Mot. Exs. 7-10) demonstrate that Plaintiff received detailed notice of the allegations against him, was made sufficiently aware of the allegations in order to mount a defense, and had multiple opportunities to be heard during which he provided his defenses, *see LMP Holdings, LLC v. PLY Enters. LLC*, No. 12cv440, 2012 U.S. Dist. LEXIS 135551, at *6 (E.D. Va. Sept. 21, 2012) ("Where factual allegations in the complaint are contradicted by such documents, those allegations need not be afforded the presumption of truth normally granted to factual allegation contained within the complaint."); and (3) Plaintiff's disagreement with how Dr. Hammat and Mr. Williams weighed the evidence is not a basis to allege a lack of due process.

As for Dr. Renshaw, Plaintiff has still failed to identify any process that Dr. Renshaw was required to give him prior to deciding on the sanctions to impose.  Plaintiff asserts that he was not provided information about the sanction process or the ability to meet with Dr. Renshaw prior to the imposition of sanctions, but he has pointed to nothing that requires any additional due process prior to a sanctioning decision.

## II.    PLAINTIFF'S FIRST AMENDMENT CLAIM MUST BE DISMISSED.

Plaintiff does not dispute that in order for his statements to be protected they must be "on matters of public concern" and Plaintiff must be speaking "in [his] capacity as [a] private citizen[]," not as an employee.  *Urofsky v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000) (en banc). Plaintiff's claim fails on both requirements.

**A914**

Plaintiff's argument is that because he was discussing sex, his comments are a matter of public concern. This argument sweeps too far. Some discussions of sex certainly relate to matters of public concern; for example, the plaintiff in *Adams v. Tr. of the Univ. of N.C.*, which Plaintiff cites, wrote opinion columns on "topics such as academic freedom, civil rights, campus culture, sex, feminism, abortion, homosexuality, religion, and morality." 640 F.3d 550, 553, 565 (4th Cir. 2011). That is a far cry from Plaintiff telling stories about his personal sexual experiences and asking a student about her pornography preferences. Plaintiff's sexual escapades in a brothel in Germany, in Vietnam, or at a party in front of other people are not a matter of public concern. Plaintiff also argues that the Individual Defendants "resort to general assertions, without context" and point to "only a few of the statements at issue." Opp. at 28. But Plaintiff's brief does not identify any statement alleged in the complaint that does not relate to his or a student's personal sexual experiences.[12]

Plaintiff's claim also fails because he was speaking as an employee and not as a public citizen. Plaintiff does not deny that he has alleged that all of the statements at issue were made either in a class Plaintiff taught as a Mason faculty member or in conjunction with his research

---

[12] Plaintiff also claims that the Individual Defendants are "dead wrong" for asserting that statements he made in the classroom are "curricular speech" and therefore "*per se*" cannot be a matter of public concern. Opp. at 29. But Plaintiff's only support for this assertion is *Scallet*, which was decided **before** the Fourth Circuit held in *Boring* that curricular speech cannot be a matter of public concern because what is included in the curriculum of a class is "is nothing more than an ordinary employment dispute." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc). The Fourth Circuit reaffirmed that holding in *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007). It is also important to note that Mason's issue with Plaintiff's speech was not the subject matter he was teaching, but rather how he taught it. The issue was Plaintiff's decision to use a personal sexual story as part of his teaching. There is simply no reason why Plaintiff needed to use a personal sexual story in his classroom. To the extent it was necessary to use the example, Plaintiff could have used it without identifying himself as a participant.

15

conducted as a Mason faculty member.  There is no First Amendment protection for statements

made by someone in their role as an employee.  *See Urofsky*, 216 F.3d at 407.  *Urofsky* dealt

with speech that faculty members claimed was connected to their research, *see id.* at 405-06, and

the Fourth Circuit held that because it was related to their work as university employees, it was

not protected speech, *id.* at 409.  Plaintiff's reliance on *Adams* to suggest otherwise is again

misplaced.  Again, *Adams* dealt with a faculty member who was publishing opinion columns

separate from his work as a faculty member.  The court rejected the university's claim that

anything Adams wrote was related to his work because of the "general concept" that professors

engage in writing articles as part of their jobs.  640 F.3d at 564.  Here, the university is not trying

to sweep in extra-curricular statements Plaintiff made and assert that they were made as part of

his job based on "general concepts;" it is Plaintiff who is alleging that the statements were made

in the context of his teaching and research.  *See* Compl. ¶ 548.

### III.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Given Plaintiff's failure to plead a valid due process or First Amendment claim, the Court

need not reach the issue of qualified immunity.  However, to the extent that it finds that Plaintiff

has plausibly alleged a constitutional violation, the Individual Defendants are entitled to

qualified immunity because "[t]he unlawfulness of the official's conduct" was not "apparent in

light of pre-existing law."  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017).

As an initial matter, Plaintiff is wrong to suggest that qualified immunity should not be

resolved on a motion to dismiss.  To the contrary, "[b]ecause qualified immunity is an immunity

from suit, and not merely a defense to liability, courts must scrutinize and dismiss appropriate

cases on qualified immunity grounds early in the litigation.  Indeed, when a district court

declines to give a qualified immunity defense a hard look at an early stage in the litigation, either

# A916

pursuant to a Rule 12(b)(6) motion to dismiss or a summary judgment motion, it risks the forfeiture of some of the protections afforded by the defense because the immunity includes an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question."  *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (internal citations and quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) ("The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery.").  Indeed, qualified immunity is often granted on a motion to dismiss, including in *Garner*, which Plaintiff repeatedly cites.  *See* 69 F. Supp. 3d at 592.  The question before the court on qualified immunity is purely one of law:  taking Plaintiff's well-pled, non-conclusory allegations as true, is there any controlling law that clearly establishes that the Individual Defendants have violated Plaintiff's constitutional rights.

Plaintiff has failed to identify any controlling Supreme Court or Fourth Circuit law demonstrating that the Individual Defendant's actions violated clearly established law.  With regard to the due process claims, Plaintiff has not identified any clearly established law holding that Plaintiff had a property interest in mentoring graduate students or in being part of a specific program within his department.  Nor has he identified any clearly established law holding that the sanctions imposed on him constitute a demotion or that disclosures to people other than potential employers can be sufficient to state a liberty interest.  Indeed, the primary district court case Plaintiff cites to support his property right argument, *Garner*, held that the defendants were entitled to qualified immunity because there was "much legitimate debate" about whether the change of position in that case constituted a deprivation of a property interest, especially in light of *Royster* and *Huang*.  69 F. Supp. 3d at 592.  To the extent that the Court finds that Plaintiff

17

has plausibly pled a property or liberty interest, there is certainly a similar legitimate debate here on that issue.

The Individual Defendants are also entitled to qualified immunity on the due process claim because there is no clearly established law holding that Plaintiff was entitled to the minimum due process of a notice and hearing. The Supreme Court has explicitly stated: "we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." *Gilbert*, 520 U.S. at 929; *see also Myers v. Shaver*, 245 F. Supp. 2d 805, 815 (W.D. Va. 2003) ("[N]either the United States Supreme Court nor the Fourth Circuit has decided whether disciplinary action short of termination entitles an employee to notice and a hearing before the employer acts."). Even if Plaintiff could overcome this hurdle, he cannot overcome qualified immunity by pointing to the general concept that due process requires a notice and a hearing. *See Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011). Instead, he would need to point to clearly established law holding that under the "circumstances at hand," i.e., what he alleges Dr. Hammat, Mr. Williams, or Dr. Renshaw did or did not do, deprived him of due process. *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007). Plaintiff has pointed to no Supreme Court or Fourth Circuit case law holding that the specific allegations he makes about the Individual Defendants are sufficient to deprive him of due process.

Finally, on the First Amendment claim, Plaintiff's only response is a footnote where he cites to *Scallet* and *Adams*. *Scallet* is a district court case and, therefore, it (as well as all of the other district court cases Plaintiff cites in responding to the due process qualified immunity argument) are irrelevant. *See Booker*, 855 F.3d at 538 (look to Supreme Court and circuit court cases). As discussed above, *Adams* is distinguishable from the circumstances here. Moreover,

**A918**

given the case law cited above, it is at a minimum debatable whether Plaintiff's speech is protected by the First Amendment.

### CONCLUSION

After Plaintiff's 162 page complaint and the extensive briefing by both sides, it is necessary to step back and recognize what this case is actually about. Plaintiff made some inappropriate statements of a sexual nature to graduate students. When they complained, Mason investigated and found that Plaintiff's repeated sexual statements rose to the level of harassment. Mason then required sexual harassment training and put in place restrictions on Plaintiff's engagement with students for four semesters to ensure that the objectionable conduct stopped. Plaintiff was not suspended, demoted, transferred, deprived of tenure, put on leave, docked pay, or terminated. He just cannot do his job the way he wants to do it.

Subsequently, Plaintiff's faculty colleagues in one of the programs within the Psychology Department decided that they no longer wanted to be associated with him because of concern about the accreditation of the program. They used the faculty grievance process provided for in Mason's Faculty Handbook, and a committee of Plaintiff's faculty peers agreed that he should disaffiliate or be disaffiliated from the program. Again, Plaintiff was not suspended, demoted, transferred, deprived of tenure, put on leave, docked pay, or terminated. He just cannot be part of a program within his department.

Plaintiff clearly disagrees with and is upset about the outcome, but that does not give him a federal constitutional claim. *See Bishop*, 426 U.S. at 350 ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."). Nor are the federal courts the "appropriate forum" to review internal personnel decisions made by a university and its faculty. *Id.* Counts II, III, and IV must be dismissed with prejudice.

19

February 5, 2020                         RESPECTFULLY SUBMITTED

                              _____/s/_____

                              Eli S. Schlam, Asst. Atty. Gen.
                              Virginia Bar Number 92987
                              George Mason University
                              4400 University Drive,
                              MS 2A3
                              Fairfax, VA 22030
                              Phone: (703) 993-2619
                              Fax: (703) 993-2340
                              eschlam@gmu.edu

                              *Attorney for Individual Defendants*

20

CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2020, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to counsel of record in this case.

_____/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

**A921**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| JOHN DOE, | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) Civil Action No. 1:19-cv-1249 |
|  | ) Hon. Liam O'Grady |
| GEORGE MASON UNIVERSITY, et al., | ) |
|  | ) |
| *Defendants.* | ) |

### MEMORANDUM OPINION & ORDER

This matter is before the Court on a motion *in limine* to proceed by pseudonym and two motions to dismiss. Dkt. 2, Dkt. 26, Dkt. 29. The motions were fully briefed, and the Court dispensed with oral argument because it would not aid in the decisional process.

### I. BACKGROUND

Plaintiff John Doe ("Doe") is a tenured, full professor at George Mason University ("GMU"). Compl. ¶¶ 3, 28, 502. He has worked there for more than fifteen years, obtained tenure in 2008 and became a full professor in 2014. Compl. ¶ 28. He teaches courses involving human sexuality, abnormal behavior, and cultural norms, and he conducts related research. Compl. ¶ 30. He is an accomplished author, has been published on many occasions, and has received grants and awards during his career. Compl. ¶ 29.

Doe teaches and works within a particular GMU department (the "Department"). Dr. Keith Renshaw is another GMU professor, Doe's supervisor, and Chair of the Department. Compl. ¶¶ 22, 169. The Department falls within a College led by Dean Ann Ardis. Compl. ¶¶ 23, 178. Dr. S. David Wu is Provost of GMU. Compl. ¶ 24.

1

GMU has policies in place regarding the investigation and processing of sexual and gender-based harassment complaints. *See, e.g.*, Compl. ¶¶ 9-10. GMU staff involved in those proceedings include a Title IX investigator and a Title IX Coordinator. Compl. ¶¶ 9, 20. At all times relevant to this action, Ms. Megan Simmons held the investigator position and Dr. Jennifer Hammat held the Coordinator position. Compl. ¶¶ 20, 104, 146-49. The Coordinator, Dr. Hammat, was ultimately responsible for determining whether a policy violation occurred after an investigation. Compl. ¶¶ 50, 555. Any appeal of her findings would be decided by Mr. Julian Williams, the Vice President of GMU's Compliance, Diversity, and Ethics ("CDE") office. Compl. ¶¶ 21, 162.

### A. Title IX Allegations and Investigation

On December 4, 2018, Dr. Hammat notified Doe by email that four Title IX complaints had been filed against him. Compl. ¶ 136. Dr. Hammat sent one email notification per complaint. Compl. ¶ 136. Each email: 1) advised Doe "of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics," 2) specifically identified a complainant's allegations, including descriptions of the allegedly harassing conduct and the time frames within which that conduct occurred, and 3) included (as attachments) copies of the GMU harassment policy and grievance procedure which were in effect at the time of the alleged conduct. Pl.'s Opp'n to Mot. to Dismiss Count I, Exs. 4, 5, 6, 7 (Dkt. 38-4, 38-5, 38-6, 38-7) ("Exs. 4, 5, 6, 7").

All four complainants were current or former graduate students, knew each other, and were friends. Compl. ¶¶ 137, 140. Though the conduct they complained of occurred while they were students, Complainant 1 and Complainant 2 had graduated from GMU's graduate program at the time they filed their complaints. Compl. ¶ 142.

The complaints alleged that over a five-year period, the sexual nature of some of Doe's conduct made the complainants uncomfortable and interfered with their educations. *See generally* Compl. ¶¶ 247-365. The complained-of conduct occurred in a variety of contexts, from in-class discussions to conversations at bars, and from sharing a hot tub to a social outing "to a strip club" where Doe "received a lap dance." Compl. ¶ 345. Generally, the complainants identified Doe's statements and inquiries as the allegedly harassing behavior. *See* Exs. 4, 5, 6, 7.

GMU initiated an investigation into the complaints, during which Doe was interviewed three times. Compl. ¶¶ 141, 145, 146 (incorrectly pleading the year 2018), 149. Doe's first interview was conducted by Ms. Simmons, GMU's Title IX investigator at the time. Compl. ¶ 146. Doe complained about Ms. Simmons after this first interview, alleging she was biased. Compl. ¶ 148. Dr. Hammat, her supervisor, removed Ms. Simmons from Doe's investigation in response to his bias allegation, and she left GMU for another position at some time during the investigation into Doe. Compl. ¶¶ 147, 148. Thereafter, Dr. Hammat conducted the second and third Doe interviews herself. Compl. ¶ 149. In addition to his three interviews, Doe provided Dr. Hammat with a list of witnesses and over 150 pages of communications between him and the complainants, course evaluations, and photographs. Compl. ¶¶ 153, 154.

Both in the course of the investigation, and in his Complaint, Doe acknowledged that much of the complained-of behavior, the allegedly harassing conduct, did in fact occur:

- Complainant 1 alleged, and Doe acknowledges, that during class he told a detailed personal story about performing oral sex at a party. Compl. ¶ 252.

- Complainant 2 alleged, and Doe acknowledges, that he shared the number of sexual partners he has had with one of his classes. Compl. ¶ 292.

- Complainant 4 alleged, and Doe acknowledges, that he attended an academic conference with a group of graduate students and that he shared details of a personal, sexual

3

experience he had with them. The particular sexual experience he related occurred while he was married and while he was attending a professional workshop. Compl. ¶¶ 335, 353.

- Complainant 4 alleged, and Doe acknowledges,[1] that while he was at a bar with students, he repeatedly asked a female student about her personal pornography preferences. Compl. ¶ 337.

- Complainant 4 alleged, and Doe acknowledges, that he invited his graduate students to his home, entered his hot tub with them, and discussed his experience at a brothel. Compl. ¶ 341-42.

- Complainant 4 alleged, and Doe acknowledges, that he attended an academic conference with a group of graduate students and engaged them in a discussion regarding sexual encounters that occurred during that trip. Compl. ¶ 344.

- Complainant 4 alleged, and Doe acknowledges, that he attended a "bar, which had a strip club component" with four graduate students during an academic conference. Compl. ¶¶ 344, 347. While there, Doe accepted a lap dance paid for by Complainant 4 after another student had declined to accept. Compl. ¶ 347. Doe also took a photo of Complainant 4 receiving a lap dance, and "joke[d] about [] using the photo for blackmail." Compl. ¶ 347.

Dr. Hammat was the initial decisionmaker regarding whether Doe had violated GMU policy. Compl. ¶¶ 150, 158. She found that he had: on February 22, 2019, Doe received four "Letters of Determination," notifying him of Dr. Hammat's findings in regard to each complaint. Compl. ¶ 160. The Letters of Determination stated that CDE had concluded its investigation into

---

[1] This, he alleges, "was a typical conversation about the research conducted in [his] laboratory." Compl. ¶ 338.

4

**A925**

each complaint, that the investigation involved interviews and document review, and that the investigation "considered the factual information" which Doe had provided.  Pl.'s Opp'n to Mot. to Dismiss Count I, Exs. 8, 9, 10, 11 (Dkt. 38-8, 38-9, 38-10, 38-11) ("Exs. 8, 9, 10, 11").

The Letters of Determination explain that "CDE did find enough factual information to sustain the allegation that [Doe] engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence*."  Exs. 8, 9, 10, 11.  Each letter then restates the corroborated allegations, the investigative findings which support them, and ultimately finds that "these repeated instances of sexual conversations with students you supervise and teach . . . combine to create a hostile environment for students in the classroom."  Exs. 8, 9, 10, 11.  Where a complainant's allegation was unsupported, the factual findings either explicitly noted that or omitted the allegation altogether.  *See, e.g.*, Ex. 10 at 2 (Letter of Determination stating that "[d]ue to lack of corroborating witnesses, the investigator was unable to determine whether" an allegation occurred); *compare* Ex. 4 at 3 (Complainant 1 alleged Doe told a class they "needed to get naked together to really get to know each other") *with* Ex. 8 (Letter of Determination regarding Complainant 1 which omits those allegations); *see also* Compl. ¶ 308.

The letters were communicated to Employee Relations and Doe's supervisor, Dr. Renshaw, and they conclude by noting Doe will be contacted regarding disciplinary sanctions.  Exs. 8, 9, 10, 11.  Doe appealed the findings to Mr. Williams, again submitted hundreds of pages of what he deemed to be supporting documentation, and his appeal was denied approximately two weeks later.  Compl. ¶¶ 165, 167.

**B. Sanctions Imposed on Doe**

As the Letters of Determination forecasted, Dr. Renshaw contacted Doe regarding his disciplinary sanctions by letter dated May 31, 2019.  Compl. ¶ 169.  The sanctions letter

explained that Dr. Renshaw, as Chair of the Department, was "responsible for determining and implementing the appropriate disciplinary sanctions to address the behavior" which violated GMU policy.  Pl.'s Opp'n to Mot. to Dismiss Count 1, Ex. 16 (Dkt. 38-16) ("Ex. 16").  Thus, because CDE had sustained various allegations of sexual or gender-based harassment which violated GMU policy, Dr. Renshaw implemented four sanctions. Ex. 16; Compl. ¶ 393.  The four sanctions are: 1) sexual harassment training, 2) teaching, interactions, and communications restrictions, 3) a performance review, and 4) reevaluation of the need for restrictions.

First, Doe was required to participate in sexual harassment training.  Second, Doe's student interactions were limited in a finite number of ways "through the end of Summer 2021 Semester, August 15, 2021."  Ex. 16; *see also* Compl. ¶ 393.  Specifically, Doe was restricted from teaching graduate-level classes, he became ineligible to recruit new graduate student mentees, and his current graduate student mentees were to be offered an opportunity to choose another mentor.  Those restrictions did not apply to undergraduate or post-graduate level students.  Regarding all students, however, Doe was required to communicate through official GMU-authorized channels, his communications would be subject to GMU's review, and his in-person interactions with students were limited to meetings and professional events and were required to occur in an open setting.  The third sanction Dr. Renshaw implemented was a regular review of Doe's conduct throughout the above-mentioned probationary period.  The review would incorporate student feedback, and based on that feedback Dr. Renshaw (as the Department Chair) and the Dean would reevaluate Doe's sanctions midway through the probationary period.  Fourth and finally, Dr. Renshaw's sanctions letter noted that if Doe's ability to teach, mentor, or

supervise graduate students were reinstated, he and the Dean might implement further or continuing restrictions if those became necessary.[2]

Doe filed a faculty grievance on June 10, 2019, grieving the sanctions which were imposed upon him based on the CDE findings. Compl. ¶ 171. In effect, this was an appeal of his sanctions. The grievance was filed with the Faculty Grievance Committee which reviewed his grievance and the sanctions before upholding them. Compl. ¶ 172.

Other faculty members from Doe's Department subsequently filed a grievance which also revolved around the sanctions imposed on Doe.[3] Compl. ¶ 173. This grievance was filed against Doe and Dr. Renshaw, as the Department Chair, because Doe remained affiliated with a Program within the Department (the "Program"). Compl. ¶ 419. The question presented in the faculty's grievance was whether Dr. Renshaw's sanctions were sufficient or whether university policy required Doe's disaffiliation from the Program because he had potentially placed the program at risk. Compl. ¶ 420. The Committee ultimately agreed with the faculty that the Faculty Handbook requires a faculty member who CDE has determined violated University Policy 1202 to disaffiliate from any Program, and if that faculty member does not do so voluntarily, the Faculty Handbook requires their supervisor to force disaffiliation. Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 30 (Dkt. 38-30) at 2-3 ("Ex. 30"); Compl. ¶ 437.

Doe informed Dr. Renshaw he would not voluntarily disaffiliate from the Program. Compl. ¶ 442. Dean Ardis, Dr. Renshaw's supervisor, concurred with the Committee, and Dr. Renshaw subsequently disaffiliated Doe from the Program. Compl. ¶¶ 447, 449.

---

[2] Though these sanctions were set to expire on August 15, 2021, Doe remained susceptible to new or further sanctions pursuant to the Faculty Handbook and his appointment letter which govern his employment.
[3] This grievance followed an unnamed professor's informal request that Doe voluntarily disaffiliate based on potential consequences to the Program—the loss of accreditation—if he did not. *See* Compl. ¶¶ 413-419.

Doe's disaffiliation caused his name to be removed from the "core faculty members" in Program materials, such as on GMU's website, caused him to be ineligible for Program leadership or committee positions, and caused him to be ineligible to participate in the Program's teaching or mentoring activities. Compl. ¶ 455. His disaffiliation is effective "at least until all students who are currently enrolled in the program as of the 2019-2020 academic year are no longer enrolled." Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 31 (Dkt. 38-31) at 2-3 ("Ex. 31").

Throughout the period in which the Faculty Grievance Committee was dealing with Doe's and the other faculty members' grievances, Doe discovered that aspects of his Title IX investigation were known to non-participants. *See* Compl. ¶ 168 (Doe "was advised that GMU could not impose 'gag orders' on parties to prevent them from sharing information,"); *see also, e.g.,* Compl. ¶¶ 412 (Student aware of Title IX proceedings), 458 (faculty in the Department discussed Doe's Title IX case).

Doe subsequently brought this lawsuit, alleging he was discriminated against based on his gender, and that his rights to due process and free speech have been violated.

## II. LEGAL STANDARDS

### A. Motion to Proceed by Pseudonym

Whether a litigant may proceed by pseudonym falls within the district court's discretion. *Doe v. Pub. Citizen,* 749 F.3d 246, 273 (4th Cir. 2014) (citing *James v. Jacobson,* 6 F.3d 233, 239 (4th Cir. 1993)). The Fourth Circuit has identified five factors, the *Jacobson* factors, which guide a district court's discretion when deciding whether to permit a party to proceed anonymously. *See Jacobson,* 6 F.3d at 238. Accordingly, courts consider:

> whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests

8

are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* Because these factors are nonexclusive, others may be considered. *Pub. Citizen*, 749 F.3d at 289.

## B. Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). A complaint containing mere labels, conclusions, or a formulaic recitation of elements is insufficient and will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

While a motion to dismiss tests the sufficiency of a complaint, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails." *Id.* at 166 (alteration in original) (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

**A930**

### III. DISCUSSION

#### A. Motion to Proceed by Pseudonym

"The Federal Rules of Civil Procedure require that the identities of the parties to a case be disclosed." *Pub. Citizen*, 749 F.3d at 273 (citing Fed. R. Civ. P. 10(a)). While courts may permit a party litigate pseudonymously, it "is a 'rare dispensation.'" *Id.* (quoting *Jacobson*, 6 F.3d at 238). John Doe, proceeding thus far by pseudonym, moved this Court to conceal his identity. Each *Jacobson* factor will be addressed in turn.

The first *Jacobson* factor is whether use of a pseudonym "is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature." *Jacobson*, 6 F.3d at 238. Relying on *Doe v. Rector and Visitors of George Mason Univ.* ("*Rector*"), 179 F. Supp. 3d 583, 593 (E.D. Va. 2016), Doe argues that this factor weighs in his favor because the lawsuit concerns sexual misconduct allegations. The *Rector* court found in that case that "what justifie[d] the use of pseudonyms . . . [was] the plaintiff's status as an accused perpetrator of sexual misconduct—a rapist," and the "significant social stigma" which accompanies that designation. *Rector*, 179 F. Supp. 3d at 593-94. But this case is not like *Rector*. Here, first of all, Doe is not accused of rape. Second, Doe's conduct which gave rise to the Title IX complaints occurred in public, not in private. Accordingly, the Court finds this factor weighs against use of a pseudonym.

The second factor is whether Doe's identification poses a risk of retaliatory harm to him, or to innocent non-parties. *Jacobson*, 6 F.3d at 238. Doe has not identified any non-parties who are at risk of harm, and instead only claims that identifying him in these proceedings will harm his reputation. While some courts have considered reputational harm to be a sixth factor in the analysis, the Court declines to do so. *See, e.g.*, *Doe v. Alger*, 317 F.R.D. 37, 40 (W.D. Va. 2016). Reputational harm is distinct from the "privacy or confidentiality concerns" which were

10

at the root of the Fourth Circuit's *Jacobson* analysis, and is more akin to mere "annoyance and criticism." *Jacobson*, 6 F.3d at 238. It is, therefore, not the type of harm which weighs in favor of anonymity under the second factor. *See Pub. Citizen*, 749 F.3d at 274 ("courts consistently have rejected anonymity requests to prevent speculative and unsubstantiated claims of harm to a company's reputational or economic interests.") (citing *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989) (per curiam) for the proposition that pseudonymity "has not been permitted when only the plaintiff's economic or professional concerns are involved" and collecting cases). Furthermore, Doe's claim of reputational harm rings hollow because his name was previously associated with the underlying complaints and he maintains that the conduct at issue was not misconduct. Accordingly, the second factor does not favor Doe.

Third, *Jacobson* instructs courts to consider the age of the people whose privacy interests are at issue. *Jacobson*, 6 F.3d at 238. Doe does not argue this factor favors him. The Court affords this factor substantial weight, and it weighs heavily against psuedonymity.

In assessing the fourth *Jacobson* factor, whether the action is against a government entity or private party, courts weigh a plaintiff's privacy interest against the public interest in open judicial proceedings. *See Pub. Citizen*, 749 F.3d at 274 ("when a party seeks to litigate under a pseudonym, a district court has an independent obligation to ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party."). "The public has an interest in knowing the names of the litigants and disclosing the parties' identities furthers openness of judicial proceedings." *Id.* at 273 (internal citations omitted). Doe has not shown any extraordinary circumstances which overcome the

public interest here, especially considering the heightened public interest in disclosure he caused

by suing an arm of the state and its officers.

He attempts to liken this situation, again, to *Rector*. The court in that case found the

fourth *Jacobson* factor weighed in favor of proceeding by pseudonym because,

> to the extent the public has a heightened interest in litigation against the
> government, the public's strong interest in monitoring the position that
> government agencies take in litigation is vindicated [] because the public has full
> access to everything the government has filed with the exception of plaintiff's and
> Roe's identities. Thus, the use of pseudonyms strikes an appropriate balance
> between ensuring that the public has access to the record in this case while also
> protecting plaintiff and Roe from any harm—including retaliatory physical
> harm—that might ensue from association with the accusations at issue here.

*Rector*, 179 F. Supp. 3d at 594 (internal citations, quotation marks, and alterations omitted). But

again, the facts of this case are dissimilar, and for three reasons. First, the *Rector* court struck a

balance to protect the litigants from physical harm. As noted above, there is no risk of harm

here. Second, the *Rector* plaintiff asserted a privacy interest in keeping his identity separate

from allegations of conduct which occurred in private—rape, stemming from what he alleged

was a consensual relationship. In contrast, here, Doe asserts a privacy interest in keeping his

identity separate from allegations of public conduct. Third and finally Doe seeks to keep his

identity separate from allegations of conduct—some of which he admits to—which he contends

was not improper. Because the facts here are distinct from those in *Rector*, and because Doe has

failed to show the extraordinary circumstances which might overcome the heightened public

interest in disclosure, this factor weighs against permitting a pseudonym.

The fifth and final factor is the risk of unfairness to the opposing party which would

result from allowing the action to proceed anonymously. *Jacobson*, 6 F.3d at 238. Doe argues

that this factor weighs in his favor because the defendants know his identity already. The Court

agrees the risk of unfairness to the defendants is minimal.

The *Jacobson* factors clearly weigh against permitting Doe to proceed by pseudonym. While any unfairness which may occur to the defendants would be minimal, all the other factors weigh against pseudonymity.  Moreover, the Court finds the movant's age, the lack of retaliatory harm, and the heightened public interest to be especially compelling here.  Accordingly, Doe's motion will be denied, and he will not continue under a pseudonym.

**B. Motions to Dismiss for Failure to State a Claim**

John Doe originally sued Defendants George Mason University, the Rector & Visitors of George Mason University, and five Mason officers, Dr. Hammat, Mr. Williams, Dr. Renshaw, Dean Ardis, and Provost Wu, each in both their individual and official capacities.  In his 162-page, four count Complaint, Doe alleges that the university violated Title IX, 20 U.S.C. § 1681(a) (Count I); that all five individual defendants violated 42 U.S.C. § 1983 by denying Doe due process in violation of the Fourteenth Amendment of the United States Constitution (Count II); that all five individual defendants violated the due process clause of the Virginia Constitution (Count III), and; that three individual defendants—Dr. Hammat, Mr. Williams, and Dr. Renshaw—violated § 1983 by denying Doe his right to free speech, guaranteed by the First Amendment of the United States Constitution (Count IV).[4]

At the outset, the Court recognizes that Doe originally named "George Mason University," as a defendant.  The university operates under the corporate name "The Rector & Visitors of George Mason University" pursuant to Va. Code § 23.1-1500(A), and George Mason University is therefore an improperly named defendant which the parties agreed to dismiss.

---

[4] To the extent that Doe asserts in paragraph 384 of his Complaint that GMU violated his privacy by notifying Complainants 1-4 of sanctions, that claim fails.  As he pleads, and as the document he incorporated into his Complaint by reference makes clear, GMU was required to inform Complainants 1-4 of not only sanctions which related directly to them, but also "any other steps . . . taken to eliminate the hostile environment, if the school found one to exist."  Compl. ¶ 384 (quoting U.S. Dep't of Educ., Office of Civil Rights, Q&A on Campus Sexual Misconduct (2017), available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

The remaining defendants are therefore the Rector & Visitors of George Mason University ("Mason")[5] and the five individual defendants. Doe withdrew his claims against Provost Wu and Dean Ardis in their individual capacities but not in their official capacities, maintaining they "are indispensable . . . because they have the authority to effectuate the injunctive relief sought in Counts II and III." Dkt. 43 at 5 n.1. Accordingly, Dr. Hammat, Mr. Williams, and Dr. Renshaw, are being sued in both their individual and official capacities, and Dean Ardis and Provost Wu are being sued only in their official capacities.

### 1. Claim Against Mason (Count I)

In Count I, Doe claims that Mason is liable for GMU's gender-based discrimination against him in violation of Title IX. Specifically, he alleges GMU unlawfully subjected him to investigative and disciplinary proceedings because of his gender, and that the university's ultimate findings were also erroneous.

Title IX prohibits federally-funded education institutions from engaging in gender discrimination. 20 U.S.C. § 1681(a). It is enforceable through an implied private right of action. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). "Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Plaintiffs in the first category proceed by an "erroneous outcome" theory, and plaintiffs in the second category proceed by a "selective enforcement" theory. *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 515 (E.D. Va. 2019). "[U]nder the 'erroneous outcome' theory, a plaintiff can claim that he or she is innocent and was 'wrongly found to have committed an offense.'" *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 606

---

[5] As noted on page 1, throughout this opinion "GMU" refers to the university as an entity, not to the improperly named defendant "George Mason University." "Mason" refers to the properly named Rector & Visitors of George Mason University.

(E.D. Va. 2019) (quoting *Yusuf*, 35 F.3d at 715). In contrast, under the "selective enforcement"
theory, a plaintiff can claim that "the severity of the penalty and/or the decision to initiate the
proceeding was affected by the [plaintiff's] gender," regardless of their guilt or innocence.
*Yusuf*, 35 F.3d at 715; *accord id.* at 606-07. Here, Doe attempts to proceed under both theories.

### (i) Erroneous Outcome

To survive a motion to dismiss, an erroneous outcome claim must claim an erroneous
outcome—that is, the plaintiff must claim innocence. *Yusuf*, 35 F.3d at 715; *accord Doe v.
Marymount Univ.*, 297 F. Supp. 3d 573, 583 (E.D. Va. 2018); *see also Doe 2*, 384 F. Supp. 3d at
607. In addition, an erroneous outcome claimant must cast some articulable doubt on the
accuracy of the outcome of the disciplinary proceeding, and allege particularized facts indicating
a causal connection between gender bias and the flawed outcome. *See Marymount Univ.*, 297 F.
Supp. 3d at 583 (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018)). A plaintiff
can satisfy the articulable doubt element "by (1) pointing to procedural flaws in the investigatory
and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3)
challenging the overall sufficiency and reliability of the evidence." *Doe 2*, 384 F. Supp. 3d at
607. The pleading burden to articulate doubt "is not heavy." *Yusuf*, 35 F.3d at 715. The facts
showing the final element, a causal connection, must both be "particularized," and suggest
"gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

Here, Doe admits to much of the underlying conduct which the complainants alleged
was, and which GMU later found to be, harassment. He disputes the ultimate findings that this
was misconduct, arguing that his actions did not limit students' educations. The Court will
assume without deciding that Doe's claims—which amount to ultimate legal conclusions—
satisfy the requirement that he claim innocence. The Court will also assume without deciding
that Doe satisfied the low bar for the element of articulable doubt. Even so, he has failed to state

15

a claim because he has not pleaded particularized facts suggesting gender bias was a motivating factor in GMU's findings.

#### (a) Particularized Facts Must Show Gender Bias Caused the Outcome

Mere "allegations of a procedurally or otherwise flawed proceeding that [] led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.* "When reviewing whether a Title IX plaintiff has pled the requisite gender bias, [] courts have considered the following types of factual allegations: 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that [] tend to show the influence of gender.'" *Marymount Univ.*, 297 F. Supp. 3d at 585 (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). But Courts reject statistical evidence which merely indicates men disproportionately comprise those accused of misconduct or those who appeal from adverse rulings as insufficient to establish gender-based discrimination. *Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d at 518 (compiling cases). Further, "vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-male bias." *Id.* at 519 (compiling cases).

Doe has not pled sufficiently particularized facts showing gender bias in his case. He relies heavily upon *Marymount*, wherein the plaintiff pled facts showing that (1) the adjudicator in his case, (2) exhibited "disbelief" of males in a subsequent investigation, and (3) believed that "males [] always enjoy sexual contact even when that contact is not consensual." *Marymount Univ.*, 297 F. Supp. 3d at 587. The conversation evidencing those well-pleaded facts allowed a reasonable inference that the adjudicator had earlier applied an anti-male bias in the plaintiff's Title IX investigation. Thus, in *Marymount*, the allegations were sufficient to defeat a motion to

16

**A937**

dismiss because well-pleaded facts "create[d] a plausible inference that the University's decision was infected with gender bias." *Id.* at 585.

The crucial allegation in that case was "that in a subsequent sexual assault investigation at Marymount," an "unpleasant exchange" between the male complainant and the investigator revealed the investigator's "decision-making was infected with impermissible gender bias, namely [a] discriminatory view that males will always enjoy sexual contact even when that contact is not consensual." *Id.* at 585–86. Bias was directly supported by well-pleaded facts showing the investigator "asked the male student 'were you aroused' by this unwanted touching? When the student responded, 'no,' [the investigator], in apparent disbelief, allegedly asked the male student again, 'not at all?'" *Id.* at 586.

*Marymount* is inapposite because Doe has not alleged similar facts about his adjudicator. The adjudicator in Doe's case was Dr. Hammat, and no well-pleaded facts directly support the inference that she, or even Mr. Williams, do not believe males, or—analogously to *Marymount*—believe males always enjoy engaging in harassing behavior. Here, Doe has failed to identify a conversation that is similar to what occurred in *Marymount* showing his adjudicator held specific, discriminatory and biased views against—or a preference for—one sex over the other. Neither has he shown that she applied such views in prior or subsequent investigations or adjudications. Having failed to allege facts showing the adjudicator was biased, Doe fails to create a plausible inference that the university's decision was infected with gender bias.

*(1) The Facts Do Not Show that Dr. Hammat Was Biased*

Perhaps in recognition of the absence of well pleaded facts directly showing Dr. Hammat to be biased, Doe asks the Court to infer her bias so that it can then infer that it infected university's decision. He claims the inference flows from her findings and her public statements. Each basis is addressed in turn.

17

The findings in the Letters of Determination do not demonstrate Dr. Hammat's bias. *See* Dkt. 38 at 21-23 (identifying ten bases, a.-j., and citing the Complaint and exhibits). Doe has identified ten grounds, but each is woefully insufficient.[6] First, for example, he points to Dr. Hammat's word choice. *See* Dkt. 38 at 21 (subsection a., citing, *inter alia*, Compl. ¶¶ 249, 287, 296, 485). Specifically, he contends that use of the words "erotic" and "wife" indicate bias. But Dr. Hammat's descriptions—of a discussion as erotic and of a woman as not Doe's wife— merely convey information about the discussion and the woman, respectively. The words do not suggest she was seeking to punish Doe, or that she held a prejudice against males. Doe suggests that, but it is not a plausible inference.

The nine other specific grounds Doe identifies similarly fail to demonstrate bias. He presents them in an attempt to show that "a decision against the weight of the evidence is indicative of bias," but without an anti-male or pro-female leaning, this amounts to an assertion that bias is the only possible explanation for Dr. Hammat's findings. Dkt. 38 at 27. But where a plaintiff alleges gender bias is the only possible explanation for the outcome, claims fail if the "conclusion does not *necessarily* follow from the facts alleged." *Doe v. Rector & Visitors of George Mason Univ.* ("*GMU*"), 132 F. Supp. 3d 712, 734 (E.D. Va. 2015). That is the case here, because "[g]ender neutral concerns might well have easily—and more plausibly—motivated the challenged actions." *Id.*

Neither do Dr. Hammat's public statements show bias. Doe argues a published story, in which Dr. Hammat related her personal life experience, reveals gendered assumptions and

---

[6] In addition to arguing for these grounds, the Complaint pleads that "Dr. Hammat was [] demonstrably biased" because in the course of interviewing Doe based on the complaints against him, she "alluded to false, unrelated allegations against [him] and suggested that he was involved in a consensual, romantic relationship with an unnamed student." Compl. ¶ 149. Yet, the purpose of the interview could reasonably include determining the truth or falsity of such allegations. And Doe has pled that Dr. Hammat learned of these allegations from one of the complainants whose complaints she was tasked with investigating. Thus, raising these issues during an interview does not demonstrate bias.

18

further argues that her participation in a Title IX-related event "raises questions about [her] impartiality." Dkt. 38 at 25. Both these arguments fail.

Doe's initial point is that, in a published article, Dr. Hammat (1) referred to victims as "she," and (2) revealed gendered assumptions when she used the phrase "kicked down doors," and expressed protectiveness of her sorority sisters. While the complained-of word, "she," is obviously a gendered pronoun, Dr. Hammat's use was merely conversational and the conversational context shows that use does not reflect any bias. The word arose within a discussion between Dr. Hammat—a woman—and two other women. Dr. Hammat was describing a hypothetical situation, and in the example, she identified a hypothetical "roommate." Given the exclusively female participants in the conversation, it is unsurprising that Dr. Hammat's hypothetical roommate would be a female. Dr. Hammat's use of the word "she" therefore does not demonstrate anti-male bias or a gendered assumption of victimhood.

Similarly, Dr. Hammat's use of "kicked down doors," and hypervigilance or protectiveness regarding her sorority do not show bias. Doe argues they reflect "gendered assumptions about males as sexual predators, females being in need of protection and the aggressive manner in which males need to be handled in order to prevent them from raping females." Dkt. 38 at 24. But Dr. Hammat was describing her own past behavior, and the actions of her sorority sisters. These factual and descriptive statements do not reflect her gendered assumptions or bias, they relate a story of what Dr. Hammat and members of her sorority did when leaving parties.

Finally, Doe's argument that Dr. Hammat's impartiality must be questioned based on her Title IX advocacy event attendance falls flat. Doe pleaded that:

> In April 2016, while employed at GMU as Title IX Coordinator, Dr. Hammat
> participated in an event that the Clearinghouse on Women's Issues listed as a "DC
> Area Feminist Event," "How Equity Advocates Can Support High Expectations

19

for Title IX and Title IX Coordinators." As part of the event, Hammat was to
provide her "wish list" of how women's advocates could assist her with Title IX
enforcement. This is yet another example of Dr. Hammat publicly taking a biased
position on the side of women's rights when she was required to make *impartial*
determinations of responsibility in GMU's sexual misconduct cases.

Compl. ¶ 152 (emphasis in original).  While this is a well-pleaded fact, it does not support a

plausible inference of bias because it is reasonable to expect a Title IX Coordinator to participate

in Title IX-related events.  This is especially the case for events such as the one described above,

which will improve the community's ability to support university personnel.  Doe has merely

pleaded that Dr. Hammat, a Title IX Coordinator, attended and participated in an event which

was directly related to her work.

In essence, Doe asks the Court to infer bias because the Complaint includes the words

"Women's Issues" and "Feminist."  That does not show bias.  *See, e.g., Miami Univ.*, 882 F.3d at

593 n.6 (noting that "being a feminist, being affiliated with a gender-studies program, or

researching sexual assault does not support a reasonable inference than [sic] an individual is

biased against men.").  Indeed, for Dr. Hammat to have avoided the event based on its

association with those words would likely demonstrate a gender bias against females.  The well-

pleaded facts indicate the event was relevant to her Title IX Coordinator job, and no facts show

she participated in, or failed to participate in, any events because of a particular sex or gender.

Accordingly, Doe has again failed to plead facts allowing a plausible inference of bias.

In sum, this case is unlike *Marymount* because no facts directly show the adjudicator's

bias.  Doe has also failed to plead facts which allow the Court to infer Dr. Hammat's bias.  While

Dr. Hammat's findings and public statements may make an inference of gender bias conceivable,

the question that the Court must answer "is whether the [] factual allegations make that inference

cross the line from conceivable to *plausible.*"  *GMU*, 132 F. Supp. 3d at 733 (emphasis in

original).  Here, they do not.  And, indeed, to the extent Doe has pled a conceivable inference of

20

bias, he has also undermined that inference by pleading that Dr. Hammat removed an investigator from his case based on his allegation that the investigator was biased. Compl. ¶¶ 9, 146 n.53, 148. Therefore, the Complaint does not plead facts which support an inference that Dr. Hammat was biased based on gender, or that bias infected the university's decision-making in Doe's proceeding.

*(2) The Facts Do Not Show that Mr. Williams Was Biased*

Doe has pled that Dr. Hammat was "the sole individual tasked with deciding the outcome of the allegations against" him. Compl. ¶ 150. Nonetheless, he argues that he has successfully stated a claim because his Complaint shows Mr. Williams' bias. It does not.

First, Doe identifies—as he did with Dr. Hammat—a number of Mr. Williams' ultimate findings, statements, and evidentiary analyses, with which he takes issue. For example, Doe appears to claim Mr. Williams improperly found him responsible for taking "a trip to a strip club with students during a professional conference," even while he "acknowledge[s] that he should have left upon realizing that the outing involved [a] strip club," but did not. Compl. ¶ 380. Regardless, as noted above, whether Doe would weigh the evidence differently himself is not indicative that the actual decisionmaker was affected by a gender bias. "And, in the absence of any specific factual allegations pointing to such a bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable." *GMU*, 132 F. Supp. 3d at 733.

Doe claims the "tone of Mr. Williams' response" to his appeal "insinuated" a gendered view. Dkt. 38 at 26. But Doe must allege facts to support such a view, and the only potentially relevant factual allegations pertain to the following statements. Doe has plead that:

> Mr. Williams made public statements in the past that campus administrators have a moral obligation to protect and care for female students and to make them feel safe when investigating and responding to allegations of sexual assault and sexual

harassment and that, regardless of the outcome, they are to be believed as telling the truth.

Compl ¶ 485.g.  Thus, two statements are at issue: that campus administrators must protect and care for female students, and that they are to be believed.

The first issue relates to campus administrators' obligations to female students.  Mr. Williams has stated "If you don't have an environment that is investigating and responding to issues of sexual assault and sexual harassment, female students on your campus may not feel safe, and they may not feel like they belong."  Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 19 (Dkt. 38-19) at 2.[7]  This statement's use of a gendered pronoun does not suggest a bias because it does not suggest an obligation to females that is exclusive of or that detracts from any obligation to males.  Instead, it merely expresses a true proposition which is, since male students may also be susceptible to those same feelings, incomplete.  There is no gender bias in recognizing and articulating that females may feel unsafe if a university does not address sexual assault and harassment issues.  That is what Mr. Williams did in his statement.

The second issue relates to believing victim statements.  Doe pleads that, regarding Title IX complainants, Mr. Williams has said: "[r]egardless of the results of the hearing, we still hear you . . . .  Just because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying."  Compl. ¶ 166.  This statement does not suggest an anti-male bias.  First, it demonstrates that Mr. Williams understands that not every Title IX complaint will support a violation.  Second, and more importantly, it suggests—at worst—a tendency to believe complainants.  Complainants and victims are and may be of any gender.  Thus, a "bias in favor

---

[7] As an initial matter, Doe was factually incorrect when he represented to the Court that Mr. Williams made public statements about a moral obligation to females.  The statement actually mentioned both "legal" and "moral obligations" and referred not to females but to "our students and our community."  Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 19 (Dkt. 38-19) at 2.

of victims and against those accused of misconduct, is not evidence of anti-male bias." *Fairfax*
*Cty. Sch. Bd.*, 403 F. Supp. 3d at 519.

Doe has failed to allege that Mr. Williams exhibited bias. Neither the contention that
Doe would weigh the evidence differently, nor the statements Mr. Williams previously made
show a gender-based bias infected his or the university's decision-making in Doe's proceeding.

*(3) Doe's Allegations of "Pressure" Do Not Show Gender Bias*

Lastly, Doe argues that GMU was subjected to pressures coming "from the federal
government, the State of Virginia, constant negative publicity, and campus activism to
aggressively protect female students from the sexual misconduct at the expense of the rights of
the accused." Dkt. 38 at 28 (quoting Compl. ¶ 101). Specific examples of the cited pressures
include, for example, two Department of Education investigations into GMU, a campus
community outcry regarding GMU's hiring of Justice Kavanaugh, and media reports concerning
allegations against GMU professors. *See, e.g.*, Compl. ¶¶ 98-135.

Accepting these allegations as true, and viewing them in the light most favorable to Doe,
the well pleaded facts give rise to the inference that the "public attention and the ongoing
investigation put pressure on the university to prove that it took complaints of sexual misconduct
seriously." *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). Even so, such "pressure alone is
not enough to state a claim that the university acted with bias in this particular case. Rather, it
provides a backdrop that, when combined with other circumstantial evidence of bias in [a]
specific proceeding," may give rise to a plausible claim. *Id.*

Doe argues that four events show Mr. Williams and Dr. Hammat succumbed to the cited
pressures and that, as a result, he has pled bias. First, as to Mr. Williams, Doe claims bias is
evident because Mr. Williams stated that GMU must comply with Title IX to avoid losing
federal funding in response to a federal investigation. Compl. ¶ 109. But compliance with Title

23

IX is a legal requirement and applies to protect both genders. Compliance with it, even for the exclusive purpose of receiving federal funding, therefore does not show bias. Second, Doe claims Mr. Williams revealed bias when he stated his office "would never want a message conveyed to [the GMU] community that suggests a student would not be listened to" when issuing a Title IX complaint. Compl. ¶ 119. Like the other statement, this does not show bias because both males and females may be "listened to" in relation to a Title IX complaint, and indeed Mr. Williams did not differentiate between male and female students. Third, Doe argues Dr. Hammat showed bias by meeting with the Women and Gender Studies Department to address their demands in Title IX proceedings. Compl. ¶ 110. This argument fails because meeting with interested stakeholders and addressing concerns is within the Title IX Coordinator's scope and no fact indicates she excluded any other individuals or groups. Finally, Doe argues Dr. Hammat showed bias when she said the Secretary of Education's remarks could be construed as devaluing sexual assault survivors. Compl. ¶ 112. Because survivors can be male or female, these statements apply to both genders and this argument also fails.

Thus, Doe has provided no basis from which to infer the existence of bias in his specific proceeding. While social, societal, or governmental pressures may provide a backdrop to a given case, a plaintiff must nonetheless plead particularized facts, such as decision-maker statements or patterns of decision-making, which "show the influence of gender." *Yusuf*, 35 F.3d at 715. Without more, the pressures which Doe cites to are insufficient to state a claim. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) (explaining "it is not reasonable to infer . . . a practice of railroading [those] accused of misconduct" based on the Department of Education's control over university's federal funding); *accord Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 956 (N.D. Ill. 2017) (finding pressure of Department of Education's investigations into university Title IX proceedings and resultant publicity did not create bias).

24

**A945**

As discussed above, Doe has not shown that Dr. Hammat or Mr. Williams were biased.

Each of Doe's numerous attempts to show an anti-male bias have failed. At most, Doe's factual allegations may allow for an inference of bias in favor of victims and against the accused—but that bias is not actionable. He has not shown that Dr. Hammat or Mr. Williams made statements demonstrating a gender-based bias, or that such a bias existed in his specific proceeding. Accordingly, Doe has failed to state an erroneous outcome claim.

### (ii) Selective Enforcement

To state a claim under a theory of selective enforcement, a plaintiff must allege (1) that the university treated him less favorably than a similarly situated person of the opposite gender,[8] and (2) that the plaintiff's gender was a motivating factor for the less favorable treatment. *See Yusuf*, 35 F.3d at 715.

In his Complaint, Doe alleges "[u]pon information and belief," that: GMU engaged in a pattern of unfair investigations and adjudications to the disadvantage of males, that female professors have not been formally investigated by Title IX administrators, and that female professors found responsible for violating university policies have received less severe sanctions than males. Compl. ¶¶ 487-89. Under the federal pleading standards, "[a] plaintiff is generally permitted to plead facts based on 'information and belief.'" *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). That pleading device is appropriate in at least two situations. First, information and belief pleading may be appropriate where allegations "rely on second-hand information." *Raub v. Bowen*, 960 F. Supp. 2d 602, 615 (E.D. Va. 2013). Second,

---

[8] The Fourth Circuit has not addressed whether a comparator is required to state a selective enforcement claim, but in the absence of binding precedent, courts within this district have. *See Doe 2*, 384 F. Supp. at 608–09 (Brinkema, J.) (noting that "both the Eastern and Western Districts of Virginia" have required a comparator to state a claim) (citing *Sheppard v. Visitors of Virginia State Univ.*, 2019 WL 1869856, at *4 (E.D. Va. Apr. 25, 2019) (Hudson, J.); *Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 932 (W.D. Va. 2017) (Dillon, J.)); *accord Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d at 515 (Trenga, J.); *see also Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 931 (S.D. Iowa 2018); *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

it may be appropriate where the underlying "facts are peculiarly within the possession and

control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010);

*accord Ridenour*, 147 F. Supp. 3d at 456. Plaintiff has alleged neither second hand information

nor the existence of particular facts which may support either element of this claim.

In *Ridenour*, the plaintiff alleged upon information and belief that "*either*" one or the

other "or both" of the two defendants—MCC and Sterling—used an inaccurate background

check report to reject his employment application. *Ridenour*, 147 F. Supp. 3d at 456-57

(emphasis in original). These "information and belief" allegations were "not prohibited" based

upon the confluence of two factors. *Id.* at 457. First, the court found that "other allegations in

the complaint plainly suggest that MCC" did in fact use the inaccurate background check report,

and second, the court found the record before it "suggests that the details of the relationship

between Sterling and MCC [were] known only to defendants." *Id.* Thus, the Complaint

contained well-pleaded facts which supported the allegations pled upon information and belief.

But while the plausibility standard does not prevent a plaintiff from pleading facts upon

information and belief, he "may not rely exclusively on conclusory allegations of unlawful

conduct, even where alleged 'upon information and belief.'" *Doe v. Salisbury Univ.*, 123 F.

Supp. 3d 748, 768 (D. Md. 2015). In *Salisbury University*, Judge Bredar explained the

permissibility and impermissibility of pleading upon information and belief in the erroneous

outcome context. The plaintiffs there pleaded, upon information and belief, "*specific factual

allegations*" which supported their claims both (1) existed and (2) were "peculiarly within the

possession" of the defendant. *Id.* (emphasis in original). Specifically, the plaintiffs alleged that

the university was in possession of certain communications which would show an intentional

gender bias motivated a particular erroneous finding. In finding these specific factual allegations

sufficient, the *Salisbury* court noted that the plaintiff's "allegations would be insufficient if they

26

had simply stated something akin to: 'Upon information and belief, procedural defects were motivated by gender bias.'" *Id.* Those defective, conclusory allegations are like the allegations in this Complaint.

Unlike *Salisbury* and *Ridenour*, the Complaint here is devoid of facts supporting the allegations that were pleaded upon information and belief. In *Salisbury*, the existence of particular communications in the control of the adverse party allowed the court to reasonably infer animus. In *Ridenour*, the existence of the inaccurate report, other facts indicating one defendant relied upon it, and the existence of a relationship between the two defendants allowed the court to reasonably infer the second defendant may have acted on the report. Here, Doe's allegations of selective enforcement are not supported by any well-pled facts that exist independent of his legal conclusions.

While he argues that "the statistical evidence necessary to prove this claim is within [GMU's] exclusive possession or control," Dkt. 38 at 29, the Complaint does not allege any such evidence exists. Unlike the communications in *Salisbury*, Doe has not pleaded facts to indicate what that evidence would be, the form it would be in, the time frame it may occupy, or the personnel involved. He has not pleaded any dates or instances of female professors engaging in conduct similar to his own. Indeed, the closest he has come to providing a well-pleaded fact which could support a selective enforcement claim is footnote 71, in which he notes that "members of the faculty, including a female professor, regularly invite students to their homes for pool parties." Compl. ¶ 379 n.71. But, even so, Doe was not accused of hosting a pool party and a pool party was not the basis for any of his Title IX proceedings. And regardless, beyond failing to allege that female professors engaged in similar conduct, he has not pleaded the critically important fact of whether students lodged similar complaints against female professors, or that any females were subjected to any investigative, adjudicative, or disciplinary measures or

27

proceedings. Instead, he has pled in a conclusory fashion and without factual support, a wholly

speculative conclusion that the university engaged in selective enforcement.

No facts support the inference that Doe was treated less favorably than a female. Even if

he was, no facts support the inference that any disparity was motivated in part by his gender.

Because Doe has not alleged the existence of a female comparator or gender-based bias, he has

failed to state a claim for selective enforcement.

### 2. Claims Against GMU Employees

In Counts II, III, and IV, Doe claims that GMU officers denied him due process and his

right to free speech, in violation of 42 U.S.C. § 1983 in violation of Virginia's constitution in its

own right. Doe seeks monetary relief from the individual defendants only in their individual

capacities.[9] *See* Compl. ¶ 530 (Count II damages); ¶ 536 (Count III damages); ¶ 558 (Count IV

damages); Compl. at 159-160 Prayer for Relief (limiting monetary damages against the

individual defendants to their individual capacities). Because his individual-capacity claims

against Provost Wu and Dean Ardis were withdrawn, the individual defendants from whom Doe

seeks money damages are only Dr. Hammat, Mr. Williams, and Dr. Renshaw. He also seeks

injunctive relief from all five individual defendants.

#### (i) Due Process Claims

Doe has asserted that the individual defendants deprived him of due process in violation

of the federal and state Constitutions.

##### (a) § 1983 Violations Predicated on Denial of Fourteenth Amendment Due
##### Process (Count II)

---

[9] The individual defendants correctly point out, and Doe does not contest, that claims against them in their official
capacities for money damages are barred. *See* Dkt. 30 at 6-7 (noting that 42 U.S.C. § 1983 actions for monetary
damages against these individual defendants in their official capacities are barred by the Eleventh Amendment); *see
also* Dkt. 43 at 6 n.3 (conceding that point).

28

**A949**

Count II alleges that all five individual defendants deprived Doe of procedural due process in the Title IX investigation, proceedings, and outcome. "To succeed on a procedural due process claim, a plaintiff must satisfy three elements." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). They are: "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)).

Doe has attempted to assert both a liberty interest and a property interest. In both cases, however, he has failed to state a due process claim. First, he has failed to plead a liberty interest is implicated in his case, and therefore has not satisfied the first element. Second, although he pled a cognizable property interest, he has failed to satisfy the second element because he did not plead a deprivation of that interest.

### (1) Doe Failed to Plead a Cognizable Liberty Interest

Doe purports to assert a reputational liberty interest. Compl. ¶ 502. Public employees have a constitutionally protected liberty interest in their "good name, reputation, honor, or integrity." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)); *accord Echtenkamp v. Loudon Cty. Pub. Sch.*, 263 F. Supp. 2d 1043, 1056 (E.D. Va. 2003). But there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 702 (1976). Accordingly, an employee's liberty interest in "reputation alone, apart from some more tangible interests such as employment," is insufficient "to invoke the procedural protection of the Due Process Clause." *Id.* at 701.

But "a public employer cannot deprive an employee of her 'freedom to take advantage of other employment opportunities.'" *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 616 (E.D. Va. 2015) (quoting *Roth,* 408 U.S. at 573). Therefore, to state a reputation liberty interest claim, "a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007) (citing *Stone,* 855 F.2d at 172 n.5). Here, Doe has failed to plead the facts which support a reasonable inference that he has suffered the necessary employment-related harm. The Court will therefore focus the discussion below on the third element and expresses no opinion as to the others.

A liberty interest in one's reputation is cognizable where a public employer has made stigmatizing remarks in the course of a discharge or significant demotion. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006) (quoting *Stone,* 855 F.2d at 172 n.5). Here, Doe does not allege that he was discharged. Compl. ¶ 502. Neither does he plead an actual demotion. Instead, he argues, that the sanctions imposed upon him effectively constitute a "significant demotion" and therefore implicate his liberty interest. Dkt. 43 at 15. In short, the sanctions imposed on Doe required sexual harassment training and performance review with student input, restricted his communications with students to official channels and settings, and restricted him from teaching graduate-level courses through August of 2021. He was also disaffiliated from the Program, a subgroup within the Department, for approximately six years, which had the effect of limiting his participation in committees, activities, and research, associated with that Program.

Doe's argument relies primarily upon *Ridpath*. There, the Fourth Circuit held that a "'significant demotion' may include the reassignment of an employee to a position outside his

30

field of choice." *Ridpath*, 447 F.3d at 309. Doe has failed to plead facts similar to those in *Ridpath*, and accordingly, that case is inapposite.

In *Ridpath*, the Fourth Circuit found a reassignment to be "a significant demotion . . . tantamount to an outright discharge," where the plaintiff's new "position [was] outside his chosen field." *Id.* at 310. In that case, Mr. Ridpath's "chosen career [was] in intercollegiate athletics administration, particularly in the area of overseeing compliance with NCAA rules." *Id.* at 300. His position was within the Department of Athletics, where he was the Compliance Director. *Id.* at 310. Mr. Ridpath was not merely reassigned from that position, but was "relegated to a position for which he lacked the necessary education and training." *Id.* He "was banished from the Department of Athletics" entirely, to an entirely dissimilar position: Director of Judicial Programs. *Id.* The Director of Judicial Programs position, outside the plaintiff's chosen field of athletics administration, "constituted, at best, a perilous detour on his career path and, at worst, a dead end." *Id.*

Doe's case is crucially different in three respects. First, Doe remains within his chosen career field. He argues that his disaffiliation from the Program is akin to Mr. Ridpath's disaffiliation from the Athletics Department, but it is not. The Program is a single, narrow component of Doe's field of choice, which is the Department. Doe was not banished from the Department; he has not been stripped of his ability to either teach courses or conduct research. Doe is therefore different from Mr. Ridpath, who was relegated from intercollegiate athletics administration to judicial programs, because Doe was originally in the Department, and is still in the Department.

Second, Doe has not lost his position. He argues that "the prohibition on working with graduate students . . . has prevented him from fulfilling his duties as a professor," but he does not plead facts which support this argument. Dkt. 43 at 17. Working with graduate students is

31

merely a single aspect of the comprehensive and varied professorial duties he has pleaded, which include teaching and researching, attending conferences and presenting at workshops. While Mr. Ridpath lost his job, his duties changed, and his title changed from Compliance Director to Director of Judicial Program, Doe is still a tenured, full professor with teaching and research duties.

Third, Doe has not lost ability to perform his calling. He is authorized to teach courses within his chosen field and to conduct research—he has merely been restricted. But the sanctions do not prohibit doctoral students, even within the Program, from working with Doe, and he retains the ability to conduct research with undergraduates, post-doctoral students, and faculty members. He has not pled facts giving rise to the inference that the sanctions imposed and disaffiliation from the Program may be, even, a perilous detour on his career path. Accordingly, Doe's sanctions are exceedingly dissimilar from the significant demotion of *Ridpath*.

Doe also points to *Miller* and *Hall* as support for the proposition that his sanctions are a significant demotion. Neither case supports his argument.

In *Hall*, a police officer—Mr. Hall—was terminated, then his position was reinstated. *Hall v. City of Newport News*, 469 F. App'x 259, 261 (4th Cir. 2012). Upon his reinstatement, however, the police department "assigned him to a civilian position in the Records Bureau and stripped him of his law enforcement powers and status as a police officer." *Id.* The Fourth Circuit found that Mr. Hall's allegations were sufficient, under *Ridpath*, "to qualify as a significant demotion" because despite his reinstatement to the police force, he was relegated to a "civilian position," lost "the police power to make stops, issue summons and warrants, and make arrests," and accordingly was put in a position which "effectively excludes him from his trade or calling as a police officer." *Id.* at 262–63. Unlike Mr. Hall, here, Doe's position remains

32

unchanged, and he has not lost his ability to perform core professorial duties of teaching and research.

Similarly, the *Miller* plaintiff was a Flight Officer in the Aviation Unit of the Baltimore Police Department. *Miller v. Hamm*, 2011 WL 9185, at *1 (D. Md. Jan. 3, 2011). He lost that position, and was "transferred to the Marine Unit, which provides uniformed foot patrol in the Inner Harbor area. He had not previously held this position or received recent training as a uniform[ed] foot patrol officer. Moreover, he was advised that this reassignment would result in a decrease in pay." *Id.* at *2. The court concluded that Mr. Miller "sufficiently alleged a significant demotion" because "reassignment to the Marine Unit excluded him from his chosen career—flying helicopters for law enforcement." *Id.* at *9. Mr. Miller's reassignment out of the field of flight, in combination with his pay decrease, were critical to the court's conclusion. But where Mr. Miller suffered (1) a reassignment, which (2) altered his career path, and (3) reduced his income, Doe suffered no such changes. He was not reassigned to a new position, remained in both the teaching and research field and the field of study of the Department, and his pay was unchanged. Doe, unlike Mr. Miller, has not pled a drastic detour in his career.

In sum, Doe's case is significantly different from *Ridpath*, *Hall*, and *Miller*, and the Court concludes he has failed to plead a significant demotion. To invoke a liberty interest, "there must have been 'some damage to [the plaintiff's] employment status.'" *Willis*, 90 F. Supp. 3d at 617 (quoting *Johnson*, 903 F.2d at 999). Although Doe has pled that the sanctions instituted changes within the nature of employment, "to change" is not synonymous with "to damage." A plaintiff "falls well short of a 'significant demotion,'" where they show a mere "minor restriction of [] freedom and authority as a result of [] placement on probation" in conjunction with "increased supervision." *Echtenkamp*, 263 F. Supp. 2d at 1057 (quoting *Stone*, 855 F.2d at 172 n.5). That is what happened here: Doe has not been reassigned to a new or different position which

33

excludes him from his field, and indeed he has not even been suspended. *See Johnson*, 903 F.2d
at 999 (where a public employee "is suspended but not discharged he 'cannot complain that he
has been made unemployable; he remains employed.'") (quoting *Hershinow v. Bonamarte*, 735
F.2d 264, 266 (7th Cir. 1984)).  Before the sanctions took effect, he was a tenured, full professor,
teaching in the Department, with a certain salary, and that all remained true after the sanctions
became effective.  The well pleaded facts do not support the inference that the sanctions are
tantamount to discharge, nor do they show a significant demotion occurred.  Therefore, Doe has
failed to implicate a liberty interest.

### *(2) Doe Failed to Plead Deprivation of a Property Interest*

Doe's "position as a tenured professor is indisputably a property right entitled to
procedural due process protection." *Huang v. Bd. of Governors of Univ. of N. Carolina*, 902
F.2d 1134, 1141 (4th Cir. 1990).  Doe has therefore satisfied the first element of his due process
claim implicating a property interest by asserting his tenured professorship as a property interest.
Compl. ¶¶ 502, 512.

The Supreme Court has not "decided whether the protections of the Due Process Clause
extend to discipline of tenured public employees short of termination." *Gilbert v. Homar*, 520
U.S. 924, 929 (1997).  The Fourth Circuit, however, has articulated the relevant legal principles
which apply to a property interest in a tenured full professorship in *Huang*.  In that case, Dr.
Huang was a tenured full professor at North Carolina State University ("NCSU"). *Huang*, 902
F.2d at 1136.  He alleged a due process violation occurred when NCSU forced him to transfer
from the Department of Biological and Agricultural Engineering ("BAE") to the Division of
University Studies ("DUS"). *Id.* at 1138.  His interdepartmental transfer was accompanied by a
reduced contractual obligation and corresponding pay reduction. *Id.*  The Fourth Circuit found
that Dr. Huang had not been deprived of his property interest where it was "beyond dispute" that

34

he "remain[ed] a tenured full professor . . . at the same or effectively greater salary." *Id.* at 1141. Indeed, citing the Eleventh, Sixth, and Fifth Circuits, the *Huang* Court went even further to hold that even "the transfer of tenured professors from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause." *Id.* at 1142 (citing *Maples v. Martin,* 858 F.2d 1546, 1550–51 (11th Cir. 1988); *Garvie v. Jackson,* 845 F.2d 647, 651 (6th Cir. 1988) (demotion from department chairman to professor not a denial of a protected property interest); *Kelleher v. Flawn,* 761 F.2d 1079, 1087 (5th Cir. 1985) (reduction of graduate student's teaching duties is not denial of a protected property interest)).

Here, Doe has not pled that he was terminated, lost his tenured position, or had his salary reduced.[10] To the contrary, he continues to hold his position. Compl. ¶ 502; *see also* Compl. ¶¶ 28 (Doe "has worked at GMU for over fifteen (15) years,"), 30 (Doe's "research focuses on sex, human sexuality and cultural norms,"), 31 (Doe "has received continuing support" regarding his Title IX matter). As such, Doe has not been deprived of his property right in his tenured full professorship.

Further, he has not pled that he was transferred and lost pay or rank. His probation and disaffiliation from the Program do not affect his professorial status or position within the Department. Thus, the sanctions here are less severe than those in *Garvie*, where a demotion from department chair to professor did not implicate a property interest. *See Garvie*, 845 F.2d at 651 (cited favorably in *Huang*, 902 F.2d at 1142). And the precise sanctions he complains of, a reduction in teaching duties, occurred in *Kelleher*, and was found not to be a denial of a protected property interest. *See Kelleher*, 761 F.2d at 1087 (cited favorably in *Huang*, 902 F.2d at 1142). Accordingly, Doe has not pled a deprivation of a protected property interest.

---

[10] Doe has pled that he is ineligible for salary *increases* and merit-based *raises*, but these losses are contractual and speculative, respectively, and do not constitute cognizable injuries. *See* Compl. ¶ 399.

He argues there is "no bright line rule in this Circuit that *requires* [] a public employee be terminated in order to plausibly allege a deprivation of his or her property interest in continuing employment." Dkt. 43 at 7 (emphasis in original). The Fourth Circuit rejected this argument when it rejected Dr. Huang's contention "that he had a property right in his BAE position." *Id.* at 1141. The Circuit Court quoted its previous opinion, explaining that:

> to hold that [an employee] had a constitutionally protected property interest in continuing to perform his services would make it impossible for a public employer, dissatisfied with an employee's performance, but without specific contractual cause to discharge him, to relieve the employee from his duties although willing to compensate the employee in full....
> We are convinced that any constitutionally protected property interest [an employee has] as a result of his employment contract [is] satisfied by payment of the full compensation due under the contract.

*Id.* (alterations in original) (quoting *Royster v. Board of Trustees,* 774 F.2d 618, 621 (4th Cir. 1985), *cert. denied,* 475 U.S. 1121 (1985)). Thus, the fact that Doe has not pled loss of his position or salary is fatal.

The three cases Doe cited do not support his proposition. In both *Willis* and *Wilkinson,* the property interests asserted included a right to not be suspended. *Willis,* 90 F. Supp. 3d at 613; *Wilkinson v. School Bd. Of Cnty. Of Henrico*, 566 F. Supp. 766, 769 (E.D. Va. 1983). Here, the metes and bounds of the asserted property right were proclaimed in *Huang,* and while they extend to not being terminated, this interest does not include a right not to be disciplined. The third case Doe cites is *Garner,* but in that case, the plaintiff was both demoted to a new position and lost a monetary subsidy provided for in a contract. *Garner v. Steger,* 69 F. Supp. 3d 581 (W.D. Va. 2014). Thus, the *Garner* plaintiff asserted a property interest in the original position which was lost, and—in accord with *Huang* and *Royster*—was denied a contractual monetary benefit. None of these cases involve a property interest that was like Doe's.

36

**A957**

To the extent Doe asserts a property interest in the right "to be free from overburdensome, unwarranted sanctions tantamount to dismissal from his professional position arises from his appointment letter," his claim also fails. Compl. ¶ 512. First, Doe's vague reference to his appointment letter fails to plead the existence of any property interest because he has not identified a source from which that right would flow.[11] Second, and resultantly, the scope of Doe's asserted property interest is limited to his tenured professorship, and he cannot claim it is tantamount to a property interest in the ability to provide his teaching services as he sees fit, or to graduate students in particular. "[T]he Fourteenth Amendment's due process right to property does not guarantee a right to a particular job, or the right to 'perform particular services.'" *Hibbitts v. Buchanan Cty. Sch. Bd.*, 433 F. App'x 203, 206 (4th Cir. 2011) (quoting *Fields v. Durham,* 909 F.2d 94, 98 (4th Cir. 1990)). Constitutionally protected property interests arising from employment contracts such as a tenured professorship are "satisfied by payment of the full compensation due under the contract." *Huang*, 902 F.2d at 1141 (quoting *Royster,* 774 F.2d at 621). Accordingly, the sanctions imposed here are not an actionable deprivation. *See id.*

The "critical point" in due process claims is that a plaintiff is entitled to constitutional protections only after he has shown that he was deprived of a cognizable interest. *Stone,* 855 F.2d at 172 ( *Roth,* 408 U.S. 564 (1972), *Daniels v. Williams,* 474 U.S. 327 (1986)). "Unless there has been a 'deprivation' . . . the constitutional right to 'due process' is simply not implicated." *Id.*; *accord Iota Xi*, 566 F.3d at 146. Here, Doe has failed to meet this threshold. Because no deprivation occurred, "the question of what process is required and whether any

---

[11] *Compare* Defs.' Mot. to Dismiss Counts II-IV, Ex. 5 (Dkt. 30-5) (appointment letter providing that Doe "may be reassigned duties as determined by the University" and incorporating terms and conditions of the Faculty Handbook) *and* Defs.' Mot. to Dismiss Counts II-IV, Ex. 4 (Dkt. 30-4) ("Faculty Handbook") (providing, in Section 2.10.3, that "work assignments include **some combination** of teaching, research and scholarship, and/or service.") (emphasis added) *with* Pl.'s Opp'n to Mot. to Dismiss Counts I-IV (Dkt. 43) at 10 (noting that the Faculty Handbook, in Section 2.10.3 guarantees "a right to procedural due process" but pointing to no guarantee of an ability to teach graduate courses, or to do so without restrictions).

37

provided could be adequate . . . is irrelevant." *Id.* Accordingly, the Court's analysis will not

reach the third element, the adequacy of procedures here.

### (b) Violations of the Due Process Clause of the Virginia Constitution (Count III)

In Count III, Doe alleges all five individual defendants violated the Virginia Constitution

by depriving him, through the Title IX investigation, its proceedings, and its outcome, of a

property interest without due process of law.

The Virginia Constitution provides that "no person shall be deprived of his life, liberty, or

property without due process of law." Va. Const. Art. I, § 11. "In order to enforce a private

right of action under the Virginia Constitution, the provision in question must be self-executing."

*GMU*, 132 F. Supp. 3d at 728 (citing *Robb v. Shockoe Slip Found.*, 228 Va. 678, 681, 324 S.E.2d

674, 676 (1985)). The due process clause of the Virginia Constitution is self-executing, but only

"with regard to *property* deprivation." *Id.* (emphasis in original) (citing *Gray v. Rhoads*, 55 Va.

Cir. 362, 368 2001 WL 34037320, at *5 (City of Charlottesville, 2001); *Graham v. Mitchell*, 529

F. Supp. 622, 625 (E.D. Va. 1982)). Doe asserts he suffered a property deprivation in regard to

his tenured position. *See* Compl. ¶ 502; Dkt. 43 at 7 n.2 (Doe "is not asserting a . . . claim with

respect to his liberty interest.").

"Virginia state courts have 'consistently held that the protections afforded under the

Virginia Constitution are co-extensive with those in the United States Constitution.'" *Doe 2*, 384

F. Supp. 3d at 612 (quoting *Lilly v. Commonwealth*, 50 Va. App. 173, 184, 647 S.E.2d 517

(2007)). As noted above, there is no question that Doe's "position as a tenured professor is [] a

property right entitled to procedural due process protection." *Huang*, 902 F.2d at 1141. But he

has not alleged that he was deprived of that tenured position. Accordingly, as discussed in more

detail above, Doe has not pleaded that he was deprived of a property interest.  Count III therefore

fails to state a claim.

### (ii) First Amendment Claim (Count IV)

Finally, Doe alleges in Count IV that individual defendants Dr. Hammat, Mr. Williams,

and Dr. Renshaw violated § 1983 when they sanctioned him based on his speech, because to do

so violated his First Amendment rights.  He argues that the various statements GMU found to be

sexual and gender-based harassment were about matters of public concern, were made in his

capacity as a private citizen, and were therefore protected speech.  Dkt. 43 at 27-30.  Notably, he

does not point the Court toward specific statements, but instead breaks the speech into two

groups: in-class statements related to human sexuality and sexual disorders, and statements made

outside the classroom.  Dkt. 43 at 29.  The question is therefore whether Doe has pleaded that

regulating those statements violates the First Amendment.

While public employees retain First Amendment rights, "the state, as an employer,

undoubtedly possesses greater authority to restrict the speech of its employees than it has as

sovereign to restrict the speech of the citizenry as a whole."  *Urofsky v. Gilmore*, 216 F.3d 401,

406 (4th Cir. 2000).  The "determination of whether a restriction imposed on a public employee's

speech violates the First Amendment requires 'a balance between the interests of the [employee],

as a citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.'"

*Id.* (alteration in original) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).  Thus, there is a

threshold inquiry: "If a public employee's speech made in his capacity as a private citizen does

not touch upon a matter of public concern, the state, as employer, may regulate it without

infringing any First Amendment protection."  *Id.* (citing *Connick*, 461 U.S. at 146; *Holland v.

Rimmer*, 25 F.3d 1251, 1254–55 & n.11 (4th Cir. 1994)).  Accordingly, Doe's claim may survive

only if he has pled facts which support that his speech both was on matters of public concern and was made by him as a private citizen, not as an employee. His claim fails because he has affirmatively pled that the speech at issue does not satisfy either element.

The essence of Doe's claim is that he is entitled to discuss any sex-related matters by virtue of his position as professor of "human sexuality, relationships and cultural taboos." Compl. ¶ 548. This argument fails at inception because, in attempting to plead his speech was of public concern, Doe has pled that his speech was not made in his capacity as a private citizen. Indeed, Doe pleads that his statements, "both inside and outside the classroom," were matters of public concern specifically *because* they occurred "with his graduate students" and "concerned . . . topics directly related to the research [Doe] and his graduate students were conducting at the time." Compl. ¶ 548; *see also, e.g.*, Compl. ¶¶ 288 ("Plaintiff's discussion about oral sex within the context of exhibitionism and paraphilias was protected academic discourse."), 253-55 (pleading that Doe recounted a story of his performing oral sex in public at a party to a class, as "an appropriate pedagogical tool."). In so pleading, Doe has asserted that the statements at issue were made either during and in relation to a class he taught in his capacity as a GMU professor, or in relation to and in conjunction with such a class or related research that he conducts in the same capacity. He has therefore pled that his speech is unprotected because it occurred in his capacity as a state employee.

Furthermore, Doe has pled that his speech is curricular and is therefore not a matter of public concern. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (citing *Connick*, 461 U.S. at 146). "For purposes of this inquiry, it does not matter 'how interesting or important the subject of an employee's speech is,' and 'the place where the speech occurs is [also] irrelevant.'" *Adams v. Trustees of the Univ. of N.C.-*

40

*Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011) (alteration in original) (quoting *Urofsky*, 216 F.3d at 407). The Fourth Circuit has made clear that sexual topics may be a matter of public concern when they are made in one's capacity as a private citizen. *See, e.g.*, *id.* (tenured associate professor, who also was a columnist and commentator, authored columns addressing sex which "plainly touched on issues of public, rather than private, concern."). Yet, one's position as a professor of sexual taboos does not confer carte blanche and render all speech protected. *See Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc) (holding that a teacher's selection of a play to be presented at a public school constituted a matter of private concern). Indeed, the Fourth Circuit has held that where the speech of a public employee is "part of [a] school's curriculum," it is "not protected speech under the First Amendment." *Id.* at 367. More specifically, because the nuances and manifestations of an institution's curriculum are to be decided between the employee/teacher and the employer/institution, curricular speech "does not present a matter of public concern and is nothing more than an ordinary employment dispute." *Id.* at 368. Here, Doe has repeatedly pled and argued that the speech at issue was curricular. *See* Dkt. 43 at 30 (arguing Doe's speech was curricular because it related to his work and citing Compl. ¶¶ 252-84, 287-89, 292, 296, 304-05, 326, 335-44, 353, 359, 362, 363, 367, 375-77, 379-80, 548-50). It is, therefore, not a matter of public concern.

Because Doe has pled that his statements were made in his capacity as an employee, and were not matters of public concern, he has failed to state a claim.

### 3. Amendment is Futile

In footnotes, Doe has requested—if his claims are to be dismissed—that two portions of those claims be dismissed without prejudice. Specifically, he has requested to replead his liberty interest claim based on the publication element, and he has requested to replead his selective

enforcement claim if his erroneous outcome claim survived. Dkt. 38 at 29 n.20; Dkt. 43 at 17

n.12. Those claims, like the others, will be denied with prejudice because amendment futile.

A party may amend its pleading once as a matter of course within certain time limits.

Fed. R. Civ. P. 15(a)(1). In all other cases, "leave to amend shall be given freely, absent bad

faith, undue prejudice to the opposing party, or futility of amendment." *United States v. Pittman*,

209 F.3d 314, 317 (4th Cir. 2000) (compiling cases); *see also* Fed. R. Civ. P. 15(a)(2).

Amendment is futile when it "'is clearly insufficient or frivolous on its face.'" *Wilkins v. Wells*

*Fargo Bank, N.A.*, 320 F.R.D. 125, 127 (E.D. Va. 2017) (quoting *Johnson v. Oroweat Foods*

*Co.*, 785 F.2d 503, 510 (4th Cir. 1986)). Clearly insufficient amendments "fail[] to state a claim

under the applicable rules and accompanying standards." *Katyle v. Penn Nat. Gaming, Inc.*, 637

F.3d 462, 471 (4th Cir. 2011). Thus, where an amended complaint "could not withstand a

motion to dismiss," amendment is futile. *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir.

1995) (citing *Glick v. Koenig*, 766 F.2d 265, 268-269 (7th Cir. 1985)); *see also Katyle*, 637 F.3d

at 471 (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376

(4th Cir. 2008)) (leave to amend may be denied if the "amended complaint fails to satisfy the

requirements of the federal rules.") .

First, as an initial matter, the Court finds that Doe's footnoted requests fail to qualify as a

motion for leave to amend. *See* Fed. R. Civ. P. 7(b), 15(a); *see also Cozzarelli v. Inspire*

*Pharms., Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008) ("[W]e cannot say that the district court

abused its discretion by declining to grant a motion that was never properly made,"); *United*

*States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004)

("While Federal Rule 15(a) provides that leave to amend shall be freely given when justice so

requires, a bare request in an opposition to a motion to dismiss—without any indication of the

particular grounds on which amendment is sought—does not constitute a motion with the

42

contemplation of Rule 15(a)."). The Court will proceed with its analysis nonetheless, assuming Doe would make such a motion. Second, Doe's requests are futile. On the one hand, his liberty interest claim fails regardless of the publication element. On the other, he premised his selective enforcement claim repleading request upon the continued existence of his erroneous outcome claim, but that claim has also failed.

Furthermore, any other amendment to Doe's original 162-page Complaint is futile. Doe has exhaustively pled each count, and this lawsuit was filed only after he had painstakingly responded with the detailed extensive rebuttal to GMU's investigation, which he provided repeatedly during the administrative review. The Court cannot envision any amendments possible under Rule 11 which would cure the defects herein because Doe has extensively pled facts which preclude his claims.

"Courts recognize that a plaintiff can plead himself out of court by pleading facts that show that he has no legal claim." *Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 594 (E.D. Va. 2013) (Lee, J.) (quoting *Whitlock v. St.*, 2012 WL 3686434, at *4 (E.D. Va. Aug. 24, 2012) (Hudson, J.) (compiling cases)). Doe has done so here. First, regarding his Title IX claims, Doe failed to plead a gender bias but alleged the existence a bias in favor of victims or complainants and against the accused. Since that bias is not gender-based, it is lawful. Second, regarding his due process claims, Doe has failed to show any deprivation which may invoke due process protections. Any subsequent deprivation will necessarily result from a separate transaction or occurrence. Third and finally, Doe has affirmatively pled that his speech at issue is unprotected by the First Amendment because it occurred in his capacity as a state employee, and was not of public concern.

Accordingly, amendment would be futile.

Case 1:19-cv-01249-LO-MSN   Document 49   Filed 04/23/20   Page 44 of 44 PageID# 1506

### IV. CONCLUSION

For the reasons stated above, Plaintiff's motion to proceed by pseudonym, Dkt. 2, is

hereby **DENIED**.

Further, the improperly named Defendant "George Mason University" is hereby

**DISMISSED**.

Further still, Defendants' motions to dismiss, Dkt. 26 and Dkt. 29 are hereby

**GRANTED**, and the Complaint is hereby **DISMISSED WITH PREJUDICE**.

It is **SO ORDERED**.


April 23, 2020                                        Liam O'Grady
Alexandria, Virginia                                 United States District Judge


44

## A965

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. Action No. 1:19-cv-01249-LO-MSN |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | **NOTICE OF APPEAL** |
| | ) | |
| Defendants. | ) | |

Notice is hereby given that Plaintiff Todd Kashdan, formerly known as John Doe,[1] in the above named action, hereby appeals to the United States Court of Appeals for the Fourth Circuit from that portion of the final order of the United States District Court for the Eastern District of Virginia, Alexandria Division, entered on April 23, 2020, dismissing the Complaint with prejudice.

Dated: April 29, 2020

Respectfully Submitted,

FARMER LEGAL, PLLC

By:   s/ *Joshua T. Farmer*
Joshua T. Farmer
5030 Sadler Place, #205
Glen Allen, VA 23060
(804)325-1441
josh@farmerlegalhelp.com

-and-

_____

[1] As part of the order entered on April 23, 2020 (Doc. No. 49), the Court denied Plaintiff's motion to proceed by pseudonym. However, given that the case was dismissed with prejudice, the case caption remains the same. Plaintiff is not appealing that part of the order.

NESENOFF & MILTENBERG, LLP

By: ____ /s/ *Andrew T. Miltenberg* _____
    Andrew T. Miltenberg (admitted *pro hac vice*)
    Kara L. Gorycki (admitted *pro hac vice*)
    363 Seventh Avenue, Fifth Floor
    New York, New York 10001
    (212) 736-4500
    amiltenberg@nmllplaw.com
    kgorycki@nmllplaw.com

    *Attorneys for Plaintiff*

**A967**

Case 1:19-cv-01249-LO-MSN   Document 50   Filed 04/29/20   Page 3 of 3 PageID# 1509

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following counsel of record:

Eli S. Schlam
George Mason University
4400 University Dr.
Legal Dept.
Fairfax, VA 22030-4444
eschlam@gmu.edu

/s/ Joshua T. Farmer
Joshua T. Farmer

3