**20-1509**

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

➤➤ ◄◄

TODD KASHDAN, f/k/a John Doe,

*Plaintiff-Appellant,*

*v.*

GEORGE MASON UNIVERSITY; RECTOR AND BOARD OF VISITORS OF GEORGE MASON UNIVERSITY; JENNIFER RENEE HAMMAT, in her official and individual capacity; JULIAN ROBERT WILLIAMS, in his official and individual capacity; KEITH DAVID RENSHAW, in his official and individual capacity; ANN LOUISE ARDIS, in her official and individual capacity; SZUYUNG DAVID DWU, in his official and individual capacity,

*Defendants-Appellees.*

───────────────

*On Appeal from the United States District Court
for the Eastern District of Virginia at Alexandria*

## BRIEF FOR PLAINTIFF-APPELLANT

NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500

*Attorneys for Plaintiff-Appellant*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ......................................................1

ISSUES PRESENTED FOR REVIEW ................................................2

STATEMENT OF THE CASE.............................................................2

    I.     Statement of Relevant Facts............................................................2

         A.    Background ............................................................2

         B.    The Proceedings ...................................................2

         C.    The Decision Makers .............................................7

         D.    The Allegations and Findings ......................................14

              Complainants 1 and 2..............................................14

              Complainant 3 ......................................................19

              Complainant 4 ......................................................21

         E.    Kashdan's Complaint Against Complainant 4 ...........27

    II.    Relevant Procedural History ..............................................27

    III.    The Rulings Presented For Review.......................................27

SUMMARY OF THE ARGUMENT .................................................28

    1.    The Title IX Claims ..........................................................28

    2.    Kashdan's Constitutionally Protected Liberty Interest ...........29

    3.    The First Amendment Claim...............................................29

i

ARGUMENT ...........................................................................................29

I.     THE STANDARD OF REVIEW ..................................................29

II.    THE COMPLAINT STATES A TITLE IX
       DISCRIMINATION CLAIM ........................................................30

       A.     The Law Concerning Title IX Discrimination Claims ................30

       B.     The Complaint Sufficiently Alleges an "Erroneous
              Outcome" Claim .........................................................................31

              1.     The District Court Erred in Holding That Doe
                     v. Marymount University is Inapposite ...............................33

              2.     The District Court Failed to Adhere to the
                     Applicable Pleading Standard..............................................37

                     a.     Hammat's Findings......................................................37

                     b.     Hammat's Public Statements......................................41

                     c.     Williams' Findings ......................................................43

                     d.     Williams' Public Statements......................................44

                     e.     Pressure on Title IX Administrators...........................46

       C.     The Complaint Sufficiently Alleges A Selective
              Enforcement Claim ......................................................................48

III.   THE COMPLAINT ALLEGES A COGNIZABLE
       LIBERTY INTEREST PROTECTED BY THE DUE
       PROCESS CLAUSE ..............................................................................51

IV.    THE COMPLAINT STATES A FIRST AMENDMENT
       CLAIM.................................................................................................54

CONCLUSION........................................................................................59

CERTIFICATE OF COMPLIANCE........................................................60

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams v. Trs. of the Univ. of N. Carolina-Wilmington*,
　640 F.3d 550 (4th Cir. 2011) ...............................................................55

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ...........................................................................37

*Boring v. Buncombe Cty. Bd. of Educ.*,
　136 F.3d 364 (4th Cir. 1998) ...............................................................56

*Demers v. Austin*,
　746 F.2d 402 (9th Cir. 2014) ...............................................................55

*Doe v. Baum*,
　903 F.3d 575 (6th Cir. 2018) ................................................. 32, 38, 46

*Doe v. Columbia*,
　101 F. Supp. 3d 356 (S.D.N.Y. 2015) *rev'd* 831 F.3d
　46, 56-58 (2d Cir. 2016) ......................................................................40

*Doe v. Fairfax Cty. Sch. Bd.*,
　403 F. Supp. 3d 508 (E.D. Va. 2019) ........................................ 31, 45

*Doe v. Loh*,
　767 Fed. Appx. 489 (4th Cir. 2019) .....................................................30

*Doe v. Marymount Univ.*,
　297 F. Supp. 3d 573 (E.D. Va. 2018) ......................................... *passim*

*Doe v. Purdue Univ.*,
　928 F. 3d 652 (7th Cir. 2019) ..............................................................31

*Doe v. Rector & Visitors of George Mason Univ.*,
　132 F. Supp. 3d 712 (E.D. Va. 2015) ........................................ 40, 41

*Doe v. Salisbury Univ.*,
　123 F. Supp. 3d 748 (D. Md. 2015) ........................................... 49, 50

*Doe v. Univ. of the Sciences*,
    961 F. 3d 203 (3d Cir. 2020)............................................................ 31, 47, 50, 51

*Doe v. Washington & Lee Univ.*,
    2015 WL 4647996 (W.D. Va. Aug. 5, 2015) ............................................. *passim*

*Dube v. State Univ. of New York*,
    900 F.2d 587 (2d Cir. 1990).......................................................................56

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ............................................................................... 29, 55

*Hall v. City of Newport News*,
    469 Fed. Appx. 259 (4th Cir. 2012)...................................................53

*Hardy v. Jefferson Cmty. Coll.*,
    260 F.3d 671 (6th Cir. 2001) ......................................................... 56, 57

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988).......................................................................... 56, 57

*Johnson v. Morris*,
    903 F.2d 996 (4th Cir. 1990) ..............................................................54

*Lee v. York County Sch. Div.*,
    484 F.3d 687 ......................................................................... 55, 56, 57

*Norris v. University of Colo., Boulder*,
    362 F. Supp. 3d 1001 (D. Colo. 2019)............................................. 32, 35, 36, 46

*Preston v. Commonwealth of Va.*,
    31 F.3d 203 (4th Cir. 1994) ...............................................................30

*Republican Party of N. Carolina v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ..............................................................37

*Ridenour v. Multi-Color Corp.*,
    147 F. Supp. 3d 452 (E.D. Va. 2015) ................................................49

*Ridpath v. Bd. of Governors Marshall Univ.*,
    447 F.3d 292 (4th Cir. 2006) ................................................... 52, 53, 54

iv

*Schwake v. Arizona Bd. of Regents*,
  2020 WL 4343730 (9th Cir. Jul. 29, 2020)...................................... 31, 32, 47, 49

*Sciolino v. City of Newport News*,
  480 F.3d 642 (4th Cir. 2007) ...............................................................51

*Stennis v. Bowie State Univ.*,
  716 Fed. Appx. 164 (4th Cir. 2017).....................................................29

*Stewart v. Iancu*,
  912 F.3d 693 (4th Cir. 2019) ...............................................................29

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971)..............................................................................51

*Yusuf v. Vassar College*,
  35 F. 3d 709 (2d Cir. 1994)........................................................ *passim*

## Statutes

20 U.S.C. § 1681 ..........................................................................................1

20 U.S.C. § 1681(a) ...................................................................................30

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

2020 WL 434730 ........................................................................................37

## Rules

Fed. R. App. P. 4(a) ....................................................................................1

Fed. R. Civ. P. 12(b)(6)........................................................................ 29, 34

## JURISDICTIONAL STATEMENT

As relevant to this appeal, this case was filed in the United States District Court for the Eastern District of Virginia based upon federal question jurisdiction, 28 U.S.C. § 1331, because the action arose out of the Constitution and laws of the United States, to wit, the First Amendment (Free Speech), Fourteenth Amendment (Due Process) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (A13 ¶ 25).

On April 23, 2020, the District Court issued an order entered final judgment granting: (i) Appellee the Rector & Visitors of George Mason University's ("Mason") Rule 12(b)(6) Motion to Dismiss Kashdan's Title IX Claim with prejudice (A934-48); and (ii) Appellees Jennifer Renee Hammat's ("Hammat"), Julian Robert Williams' ("Williams"), and Keith David Renshaw's ("Renshaw") (collectively, the "Individual Appellees") Rule 12(b)(6) Motion to Dismiss Kashdan's federal Due Process and First Amendment claims (the "Order"). (A948-61.) The Order disposed of all parties' claims. (A964.)

This appeal is as of right, and the Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a). The Notice of Appeal was timely filed. (A965).

## ISSUES PRESENTED FOR REVIEW

1.      Did the District Court err in dismissing Kashdan's Title IX erroneous outcome claim on the ground that he failed to plausibly allege gender bias?

2.      Did the District Court err in dismissing Kashdan's Title IX selective enforcement claim?

3.      Did the District Court err in dismissing Kashdan's federal due process claim on the ground that he failed to plead a cognizable liberty interest?

4.      Did the District Court err in dismissing Kashdan's First Amendment claim on the ground that his speech was constitutionally unprotected?

## STATEMENT OF THE CASE

**I.      Statement of Relevant Facts**

**A.  Background.**

Kashdan, a full tenured professor at Mason, conducts research on human sexuality and cultural norms. His work is regularly published and he has received numerous awards, accolades and research grants over the span of his career. He has worked at Mason for well over 15 years, receiving consistently stellar evaluations. (A9 ¶2, A14-15 ¶¶28-31.)

**B.      The Proceedings.**

Prior to December 2018, when Kashdan became the subject of a baseless Title IX investigation, he had an unblemished record. (A14.) In fall 2018, a few months

after Kashdan fired Complainant 4 from his lab—a decision supported by Complainant 4's colleagues—she and three of her friends (Complainants 1-3) brought Title IX complaints against him, alleging that Kashdan created a hostile environment for female graduate students. (A9 ¶3; A43 ¶140; A93-94 ¶¶330-332; A968-1053.)

Hammat, Mason's Title IX Coordinator at the time, initiated a Title IX investigation with respect to all four complaints even though: i) Complainants 1 and 2 had already graduated and no Mason policy permitted the investigation of *post hoc* complaints (A43-44 ¶142); and ii) nearly all of the allegations were timed out under Mason's applicable procedures (A43-44 ¶¶142-44.)

After a gender-biased investigation was conducted, from which the Title IX investigator was removed, Hammat found Kashdan responsible for "Sexual or Gender-Based Harassment" with respect to all four Complainants, despite a wealth of evidence that contradicted their allegations and no evidence that any Complainant was denied access to her education (A42-107 ¶¶136-365; A1054-63.) Williams denied Kashdan's appeal. (A107-11 ¶¶370-384, A1064-65.)

Kashdan's supervisor, Renshaw, imposed sanctions that *inter alia* prohibited Kashdan from recruiting new graduate students to work under his mentorship or supervision and teaching graduate courses. Renshaw also met with Kashdan's current graduate students to determine whether they wanted to continue their work

with Kashdan or transfer to a new mentor/supervisor. (A115-16 ¶ 393, A371-74.) The sanctions will remain in place for an indefinite period of time, until Renshaw and the Dean of the College of Humanities and Social Sciences determine, in their discretion, that Kashdan exhibits "sufficient behavioral change" to resume these aspects of his professorship (the "Title IX Sanctions"). *Id.* The Title IX Sanctions also left open the possibility of "continuing restrictions" on Kashdan if he is even allowed to resume teaching graduate students. *Id.* As a result of the Title IX Sanctions, Kashdan is ineligible for salary increases for an indefinite period of time. (A118 ¶399.)

Complainants 1-4 were dissatisfied with the Title IX Sanctions and sought more severe punishment through faculty mentors in Mason's Clinical Psychology program. (A129 ¶445; A133 ¶459.) Shortly after the Title IX Sanctions were imposed, Mason's Psychology faculty also spread rumors about Kashdan to students within the Department. (A121 ¶412.) A female professor in charge of the Clinical Psychology program—which Kashdan helped to establish and was affiliated with for his entire career—tried to force Kashdan to disaffiliate from the Program. She misrepresented that the Program would lose its accreditation if he remained involved. (A121-22 ¶¶413-418). Kashdan spoke with two representatives of the accrediting organization and was told that neither Hammat's findings nor the Title IX Sanctions put Mason's accreditation at risk. (A124 ¶424.) When Kashdan elected

4

not to disaffiliate from the program, a group of his colleagues (7 female and 1 male) filed a grievance against him, to force his disaffiliation. (A122-25).

Ignoring that Mason's accreditation *was not* at risk, the grievance committee recommended Kashdan's disaffiliation, causing Renshaw to remove Kashdan from the Clinical Psychology program for a period of *5-6 years* with no clear plan for reinstatement. As a result, Kashdan was prohibited *inter alia* from teaching courses or seminars in the Program, conducting program-related research, or conducting "other work" related to the Program. Kashdan was also prohibited from graduate students in the Program who wished to continue working with him (the "Disaffiliation Sanctions"). Whether or not Kashdan can ever re-affiliate with the Program is an open question. (A130-33 ¶¶449-59; A770-72, A1195-97.)

The combined impact of the Title IX and Disaffiliation Sanctions, is an absolute ban on Kashdan working with, mentoring, and teaching graduate students for an indefinite period of time. For over 15 years, the only graduate students who worked on Kashdan's research team were in the Clinical Psychology program. (A125 ¶426.) Graduate students are the primary people that keep his research lab functioning. (A117 ¶¶394-396, A791.) A professor's inability to utilize graduate students to conduct research hobbles productivity, which results in an inability to attract or maintain research funding. (A791.)

Both the Title IX and Disaffiliation Sanctions have jeopardized Kashdan's position as a full tenured professor. With respect to evaluating tenured faculty, Mason's Faculty Handbook sets forth criteria for annual evaluations, which are the "primary basis for determining salary increases." (A840 §2.6.1.) The evaluations examine whether professors are effective teachers, including with respect to "the training and supervision of teaching assistants, mentoring graduate students, clinical and field supervision of students and student advising." (A838 §2.4.1.) The Disaffiliation Sanctions bar Kashdan from engaging in any of these activities for an unlimited period of time. (A1197.)

Tenured faculty are also evaluated for scholarly achievement, or original publications and peer-reviewed contributions, which will be impacted by Kashdan's lack of graduate student staff. (A839 §2.4.2.) A third component of faculty evaluations is University and professional service. *Id.* §2.4.3. This requires participation in faculty meetings, governance and operational activities outside the classroom. *Id.* Kashdan has been banned from participating in meetings, and sitting on committees, in his program. (A1196.) Kashdan's inability to participate will negatively impact his evaluations going forward. Tenured faculty who receive two "unsatisfactory" reviews in a four-year period may be terminated. (A841 §2.6.2.)

### C. **The Decision Makers.**

Megan Simmons ("Simmons"), Hammat, Williams and Renshaw were the decision makers involved in the Title IX proceedings against Kashdan:

***Megan Simmons***: Simmons investigated the allegations against Kashdan and was removed from the case for exhibiting gender bias. (A44-45 ¶¶146-48.) Simmons investigated the four complaints together, which tainted the information gathering process. (A139 ¶483(i).) She further presumed that Kashdan was guilty of sexual harassment. *Id.* By the time Simmons was removed, she had already conducted the bulk of the investigation, including taking witness statements that Hammat later relied upon in determining responsibility. *Id.* Simmons' gender bias compromised the reliability of the evidence gathered in Kashdan's case by, for example, failing to name Complainants 1-4 when questioning witnesses. (A145 ¶148.) To the extent that Hammat relied on the evidence gathered by Simmons, the investigation was irreparably tainted. (A139 ¶483(i).) Hammat conducted the remainder of the investigation (A45 ¶149.)

Simmons has a lengthy background of advocacy on behalf of female victims of sexual violence. (A44-45 ¶ 147.) She has worked on various committees tasked with ending violence against women. *Id.* Simmons left Mason to work for a non-profit that advocates for the prevention of violence against women. *Id.* She serves as a guest lecturer in Mason's Women and Gender Studies Department. *Id.* It is

believed that Mason trained Simmons to adopt a trauma-informed approach to Title IX investigations, including to assume the complete veracity of a complainant's allegations. (A142 ¶484(b).)

*Jennifer Hammat*: Hammat was the sole individual tasked with deciding the outcome of Kashdan's case. (A46 ¶150.) She has been publicly vocal about being a survivor of a sexual assault that happened when she was a college student. *Id*. In an interview that was published while she was Title IX administrator at a different university, the sexual assault was described as an "experience that informs Hammat's work." (A332.) Hammat recounted that in college she formed a sorority pledge patrol group which "wouldn't leave a party until we had gone into every room, kicked down doors, got all our girls out." (A333.) Hammat also referenced speaking at a fraternity house where she told the members to be "angry and…protective of every female that walks in this house." *Id.* Hammat has been publicly criticized as "such an ideologue that she's incapable of interpreting statistical data that contradicts her preconceived worldview" and "redefin[ing] (and broaden[ing]) the meaning of rape and sexual assault to such an extent that it bears no relationship to how these commonly referenced terms are defined …under most states' criminal law." (A46 ¶151; A359.)

Hammat was hired as Mason's Title IX Coordinator in the wake of the United States Department of Education's Office for Civil Rights ("OCR") commencing an

investigation into Mason's alleged creation of a "a sexually hostile environment" for female students by failing to respond promptly and equitably to Title IX complaints (the "2016 OCR Investigation"). (A34 ¶¶108, 110.) Hammat participated in at least one "DC Area Feminist Event," providing a "wish list" of how women's advocates could assist her with Title IX enforcement. (A47 ¶152.) Hammat also met with Mason's Women and Gender Studies Department in order to address a list of demands that included the use of a trauma-informed approach in the Title IX process. (A34 ¶110.)[1] In a fall 2017 interview, Hammat said that Secretary of Education Betsy DeVos' criticism of the April 2011 Dear Colleague Letter led some sexual assault survivors to believe that DeVos was making it more difficult to file Title IX complaints, causing survivors to feel devalued. (A35 ¶112.)

Hammat had a conflict of interest because she was not only Mason's Title IX Coordinator, responsible for Title IX enforcement, but tasked with determining the outcome of Kashdan's case. (A45 ¶149, A56 ¶197, A59 ¶207, A136 ¶473).

Hammat participated in the revision process for Mason's 2016-2017 and 2017-2018 Sexual Misconduct Policies, which expanded the definition of Sexual Harassment and included the new category of Gender-Based Harassment. (A55 ¶¶192, 199, A58 ¶202.) The policy revisions eroded the rights of Mason's faculty

---

[1] The trauma-informed approach in investigating and adjudicating university Title IX complaints has recently been criticized by the Association of Title IX Administrators, scientists and courts. (A33-34 ¶¶103-107).

and expanded the definition of sexual harassment to include nearly any form of conduct that a person found offensive. (A78 ¶279.) It is believed that Hammat was trained to use a trauma-informed approach. (A33-34 ¶¶103-107.)

Hammat i) failed to question the Complainants' motives and credibility and ignored exculpatory evidence (A48 ¶157; A69-74 ¶¶251, 256, 258-260, 264-265; A77 ¶¶275-276; A80-83 ¶¶289, 293; A86 ¶309; A96-101 ¶¶336, 339-340, 343, 347-349, 355); ii) denied Kashdan access to the evidence against him (A47 ¶155; A55-56 ¶194; A58-59 ¶204); iii) did not disclose the names of the witnesses involved in the investigation (A47 ¶153; A55-56 ¶194; A58-59 ¶204); iv) made biased statements when interviewing Kashdan (A139 ¶483(j)); v) presumed Kashdan was guilty (*Id.*); vi) added new allegations to her determination letters to which Kashdan had no opportunity to respond during the investigation (A79 ¶282; A88-90 ¶¶318, 320, 322; A102-104 ¶¶358-360, 362, 364); vii) provided the Complainants with an opportunity to respond to Kashdan's account of what occurred (A144 ¶ 485(e)); viii) made statements that reflected gender biased views of relationships between men and women (A79-82 ¶¶282, 287, 289-290, 296; A84 ¶304; A89 ¶¶320-321, A144 ¶485(f)); and ix) failed to recognize that the Complainants were not denied access to their education (A69 ¶250; A243 ¶293; A441-44.)

***Julian Williams***: Williams was the sole individual tasked with deciding Kashdan's appeal. (A50 ¶167.) He had conflicts of interest because he supervised

Hammat and Simmons, (A10 ¶6; A114 ¶390(7).)[2] and was responsible for Title IX

compliance. (A141 ¶483(z).)

In an interview published in April 2015, when he was the Title IX Officer at

Vassar College, Williams said:

> If you don't have an environment that is investigating and responding
> to issues of sexual assault and sexual harassment, ***female students*** on
> your campus may not feel safe, and they may not feel like they belong.
> So…we want to meet…our moral obligations to protect and care for
> our students and our community. (emphasis added.)

He added that "just because a panel may not have had enough information to

determine that there has been a probable policy violation doesn't mean we don't

believe you, doesn't mean we think you are lying."[3] (A50 ¶166; A363, 365.)

Williams was involved in responding to the 2016 OCR Investigation, which

was pending during Kashdan's Title IX case. (A34 ¶¶108-109; A142 ¶484(d).) With

respect to the Investigation, Williams acknowledged "[t]he biggest sort of power

[OCR] would yield would be one of the egregious cases where they could limit a

university's ability to accept financial aid funding." *Id.* In April 2018, after OCR

launched a second investigation at Mason, Williams called for the retraction of

statements made in the student newspaper concerning Mason's failure to investigate

a female student's sexual harassment complaint for over one year because "[w]e

---

[2] Mason's Faculty Senate Committee complained to the Provost about this very
conflict. (A740.)

[3] This comports with a trauma-informed approach, discussed *supra* note 1.

would never want a message conveyed to our community that suggests a student would not be listened to or receive a timely response." (A38 ¶119.)

With respect to Kashdan's appeal, Williams: i) ignored exculpatory evidence (A71-72 ¶¶256-259; A74 ¶¶264-265; A76-77 ¶¶272, 275-276; A80-81 ¶288, 291; A86 ¶309; A93-94 ¶¶327-331; A96-101 ¶337, 339-340, 343, 346-349, 351; A102 ¶359; A104-105 ¶365; A108 ¶376); ii) relied upon the interviews of 12 witnesses that were never disclosed to Kashdan (A108 ¶374); iii) failed to question the Complainants' delay in reporting, credibility or motives (A83 ¶302; A101 ¶352; A109 ¶378; A145 ¶485 (i)); iv) ignored that none of the Complainants were denied access to their education (A69 ¶250; A81-82 ¶293; A90-92 ¶¶322-323; A108-109 ¶376-377; A442-44); v) attributed fault to Kashdan for the creation of a "hypersexual environment" that did not exist or, to the extent it did exist, was attributable to Complainant 4's words and conduct (A108 ¶375; A1064-65); vi) found a *quid pro quo* based on participation in "sexual conversations" even though there was no evidence that Complainants 1-3 participated in discourse concerning sex, (A108 ¶376), and, with respect to Complainant 4, who researched human sexuality with Kashdan, no *quid pro quo* existed (A108-109 ¶377); vii) assumed that adult, females in their mid-twenties are in need of parenting by male professors and would not voluntarily participate in discourse about sex (A110 ¶381); viii) failed to investigate Kashdan's allegations that certain Complainants submitting false or misleading

information (A105-107 ¶¶366-71); and ix) allowed Complainants 1-4 to publicly disclose confidential information about the Title IX proceedings (A110-11 ¶¶ 382-383).

**Renshaw:** Renshaw was the sole arbiter of the Title IX and Disaffiliation Sanctions. (A50 ¶169.) Within weeks of imposing the Title IX Sanctions, Mason's Faculty Senate, of which Renshaw was a member, called for an investigation of U.S. Supreme Court Justice Brett Kavanaugh, whom Mason had hired to teach a course for its law school. (A41 ¶131.)

With respect to Kashdan's case, Renshaw: i) prohibited Kashdan from recruiting and hiring graduate students before Hammat determined responsibility (A48 ¶159); ii) imposed sanctions which required him to divulge confidential information to Kashdan's graduate students (A117 ¶395); iii) permitted faculty in the Psychology Department to divulge confidential information about Kashdan to their students (A121 ¶412; A125 ¶427); iv) expected Kashdan to take steps to quell the hostility of Department faculty (A125 ¶428); v) acknowledged that the #metoo movement may have caused Complainants 1-4 to "reframe" Kashdan's conduct as sexual harassment (A129 ¶444); vi) acknowledged that the Psychology Department had no clear guidelines for faculty socializing with graduate students (A129 ¶446); and vii) imposed increasingly severe sanctions after Complainants 1-4 expressed

dissatisfaction with the Title IX Sanctions, even though he was not required to impose the Disaffiliation Sanction (A129 ¶445; A130-32 ¶449-55.)

**D.  The Allegations and Findings.**

Hammat found Kashdan responsible for "Sexual or Gender-Based Harassment" with respect to the allegations detailed below, applying the most recent, and more stringent, Sexual Misconduct Policy in all rather than the policy relevant each timeframe. (A968-1063.)

***Complainants 1 and 2****:*

Complainants 1 and 2 made nearly identical allegations concerning an example Kashdan used in one class taught as part of Course A, in Spring 2013, in which Kashdan referenced a woman asking for oral sex in a public setting. (A68 ¶¶247, 249; A79-90, ¶¶285, 287.) The example was part of a discussion about sexual disorders. (A70-71 ¶¶252-256.) Kashdan received stellar student evaluations for Course A with 100% of his students (including Complainants 1 and 2) rating his teaching as a 5 out of 5. (A71 ¶256.) In support of his appeal, Kashdan provided a peer evaluation of the very class on sexual disorders that was the subject of the Title IX complaint, in which the evaluator, Dr. James Thompson, noted "an atmosphere of mutual respect and fact-based discussion throughout the class" and that "Dr. Kashdan's teaching style was positive and encouraging, and allowed the students to voice a range of thoughts and opinions in a highly supportive environment." (A71-

72 ¶257; A777-78.) Williams ignored this exculpatory evidence. (A107 ¶373; A118-19 ¶401.)

Neither Complainant 1 nor Complainant 2 made any contemporaneous complaints about Kashdan. (A72 ¶258.) On the contrary, both women specifically requested that Kashdan teach a second course which he had never taught before (Course B) so that they could have him as an instructor for a second time. (A71 ¶256; A1183.) In July 2013, Complainant 1 solicited Kashdan's participation in her second-year graduate project. (A72 ¶258; A1187.) She later asked Kashdan to provide a reference letter for her internship, referencing Course A as one of their "primary interactions." (A72 ¶259; A1185.) She and Kashdan collaborated on a number of research articles. She also asked Kashdan to serve on her dissertation committee over other faculty members who were more qualified to so. (A72 ¶259; A1186.)

Despite this evidence, Hammat found Kashdan responsible with respect to both Complainants. (A78 ¶281; A82 ¶296.) Hammat and Williams each ignored that the example used by Kashdan was protected academic discourse under the applicable Sexual Misconduct Policy. (A118 ¶401.)

Complainants 1 and 2 next took Course B, which Kashdan taught (at their request) in Spring 2014. Complainants 1 and 2 alleged that in one class taught as part of Course B, Kashdan used an example about watching a woman skinny dipping

while on a trip to the Middle East. (A68 ¶249; A80 ¶287.)[4] Kashdan provided a detailed explanation of the example, which did not concern skinny dipping. (A73-74 ¶¶260-63.) Student witnesses corroborated this. (A73 ¶260; A80 ¶289.) Kashdan once again received stellar course evaluations for Course B. (A74 ¶265.) Complainant 1 emailed him, copying Complainant 2, and praised Kashdan's teaching in Course B. (A1181.) Complainant 2 also emailed Kashdan in July 2014 to ask for a letter of recommendation. (A81 ¶291.)

With respect to Complainant 2 (but not Complainant 1), Hammat found that the example created a hostile environment. (A82 ¶296.) Hammat described Kashdan's example, which concerned swimming in the ocean with a female clad in a bathing suit, to be an "erotic" "intimate encounter." (A73-74 ¶¶260-62; A1056.) Hammat and Williams again ignored that Kashdan's example constituted protected academic discourse under the applicable policy. (A74 ¶263; A118 ¶401.)

Complainants 1 and 2 alleged that either during Course A or Course B, Kashdan recommended that his graduate students visit Spa World. The Notices of Investigation referred to Spa World as a "spa where people are often naked in the common areas" and "allegedly known for human trafficking and public nudity." (A69 ¶249; A80 ¶287.) Complainant 1 made the false allegation that Kashdan

---

[4] In Complainant 2's Notice of Investigation, Hammat noted that the woman was not Kashdan's wife. (A976.)

recommended that his students "get naked together" at Spa World, which Kashdan denied. (A76 ¶274.) Kashdan recommended Spa World as one of a number of activities to alleviate the stress of graduate school. *Id*. Kashdan had no knowledge of any human trafficking activities at Spa World when recommending it to his students. (A81 ¶290.)[5] Spa World does not allow nudity in its common areas. (A76 ¶274.)

With respect to Complainants 1 and 2, Hammat found Kashdan responsible for recommending Spa World. (A78 ¶281, A82 ¶296.)

Complainant 1 also alleged that Kashdan joked in class about graduate students sleeping with and being "incestuous" with each other. Kashdan denied these allegations and they were not corroborated by other students in class. (A77 ¶277.)

Complainant 1 further alleged that Kashdan dismissed students' concerns topics of class discussion as "emotional" "irrational" or "weak." (A69 ¶249.) Kashdan submitted evidence demonstrating his caring approach to challenging class topics. (A74-77 ¶¶264-65, 269-73, 275; A776-78.) One student witness stated that Kashdan called one student's *arguments* emotional, rather than evidence based, in class. (A77 ¶275.)

---

[5] Indeed, allegations concerning human trafficking at Spa World came to light after Kashdan taught Courses A and B, which he learned only from a Google search when preparing his appeal. (A81 n. 64.) This suggests that Complainant 2 embellished her allegations to make the recommendation seem more sinister.

Hammat added to Complainant 1's determination letter the vague, uncorroborated statement that "interactions with [Kashdan] included regular and gratuitous stories detailing sexual encounters, disparaging comments and actions regarding stereotypical female traits (e.g. being emotional[6])." (A79 ¶282; A1055.) Hammat noted that Kashdan cautioned students about sharing stories he told outside of class. *Id.* Kashdan did not have the opportunity to address these allegations during the investigation. *Id.*

Complainant 2 alleged that Kashdan "shared with students the number of sexual partners he had." (A80 ¶287.) On the last day of Course A, ***Complainant 2*** asked Kashdan to disclose the number of sexual partners he had. (A81 ¶292.) He responded with only the number. *Id.* Hammat found that responding to Complainant 2's question constituted Sexual or Gender-Based Harassment. (A82 ¶296; A1056).

With respect to Complainant 2, Hammat added the allegation to her determination letter that Kashdan's "behavior" was an issue of Mason's Psychology Department, which contributed to a "toxic environment" and that "the fact that he is unaware of what transpires in his lab…is grossly negligent." (A82 ¶297; A1057.) Kashdan had no opportunity to respond to these allegations during the investigation. (A82 ¶297.) Complainant 2 spent no time in Kashdan's lab and only took Courses

---

[6] It is a gender-biased assumption that only females can be described as emotional.

A and B, the latest being over four years prior to her complaint. *Id.* This was not questioned by either Hammat or Williams. *Id.*

***Complainant 3*:**

Complainant 3 took only one graduate class with Kashdan, in Fall 2014. (A90 ¶323(a).) She worked on one group literature review with Kashdan for which all communications took place via email or in a group setting. (A90 ¶323(b).) Complainant 3 never worked in Kashdan's lab. (A91 ¶323(e).)

Complainant 3 alleged that, in November 2014, Kashdan made a derogatory comment about her to her boyfriend. (A84 ¶303.) Kashdan had no recollection of making any derogatory comments to Complainant 3's boyfriend, with whom Kashdan often engaged in banter of a personal nature, and certainly not in Complainant 3's presence. (A85 ¶306.) He was unaware that either Complainant 3 or her boyfriend took any offense to anything he said in the past. *Id.* Hammat found Kashdan responsible for this allegation even though witnesses provided differing details as to whether the conversation occurred as reported. (A88 ¶315; A1058.)

Complainant 3 also alleged that, in mid-February 2015, at a party for graduate students at Kashdan's home, Kashdan made a comment about her boyfriend's penis size. (A84 ¶303.) Neither Kashdan nor Complainant 3's boyfriend recalled this conversation. (A86 ¶308; A0158.) On the Monday after the party, Complainant 3

sent Kashdan an unsolicited email praising his work and thanking him for inviting her to the party. "See you soon" it ended. (A86 ¶309; A1189.)

Complainant 3 also alleged that, in Spring 2016, Kashdan hugged her and told her he overheard a conversation with her friend, that "he knew how to keep secrets" and would not tell her boyfriend what he overheard. (A84 ¶303.) Kashdan denied this allegation. (A86 ¶310.) Subsequent to Spring 2016, Complainant 3 asked to be part of one of Kashdan's research projects and asked him for letters of reference. (A86-87 ¶311; A1193.) Hammat's determination letter embellished the allegation, and found Kashdan responsible because a "non-student witness" provided a photo that contradicted Kashdan's recollection of where he was sitting (two and a half years before the allegation was made). (A88-89, ¶¶318-319.) Kashdan has not seen the photo nor does he know the name of the witness. *Id*.

Complainant 3 further alleged that in Spring 2016, after she broke up with her boyfriend, Kashdan stopped her in a public hallway, hugged her and said that she was intelligent, attractive and creative. (A84 ¶303.) Kashdan denied calling Complainant 3 attractive. He said it was possible that he greeted Complainant 3 with a brief hug, as she had previously hugged Kashdan, his wife and numerous other people when visiting his home. (A87 ¶312.) In Hammat's determination letter, the hug suddenly became "tightly and for too long" and Kashdan was illogically accused of "grooming behavior." (A89 ¶321; A1155.)

20

Hammat's determination letter contained a new, false allegation that Complainant 3 removed herself from future opportunities with Kashdan and turned down a grant because she could no longer stay in the program. (A90 ¶322.) On appeal, Kashdan demonstrated that the new allegations were wholly inaccurate. (A90-92 ¶323.)

***Complainant 4***: Complainant 4 worked in Kashdan's lab, co-authored a number of published papers with him, and, with Kashdan's assistance, secured a prominent internship that resulted in her full-time employment in the private sector after she graduated from a doctoral program in May 2019. Complainant 4 and Kashdan conducted research on topics concerning human sexuality. Complainant 4 and Kashdan had hundreds of hours of conversations, only a small portion of which concerned sexuality related topics. She regularly touted the lab and its culture. Kashdan had a close, professional and positive working relationship with Complainant 4 until he removed her from his lab in September 2018 for poor performance. (A92-94 ¶¶324-32.)

Complainant 4 alleged that in December 2016, Kashdan invited his lab students to his home for drinks and "hot tubbing," and shared stories about his experience at a brothel in Germany. (A95 ¶335.) Kashdan acknowledged that at an

end of semester party, he and his graduate students sat in a hot tub in their swimsuits[7] and that, as part of a group conversation about research on human sexuality he discussed his trip to Germany. (A98 ¶342.) Complainant 4 actively participated in the conversation and a multitude of topics were discussed. *Id.* Within days of attending the party, Complainant 4 emailed Kashdan that she was "unbelievably proud and grateful" to be part of the lab and that having Kashdan as her mentor "changed the course of [her] entire life." (A98 ¶343.) Hammat ignored this evidence and, it is believed, chose not to question Kashdan's corroborating witnesses who were present for the conversation. *Id.* Hammat embellished Complainant 4's allegations in her determination letter, stating that Complainant 4 felt stuck and extremely uncomfortable in the hot tub. This was contradicted by Complainant 4's demeanor and subsequent communications with Kashdan. (A102 ¶359.)

Complainant 4 alleged that while at a conference with his graduate students in January 2017, Kashdan discussed explicit details of a sexual encounter that he had at the conference. (A95 ¶335.) Kashdan acknowledged that at the conference there was a mutual and voluntary group discussion about sexual encounters that occurred on the trip. At the time, Kashdan did not get the impression that anyone was uncomfortable. Complainant 4 regularly volunteered information about her sex life

---

[7] Members of Mason's faculty, including a female faculty member, routinely invite students to their homes for pool parties. (A109 n. 71.)

to the group. (A98-99 ¶344.) Hammat's determination letter embellished this allegation to include that Kashdan asked for "explicit details" of his graduate students' sexual encounters at the conference. (A102 ¶360.) Kashdan had no opportunity to respond to this new allegation during the investigation. (A103 ¶361.) Kashdan disputed the new version of events on appeal, reiterating that the conversation that took place was mutual, voluntary and did not constitute sexual harassment. *Id.*

Complainant 4 also alleged that, during a Fall 2017 gathering at a local bar, Kashdan discussed an erotic massage he received in Thailand. He denied this allegation. (A101 ¶354.)

Complainant 4 alleged that, in spring 2018, while at a local bar, Kashdan repeatedly asked Student 1 what type of pornography she liked to watch. (A95 ¶336.) Student 1 was interviewed as part of the Title IX investigation and said that Complainant 4's allegation was untrue and "nonsense." (A97 ¶340.) Kashdan only knew this occurred because Student 1 approached him about it in June 2019. *Id.*

Kashdan acknowledged having a group conversation about pornography on the occasion in question, but only in the context of its usefulness when conducting research. (A96 ¶338.) During the conversation, ***Complainant 4*** raised ideas for future research on whether the use of pornography influences the quality of people's sex lives, using questionnaires that Kashdan and Complainant 4 had used in their

recently published research on sex. *Id*. Kashdan asked Student 1 a question within the context of the group discussion about this research idea initiated by Complainant 4, as corroborated by Student 1 herself. (A96-97 ¶¶338-40.)

Complainant 4 falsely alleged that Kashdan took his graduate students to a strip club while attending a conference in Atlanta in March 2018. (A1097.) In fact, ***Complainant 4*** organized a trip for the group to the Clermont Lounge, a kitschy establishment found in mainstream travel books, and featured on travel shows. At the Clermont Lounge, Complainant 4 purchased and directed a lap dance to Kashdan. Complainant 4 received a lap dance. Kashdan and Complainant 4 joked about a "blackmail" photo. On the next day, Complainant 4 sent a message to the group "Thanks for dinner and everything that night…everything I could have hoped for in a first titty bar." Less than two months after the event, Complainant 4 referenced "seedy Atlanta bars" as "bonus, unforgettable memories" in an email to Kashdan. (A99-100 ¶¶ 346-50; A1176, 1178.)

On appeal, Kashdan acknowledged that once he arrived at the Clermont Lounge, and realized that Complainant 4 had taken the group there ***because of*** its strip club component, he should have bowed out. (A100 ¶350.)[8] However, Kashdan

---

[8] Prior to submitting his appeal, Kashdan learned from a graduate student that Complainant 4 often organized sex-related activities for her colleagues while they were at professional conferences. Besides the Clermont Lounge, Complainant 4 also organized a trip to a sex shop in Japan. (A100-101 ¶¶351-52; A1178.)

denied engaging in any discriminatory behavior towards Complainant 4. *Id*. Neither Hammat nor Williams explained how his agreement to participate in a trip organized by Complainant 4, her purchase of a lap dance for him, accompanied by mutual joking around, constituted any form of harassment. *Id*. Hammat's determination letter referenced the fact that one person—an adult graduate student—threw up in the bathroom at the Clermont Lounge, suggesting that Kashdan was responsible for monitoring the behavior of adults at a social event. (A1160.)

Complainant 4 alleged that, while attending an academic conference with graduate students in August 2018, Kashdan discussed an intimate encounter he had with "a 24-year old woman" in Hanoi. (A95 ¶335.) The Notice of Investigation did not specify the relevance of the age of the adult woman who engaged in the consensual encounter, or how old Kashdan was at the time of the encounter. (A1010.) Kashdan acknowledged that his experience in Hanoi came up as a topic of conversation at the conference but that no one expressed any discomfort at the time. (A101 ¶353.)[9]

Hammat's determination letter stated for the first time that only after time away from Kashdan's lab was Complainant 4 able to articulate "how inappropriate the power imbalance of [Kashdan's] mentorship was. She conveyed that the way

---

[9] Notably, Mason regularly sponsored mandatory student events at which explicit sexual encounters were discussed. (A110 n. 72.)

[Kashdan] viewed her (including her sexual behaviors) had an effect on his decisions for how he handled graduate assistantships, authorships, and consulting opportunities." (A104 ¶364.) Complainant 4 failed to mention that she was fired from Kashdan's lab. (A014 ¶365.) Kashdan had no opportunity to address this statement during the investigation. On appeal, he submitted substantial evidence which demonstrated the falsity of Complainant 4's allegation of harm. Over the course of the approximately two years that she worked in Kashdan's lab, she: 1) was credited as a co-author on five published articles and three conference presentations; 2) received funding from two consulting projects; 3) obtained an internship for Summer 2018 because of her work in Kashdan's lab; and 4) received a six-figure job offer from that internship. *Id*. Kashdan also demonstrated that Complainant 4: a) never received first authorship because she never completed any project that she led; b) encountered disagreement from her colleagues with respect to co-authorship and participation; c) had motive to tarnish Kashdan's reputation; d) was removed from a paper that she was working on with Kashdan; and e) was asked to leave the lab because she was not conducting the research required for the projects to which she was assigned. *Id.*

### E.    Kashdan's Complaint Against Complainant 4

On April 1, 2019, before Williams denied his appeal, Kashdan filed a conduct complaint against Complainant 4 for providing false or misleading information to Hammat. (A106 ¶369; 1164-70.) The complaint outlined the falsehoods, contradictions and inconsistencies in Complainant 4's allegations and noted Kashdan's belief that Complainant 4—who was upset by being fired—solicited her friends to file complaints against him. Mason ignored Kashdan's complaint. *Id.*

## II.    Relevant Procedural History.

The Complaint was filed on September 26, 2019. On December 20, 2019, Appellees filed motions to dismiss all of Kashdan's claims. The motions were fully briefed as of February 5, 2020. On April 23, 2020, the District Court issued the Order dismissing all of Kashdan's claims with prejudice. On April 29, 2020 Kashdan filed a Notice of Appeal. (A1-7.)

## III.    The Rulings Presented For Review.

Kashdan is appealing the District Court's rulings that Kashdan failed to state a: i) Title IX erroneous outcome claim because he failed to adequately plead gender bias (A935-45); ii) Title IX selective enforcement claim because Kashdan's allegations, pled "upon information and belief," were deficient (A945-48); iii) federal due process claim against the Individual Appellees because he failed to plead a cognizable liberty interest (A948-54.); and iv) First Amendment claim because his

speech, inside and outside the classroom, was not constitutionally protected. (A959-61.)

## SUMMARY OF THE ARGUMENT

1.    **The Title IX Claims.** The District Court erred in ruling that Kashdan failed to plead gender bias in support of his Title IX "erroneous outcome" claim. *Yusuf v. Vassar College*, 35 F. 3d 709, 715 (2d Cir. 1994). The District Court adopted a literal, and narrow, interpretation of *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018), relied on inapposite case law and violated motion to dismiss rules to explain away Kashdan's well-pled allegations that the decisionmakers in his Title IX case exhibited gender bias. The District Court also failed to consider numerous allegations that raised a plausible inference of gender bias with respect to Kashdan's Title IX proceeding, including procedural irregularities and the failure to consider exculpatory evidence and question the Complainants' credibility.

The District Court also erred in holding that Kashdan failed to plead a Title IX "selective enforcement" claim. The District Court again imposed a heightened pleading standard on Kashdan, erroneously rejecting the allegations pled "upon information and belief" as conclusory. The District Court failed to consider Kashdan's allegation that Mason ignored his complaint against Complainant 4 and assumed the complete veracity of Complainant 4's allegations against him to pursue a Title IX investigation.

2.        **Kashdan's Constitutionally Protected Liberty Interest.** The District Court erred in holding that Kashdan failed to plead a cognizable liberty interest because he did not allege a significant demotion or damage to his employment status. The well pled facts of the Complaint plausibly allege both, because the Title IX and Disaffiliation Sanctions banished Kashdan from working and conducting research in his chosen field, Clinical Psychology.

3.        **The First Amendment Claim.** The District Court erred in dismissing Kashdan's First Amendment claim because the court relied on the general rule in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), without addressing this Court's prior holdings that the *Garcetti* rule does not apply to speech made by state-employed teachers related to their teaching. The District Court also ignored controlling Supreme Court and Fourth Circuit precedent concerning curricular speech.

## ARGUMENT

### I.
### THE STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6), accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party. *See Stewart v. Iancu*, 912 F.3d 693, 702 (4th Cir. 2019); *Stennis v. Bowie State Univ.*, 716 Fed. Appx. 164, 166 (4th Cir. 2017).

## II.

## THE COMPLAINT
## STATES A TITLE IX
## <u>DISCRIMINATION CLAIM</u>

**A.** **<u>The Law Concerning Title IX Discrimination Claims</u>.**

Title IX provides in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX prohibits sex discrimination against employees of universities that receive federal funding and is enforced by an implied private right of action. *Preston v. Commonwealth of Va.*, 31 F.3d 203, 206 (4th Cir. 1994).

Title IX may be violated by "the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf*, 35 F.3d at 715. *Yusuf*, which has been followed by the district courts in this Circuit, classified challenges to university disciplinary proceedings as falling into two categories: (1) "erroneous outcome" and (2) "selective enforcement." *Id*. This Court has acknowledged, but has not expressly adopted, the application of the erroneous outcome theory in Title IX actions. *See Doe v. Loh*, 767 Fed. Appx. 489, 490 (4th Cir. 2019). This Court has not addressed the application of the selective enforcement

theory in Title IX actions. *See Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 515 (E.D. Va. 2019).

Recently, the United States Courts of Appeals for the Third and Ninth Circuits followed the Seventh Circuit in rejecting the application of doctrinal tests to Title IX claims, holding that the only question that need be asked is "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex?'" *Doe v. Purdue Univ.*, 928 F. 3d 652, 667-668 (7th Cir. 2019). *See Schwake v. Arizona Bd. of Regents*, 2020 WL 4343730 at \*5 (9th Cir. Jul. 29, 2020); *Doe v. Univ. of the Sciences*, 961 F. 3d 203, 209 (3d Cir. 2020). Whether this Court elects to follow *Yusuf* or *Purdue* to evaluate Kashdan's Title IX claim it should find that the District Court erred in dismissing his claim.

**B.  The Complaint Sufficiently Alleges an "Erroneous Outcome" Claim.**

Under an erroneous outcome theory, which the District Court applied, "the claim is that plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715. As relevant to this appeal,[10] gender bias may be

---

[10] The District Court, "assume[d] without deciding" that Kashdan "satisfied the low bar for the element of articulable doubt" on the accuracy of the outcome of his disciplinary proceeding and "the requirement that he claim innocence," (A935), dismissing his Title IX claim on the sole, albeit erroneous, ground that Kashdan failed to plausibly allege gender bias. Kashdan reserves the right to address the first prong of the erroneous outcome test, and the question of whether he adequately alleged his innocence, should it become necessary as part of this appeal or on remand, and does not waive any argument that the record amply supports that he plausibly alleged all elements of an erroneous outcome claim. (A444-54.)

demonstrated through the statements of pertinent university officials or patterns of decision-making that tend to show the influence of gender. *Yusuf*, 35 F. 3d at 715; *Marymount*, 297 F. Supp. 3d at 586-587; *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015). *See also Schwake*, 2020 WL 4343730 at *7. Gender bias may also be inferred from a decision-maker's "outdated and discriminatory views of gender and sexuality." *Marymount*, 297 F. Supp. 3d at 586; *See Doe v. Grinnell College*, (A664-70); *Washington & Lee*, 2015 WL 4647996, at *10.

Gender bias can further be inferred from the manner in which university officials treat a male Title IX respondent as compared to the female complainant(s), including: (i) allegations that exculpatory evidence was overlooked in favor of finding the male responsible for Title IX violations, *Marymount*, 297 F. Supp. 3d at 586-587; *Norris v. University of Colo., Boulder*, 362 F. Supp. 3d 1001, 1011-1013 (D. Colo. 2019); (ii) an "atmosphere of bias against [the plaintiff] during the course of the University's disciplinary case" *Schwake*, 2020 WL 4343730 at *7; and (iii) procedural irregularities or biased statements combined with evidence of pressure on a university to convict male respondents. *Doe v. Baum*, 903 F.3d 575, 586-587 (6th Cir. 2018); *Marymount*, 297 F. Supp. 3d at 586-587; *Washington & Lee*, 2015 WL 4647996, at *10. *See Schwake*, 2020 WL 4343730 at *7-8.

### 1. The District Court Erred in Holding That *Doe v. Marymount University* is Inapposite.

In determining that Kashdan failed to plausibly allege gender bias, the District Court misconstrued *Marymount* as requiring Kashdan "to identify a conversation that is similar to what occurred in *Marymount*," or allege that Hammat and Williams "do not believe males, or…believe males always enjoy engaging in harassing behavior." (A937.) Kashdan alleged that Hammat publicly expressed gender-biased views, including that female college students need to be protected at all times from predatory male fraternity members, including the "kicking down" of bedroom doors by their sorority sisters. (A33 ¶150; A457-58.) Kashdan further alleged that Williams stated a belief that Title IX complainants tell the truth, even in cases where Title IX policy violations are not found. (A365.)

The District Court also held that Kashdan was required to show that Hammat "applied such views in prior or subsequent investigations or adjudications." (A937.) This is an overly narrow construction of *Marymount's* holding and the erroneous outcome test. Under the District Court's interpretation, each plaintiff alleging a Title IX claim would have to allege direct evidence of gender bias which, in the majority of cases, is nearly impossible, especially at the pleading stage. All that is required is an *inference* of gender bias under the totality of the circumstances. *Marymount*, 297 F. Supp. 3d at 587; *Washington & Lee*, 2015 WL 4647996, at *10. Per the District Court's narrow holding, each Title IX plaintiff would also be constrained to pleading

33

that a pattern of gender-biased decision-making occurred or else face dismissal of his claim, even though pattern evidence is but one example of what courts have considered in evaluating allegations of gender bias. *Marymount*, 297 F. Supp. 3d 585.

In *Marymount* the court held that ***any evidence*** of the adjudicator's gender bias was "particularly probative" because if he "possessed the outdated and discriminatory views of gender and sexuality alleged in [the] Complaint, those views would have naturally infected the outcome of [plaintiff's] Title IX disciplinary proceedings." *Marymount*, 297 F. Supp. 3d at 586. Such is the case here. As set forth above, with respect to Hammat and Williams, the Complaint is replete with allegations from which discriminatory views of gender can be inferred. SOC,[11] Pt. I.C. As addressed below, the District Court rationalized away these clear allegations of gender bias and improperly drew inferences in favor of Mason. The District Court did not consider Renshaw's statements, including that the #metoo movement influenced Kashdan's case. (A129 ¶444.)

In *Marymount*, the court also held that the plaintiff's additional allegations concerning the university's more favorable treatment of the Title IX complainant and various procedural irregularities, including the university's reliance on a biased investigator, collectively "nudged his Title IX claim over the Rule 12(b)(6) bar." *Id.*

---

[11] "SOC" refers to the Statement of the Case.

at 587. Here, the District Court did not consider that Kashdan's numerous allegations concerning the irregularities and inequity in his Title IX process as a whole, as detailed above, also supported an inference of gender bias. SOC, Pt. I.B-D. Instead, the District Court held that Kashdan pleaded a "conceivable" but not a "plausible" inference of gender bias. (A940-41.)

The District Court found that Kashdan "undermined" the inference that Hammat was gender-biased because she removed Simmons from Kashdan's case. The District Court ignored Kashdan's allegations that Hammat continued to rely on the evidence gathered by Simmons, irreparably tainting the Title IX proceedings. (A45 ¶¶148-49; A139 ¶483(i); A143 ¶485(a).) Whether or not Hammat's removal of Simmons demonstrated a lack of gender bias in Hammat's own evaluation of Kashdan's case is an issue of fact that should not have been determined at the motion to dismiss stage.

The District Court elected not to consider two cases which followed *Marymount,* and which Kashdan cited in support of his Title IX claim, *Grinnell College* (A642-84) and *Norris*, 362 F. Supp. 3d at 1013. In *Grinnell*, the plaintiff argued that the findings in his case were influenced by the adjudicator's belief that females are incapable of asserting themselves in sexual situations with male counterparts. The court agreed, holding that the female adjudicator's (i) failure to consider evidence which contradicted the complainants' accusations of sexual

35

misconduct, including their own behavior; and (ii) written statements which reflected her assumptions about the passivity and naivete of women, raised questions of fact which precluded summary judgment in the college's favor. (A664-68.) Kashdan alleged *inter alia* that Hammat failed to question the Complainants' motives, ignored exculpatory evidence and made statements that reflected gender biased views. SOC Pt.I.C. Kashdan made the same allegations with respect to Williams. *Id.*

In *Norris*, the court held that the backgrounds of the Title IX administrators involved in the plaintiff's case, their conflicts of interest, public pressure on the university and a number of procedural deficiencies in the investigation supported a plausible inference of gender bias. 362 F. Supp. 3d at 1012-1013. Kashdan alleged similar, specific allegations with respect to Simmons, Hammat and Williams. (A138-45 ¶483-86.) The District Court failed to address Hammat's and Williams' conflicts of interest, including that Mason's faculty complained to the Provost that Williams' bias as Hammat's supervisor impacted the faculty's right to due process in Title IX proceedings. (A45 ¶149; A56 ¶197; A59 ¶207; A114 ¶390; 473; A136 ¶473).

### 2.     The District Court Failed to Adhere to the Applicable Pleading Standard.

As the Ninth Circuit recently held in *Schwake*, "[t]here is no heightened pleading standard for Title IX claims." 2020 WL 434730 at \*7. As set forth below, in evaluating whether Kashdan sufficiently pleaded gender bias, the District Court improperly required the "heightened fact pleading of specifics" when Kashdan only needed to, and did, plead "enough facts sufficient to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The District Court further erred by "'resolving contests surrounding the facts, the merits of [the] claim [and] the applicability of defenses.'" *Washington & Lee*, 2015 WL 4647996, at \*1 (quoting *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Rather than drawing all reasonable inferences in Kashdan's, the District Court drew inferences in favor of Mason. (A935-45.)

### a.     Hammat's Findings.

The District Court held that the "findings in the Letters of Determination do not demonstrate…Hammat's bias" because her "word choice" did not suggest "she was seeking to punish" Kashdan or "that she held a prejudice against males." (A938.)[12] The District Court generally classified the "ten grounds" that Kashdan

---

[12] The District Court only addressed Hammat's findings. As detailed *supra*, SOC Pt. I.C, Kashdan also alleged a number of facts concerning the one-sided manner in which Hammat handled the Title IX investigation process, which also support his

identified in the determination letters as "woefully insufficient" without addressing each one in turn. *Id*. The District Court ignored that gender bias was directly evident in Hammat's word choices and the gender-biased assumptions that can be inferred from her findings. *See Grinnell* (A664-68.) As alleged in the Complaint:

1.      Hammat acknowledged that no witnesses corroborated that Kashdan discussed "skinny dipping" in class, yet Hammat found him responsible for creating a hostile environment because he discussed the "intimate" and "erotic" encounter of swimming with a woman clad in a swimsuit as part of a lesson on cultural norms. (A82 ¶296; A1056.) The District Court concluded that Hammat "merely conveyed information about the discussion," (A938), ignoring that the purpose of Hammat's determination letter was to convey her basis for finding that Kashdan created a hostile environment with respect to Complainant 2. Thus, any verbiage adopted by Hammat was an expression of her personal view. At the very least, this was a fact issue that the District Court should not have determined.

2.      Hammat found Kashdan responsible for sexual harassment because he recommended that his students go to a local spa to relax. The evidence contradicted the Complainants' allegations, including the false allegation that Kashdan knew that

---

claim of gender bias. *Baum*, 903 F.3d at 586-587; *Marymount*, 297 F. Supp. 3d at 586-587; *Washington & Lee*, 2015 WL 4647996, at *10.

the spa in question engaged in human trafficking. (A69 ¶249; A76 ¶274; A78 ¶281; A80-81 ¶287; A82 ¶296.)

3.    Even though there was no evidence to support the allegation, Hammat found Kashdan responsible for sexual harassment because he dismissed student concerns about topics of discussion in class as "emotional." (A69 ¶249; A77 ¶275.) Hammat described being "emotional" as a "stereotypical female trait." (A79 ¶282; A1055.)

4.    Hammat found that Kashdan sexually harassed Complainant 2 by responding to a question *she* asked during class concerning the number of sexual partners Kashdan had. (A81-82 ¶¶ 292, 296.)

5.    Hammat found that Kashdan engaged in "grooming behavior" with respect to Complainant 3, an adult graduate student. Even assuming that Complainant 3's allegations were true, there was no evidence of "grooming," only that Kashdan noted her attractiveness on one occasion (which he denied) and briefly greeted her with a hug on two occasions in public places. (A89-90 ¶¶320-321; A1059.)

6.    Hammat found Kashdan responsible for sexual harassment with respect to Student 1, even though Student 1 herself discredited Complainant 4's allegation when interviewed by Hammat. (A95 ¶335; A97 ¶340.)

7.     Hammat found Kashdan responsible for sexual harassment with respect to Complainant 4 because he accepted *her* invitation to go to the Clermont Lounge on a group trip that *she* organized, *she* purchased and directed a lap dance his way and the two joked around. (A99 ¶¶346-347.) Hammat ignored that Complainant 4 first made the false allegation that Kashdan took his graduate students to the Lounge. (A95 ¶335; A1009; A1176.) Hammat further ignored that Complainant 4 praised the trip as a great experience in subsequent communications with Kashdan and her peers. (A100 ¶¶348-349; A1176, 1178.)

In rejecting these well-pled allegations, the District Court erroneously relied on the inapposite case of *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 734 (E.D. Va. 2015) ("*GMU*"), to conclude that gender neutral concerns more plausibly motivated Hammat's findings. (A938.) Unlike Kashdan, the *GMU* plaintiff pleaded only that "gender bias is the 'only' explanation for the outcome of his proceeding." *Id*. In finding that the defendants' more favorable treatment of the complainant could have been motivated by lawful, independent goals, the court in *GMU* relied on the since reversed district court opinion in *Doe v. Columbia*, 101 F. Supp. 3d 356, 371-372 (S.D.N.Y. 2015) *rev'd* 831 F.3d 46, 56-58 (2d Cir. 2016). The court also contrasted the *GMU* plaintiff's utter lack of gender bias allegations with the plaintiff in *Washington & Lee*, who, like Kashdan, alleged that a school official with influence over the challenged proceedings had

demonstrated bias against males. *GMU*, 132 F. Supp. 3d at 733 & n. 29; *Washington & Lee*, 2015 WL 4647996, at *10. In *Washington & Lee*, the university official in question merely endorsed an article that expressed bias against males. As alleged by Kashdan, and discussed below, Hammat herself made statements from which gender bias can be plausibly be inferred.

### b. Hammat's Public Statements.

The District Court erroneously drew inferences against Kashdan, and made findings of fact, to conclude that Hammat's public statements do not reflect gender bias. (A939.) Hammat was interviewed in her role as a Title IX coordinator, for an article published by the Institute on Domestic Violence & Sexual Assault, "Jennifer Hammat Brings Life Experience To The Job." (A331.) Per the article, an experience that "inform[ed] Hammat's work is that she is a survivor of sexual assault that happened on a college campus." (A332.) In discussing her experience, Hammat said that her sorority started a patrol group where her "'pledge sisters agreed we wouldn't leave a party until we had gone into every room, kicked down doors, got all our girls out.'" (A333.) Hammat said she also lectured fraternity members that they needed to be "'angry and…protective of every female that walks in this house.'" *Id.* In the article Hammat referenced victims of sexual assault as female. *Id.* As alleged by Kashdan, Hammat's statements suggest that she holds stereotypical views about men and women which potentially influenced her decision-making in sexual misconduct

cases at Mason, including in Kashdan's case. (A46 ¶150.) Hammat made a point, while being interviewed about Title IX, to discuss the hypervigilance with which she chose to protect females. (A457-58.)

The District Court rationalized away Hammat's decision to make these statements in the context of her work as a Title IX administrator, and drew inferences against Kashdan, to conclude that Hammat was merely "describing her own past behavior…. These factual and descriptive statements do not reflect her gendered assumptions or bias, they relate a story of what Dr. Hammat and members of her sorority did when leaving parties." (A939.) Hammat has not yet been questioned about what her motivation was in recounting the story.

The District Court similarly rationalized away Hammat's participation in a feminist event for Title IX Coordinators as "an event directly related to her work." (A940.) Contrary to the District Court's finding, Kashdan did not allege that Hammat was a feminist or was affiliated with a gender-studies program. *Id*. He alleged that Hammat participated in an event concerning how women's advocates could assist her with Title IX *enforcement*. (A47 ¶152.) This directly conflicted with Hammat's role in deciding Title IX cases at Mason.[13] Her participation in such events suggests that she was not an impartial decisionmaker. *Id*.

---

[13] The District Court did not address Hammat's conflict of interest, prohibited by Title IX guidance, in serving a dual role as Mason's Title IX Coordinator and the sole decisionmaker in Title IX sexual misconduct cases. (A136 ¶¶473, 475; A140

While the District Court held that bias cannot be inferred from the words "Women's Issues" and "Feminist," the court also held that Hammat's election not to participate in feminist events "would likely demonstrate a gender bias against females." (A940.) Under this analysis, participation in such an event could show favoritism towards females over males.

### c.    Williams' Findings.

Again relying on the inapposite *GMU* case, the District Court found that Kashdan's allegations concerning Williams' findings on appeal did not allege gender bias. (A941.) The District Court focused on only one "example" of a "number" of Williams' erroneous findings, concerning the group trip to the Clermont Lounge.[14] The District Court improperly found that Williams' committed no error in finding Kashdan responsible because he "acknowledge[s] that he should have left upon realizing the outing involved [a] strip club" but did not." *Id*. The District Court failed to consider the allegation that Complainant 4 organized the trip and then falsely accused Kashdan of taking the group to the Lounge. (A95 ¶335; A110 ¶380.) Complainant 4 also purchased and directed a lap dance to Kashdan. (A99-100 ¶347.)

---

¶483k.) Nor did the District Court address Hammat's role in revising Mason's Title IX policies. (A78 ¶279.) The Court also elected not to address that Hammat was trained to adopt a trauma-informed approach to Title IX investigations. (A333-34 ¶101-107.)

[14] The flaws in Williams' review of Kashdan's appeal are discussed *supra*, SOC at Pt.I.C. (*See* A458-59.)

Kashdan also denied engaging in discriminatory behavior towards Complainant 4. (A99-100 ¶347-50.)

### d. **Williams' Public Statements.**

In finding that Williams was not gender biased, the District Court divorced the gendered language in Williams' public statements from their meaning to assert that Kashdan was "factually incorrect" in his allegation that Williams expressed a moral obligation to protect female students. (A942.) Mr. Williams stated "[i]f you don't have an environment that is investigating and responding to issues of…sexual harassment, female students on your campus may not feel safe, and they may not feel like they belong." (A363.) In the very next sentence, Williams states "we want to meet not only our legal obligations under Title IX but, more importantly, our moral obligations to protect and care for our students." *Id*. The District Court erroneously found that because Williams did not again refer to female students in the second sentence that no gender bias could be inferred.

The District Court also found that Williams' "use of a gendered pronoun does not suggest a bias" but instead "merely expresses a true proposition which is, since male students may also be susceptible to those same feelings, incomplete." (A942.) This improperly draws inferences against Kashdan, and reads meaning into Williams' words that is not there. Had Williams intended to address all students' feelings of safety and belonging, then he would have used "our students" throughout

his statement. At the very least, Williams' intent and meaning is a question of fact that should not have been resolved by the District Court.

The District Court further asserted that "there is no gender bias in recognizing and articulating that females may feel unsafe if a university does not address sexual assault and harassment issues." *Id*.[15] Taken out of context this could be true. When evaluated from the perspective that Williams felt a moral obligation to protect female students, had conflicts of interest, was a key decision-maker in Mason's Title IX process who was responsible for responding to OCR complaints, and that he made a number of erroneous findings in evaluating Kashdan's appeal, these statements raise a plausible inference of gender bias at the pleading stage. SOC, Pt. I.C. *See Marymount*, 297 F. Supp. 3d at 587; *Washington & Lee*, 2015 WL 4647996, at *8, 10.

The District Court also erroneously found that Williams' belief that Title IX complainants do not lie was not indicative of gender bias. (A942.) The District Court relied on the inapposite summary judgment opinion of *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 518 (E.D. Va. 2019), in which, unlike Kashdan, the plaintiff, failed to identify statements made by any relevant decisionmaker which suggested gender bias. *Id.* The District Court again divorced Williams' statement from the

---

[15] Williams also said that female students "may not feel like they belong." (A363.)

context in which it was made, and also from the totality of the circumstances alleged in the Complaint which support Kashdan's claim of gender bias.

### e.  <u>Pressure on Title IX Administrators.</u>

The District Court correctly held that Kashdan adequately pleaded that Mason was under pressure from *inter alia* negative publicity and the two OCR investigations, to "'prove that it took complaints of sexual misconduct seriously.'" (A943 (citing *Baum*, 903 F.3d at 586).) However, the District Court erroneously required Kashdan to demonstrate that Hammat and Williams "succumbed to the cited pressures." (A943-44.) Evidence of pressure on a university provides a "backdrop that, when combined with other circumstantial evidence of bias…gives rise to a plausible claim of gender bias." *Baum*, 903 F.3d at 586. There is no requirement that a plaintiff plead direct evidence that the decision-makers involved in a proceeding acted only as a result of external pressure, such as an OCR investigation.

In *Marymount*, the court held that allegations of pressure combined with other factors, including the university's failure to provide the plaintiff unfettered access to evidence, employment of biased investigators, crediting of the complainant's implausible allegations, and failure to consider evidence that supported the plaintiff's claims "nudged his Title IX claim over the Rule 12(b)(6) bar." 297 F. Supp. 3d at 586-587. *See Norris*, 362 F. Supp. 3d at 1012-13.

In *Schwake*, which was decided after the District Court's decision, the Ninth Circuit found a plausible inference of gender bias where the plaintiff alleged pressure on the university, plus that university officials divulged confidential information, modified the plaintiff's sanction to show that the university took sexual misconduct complaints seriously, prohibited the plaintiff from filing a complaint against the complainant, and conducted a one-sided investigation. 2020 WL 4343730, at *6-9.

In *University of the Sciences*, also decided after the District Court issued its opinion, the Third Circuit found a plausible inference of gender bias where the plaintiff alleged pressure plus the university's failure to investigate the complainant's breach of the university's Title IX by colluding with a witness. 961 F.3d at 211.

Kashdan alleged that both Hammat and Williams were directly involved in addressing the pressure placed on Mason by OCR and the campus community. (A34-35 ¶¶108-110, 112; A37 ¶116-118.) Kashdan further alleged that: (i) Hammat denied him access to the evidence in his case (A47 ¶¶153, 157); (ii) Mason employed a biased investigator (A44-45 ¶146); (iii) Hammat and Williams credited implausible allegations (A140 ¶483(t); A144 ¶485(i)); (iv) Renshaw and other officials disclosed confidential information about the Title IX proceedings to students and faculty (A121 ¶ 412; A125 ¶427); (v) Williams refused to stop the Complainants from divulging confidential information (A50 ¶168); (vi) Renshaw imposed harsher

sanctions on Kashdan  after the Complainants expressed dissatisfaction with the sanctions already imposed (A129-32 ¶445, 449-455); (vii) Mason ignored Kashdan's conduct complaint against Complainant 4 (A106-107 ¶369; A1163-70); (viii) the Title IX investigation was one-sided (A42-48 ¶¶136-58); and (ix) Hammat and Williams failed to investigate Kashdan's allegation that Complainant 4 solicited her three friends to file false sexual harassment charges against Kashdan because he fired Complainant 4 from his lab. (A9-10 ¶5.)

### C.   The Complaint Sufficiently Alleges A Selective Enforcement Claim.

Under a selective enforcement theory, regardless of the [plaintiff's] guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the [plaintiff's] gender." *Yusuf*, 35 F.3d at 715. District courts in this Circuit have required the plaintiff to allege that a similarly-situated female comparator was treated differently than the plaintiff, an issue which this Court has not yet decided. The District Court adopted the similarly-situated comparator requirement and dismissed the selective enforcement claim because Kashdan made his allegations upon information and belief. (A945-48.) In doing so, the District Court misconstrued relevant case law.

Kashdan alleged, upon information and belief: i) that Mason engaged in a pattern of unfair investigations and adjudications resulting in unduly severe sanctions being imposed on males accused of sexual or gender-based harassment; ii)

unlike Kashdan, female professors accused of sexual or gender-based harassment have not been formally investigated; iii) to the extent that Mason has investigated female professors, and found them responsible for policy violations, Mason imposed far less severe sanctions on them as compared to male professors found responsible for similar violations. (A145-46 ¶¶486-489.) Kashdan also alleged that information concerning Mason's sexual misconduct proceedings, including the gender of the respondents, was exclusively in Mason's possession and control. (A146 ¶489 n. 74.)

The absence of a high level detail in support of a Title IX claim at the pleading stage does not render a plaintiff's allegations conclusory or insufficient because "[i]t may be difficult for a plaintiff to know the full extent of alleged discrimination in decisionmaking before discovery allows a plaintiff to unearth information controlled by the defendant." *Schwake*, 2020 WL 4343730, at *7. *See Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456-457 (E.D. Va. 2015); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768-769 (D. Md. 2015).

The District Court erroneously distinguished *Ridenour* as inapposite. In *Ridenour* the court accepted allegations pled on information and belief on the sole ground that information necessary to support the allegations was exclusively known to the defendants. 147 F. Supp. 3d at 457. Similarly, Kashdan alleged that the information necessary to prove his selective enforcement claim is in Mason's exclusive possession. As detailed above, he also alleged a host of other facts which

49

suggest that Mason exhibited gender bias in its enforcement of Title IX, including in Kashdan's proceeding.

Relying on *Salisbury*, the District Court incorrectly found that Kashdan was required to plead "what the evidence would be, the form it would be in, the time frame it may occupy, or the personnel involved." (A947.) Yet in *Salisbury* the plaintiffs asserted only general allegations of gender bias, sparse in comparison to Kashdan's, and the court allowed the Title IX claim to proceed to discovery.

The District Court did not address Kashdan's allegation that Mason engaged in selective enforcement with respect to Complainant 4 when it assumed the "complete veracity" of her allegations and pursued a formal investigation against Kashdan while taking no action in regard to his complaint against Complainant 4. (A146 ¶ 490.) In *University of the Sciences*, the Third Circuit held that similar allegations raised a plausible inference that the university enforced its policy against the plaintiff because of his sex. 961 F.3d at 211.

50

# III.

## THE COMPLAINT ALLEGES
## A COGNIZABLE LIBERTY INTEREST PROTECTED
## BY THE DUE PROCESS CLAUSE

The District Court dismissed Kashdan's federal due process claim on the ground that he did not adequately plead a cognizable liberty interest. (A949-54.) In so holding, the District Court misapplied the law and made adverse factual findings that were improper on a Rule 12(b)(6) motion. *Id.*

A public employee has "the right to due process '[w]here [his] good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). In this Circuit, to adequately plead the deprivation of a protected liberty interest, Kashdan was required to allege "that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Id.* The District Court rested dismissal solely on the third element,[16] finding that Kashdan failed to plead a significant demotion or that he suffered any damage to his employment status. (A950.)

---

[16] Kashdan reserves his right to address the remaining elements necessary to plead deprivation of a liberty interest should it become necessary as part of this appeal or on remand, and does not waive any argument that the record amply supports this claim. (A794-98.)

In other words, the District Court found that a tenured professor barred from pursuing his chosen field of Clinical Psychology (A115-17 ¶393-396; A122-25 ¶419-26; A130-32 ¶449-456; A372-74; A1195-97), stripped of his right to participate in program governance (A1196), banned from teaching (A373; A1196),[17] barred from conducting Clinical Psychology research with doctoral students (A1196), precluded from mentoring graduate students (A372-73; 1196), declared ineligible for salary and merit-based pay increases (A118 ¶399), and branded with the stigma of sexual harassment (A149-50 ¶¶503-511), has suffered no significant demotion or damage to his employment status. The District Court further held, in making improper and erroneous findings of fact, that Kashdan was not even entitled to the inference that the Title IX and Disaffiliation Sanctions caused a "perilous detour on his career path." (A952.) The District Court's improper findings were erroneous as a matter of law.

Under the law of this Circuit, "a 'significant demotion' may include the reassignment of an employee to a position outside his field of choice." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006). The *Ridpath* Court found a significant demotion where plaintiff, formerly employed as a university athletics assistant, was reassigned to a higher-paying (and arguably more

---

[17] The District Court erroneously found that Kashdan is "authorized to teach courses within his chosen field." (A953.) *Cf.* (A132 ¶4553(a); A132.)

prestigious) position as Director of Judicial Programs. The court emphasized that plaintiff's "chosen field" was "intercollegiate athletics administration," and that as a result of the university's actions, he had been "completely excluded from his chosen field." *Id*. at 311.

The impact on Kashdan, even more than in *Ridpath* (where the plaintiff was reassigned to a *higher-paying* and arguably *more prestigious* position within the university), was to subject him "to a dramatic change of status equivalent to outright discharge." *Id*. *See also Hall v. City of Newport News*, 469 Fed. Appx. 259, 263 (4th Cir. 2012). The Disaffiliation Sanction amounted to Kashdan's "banishment" from the Clinical Psychology program, forcing Kashdan into a position outside his field of choice and completely excluding him from his chosen field within the university. (A123-24 ¶423; A1195-97.) As Kashdan alleged, and will be proven, he helped establish Mason's Clinical Psychology program, and his work and research at Mason was dedicated to that field. Mason barred him from working in that field for a minimum of 5-6 years, with no clear path to reaffiliation. (A124 ¶ 423; A125 ¶426; A130-31 ¶449-457.) The Title IX and Disaffiliation Sanctions have further deprived Kashdan of salary increases to which he would be entitled in accordance with Mason's Faculty Handbook. (A840 §2.6.1; A118 ¶399.) Within the realities, customs and conventions of American universities, the Sanctions amount to an expulsion from his chosen field.

The District Court ignored these realities, which were plainly alleged in Kashdan's pleading, to find that Mason did not exclude Kashdan from his chosen field. (A953-54.) In doing so, the District Court relied on this Court's decision in *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990), which this Court readily distinguished from the facts at issue in *Ridpath*. As this Court noted in *Ridpath*, the liberty interest claim in *Johnson* was dismissed because the plaintiff "was merely demoted from one position to another…presumably with no change in line of work (as there was no allegation to the contrary)." 447 F.3d at 311, n. 19. In contrast, and as set forth above, Kashdan was completely excluded from his chosen field and, at the very least, suffered a perilous detour in his career path.

## IV.

## THE COMPLAINT STATES A FIRST AMENDMENT CLAIM

The District Court dismissed Kashdan's First Amendment claim on the ground that his "speech was not made in his capacity as a private citizen" but rather "in relation to or in conjunction with" a "class he taught in his capacity as a…professor" or "related research that he conducts in the same capacity." (A960.) This astonishing holding, under which state universities could chill, silence or punish tenured professors with impunity for any speech or research related to their academic positions, whether in or out of class, is erroneous as a matter of law.

The District Court relied on the general rule in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." In so holding, the District Court made the same "fundamental error" that led this Circuit to reverse in *Adams v. Trs. of the Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 561 (4th Cir. 2011), finding that the district court applied the *Garcetti* rule "without acknowledging, let alone addressing, the clear language in that opinion that casts doubt on whether the *Garcetti* analysis applies in the academic context of a public university."[18] This Court has twice held that the *Garcetti* rule does not apply to speech made by state-employed teachers related to their teaching. *Adams*, 640 F.3d at 563; *Lee v. York County Sch. Div.*, 484 F.3d 687, 694 & n. 11 (4th Cir. 2007).[19]

The District Court held that the Appellees disciplined Kashdan for statements "related" to his "teaching" or "research." (A960.) In holding such speech

---

[18] In *Garcetti*, the Supreme Court expressly reserved the question of whether the general rule it announced applied to "classroom instruction" or other speech "related to scholarship or teaching." 547 U.S. at 425.

[19] Other circuits have similarly held that *Garcetti* does not apply to university professors. *See, e.g.*, *Demers v. Austin*, 746 F.2d 402, 412 (9th Cir. 2014) ("*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to official duties' of a teacher of professor.").

constitutionally unprotected, the District Court rejected (without any discussion) this Circuit's controlling precedents as well as longstanding case law across the country. "The First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Dube v. State Univ. of New York*, 900 F.2d 587, 598 (2d Cir. 1990) (citation omitted). *See also Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001). The dismissal of Kashdan's First Amendment claims on this ground should therefore be reversed.

The District Court also rested dismissal of Kashdan's First Amendment claim on the additional ground that his statements were "curricular," as they "related to his work," and were therefore constitutionally unprotected. (A961.) The District Court again ignored controlling Supreme Court and Fourth Circuit precedent. While purely "curricular" speech by a public schoolteacher is not constitutionally protected, *see Boring v. Buncombe Cty. Bd. of Educ.*, 136 F.3d 364, 368-69 (4th Cir. 1998), this Court expressly held in *Lee* that in "evaluating whether a schoolteacher's in-class speech is curricular in nature," courts are "obliged to apply the *Hazelwood* definition of 'curriculum.'" *Lee*, 484 F.3d at 697 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988)). Here, the District Court made no mention of *Hazelwood*, never applied the *Hazelwood* test, and ruled in direct conflict to it.

As this Court explained in *Lee*, the first "requirement" of the *Hazelwood* test is that the speech at issue must be "school-sponsored expression bearing the imprimatur of the school." *Id*. Unlike *Boring*, where the choice of a high school play was clearly "school-sponsored expression" and could be reasonably viewed as "bearing the imprimatur of the school," there is no similar claim with respect to Kashdan's statements. On the contrary, the Appellees found that Kashdan's speech violated Mason's policies and lacked Mason's imprimatur. (A 78 ¶281; A82 ¶296; A94-97 ¶¶335-40; A102-103 ¶¶359-63; A109 ¶379; A118-19 ¶401.)

It is an axiom not only of American university education but of academic freedom itself that a professor's distinctive or controversial expression in connection with his research or classroom teaching is not to be viewed as the university's speech. If a professor's expression was deemed inherently "related to his work," and thus unprotected, there would be no academic freedom. That emphatically is not the law, even when the professor has engaged in allegedly offensive speech. *See, e.g.*, *Hardy*, 260 F.3d at 679.

The District Court erred both in its *Garcetti* and curricular-speech holdings, never reaching the other elements of the applicable *McVey* test. The other elements

of that test are all well-pleaded in the Complaint[20] and involve factual matters inappropriate for a Rule 12(b)(6) motion.

---

[20] Kashdan reserves the right to address the remaining *McVey* elements should it become necessary as part of this appeal or on remand, and does not waive any argument that the record amply supports that he plausibly alleged a First Amendment claim (A806-809).

## **CONCLUSION**

For the above stated reasons, the Court should: (i) reverse the District Court's dismissal of Kashdan's Title IX, federal due process and First Amendment claims; (ii) remand the case to the District Court for discovery and trial; and (iii) grant such other and further relief as the Court deems just and proper.

Dated:        August 12, 2020

Respectfully Submitted,

/s/ Kara L. Gorycki
   Kara L. Gorycki (Counsel of Record)
Andrew T. Miltenberg
**NESENOFF & MILTENBERG, LLP**
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212)736-4500
(212)736-2260
kgorycki@nmllplaw.com
amiltenberg@nmllplaw.com

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief has been prepared using Microsoft Word software, Times New Roman font, 14-point proportional type size.

2.      Exclusive of the table of contents, table of authorities, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains no more than 13,000 words. It contains 12, 929 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


Dated:        August 12, 2020

                                Respectfully Submitted,

                                /s/ Kara L. Gorycki
                                   Kara L. Gorycki (Counsel of Record)
                                Andrew T. Miltenberg
                                **NESENOFF & MILTENBERG, LLP**
                                363 Seventh Avenue, 5th Floor
                                New York, New York 10001
                                (212)736-4500
                                (212)736-2260
                                kgorycki@nmllplaw.com
                                amiltenberg@nmllplaw.com